**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| CITY OF SOUTH MIAMI; FLORIDA IMMIGRANT COALITION, INC.; THE FARMWORKER ASSOCIATION OF FLORIDA INC.; FAMILY ACTION NETWORK MOVEMENT, INC.; QLATINX; WECOUNT!, INC.; WESTMINSTER PRESBYTERIAN CHURCH UNITED OF GAINESVILLE, FLORIDA, INC.; AMERICANS FOR IMMIGRANT JUSTICE, INC.; THE GUATEMALAN-MAYA CENTER, INC.; AND HOPE COMMUNITY CENTER, INC., | Civil Action File No. |
| Plaintiffs, | _____ |
| v. | **JURY TRIAL DEMANDED** |
| RON DESANTIS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF FLORIDA AND ASHLEY MOODY, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF FLORIDA, | |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE RELIEF**
**AND DECLARATORY JUDGMENT**

Plaintiffs City of South Miami; Florida Immigrant Coalition, Inc. ("FLIC"), The Farmworker Association of Florida Inc. ("FWAF"), Family Action Network Movement, Inc. ("FANM"), QLatinx, and WeCount!, Inc. ("WeCount"), on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc. ("AI Justice"), The Guatemalan-Maya Center, Inc. ("GMC"), Hope Community Center, Inc., and Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster"), on behalf of their organizations (collectively,

the "Plaintiffs") sue Defendants Ron DeSantis, Governor of the State, of Florida, and Ashley Moody, Attorney General of the State of Florida.

## I.     INTRODUCTION

1.      On May 2, 2019, the Florida Legislature passed the anti-immigrant and unconstitutional Senate Bill 168, enacted as Chapter 908 of Florida Statutes ("SB 168"). *See* Exhibit 1 (Enacted Version of SB 168).

2.      Described in the bill title as "[a]n act relating to federal immigration enforcement," the original version of SB 168 was drafted by anti-immigrant hate groups, Floridians for Immigration Enforcement ("FLIMEN") and The Federation for American Immigration Reform ("FAIR").

3.      Governor Ron DeSantis, who ran for office on an anti-immigrant platform, signed the bill into law on June 14, 2019.

4.       Deemed by its sponsors an "anti-sanctuary cities law," SB 168 impermissibly authorizes and requires state and local law enforcement to perform the functions of federal immigration agents. This encroaches into an area of exclusive federal authority and will interfere and conflict with the comprehensive federal immigration system enacted by Congress in violation of the Supremacy Clause of the U.S. Constitution. SB 168 targets immigrants and people of color throughout the state of Florida who will be subject to arrest for deportation by state and local police, under circumstances not permitted by the Immigration and Nationality Act ("INA"), even when the cities, and counties, and local law enforcement object.

5.      SB 168 will lead to the erosion of trust in law enforcement, racial profiling, and the violation of the constitutional rights of hundreds of thousands of Floridians.

6.      SB 168 will subject Floridians—including countless U.S. citizens and noncitizens who have permission from the federal government to remain in the United States—to racial profiling. Black and brown Floridians who may be perceived as "foreign" by state or local law enforcement will be in constant jeopardy of harassment and unlawfully prolonged detention and arrest by state and local law enforcement officers operating under SB 168.

7.      Racial and national origin minorities who are victims of domestic violence, sexual assault, and human trafficking will be deterred from accessing services for crime, placing them at greater risk and undermining public safety.

8.      As a result of SB 168, and under color of state law, Plaintiffs will be deprived of rights, privileges, or immunities guaranteed under the U.S. Constitution.

9.      This action challenges SB 168 on multiple constitutional grounds to prevent imminent harm that Plaintiffs and other Floridians, including both U.S. citizens and noncitizens, will suffer if the law goes into effect.

10.     Plaintiffs seek injunctive and declaratory relief to prevent such egregious unconstitutional actions from occurring in their communities.

A.      KEY PROVISIONS OF SB 168

11.     In addition to challenging SB 168 in its entirety, Plaintiffs specifically challenge sections 908.102(6), 908.103, 908.104(1), 908.104(4), 908.105(1), and 908.106.

12.     Section 908.102(6) defines sanctuary policies.

> 908.102 Definitions.—As used in this chapter, the term: . . . (6) 'Sanctuary policy' means a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from: (a) Complying with an immigration detainer; (b) Complying with a request

3

from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency; (c) Providing a federal immigration agency access to an inmate for interview; (d) Participating in any program or agreement authorized under section 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or (e) Providing a federal immigration agency with an inmate's incarceration status or release date.

13.    Section 908.103 bans sanctuary policies.

Sanctuary policies prohibited. — A sate entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy.

14.    Section 908.104(1) mandates the use of "best efforts" to support the enforcement

of federal immigration law.

908.104 Cooperation with federal immigration authorities. — (1) A law enforcement agency shall use best efforts to support the enforcement of federal immigration law. This subsection applies to an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment.

15.    Section 908.104(4) deals with transportation across state lines.

908.104 Cooperation with federal immigration authorities.— . . . (4) When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

16.    Section 908.105(1) mandates arrests for civil immigration violations upon receipt

of an immigration detainer request.

908.105 Duties related to immigration detainers. — (1) A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall: (a) Provide to the judge

authorized to grant or deny the person's release on bail under chapter 903 notice that the person is subject to an immigration detainer. (b) Record in the person's case file that the person is subject to an immigration detainer. (c) Upon determining that the immigration detainer is in accordance with s. 908.102(2), comply with the requests made in the immigration detainer.

17.   Section 908.106 requires agreements with ICE.

Reimbursement of costs. — Each county correctional facility shall enter into an agreement or agreements with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons. A compliant agreement may include any contract between a correctional facility and a federal immigration agency for housing or detaining persons subject to immigration detainers, such as basic ordering agreements in effect on or after July 1, 2019, agreements authorized by section 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357, or successor agreements and other similar agreements authorized by federal law.

## II.    JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

19.   This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

20.   Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District or Division and a substantial number of Plaintiffs are located in this judicial district. Defendants are sued in their official capacity. Each Defendant resides within the State of Florida.

### III.    PARTIES

21.    **Plaintiff City of South Miami ("South Miami")** is a municipal corporation organized under the laws of the State of Florida and is located in Miami-Dade County, Florida.

22.    South Miami's leadership consists of the Mayor, Vice-Mayor, and three City Commissioners who are responsible for adopting an annual budget and establishing policies and local laws and ordinances.

23.    South Miami has an estimated population of 12,219. Approximately 43.1% of the City identifies as Hispanic or Latino, 17.8% identifies as Black or African-American, and 4.8% identifies as being of Asian descent. Families make up approximately 56% of the City of South Miami's population. Immigrants make up part of South Miami's community.

24.    The South Miami Police Department ("SMPD") is an integral arm of the City of South Miami as a full-service law enforcement agency with approximately 48 sworn positions and eight civilian staff.

25.    In 2017, South Miami adopted Resolution 028-17-14829 ("Resolution") that limits SMPD's entanglement with federal immigration enforcement.

26.    The Resolution provides that immigration detainers will not be honored as a matter of course and was passed to avoid repeating past incidents of entanglement between SMPD with federal immigration agents from U.S. Immigration and Customs Enforcement ("ICE") that resulted in South Miami residents being detained and deported. These incidents involved a request from ICE that SMPD enter a South Miami resident's home to turn the individual over to ICE, ICE participation in SMPD checkpoints for driving under intoxication, and an investigation by SMPD into immigration matters of a legal permanent resident.

6

27.     SMPD receives immigration detainer requests to arrest individuals for civil immigration violations, but SMPD does not carry out these arrests automatically. The Miami-Dade County Police Department, however, has a policy of arresting people on all immigration detainers. The Miami-Dade County Police Department occasionally conducts operations inside South Miami without notifying SMPD, and South Miami uses the county's police services for homicide investigations and SWAT.

28.     South Miami believes SB 168 does not provide South Miami, SMPD, or its residents any actual and understandable notice of the statutory requirements that apply to their conduct.

29.     South Miami is not clear as to which portions of SB 168 apply to it, making it difficult to attempt compliance.

30.     South Miami believes that it may be deemed out of compliance with SB 168 by Defendant DeSantis, which will lead to (1) the suspension without pay of its leadership, including its Mayor, Vice-Mayor, and Commissioners; and (2) a lawsuit by Defendant DeSantis and Defendant Moody.

31.     South Miami believes that attempts to comply with SB 168 will lead to liability in damage lawsuits by residents and visitors against South Miami or SMPD.

32.     **Plaintiff Florida Immigrant Coalition ("FLIC")** is a non-profit organization and statewide coalition of more than 50 member organizations and over 100 allies. FLIC is based in Miami, Florida and has staff covering six counties throughout Florida. FLIC's member organizations are located in over twenty Florida counties.

33.     Some of FLIC's members and constituents lack immigration status, are the parents of children born abroad, or U.S. Citizen children of parents born abroad.

34.     FLIC works with people of different status from the undocumented to citizens, those with Temporary Protected Status ("TPS"), Legal Permanent Resident ("LPR") status, and refugees, including many immigrants who are subject to arrest due to an immigration detainer request.

35.     FLIC's mission is to grow the connection, consciousness, and capacity of immigrant families, organizations and communities so that everyone can live, love, and labor without fear.

36.     FLIC has several campaigns and programs to advocate and assist the Florida immigrant community, such as driver's licenses, a Farmworker Caucus, immigration reform, a Florida New Americans program to help people on a path to naturalization, English classes, access to college, wage theft, public education, and voter registration.

37.     FLIC also operates a toll-free hotline that provides information to immigrant communities, allies, and concerned stakeholders as it relates to citizenship, access to college, detention and deportation, and other basic social needs.

38.     FLIC has diverted resources away from some of these campaigns and programs as a result of the enactment of SB 168.

39.     The uncertainty surrounding the meaning of SB 168 and how it will be implemented in different parts of Florida has strained FLIC's staff and resources as they work to try and answer the immigrant community's questions regarding SB 168.

40.     FLIC's toll-free hotline has received more than twice the normal number of calls it normally receives. Due to the increase in questions regarding SB 168,  FLIC has been forced to change the hotline script to address SB 168.

41.     FLIC's services, organizing, civic engagement, and administration teams have all had a significant increase in work to respond to the passage of SB 168. Since SB 168 passed, approximately 45% of FLIC's staff time has been devoted to answering questions and responding to needs related to the implementation of SB 168. This diversion of resources has resulted in a major reduction of time spend on FLIC's core work and programs. Moreover, FLIC has had to rely more heavily on volunteers as a stopgap measure in an attempt to meet the overwhelming needs regarding detention and deportation, immigration policy, and immigration law.

42.     The work caused by SB 168 has taken time away from existing priorities for FLIC's other programs and initiatives, such as family separation, child detention deaths, the census citizenship question, and DACA.

43.     FLIC will be forced to continue to divert resources from the communications, fundraising, and development departments, as well as other programs, to address issues relating to SB 168, including an increase in the arrests of individual members and members of its organizational members due to racial profiling. These limitations will hinder FLIC's future ability to respond and provide support to its members and the immigrant communities.

44.     **Plaintiff The Farmworker Association of Florida ("FWAF")** is a non-profit organization with headquarters in Apopka, Florida, and offices throughout the state, including Homestead, Fellsmere, Immokalee, and Pierson, Florida.

