**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**CITY OF SOUTH MIAMI**, *et al.*

      *Plaintiffs*,

vs.                              CASE NO. 1:19-cv-22927-BB

**RON DESANTIS, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
STATE OF FLORIDA**, *et al.*

      *Defendants*.

_____/

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Effective law enforcement requires cooperation. Although the federal government and the States divide law-enforcement responsibility, both benefit when officials collaborate. For that reason, Florida law enforcement agencies routinely work alongside, among others, the U.S. Department of Homeland Security ("DHS") to address public-safety issues. By enacting Senate Bill 168 ("SB 168"), the Florida Legislature enshrined the State's policy of cooperating with DHS and withdrew from local governments the authority to deviate from this policy. Plaintiffs' position—that assisting the federal government violates the Constitution—is meritless, they lack standing to pursue a number of their claims, and they have not shown that equity favors a preliminary injunction. The Court should deny their request for a preliminary injunction.

**BACKGROUND**

**I.    FEDERAL & STATE IMMIGRATION ENFORCEMENT.**

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, codifies the federal government's immigration system and grants enforcement authority to DHS. A DHS component—Immigrations and Customs Enforcement ("ICE")—has authority to enforce

immigration laws in the interior of the United States (i.e., other than at borders and ports of entry). Among other things, ICE is tasked with removing unlawfully present persons. To effectuate this responsibility, the INA gives ICE authority to issue administrative arrest warrants, 8 U.S.C. § 1226(a); to arrest and detain aliens, *id.*; and to remove them, *id.* § 1231(a).[1]

"Consultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012). The INA expressly contemplates this collaboration by authorizing cooperation agreements between DHS and state and local governments ("287(g) Agreements"). 8 U.S.C. § 1357(g);[2] Ex. B-1, at 5–6;[3] Ex. A, at 4–6. And even in the absence of a 287(g) Agreement, the INA makes clear that "[n]othing in this subsection shall be construed to require an agreement . . . for any officer or employee of a State or political subdivision . . . to cooperate . . . in the identification, apprehension, detention, or removal of aliens." 8 U.S.C. § 1357(g)(10). State and local governments cooperate with DHS in a variety of ways, such as participating in joint task forces and responding to requests for information or cooperation. *See, e.g.*, 8 U.S.C. § 1373 (ensuring that state and local officials may exchange "information regarding the citizenship or immigration status . . . of any individual"); Ex. A, at 8 (discussing cooperation).

---

[1] Prior to the creation of DHS, immigration enforcement was conducted by the Immigration and Nationality Service ("INS"), which was part of the Department of Justice. In 2003, the INS was abolished and many of its functions were transferred to DHS. *See La. Forestry Ass'n, Inc. v. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014). Thus, in many cases, INA references to the "Attorney General" are understood to refer to the Secretary of DHS.

[2] Agreements under 8 U.S.C. § 1357(g) are so named because this provision is found in § 287 of the INA. These agreements allow an "officer or employee" of a State or political subdivision to perform certain functions of a federal "immigration officer" after receiving training from the federal government. 8 U.S.C. § 1357(g)(1)–(2).

[3] Exhibits include documents with separate page numbers. Defendants have separately paginated the exhibits in the bottom right portion of each page. Citations are to those page numbers.

One common way ICE requests cooperation is through an ICE detainer. *See* Ex. B-3, at 17–19; Ex. A, at 4–6. When a state or local detention facility books a person into criminal detention, the person's fingerprints are, in many instances, automatically shared with ICE. Ex. B-2, at 14; Ex. A, at 4. If ICE has probable cause to believe the persons is removable, it sends a detainer to the state or local law enforcement agency with custody of the person. *See* 8 C.F.R. § 287.7; Ex. A, at 4–5. If ICE does not have probable cause that the person is removable, but receives a "no match" in its database, it often sends an immigration official to the facility to interview the inmate. *See* 8 U.S.C. § 1357(a)(1); Ex. B-2, at 14; Ex. A, at 5. The detainer asks the state or local agency to (1) provide ICE with advance notice before releasing the person so that ICE can be present upon release to take him into custody; and (2) if sufficient advance notice is not practicable, hold the person up to an additional 48 hours. Ex. B-3, at 17. The goal of the ICE detainer process is to avoid at-large arrests, which present greater risks to law enforcement and the public. Ex. A, at 6, 8. As of April 2, 2017, all detainers now include an administrative warrant. *See* Ex. B-4, at 22.