45.     FWAF is a grassroots and community-based farmworker membership organization with over 10,000 Haitian, Latinx, and African American members.

46.     FWAF serves seasonal workers as well as migrant workers who travel with the seasons to harvest crops. FWAF's members include immigrants who are both documented and undocumented, including some who are subject to immigration detainers.

9

47.     FWAF's mission is to build power among farmworker and rural low-income communities, to respond to and gain control over the social, political, economic, workplace, health, and environmental justice issues that impact their lives. FWAF's programs include civic participation, advocacy, worker's rights, health and safety, and immigrant rights.

48.     The passage of SB 168 has already substantially diverted scarce organizational resources away from FWAF's health and safety and civic engagement work.

49.     FWAF staff has devoted additional time to train existing volunteers and new volunteers on SB 168. Since SB 168 passed, FWAF has started providing more Know Your Rights ("KYR") presentations, holding member meetings regarding SB 168, and sending out information and communications to its members and the immigrant community.

50.     FWAF staff have received more calls each day since SB 168 passed, including calls with concerns regarding deportation, travel in Florida, family separation when a parent is detained, and how FWAF can help once SB 168 goes into effect.

51.     Because of SB 168, FWAF is working on developing a rapid response strategy to ICE arrests and raids in anticipation of an increased ICE presence in the communities it serves. FWAF is preparing itself for a surge in deportations when SB 168 goes into effect by identifying attorneys and counselors for referrals and working with a coalition of organizations to provide a rideshare service.

52.     The increase in FWAF staff's time and focus on SB 168 is driven by the needs of FWAF's membership.

53.     FWAF lacks the funds to increase its staffing to educate the community on SB 168 and its consequences. FWAF must now divert resources to fundraise in an attempt to address this deficit.

10

54.     FWAF anticipates that the community impact of SB 168, including arrests and detentions, will continue to divert FWAF's resources from its core mission of strengthening farmworker communities through its different programs and normal organizing work.

55.     FWAF also expects rapid response alerts will take staff time away from other work, such as civic engagement and health and safety.

56.     FWAF expects that there will be less immigrant community participation in important health clinics and other services that FWAF offers due to concerns about transportation, thereby requiring new strategies and additional outreach.

57.     **Plaintiff Family Action Network Movement ("FANM")** is a social services non-profit organization located in Little Haiti in Miami-Dade County, Florida, home to one of the largest Haitian immigration communities in the United States.

58.     FANM's mission is to empower low to moderate income families socially, financially, and politically through counseling, services, organizing, and advocacy.

59.     FANM has approximately 300 members, who are mostly Haitian immigrants and families of mixed immigration statuses, including United States citizens, lawful permanent residents, Temporary Protected Status ("TPS") recipients, and many undocumented immigrants.

60.     FANM's members reside in Miami-Dade and Broward counties.

61.     FANM has six main program areas: Family Intervention and Empowerment; Health Promotion and Prevention; Youth Development and Leadership; Immigration Services and Advocacy; Community Economic Development; and Adult Education.

62.     Through its various program areas, FANM provides approximately 6,000 beneficiaries throughout Florida with a wide-range of social services and programs every year,

11

including but not limited to counseling, health education, language instruction, financial literacy and planning, small business development, afterschool programs, and legal case referrals.

63.     Additionally, FANM is involved in community organizing and advocacy on many pressing issues impacting Haitian immigrants and families, including local campaigns to combat gentrification and inequitable development in Little Haiti and a national campaign to protect TPS for Haitians and other affected immigrants.

64.     Since the time SB 168 was filed and passed, FANM has been forced to respond to an increase in inquiries from members and community residents concerned about SB 168's impact on Haitian immigrants and families.

65.     FANM has hosted community meetings to educate its members and community residents on immigration detainers and the impact of SB 168, translated informational materials on SB 168 into Haitian-Creole, and responded to office visits, calls, and emails requesting information on SB 168.

66.     Because of SB 168, FANM has been forced to divert resources and staff time away from other programs, services, and campaigns.

67.     As SB 168 is implemented, FANM expects it will be forced to devote even more resources, time, and attention to inform members about how the SB 168 is being implemented and to assist members who are stopped, arrested, and/or deported in Miami-Dade and Broward because of SB 168.

68.     Given FANM's predominately Black membership, FANM anticipates that SB 168 will have an acute impact on its members and lead to increased racial profiling, police scrutiny, and criminalization of its members, documented and undocumented, who will be at risk of being subject to immigration detainers.

69.     FANM's continued diversion of resources to address issues related to SB 168 and its implementation will hinder its ability to dedicate the resources, time, and attention needed to effectively implement its other programs, services, and campaigns.

70.     **Plaintiff QLatinx** is an educational advocacy and support group located in Orlando, Florida.

71.     QLatinx was founded as an unincorporated association in response to the 2016 mass shooting at Pulse nightclub in Orlando, Florida during the LGBTQ+ establishment's Latinx-themed night. QLatinx brought together members of the local community directly impacted by this tragedy to build a supportive infrastructure, address inequity, and promote inclusionary practices for local leadership and partnering agencies.

72.     The QLatinx mission is to center and empower the most marginalized members of its community, establish affirming and supportive healing spaces, build a strong and united community, and work towards a society free of fear, violence, and hate.

73.     QLatinx has created several initiatives and programs, including immigration advocacy; a multicultural education series that explores various traditions through music, language, and cuisine; a Social Justice Institute; a series of workshops and trainings on diversity, inclusion, and social equity for corporations, nonprofits, and government agencies to bolster diversity and inclusion efforts; and an HIV prevention and education initiative.

74.     The passage of SB 168 has already substantially diverted scarce organizational resources away from QLatinx's work on its non-immigration programs and services as well as its own organizational development to grow into a self-sustaining non-profit organization. QLatinx had to hire an additional staff member to focus on the immigration issues that arose after SB 168 passed.

13

75.     QLatinx anticipates additional immigration work and a reallocation of staff time to work on immigration issues after it becomes clear how SB 168 is implemented by law enforcement in Orlando, Florida and surrounding areas.

76.     QLatinx anticipates it will need to address the isolation of its documented and undocumented immigrant members due to the fear of being racially profiled and arrested, thereby making them unable to access the greater community in Orlando, healthcare, social spaces, and learning spaces that are LGBTQ competent.

77.     QLatinx was instrumental in getting the City of Orlando to adopt a Trust Act resolution on July 23, 2018. QLatinx has been working to expand these efforts across the region. Because of SB168's restriction on sanctuary policies, a regional Trust Act for central Florida will likely be stalled and prevent QLatinx from advancing efforts to create a more welcoming and affirming central Florida.

78.     **Plaintiff WeCount! ("WeCount")** is a community-based, non-profit organization located in Homestead, Florida. WeCount serves the areas of Homestead and Florida City.

79.     WeCount has approximately 200 members, including immigrant adults and youth of mixed immigration statuses. Many of its members, documented and undocumented, could be subject to immigration detainers. The majority of WeCount's members are Mexican and Central American immigrants who work in farm work, plant nursery work, and construction.

80.     WeCount's mission is to build the power of Latin American immigrants in Homestead, Florida through education, support, and collective action.

81.     WeCount has three main projects: education, support, and collective action.

82.     WeCount provides members and community residents with language instruction, computer literacy classes, and workshops on wage theft, workplace health and safety, and

immigration. WeCount also hosts a community radio station, "Radio Poder," that broadcasts music and educational information to Homestead residents in Spanish and indigenous languages.

83.     WeCount supports members affected by workplace and immigration issues by assisting members and their families with filling out necessary paperwork, accompanying members through complaint processes, hosting screening clinics with legal service organizations, offering case referrals, and providing social, emotional, and psychological support.

84.     WeCount is also involved in collective action and organizing campaigns, including a Planting Justice ("Sembrando Justicia") campaign to improve the wages and working conditions of plant nursery workers in South Florida and a campaign to close the Homestead Detention Center, where thousands of immigrant children are being detained. These campaigns have included publishing a research report, organizing marches and events, coordinating community coalitions, and meeting with elected officials.

85.     Because of SB 168, WeCount has been forced to divert its limited staff's time, attention, and resources away from its education, support, and collective action projects.

86.     Since SB 168 was filed and passed, WeCount has been forced to divert time, attention, and resources to educate its members and community residents on SB 168 and to respond to an increase in inquiries from members and community residents concerned about SB 168's impact on immigrant families in Homestead.

87.     SB 168 has caused a growing fear and concern in WeCount's membership and in the immigrant community of Homestead. Because of the confusion around SB 168 and its implementation, many of WeCount's members are fearful of interacting with local law enforcement agencies and being subject to racial profiling and police harassment.

88.      Due to SB 168, WeCount anticipates that many of its members will be less willing to report crimes, pursue medical assistance at hospitals, and interact with government agencies.

89.      WeCount expects to expend even more time and resources responding to SB 168, including updating members on the implementation of SB 168 and supporting members who are arrested, placed on immigration detainers, or have issues with the police due to SB 168. These activities related to SB 168 will force WeCount to further divert its scarce organizational resources and will harm the organization and its members.

90.      **Plaintiff Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster")** is a non-profit corporation and house of worship with approximately 105 members located in Gainesville, Florida.

91.      Westminster's mission is to nurture, equip, and send out disciples to be Christ's ministers of compassion, healing and peace in their daily lives.

92.      Westminster hosts worship services, bible study, and community classes each week. Westminster also partners with several other organizations to participate in a variety of programming and work on issues relating to homelessness, housing, medical care, education, food scarcity, and economic diversity.

93.      Westminster declared itself a sanctuary church approximately two years ago and converted a building behind the church into a sanctuary house for those who are facing deportation and are in the process of either appealing or filing for asylum to care for and serve those in need of shelter and protection.

94.      Since SB 168 passed, Westminster has received an increase in requests for referrals to immigration attorneys, and inquiries about the requirements to stay in the sanctuary house, whether Westminster's ability to provide the sanctuary house will be affected by SB 168, and how

local law enforcement will respond to SB 168 in Alachua County. The increase in these requests, along with attempting to understand how SB 168 will be interpreted by Alachua County law enforcement has created additional work for Westminster since SB 168 passed.

95.     Before SB 168 was enacted, the Alachua County Sheriff's Office maintained a policy of not arresting people with an immigration detainer, except in very limited circumstances.[1]

96.     Westminster anticipates a sharp increase in requests for personalized assistance, housing in Westminster's sanctuary house, access to resources, and support in managing the emotional harm to families affected by SB 168. Because of SB 168, the Alachua County Sheriff will begin arresting people when immigration authorities lodge detainer requests.[2] Meeting community needs as a result of this increase in arrests will divert time and resources away from the other services and events that Westminster provides to the local and immigrant community.

97.     **Plaintiff Americans for Immigrant Justice, Inc. ("AI Justice")** is a non-profit law and advocacy organization that protects and promotes the basic human rights of immigrants. AI Justice is located in Miami-Dade County, Florida and has served over 130,000 immigrants from all over the world since it was founded in 1996.

98.     AI Justice's mission is to protect and promote the basic human rights of immigrants through a unique combination of free direct services, impact litigation, policy reform, and public education at local, state, and national levels.