Administrative warrants take one of two forms. If ICE has probable cause that an alien is removable and wishes to place him in removal proceedings, it issues a Form I-200 warrant. *See* 8 U.S.C. § 1226; Ex. B-5, at 28; Ex. A at 5. If ICE already has a final order of removal from an immigration court, it issues a Form I-205 warrant. *See* 8 U.S.C. § 1231; Ex. B-6, at 30–31; Ex. A, at 5. Either warrant must be issued by a designated federal immigration officer and must set forth the basis for that officer's probable-cause determination. *See* 8 C.F.R. §§ 236.1, 241.2, 287.5; Ex. B-4, at 22. These warrants provide state and local officials with federal authorization to detain an alien on probable cause that he is removable, allowing these officials to honor the requests for brief detention contained in ICE detainers.

**II.**   **THE FLORIDA LEGISLATURE ENACTS SENATE BILL 168.**

Despite the partnership contemplated by the INA, some jurisdictions have adopted "sanctuary policies." These policies, which often differ at the margins, generally contemplate that the jurisdiction will not cooperate with ICE. *See* Ex. B-7, at 35–37. In response, the Florida Legislature enacted and (on June 14, 2019) Governor DeSantis signed into law SB 168, which declares that "it is an important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within th[e] state." § 908.101, Fla. Stat. To animate this interest, SB 168 requires State and local law enforcement agencies, as well as their "official[s], representative[s], agent[s], and employee[s]," to "use best efforts to support the enforcement of federal immigration law" while "acting within the scope [of] official duties or . . . employment." § 908.104, Fla. Stat. SB 168 also expressly requires compliance with ICE detainers. § 908.105, Fla. Stat.

To ensure this cooperation, SB 168 prohibits, as a matter of State preemption, local jurisdictions from adopting "sanctuary polic[ies]." It defines "sanctuary polic[ies]" as those that "prohibit[] or impede[] a law enforcement agency from complying with" the information sharing requirements of 8 U.S.C. § 1373, or that "prohibit[] or impede[] a law enforcement agency" from: (1) complying with either of the two requests in an ICE detainer; (2) allowing ICE officials to interview inmates in Florida state or local custody; or (3) participating in 287(g) Agreements. §§ 908.103; 908.102(6), Fla. Stat. Any political subdivision with sanctuary policies must repeal them by September 29, 2019.

While SB 168 requires local governments to comply with ICE administrative warrants, it includes an additional mechanism—in addition to advance notice of release—to avoid extending a person's detention. Specifically, a Florida judge may reduce an individual's domestic sentence up to 12 days to facilitate a transfer of custody to ICE. *See* § 908.104(3)(a)–(c), Fla. Stat. SB 168

also authorizes "county correctional facilit[ies] and the "Department of Corrections" to "transport the person to a federal facility in [the] state," § 908.104(4), Fla. Stat., and, if necessary, to a federal facility outside the state, so long as the law enforcement agency has "judicial authorization." *Id.*

SB 168 divides enforcement authority between the Attorney General and the Governor. If a government official violates SB 168, the Governor can sue for an injunction or exercise his constitutional suspension power. § 908.107(1), Fla. Stat. And if a local government entity or law enforcement agency violates SB 168, the Attorney General can sue for an injunction. § 908.107(2)–(3), Fla. Stat. The enforcement provisions do not take effect until October 1, 2019.

Finally, SB 168 requires county correctional facilities to pursue a contract with ICE for reimbursement of costs associated with honoring detainers. § 908.106, Fla. Stat. It also establishes that state and local law enforcement agencies need not turn over the identities of crime victims or witnesses, § 908.104(5)–(8), Fla. Stat., that SB 168 does not apply to education records, § 908.108, Fla. Stat., and that it does not authorize unlawful discrimination, § 908.109, Fla. Stat.

### III.   PLAINTIFFS' CHALLENGE TO SENATE BILL 168.

On July 16, 2019, the City of South Miami (the "City") and nine public interest organizations (the "Organizational Plaintiffs"), filed this lawsuit. DE 1. That same day, they moved for a preliminary injunction, DE 5, in which they advance five federal constitutional challenges:

**1.** The City and the Organizational Plaintiffs both argue that Section 908.105(1), which requires providing the federal government with assistance when the federal government requests that assistance via a detainer, is preempted by federal law. DE 5-1, at 6–7; DE 1, at 44–48.

**2.** The City and the Organizational Plaintiffs both argue that Section 908.104(1), which requires law enforcement agencies to use "best efforts to support the enforcement of federal immigration law," is unconstitutionally vague, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. DE 5-1, at 10–14; DE 1, at 57–62.

**3.** The City and the Organizational Plaintiffs both argue that Section 908.103, which prohibits "sanctuary polic[ies]," and Section 908.102(6), which defines "sanctuary polic[ies]," are unconstitutionally vague. DE 5-1, at 14–15; DE 1, at 53–55.