---

[1] Cindy Swirko, *Alachua Sheriff Won't Join ICE Pilot Program*, The Gainesville Sun, Jan. 18, 2018, *available at* https://www.gainesville.com/news/20180118/alachua-sheriff-wont-join-ice-pilot-program.
[2] Cindy Swirko, *Sheriff Will Hold Inmates 48 Hours for ICE*, The Gainesville Sun, June 18, 2019, *available at* https://www.gainesville.com/news/20190618/sheriff-will-hold-inmates-48-hours-for-ice.

99.     AI Justice represents numerous undocumented individuals, including some who are subject to immigration detainers, through its various programs.

100.    AI Justice's programs include family defense, advocacy, litigation, children's legal, domestic violence and human trafficking ("Lucha Program"), and detention. These programs served over 9,000 individual clients in 2018 alone.

101.    Since SB 168 passed, AI Justice has seen an increase in attendees at its in-office intakes, clients concerned about their possible detention and removal due to SB 168, and questions about the law's significance during screenings and KYR presentations.

102.    AI Justice has experienced a dramatic increase in calls and emails from social service and community-based organizations seeking guidance on whether immigrant victims should continue to report domestic violence, sexual assault, and human trafficking to local law enforcement. AI Justice has noticed that more trafficking and domestic abuse victims are hesitant to report crimes because they are confused about the implications of SB 168.

103.    SB 168 threatens twenty years of AI Justice's work with local law enforcement to ensure that victims are unafraid of the police and will force AI Justice to shift its resources to assessing whether it is safe for a victim to report a crime post-SB 168 and training social service providers that interact with immigrant victims.

104.    Because SB 168's ultimate implementation is unclear, AI Justice has had to put additional work into evaluating the law to respond to inquiries from clients and the community. AI Justice has also incorporated information about SB 168 into its KYR and general immigration presentations.

105.    As SB 168 is implemented throughout Florida, AI Justice anticipates an increase in work across all its projects.

106.     AI Justice expects an increase in immigrants who are arrested and detained due to SB 168, along with a corresponding increase in the detained population. AI Justice is concerned that it will be unable to stretch its limited resources to meet the needs of the detained population.

107.     AI Justice also expects an increase in requests for presentations, advice, and counsel regarding SB 168.

108.     Depending on how school systems throughout Florida interpret and implement SB 168, AI Justice expects a significant amount of resources will be diverted to advocating for the rights of undocumented children in public schools.

109.     AI Justice also expects to divert resources from representing immigrant victims in their immigration matters in several of its programs, to educating and advising other social and legal service providers on how to proceed in light of SB 168.

110.     **Plaintiff The Guatemalan-Maya Center, Inc. ("GMC")** is a non-profit organization located in Lake Worth, Florida.

111.     GMC was founded in 1992 to address the dire need for prenatal care for indigenous women in Palm Beach County and provide cultural interpretation for the medical community.

112.     GMC's mission is to foster a nurturing, stable and culturally diverse environment to empower those victimized by violence to seek justice and to build community.

113.     GMC provides several programs for immigrant and refugee families in Palm Beach County, including early childhood education programs and case management services relating to health care, education, public safety, emergency management, housing, and legal needs.

114.     In addition to its regular programs, GMC also seeks to respond to the community's concerns regarding immigration issues and address fears of ever-changing immigration policies.

115.    The majority of the clients served by GMC are undocumented or come from families of mixed legal status.

116.    Since SB 168 passed, GMC has participated in calls and virtual meetings with local organizations in response to SB 168 and responded to community members requests for clarification regarding SB 168 due to inconsistent messages from Palm Beach Sheriff's Office regarding how they will handle immigration detainer requests.

117.    GMC has also seen incidents of miscommunication between local law enforcement and individuals who speak indigenous languages.

118.    GMC has noticed a recent increase in the number of immigrants being arrested by local law enforcement for minor infractions such as fishing after hours or driving without a license.

119.    Many of GMC's immigrant clients fear contacting local enforcement and being stopped by local law enforcement officials due to their race or color. Many also fear that local law enforcement will act as ICE agents to raid their homes and arrest them for ICE.

120.    GMC anticipates an increase in its need to respond to misinformation and its clients' requests for assistance as SB 168 is implemented.

121.    As the implementation of SB 168 unfolds, the increase in demand for assistance will require GMC to divert case managers from existing caseloads in order to provide Know Your Rights presentations and legal screenings and to respond to requests for referrals to attorneys, and other types of assistance that GMC does not currently provide.

122.    The additional work brought about by SB 168 will be a significant drain on GMC's resources.

123.    **Plaintiff Hope Community Center, Inc. ("Hope Community Center")** is a non-profit faith-based organization located in Apopka, Florida. Hope Community Center is a service-

learning community dedicated to the empowerment of Central Florida's immigrant and working poor communities through education, advocacy and spiritual growth.

124.    Hope Community Center's mission is to cultivate self-determined communities through personal, social, and communal transformation and its vision is to be the premier center of hope and empowerment for central Florida's immigrant and working poor communities.

125.    Hope Community Center serves approximately 6,600 people each year in Lake, Orange, Seminole, Volusia, and Osceola counties. Many of the families with whom Hope Community Center works with are of mixed immigration status, having at least one family member who is undocumented, including some who are subject to immigration detainers.

126.    Hope Community Center's programs and services include immigration, education, service learning, community organizing, and youth and families.

127.    Since SB 168 passed, Hope Community Center has diverted resources from its non-immigration programs due to additional work relating to SB 168. For example, Hope Community Center organized forums on SB 168 and legal clinics to aid in the preparation of power of attorneys for the immigrant community in anticipation of increased deportations and separated families.

128.    Hope Community Center has been researching how local police will proceed with detaining community members for minor traffic infractions once SB 168 is implemented.

129.    Hope Community Center has been working on responding to an increase in members' needs arising from the fear of being racially profiled due to SB 168. Hope Community Center has been organizing transportation for people who need to attend court, preparing educational materials on SB 168, and researching other arrest scenarios that may come up due to SB 168.

130.    Hope Community Center expects that its resources, staff time, and funds will continue to be diverted from its other programs and services such as child education, family educational services, service learning, community organizing, and family work. Specifically, Hope Community Center anticipates diverting more staff time to creating circles of protection for the immigrant community in Apopka by providing information and education regarding their rights.

131.    Hope Community Center also plans to work on a rapid response project to assist the anticipated increase in detained members.

A.    Defendants

132.    **Defendant Ron DeSantis** is the Governor of Florida. Pursuant to Article IV Section 1(a) of the Florida Constitution, Defendant DeSantis is vested with the "supreme executive" power in Florida and is constitutionally required to "take care that the laws be faithfully executed." Fla. Const. Art. IV, § 1(a).

133.    SB 168 provides that "[a]ny executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor in the exercise of his or her authority under the State Constitution and state law." Fla. Stat. § 908.107(1).

134.    SB 168 further provides that pursuant to Article IV Section 1(b) of the Florida Constitution, "the Governor may initiate judicial proceedings in the name of the state against such officers to enforce compliance with any duty under this chapter or restrain any unauthorized act contrary to this chapter" Fla. Stat. § 908.107(1).

135.    Article IV Section 1(b) of the Florida Constitution states that "[t]he governor may initiate judicial proceedings in the name of the state against any executive or administrative state,

22

county or municipal officer to enforce compliance with any duty or restrain any unauthorized act." Fla. Const. Art. IV, § 1(b).

136.    Article IV Section 7(a) of the Florida Constitution provides that "[b]y executive order stating the grounds and filed with the custodian of state records, the governor may suspend from office any state officer not subject to impeachment, any officer of the militia not in the active service of the United States, or any county officer, for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony, and may fill the office by appointment for the period of suspension. The suspended officer may at any time before removal be reinstated by the governor." Fla. Const. Art. IV, § 7(a).

137.    Therefore, Defendant DeSantis is responsible for the enforcement of SB 168 in the State of Florida and is an appropriate defendant in this case.

138.    Defendant DeSantis is sued in his official capacity.

139.    **Defendant Ashley Moody** is the Attorney General of Florida, the chief legal officer of the state.  Fla. Const. Art. IV, § 4(b).

140.    The Attorney General is required to appear in the courts on behalf of the State of Florida. Fla. Stat. § 16.01(4).

141.    SB 168 provides that the "Attorney General may file suit against a local governmental entity or local law enforcement agency in a court of competent jurisdiction for declaratory or injunctive relief for a violation of this chapter." Fla. Stat. § 908.107(2).

142.    Therefore, Defendant Moody is responsible for the enforcement of SB 168 in the State of Florida and is an appropriate defendant in this case.

143.    Defendant Moody is sued in her official capacity.

### IV.    FACTS

A.  SB 168 Intentionally Incorporates Racial and National Origin Animus into Florida Law

144.    SB 168 is an overly broad law that is rooted in anti-immigrant animus and makes state and local agencies enforcers of immigration law.

145.    The original version of SB 168 was drafted by anti-immigrant hate groups, the Federation for American Immigration Reform ("FAIR") and their Florida-state affiliate, Floridians for Immigration Enforcement ("FLIMEN"), who recruited Florida state representatives to turn their anti-immigrant agenda into state law. Additionally, sponsors of SB 168 used biased data provided by FAIR and its sister organization, the Center for Immigration Studies ("CIS"), in their staff analysis of the bill.

146.    FAIR and its sister organization, CIS, have both designated as hate groups by the Southern Poverty Law Center ("SPLC").[3]

147.    FAIR and CIS were both founded by John Tanton, an avowed white supremacist whose history of racism, xenophobia, and current influence in anti-immigrant legislation and politics is well documented.[4]

148.    FLIMEN is an anti-immigrant group closely associated with FAIR.[5]

---

[3] *See* "*Center for Immigration Studies*," Southern Poverty Law Center, *available at* https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies.

[4] *See* "*Ties Between Anti-Immigrant Movement and Eugenics*," Anti-Defamation League, February 22, 2013, *available at* https://www.adl.org/news/article/ties-between-anti-immigrant-movement-and-eugenics ; *see also* Jessica Cobian, "*The Anti-Immigrant Extremists in Charge of the U.S. Immigration System*," Center for American Progress, June 24, 2019, *available at* https://www.americanprogress.org/issues/immigration/news/2019/06/24/471398/anti-immigrant-extremists-charge-u-s-immigration-system/.

[5] In 2010, FLIMEN's site indicated then-president, Janet Renner, and vice president and founder, David Caulkett, serve as "Florida state advisors" for FAIR. That same year, FAIR listed FLIMEN on its page under "Join a Local Immigration Reform Group."  In November 2018, FAIR President Dan Stein hosted Caulkett on FAIR's podcast to discuss FLIMEN's influence over legislation in Florida. As of June 2019, Caulkett is listed as a "Florida State Advisor for FAIR" on FLIMEN's site.

149.    On December 13, 2016, FILMEN's former legislative director Jack Oliver emailed Senator Aaron Bean (District 4)'s office seeking a sponsor for a mandatory E-Verify and anti-sanctuary city bill the organization had drafted.[6]

150.    One month later, David Caulkett, FLIMEN's founder and Florida state advisor for FAIR, left a voicemail for Sen. Bean asking him to be the Senate sponsor for an E-verify bill his organization had already written.[7]

151.    In December 2018, Florida Senators Bean and Joe Gruters (District 23) filed anti-sanctuary bills—SB 168 and SB 170 respectively—in the state Senate that closely resembled the model legislation sent by FLIMEN in the December 2016 email.[8] In fact, the final bill as passed retains many remnants of FAIR's model legislation, including four near-identical sentences. *See* Exhibit 5 (Enacted Version of SB 168 with Language in Common from Model Legislation Highlighted).