**4.** The Organizational Plaintiffs (but not the City) argue that Section 908.104(4), which states that Florida law enforcement agencies "may" transport individuals subject to a detainer to a federal facility—rather than requiring federal officials to pick the individual up at a state facility in all instances—is preempted by federal law. DE 5-1, at 8–9; DE 1, at 48–49.

**5.** The Organizational Plaintiffs (but not the City) argue that Section 908.106, which states that "[e]ach county correctional facility shall enter into an agreement" with a federal immigration agency for "temporarily housing persons who are" subject to detainers and for "payment of the costs of housing" for those persons, is preempted by federal law. DE 5-1, at 9; DE 1, at 50–51.

## LEGAL STANDARDS

A district court may issue a preliminary injunction only if Plaintiffs show "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be [adverse] to the public interest." *Gissendaner v. Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quotations omitted). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quotations omitted).

## ARGUMENT

### I. THE COURT LACKS SUBJECT MATTER JURISDICTION TO DECIDE FOUR OF PLAINTIFFS' FIVE CLAIMS.

The Court should decline to reach the merits of any challenge except for the Plaintiffs' claim that Section 908.105(1) is preempted. Neither the City nor the Organizational Plaintiffs has standing to advance the other claims.

To establish standing, the Plaintiffs must show (1) injury-in-fact, meaning a concrete and particularized invasion of a legally protected interest; (2) a causal connection between that injury and the complained-of conduct; and (3) redressability, meaning a favorable decision will eliminate the injury. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court has also made clear that where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," a stronger showing is needed, making standing "substantially more difficult" to establish. *Id.* at 562 (emphasis in original) (citations and quotations omitted).

#### A. The Organizational Plaintiffs lack standing to bring any claim other than their preemption challenge to Section 908.105(1).[4]

Under Section 908.104(4), Florida law enforcement agencies "may" transport individuals subject to a detainer to a federal facility. And under Section 908.106, "[e]ach county correctional facility shall enter into an agreement" with a federal immigration agency for "temporarily housing persons who are" subject to detainers and for "payment of the costs of housing" for those persons. The Organizational Plaintiffs argue that these provisions are preempted by federal law.

---

[4] In light of the Eleventh Circuit's decision in *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012), Defendants do not contend that the Organizational Plaintiffs lack standing to bring their preemption challenge to Section 908.105(1). Defendants do, however, preserve for further review the argument that the holding in *Georgia Latino Alliance* should be revisited.

The problem, however, is that neither provision imposes any requirement on the Organizational Plaintiffs themselves or on any of their members. Nor do the Organizational Plaintiffs explain how these provisions harm (or could harm) either themselves or their members. They only allege that Sections 908.104(4) and 908.106 inflict an injury on the federal government. But the Supreme Court has routinely rejected standing arguments based on "genera[l] . . . grievance[s]" like these. *Lujan*, 504 U.S. at 573.

Similarly, the Organizational Plaintiffs lack standing to assert their vagueness challenges. The purpose of the vagueness doctrine is to ensure adequate "notice of the required conduct to one who would *avoid . . . penalties*." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952) (emphasis added).[5] As an initial matter, the purportedly deficient provisions they attack (Section 908.104(1)'s use of the phrase "best efforts" and Sections 908.103 and 908.102(6)'s ban on "sanctuary polic[ies]") prohibit no conduct by and impose no requirements on any private individual or entity. Instead, they regulate only state and local government entities and officials. For this reason, these provisions do not, and cannot, inflict any legally cognizable injury on them.

Moreover, the crux of the Organizational Plaintiffs' alleged injury-in-fact—that persons who lack lawful immigration status may be subject to greater federal immigration enforcement— is not, at its core, fairly traceable to SB 168. *See Lujan*, 504 U.S. at 560. That purported injury, instead, is caused by the INA, and the Organizational Plaintiffs have advanced no argument that federal immigration law is unconstitutionally vague. In any event, greater susceptibility to an unchallenged, duly-enacted federal law cannot, standing alone, give rise to the constitutionally

---

[5] *See also Parker v. Levy*, 417 U.S. 733, 756 (1974) (finding that a plaintiff cannot "challenge the vagueness of [laws] as they might be hypothetically applied to the conduct of others"); *Bailey v. Carter*, 15 F. App'x 245, 252 (6th Cir. 2001) (recognizing that a challenged law "does not prohibit any conduct, and [so] vagueness principles provide no basis for challenging it").

mandated injury-in-fact for purposes of Article III standing. *See Wash. v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 468 n.5 (1979) (rejecting a vagueness challenge because the challenged law "create[d] no new criminal offenses but merely extend[ed] jurisdiction over certain classes of offenses defined elsewhere" (citation omitted)).