---

[6] Mr. Oliver emailed Senator Bean stating: "Floridians for Immigration Enforcement is seeking sponsorship for our mandatory E-Verify bill and our anti-sanctuary city bill … I know you have taken a stand for the citizens of Florida on immigration issues in the past and hope that you will take a stand this legislative session by being a sponsor for these important bills." *See* Exhibit 2 (FOIA-produced Electronic Correspondence dated December 13, 2016). Mr. Oliver attached model legislation for both bills to the email.

[7] Senator Bean's aide detailed the content of the voicemail in an email. The aide said the message was "asking the Senator to sponsor their e-verify bill which they have already written. They currently have a House sponsor but need a Senate sponsor." *See* FOIA-produced Electronic Correspondence, *available at* https://www.documentcloud.org/documents/5730601-Jan-23-2017-FLIMEN-Sen-Bean-Email.html.

[8] *See* Exhibit 3(FAIR Anti-Sanctuary Model Legislation). *See also* Exhibit 4 (Version of SB 168 Bill Filed on December 18, 2018 with Language in Common from Model Legislation Highlighted) and Exhibit 5 (Enacted Version of SB 168 with Language in Common from Model Legislation Highlighted).

152.    The staff analysis used by sponsors of SB 168, relied on biased information from FAIR and CIS to accuse multiple cities of still operating as "sanctuary" jurisdictions in Florida.[9] *See* Exhibit 6, (Excerpt from Florida Senate's Staff Analysis of SB 168).

153.    On March 12, 2019 during a Florida Senate committee meeting, Senator Janet Cruz (District 18) questioned Senator Gruters about the staff analysis in support of the bill: "I researched that both of the institutions whose estimates were mentioned [CIS and FAIR] have been deemed anti-immigrant hate groups … with foundational principles in white nationalism and connections to white supremacists. So, my question is how was this used? Why did we use them? How did this happen in our analysis?"[10]

154.    In April 2019, Representatives of FLIMEN once again emailed and coordinated with Florida legislators, including Florida Senator Gruters and Florida Representative Cord Byrd, during the Florida Legislative Session to push SB 168 and HB 527 forward.[11]

155.    On April 17, 2019 Florida Senator Gruters and Representative Byrd sponsored and participated in a press conference planned by FLIMEN, who hosted and invited speakers Amapola Hansberger and Yvonne Larsen. Hansberger and Larsen are well-known for their fear-mongering

---

[9] *See* Jerry Iannelli, "*Florida GOP Chair Is Consulting With Groups Linked to White Nationalists*," March 27, 2019 *available at* https://www.miaminewtimes.com/news/florida-gop-chair-joe-gruters-consulted-with-fair-group-linked-to-white-nationalists-11130302.

[10]    *See Senate Committee Meeting at 1:27:48*, March 12, 2019, *available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019031164&Redirect=true

[11]    *See* Exhibit 7 (FOIA-produced Electronic Correspondence dated April 15, 2019 and April 19, 2019).

and hateful rhetoric toward immigrants.[12] During the press conference, Hansberger warned that

"[undocumented people] will kill you."[13]

156.    SB 168 was drafted by these anti-immigrant hate groups to spread fear in the state.

As a result of their successful attempt to rope Florida representatives into promoting their hateful

ideals, Floridians must now bear the consequences of an unconstitutional law.

*Pre-emption of Federal Law*

157.    In enacting SB 168, the Florida legislature legislated in an area committed

exclusively to the federal government under the U.S. Constitution and the Immigration and

Nationality Act.

158.    The legislative record and public comments from proponents and sponsors of SB

168 make it clear that a primary motivating factor in passing this law was the Florida Legislature's

---

[12] Hansberger is the founder and president of Legal Immigrants for America (LIFA). LIFA is a group that advocates for "ending citizenship to anchor babies" and restricting immigration to English speakers only. *See* "LIFA GOALS!" (listing "requiring proficiency in English") athttps://www.golifa.com/lifa-goals/; *see also* "LIFA Sends Letters to Congress in Support of Ending U.S. Citizenship to Anchor Babies," (Aug. 17, 2017), https://www.golifa.com/lifa-sends-letters-to-congress-in-support-of-ending-us-citizenship-to-anchor-babies/. LIFA also falsely blames undocumented immigrants for "increased crime rates, lower standards of education, and the declining home values where they live." *See* LIFA Facebook page, "*Our Story*," (Dec. 26, 2019), https://www.facebook.com/pg/4golifa/about/?ref=page internal. Yvonne Larsen is a member of the Remembrance Project, whose founder Maria Espinoza, propagates hate speech against undocumented immigrants. For example, a March 2014 Facebook post by Espinoza read, "Child molestation and rape are very numerous in this illegal alien demographic!" *See* Anti-Defamation League, "*Anti-Immigrant Activist Maria Espinoza Increases Her Profile*," (June 2, 2014), https://www.adl.org/news/article/anti-immigrant-activist-maria-espinoza-increases-her-profile. Just two days prior to the FLIMEN-coordinated press conference, Larsen testified before the Senate during a Florida Senate Rules Committee Meeting, intimating that undocumented immigrants were responsible for sexual assault and domestic assault in Miami Dade. *See Hearing on SB 168 Before the Senate Rules Committee Meeting at 1:02:05*, April 17, 2019, at http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019041212&Redirect=true
[13] *See* "*4/17/19 Press Conference on HB 527 Sanctuary Cities*," Florida Channel, April 17, 2019, *available at* https://thefloridachannel.org/videos/4-17-19-press-conference-on-hb-527-sanctuary-cities/.

desire to correct the perceived failings of the federal government with respect to immigration enforcement.

159.     Speaking at a bill signing ceremony in Sarasota on May 17, 2019, Governor Ron DeSantis told reporters, "We cannot accommodate in Florida the dumping of unlawful migrants in our state. … The state legislature, at my urging, just passed a bill outlawing sanctuary cities and so we basically as a state said … we are going to work with them to help remove criminal aliens. … To just be put on the hook for things that are a result of the Congress' failure and failed policy at the federal level, that is not acceptable."[14]

160.     In April 2019, speaking to reporters about SB 168 and HB 527, Sen. Gruters said, "[o]verall, we have a complete failure of Washington to take care of the [immigration] situation…"[15]

161.     Florida Representative Mike Beltran (District 57), co-sponsor of HB 527, made several statements showing the legislature's intent to supplant federal immigration authority. For example, on March 20, 2019, during a Civil Justice Subcommittee meeting on HB 527, Rep. Beltran explained that it would be easier – if not better – for local law enforcement to identify and detain undocumented persons: "[s]tate and local law enforcement vastly outnumber ICE agents or

---

[14] *See* Carey Codd, "*Florida Gov. Ron DeSantis, 'We Cannot Accommodate The Dumping Of Unlawful Migrants In Our State'*" CBS Miami, May 17, 2019, at https://miami.cbslocal.com/2019/05/17/gov-desantis-blindsided-by-feds-plan-to-send-migrants-to-broward-palm-beach/.
[15] *See* Samantha J. Gross, "*Amid Trump's Threats, Florida lawmakers push ban on 'sanctuary cities'*" Tampa Bay Times, April 16, 2019, at https://www.adl.org/news/article/ties-between-anti-immigrant-movement-and-eugenics.

FBI agents or anyone else at the federal level and this is really an alternative to having ICE go to work sites, go to communities and try to find undocumented folks."[16]

162.    On the afternoon of April 17, 2019, during a Senate Rules Committee meeting, Sen. David Simmons (District 9) expressed support of SB 168, stating "We need a solution to our federal immigration policies."[17]

163.    On the afternoon of May 2, 2019, during the 59th Regular House Session, Rep. Elizabeth Fetterhoff (District 26) said of SB 168, "I am voting yes on this bill today knowing full well that our immigration system is broken and knowing full well that we are in desperate need of overhaul of that system."[18]

164.    On March 12, 2019 during a Senate Infrastructure and Security Committee Meeting, Sen. Gruters avoided answering why he included data provided by designated hate groups FAIR and CIS in SB-168's staff analysis by stating, "[w]e have an opportunity where we have 29 counties right now with Basic Operating Agreements. We can get that all the way up to 67."[19]

---

[16] *See Hearing on SB 168 Before the House Civil Justice Subcommittee at 1:35:15*, March 20, 2019, *available at* https://thefloridachannel.org/videos/3-20-19-house-civil-justice-subcommittee/.

[17] *See Hearing on SB 168 Before the Senate Rules Committee Meeting at 1:51:25, available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019041212&Redirect=true

[18] *See Hearing on SB 168 Before the House – 59th Day of Regular Session at 3:46:55, available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019051001&Redirect=true.

[19] *See Hearing on SB 168 Before the Senate Infrastructure and Security Committee Meeting at 1:29:00, available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019031164&Redirect=true.

165.     In short, as expressed by Florida Senator Wengay Newton (District 70) during the April 24, 2019 House Session on HB 527, "[W]e are creating Federal Immigration Enforcement."[20]

B. SB 168 Will Lead to Racial Profiling and Discriminatory Enforcement, and Heightened Risk to Victims of Domestic Violence, Sexual Assault, and Human Trafficking

166.     Section 908.104(1) mandates the use of "best efforts" to support the enforcement of federal immigration law.  This "best efforts" clause will lead to state and local law enforcement using race and color as a proxy for immigration status.  Cases and data across the country show that racial minorities "are vulnerable to arrest for minor traffic violations, such as driving without a license or driving with an expired license." *See* Hagan, Jacqueline, et al., *The Effects of U.S. Deportation Policies on Immigrant Families and Communities: Cross-Border Perspectives*, 88 N. C. L. REV. 1799, 1815 (2010) (discussing the fear of deportation in a North Carolina immigrant community stemming from a police stop for driving without a license).

167.     Black and Latino drivers are more likely to be stopped for discretionary investigatory stops, searched, and arrested than white drivers.[21] For example, in Alamance County, North Carolina, the U.S. Department of Justice found that local law enforcement targeted Latino

---

[20] *See Hearing on SB 168 Before the House – 51ˢᵗ Day of Regular Session at 02:05:00*, *available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019041282&Redirect=true .

[21] *Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance Regarding Racial Disparities in the U.S. Criminal Justice System*, March 2018, *available at* https://www.sentencingproject.org/publications/un-report-on-racial-disparities/ (citing Langton, L. & Durose, M., U.S. Dept. of Justice Bureau of Justice Statistics, *Police Behavior during Traffic and Street Stops, 2011* (Sept. 2013) *available at* https://www.bjs.gov/content/pub/pdf/pbtss11.pdf; Eith, C. & Durose, M. R., U.S. Dept. of Justice Bureau of Justice Statistics, *Contacts Between Police and the Public, 2008* (Oct. 11, 2011) *available at* https://www.bjs.gov/content/pub/pdf/cpp08.pdf ).

drivers for traffic stops and were between four and ten times more likely to stop Latino drivers than non-Latino drivers.[22]

168.    Latinos are especially susceptible to racial profiling when local law enforcement officers assume the role of federal immigration agents.[23] Cities have seen an increase in the number of Latinos stopped, questioned, and detained by local law enforcement following the implementation of formal collaborations with ICE.[24]

---

[22] *U.S. v. Johnson, Terry S.*, No. 12-CV-01349 (M.D.N.C. Dec. 20, 2012).