Put differently, the objections that the Organizational Plaintiffs have to Sections 908.104(4), 908.103, and Section 908.102(6) are not fairly traceable to a Fourteenth Amendment vagueness theory. These provisions only affect the Organizational Plaintiffs insofar as they alter the enforcement discretion of state and local government entities and officials—namely, SB 168 withdraws from these officials the ability to decline to assist the federal government. But so long as the "conduct prohibited" is not vague, "the fact that there may be 'uncertainty' about" how enforcement discretion will be exercised does not give rise to a legally cognizable injury. *Kincaid v. District of Columbia*, 854 F.3d 721, 730 (D.C. Cir. 2017) (Kavanaugh, J.) (quoting *Beckles v. United States*, 137 S. Ct. 886, 893 (2017)).

### B.     The City lacks standing to bring its vagueness challenges.

The City also argues that these provisions of SB 168 are unconstitutionally vague. The vagueness doctrine derives from the Fourteen Amendment's Due Process Clause, *see Lanzetta v. New Jersey*, 306 U.S. 451, 458 (1939), which applies only to "persons." U.S. Const. amend. XIV. The Supreme Court has, therefore, made clear that political subdivisions like the City have no legally cognizable due process rights under the Fourteenth Amendment. *See City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923) ("[T]he "Fourteenth Amendment" does not affect "[t]he power of the state" over political subdivisions. (citation omitted)). And because a plaintiff has standing only when "the constitutional or statutory provision on which [a] claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief," *Warth v. Seldin*, 422 U.S. 490, 500 (1975), the City has "no standing to invoke . . . provisions of the

Fourteenth Amendment.'" *United States v. Alabama*, 791 F.2d 1450, 1455 (11th Cir. 1986) (quoting *Coleman v. Miller*, 307 U.S. 433, 441 (1939)).

Because (1) no Plaintiff has standing to bring a vagueness challenge; and (2) the Organizational Plaintiffs lack standing to bring their preemption challenges to Sections 908.104(4) and Section 908.106 (and the City does not join these challenges), the Court should limit its inquiry to the Plaintiffs' challenge to Section 908.105(1) and deny the Plaintiffs' request for a preliminary injunction in all other respects due to lack of subject matter jurisdiction.

**II.     THE PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF ANY OF THEIR CLAIMS.**

Even if the Court has jurisdiction, none of Plaintiffs' claims are likely to succeed on the merits. Plaintiffs assert facial challenges only. DE 1, at 67. Accordingly, they must show that "no set of circumstances exists under which [SB 168] would be valid." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001) (quotations omitted). This "heavy burden" is "the most difficult challenge to mount successfully." *Id.* (quotations omitted). They have failed to do so.

**A.     Congress has not preempted the field of immigration cooperation, so no part of SB 168 is barred by field preemption.**

Field preemption bars all state law in a field if Congress has so pervasively regulated it that there remains "no room for the States to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotations omitted). Courts begin with the "presumption that Congress does not intend to supplant state law." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) (citations omitted). Plaintiffs have not overcome that presumption.

The Plaintiffs argue that, by enacting the INA, Congress intended to preclude all state law regulating "when and by whom an individual can be arrested and detained for a civil immigration violation," and "how state and local law enforcement may be authorized to carry out the functions of federal immigration agents." DE 5-1, at 2. But while "[e]very Act of Congress occupies some

field," the Court must ascertain "the boundaries of that field before [it] can say that [Congress] has precluded a state from the exercise of any power reserved to it by the Constitution." *City of El Cenizo v. Texas*, 890 F.3d 164, 177–78 (5th Cir. 2018) (quoting *De Canas v. Bica*, 424 U.S. 351, 360 n.8 (1976)). Congress did no such thing.

Plaintiffs rely, in significant part, on 8 U.S.C. § 1357 for their field preemption arguments. DE 5-1, at 4. Plaintiffs' position is that, other than a few narrow exceptions in the INA, the detention of aliens pursuant to an ICE detainer requires a 287(g) Agreement. DE 5-1, at 4. But Section 1357 says the opposite: "Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision" to "cooperate . . . in the identification, apprehension, detention, or removal of aliens." 8 U.S.C. § 1357(g)(10). In other words, although Congress "did not" make cooperation between federal and state law enforcement "mandatory," it expressly disavowed any suggestion that the INA *prohibits* cooperation between federal and state law enforcement. *City of El Cenizo*, 890 F.3d. at 180–81. It cannot be said, therefore, that "the clear and manifest purpose of Congress" in passing the INA was to secure a "complete ouster of state power'" in a way that would make federal immigration regulation *more* difficult. *Id.* at 176 (quoting *De Canas*, 424 U.S. at 357).