[23] *See* Johnson, Kevin R., *The Case Against Racial Profiling in Immigration Enforcement*, 78 WASH U. L.Q. 675, 677 (2000) (explaining that U.S. citizens and lawful permanent residents of Latin American descent "bear the brunt of race-based immigration enforcement.").

[24] In 2017, local police and state troopers stopped Latino drivers, "questioned them and their passengers about their immigration status, and then detained them without warrants for up to four hours until ICE arrived." See Pro Publica, For Cops Who Want to Help ICE Crack Down on Illegal Immigration, Pennsylvania Is a Free-for-All, *available at* https://www.propublica.org/article/pennsylvania-immigration-ice-crackdown-cops-free-for-all. When Davidson County, Tennessee entered into a 287(g) agreement, the arrest rate for Latinos driving without a license increased 136 percent. Lindsey Kee, *The Consequences and Costs of a 287(g) Jail Agreement: One Tennessee County's Story*, American Civil Liberties Union of Tennessee, (2013), *available at* https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/consequences-and-costs-287g-jail-agreement (last visited July 13, 2019). After Irving, Texas entered into a 287(g) agreement, there was an "immediate" and "dramatic" increase in the discretionary arrests of Latinos for "petty offenses—particularly minor traffic offenses" consistent with racial profiling of Latinos "in order to filter them through the [federal immigration enforcement program's] screening system." Trevor Gardner II and Aarti Kohli, *The C.A.P. Effect: Racial Profiling in the ICE Criminal Alien Program* (Sept. 2009), *available at* https://www.law.berkeley.edu/files/policybrief_irving_0909_v9.pdf. In Arizona, a sheriff's policy of using race as a factor in determining reasonable suspicion and in investigating or detaining Latino occupants of motor vehicles suspected of being undocumented without any basis for state charges was held to be in violation of the Fourth Amendment and Fourteenth Amendment grounds. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826 (D. Ariz. 2013) (detailing constitutional violations committed by Maricopa County police officers against individuals of Latino descent who the officers suspected were undocumented noncitizens), *aff'd in part vacated in part*, *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), *cert. denied*, *Maricopa County, Az. v. Melendres*, 136 S.Ct. 799, U.S. (Jan. 11, 2016). In East Haven, Connecticut, the U.S. Department of Justice filed an action against the town in 2012 alleging that the local police targeted Latinos for routine traffic stops and detained Latino drivers and passengers to determine immigration status without any lawful basis due to race, color, or national origin. *U.S. v. East Haven*, No. 12-1652 (D. Conn. filed

169.    U.S. citizens have been wrongfully arrested pursuant to immigration detainers because of law enforcement officers' assumptions based on the individual's appearance and language. *See e.g.*, *Galarza v. Szalcyk*, 745 F.3d 634, 636, 638 (finding that a Latino U.S. citizen was wrongfully held in custody under an immigration detainer for several days after he posted bail). Wrongful arrests will only increase as a result of SB 168.

170.    As Plaintiff AI Justice has directly experienced, and as numerous experts, advocates and journalists have documented, human traffickers, perpetrators of sexual assault (including sexual abuse in the workplace), and domestic abusers prey on vulnerable immigrants, threatening to turn victims over to immigration officials and filing frivolous complaints that may result in serious consequences for victims.[25]

171.    As documented in a recent national survey, immigrant victims of domestic violence, sexual assault, and trafficking are increasingly afraid to contact police, pursue civil or criminal cases, or go to court for any reason.[26] This traps victims in a Catch-22 situation: Ask for

---

Nov. 20, 2012). According to the Complaint, an "analysis of traffic stop data over a two-year period revealed that almost 20% of all traffic stops conducted by [local] officers were of Latinos, while only approximately 8.3% of drivers in East Haven are Latino. *Id.*

[25] *See* Cora Engelbrecht, N.Y. TIMES, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation*, *available at* https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html; Hannah Rappleye, *Immigration crackdown makes women afraid to testify against abusers, experts warn*, NBC News, (Sept. 2018), *available at* https://www.nbcnews.com/politics/immigration/immigration-crackdown-makes-women-afraid-testify-against-abusers-experts-warn-n908271; Olivares, Mariela, *Battered by Law: The Political Subordination of Immigrant Women*, 64 AM. U. L. REV. 231, 231-283 (2014)*;* Gonzalez, B., Collingwood, L., & El-Khatib, S. O. (2017), *The politics of refuge: Sanctuary cities, crime, and undocumented immigration*, Urban Affairs Review, *available at* https://doi.org/10.1177/1078087417704974; Wong, T., *The effects of sanctuary policies on crime and the economy*. Washington, DC: Center for American Progress (2017); Melissa Jeltsen, *Domestic Abusers Have An Ally In The Trump Era. It's ICE*, Huffpost, (July 2018), *available at* https://www.huffpost.com/entry/ice-domestic-violence-abuse_n_5b561740e4b0b15aba914404.
[26] *See* Tahirih Justice Center et al., *May 2019 Findings: Immigrant Survivors Fear Reporting Violence* (June 2019), *available at* https://www.tahirih.org/wp-content/uploads/2019/06/2019-

help and risk deportation, retaliation by an abuser, and separation from one's children; or stay with a violent partner and risk one's life.

172.    SB 168 reinforces and legitimates these fears for victims of domestic abuse, sexual assault, and human trafficking in Florida. This law will place victims at greater risk and undermine public safety.

C.   SB 168 Intentionally Regulates Areas of Law Reserved for Federal Immigration Enforcement

173.    The federal government has exclusive power over immigration matters. Congress has legislated when and by whom an individual can be arrested and detained for a civil immigration violation.  It also legislates how state and local law enforcement may be authorized to carry out functions of federal immigration agents, such as the arrest and transportation of people.

174.    The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. Art. I, § 8, cl. 3.  In addition, the Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

175.    Because immigration policies can implicate foreign relations, the United States has a core, constitutionally-protected interest in setting a uniform federal immigration scheme. *Arizona v. United States*, 567 U.S. 387, 395 (2012).

---

Advocate-Survey-Final.pdf (national survey finding that three out of four advocates and attorneys reported that immigrant survivors have concerns about going to court for a matter related to the abuser/offender, and over 76% reported that immigrant survivors have concerns about contacting the police).

176.    The U.S. Congress has created a comprehensive system of federal laws, agencies, and procedures regulating immigration. *See id.; see generally*, Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*

177.    The INA carefully calibrates the nature—criminal or civil—and the degree of penalties applicable to each possible violation of its terms.

178.    Mere presence inside the United States without federal immigration status is not a criminal offense. Rather, it is a civil violation under federal immigration law.

179.    Through the INA, Congress granted the power to enforce civil immigration law, including the power to make warrantless arrests under limited circumstances, to federal immigration agents. *Arizona*, 567 U.S. at 407-10; *Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276, 1293 (S.D. Fla. 2018).

180.    Congress also created three narrow exceptions under which state and local law enforcement may make a civil arrest. *Arizona*, 567 U.S. at 408-09.

181.    The first exception, 8 U.S.C. § 1357(g), is that state and local governments can apply for specified officers to be trained and deputized as immigration agents authorized to make civil immigration arrests, detain, and to transport "aliens across state lines to detention centers." 8 U.S.C. § 1357(g)(1).

182.    Through § 1357(g) agreements, Congress created an exclusive pathway to delegate civil arrest authority to specified state and local law enforcement officers, who must undergo training before they can make an arrest, detain, or transport noncitizens across state lines to detention centers. 8 U.S.C. § 1357(g)(2). The agreement specifies the authorities delegated, requires direction and supervision by federal immigration officials, and limits the direction of authority. 8 U.S.C. § 1357(g)(3) & (g)(5).

34

183.     Prior to the passage of SB 168, fourteen Florida counties had entered into 1357(g) agreements—commonly known as "287(g) Agreements"—to deputize specific local officers as immigration agents.

184.     The second exception, 8 U.S.C. § 1103(a)(10), permits the U.S. Attorney General to delegate enforcement authority to local law enforcement in the case of a mass immigration influx, but only "with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving." *See* 28 C.F.R. § 65.81 *et. seq.* (implementing regulations requiring a written agreement that specifies training, specific delegation of authority, and the limited duration). As of the filing of this action, no such authorization has been issued to state or local law enforcement in Florida.

185.     The third exception, 8 U.S.C. § 1252c(a), grants authority to state and local law enforcement to make civil immigration arrests of (1) any convicted felon, (2) who was deported after the felony conviction, and (3) who illegally reentered the United States. But arrests under this exception can occur only "after confirmation from [Immigration and Customs Enforcement (ICE)] of the status of such individual" and "only for such period of time as may be required for [ICE] to take the individual into Federal custody."

186.     Absent these three narrow exceptions, state and local law enforcement lack authority to perform the functions of federal immigration agents.

D.     "Immigration Detainer Request" System

187.     Typically, persons who are arrested for a criminal offense are taken to a state or local jail, where jail officials take their fingerprints.

188.     These fingerprints are sent to the Federal Bureau of Investigation and the FBI automatically shares them with ICE for possible issuance of an immigration detainer.

189.    The fingerprint background check reveals any outstanding judicial warrants. It may also trigger an immigration detainer request.

190.    A detainer asks a state or local law enforcement agency to hold an individual for up to 48 hours after there is no longer any basis to hold the person under state law—whether because the person posts bond, completes his sentence, or otherwise resolves his state charges.

191.    Continuing to detain a person after the authority for the criminal arrest expires constitutes a new arrest and requires arrest authority. *See e.g., Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (affirming the District Court's finding that detaining someone beyond their release date is an arrest under the Fourth Amendment).

192.    The detainer request is conveyed through a form that ICE fills out remotely and sends to the local law enforcement agency.

193.    A detainer request is not a judicial warrant.

194.    Detainers are a check-box form, with check boxes for a generic list of potential sources of information that do not form the basis for a particularized probable cause determination that the detainer subject is removable on a civil immigration violation.

*195.*    The detainer request form contains no determination that there is a reason to believe that the subject individual is "likely to escape before a warrant can be obtained," as is required for federal authorities to make a warrantless civil immigration arrest under federal law. 8 U.S.C. § 1357(a)(2); *Arizona*, 367 U.S. at 408; *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005-09 (N.D. Ill. 2016) (conceding that ICE never makes flight risk determinations when issuing detainers).

196.    ICE issues detainer requests based solely on database information. These databases are unreliable and can lead to the wrongful detention of individuals. *Roy v. Cty. of Los Angeles*, No. CV1209012ABFFMX, 2018 WL 914773, at *2 (C.D. Cal. Feb. 7, 2018), *reconsideration*

*denied*, No. CV1209012ABFFMX, 2018 WL 3439168 (C.D. Cal. July 11, 2018).For example, a recent National Public Radio study showed that, from 2007 to 2015, local law enforcement authorities improperly detained 693 U.S. citizens in local jails on federal immigration detainers.