*Arizona v. United States* is consistent with this position. In that case, the Supreme Court held that states could not unilaterally *enforce* federal immigration laws *absent* a request from the federal government. SB 168, by contrast, simply requires localities to *cooperate* with the federal government when the federal government *requests* help. The Supreme Court not only recognized this distinction but also made clear that "State officials can . . . assist the Federal Government by responding to requests for information about when an alien will be released from their custody." *Arizona*, 567 U.S. at 410; *accord City of El Cenizo*, 890 F.3d at 179 (upholding a Texas statute

11

against a similar challenge because, "[u]nlike the statute in *Arizona* . . . [the challenged provision] does not authorize unilateral enforcement").[6]

### B. Conflict preemption does not bar any portion of SB 168.

Plaintiffs argue that three separate provisions of SB 168 are conflicted preempted. Because these provisions do not stand as "obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399 (quotations omitted), Plaintiffs are mistaken.

**A.** Section 908.105(1) requires state and local law enforcement agencies to honor ICE detainers, which ask state and local law enforcement to notify ICE of an individual's release date and, in some cases, to hold them for an additional 48 hours. According to Plaintiffs, the INA only authorizes state and local law enforcement agencies to honor detainers if they enter a 287(g) Agreement. DE 5-1, at 6–7. That is incorrect. "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Indeed, as discussed above, Congress included an express savings clause disavowing this position. *See* 8 U.S.C. § 1357(g)(10) (explaining that no agreement is required for local governments to cooperate in the detention of aliens). In other words, the plain terms of the INA make clear that Congress sought to *facilitate*, not preempt, the system established by SB 168. *City of El Cenizo*, 890 F.3d at 179 (rejecting this argument for this reason); 8 C.F.R. § 287.7(a) (explaining that ICE can issue detainers "to any . . . Federal, State, or local law enforcement agency").

**B.** Under Section 908.104(4), Florida law enforcement agencies "may" transport removable aliens to a federal facility. The Organizational Plaintiffs contend that this provision

---

[6]    *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012), is consistent with this position for the same reasons. *See id.* at 1263–67.

conflicts with federal law because it "interferes with federal control of the transport of immigration arrestees and the use of immigration detention space." DE 5-1, at 8. In their view, Section 908.104(4) will force state and local law enforcement agencies to transport removable aliens to federal facilities that do not wish to take custody of these individuals.

At no point do the Organizational Plaintiffs offer any evidence to support their speculative argument that state and local officials will rely on Section 908.104(4) to frustrate, rather than assist, the federal government's immigration enforcement efforts. Indeed, the Clay County Sheriff's Office's 287(g) Agreement assumes that Clay County will "transport incarcerated aliens . . . to a facility or location" only to the extent that the facility or location is "*designated by ICE*." Ex. B-8, at 51 (emphasis added). In any event, presuming cooperation, rather than obstruction, is consistent with the "broader context of [SB 168] as a whole." *Bautista v. Star Cruises*, 396 F.3d 1289, 1295 (11th Cir. 2005) (quotations omitted). The legislative purpose of SB 168 is to "cooperate and assist the federal government" in enforcing immigration law, § 908.101, Fla. Stat, and the framework of SB 168 is oriented around supporting those efforts. Simply put, Section 908.104(4) can "be read to avoid the[] concerns" suggested by Plaintiffs, and the Court should not "assume [it] will be construed in a way that creates a conflict with federal law." *Arizona*, 567 U.S. at 413–15 (citations omitted). For these reasons, it is not conflict preempted.

**C.** Section 908.106 states that "county correctional facilit[ies] shall enter into an agreement" with a federal immigration agency for "temporarily housing persons who are" subject to detainers and for "payment of the costs of housing." Plaintiffs advance two objections to this provision. First, they argue that this provision "mandates that the *federal government* enter into contracts with every Florida law enforcement agency." DE 5-1, at 9 (emphasis added). Second, they argue that 8 U.S.C. § 1357(g)(1), which allows state and local government entities to carry

out Section 287(g) Agreements "at the expense of the State or political subdivision," preempts Section 908.106's mandate. DE 5-1, at 9 (quoting 8 U.S.C. § 1357(g)(1)). Both arguments fail.