197.    Miami-Dade County's internal database of immigration detainers lists 420 individuals jailed or to be jailed on immigration detainers as U.S. Citizens.[27]

198.    Local and state law enforcement is vulnerable to litigation challenging detentions of U.S. citizens pursuant to immigration detainers in violation of the Fourth Amendment, as demonstrated by pending lawsuits against Miami-Dade and Monroe Counties. *See Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018); *Brown v. Ramsay*, Case No. 4:18-cv-10279, S.D. Fla. (2018).

E.    Impossibility of Local Law Enforcement to Accurately Determine Immigration Status

199.    Under the INA, a noncitizen's immigration status may be fluid and subject to change over time. *See Plyler v. Doe*, 457 U.S. 202, 241 (1982). An inquiry into ICE's database yields, at best, a possibly outdated snapshot of an individual's immigration status which may not correspond to the ultimate finding of whether she is subject to removal.[28]

200.    A noncitizen who enters the United States with authorization, such as a visa, may overstay his visa and either lose his status or, if he is eligible to change into a different visa

---

[27] Jerry Iannelli, *ICE Issued False Deportation Requests for 420 U.S. Citizens, in Miami-Dade, ACLU Reports*, Miami New Times, Mar. 20, 2019, available at https://www.miaminewtimes.com/news/ice-issued-420-detainer-requests-to-deport-us-citizens-in-miami-aclu-says-11122765 (last visited July 14, 2019).

[28] *See* Department of Justice Office of the Inspector General, Follow-up Review of the Status of IDENT/IAFIS Integration at 41 (2004), *available at* http://www.justice.gov/oig/reports/plus/e0501/final.pdf (noting that, according to DHS officials, DHS's immigration "databases cannot be relied upon to accurately determine immigration status [at any given time] because immigration status is dynamic[,]" and database entries may be outdated).

classification, remain in status. Conversely, a noncitizen who enters the United States without authorization may file a successful asylum application and subsequently gain lawful status.

201.    Even when a noncitizen is in removal proceedings, there is no assurance the person will be removed because the federal government has prosecutorial discretion to decide how to prioritize and pursue each case based upon a wide range of equitable factors.

202.    This fluidity of immigration status is a fundamental feature of the Immigration and Nationality Act that accommodates important national interests, including the nation's humanitarian and international law obligations regarding asylum seekers and refugees fleeing torture.

## V.    SB 168'S REGULATION OF FEDERAL IMMIGRATION ENFORCEMENT

203.    SB 168 purports to authorize state and local law enforcement to exercise power delegable only by Congress via the Attorney General,[29] where no such delegation exists under the INA.

204.    As a state law, SB 168 cannot unilaterally confer authority to carry out the functions of federal immigration agents.

205.    SB 168 Section 908.105 requires that local and state law enforcement agencies make warrantless civil immigration arrests based on immigration detainers.

206.    SB 168 does not track the INA. It does not require that law enforcement officers qualify under any of the three exceptions in the INA that authorize local and state officers to make a civil immigration arrest. *Arizona*, 567 U.S. at 408-09, *supra* ¶¶180-186.

---

[29] Following the passage of the Homeland Security Act of 2002,  many of the refences to the "Attorney General" in the INA are now read to mean the DHS Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

207.     Nor does SB 168 track the INA's requirement of a "flight risk" determination before a warrantless arrest can be made lawfully under the INA. 8 U.S.C. § 1357(a)(2); *Arizona*, 367 U.S. at 408-09 (holding that state law enforcement cannot have broader immigration warrantless arrest authority than federal immigration officials); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005-09 (N.D. Ill. 2016) (conceding that ICE never makes a "likelihood to escape" determination before issuing a detainer).[30]

208.     SB 168 requires law enforcement to comply with immigration detainers based on civil immigration violations even when they possess evidence negating probable cause of removability.

209.     SB 168 leaves no room for state and local law enforcement to conduct an individualized assessment of probable cause, as required by the Fourth Amendment.

*210.*     SB 168 presumes that immigration status is definite, not subject to nuance, and readily and quickly ascertained. But those presumptions are not accurate.

*SB 168 Authorizes Agreements Other Than Under 287(g)*

211.     SB 168 does not require state or local law enforcement agencies to enter into 287(g) Agreements. Section 908.106 requires county correctional facilities to enter into "an agreement or agreements with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons." This provision can be satisfied by "… *any contract* between a correctional facility and a federal immigration agency." (emphasis added).

---

[30] Undeputized state and local law enforcement officers cannot make an arrest pursuant to the I-200 or I-205 administrative warrant that sometimes accompanies a detainer. *See Arizona,* 367 U.S. at 407-08 (only trained immigration officers are authorized to make arrests pursuant to administrative warrants).

212.     At the time of SB 168's passage, only a small number of Florida County Sheriff's Offices had 287(g) Agreements in place authorizing some, but not all of their officers to perform specific federal immigration duties, including the power to arrest and transport. With passage of SB 168, however, all local and state law enforcement entities are now required to perform specific federal immigration duties.

213.     Even in jurisdictions that currently have 287(g) Agreements in place, SB 168 will now require that all law enforcement officers - even those who have not received training and certification pursuant to a 287(g) Agreement and as required by 8 USC § 1357(g) – carry out immigration functions.

214.     287(g) Agreements, by definition, are voluntary service agreements and require delegated functions be carried out at the expense of the state or local agency. 8 USC § 1357(g)(1). Federal law expressly disallows what Section 908.106 purports to require, namely "Reimbursement of costs" ". . . for temporarily housing persons who are the subject of immigration detainers."

215.     As of January 2019, twenty-eight (28) Florida counties have entered into Basic Ordering Agreements ("BOA"), provide for some payment to local law enforcement.

216.     BOAs, however, do not delegate any powers of federal immigration agents to state and local officers.

*SB 168's Impact on Foreign Relations*

217.     Florida's attempt to regulate immigration through SB 168 adversely impacts the United States' ability to conduct foreign relations with other countries. SB 168 undermines the ability of the U.S. government to speak with a single voice about immigration, including communicating to foreign nations what their nationals can expect when they come to visit or reside

in the United States.  State attempts to interfere with these inherently federal issues can have severe impacts on foreign relations.

218.    SB 168 interferes with U.S. foreign relations by calling into question the federal government's ability to ensure compliance with our country's treaty obligations. In particular, the United States has signed and ratified two international treaties that prohibit racial profiling: the Convention on the Elimination of All Forms of Racial Discrimination ("ICERD"), art. 2(2), 660 U.N.T.S. 195, 218; and the International Covenant on Civil and Political Rights ("ICCPR"), art. 2(2), 999 U.N.T.S. 171, 173. Those treaties, ratified by the United States, require the U.S. government to combat racial profiling. By encouraging and authorizing racial profiling, and in light of formal statements of concern by foreign governments, SB 168 interferes with the United States' compliance with its treaty obligations and subjects the United States to international censure.

219.    In response to similar state anti-immigrant laws, such as Arizona SB 1070 and Georgia's HB 87, numerous foreign governments expressed concern that such laws will cause widespread violations of the United States' treaty obligations, which would harm their nationals living in or visiting the United States. *See*, *e.g*., Brief of the United Mexican States as Amicus Curiae in Support of Plaintiffs, *Friendly House et al. v. Whiting et al*. at 1, Case No. 10-01061, Doc. No. 299 (D. Ariz. filed July 8, 2010); Motion of the Governments of Argentina, Brazil, Chile, Colombia, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua and Peru for Leave to Join Brief of the United Mexican States as Amicus Curiae in Support of Plaintiffs at 3, *Georgia Latino Alliance for Human Rights, et al. v. Deal, et al*., Case No. 11-1804, Doc. No. 54 (N.D. Ga. filed June 15, 2011).

220.    These governments have also explained that state immigration laws, if implemented, would negatively impact foreign relations by undermining public opinion in their home countries and by making it impossible for their countries to engage on a sovereign-to-sovereign basis with the United States on important issues such as immigration and trade.

## VI.    SB 168'S VAGUE PROVISIONS

221.    Under SB 168, law enforcement agencies are required to "use best efforts to support the enforcement of federal immigration law." *See* § 908.104(1).

222.    State and local government entities cannot "prohibit[] or impede[] a law enforcement agency from complying with 8 U.S.C. § 1373." nor may they prohibit or impede a wide range of communication or cooperation with a federal immigration agency. *See* § 908.102(6).

223.    Prohibited "sanctuary policies" as defined in SB 168, include not only a "law" or "policy," but also a "practice," "procedure," or "custom" that are adopted or even simply "allowed" by state or local government entities. *See* §§ 908.102(6); 908.103.

224.    These provisions contain vague language that cannot be understood by people of "ordinary intelligence." *United States v. Williams*, 553 U.S. 285, 304 (2008).

225.    Due to the vague language "best efforts" and "impede" in Sections 908.104(1) and 908.102(6), it is unclear is whether local government officials may adopt policies to ensure that federal immigration enforcement does not undermine community cooperation with their own law enforcement officers. For example, a police chief might tell officers to not perform the functions of federal immigration agents at hurricane shelters, colleges, court houses, or homeless shelters, so as to ensure that they do not deter access to necessary and, at times, life-saving civic resources.

226.    Local government entities and law enforcement agencies struggle to interpret what these broad provisions require or prohibit. And given the severe penalties that SB 168 sets out,

local officials are likely to overcompensate, in violation of federal law and the Constitution. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826 (D. Ariz. 2013); *U.S. v. East Haven*, No. 12-1652 (D. Conn. filed Nov. 20, 2012); *U.S. v. Johnson, Terry S.*, No. 12-CV-01349 (M.D.N.C. filed Dec. 20, 2012).

## VII.   DECLARATORY AND INJUNCTIVE RELIEF

227.    An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs face an imminent threat of harm if SB 168 is enforced. They dispute Defendants' power to carry out the enforcement of federal immigration agents and contend that this law violates the U.S. Constitution and federal law.

228.    Defendants are obligated to enforce SB 168 unless it is found to be illegal, and their enforcement of SB 168 will constitute an official policy of the State of Florida.

229.    In violating Plaintiffs' rights under the U.S. Constitution and federal law, Defendants have acted and will be acting under color of state law.

230.    If allowed to go into effect, SB 168 will cause irreparable injury to Plaintiffs.

231.    Plaintiffs have no plain, speedy, and adequate remedy at law against SB 168 other than the relief requested in this Complaint.

232.    If SB 168 takes effect, the Plaintiffs' members and staff, and other individuals in Florida, will be subject to unlawful detention, arrest, and harassment on the basis of race, ethnicity, and national origin.

233.    If allowed to take effect, SB 168 would violate the Supremacy Clause because Florida law enforcement agencies and officials will be carrying out the functions of federal immigration authorities without authorization under the INA.

234.     If allowed to take effect, SB 168 would violate the right to equal protection of all organizational Plaintiffs, their staff, and members, as guaranteed by the Fourteenth Amendment.

235.     SB 168 will thwart the organizational Plaintiffs' missions by forcing them to divert their resources in order to respond to their members' and community partners' questions regarding the new law, and to assist members who are arrested as a result of the law's implementation. This undermines Plaintiffs' ability to advance pre-existing organizational priorities, programs, and services.

236.     SB 168 will further thwart the organizational Plaintiffs' missions by deterring their members from participating in membership activities.