Plaintiffs' first argument contradicts Section 908.106's plain terms, which bind county governments, not the federal government. The federal government has long enjoyed the prerogative to contract with state and local governments to defray shared immigration-enforcement costs; indeed, the record in this case shows that sheriffs across the State have entered into cost-sharing agreements with the federal government. *See, e.g.*, Ex. B-8, at 51 (describing Clay County's reimbursement agreement); Ex. B-1, at 7–8 (listing numerous Florida government entities with similar agreements); Ex. A, at 7 (describing ICE's reimbursement policy); DE 5-11, at 6 (admitting that Lake County receives $50 a day for holding removable aliens up to 48 hours). At a minimum, Section 908.106 "could be read to avoid these concerns." *See Arizona*, 567 U.S. at 413. Because the Florida Legislature has no power to bind the federal government by passing a State law, the most natural reading of the statute is that a county government "shall" attempt to "enter into an agreement" with the federal government, while the federal government retains the ultimate right to decline the invitation. Take, for example, 5 U.S.C. § 5517(a)(2), which states that the Secretary of the Treasury "shall enter into an agreement" with States related to the withholding of taxes. This provision has been interpreted as a grant of authority to the Treasury Department, not as one issuing a command to (and therefore commandeering) the States. *See Romero v. United States*, 38 F.3d 1204, 1209–10 (Fed. Cir. 1994).[7] Such an interpretation of Section 908.106 raises no preemption concerns.

---

[7]     *See also Simmons v. State*, 160 Fla. 626, 629–30 (Fla. 1948) (interpreting "shall" to avoid an unconstitutional result).

14

Plaintiffs' second argument—that Section 1357(g)(1) forbids reimbursement for detention pursuant to a detainer—fares no better. This provision authorizes state and local officers, "notwithstanding [31 U.S.C. § 1342]," to perform "immigration officer . . . function[s]" and provides that jurisdictions "*may* carry out [these functions] at the expense of the State or political subdivision." 8 U.S.C. § 1357(g)(1) (emphasis added). This provision carves out 287(g) Agreements from 31 U.S.C. § 1342, which prohibits the "United States Government" from "accept[ing]" certain "voluntary services." In other words, Section 1357(g)(1) *authorizes* state and local governments to provide these services at their own expense, it does not, by its plain terms, prevent the federal government from reimbursing local governments. For example, a separate provision, 8 U.S.C. § 1103(a)(11), authorizes DHS to "make payments from funds appropriated for the administration and enforcement of the laws relating to immigration" for "the housing, care, and security of persons detained" by DHS in "non-Federal institutions." 8 U.S.C. § 1103(a)(11). The federal government's practices confirm this understanding. Ex. B-8, at 51 (explaining that Clay County may enter an agreement with ICE whereby ICE "reimburs[es]" Clay County for "det[ention] . . . following completion of the alien's criminal incarceration"); Ex. A, at 7 (describing ICE's reimbursement policy).

### C.      SB 168 is not unconstitutionally vague.

Plaintiffs argue that two provisions of SB 168 are unconstitutionally vague: (1) SB 168's requirement that state entities may not prohibit or "impede[]" law enforcement agencies from cooperating with the federal government in certain enumerated ways, §§ 908.103, 908.102(6), Fla. Stat.; and (2) SB 168's requirement that law enforcement use "best efforts" to cooperate with federal officials, § 908.104(1), Fla. Stat. These challenges, however, are meritless.

A civil statute is only unconstitutionally vague if it is "so indefinite as 'really to be no rule or standard at all.'" *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th

15

Cir. 2009) (quotations omitted). In making this determination, "the particular context is all important." *American Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950). And because Plaintiffs bring only a facial challenge, they cannot succeed if "circumstances exist under which [the statute] clearly would *not* be unconstitutionally vague." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329–30 (11th Cir. 2001) (emphasis in original). The challenged provisions give fair notice of prohibited conduct. Accordingly, they are not unconstitutionally vague.

**A.** SB 168 defines a "sanctuary polic[y]" as one that "prohibits or impedes a law enforcement agency from" cooperating with the federal government "*so as to limit*" the law enforcement agency from (1) complying with 8 U.S.C. § 1373; (2) complying with either of the two requests in a detainer; (3) entering a 287(g) Agreement; and (4) providing ICE officers with access to inmates for an interview. § 908.102(6) (emphasis added). Plaintiffs allege that the term "impedes," in this context, is an "indeterminate, internally incoherent, and amorphous, standard[]." DE 1, at 55. The word "impede," however, has a plain meaning—"to interfere with or get in the way of the progress of" something. *Webster's Third New International Dictionary*, at 1132.