237.     In taking the actions alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S. Constitution and federal law.

238.     Plaintiffs are entitled to a declaration that SB 168 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.


## VIII.   CAUSES OF ACTION

### COUNT I
**SB 168 Section 908.105 Violates the Supremacy Clause
of the U.S. Constitution
(42 U.S.C. § 1983)
Declaratory and Injunctive Relief**

239.     Plaintiff City of South Miami repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-31, 132-143, 173-220, 227-231, 233, and 237-238 as if fully set forth herein.

240.     Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-31, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

241.     Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 44-56, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

242.     Plaintiff FANM, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 57-69, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

243.     Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 110-122, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

244.     Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 70-77, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

245.     Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 78-89, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

246.     Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 90-96, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

247. Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 97-109, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

248. Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 16, 18-20, 123-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

249. Under the Supremacy Clause of the U.S. Constitution, the "Constitution, and the laws of the United States … shall be the supreme law of the land."

250. The federal government has exclusive power over immigration law and policy. Congress has created a comprehensive system of federal laws regulating immigration law enforcement. *See generally* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*; *Arizona v. United States*, 567 U.S. 387, 395 (2012).

251. The INA creates an exhaustive framework that dictates who can perform which immigration enforcement functions and under which circumstances. Through the INA, Congress has occupied the fields of when and by whom an individual can be arrested and detained for a civil immigration violation and how state and local law enforcement may be authorized to carry out the functions of immigration agents.

252. Congress has authorized only three narrow circumstances in which state and local law enforcement has authority to carry out the functions of federal immigration agents to make an arrest on the basis of civil immigration violations. *See Arizona*, 567 U.S. at 408-09.

253. SB 168 Section 908.105 unlawfully legislates in an area occupied by federal law and is preempted under the Supremacy Clause.

254.   Section 908.105 requires that state and local law enforcement officials comply with immigration detainers. Under this provision, state and local officers must arrest and detain individuals for a suspected civil immigration violation after the basis for their detention under state law has expired. This custody constitutes a new arrest.

255.   State and local officers, however, lack federal authority to arrest and detain a person for a civil immigration violation outside the narrow exceptions in the INA. Section 908.105 requires them to act, nonetheless.

256.   Even for agencies operating under a 287(g) Agreement, Section 908.105 requires individual officers who have not been trained or certified to comply with immigration detainers to do so.

257.   Section 908.105 is preempted for the additional reason that it conflicts with federal law's requirement that a person must be found likely to escape before a warrantless immigration arrest can occur.

258.   Congress has only authorized warrantless arrests (whether pursuant to a detainer or otherwise) in the limited circumstance when there has been an individualized determination that the individual is "likely to escape before a warrant can be obtained for [the] arrest." 8 U.S.C. § 1357(a)(2).

259.   Section 908.105's mandate that state and local law enforcement detain people upon request by the federal government leaves no room for law enforcement to make a flight assessment, and requires warrantless arrests and detention where no risk of escape exists.

260.   Section 908.105 does not limit the immigration detainer mandate in instances where other federal or constitutional protections, such as when evidence of U.S. Citizenship or legal permanent residency is presented, are triggered.

47

261.    Plaintiffs move for relief on this claim directly under the Constitution and also under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

**COUNT II**
**SB 168 Section 908.104(4) Violates the Supremacy Clause**
**of the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

262.    Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 32-43, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

263.    Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 44-56, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

264.    Plaintiff FANM, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 57-69, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

265.    Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 110-122, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

266.    Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 70-77, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

267.    Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 78-89, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

268.    Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 90-96, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

269.    Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 97-109, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

270.    Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 15, 18-20, 123-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

271.    Under the Supremacy Clause of the U.S. Constitution, the "Constitution, and the laws of the United States … shall be the supreme law of the land."

272.    The federal government has exclusive power over immigration law and policy. Congress has created a comprehensive system of federal laws regulating immigration law enforcement. *See generally*, Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*; *Arizona*.

273.    Congress has created an exhaustive framework that dictates who can perform which immigration enforcement functions and under which circumstances. Through the INA, they have occupied the fields of when and by whom an individual can be arrested and detained for a civil immigration violation and how state and local law enforcement may be authorized to carry out the functions of federal immigration agents.

49

274.    8 U.S.C. § 1357(g)(1) allows for the delegation of federal immigration agents' function to transport "aliens across state lines to detention centers" only through 287(g) Agreements.

275.    SB 168 Section 908.104(4) authorizes, by other means, correctional agents to transport people suspected of violating civil immigration law within and across state lines.

276.    State and local officers, including correctional agents, lack federal authority to take custody of and transport people across suspected civil immigration violations outside of 287(g) Agreements.

277.    Because Section 908.104(4) creates additional authority under which correctional agents may transport people for civil immigration purposes, it is unconstitutional under the Supremacy Clause.

278.    Plaintiffs move for relief on this claim directly under the Constitution and under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

**COUNT III**
**SB 168 Section 908.106 Violates the Supremacy Clause**
**of the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

279.    Plaintiff FLIC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 32-43, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

280.     Plaintiff FWAF, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 44-56, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

281.     Plaintiff FANM, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 57-69, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

282.     Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 110-122, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

283.     Plaintiff QLatinx, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 70-77, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

284.     Plaintiff WeCount, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 78-89, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

285.     Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 90-96 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

286.     Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 97-109, 132-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

287.    Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 17-20, 123-143, 173-220, 227-233, and 235-238 as if fully set forth herein.

288.    Under the Supremacy Clause of the U.S. Constitution, the "Constitution, and the laws of the United States … shall be the supreme law of the land."

289.    The federal government has exclusive power over immigration law policy. Congress has created a comprehensive system of federal laws regulating immigration law enforcement. *See generally* Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*; *Arizona*, 567 U.S. at 395 (2012).

290.    Section 908.106 mandates: "Each county correctional facility shall enter into an agreement … with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons." The title of the section is "Reimbursement of Costs."

291.    8 U.S.C. § 1103(a)(11) grants the federal government discretion to decide when to enter into detention contracts with localities.

292.    Federal law does not allow localities to be paid for such functions carried out under 287(g) Agreements. Although 31 U.S.C. § 1342 generally bans volunteer service to the federal government, 8 U.S.C. § 1357(g)(1) creates an exception for service under a 287(g) Agreement. See 8 U.S.C. § 1357(g)(1) (specifying that services rendered to the federal government are "at the expense of the State or political subdivision").

293.    Section 908.106 is preempted because it conflicts with 8 U.S.C. § 1103(a)(11) and 8 U.S.C. § 1357(g)(1).

294.     Plaintiffs move for relief on this claim directly under the Constitution and under 42

U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of

state law.


### COUNT IV
### SB 168 Sections 908.102(6) and 908.103 Violate the
### Due Process Clause of the 14th Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)
### Declaratory and Injunctive Relief

295.     Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and

incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 32-43,

132-143, 221-232, and 235-238 as if fully set forth herein.

296.     Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and

incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 44-56,

132-143, 221-232, and 235-238 as if fully set forth herein.

297.     Plaintiff FANM, on behalf of itself as an organization and its members, repeats and

incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 57-69,

132-143, 221-232, and 235-238 as if fully set forth herein.

298.     Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by

reference each allegation of the prior paragraphs numbered 1-13, 18-20, 110-122, 132-143, 221-

232, and 235-238 as if fully set forth herein.

299.     Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats

and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 70-

77, 132-143, 221-232, and 235-238 as if fully set forth herein.

300.   Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 78-89, 132-143, 221-232, and 235-238 as if fully set forth herein.

301.   Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 90-96, 132-143, 221-232, and 235-238 as if fully set forth herein.

302.   Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 97-109, 132-143, 221-232, and 235-238 as if fully set forth herein.

303.   Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 123-143, 221-232, and 235-238 as if fully set forth herein.

304.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

305.   Section 908.102(6) is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and its lack of standards authorizes, and encourages, arbitrary and discriminatory enforcement.

306.   Section 908.103 is unconstitutionally vague because the definition of "sanctuary policy" found in Section 908.102(6) is itself unconstitutionally vague due to its unclear language and undefined terms, including, but not limited to its use of the term "impede."

307.   Government entities and law enforcement agencies that are found to have violated SB 168 are subject to enforcement actions brought by the Attorney General. Executive or

administrative state, county, and municipal officers who are said to have violated this section are subject to enforcement actions brought by the Governor of Florida and are subject to suspension from office.  The due process clause does not allow these officers livelihoods to be subject to such indeterminate, internally incoherent, and amorphous, standards.

308.    Such vague language authorizes and encourages discriminatory enforcement of SB 168 by Defendants against law enforcement agencies and government entities.  It also authorizes and encourages discriminatory enforcement of federal immigration law by state and local law enforcement and against individuals, including members of the Plaintiff organizations.

309.    These vague mandates threaten individual Floridians and members of Plaintiff organizations, who have no way of determining what conduct is prohibited, nor what state and local law enforcement will choose to enforce under SB 168's purported authorization.

310.    Plaintiffs move for relief on this claim directly under the Constitution and under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.


**COUNT V**
**SB 168 Sections 908.102(6) and 908.103 Violate the**
**Due Process Clause of the 14th Amendment to the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

311.    Plaintiff City of South Miami repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-31, 132-143, 221-231, and 237-238 as if fully set forth herein.

312.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

313.     Section 908.102(6) is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and its lack of standards authorizes, and encourages, arbitrary and discriminatory enforcement.

314.     Section 908.102(6) is vague and violates due process because the term "impede" when applied to the actions, or lack of action, from a state or local government entity is undefined and fails to provide any meaningful standard of conduct. This vague language will result in arbitrary and discriminatory enforcement.

315.     Section 908.103 is unconstitutionally vague because the definition of "sanctuary policy" found in Section 908.102(6) is itself unconstitutionally vague, including, but not limited to its use of the term "impede."

316.     Due to these vague terms, the City of South Miami is unable to determine whether any of actions, resolutions, policies, or statements by its leadership place it in violation of SB 168.

317.     Government entities and law enforcement agencies that are found to have violated SB 168 are subject to enforcement actions brought by the Attorney General. Executive or administrative state, county, and municipal officers who are said to have violated this section are subject to enforcement actions brought by the Governor of Florida and are subject to suspension from office.  The due process clause does not allow these officers livelihoods to be subject to such indeterminate, internally incoherent, and amorphous, standards.

318.     Such vague language authorizes and encourages discriminatory enforcement of SB 168 by Defendants against law enforcement agencies and government entities such as the City of

South Miami. It also authorizes and encourages discriminatory enforcement of federal immigration law by state and local law enforcement and against individuals, including residents of the City of South Miami.

319.     SB 168's vague mandates also threaten individual Floridians and residents of the City of South Miami who have no way of determining what conduct is prohibited, nor what state and local law enforcement agencies will choose to enforce under SB 168's purported authorization.

320.     Even if City of South Miami attempts to comply with SB 168, City of South Miami's leadership, including the Mayor, Vice-Mayor, and Commissioners, may still be subjected to suspension and an enforcement lawsuit by the Governor of Florida and Attorney General, respectively, if the City of South Miami is deemed to be out of compliance based on unknown and unspecified standards.

321.     Plaintiffs move for relief on this claim directly under the Constitution and under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

**COUNT VI**
**SB 168 Section 908.104(1) Violates the Due Process Clause**
**of the 14th Amendment to the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

322.     Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 32-43, 132-143, 221-232, and 235-238 as if fully set forth herein.