SB 168, moreover, does not leave unadorned the term "impedes." Rather, as discussed above, it limits its application to policies that operate "so as to limit" four specific forms of cooperation. In this context, it cannot be said that this provision is "so indefinite as really to be no rule or standard at all." *Leib*, 558 F.3d at 1310 (quotations omitted). The Fifth Circuit recently upheld a similar provision against a vagueness challenge. *See City of El Cenizo*, 890 F.3d at 190–91 (upholding, in a facial vagueness challenge, a prohibition on local policies that "materially limit[]" immigration enforcement).[8]

---

[8] Plaintiffs' argument that they "have no idea whether their policies" comply with *8 U.S.C. § 1373* does not help their challenge to *SB 168* because Plaintiffs have neither challenged Section 1373, nor do they allege that it is unconstitutionally vague. *See* DE 5-1, at 15.

**B.** Plaintiffs also challenge Section 908.104's requirement that law enforcement agencies use "best efforts" to assist federal immigration enforcement. The phrase "best efforts" is used throughout the Florida Code.[9] Defendants are aware of only one case addressing this question, wherein the Alaska Supreme Court found that "best efforts" is not unconstitutionally vague. *See Allen v. Alaska Dep't of Revenue*, 2005 WL 3445483, at *7 (Alaska).

As with the term "impedes," "best efforts" is elucidated with context. Contrary to Plaintiffs' assertions, law enforcement officials do not "lack clarity" in how to cooperate. DE 5-1, at 13. ICE policies are well-known to cooperating jurisdictions. *See* Ex. A, at 4–5 (describing ICE's updated detainer policy). These policies clarify what cooperation ICE wants (and does not want) from state and local governments. *See* Ex. A, at 7 (explaining that cooperating jurisdictions "have a detailed description of exactly how, in what manner, and to what extent" ICE desires cooperation).

Plaintiffs offer only contract-interpretation cases finding that the term "best efforts" can cause confusion. DE 5-1, at 10. But "vagueness" in contract law and "vagueness" in contravention of the Due Process Clause are not equivalent. In contract law, a court must determine whether the parties had a mutual understanding of a contractual provision. *See* Restatement (Second) of Contracts § 33 (1981).[10] Here, Plaintiffs can establish constitutional vagueness only if they can

---

[9] *See* § 741.315(3)(b), Fla. Stat. ("the sheriff shall use best efforts to ascertain whether the order was served"); *id.* § 672.306(2) ("the seller [shall] use best efforts to supply the goods"); *id.* § 760.06(7) ("the commission shall have [the power] to use its best efforts" to eliminate discrimination); *id.* § 548.058(1) (participants in boxing matches shall use "best efforts" and "strive earnestly to win"); *id.* § 215.4725(2)(a) (the State Board of Administration shall use "best efforts to identify" companies that boycott Israel).

[10] Courts sometimes refer to this inquiry as one of "vagueness," but it has no relationship to constitutional vagueness. *See, e.g.*, *SSE Security Equip., Inc. v. Comco Sys., Inc.*, 2005 WL 8158573, at *3 (N.D. Ala. 2005).

show that Section 908.104 has *no* standard and is vague in every conceivable application. They cannot.

Even if Plaintiffs' contract-interpretation cases had some relevance (and they do not), these cases demonstrate that the term "best efforts" in this context is not vague. Plaintiffs recognize that "best efforts" clauses pass muster where, as here, context provides sufficient clarity on how to measure compliance. DE 5-1, at 10 ("best efforts" clauses are not invalid where "there are objective criteria present by which to judge whether the proper effort has been made" (quoting *Gates v. Johnson Worldwide Assocs., Inc.*, 2002 WL 663586, at *4 (N.D. Ill. 2002))); *accord Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 721 (7th Cir. 2004).

Plaintiffs also suggest that Section 908.104 is vague because, in their view, no one can tell whether it applies to all Florida government entities "or just towards law enforcement agencies." DE 5-1, at 13. But the plain terms of Section 908.104 demonstrate that the latter interpretation is the correct one—"[a] *law enforcement agency* shall use best efforts." § 908.104, Fla. Stat. (emphasis added). The provision goes on to explain that it only "applies to [employees] of the entity or agency" (i.e., the "law enforcement agency") "when he or she is acting within the scope of his or her official duties." § 908.104, Fla. Stat. This provision simply clarifies that employees of law enforcement agencies are only bound by Section 908.104 in their official capacity.

For the foregoing reasons, the challenged provisions are not vague. In any event, to the extent there is ambiguity at the margins of any of these challenged provisions, the nuances of interpretation in any specific context are better left to as-applied challenges—"the basic building blocks of constitutional adjudication." *City of El Cenizo*, 890 F.3d at 191 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007)).

**III.**    **THE REMAINING EQUITABLE FACTORS WEIGH AGAINST ENTERING A PRELIMINARY INJUNCTION.**

Even if Plaintiffs could show a likelihood of success on the merits, the other equitable factors weigh against granting their motion. As to irreparable harm, the Organizational Plaintiffs allege that—without an injunction—their members will face the consequences of immigration-law violations and that the Organizational Plaintiffs will expend resources to assist others in understanding SB 168. DE 5-1, at 16–17. The City alleges that its leadership may face legal liability and removal from office. DE 5-1, at 18. But Plaintiffs' motion does not explain how these harms are "actual and imminent," rather than "remote" and "speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quotations omitted).