323.     Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 44-56, 132-143, 221-232, and 235-238 as if fully set forth herein.

324.    Plaintiff FANM, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 57-69, 132-143, 221-232, and 235-238 as if fully set forth herein.

325.    Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 110-122, 132-143, 221-232, and 235-238 as if fully set forth herein.

326.    Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 70-77, 132-143, 221-232, and 235-238 as if fully set forth herein.

327.    Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 78-89, 132-143, 221-232, and 235-238 as if fully set forth herein.

328.    Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 90-96, 132-143, 221-232, and 235-238 as if fully set forth herein.

329.    Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 97-109, 132-143, 221-232, and 235-238 as if fully set forth herein.

330.    Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 123--143, 221-232, and 235-238 as if fully set forth herein.

331.    The Bill Title of SB 168 includes the following:

An act relating to federal immigration enforcement … requiring state entities, local governmental entities, and law enforcement agencies to use best efforts to support the enforcement of federal immigration law.

332.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

333.     Section 908.104(1) is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and its lack of standards authorizes, and encourages, arbitrary and discriminatory enforcement.

334.     Section 908.104(1) is vague and violates due process because the clause "best efforts to support the enforcement of federal immigration law" is unclear and fails to provide any meaningful standard of conduct.

335.     Such vague language authorizes and encourages discriminatory enforcement of SB 168 by Defendants against law enforcement agencies and government entities.  It also authorizes and encourages discriminatory enforcement of federal immigration law by state and local law enforcement and against individuals, including members of the Plaintiff organizations.

336.     Such vague language will inevitably result in arbitrary or discriminatory enforcement.

337.     Government entities and law enforcement agencies that are found to have violated these provisions are subject to enforcement actions brought by the Attorney General. Executive or administrative state, county, and municipal officers who are said to have violated these sections are subject to enforcement actions brought by the Governor of Florida and are subject to suspension from office. The due process clause does not allow these officers livelihoods to be subject to such indeterminate, internally incoherent, and amorphous, standards.

59

338.     These vague mandates threaten individual Floridians and members of Plaintiff organizations, who have no way of determining what conduct is prohibited, nor what state and local law enforcement will choose to enforce under SB 168's purported authorization.

339.     Plaintiffs move for relief on this claim directly under the Constitution and as an action seeking redress of the deprivation of statutory rights under the color of state law, also under 42 U.S.C. § 1983.

**COUNT VII**
**SB 168 Section 908.104(1) Violates the Due Process Clause**
**of the 14th Amendment to the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

340.     Plaintiff City of South Miami repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-31, 132-143, 221-231, and 237-238 as if fully set forth herein.

341.     The Bill Title of SB 168 includes the following:

An act relating to federal immigration enforcement … requiring state entities, local governmental entities, and law enforcement agencies to use best efforts to support the enforcement of federal immigration law.

342.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

343.     Section 908.104(1) is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and its lack of standards authorizes, and encourages, arbitrary and discriminatory enforcement.

344.     Section 908.104(1) is vague and violates due process because the clause "best efforts to support the enforcement of federal immigration law" is unclear and fails to provide any meaningful standard of conduct.

345.     Such vague language authorizes and encourages discriminatory enforcement of SB 168 by Defendants against law enforcement agencies and government entities.  It also authorizes and encourages discriminatory enforcement of federal immigration law by state and local law enforcement and against individuals, including members of the Plaintiff organizations.

346.     Such vague language will inevitably result in arbitrary or discriminatory enforcement.

347.     Government entities and law enforcement agencies that are found to have violated these provisions are subject to enforcement actions brought by the Attorney General. Executive or administrative state, county, and municipal officers who are said to have violated these sections are subject to enforcement actions brought by the Governor of Florida and are subject to suspension from office. The due process clause does not allow these officers livelihoods to be subject to such indeterminate, internally incoherent, and amorphous standards.

348.     SB 168's inconsistent references to local entities makes it difficult for local entities to determine whether certain portions of SB 168, including the "best efforts" requirement applies to them, thereby making it impossible for the City of South Miami to attempt to fully comply with SB 168.

349.     These vague mandates threaten individual Floridians and residents of the City of South Miami, who have no way of determining what conduct is prohibited, nor what state and local law enforcement will choose to enforce under SB 168's purported authorization.

350.     These vague SB 168 mandates place the City of South Miami's leadership at risk of lawsuits by its residents and visitors for civil rights violations if City of South Miami attempts to interpret SB 168's without the necessary statutory guidance and use its "best efforts" to support the enforcement of federal immigration law. This also undermines the City of South Miami's ability to control its own budget and provide its residents with necessary services.

351.     Even if City of South Miami attempts to comply with SB 168, City of South Miami's leadership, including the Mayor, Vice-Mayor, and Commissioners, may still be subjected to suspension and an enforcement lawsuit by the Governor of Florida and Attorney General, respectively, if the City of South Miami is deemed to be out of compliance based on unknown and unspecified standards.

352.     Plaintiffs move for relief on this claim directly under the Constitution and as an action seeking redress of the deprivation of statutory rights under the color of state law, also under 42 U.S.C. § 1983.

**COUNT VIII**
**SB 168 Section 908.104(1) Violates Equal Protection of**
**the 14th Amendment to the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

353.     Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 32-43, 132-172, 227-232, and 234-238 as if fully set forth herein.

354.     Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 44-56, 132-172, 227-232, and 234-238 as if fully set forth herein.

355.    Plaintiff FANM, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 57-69, 132-172, 227-232, and 234-238 as if fully set forth herein.

356.    Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 110-122, 132-172, 227-232, and 234-238 as if fully set forth herein.

357.    Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 70-77, 132-72, 227-232, and 234-238 as if fully set forth herein.

358.    Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 78-89,  132-172, 227-232, and 234-238 as if fully set forth herein.

359.    Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 90-96, 132-172, 227-232, and 234-238 as if fully set forth herein.

360.    Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 97-109, 132-172, 227-232, and 234-238 as if fully set forth herein.

361.    Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-11, 14, 18-20, 123-131, 132-172, 227-232, and 234-238 as if fully set forth herein.

362.    SB 168 requires law enforcement agencies to use their "best efforts to support the enforcement of federal immigration law." Fla. Stat. § 908.104(1).

63

363.    The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

364.    SB 168 was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors, on the basis of race, color, and national origin.

365.    The term "best efforts" is not defined by SB 168 and does not provide any guidance or limitations on how much discretion law enforcement officers can use to support the enforcement of federal immigration law during the course of daily duties operations.

366.    Without any parameters on the extent to which law enforcement officers may use their "best efforts" to support the enforcement of federal immigration law, SB 168 authorizes impermissible discrimination by Florida state, local, and municipal officers and officials on the basis of race, color, and national origin.

367.    SB 168 impermissibly allows discrimination against U.S. citizens and noncitizens alike on the basis of race, color, and national origin and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution. Such discrimination deters racial and national origin minorities from accessing public services, healthcare, public education, and services for crime, domestic violence, and trafficking victims.

368.    SB 168 subjects Plaintiffs and their members who on the basis of race, color, and national origin to discrimination by law enforcement officials in violation of the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.

369.    Plaintiffs move for relief on this claim directly under the Constitution and under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

## COUNT IX
## SB 168 Section 908.103 Violates Equal Protection of
## the 14th Amendment to the U.S. Constitution
## (42 U.S.C. § 1983)
## Declaratory and Injunctive Relief

370.    Plaintiff FLIC, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 32-43, 132-172, 227-232, and 234-238 as if fully set forth herein.

371.    Plaintiff FWAF, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 44-56, 132-172, 227-232, and 234-238 as if fully set forth herein.

372.    Plaintiff FANM, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 11-13, 18-20, 57-69, 132-172, 227-232, and 234-238 as if fully set forth herein.

373.    Plaintiff GMC, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 110-122, 132-172, 227-232, and 234-238 as if fully set forth herein.

374.    Plaintiff QLatinx, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 70-77, 132-172, 227-232, and 234-238 as if fully set forth herein.

375.    Plaintiff WeCount, on behalf of itself as an organization and its members, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 78-89, 132-172, 227-232, and 234-238as if fully set forth herein.

376. Plaintiff Westminster, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 90-96, 132-172, 227-232, and 234-238 as if fully set forth herein.

377. Plaintiff AI Justice, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 11-13, 18-20, 97-109, 132-172, 227-232, and 234-238 as if fully set forth herein.

378. Plaintiff Hope Community Center, on behalf of itself as an organization, repeats and incorporates by reference each allegation of the prior paragraphs numbered 1-13, 18-20, 123-172, 227-232, and 234-238 as if fully set forth herein.

379. The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

380. SB 168 was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors, on the basis of race, color, and national origin.

381. SB 168 authorizes impermissible discrimination by Florida state, local, and municipal officers and officials on the basis of race, color, and national origin.

382. SB 168 impermissibly allows discrimination against U.S. citizens and noncitizens alike on the basis of race color, and national origin and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

383. SB 168's bar on sanctuary policies seeks to deter racial and national origin minorities from accessing public services, healthcare, and public education. Moreover, SB 168 will deter victims of domestic violence, sexual assault, and human trafficking from racial and national origin minority groups from accessing services for crime, thus undermining public safety.

66

384.     Therefore, SB 168 impermissibly deprives Plaintiffs and their members who are racial and national origin minorities of equal protection pursuant to the Fourteenth Amendment to the U.S. Constitution.

385.     Plaintiffs move for relief on this claim directly under the Constitution and 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

## IX.     PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

a.     Assume jurisdiction over this matter;

b.     Declare that sections 908.102(6), 908.103, 908.104(1), 908.104(4), 908.105(1), and 908.106 are unconstitutional;

c.     Declare that SB 168 is unconstitutional in its entirety;

d.     Preliminarily and permanently enjoin Defendants sections 908.102(6), 908.103, 908.104(1), 908.104(4), 908.105(1), and 908.106;

e.     Preliminarily and permanently enjoin Defendants from enforcing SB 168 in its entirety;

f.     Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

g.     Grant any other relief as the Court may deem just and proper.


Dated: July 16, 2019                               Respectfully submitted,

                                                   /s/ Anne Janet Hernandez Anderson
                                                   *On behalf of Attorneys for Plaintiffs*

Anne Janet Hernandez Anderson (Fla. Bar No. 0018092)
E-mail: aj.hernandez@splcenter.org
Paul R. Chavez*
E-mail: paul.chavez@splcenter.org
Mich Gonzalez*
E-mail: mich.gonzalez@splcenter.org
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037
Miami, FL 33137-0037
Telephone: (786) 810-5673
Fax: (786) 237-2949

Rebecca Sharpless (Fla. Bar No. 0131024)
E-mail: rsharpless@law.miami.edu
IMMIGRATION CLINIC
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive, E273
Coral Gables, FL 33146
Tel.: (305) 284-6092
Fax: (305) 284-6093

Alana Greer (Fla. Bar No. 92423)
Email: alana@communityjusticeproject.com
Oscar Londoño (Fla. Bar No. 1003044)
E-mail: oscar@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33137
Tel.: (305) 907-7697 ext. 1

*Attorneys for Plaintiffs*

\* Application for admission *pro hac vice* forthcoming