Even if Plaintiffs can demonstrate irreparable harm, any such harm does not outweigh the harm that a preliminary injunction would inflict on the State and the public.

SB 168 ensures that individuals already in police custody—meaning they have been arrested for a domestic crime—are not released into the community. *See* Ex. A, at 8. The Supreme Court has recognized the harm to States where individuals subject to removal commit crimes within their territory. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 2019 WL 3049129, at *9 (9th Cir. 2019) (discussing *Arizona v. United States*, 567 U.S. 387, 398 (2012)). "Congress has likewise expressed concern" regarding such criminal activity. *City of Los Angeles*, 2019 WL 3049129, at *9 (quoting *Demore v. Kim*, 538 U.S. 510, 518 (2003)). What is more, an injunction against SB 168 will result in fewer orderly transfers of custody and more at-large arrests, which are more dangerous to both law enforcement personnel and the public at large. *See* Ex. A, at 6, 8. Further, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

1301, 1301 (2012) (Roberts, C.J., in chambers) (quotations omitted); *accord Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018).

**IV.   IF THE COURT DISAGREES, THE CHALLENGED PROVISIONS ARE SEVERABLE.**

If the Court enters an injunction against any of the challenged provisions, it should treat the remaining provisions as severable. Severability is a matter of state law, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996), and Florida law "clearly favors" severability, *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) (quotations omitted). The test is one of legislative intent, *State ex rel. Boyd v. Green*, 355 So. 2d 789, 794 (Fla. 1978), and here, the Florida Legislature intended that state and local government entities will "cooperate and assist the federal government," § 908.101, Fla. Stat. It is logical to assume, therefore, that if any provisions of SB 168 are found unconstitutional, the legislature intended for the other provisions to survive.

All the more so because "federal courts have an affirmative duty" under severability doctrine "to preserve the validity of legislative enactments when . . . at all possible." *City of Sunrise*, 371 F.3d at 1347 (quotations omitted). Plaintiffs bear the burden of rebutting this, *see Ray v. Mortham*, 742 So. 2d 1276, 1281, 1283–84 (Fla. 1999), and have not done so.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. If the Court disagrees, it should sever the statute and decline to enjoin the remainder of SB 168.

Respectfully submitted this 9th of August, 2019.

| | |
|---|---|
| **ASHLEY MOODY**<br>**ATTORNEY GENERAL** | **RON DESANTIS**<br>**GOVERNOR** |

*/s/ James H. Percival*                                           */s/ James H. Percival*

*James H. Percival* (FBN 1016188)                   *Joe Jacquot* (FBN 189715)

DEPUTY SOLICITOR GENERAL                       GENERAL COUNSEL

*Edward M. Wenger* (FBN 85568)                  *Colleen Ernst* (FBN 112903)

CHIEF DEPUTY SOLICITOR GENERAL              DEPUTY GENERAL COUNSEL

*Daniel W. Bell* (FBN 1008587)                   *Nicholas A. Primrose* (FBN 104804)

DEPUTY SOLICITOR GENERAL                       DEPUTY GENERAL COUNSEL

*Barbara Throne* (FBN 776505)                  *John MacIver* (FBN 97334)

SENIOR ASSISTANT ATTORNEY GENERAL        DEPUTY GENERAL COUNSEL

Office of the Attorney General                    *James Uthmeier* (FBN 113156)

The Capitol, Pl-01                                 DEPUTY GENERAL COUNSEL

Tallahassee, Florida 32399-1050              Executive Office of the Governor

(850) 414-3300                                     The Capitol, PL-05

(850) 410-2672 (fax)                           Tallahassee, Florida 32399-0001

james.percival@myfloridalegal.com        Phone: (850) 717-9310

edward.wenger@myfloridalegal.com       Joe.Jacquot@eog.myflorida.com

daniel.bell@myfloridalegal.com             Colleen.Ernst@eog.myflorida.com

barbara.throne@myfloridalegal.com       Nicholas.Primrose@eog.myflorida.com

                                               John.MacIver@eog.myflorida.com

                                               James.Uthmeier@eog.myflorida.com

*Counsel for Attorney General Moody*

                                               *Counsel for Governor DeSantis*

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF system, which provides notice to all parties, on this 9th day of August, 2019.


/s/ *James H. Percival*
James H. Percival
DEPUTY SOLICITOR GENERAL