# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

**CITY OF SOUTH MIAMI**, *et al.*

      *Plaintiffs*,

vs.

      CASE NO. 1:19-cv-22927-BB

**RON DESANTIS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF FLORIDA**, *et al.*

      *Defendants*.

_____/

### Affidavit of Todd Price

I, the undersigned, do hereby certify and affirm that:

1. I am over the age of 18 and am not a party to this action. All following facts are based on my personal knowledge, which I would be willing to testify competently to the following facts if called as a witness at trial.

2. I am the Chief Technology Officer at Page Vault Inc., located at 566 W. Adams St., Suite LL-1, Chicago, Illinois, 60661. I have been so employed since March 2013.

3. Page Vault's On Demand service helps legal professionals capture Web Based Content (WBC) in a manner that preserves and accurately portrays the WBC as of the date of the capture.

4. To perform the capture, Page Vault configures its Capture Server (PVCS) to collect the WBC.

5. The PVCS connects to the WBC and saves Captures of the WBC locally to the PVCS. Captures include the associated metadata and are digitally signed and hashed.

6. PVCS securely stores these Captures on Page Vault's Servers (PVS).

7. Page Vault sends the Captures to the original requestor of the WBC.

8. Attached hereto are true and accurate copies of Captures of the WBC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Executed this* __8th__ *day of* _____August_____, __2019__ *at* _____Evanston_____, _____Illinois_____.

_____
Todd Price

**2**

3

# EXHIBIT B-1

PAGEVAULT
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act \| ICE |
| Capture URL: | https://www.ice.gov/287g |
| Captured site IP: | 104.96.228.19 |
| Page loaded at (UTC): | Thu, 08 Aug 2019 18:47:31 GMT |
| Capture timestamp (UTC): | Thu, 08 Aug 2019 18:48:15 GMT |
| Capture tool: | v6.11.2 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Chrome/70.0.3538.77 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 8 |
| Capture ID: | cf9db809-0640-432a-ab7f-3f0a9d11e145 |
| User: | pagevault-steve |

PDF REFERENCE #:      hfrZWz5RAiEAkVSY15Lzoq

4

Official Website of the Department of Homeland Security


**U.S. Immigration and Customs Enforcement**

Report Crimes: Email or Call 1-866-DHS-2-ICE

Search ICE.gov

Home | Who We Are | **What We Do** | Newsroom | Information Library | Contact ICE | Careers | En Español

 Immigration Enforcement

# Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act

ERO

---

SHARE

    

## Overview

U.S. Immigration and Customs Enforcement (ICE) 287(g) Program enhances the safety and security of communities by creating partnerships with state and local law enforcement agencies to identify and remove aliens who are amenable to removal from the United States.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 added Section 287(g), to the Immigration and Nationality Act. This section of law authorizes the Director of ICE to enter into agreements with state and local law enforcement agencies, that permit designated officers to perform limited immigration law enforcement functions. Agreements under section 287(g) require the local law enforcement officers to receive appropriate training and to function under the supervision of ICE officers.

The 287(g) Program continues to receive overwhelmingly positive feedback from its partners. The mutually beneficial agreements allow state and local officers to act as a force multiplier in the identification, arrest, and service of warrants and detainers of incarcerated foreign-born individuals with criminal charges or convictions. Those deemed amenable to removal are identified while still secure in state or local custody, potentially reducing the time the alien spends in ICE custody. The state and local partners benefit by reducing the number of criminal offenders that are released back into the community without being screened for immigration violations. Gang members, sex offenders, and murderers are often identified and taken into ICE custody after serving their criminal sentences, thus being removed from the community. The efficiency and safety of the program allows ICE to actively engage criminal alien offenders while incarcerated in a secure and controlled environment as opposed to the alternative of conducting at-large arrests which can pose safety concerns for the officers and the community and may result in collateral arrests. Federal, state and local officers working together provide a tremendous benefit to public safety through increased law enforcement communication and overall community policing effectiveness.

## Memorandum of Agreement

ICE and the requesting Law Enforcement Agency (LEA) sign a Memorandum of Agreement (MOA) that defines the scope, duration and limitations of the delegation of authority. It also sets forth the training requirements, the terms of ICE supervision, and requires the partnering LEA to follow DHS and ICE policies when its designated immigration officers (DIOs) perform delegated immigration enforcement functions.

## How to Participate

Officers participating in the 287(g) Program must possess U.S. citizenship, complete and pass a background investigation, and have knowledge of and have enforced laws and regulations pertinent to their law enforcement activities at their jurisdictions. If interested in becoming a law enforcement partner under the 287(g) Program, please send your inquiry to ERO287g@ice.dhs.gov.

## Types of Models

- Jail Enforcement Model

---

### Related Information

**Fact Sheets**

 Criminal Alien Program

 Enforcement & Removal Operations

Memorandum of Agreement Template

---

Officers participating in the 287(g) Program must possess U.S. citizenship, complete and pass a background investigation, and have knowledge of and have enforced laws and regulations pertinent to their law enforcement activities at their jurisdictions. If interested in becoming a law enforcement partner under the 287(g) Program, please send your inquiry to ERO287g@ice.dhs.gov.

## Types of Models

- **Jail Enforcement Model**
  The 287(g) Program utilizes the Jail Enforcement Model (JEM) to accomplish its mission, which is designed to identify and process removable aliens with criminal or pending criminal charges who are arrested by state or local LEAs. The JEM Program is supervised by the local ICE Office of Enforcement and Removal Operations Field Office. Under the JEM, nominated state and local law enforcement officers will be trained, certified, and authorized by ICE to perform only those immigration functions that are established on the Standard Operating Procedures (SOP) of the Memorandum of Understanding. ICE provides a training program conducted at the Federal Law Enforcement Training Center ICE Academy in Charleston, SC.

- **Warrant Service Officer Model**
  The 287(g) Program developed the Warrant Service Officer (WSO) model to provide an opportunity for jurisdictions to participate in a narrower cooperative agreement with ICE. Under the WSO model, nominated state and local law enforcement officers will be trained, certified, and authorized by ICE to perform limited functions of an immigration officer within the law enforcement agency's jail and/or correctional facilities as set forth in the Standard Operating Procedures of the Warrant Service Officer Memorandum of Agreement.
  ICE provides a training program conducted by certified instructors at a location most convenient for the participating LEA.

## 287(g) Successes

In fiscal year (FY) 2018, the 287(g) Program encountered approximately 700 aliens convicted for assault, 670 convicted for dangerous drugs, 150 convicted for sex offenses/assaults, 150 convicted for obstructing police, 125 convicted for weapon offenses, and 13 convicted for homicide.

## Recent Arrests

- **New Jersey** – On May 23, 2019, a Designated Immigration Officer from the Monmouth County, NJ 287(g) Program encountered a citizen of Mexico charged with luring-enticing a child, sex assault victim under 13, lewdness, endangering-sexual conduct with a child. The subject entered the United States on an unknown date and location without inspection. The Monmouth County 287(g) Program placed an immigration detainer, Form I-247A, and warrant on the subject who will be served a Notice to Appear.

- **New Jersey** – On May 4, 2019, a Designated Immigration Officer from the Cape May County, NJ Sheriff's Office 287(g) Program encountered a citizen of Jamaica charged with domestic violence-simple assault knowingly causing bodily injury and possession of a weapon for an unlawful purpose. The subject was admitted to the United States on April 19, 2008 as a nonimmigrant with authorization to remain in the United States for a period not to exceed 180 days. The subject failed to depart the United States as required. The Cape May County 287(g) Program placed an immigration detainer, I-247A, and warrant on the subject who will be served with a Notice to Appear.

- **South Carolina** – On March 13, 2019, a Designated Immigration Officer from the Charleston County, SC Sheriff's Office 287(g) Program encountered a citizen of Mexico who was charged with criminal sexual conduct with a minor second degree – victim 11 to 14 years of age. The individual had previously been removed. The Charleston County 287(g) Program placed an immigration detainer, Form I-247A, and warrant on the subject who will be served with a Notice of Intent/Decision to Reinstate Prior Order.

## Participating Entities

As of July 2019, ICE has 287(g) JEM agreements with 79 law enforcement agencies in 21 states. ICE also has 287(g) WSO agreements with 10 law enforcement agencies in the state of Florida.

with criminal sexual conduct with a minor second degree – victim 11 to 11 years of age. The individual had previously been removed. The Charleston County 287(g) Program placed an immigration detainer, Form I-247A, and warrant on the subject who will be served with a Notice of Intent/Decision to Reinstate Prior Order.

## Participating Entities

As of July 2019, ICE has 287(g) JEM agreements with 79 law enforcement agencies in 21 states. ICE also has 287(g) WSO agreements with 10 law enforcement agencies in the state of Florida.

**Mutually Signed Agreements**

| STATE | LAW ENFORCEMENT AGENCY | SUPPORT TYPE | SIGNED | MOA |
|---|---|---|---|---|
| ALABAMA | Etowah County Sheriff's Office | Jail Enforcement Model | 2016-06-08 | link |
| ARIZONA | Arizona Department of Corrections | Jail Enforcement Model | 2016-06-08 | link |
| ARIZONA | Mesa Police Department | Jail Enforcement Model | 2016-06-23 | link |
| ARIZONA | Pinal County Sheriff's Office | Jail Enforcement Model | 2016-06-13 | link |
| ARIZONA | Yavapai County Sheriff's Office | Jail Enforcement Model | 2016-06-08 | link |
| ARKANSAS | Benton County Sheriff's Office | Jail Enforcement Model | 2016-06-13 | link |
| ARKANSAS | Craighead County Sheriff's Office | Jail Enforcement Model | 2019-02-28 | |
| ARKANSAS | Washington County Sheriff's Office | Jail Enforcement Model | 2016-06-23 | link |
| COLORADO | Teller County Sheriff's Office | Jail Enforcement Model | 2019-01-06 | |
| FLORIDA | Brevard County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Charlotte County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Clay County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| FLORIDA | Collier County Sheriff's Office | Jail Enforcement Model | 2016-06-13 | link |
| FLORIDA | Columbia County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Hernando County Sheriff's Office | Jail Enforcement Model | 2018-02-27 | link |
| FLORIDA | Hernando County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Jacksonville Sheriff's Office | Jail Enforcement Model | 2016-06-30 | link |
| FLORIDA | Levy County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Manatee County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Pasco County Sheriff's Office | Jail Enforcement Model | 2017-08-22 | link |

| | | Model | | |
|---|---|---|---|---|
| FLORIDA | Levy County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Manatee County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Pasco County Sheriff's Office | Jail Enforcement Model | 2017-08-22 | link |
| FLORIDA | Pinellas County Sheriff's Office | Warrant Service Officer | 2019-04-24 | |
| FLORIDA | Polk County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Sarasota County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| FLORIDA | Walton County Sheriff's Office | Warrant Service Officer | 2019-05-06 | |
| GEORGIA | Cobb County Sheriff's Office | Jail Enforcement Model | 2016-06-30 | link |
| GEORGIA | Floyd County Sheriff's Office | Jail Enforcement Model | 2018-02-02 | link |
| GEORGIA | Georgia Department of Corrections | Jail Enforcement Model | 2018-02-05 | link |
| GEORGIA | Gwinnett County Sheriff's Office | Jail Enforcement Model | 2016-06-30 | link |
| GEORGIA | Hall County Sheriff's Office | Jail Enforcement Model | 2016-06-23 | link |
| GEORGIA | Whitfield County Sheriff's Office | Jail Enforcement Model | 2016-06-08 | link |
| LOUISIANA | East Baton Rouge Parish Sheriff's Office | Jail Enforcement Model | 2017-05-03 | link |
| LOUISIANA | Ouachita Parish Sheriff's Office | Jail Enforcement Model | 2019-02-28 | |
| LOUISIANA | Terrebonne Parish Sheriff's Office | Jail Enforcement Model | 2019-02-28 | |
| MARYLAND | Cecil County Sheriff's Office | Jail Enforcement Model | 2019-02-13 | |
| MARYLAND | Frederick County Sheriff's Office | Jail Enforcement Model | 2016-08-03 | link |
| MARYLAND | Harford County Sheriff's Office | Jail Enforcement Model | 2016-10-26 | link |
| MASSACHUSETTS | Barnstable County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| MASSACHUSETTS | Bristol County Sheriff's Office | Jail Enforcement Model | 2017-02-08 | link |
| MASSACHUSETTS | Massachusetts Department of Corrections | Jail Enforcement Model | 2016-06-23 | link |
| MASSACHUSETTS | Plymouth County Sheriff's Department | Jail Enforcement Model | 2017-02-08 | link |
| NEBRASKA | Dakota County Sheriff's Office | Jail Enforcement Model | 2018-01-16 | link |
| NEVADA | Las Vegas Metropolitan Police | Jail Enforcement | 2018-00-00 | link |

| | | | | |
|---|---|---|---|---|
| MASSACHUSETTS | ...Department of Corrections | Jail Enforcement Model | | |
| MASSACHUSETTS | Plymouth County Sheriff's Department | Jail Enforcement Model | 2017-02-08 | link |
| NEBRASKA | Dakota County Sheriff's Office | Jail Enforcement Model | 2018-01-16 | link |
| NEVADA | Las Vegas Metropolitan Police Department | Jail Enforcement Model | 2016-06-28 | link |
| NEVADA | Lyon County Sheriff's Office | Jail Enforcement Model | 2018-05-04 | link |
| NEVADA | Nye County Sheriff's Office | Jail Enforcement Model | 2017-04-20 | link |
| NEW JERSEY | Cape May County Sheriffs Office | Jail Enforcement Model | 2017-04-10 | link |
| NEW JERSEY | Monmouth County Sheriff's Office | Jail Enforcement Model | 2016-06-08 | link |
| NEW YORK | Rensselaer County Sheriff's Office | Jail Enforcement Model | 2018-01-30 | link |
| NORTH CAROLINA | Cabarrus County Sheriff's Office | Jail Enforcement Model | 2016-06-28 | link |
| NORTH CAROLINA | Gaston County Sheriff's Office | Jail Enforcement Model | 2016-06-30 | link |
| NORTH CAROLINA | Henderson County Sheriff's Office | Jail Enforcement Model | 2017-02-28 | link |
| NORTH CAROLINA | Nash County Sheriff's Office | Jail Enforcement Model | 2018-02-02 | link |
| OHIO | Butler County Sheriff's Office | Jail Enforcement Model | 2016-09-30 | link |
| OKLAHOMA | Canadian County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| OKLAHOMA | Okmulgee County Criminal Justice Authority | Jail Enforcement Model | 2018-01-25 | link |
| OKLAHOMA | Tulsa County Sheriff's Office | Jail Enforcement Model | 2016-06-23 | link |
| SOUTH CAROLINA | Charleston County Sheriff's Office | Jail Enforcement Model | 2016-06-23 | link |
| SOUTH CAROLINA | Horry County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| SOUTH CAROLINA | Lexington County Sheriff's Office | Jail Enforcement Model | 2016-11-04 | link |
| SOUTH CAROLINA | York County Sheriff's Office | Jail Enforcement Model | 2016-06-28 | link |
| TENNESSEE | Greene County Sheriff's Office | Jail Enforcement Model | 2019-02-28 | |
| TENNESSEE | Knox County Sheriff's Office | Jail Enforcement Model | 2017-06-15 | link |
| TEXAS | Aransas County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Burnet County Sheriff's Office | Jail Enforcement | 2018-02-02 | link |

| TENNESSEE | Greene County Sheriff's Office | Jail Enforcement Model | 2019-02-28 | |
| TENNESSEE | Knox County Sheriff's Office | Jail Enforcement Model | 2017-06-15 | link |
| TEXAS | Aransas County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Burnet County Sheriff's Office | Jail Enforcement Model | 2018-02-02 | link |
| TEXAS | Calhoun County Sheriff's Office | Jail Enforcement Model | 2017-06-28 | link |
| TEXAS | Chambers County Sheriff's Office | Jail Enforcement Model | 2017-07-17 | link |
| TEXAS | DeWitt County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Galveston County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Goliad County Sheriff's Office | Jail Enforcement Model | 2017-06-26 | link |
| TEXAS | Jackson County Sheriff's Office | Jail Enforcement Model | 2017-01-26 | link |
| TEXAS | Kendall County Sheriff's Office | Jail Enforcement Model | 2018-03-26 | link |
| TEXAS | Lavaca County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Lubbock County Sheriff's Office | Jail Enforcement Model | 2016-11-16 | link |
| TEXAS | Matagorda County Sheriff's Office | Jail Enforcement Model | 2017-07-27 | link |
| TEXAS | Montgomery County Sheriff's Office | Jail Enforcement Model | 2017-06-28 | link |
| TEXAS | Nueces County Sheriff's Office | Jail Enforcement Model | 2018-01-18 | link |
| TEXAS | Potter County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Refugio County Sheriff's Office | Jail Enforcement Model | 2017-06-28 | link |
| TEXAS | Rockwall County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Smith County Sheriff's Office | Jail Enforcement Model | 2017-04-25 | link |
| TEXAS | Tarrant County Sheriff's Office | Jail Enforcement Model | 2017-06-19 | link |
| TEXAS | Terrell County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Victoria County Sheriff's Office | Jail Enforcement Model | 2017-07-12 | link |
| TEXAS | Walker County Sheriff's Office | Jail Enforcement Model | 2017-07-20 | link |
| TEXAS | Waller County Sheriff's Office | Jail Enforcement Model | 2017-05-22 | link |

Document title: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act | ICE
Capture URL: https://www.ice.gov/287g
Capture timestamp (UTC): Thu, 08 Aug 2019 18:48:15 GMT

| | | Model | 2018-05-20 | link |
|---|---|---|---|---|
| TEXAS | Kendall County Sheriff's Office | Jail Enforcement Model | | |
| TEXAS | Lavaca County Sheriff's Office | Jail Enforcement Model | 2017-06-30 | link |
| TEXAS | Lubbock County Sheriff's Office | Jail Enforcement Model | 2016-11-16 | link |
| TEXAS | Matagorda County Sheriff's Office | Jail Enforcement Model | 2017-07-27 | link |
| TEXAS | Montgomery County Sheriff's Office | Jail Enforcement Model | 2017-06-28 | link |
| TEXAS | Nueces County Sheriff's Office | Jail Enforcement Model | 2018-01-18 | link |
| TEXAS | Potter County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Refugio County Sheriff's Office | Jail Enforcement Model | 2017-06-28 | link |
| TEXAS | Rockwall County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Smith County Sheriff's Office | Jail Enforcement Model | 2017-04-25 | link |
| TEXAS | Tarrant County Sheriff's Office | Jail Enforcement Model | 2017-06-19 | link |
| TEXAS | Terrell County Sheriff's Office | Jail Enforcement Model | 2018-01-25 | link |
| TEXAS | Victoria County Sheriff's Office | Jail Enforcement Model | 2017-07-12 | link |
| TEXAS | Walker County Sheriff's Office | Jail Enforcement Model | 2017-07-20 | link |
| TEXAS | Waller County Sheriff's Office | Jail Enforcement Model | 2017-05-22 | link |
| TEXAS | Wharton County Sheriff's Office | Jail Enforcement Model | 2017-07-17 | link |
| TEXAS | Williamson County Sheriff's Office | Jail Enforcement Model | 2018-02-08 | link |
| VIRGINIA | Culpeper County Sheriff's Office | Jail Enforcement Model | 2018-04-24 | link |
| VIRGINIA | Prince William-Manassas Regional Adult Detention Center | Jail Enforcement Model | 2016-06-23 | link |
| WISCONSIN | Waukesha County Sheriff's Office | Jail Enforcement Model | 2018-02-08 | link |

Last Reviewed/Updated: 08/05/2019



Document title: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act | ICE
Capture URL: https://www.ice.gov/287g
Capture timestamp (UTC): Thu, 08 Aug 2019 18:48:15 GMT

**11**

12

# EXHIBIT B-2

PAGEVAULT®
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Criminal Alien Program \| ICE |
| Capture URL: | https://www.ice.gov/criminal-alien-program |
| Captured site IP: | 104.96.228.19 |
| Page loaded at (UTC): | Thu, 08 Aug 2019 18:48:37 GMT |
| Capture timestamp (UTC): | Thu, 08 Aug 2019 18:49:11 GMT |
| Capture tool: | v6.11.2 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Chrome/70.0.3538.77 |
| Operating system: | Microsoft Windows NT 10.0.14393.0 (10.0.14393.0) |
| PDF length: | 3 |
| Capture ID: | 730d9fac-cdf0-40a9-9350-869a998f7caa |
| User: | pagevault-steve |

PDF REFERENCE #:          gSfNRmzyieZeHqLuK6CKkE



Official Website of the Department of Homeland Security

**U.S. Immigration and Customs Enforcement**

Report Crimes: Email or Call 1-866-DHS-2-ICE          Search ICE.gov

| Home | Who We Are | **What We Do** | Newsroom | Information Library | Contact ICE | Careers | En Español |

☰ Immigration Enforcement

# Criminal Alien Program                                                    ERO

| Overview | **Key Initiatives** |

SHARE

   

## IDENT/IAFIS Interoperability

Automated Biometric Identification System (IDENT)/Integrated Automated Fingerprint Identification System (IAFIS) interoperability is a biometric screening process that is consistent and efficient in the identification of criminal and other priority aliens. ICE leveraged an already-existing Federal information-sharing partnership between US-VISIT and the FBI that helps to identify criminal aliens at arrest or book-in without imposing new or additional workload on state and local law enforcement agencies. It has been fully deployed in all state and local jurisdictions, as well as Federal agencies, to include the DOD. Full deployment of IDENT/IAFIS interoperability has led to an increase in the number of criminal and other priority aliens identified and arrested.

When state and local law enforcement arrest and book someone into a jail facility for a violation of a state criminal offense, they will generally fingerprint the person. The fingerprints are electronically submitted to the state's fingerprint database, and are then forwarded to the FBI. Provided that the person had been previously encountered and fingerprinted by an immigration official, a "match" will register at which time ICE is notified and an ICE officer determines the person's immigration and criminal status to establish the appropriate immigration enforcement action, if any. If the person has not previously been fingerprinted by an immigration official, there will be "no match." In all cases, an ICE or 287(g) designated immigration officer will need to interview the individual to determine the appropriate enforcement action.

## Violent Criminal Alien Section

VCAS screens recidivist criminal aliens encountered through ERO's enforcement efforts and local law enforcement to seek criminal prosecution to mitigate the risk of future recidivism and enhance the integrity of the U.S. immigration system. Integral to success in this effort is the collaboration with the Offices of the United States Attorneys to prosecute the charged criminal offenders.

## Joint Criminal Alien Removal Taskforces

Joint Criminal Alien Removal Taskforces (JCART) identifies, investigates and arrests at-large criminal aliens with, but not limited to, convictions for drug trafficking offenses, crimes of violence and sex offenses. JCART will also identify and target aliens involved in human trafficking, smuggling and transnational organized crime for increased information collection. In addition to working with ICE's Homeland Security Investigations, JCART partners with other law enforcement entities, such as probation and parole offices, the U.S. Marshals Service, U.S. Customs and Border Protection, the Bureau of Prisons and local law enforcement agencies to conduct special operations.

## Detention Enforcement and Processing Offenders by Remote Technology

Approximately 27 percent of inmates in Federal Bureau of Prisons (BOP) custody are non-U.S. citizens. ERO created the Detention Enforcement and Processing Offenders by Remote Technology (DEPORT) Center in Chicago to process this population through CAP. ERO officers and agents

### Related Information

 Rapid REPAT

 Enforcement & Removal Operations

arrest or book-in without imposing new or additional workload on state and local law enforcement agencies. It has been fully deployed in all state and local jurisdictions, as well as Federal agencies, to include the DOD. Full deployment of IDENT/IAFIS interoperability has led to an increase in the number of criminal and other priority aliens identified and arrested.

When state and local law enforcement arrest and book someone into a jail facility for a violation of a state criminal offense, they will generally fingerprint the person. The fingerprints are electronically submitted to the state's fingerprint database, and are then forwarded to the FBI. Provided that the person had been previously encountered and fingerprinted by an immigration official, a "match" will register at which time ICE is notified and an ICE officer determines the person's immigration and criminal status to establish the appropriate immigration enforcement action, if any. If the person has not previously been fingerprinted by an immigration official, there will be "no match." In all cases, an ICE or 287(g) designated immigration officer will need to interview the individual to determine the appropriate enforcement action.

## Violent Criminal Alien Section

VCAS screens recidivist criminal aliens encountered through ERO's enforcement efforts and local law enforcement to seek criminal prosecution to mitigate the risk of future recidivism and enhance the integrity of the U.S. immigration system. Integral to success in this effort is the collaboration with the Offices of the United States Attorneys to prosecute the charged criminal offenders.

## Joint Criminal Alien Removal Taskforces

Joint Criminal Alien Removal Taskforces (JCART) identifies, investigates and arrests at-large criminal aliens with, but not limited to, convictions for drug trafficking offenses, crimes of violence and sex offenses. JCART will also identify and target aliens involved in human trafficking, smuggling and transnational organized crime for increased information collection. In addition to working with ICE's Homeland Security Investigations, JCART partners with other law enforcement entities, such as probation and parole offices, the U.S. Marshals Service, U.S. Customs and Border Protection, the Bureau of Prisons and local law enforcement agencies to conduct special operations.

## Detention Enforcement and Processing Offenders by Remote Technology

Approximately 27 percent of inmates in Federal Bureau of Prisons (BOP) custody are non-U.S. citizens. ERO created the Detention Enforcement and Processing Offenders by Remote Technology (DEPORT) Center in Chicago to process this population through CAP. ERO officers and agents assigned to the DEPORT Center conduct interviews of BOP inmates nationwide using video teleconference equipment. Through the combined effort of the DEPORT Center and local ERO resources, criminal aliens from all federal detention facilities are taken into ERO custody upon completion of their sentences.

## Rapid Removal of Eligible Parolees Accepted for Transfer

The Rapid REPAT program offers selected criminal aliens incarcerated in U.S. prisons and jails the opportunity to accept early release in exchange for voluntarily returning to their country of origin. Aliens who have been convicted of non-violent offenses may receive early conditional release if they have a final order of removal and agree not to return to the United States. Eligible aliens must agree to waive appeal rights associated with their state convictions. If aliens re-enter the country following removal under the Rapid REPAT program, state statutes may provide for revocation of parole and incarceration for the remainder of the alien's original sentence. Additionally, aliens illegally re-entering may face additional federal charges and penalties. Rapid REPAT also helps participating states reduce the costs associated with detention.

Last Reviewed/Updated: 01/03/2018

     

Document title: Criminal Alien Program | ICE
Capture URL: https://www.ice.gov/criminal-alien-program
Capture timestamp (UTC): Thu, 08 Aug 2019 18:49:11 GMT

15

# EXHIBIT B-3

DEPARTMENT OF HOMELAND SECURITY
## IMMIGRATION DETAINER - NOTICE OF ACTION

| | |
|---|---|
| Subject ID:<br>Event #: | File No:<br>Date: |

| | |
|---|---|
| TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) | FROM: (Department of Homeland Security Office Address) |

Name of Alien: _____

Date of Birth: _____   Citizenship: _____   Sex: _____

**1. DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON** *(complete box 1 or 2).*

☐ A final order of removal against the alien;

☐ The pendency of ongoing removal proceedings against the alien;

☐ Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE ALIEN TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION** *(complete box 1 or 2).*

☐ Upon completion of the proceeding or investigation for which the alien was transferred to your custody, DHS intends to resume custody of the alien to complete processing and/or make an admissibility determination.

**IT IS THEREFORE REQUESTED THAT YOU:**

- **Notify DHS** as early as practicable (at least 48 hours, if possible) before the alien is released from your custody. Please notify DHS by calling ☐ U.S. Immigration and Customs Enforcement (ICE) or ☐ U.S. Customs and Border Protection (CBP) at _____. If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.
- **Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien **must be served with a copy of this form** for the detainer to take effect. This detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters
- Relay this detainer to any other law enforcement agency to which you transfer custody of the alien.
- Notify this office in the event of the alien's death, hospitalization or transfer to another institution.

☐ If checked: please cancel the detainer related to this alien previously submitted to you on _____ (date).

_____<br>(Name and title of Immigration Officer)

_____<br>(Signature of Immigration Officer) (Sign in ink)

**Notice:** If the alien may be the victim of a crime or you want the alien to remain in the United States for a law enforcement purpose, notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing or faxing a copy to _____ .

Local Booking/Inmate #: _____   Estimated release date/time: _____

Date of latest criminal charge/conviction: _____   Last offense charged/conviction: _____

This form was served upon the alien on _____ , in the following manner:

☐ in person   ☐ by inmate mail delivery   ☐ other (please specify): _____

_____<br>(Name and title of Officer)

_____<br>(Signature of Officer) (Sign in ink)

DHS Form I-247A (3/17)   Page 1 of 3

## NOTICE TO THE DETAINEE

The Department of Homeland Security (DHS) has placed an immigration detainer on you. An immigration detainer is a notice to a law enforcement agency that DHS intends to assume custody of you (after you otherwise would be released from custody) because there is probable cause that you are subject to removal from the United States under federal immigration law.  DHS has requested that the law enforcement agency that is currently detaining you maintain custody of you for a period not to exceed 48 hours beyond the time when you would have been released based on your criminal charges or convictions. **If DHS does not take you into custody during this additional 48 hour period, you should contact your custodian** (the agency that is holding you now) to inquire about your release. **If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

## NOTIFICACIÓN A LA PERSONA DETENIDA

El Departamento de Seguridad Nacional (DHS) le ha puesto una retención de inmigración. Una retención de inmigración es un aviso a una agencia de la ley que DHS tiene la intención de asumir la custodia de usted (después de lo contrario, usted sería puesto en libertad de la custodia) porque hay causa probable que usted está sujeto a que lo expulsen de los Estados Unidos bajo la ley de inmigración federal. DHS ha solicitado que la agencia de la ley que le tiene detenido actualmente mantenga custodia de usted por un periodo de tiempo que no exceda de 48 horas más del tiempo original que habría sido puesto en libertad en base a los cargos judiciales o a sus antecedentes penales. **Si DHS no le pone en custodia durante este periodo adicional de 48 horas, usted debe de contactarse con su custodio** (la agencia que le tiene detenido en este momento) para preguntar acerca de su liberación. **Si usted cree que es un ciudadano de los Estados Unidos o la víctima de un crimen, por favor avise al DHS llamando gratuitamente al Centro de Apoyo a la Aplicación de la Ley ICE al (855) 448-6903.**

## AVIS AU DETENU OU À LA DÉTENUE

Le Département de la Sécurité Intérieure (DHS) a placé un dépositaire d'immigration sur vous. Un dépositaire d'immigration est un avis à une agence de force de l'ordre que le DHS a l'intention de vous prendre en garde à vue (après celà vous pourrez par ailleurs être remis en liberté) parce qu'il y a une cause probable que vous soyez sujet à expulsion des États-Unis en vertu de la loi fédérale sur l'immigration. Le DHS a demandé que l'agence de force de l'ordre qui vous détient actuellement puisse vous maintenir en garde pendant une période ne devant pas dépasser 48 heures au-delà du temps après lequel vous auriez été libéré en se basant sur vos accusations criminelles ou condamnations. **Si le DHS ne vous prenne pas en garde à vue au cours de cette période supplémentaire de 48 heures, vous devez contacter votre gardien (ne)** (l'agence qui vous détient maintenant) pour vous renseigner sur votre libération. **Si vous croyez que vous êtes un citoyen ou une citoyenne des États-Unis ou une victime d'un crime, s'il vous plaît aviser le DHS en appelant gratuitement le centre d'assistance de force de l'ordre de l'ICE au (855) 448-6903**

## NOTIFICAÇÃO AO DETENTO

O Departamento de Segurança Nacional (DHS) expediu um mandado de detenção migratória contra você. Um mandado de detenção migratória é uma notificação feita à uma agência de segurança pública que o DHS tem a intenção de assumir a sua custódia (após a qual você, caso contrário, seria liberado da custódia) porque existe causa provável que você está sujeito a ser removido dos Estados Unidos de acordo com a lei federal de imigração. ODHS solicitou à agência de segurança pública onde você está atualmente detido para manter a sua guarda por um período de no máximo 48 horas além do tempo que você teria sido liberado com base nas suas acusações ou condenações criminais. **Se o DHS não leva-lo sob custódia durante este período adicional de 48 horas, você deve entrar em contato com quem tiver a sua custódia** (a agência onde você está atualmente detido) para perguntar a respeito da sua liberação. **Se você acredita ser um cidadão dos Estados Unidos ou a vítima de um crime, por favor informe ao DHS através de uma ligação gratuita ao Centro de Suporte de Segurança Pública do  Serviço de Imigração e Alfândega (ICE) pelo telefone (855) 448-6903.**

**THÔNG BÁO CHO NGƯỜI BỊ GIAM**

Bộ Nội An (DHS) đã ra lệnh giam giữ di trú đối với quý vị. Giam giữ di trú là một thông báo cho cơ quan công lực rằng Bộ Nội An sẽ đảm đương việc lưu giữ quý vị (sau khi quý vị được thả ra) bởi có lý do khả tín quý vị là đối tượng bị trục xuất khỏi Hoa Kỳ theo luật di trú liên bang. Sau khi quý vị đã thi hành đầy đủ thời gian của bản án dựa trên các tội phạm hay các kết án, thay vì được thả tự do, Bộ Nội An đã yêu cầu cơ quan công lực giữ quý vị lại thêm không quá 48 tiếng đồng hồ nữa. Nếu Bộ Nội An không đến bắt quý vị sau 48 tiếng đồng hồ phụ trội đó, quý vị cần liên lạc với cơ quan hiện đang giam giữ quý vị để tham khảo về việc trả tự do cho quý vị. Nếu quý vị là công dân Hoa Kỳ hay tin rằng mình là nạn nhân của một tội ác, xin vui lòng báo cho Bộ Nội An bằng cách gọi số điện thoại miễn phí 1(855) 448-6903 cho Trung Tâm Hỗ Trợ Cơ Quan Công Lực Di Trú.

被拘留者通知書

國土安全部(Department of Homeland Security，簡稱DHS)已經對你發出移民拘留令。移民拘留令為一給予執法機構的通知書，闡明**DHS**意欲獲取對你的羈押權(若非有此羈押權，你將會被釋放)；因為根據聯邦移民法例，並基於合理的原由，你將會被遞解離美國國境。**DHS**亦已要求現正拘留你的執法機構，在你因受到刑事檢控或定罪後，而在本應被釋放的程序下，繼續對你作出不超過四十八小時的監管。若你在這附加的四十八小時內，仍未及移交至**DHS**的監管下，你應當聯絡你的監管人(即現正監管你的機構)查詢有關你釋放的事宜。若你認為你是美國公民或為罪案受害者，請致電**ICE**執法部支援中心**(Law Enforcement Support Center)**知會**DHS**，免費電話號碼：**(855)448-6903**。

SAMPLE

# EXHIBIT B-4

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**Policy Number 10074.2:**     **Issuance of Immigration Detainers by ICE Immigration Officers**

**Issue Date:  March 24, 2017**
**Effective Date:  April 2, 2017**
**Superseded:** Interim Policy No. 10074.1: *Detainers* (Aug. 2, 2010)
**Federal Enterprise Architecture Number:** 306-112-002b

1.    **Purpose/Background.**  This Directive establishes U.S. Immigration and Customs Enforcement (ICE) policy and procedures regarding the issuance of civil immigration detainers to federal, state, local, and tribal law enforcement agencies (LEAs).  ICE issues detainers to federal, state, local, and tribal LEAs to provide notice of its intent to assume custody of a removable alien detained in federal, state, local, or tribal custody.  The Department of Homeland Security's (Department or DHS) detainer authority, codified in section 287.7 of title 8 of the Code of Federal Regulations (C.F.R.), arises from the Secretary of Homeland Security's power under section 103(a)(3) of the Immigration and Nationality Act (INA) to provide regulations "necessary to carry out his authority," and from ICE's general authority to arrest and detain aliens subject to removal or removal proceedings, pursuant to sections 236, 241, and 287 of the INA.  The use of immigration detainers, however, long pre-dates any reference to detainers in the statute or regulations.[1]  In fact, the former Immigration and Naturalization Service first used the Form I-247 as early as 1952.

Detainers enable ICE to judiciously deploy its investigative, detention, and removal resources consistent with the immigration enforcement priorities of the Department and the executive branch of the U.S. Government.  Detainers also allow ICE immigration officers to avoid the risks to public safety and officer safety associated with arrests outside the custodial environment.

2.    **Policy.**  It is ICE policy to ensure that ICE immigration officers exercise detainer authority in a manner consistent with all legal requirements and in a manner that ensures ICE's LEA partners may honor detainers.

2.1.    The consolidated detainer form, Form I-247A (Immigration Detainer – Notice of Action), attached to this Directive shall be used as of the effective date of this Directive.  Form I-247D (Immigration Detainer – Request for Voluntary Action), Form I-247N (Request

---

[1] *See, e.g., Chung Young Chew v. Boyd*, 309 F.2d 857 (9th Cir. 1962); *Rinaldi v. United States*, 484 F. Supp. 916 (S.D.N.Y. 1977); *Slavik v. Miller*, 89 F. Supp. 575 (W.D. Pa. 1950), *aff'd*, 184 F.2d 575 (3d Cir. 1950), *cert. denied*, 340 U.S. 955 (1951); *Matter of Lehder*, 15 I&N Dec. 159 (BIA 1975).

1

21

for Voluntary Notification of Release of Suspected Priority Alien), and Form I-247X (Request for Voluntary Transfer), may no longer be issued. Detainers issued on prior versions of the detainer form remain active and need not be replaced with a Form I-247A. *See* Attachment 8.4 for guidance on how to complete the Form I-274A.

2.2.    Only ICE immigration officers, including designated officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA, may issue immigration detainers.

2.3.    Regardless of whether a federal, state, local, or tribal LEA regularly cooperates with DHS immigration detainers, ICE immigration officers shall issue a detainer to the LEA for an alien in the LEA's custody after the alien is arrested for a criminal offense and the officer has probable cause to believe that the subject is an alien who is removable from the United States.

2.4.    ICE immigration officers must establish probable cause to believe that the subject is an alien who is removable from the United States before issuing a detainer with a federal, state, local, or tribal LEA. Further, as a matter of policy, all detainers issued by ICE must be accompanied by either: (1) a properly completed Form I-200 (Warrant for Arrest of Alien) signed by an authorized ICE immigration officer; or (2) a properly completed Form I-205 (Warrant of Removal/Deportation) signed by an authorized ICE immigration officer.[2]

2.5.    Except for circumstances in which the alien is detained in ICE custody at the time the detainer is issued, an ICE immigration officer shall not issue an immigration detainer to an LEA unless the LEA has arrested the alien for a criminal offense in an exercise of the LEA's independent arrest authority.[3] ICE Immigration officers shall not issue an immigration detainer for an alien who has been temporarily detained or stopped, but not arrested, by another LEA. This does not preclude the LEA from temporarily detaining an alien while an ICE immigration officer responds to the scene.

2.6.    An ICE immigration officer may not issue a detainer based upon the initiation of an investigation to determine whether the subject is a removable alien. An ICE immigration officer may not establish probable cause of alienage and removability, for purposes of detainer issuance, solely based on evidence of foreign birth and the absence of records in available databases ("foreign-born-no match").

---

[2] Although ICE maintains that this is not legally required, ICE is implementing this warrant measure as a nationwide policy in light of one district court's ruling that detention pursuant to an ICE detainer constitutes a warrantless arrest and that section 287(a)(2) of the INA only authorizes a warrantless arrest if there is reason to believe the alien will escape before an arrest warrant can be secured. *See Moreno v. Napolitano*, --- F. Supp. 3d ---, 2016 WL 5720465, at *8 (N.D. Ill. Sept. 30, 2016).

[3] Box 2 on Form I-247A (Immigration Detainer – Notice of Action) is used by ICE to ensure that an alien detained in ICE's custody is returned to ICE custody after being transferred to another LEA for a proceeding or investigation. Such detainers may be issued prior to the other LEA assuming custody of the subject of the detainer.

2

2.7. ICE immigration officers must promptly assume custody of an alien who is the subject of an immigration detainer. Further, ICE immigration officers should assume custody of an alien subject as soon as practicable, and as close as possible to the time at which the alien would otherwise have been released by the relevant LEA, but in no circumstances more than 48 hours after such time. If it becomes apparent that ICE cannot assume custody of the alien within 48 hours of when he or she would otherwise be released, the ICE immigration officer should immediately cancel the detainer.

2.8. In some cases, after issuing an immigration detainer for an individual in the custody of a federal, state, local, or tribal LEA, ICE may determine that it will not assume custody of the subject. In these cases, the ICE immigration officer must cancel the immigration detainer as soon as such determination is made.

2.9. As a matter of law, ICE cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen.[4]

3. **Definitions.** The following definitions apply only for purposes of this directive.

3.1. **Detainer.** A notice that ICE issues to a federal, state, local, or tribal LEA to inform the LEA that ICE intends to assume custody of a removable alien in the LEA's custody.

3.2. **ICE Immigration Officer.** The term "ICE immigration officer" means Enforcement and Removal Operations (ERO) deportation officers and Homeland Security Investigations (HSI) special agents, including supervisory and managerial personnel who are responsible for supervising authorized immigration officers, as well as designated officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA. *See* 8 C.F.R. § 287.7(b).

3.3. **Probable Cause.** The facts and circumstances within the officer's knowledge and of which they have reasonably trustworthy information that are sufficient in themselves to warrant a person of reasonable caution in the belief that an individual is a removable alien.

4. **Responsibilities.**

4.1. **All ICE employees** are responsible for complying with the policy and procedures set forth in this Directive.

4.2. **ICE immigration officers,** including designated immigration officers of a state or political subdivision of a state authorized to perform certain immigration officer functions under section 287(g) of the INA, are responsible for issuing and executing

---

[4] ICE immigration officers must comply with requirements of ICE Policy No. 16001.2, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (Nov. 10, 2015), when issuing detainers. In particular, footnote 1 of that policy specifically applies to prior versions of the detainer "and/or any successor form serving the same or substantially similar" purpose.

immigration detainers in accordance with the policy and procedures set forth in this Directive.

**4.3.** **ICE ERO Assistant Directors, Deputy Assistant Directors, Field Office Directors (FODs), and the Directors of the National Criminal Analysis and Targeting Center, the Pacific Enforcement Response Center, and the Law Enforcement Support Center,** and their designees, as well as the **ICE HSI Assistant Director for Domestic Operations** and **ICE HSI Special Agents in Charge (SACs)** and their designees, are responsible for disseminating and ensuring compliance with this Directive.

**5.** **Procedures.**

**5.1.** **Establishing Probable Cause.**

As a matter of policy, a detainer must be supported by probable cause based upon one of the following four categories of information:

1)  A final order of removal against the alien;

2)  The pendency of ongoing removal proceedings against the alien, including cases in which DHS has issued a charging document and served the charging document on the alien;

3)  Biometric confirmation of the alien's identity and a records match in federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks lawful immigration status or, notwithstanding such status, is removable under U.S. immigration law; and/or

4)  Statements made voluntarily by the alien to an ICE immigration officer and/or other reliable evidence that indicate the alien either lacks lawful immigration status or, notwithstanding such status, is removable under U.S. immigration law.

An ICE immigration officer may not issue a detainer prior to establishing probable cause to believe that the subject is a removable alien. Further, an ICE immigration officer may not issue a detainer based upon the initiation of an investigation to determine whether the subject is a removable alien. The pendency of ongoing removal proceedings refers to cases in which DHS has issued a charging document and served the charging document on the alien. As a matter of policy, an ICE immigration officer may not establish probable cause of alienage and removability, for purposes of detainer issuance, solely based on evidence of foreign birth and the absence of records in available databases ("foreign-born-no match").

**5.2.** **Issuing an Immigration Detainer and Administrative Warrant.** All immigration detainers (Form I-247A Immigration Detainer – Notice of Action) must be accompanied by either Form I-200 (Warrant for Arrest of Alien) or Form I-205 (Warrant of Removal/Deportation).

4

1) If the subject of the detainer is a removable alien who is not yet subject to a final order of removal, the ICE immigration officer who issues the detainer shall attach a Form I-200 (Warrant for Arrest of Alien) to the detainer.

   a. The Form I-200 shall be issued by any of the supervisory immigration officials listed at 8 C.F.R. § 287.5(e)(2).

2) If the subject of the detainer is also the subject of a final order of removal, including where the alien is subject to reinstatement of removal under section 241(a)(5) of the INA, the ICE immigration officer who issues the detainer shall attach a Form I-205 (Warrant of Removal/Deportation) to the immigration detainer.

   a. The Form I-205 shall be issued by any of the supervisory immigration officials listed in 8 C.F.R. § 241.2(a)(1).

**5.3.** **Declined Immigration Detainers.** When ICE becomes aware that an LEA failed to honor an immigration detainer issued by ICE, the ICE immigration officer shall document the declined detainer in the ENFORCE Alien Removal Module (EARM) through the use of the detainer lift code of "A – Declined by LEA."

**5.4.** **Cancelling an Immigration Detainer.** If after issuing an immigration detainer ICE determines that it will not assume custody of the subject, the ICE immigration officer must cancel the immigration detainer.

1) Form I-247A shall be issued to the relevant LEA requesting cancellation of the detainer; and

2) All cancelled detainers shall be documented in EARM through the use of the detainer lift code of "L - Lifted", or using another case-specific lift code requiring the cancellation of the detainer (e.g. "D – Died", "N – Alien not subject to deportation").

**6.** **Recordkeeping.** ICE maintains records generated pursuant to this policy, specifically Forms I-247A (Immigration Detainer-Notice of Action), Forms I-200 (Warrant for Arrest of Alien) and Forms I-205 (Warrant of Removal/Deportation) in the Alien File.

**7.** **Authorities/References.**

**7.1.** Immigration and Nationality Act of 1952, Pub. L. No. 82-414, as amended (codified at 8 U.S.C. §§ 1101 *et seq.*).

**7.2.** 8 C.F.R. §§ 236.1, 241.2, 287.3, 287.5, 287.7.

**7.3.** *Moreno v. Napolitano*, --- F. Supp. 3d ---, 2016 WL 5720465 (N.D. Ill. Sept. 30, 2016).

**7.4.** Executive Order 13768, *Enhancing Public Safety in the Interior of the United States* (Jan. 25, 2017).

**7.5.** Memorandum from DHS Secretary John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017).

**7.6.** ICE Policy No. 16001.2, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (Nov. 10, 2015).

**7.7.** ICE Policy No. 13001.1, *State Personnel Designated to Act as Immigration Officers for Immigration Enforcement Purposes* (Dec. 4, 2008).

**8.    Attachments.**

**8.1.** Form I-247A (Immigration Detainer – Notice of Action).

**8.2.** Form I-200 (Warrant for Arrest of Alien).

**8.3.** Form I-205 (Warrant of Removal/Deportation).

**8.4.** ICE Guidance For Completing the Form I-247A.

**9.    No Private Right Statement.** This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create or diminish any rights, substantive or procedural, enforceable at law or equity by any party in any criminal, civil, or administrative matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

6

26

# EXHIBIT B-5

**U.S. DEPARTMENT OF HOMELAND SECURITY**     **Warrant for Arrest of Alien**

File No. _____

Date: _____

**To:**     **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____ is removable from the United States.  This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

_____
(Printed Name and Title of Authorized Immigration Officer)

---

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _____
(Location)

on _____ on _____, and the contents of this
(Name of Alien)                          (Date of Service)

notice were read to him or her in the _____ language.
(Language)

_____   _____
Name and Signature of Officer            Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)
**28**

29

# EXHIBIT B-6

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# WARRANT OF REMOVAL/DEPORTATION

**File No:** _____

**Date:** _____

**To any immigration officer of the United States Department of Homeland Security:**

_____
(Full name of alien)

who entered the United States at _____ on _____
(Place of entry)                                    (Date of entry)

is subject to removal/deportation from the United States, based upon a final order by:

☐ an immigration judge in exclusion, deportation, or removal proceedings

☐ a designated official

☐ the Board of Immigration Appeals

☐ a United States District or Magistrate Court Judge

and pursuant to the following provisions of the Immigration and Nationality Act:

I, the undersigned officer of the United States, by virtue of the power and authority vested in the Secretary of Homeland Security under the laws of the United States and by his or her direction, command you to take into custody and remove from the United States the above-named alien, pursuant to law, at the expense of:

_____
(Signature of immigration officer)

_____
(Title of immigration officer)

_____
(Date and office location)

ICE Form I-205 (8/07)                                                                 Page 1 of 2

30

To be completed by immigration officer executing the warrant: Name of alien being removed:

_____

**Port, date, and manner of removal:** _____

Photograph of alien
removed

Right index fingerprint
of alien removed

SAMPLE

_____
(Signature of alien being fingerprinted)

_____
(Signature and title of immigration officer taking print)

Departure witnessed by: _____
(Signature and title of immigration officer)

If actual departure is not witnessed, fully identify source or means of verification of departure:

_____

_____

_____

_____

If self-removal (self-deportation), pursuant to 8 CFR 241.7, check here.  ☐

Departure Verified by: _____
(Signature and title of immigration officer)

ICE Form I-205 (8/07)

# EXHIBIT B-7

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

Prepared By: The Professional Staff of the Committee on Judiciary

BILL:  CS/SB 168

INTRODUCER:  Judiciary Committee and Senators Gruters and Bean

SUBJECT:  Federal Immigration Enforcement

DATE:  February 21, 2019  REVISED:

| | ANALYST | STAFF DIRECTOR | REFERENCE | | ACTION |
|---|---|---|---|---|---|
| 1. | Davis | Cibula | JU | **Fav/CS** | |
| 2. | | | IS | | |
| 3. | | | RC | | |

---

## Please see Section IX. for Additional Information:

COMMITTEE SUBSTITUTE - Substantial Changes

---

## I.    Summary:

CS/SB 168 seeks to ensure that state and local entities and law enforcement agencies cooperate with federal government officials to enforce, and not obstruct, immigration laws. In its most general and broad terms, the bill prohibits sanctuary jurisdictions and requires state and local entities to comply with federal immigration detainers when they are supported by proper documentation.

In more specific terms, the bill:
- Prohibits a state entity, law enforcement agency, or local governmental entity, from having a sanctuary policy.
- Requires a covered government body to use its best efforts to support the enforcement of federal immigration law.
- Prohibits a state entity, local governmental entity, or law enforcement agency from restricting a law enforcement agency's ability to communicate or exchange information with a federal immigration agency on immigration enforcement matters.
- Provides procedures for a court to follow to reduce a defendant's sentence and thereby permit law enforcement agencies to transfer the defendant to a federal facility.
- Requires a law enforcement agency that has custody of someone who is subject to an immigration detainer to notify the judge of the detainer, record in the person's file the existence of the detainer, and comply with the detainer.
- Requires a county correctional facility to enter into an agreement with a federal immigration agency for the payment of costs associated with housing and detaining defendants.

33

- Permits the Attorney General to institute an action for a violation of this law or to prevent a violation of the law.
- Requires any sanctuary policies currently in effect be repealed within 90 days after the effective date of the act.

The bill takes effect July 1, 2019, except that the section establishing penalties takes effect October 1, 2019.

## II.   Present Situation:

### General Overview

The Federal Government is responsible for both establishing and enforcing immigration laws. Congress has enacted legislation, which the federal courts have interpreted, and the body of immigration law has developed. The responsibility for enforcing immigration laws rests with the Division of Homeland Security's U.S. Immigration and Customs Enforcement (ICE) and its Enforcement and Removal Operations (ERO). It is the mission of Enforcement and Removal Operations to identify, apprehend, and remove aliens who are a risk to national security or public safety, enter the country illegally, or seek to undermine the integrity of the country's immigration laws or border control efforts.[1] In order to carry out its mission, ICE depends, in part, on the assistance of local and state law enforcement agencies to identify removable aliens.[2] However, some state and local jurisdictions have chosen to expressly define or limit their roles in immigration enforcement and have become known as "sanctuary" jurisdictions. The critics of sanctuary jurisdictions argue that they limit law enforcement's abilities and encourage illegal immigration. Those who support sanctuary jurisdictions argue that they are necessary to prevent local law enforcement resources from being diverted to enforce immigration laws.[3]

### Federal Immigration Law

The Federal Government's authority to regulate immigration law is established in the United States Constitution. This power is extensive. The Constitution grants Congress the power to "establish an uniform Rule of Naturalization,"[4] and to "regulate Commerce with foreign Nations."[5] Additional authority is found in the Federal Government's broad powers over foreign affairs.[6]

The individual states are not granted similar powers under the Constitution and they may not encroach upon federal authority in this area. When states enact immigration laws, they are often challenged on the grounds that the law is preempted by federal law under the Supremacy Clause

---

[1] U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations, Mission*, https://www.ice.gov/ero
[2] Congressional Research Service, *Sanctuary Jurisdictions and Criminal Aliens: In Brief* (Jan. 10, 2017), https://www.everycrsreport.com/reports/R44118.html#Content.
[3] *Id*.
[4] U.S. CONST. art. 1, s. 8, cl. 4.
[5] U.S. CONST. art. 1, s. 8, cl. 3.
[6] *Toll v. Moreno*, 458 U.S. 1 (1982).

34

of the Constitution.[7] The federal preemption doctrine is a principle of law which holds that federal laws take precedence over state laws, and as such, states may not enact laws that are inconsistent with the federal law.

Yet, the U.S. Supreme Court has noted that this vast federal power is not without limits. In *De Canas v. Bica*, a 1976 decision, the U.S. Supreme Court held that federal immigration law does not inherently preempt state court jurisdiction over all matters involving immigration issues. The Court noted that it has never held that every state statute "which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power."[8] In *Arizona v. Unites States*,[9] a 2012 U.S. Supreme Court ruling, the Court similarly stated that "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"

### Tenth Amendment and Anti-Commandeering Doctrine

While the Federal Government has substantial authority to preempt state or local immigration regulations, the authority is restricted by the anti-commandeering principles of the Tenth Amendment.[10] Those principles prevent Congress from "commandeering" or forcing state or local governments to implement a federal regulatory program.[11] Some state and local jurisdictions have relied on this principle to avoid enforcing federal immigration policies and, as a result, have established sanctuary jurisdictions.[12]

### Sanctuary Jurisdictions

Although the term "sanctuary jurisdiction" is not defined in federal statute or regulation, it is generally understood to be a jurisdiction that has adopted a law or policy intended to significantly limit participation in the enforcement of federal immigration activities. States and municipalities have adopted varying degrees of sanctuary policies which have taken on multiple forms. Some jurisdictions have adopted "don't enforce" policies in which law enforcement is restricted from cooperating with federal immigration authorities who are attempting to apprehend removable aliens. Other jurisdictions have adopted "don't ask" policies that restrict law enforcement officials from inquiring about someone's immigration status. Yet other entities

---

[7] U.S. CONST. art. 6. The Supremacy Clause states that the Constitution and federal laws "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."

[8] *De Canas v. Bica*, 424 U.S. 351, 355 (1976).

[9] *Arizona v. United States*, 567 U.S. 387, 400 (2012). See also *United States v. California*, 314 F. Supp. 3d 1077, 1085 (E.D. Cal. 2018)

[10] The Tenth Amendment to the United States Constitution provides "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[11] *New York v. U.S.*, 505 U.S. 144, 188 (1992). In weighing whether a federal law that created incentives for states to dispose of low-level radioactive waste violated the anti-commandeering doctrine the Court held, "Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program." See also *Printz v. United States*, 521 U.S. 898 (1997). The Court has also held that every federal requirement imposed on state or local entities is not necessarily a violation of the anti-commandeering doctrine. Some federal statutes that require states to collect and report information to federal agencies are acceptable. *Reno v. Condon*, 528 U.S 141 (2000).

[12] Sarah S. Herman, Congressional Research Service, *State and Local "Sanctuary" Policies Limiting Participation in Immigration Enforcement* (March 23, 2017), https://fas.org/sgp/crs/homesec/R44795.pdf.

have adopted "don't tell" policies that restrict local law enforcement officials from sharing information with federal immigration officials. These last measures are primarily directed at preventing federal immigration officials from relying on the information to identify and arrest for removal aliens who are unlawfully present. Some jurisdictions have even adopted policies that prevent law enforcement officials from alerting federal immigration officials about the release status of aliens who are incarcerated.[13]

**Sanctuary Jurisdictions in Florida**

It is difficult to determine how many sanctuary jurisdictions, if any, exist in Florida because organizations use different criteria for making their determinations. For example, the Federation for American Immigration Reform (FAIR) released a list of sanctuary jurisdictions in May 2018 which stated that, as of April 2018, 12 counties and 3 cities qualified as Florida sanctuary jurisdictions.[14] The Center for Immigration Studies provided a list of sanctuary jurisdictions, updated October 2018, which stated that Alachua and Clay Counties were sanctuary jurisdictions.[15]

Perhaps one of the most objective ways to measure whether an entity is a sanctuary jurisdiction is to determine whether it is disqualified from receiving federal criminal justice grant funds due to perceived violations of federal immigration law. Those violations generally involve limiting or restricting communication and information between a state or local entity and the Department of Homeland Security (DHS) about an immigrant's status or release. The Florida Department of Law Enforcement (FDLE) serves as the state administering agency for the federal Byrne Justice Assistance Grant Program.[16] According to FDLE and the U.S. Department of Justice (DOJ), Office of Justice Programs, applicants that seek grant funding[17] from the Department of Justice must submit specific certifications from the attorney general and the chief executive officer, which is either the governor or mayor, stating that the applicant complies with 8 U.S.C. s. 1373[18]

---

[13] *Id*.

[14] Federation for American Immigration Reform, *Sanctuary Jurisdictions Nearly Double Since President Trump Promised to Enforce Our Immigration Laws*, 52-55 (May 2018), http://www.fairus.org/sites/default/files/2018-05/Sanctuary-Report-FINAL-2018.pdf. FAIR stated that it drew its information from resolutions, ordinances, and policy directives as well as secondary sources. At that time, and not necessarily currently, the counties listed were Alachua, Bradford, Broward, Flagler, Gulf, Highlands, Leon, Palm Beach, Seminole, St. Lucie, Volusia, and Washington. The cities were Key West, St. Petersburg, and West Palm Beach.

[15] Center for Immigration Studies, *Fact Sheet, Sanctuary Cities, Counties, and States* (Oct. 2018), https://cis.org/Fact-Sheet/Sanctuary-Cities.

[16] Email from Rona Kay Cradit, Bureau Chief, Office of Criminal Justice Grants, Florida Department of Law Enforcement (Feb. 5, 2019) (on file with the Senate Committee on Judiciary).

[17] The grants are Edward Byrne Memorial Justice Assistance Grant program, funded through the U.S. Department of Justice, the largest source of criminal justice grant funding.

[18] The requirements of 8 U.S.C. s. 1373 have been found unconstitutional by federal district courts with respect to the jurisdictions in those cases. However, the issues in those cases are under appeal. See *State of New York v. Department of Justice*, 343 F.Supp.3d 213, (S.D.N.Y. 2018), *appeal docketed*, No. 19-275 (2nd Cir. Jan. 28, 2019). The text of 8 U.S.C s. 1373 is as follows:

**§1373. Communication between government agencies and the Immigration and Naturalization Service**
**(a) In general**
Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to,

and does not restrict communications between state and local agencies and DHS entities regarding someone's citizenship or immigration status. Beginning in 2017, the Office of Justice Programs added two requirements for applicants to receive grant funding: an award recipient must permit DHS access to correctional and detention facilities to meet with an alleged alien to inquire about his or her right to be in the country; and an award recipient must also provide DHS a minimum of 48 hours' advance notice concerning the scheduled release time and date of someone in the jurisdiction's custody when DHS requests that notice in order to take the person into custody.[19]

As of February 5, 2019, FDLE has received 188 executed attorney general certifications and 111 executed chief executive officer certifications from county and municipal governments.[20] In essence, these entities are stating that they comply with federal law and do not limit, restrict, or prohibit the exchange of information between governmental entities, agencies, or persons concerning the citizenship or immigration status of a person. This is the criteria many groups use to determine what constitutes a sanctuary jurisdiction.

Only one Florida municipality, the City of West Palm Beach, appeared on a compliance review list released by DOJ in January 2018.[21] The city was required to submit documentation to the Department of Justice demonstrating whether its employees could communicate with DOJ, DHS, ICE, or their agents.[22] The City of West Palm Beach now appears on the current FDLE list of jurisdictions that have submitted certifications stating that it is in compliance with federal immigration laws.

or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

    (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

    (2) Maintaining such information.

    (3) Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

[19] U.S. Department of Justice, Office of Justice Programs, *Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements – FY 2017 Awards; Alert: New Requirements for Certain FY 2017 Programs* (2017), https://ojp.gov/funding/Explore/SolicitationRequirements/index.htm.

[20] See Email from Rona Kay Cradit, *supra* note 16.

[21] *Id.*

[22] Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, Correspondence to the City of West Palm Beach, p. 25-26 (Jan. 24, 2018), https://www.justice.gov/opa/press-release/file/1028311/download.

**Immigration Law and Removals**

The Federal Government, through immigration law,[23] seeks to control the number and type of aliens who are granted permission to enter, remain in the United States, and become citizens. Just as the Federal Government has established criteria for entering the country, it has also established formal criteria and procedures for removing or deporting an alien from this country who has violated the immigration laws. An alien may be removed for a number of reasons, including entering the country illegally, remaining longer than a visa authorizes, committing marriage fraud to obtain entry, or committing certain crimes.[24]

**Immigration Detainers**

An immigration detainer is a notice that the Department of Homeland Security issues to a law enforcement agency, whether federal, state, or local, to notify the agency that Immigration and Customs Enforcement (ICE) intends to take custody of someone in the custody of that law enforcement agency. A copy of the federal detainer form currently used by the Department of Homeland Security appears at the end of this analysis.[25]

A detainer serves three purposes:
- To serve notice to a law enforcement agency that ICE intends to take custody of an alien who is in the agency's custody once he or she is no longer subject to that agency's detention;
- To request information from the law enforcement agency concerning the alien's upcoming release so that ICE may gain custody before the alien is released; and
- To request a law enforcement agency to maintain custody, for no more than 48 hours, of an alien who otherwise would be released in order to permit ICE enough time to assume custody. The 48 hour period excludes Saturday, Sundays, and holidays.[26]

According to U.S. Immigration and Customs Enforcement, detainers are an essential tool ICE needs to identify and remove criminal aliens who are currently in the custody of federal, state, or local law enforcement. ICE is dependent on state and local law enforcement to cooperate and partner with them in this effort.[27]

Whether to comply with a federal immigration detainer has been a challenging issue for local law enforcement agencies. For many years, sheriffs' offices simply honored detainers and provided the requested information about the detention or upcoming release of someone held in custody. In 2014, this changed. Two federal court cases[28] questioned the legality of detaining an

---

[23] The Immigration and Nationality Act of 1952 and its amendments contain the current body of immigration law. It is contained in 8 U.S.C.A., Title 8 – Aliens and Nationality.

[24] 8 U.S.C. s. 1227.

[25] DHS Form I-247A.

[26] *Ice Detainers: Frequently Asked Questions*, U.S. Immigration and Customs Enforcement (Dec. 28, 2011), https://www.ice.gov/ice-detainers-frequently-asked-questions.

[27] *Id*. The authority to issue a detainer stems from federal regulations found at 8 C.F.R. § 287.7, which arises from the Secretary's power under the Immigration and Nationality Act § 103(a)(3), 8 U.S.C. 1103(a)(3), to issue "regulations … necessary to carry out [her] authority" under the INA, and from ICE's general authority to detain individuals who are subject to removal or removal proceedings."

[28] *Galarza v. Szalczyk*, 745 F. 3d 634 (3d Cir. 2014) and *Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317-ST, 2014 WL 1414305 (D. Ore. April 11, 2014).

inmate based solely upon a detainer from ICE when there was no accompanying probable cause to support the detention.[29] In both cases the plaintiffs were detained pursuant to ICE detention orders. Information was provided to the counties which indicated that investigations were being undertaken to learn whether the plaintiffs were candidates for removal and deportation. Both counties were ultimately held civilly liable for an unlawful seizure, even though the counties complied with a federal regulation cited in the detainer form that gave them the apparent authority to detain the inmates. Not surprisingly, ICE detainers have been interpreted by federal courts to be requests, not mandatory commands that deprive an agency of any discretion whether to detain an alien. In *Galarza*, the court noted that under the Tenth Amendment, immigration officials may not command state and local officials to imprison suspected aliens, because doing so would be inconsistent with the anti-commandeering principle of the Tenth Amendment.[30]

**New Enforcement Policy Between ICE and 29 Florida Sheriffs**

On January 17, 2018, the U.S. Immigration and Customs Enforcement office issued a news release announcing that 17 basic ordering agreements had been agreed to with sheriffs around the state. The number of agreements is now at 29.[31] These agreements detail "a new process to clarify that aliens held by these jurisdictions are held under the color of federal authority." As such, the local law enforcement jurisdictions receive "liability protection from potential litigation as a result of faithfully executing their public safety duties." The news release stated that sheriffs will no longer have to choose between releasing criminal illegal aliens from their custody back into the community or exposing themselves to potential civil liability for violating the alien's civil rights. The participating sheriffs will also receive compensation for complying with the detainers.[32]

**Texas Legislation and Litigation**

In 2017, Texas enacted SB 4, a law that, among other things, prohibited local authorities from restricting their cooperation or communication with federal immigration enforcement officials and directed local law enforcement to comply with ICE detainer requests.[33] Several cities moved for preliminary injunctive relief before the bill became effective. The plaintiffs challenged the bill in Federal District Court on the grounds of federal preemption and violations of First Amendment free speech and Fourth Amendment search and seizure protections.[34] The court granted a preliminary injunction preventing several sections of the law from taking effect. The state appealed to the U.S. Court of Appeals for the Fifth Circuit and requested a stay of each injunction. The Fifth Circuit ultimately upheld the majority of the statute.[35] In a lengthy decision the court determined that:

- Texas was not preempted from enacting the legislation;

---

[29] Florida Sheriffs Association, *Legal Alert: ICE Detainers* (on file with the Senate Committee on Judiciary).

[30] *Galarza,* 745 F. 3d at 643.

[31] Email from Matt Dunagan, Deputy Executive Director of Operations, Florida Sheriffs Association (Feb. 7, 2019) (on file with the Senate committee on Judiciary).

[32] U.S. Immigration and Customs Enforcement, News Releases, *ICE, 17 FL Sheriffs Announce New Enforcement Partnership* (Jan. 17, 2018) https://www.ice.gov/news/releases/ice-17-fl-sheriffs-announce-new-enforcement-partnership.

[33] *Texas Senate Bill 4* (2017-2018), *https://legiscan.com/TX/bill/SB4/2017*.

[34] *City of El Cenizo, et al., v. State of Texas, et. al.,* 264 F. Supp. 3d 744 (2017).

[35] *City of El Cenizo, et al., v. State of Texas, et al.,* 890 F. 3d 164 (2018).

- A requirement that law enforcement agencies comply with an immigration detainer request when the agency had custody of a person who was the subject of the detainer was not facially unconstitutional;
- The Fourth Amendment prohibition against unlawful search and seizure did not require probable cause of criminality in order to detain someone in the context of immigration law; and
- The Texas constitution did not prevent the state from pre-empting the home-rule authority of cities when it passed the law.

The *City of El Cenizo* opinion, the case upholding Texas SB 4, has been somewhat distinguished by other cases, one of which is a Florida federal district case in Miami that is still in the discovery stage.[36] In that case, the plaintiffs, comprised of aliens and immigrant advocacy groups, brought an action against Miami-Dade County and alleged that the county violated their civil rights under the Fourth Amendment when it arrested them based upon an ICE detainer request and without probable cause to believe that they had committed a crime. Miami-Dade County moved to dismiss the plaintiffs' case. The court concluded that it "does not find the analysis in *EL Cenizo* persuasive or helpful . . ." and ruled that the plaintiffs had alleged enough facts under the Fourth Amendment to withstand a complete motion to dismiss. This case is ongoing.

## III.    Effect of Proposed Changes:

CS/SB 168 seeks to ensure that state and local entities and law enforcement agencies cooperate with the Federal Government to enforce, and not obstruct, immigration laws. In its most general terms, the bill prohibits sanctuary jurisdictions and requires state and local entities to comply with federal immigration detainers.

**Findings and Intent (s. 908.101, F.S.)**

The Legislature finds that it is an important state interest to cooperate and assist the Federal Government as it seeks to enforce federal immigration laws throughout the state.

**Sanctuary Policies are Prohibited (s. 908.103, F.S.)**

A state entity, law enforcement agency, or local governmental entity is prohibited from adopting or having a sanctuary policy. A sanctuary policy is generally defined as a law or policy which contravenes 8 U.S.C. s. 1373(a) or (b), by:
- Prohibiting or restricting information between a federal, state, or local government agency and the Immigration and Naturalization Service regarding the citizenship or immigration status of an individual; or
- Prohibiting or restricting a Federal, state, or local government entity from sending, requesting, receiving, maintaining, or exchanging information regarding the immigration status of an individual to, or from, the Immigration and Naturalization Service.

---

[36] *C.F.C. et al., v. Miami-Dade County*, 2018 WL 6616030.

40

Additionally, a sanctuary policy means a policy which knowingly prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency with regard to federal immigration enforcement, including, but not limited to, limiting or preventing a law enforcement agency from:

- Complying with an immigration detainer;
- Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in its custody;
- Providing a federal immigration agency access to an inmate for an interview;
- Participating in any program or agreement authorized under section 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357;[37] or
- Providing a federal immigration agency with an inmate's incarceration status or release date.

**Cooperation with Federal Immigration Authorities (s. 908.104, F.S.)**

A law enforcement agency must use its best efforts to support the enforcement of federal immigration law. However, this requirement only applies to an official, representative, agent, or employee when he or she is acting within the scope of official duties or scope of employment.

The bill prohibits a state entity, local governmental entity, or law enforcement agency, except where provided by federal law, from restricting a law enforcement agency's ability to:

- Send information regarding a person's immigration status to, or requesting, receiving, or reviewing that information from a federal immigration agency;
- Record and maintain immigration status information for purposes of the act;
- Exchange immigration status information with a federal immigration agency, state entity, local governmental entity, or law enforcement agency;
- Use the immigration information to comply with an immigration detainer; or
- Use the immigration information to confirm the identity of a person who is detained by a law enforcement agency.

*Criminal Cases*

The bill requires a judge in a criminal case to order a secure correctional facility where the defendant is to be confined to reduce a defendant's sentence by not more than 7 days if the facility determines that the reduction will facilitate the defendant's seamless transfer into federal custody if he or she is subject to an immigration detainer. The judge must indicate on the record that the defendant is subject to an immigration detainer or otherwise indicate that the defendant is subject to transfer into federal custody when making the order. If a judge does not have this information at the time of sentencing, but a law enforcement agency receives the information after sentencing, the law enforcement agency must notify the judge and he or she must issue the order to the secure correctional facility as soon as the information becomes available.

---

[37] This program, known as the 287(g) program, is a partnership venture that involves a delegation of federal authority to a state or local law enforcement entity. The program allows the state or local entity to enter into a memorandum of agreement, thereby forming a partnership with ICE, to permit designated law enforcement officers, who are specially trained and supervised, to perform the functions of immigration law enforcement within their respective jurisdictions. The ICE website states that the sheriff's offices of Clay, Collier, Hernando, and Pasco counties, as well as the Jacksonville Sheriff's Office, have these mutually signed agreements in force. U.S. Immigration and Customs Enforcement, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (rev. July 10, 2018), https://www.ice.gov/287g.

*Transport*

When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in its custody the agency may securely transport the person to a federal facility in this state or to a point of transfer to federal custody outside the jurisdiction of the agency. However, the law enforcement agency may transport the alien only when authorized by a court order unless the transportation will happen within the 7 day time period mentioned above. The law enforcement agency must first obtain judicial authorization before transporting the alien outside of the state.

*Victims or Witnesses*

The cooperation and support requirements in this section do not require a state entity, local governmental entity, or law enforcement agency to provide a federal immigration agency with information related to a victim or witness to a criminal offense if the victim or witness timely cooperates in good faith in the investigation or prosecution of the crime. A victim or witness's cooperation must be documented in the entity's or agency's investigative records, and the entity or agency must retain the records for at least 10 years for the purposes of audit, verification, or inspection by the Auditor General.

**Duties Related to Immigration Detainers (s. 908.105 F.S.)**

The bill establishes the duties of a law enforcement agency when it has custody of someone subject to an immigration detainer. If an agency has custody of a person subject to a detainer, the agency must:
- Inform the judge who is authorized to grant or deny bail that the person is subject to a detainer;
- Record the detainer information in the person's case file; and
- Comply with the requests made in the detainer after determining that the detainer is consistent with the requirements set forth in s. 908.102, F.S., as explained above.

A law enforcement agency is not required to perform the three duties listed above for a person who is transferred from another law enforcement agency if the previous agency performed the duty before transferring custody. Additionally, a judge who receives notice that someone is subject to an immigration detainer must cause the detainer information is recorded in the court record, regardless of whether the detainer notice is received before or after a judgment is rendered in the case.

**Reimbursement of Costs (s. 908.106, F.S.)**

The bill requires each county correctional facility to enter into an agreement with a federal immigration agency for the temporarily housing and payment of the costs of persons who are the subject of immigration detainers.  Those agreements may be basic ordering agreements, agreements authorized by section 287 of the Immigration and Nationality Act[38] or successor or similar acts.

[38] *See* note 37 *supra*.

**Enforcement (s. 908.107, F.S.)**

The bill authorizes the Attorney General to institute a civil action against any state entity, local government entity, or law enforcement agency for a violation of this law or to prevent a violation of the law. The civil action may be an action for an injunction or any other appropriate orders or relief.

When a court determines, either through adjudication or a consent decree, that a state entity, local governmental entity, or law enforcement agency has violated this act, the court must enjoin the unlawful sanctuary policy. The court retains continuing jurisdiction over the parties and subject matter and may initiate contempt proceedings to enforce its orders. An order that approves a consent decree or grants an injunction must contain written findings of fact that specifically describe the sanctuary policy that violates the prohibition against sanctuary jurisdictions.

**Education Records (s. 908.108, F.S.)**

The bill provides that it does not apply to the release of education records of an educational agency or institution, unless that release conforms to the provisions of the Family Educational Rights and Privacy Act of 1974. For purposes of that act, education records mean those records, files, documents, and other materials which contain information directly related to a student and are maintained by an educational agency or institution or by a person acting for the agency or institution. Education records do not include records of instructional, supervisory, and administrative personnel, records maintained by a law enforcement unit of the educational agency or institution, certain employment records for people who are not in attendance at the agency or institution, and medical or psychological records used in treating a student.[39]

**Discrimination Is Prohibited (s. 908.109, F.S.)**

The bill prohibits discrimination based upon a person's gender, race, religion, national origin, or physical disability, except as authorized by the United States Constitution or State Constitution.

**Repeal of Sanctuary Policies Required (Section 2)**

Any sanctuary policy, as defined in the bill, in effect on the effective date of the act must be repealed within 90 days after the act's effective date.

**Effective Dates**

The act takes effect on July 1, 2019, but the section pertaining to enforcement contained in s. 908.107, F.S., takes effect on October 1, 2019.

---

[39] 20 U.S.C. 1232g(a)(4)(A) and (B).

IV.   **Constitutional Issues:**

A.   Municipality/County Mandates Restrictions:

It appears that the bill, by requiring counties and municipalities to comply with immigration detainers, requires a "county or municipality to spend funds or to take an action requiring the expenditure of funds" as described in Article VII, section 18 of the Florida Constitution.

Article VII, section 18, subsection (a) of the Florida Constitution provides in part that a county or municipality may *not* be bound by a general law requiring the county or municipality to spend funds or to take an action that requires the expenditure of funds unless the law fulfills an important state interest and a listed exception is met.

Additionally, Article VII, section 18, subsection (d) provides eight exemptions, which, if any single one is met, exempt the law from the limitations on mandates. One of the exemptions applies when the law has an "insignificant fiscal impact." At this time, whether the fiscal impact is insignificant or significant cannot be known. The bill requires each county correctional facility to enter into an agreement with a federal immigration agency for the payment of the costs of temporarily housing and detaining persons who are the subject of an immigration detainer. It is unknown if these agreements will completely cover the costs of detaining people. Many sheriffs' offices have already entered into basic ordering agreements with the Federal Government and are reimbursed for housing inmates, pursuant to a detainer, at a rate of $50 for up to 48 hours of detention. If the person is not held for very long, arguably, the sheriff's office could profit, depending on what it costs to hold someone. If, in contrast, a person is held for the full 48 hours, the costs might result in a loss, depending on what reimbursement costs are negotiated. There is no data available yet to answer this concern.

Article VII, section 18, subsection (a) also provides that a mandate may be binding if the Legislature determines that the law fulfills an important state interest and is approved by two-thirds vote of the membership in each house. If the bill does have a significant fiscal impact and another exemption or exception in Article VII, section 18 does not apply, the bill must be approved by two-thirds vote of each chamber to be binding upon the counties and municipalities.

B.   Public Records/Open Meetings Issues:

None.

C.   Trust Funds Restrictions:

None.

D.   State Tax or Fee Increases:

None.

44

E.  Other Constitutional Issues:

This bill has provisions that are similar to Texas Senate Bill 4, enacted in 2017. That bill among other things, prohibited local authorities from restricting cooperation or communication with federal immigration enforcement officials and directed local law enforcement agencies to comply with ICE detainers.[40] Several cities moved for preliminary injunctive relief before the bill became effective, alleging that the bill violated Fourth Amendment search and seizure protections among other things.[41] When the case, *City of El Cenizo v. State of Texas*, reached the U.S. Court of Appeals for the Fifth Circuit, the court upheld the majority of the statute.[42] In a lengthy decision, the court determined that:

- Texas was not preempted by federal law from enacting the legislation;
- A requirement that law enforcement agencies comply with an immigration detainer when the agency had custody of a person who was the subject of the detainer was not facially unconstitutional; and
- The Fourth Amendment prohibition against unlawful search and seizure did not require probable cause of criminality in order to detain someone in the context of immigration law.

Notwithstanding the Fifth Circuit's *El Cenizo* opinion, there are a number of federal court opinions holding that ICE detainers alone are not sufficient authority for a state or local government entity to detain a person. However, many of these cases may be distinguishable from litigation that may result from SB 168.

The main distinguishing feature may be the fact that the cases predate significant changes to ICE detainer policies made in April 2017. Under the new policies, ICE detainers must be accompanied by an administrative arrest warrant and include a probable cause determination.[43] Other court opinions involving ICE detainers have found that local law enforcement agencies were without authority under state law to comply with an immigration detainer. But, SB 168 clearly authorizes compliance with immigration detainers and ICE warrants.

Nonetheless, a federal district court in Miami in *C.F.C. v. Miami-Dade County* issued an "Order on Defendant's Motion to Dismiss" in which the court determined that "Plaintiffs have alleged plausible facts to support their contention that the County violated their Fourth Amendment rights when it arrested [them] based on a detainer and without probable cause that either of them had committed a crime."[44] This case, however, is not final and it remains in the discovery stage.

---

[40] *Texas Senate Bill 4* (2017-2018), *https://legiscan.com/TX/bill/SB4/2017*.
[41] *City of El Cenizo, et al., v. State of Texas, et. al.,* 264 F. Supp. 3d 744 (2017).
[42] *City of El Cenizo, et al., v. State of Texas, et al.,* 890 F. 3d 164 (2018).
[43] *Creedle v. Miami-Dade County*, 349 F.Supp.3d 1276, at *9 (S.D. Fla. 2018).
[44] *C.F.C. v. Miami-Dade County*, 349 F.Supp.3d 1236 (S.D. Fla. 2018).

**V.      Fiscal Impact Statement:**

A.      Tax/Fee Issues:

None.

B.      Private Sector Impact:

None.

C.      Government Sector Impact:

None.

**VI.      Technical Deficiencies:**

The underlying bill contained a chapter title, "Federal Immigration Enforcement," that was deleted in the committee substitute. Because a new chapter 908 is being created with this act, it would be beneficial to add a chapter title to the bill.

**VII.      Related Issues:**

None.

**VIII.      Statutes Affected:**

This bill creates the following sections of the Florida Statutes:  908.101, 908.102, 908.103, 908.104, 908.105, 908.106, 908.107, 908.108, and 908.109.

**IX.      Additional Information:**

A.      Committee Substitute – Statement of Substantial Changes:
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

**CS by Judiciary on February 19, 2019:**
The committee substitute significantly reduces the scope of the underlying bill. The committee substitute removes the provisions pertaining to: the duty of a law enforcement agency to determine an arrested person's immigration status at the time of booking; the duty of officials to report violations of the act and the ensuing possibility that they might be suspended or removed from office for not reporting violations; the requirement that the Attorney General provide a format for complaints alleging violations of the act; the responsibility of the state attorney to investigate and pursue complaints of violations; financial penalties for having sanctuary policies; the creation of a civil cause of action for injuries or wrongful death attributed to a sanctuary policy; and the ineligibility of entities to receive state grant funding if the entity had a sanctuary policy in effect. The committee substitute adds a provision that requires agencies to enter into agreements with federal entities to recover costs for detaining aliens. The committee substitute also adds a provision specifying that a detainer must be accompanied by a particular form of federal warrant to be sufficient.

B.      Amendments:

None.

DEPARTMENT OF HOMELAND SECURITY
**IMMIGRATION DETAINER - NOTICE OF ACTION**

| Subject ID:<br>Event #: | File No:<br>Date: |
|---|---|

| TO: (Name and Title of Institution - OR Any Subsequent Law<br>Enforcement Agency) | FROM: (Department of Homeland Security Office Address) |
|---|---|

Name of Alien: _____

Date of Birth: _____    Citizenship: _____    Sex: _____

**1. DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON** *(complete box 1 or 2).*

☐ A final order of removal against the alien;

☐ The pendency of ongoing removal proceedings against the alien;

☐ Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE ALIEN TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION** *(complete box 1 or 2).*

☐ Upon completion of the proceeding or investigation for which the alien was transferred to your custody, DHS intends to resume custody of the alien to complete processing and/or make an admissibility determination.

**IT IS THEREFORE REQUESTED THAT YOU:**

• **Notify DHS** as early as practicable (at least 48 hours, if possible) before the alien is released from your custody. Please notify DHS by calling ☐ U.S. Immigration and Customs Enforcement (ICE) or ☐ U.S. Customs and Border Protection (CBP) at _____. If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.

• **Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien **must be served with a copy of this form** for the detainer to take effect. This detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters.

• Relay this detainer to any other law enforcement agency to which you transfer custody of the alien.

• Notify this office in the event of the alien's death, hospitalization or transfer to another institution.

☐ If checked: please cancel the detainer related to this alien previously submitted to you on _____ (date).

_____     _____
(Name and title of Immigration Officer)     (Signature of Immigration Officer) (Sign in Ink)

**Notice:** If the alien may be the victim of a crime or you want the alien to remain in the United States for a law enforcement purpose, notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing or faxing a copy to _____ .

Local Booking/Inmate #: _____    Estimated release date/time: _____

Date of latest criminal charge/conviction: _____    Last offense charged/conviction: _____

This form was served upon the alien on _____ , in the following manner:

☐ in person    ☐ by inmate mail delivery    ☐ other (please specify): _____

_____     _____
(Name and title of Officer)     (Signature of Officer) (Sign in Ink)

DHS Form I-247A (3/17)                                                     Page 1 of 3

---

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

48

49

# EXHIBIT B-8

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (MOA) constitutes an agreement between U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Clay County Sheriff's Office (CCSO), pursuant to which ICE delegates to nominated, trained, certified, and authorized CCSO personnel the authority to perform certain immigration enforcement functions as specified herein. It is the intent of the parties that these delegated authorities will enable the CCSO to identify and process for removal, under ICE supervision, aliens in CCSO jail/correctional facilities who fall within ICE's civil immigration enforcement priorities. The CCSO and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein.

### I. PURPOSE

The purpose of this collaboration is to enhance the safety and security of communities by focusing resources on identifying and processing for removal aliens who fall into ICE's civil immigration enforcement priorities. This MOA sets forth the terms and conditions pursuant to which selected CCSO personnel (participating CCSO personnel) will be nominated, trained, and approved by ICE to perform certain functions of an immigration officer within the CCSO's jail/correctional facilities. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating CCSO personnel as members of the CCSO. However, the exercise of the immigration enforcement authority delegated under this MOA to participating CCSO personnel shall occur only as provided in this MOA.

### II. AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g) (1996), as amended by the Homeland Security Act of 2002, Public Law 107-296, authorizes the Secretary of DHS to enter into written agreements with a State or any political subdivision of a State so that qualified personnel can perform certain functions of an immigration officer. Such authority has been delegated by the Secretary to ICE, and this MOA constitutes such a written agreement.

### III. POLICY

This MOA sets forth the following: 1) the functions of an immigration officer that DHS is authorizing the participating CCSO personnel to perform; 2) the duration of the authority conveyed; 3) the supervisory requirements, including the requirement that participating CCSO personnel are subject to ICE supervision while performing immigration-related duties pursuant to this MOA; and 4) program information or data that the CCSO is required to collect as part of the operation of the program. For the purposes of this MOA, ICE officers will provide supervision for participating CCSO personnel only as to immigration enforcement functions as authorized in this MOA. The CCSO retains supervision of all other aspects of the employment and performance of duties by participating CCSO personnel.

ICE retains sole discretion in determining how it will manage its detention resources and

1

6/26/17

50

advance its mission. ICE will prioritize the detention of aliens in conformity with its civil immigration enforcement priorities. ICE reserves the right to detain aliens to the extent provided by law.

The CCSO is expected to pursue to completion all criminal charges that caused the alien to be taken into custody and over which the CCSO has jurisdiction. Subject to its civil immigration enforcement priorities, ICE will assume custody of an alien for purposes of removal, only after said individual has been released from CCSO custody. The CCSO agrees to use its 287(g) authority in a manner consistent with ICE's civil immigration enforcement priorities.

## IV. DESIGNATION OF AUTHORIZED FUNCTIONS

Approved participating CCSO personnel will be authorized to perform only those immigration officer functions that are set forthin the Standard Operating Procedures (SOP) in Appendix D to this MOA.

## V. OPTIONAL INTER-GOVERNMENTAL SERVICE AGREEMENTS

ICE and the CCSO may enter into an Inter-Governmental Service Agreement (IGSA) pursuant to which the CCSO will continue to detain, for a reimbursable fee, aliens for immigration purposes, if ICE so requests, following completion of the alien's criminal incarceration. If ICE and the CCSO enter into an IGSA, the CCSO must meet applicable detention standards.

In addition to detention services, ICE and the CCSO may enter into an IGSA provide for transportation services relating to incarcerated aliens. Under a transportation IGSA, the CCSO will transport incarcerated aliens who have completed their criminal sentences to a facility or location designated by ICE, if ICE makes such a request. Reimbursement to the CCSO will occur only when the CCSO obtained prior ICE approval for the transportation. ICE will not reimburse if the CCSO did not obtain prior approval from ICE.

The parties understand that the CCSO will not continue to detain an alien after that alien is eligible for release from the CCSO's custody in accordance with applicable law and CCSO policy, except for a period of up to 48 hours, pursuant to an immigration detainer issued in accordance with 8 C.F.R. § 287.7, absent an IGSA in place as described above.

## VI. NOMINATION OF PERSONNEL

The CCSO will nominate candidates for ICE training and approval under this MOA. All candidates must be United States citizens. All CCSO candidates shall have knowledge of and have enforced laws and regulations pertinent to their law enforcement activities and their jurisdictions, All CCSO candidates shall have experience supervising inmates, have been trained on maintaining the security of CCSO facilities, and have enforced rules and regulations governing inmate accountability and conduct. Candidates must also show an ability to meet and deal with people of differing backgrounds and behaviors.

The CCSO is responsible for conducting a criminal background check covering the last five

2

years for all nominated candidates. Upon request, the CCSO will provide all related information and materials it collected, referenced, or considered during the criminal background check for nominated candidates to ICE.

In addition to the CCSO background check, ICE will conduct an independent background check for each candidate. This background check requires all candidates to complete a background questionnaire. The questionnaire requires, but is not limited to, the submission of fingerprints, a personal history questionnaire, and the candidate's disciplinary history (including allegations of excessive force or discriminatory action). ICE reserves the right to query any and all national and international law enforcement databases to evaluate a candidate's suitability to exercise immigration enforcement functions under this MOA. Upon request by ICE, the CCSO will provide continuous access to disciplinary records of all candidates along with a written privacy waiver signed by the candidate allowing ICE to have continuous access to his or her disciplinary records.

The CCSO agrees to use due diligence to screen individuals nominated for training and agrees that individuals who successfully complete the training under this MOA will perform immigration officer functions authorized under section 287(g) of the INA for a minimum of two years. If CCSO personnel under consideration are in a collective bargaining unit, the CCSO must, prior to the execution of the MOA, have an agreement with the exclusive representative that allows the designated officers to remain in their position for a minimum of two years. This two-year requirement may be waived solely at the discretion of ICE for good cause in situations that involve, among other things, imminent promotion, officer career development, and disciplinary actions. Failure by the CCSO to fulfill this commitment could jeopardize the terms of this MOA.

All CCSO candidates must be approved by ICE and must be able to qualify for access to the appropriate DHS and ICE databases/systems and associated applications. Should a candidate not be approved, a qualified substitute candidate may be submitted. Any future expansion in the number of participating CCSO personnel or scheduling of additional training classes is subject to all the requirements of this MOA and the accompanying SOP.

## VII. TRAINING OF PERSONNEL

Before participating CCSO personnel receive authorization to perform immigration officer functions under this MOA, they must successfully complete the Immigration Authority Delegation Program (IADP) training provided by ICE. IADP training will be taught by ICE instructors and tailored to the immigration enforcement functions to be performed. Each CCSO nominee must pass each IADP examination with a minimum score of 70 percent to receive certification. If an CCSO nominee fails to attain a 70-percent rating on an examination, the CCSO nominee will have 1 opportunity to review the testing material and re-take a similar examination. During the entirety of the IADP, the CCSO nominee will be offered a maximum of 1 remedial examination. Failure to achieve a 70-percent rating on any 2 examinations (inclusive of any remedial examination), will result in the disqualification of the CCSO nominee and discharge of the nominee from the IADP.

3

Training will include, among other topics: (i) discussion of the terms and limitations of this MOA; (ii) the scope of delegated immigration officer authority; (iii) relevant immigration laws; (iv) ICE's civil immigration enforcement priorities, including prosecutorial discretion; (v); civil rights laws; (vi) the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014, and related DHS guidance; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) obligations related to consular notification concerning the arrest or detention of foreign nationals.

Participating CCSO personnel will also be required to complete refresher training, Immigration Authority Delegation Refresher Program (IADRP), every two years, and any additional training required by ICE on relevant administrative, legal, and operational issues related to the performance of immigration officer functions.

ICE will review the training requirements annually and reserves the right to amend them.

Trained CCSO personnel will receive a DHS email account and access to the necessary DHS systems and associated applications. The use of the information technology (IT) infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer (CISO) and the CCSO's Designated Accreditation Authority (DAA). The CCSO agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the IT policies and rules of behavior for each user granted access to the DHS network and applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

## VIII.  CERTIFICATION AND AUTHORIZATION

Upon successful completion of IADP training, CCSO personnel shall be deemed "certified" under this MOA.

On a yearly basis, ICE will certify in writing the names of those CCSO personnel who successfully complete training and pass all required test(s). Upon receipt of the certification, the ICE Field Office Director (FOD) in Miami District will provide the participating CCSO personnel a signed authorization letter allowing the named CCSO personnel to perform specified functions of an immigration officer for an initial period of one year from the date of the authorization. ICE will also provide a copy of the authorization letter to the CCSO. Only those certified CCSO personnel who receive authorization letters issued by ICE and whose immigration enforcement efforts are overseen by an ICE supervisor may conduct immigration officer functions described in this MOA.

Along with the authorization letter, ICE will issue the certified CCSO personnel official immigration officer credentials. Upon receipt of the credentials, CCSO personnel will provide ICE a signed receipt of the credentials on the ICE Record of Receipt – Property Issued to Employee (Form G-570). Participating CCSO personnel shall carry their ICE-issued credentials while performing immigration officer functions under this MOA. Such credentials provided by

4

53

ICE shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, when a participating CCSO employee ceases his/her participation, or when deemed necessary by the ICE FOD in Miami District.

Authorization of participating CCSO personnel to act pursuant to this MOA may be withdrawn at any time and for any reason by ICE and must be memorialized in a written notice of withdrawal identifying an effective date of withdrawal and the personnel to whom the withdrawal pertains. Such withdrawal may be effectuated immediately upon notice to the CCSO. The CCSO and the ICE FOD in Miami District will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA shall constitute immediate revocation of all immigration enforcement authorizations delegated hereunder.

The CCSO will notify ICE within 48 hours of when participating CCSO personnel cease their participation in the 287(g) program, so that appropriate action can be taken in accordance with ICE policies, including inventorying and retrieval of credentials and termination of user account access to the appropriate DHS and ICE databases/systems and associated applications.

## IX.  COSTS AND EXPENDITURES

The CCSO is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material. The CCSO is responsible for the salaries and benefits, including overtime, of all of its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating CCSO personnel while they are receiving training. The CCSO will cover the costs of all CCSO personnel's travel, housing, and per diem affiliated with the training required for participation in this MOA. ICE is responsible for the salaries and benefits of all of its personnel, including instructors and supervisors.

If ICE determines the training provides a direct service for the Government and it is in the best interest of the Government, the Government may issue travel orders to selected personnel and reimburse travel, housing, and per diem expenses only. The CCSO remains responsible for paying salaries and benefits of the selected personnel.

ICE will provide instructors and training materials.

Subject to the availability of funds, ICE will be responsible for the purchase, installation, and maintenance of technology (computer/Integrated Automated Fingerprint Identification System/Photo and similar hardware/software) necessary to support the immigration enforcement functions of participating CCSO personnel at each CCSO facility with an active 287(g) program. Only participating CCSO personnel certified by ICE may use this equipment. ICE will also provide the necessary technological support and software updates for use by participating CCSO personnel to accomplish the delegated functions. Such hardware, software, and other technology purchased or provided by ICE shall remain the property of ICE and shall be returned to ICE upon termination of this agreement, or when deemed necessary by the ICE FOD in Miami District.

5

The CCSO is responsible for covering all expenses at the CCSO facility regarding cabling and power upgrades. If the connectivity solution for the CCSO is determined to include use of the CCSO's own communication lines - (phone, DSL, site owned T-1/T-3, etc.), the CCSO will be responsible for covering any installation and recurring costs associated with the CCSO line.

The CCSO is responsible for providing all administrative supplies, such as paper, toner, pens, pencils, or other similar items necessary for normal office operations. The CCSO is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints and flexi cuffs, etc.

Also, if requested by ICE, the CCSO will provide at no cost to ICE, an office within participating CCSO facilities from which ICE supervisory employees can work.

## X.  ICE SUPERVISION

Immigration enforcement activities conducted by the participating CCSO personnel will be supervised and directed by ICE supervisory officers. Participating CCSO personnel are not authorized to perform immigration officer functions except when working under the supervision or guidance of ICE. Additional supervisory and administrative responsibilities are specified in the SOP in Appendix D.

The actions of participating CCSO personnel will be reviewed by ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for individual training or guidance.

For purposes of this MOA, ICE officers will provide supervision of participating CCSO personnel only as to immigration enforcement functions conducted in conjunction to this authority. The CCSO retains supervision of all other aspects of the employment of and performance of duties by participating CCSO personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating CCSO personnel in exercising these delegated authorities under this MOA shall be DHS and ICE policies and procedures. ICE is responsible for providing the CCSO with the applicable DHS and ICE policies.
However, when engaged in immigration enforcement activities, no participating CCSO personnel will be expected or required to violate or otherwise fail to maintain the CCSO's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law.

If a conflict arises between an order or direction of an ICE supervisory officer or a DHS or ICE policy and the CCSO's rules, standards, or policies, the conflict shall be promptly reported to the points of contact listed in Appendix A who shall attempt to resolve the conflict.

## XI.  REPORTING REQUIREMENTS

The CCSO will provide statistical or aggregated arrest data to ICE, as requested by ICE.  The

6

CCSO will also provide specific tracking data and/or any information, documents, or evidence related to the circumstances of a particular arrest upon request. ICE may use this data to compare and verify ICE's own data, and to fulfill ICE's statistical reporting requirements, or to assess the progress and success of the CCSO's 287(g) program.

## XII. LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by Federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the CCSO will be responsible and bear the costs of participating CCSO personnel with regard to their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating CCSO personnel will be treated as Federal employees only for purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating CCSO personnel will enjoy the same defenses and immunities from personal liability for their in-scope acts that are available to ICE officers based on actions conducted in compliance with this MOA. *See* 8 U.S.C. § 1357(g)(8).

Participating CCSO personnel named as defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. CCSO personnel who wish to submit a request for representation shall notify the local ICE Office of the Chief Counsel at 3535 Lawton Road, Suite #100, Orlando, FL 32803. The Office of the Chief Counsel in turn will notify the ICE Headquarters Office of the Principal Legal Advisor (OPLA), which will assist CCSO personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g); and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. Subject to DHS Policy, ICE may defend or indemnify acts of intentional misconduct on the part of the participating CCSO personnel only to the extent authorized by law.

The CCSO agrees to cooperate with any Federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating CCSO employee to cooperate in any Federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The CCSO agrees to cooperate with Federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any CCSO personnel under threat of disciplinary action in an

7

56

administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating CCSO personnel under this MOA are undertaken under Federal authority, the participating CCSO personnel will comply with Federal standards and guidelines relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The CCSO and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. §552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

## XIII.  COMPLAINT PROCEDURES

The complaint reporting procedure for allegations of misconduct by participating CCSO personnel, including activities undertaken under the authority of this MOA, is included in Appendix B.

## XIV.  CIVIL RIGHTS STANDARDS

Participating CCSO personnel are bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014," and Title VI of the Civil Rights Act of 1964, as amended, 42. U.S.C. 2000 et seq., which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving Federal financial assistance.

## XV.  INTERPRETATION SERVICES

Participating CCSO personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the CCSO, as needed.

The CCSO will maintain a list of qualified interpreters or companies it contracts with to provide such interpreters. Participating law enforcement personnel will be instructed on the proper administrative procedures to follow to obtain the services of an interpreter. A qualified interpreter, which may include CCSO personnel, means an interpreter who can interpret effectively, accurately, and impartially, using any specialized vocabulary. If an interpreter is used when a designated officer is performing functions under this MOA, the interpreter must be identified, by name, in records.

## XVI.  COMMUNICATION

The ICE FOD in Miami District, and the CCSO shall meet at least annually, and as needed, to

8

review and assess the immigration enforcement activities conducted by the participating CCSO personnel, and to ensure compliance with the terms of this MOA. When necessary, ICE and the CCSO may limit the participation of these meetings in regards to non-law enforcement personnel. The attendees will meet in Miami District at locations to be agreed upon by the parties, or via teleconference. The participants will be supplied with specific information on case reviews, individual participants' evaluations, complaints filed, media coverage, and, to the extent practicable, statistical information on immigration enforcement activity in Miami District. An initial review meeting will be held no later than nine months after certification of the initial class of participating CCSO personnel under Section VII, above.

## XVII.   COMMUNITY OUTREACH

The CCSO will, as necessary, engage in Steering Committee meetings and may engage in other community outreach with individuals and organizations expressing an interest in this MOA. ICE may participate in such outreach upon the CCSO's request. Nothing in this MOA shall limit ICE's own community outreach efforts.

## XVIII.   RELEASE OF INFORMATION TO THE MEDIA AND OTHER THIRD PARTIES

The CCSO may, at its discretion, communicate the substance of this agreement to organizations and groups expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the CCSO is authorized to do the same.

The CCSO hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the CCSO must coordinate in advance of release with the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval prior to any release. The points of contact for ICE and the CCSO for this purpose are identified in Appendix C. For releases of information to all other parties, the CCSO must coordinate in advance of release with the applicable ICE Field Office.

Information obtained or developed as a result of this MOA, including any documents created by the CCSO that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the CCSO has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE supervisor prior to releases to all other parties.

CCSO questions regarding the applicability of this section to requests for the release of information shall be directed to an ICE supervisor.

Appendix B to this MOA describes the complaint procedures available to members of the public regarding actions taken by participating CCSO personnel pursuant to this agreement.

## XIX.   MODIFICATIONS TO THIS MOA

Modifications to this MOA must be proposed in writing and approved and signed by both

9

parties. Modification to Appendix D shall be done in accordance with the procedures outlined in the SOP.

## XX. POINTS OF CONTACT

ICE and the CCSO points of contact for purposes of this MOA are identified in Appendix A. Points of contact (POC) can be updated at any time by providing a revised Appendix A to the other party to this MOA.

## XXI. DURATION AND TERMINATION OF THIS MOA

This MOA will remain in effect from the date of signing to June 30, 2019 unless terminated earlier by either party. Prior to the expiration of the effective period, ICE and the CCSO shall review the MOA for consideration whether to modify, extend, or permit the MOA to lapse. During the MOA's effective period, either party, upon written notice to the other party, may terminate or suspend the MOA at any time. A termination or suspension notice by ICE shall be delivered personally or by certified or registered mail to the CCSO and termination or suspension shall take effect immediately upon receipt of such notice. Notice of termination or suspension by the CCSO shall be given to the ICE FOD in Miami District and termination or suspension shall take effect immediately upon receipt of such notice. Upon a subsequent demonstration of need, all costs to reinstate access to such authorities and/or program services will be incurred by the CCSO.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

JUN 30 2017

Date: _____

Matthew T. Albence
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Department of Homeland Security

Date: 6-26-17

Darryl R. Daniels
Sheriff
Clay County Sheriff's Office

10

# APPENDIX A

## POINTS OF CONTACT

The ICE and CCSO points of contact for purposes of implementation of this MOA are:

For the CCSO:

Steven Inman
Chief of Detention Security
Clay County Sheriff's Office
Office (904) 529-5901
sinman@claysheriff.com


For ICE Enforcement and Removal Operations (ERO):

Sean M. Stephens
Detention and Deportation Officer
287(g) Program Manager
13077 Veveras Drive
Jacksonville, FL 32258
Office (904) 288-4613
Sean.M.Stephens@ice.dhs.gov

**11**

## APPENDIX B

## COMPLAINT PROCEDURE

This Memorandum of Agreement (MOA) is between the U.S. Department of Homeland Security's U.S. Immigration and Customs Enforcement (ICE) and the Clay County Sheriff's Office, (CCSO), pursuant to which selected CCSO personnel are authorized to perform immigration enforcement duties in specific situations under Federal authority. As such, the training, supervision, and performance of participating CCSO personnel pursuant to the MOA, as well as the protections for U.S. citizens' and aliens' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

The MOA sets forth the process for designation, training, certification, and authorization of certain CCSO personnel to perform certain immigration enforcement functions specified herein. Complaints filed against those personnel in the course of their non-immigration duties will remain the domain of the CCSO and be handled in accordance with the CCSO's applicable rules, policies, and procedures.

If any participating CCSO personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA or a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the CCSO shall, to the extent allowed by State law, notify ICE within 48 hours of the existence and nature of the complaint or allegation. The results of any internal investigation or inquiry connected to the complaint or allegation and the resolution of the complaint shall also be promptly reported to ICE. The ICE notifications must be made locally to the ICE FOD in Miami District and to the ICE Office of Professional Responsibility (OPR) via the Joint Intake Center (JIC) at JointIntake@cbp.dhs.gov. Complaints regarding the exercise of immigration enforcement authority by participating CCSO personnel shall be handled as described below.

The CCSO will also handle complaints filed against CCSO personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Further, any such complaints regarding non-designated CCSO personnel must be forwarded to the JIC.

In order to simplify the process for the public, complaints against participating CCSO personnel relating to their immigration enforcement can be made according to the procedures outlined below.

12

### 1.Complaint and Allegation Reporting Procedures

Complaint reporting procedures shall be disseminated by the CCSO within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that all individuals are aware of the availability of such procedures. Such material must include up-to-date contact information necessary to file the complaint.

Complaints will be accepted from any source (e.g., ICE, CCSO, participating CCSO personnel, inmates, and the public). ICE will immediately forward a copy of the complaint to the DHS Office for Civil Rights and Civil Liberties (CRCL).

Complaints can be reported to Federal authorities as follows:

A. Telephonically to the DHS Office of the Inspector General (DHS OIG) at the toll free number 1-800-323-8603, or

B. Telephonically to the ICE OPR at the Joint Intake Center (JIC) in Washington, D.C., at the toll-free number 1-877-246-8253, email JointIntake@cbp.dhs.gov, or

C. Via mail as follows:
> Department of Homeland Security
> U.S. Immigration and Customs Enforcement
> Office of Professional Responsibility
> P.O. Box 14475
> Pennsylvania Avenue NW
> Washington D.C. 20044

### 2. Review of Complaints

All complaints or allegations (written or oral) reported to the CCSO directly that involve CCSO personnel with ICE delegated authority will be reported to ICE OPR via the JIC. ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Headquarters. Complaints received by any ICE entity will be reported directly to ICE OPR as per existing ICE policies and procedures.

ICE OPR, as appropriate, will make an initial determination regarding ICE investigative jurisdiction and refer the complaint to the appropriate ICE office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to ICE OPR will be shared with the CCSO's Internal Investigations Unit when the complaint involves CCSO personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

### 3. Complaint and Allegations Resolution Procedures

13

Upon receipt of any complaint or allegation, ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above, ICE OPR will adhere to the reporting requirements as stated above and as they relate to the DHS OIG and CRCL and/or the DOJ Civil Rights Division. Complaints will be resolved using the existing procedures, supplemented as follows:

A.  Referral of Complaints or Allegations to the CCSO's Internal Investigations Unit.

The ICE OPR will refer complaints, as appropriate, involving CCSO personnel to the CCSO's Internal Investigations Unit for resolution. The facility commander will inform ICE OPR of the disposition and resolution of any complaints or allegations against CCSO's participating officers.

B.  Interim Action Pending Complaint Resolution

When participating CCSO personnel are under investigation for any reason that could lead to disciplinary action, demotion, or dismissal, or are alleged to have violated the terms of this MOA, ICE may suspend or revoke an individual's immigration enforcement authority and have that individual removed from participation in the activities covered under the MOA.

C.  Time Parameters for Resolution of Complaints or Allegations

It is expected that any complaint received will be resolved within 90 days of receipt. However, this will depend upon the nature and complexity of the substance of the complaint itself.

D.  Notification of Resolution of a Complaint or Allegation

ICE OPR will coordinate with the CCSO's Internal Investigations Unit to ensure notification as appropriate to the JIC, the subject(s) of a complaint, and the person filing the complaint regarding the resolution of the complaint.

These Complaint Reporting and Allegation Procedures are ICE's internal policy and may be supplemented or modified by ICE unilaterally. ICE will provide CCSO with written copies of any such supplements or modifications. These Complaint Reporting and Allegation Procedures apply to ICE and do not restrict or apply to other investigative organizations within the federal government.

14

64

## APPENDIX C

## PUBLIC INFORMATION POINTS OF CONTACT

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate appropriate release of information to the media, provided the release has been previously approved by the ICE Privacy Officer, regarding actions taken under this MOA before any information is released. The points of contact for coordinating such activities are:

For the CCSO:

Angela Spears
Public Relations Senior Executive
(904) 529-6397
aspears@claysheriff.com


For ICE:

Office of Public Affairs
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Washington, DC 20536
202-732-4242
icemedia@ice.dhs.gov

15

64

## APPENDIX D

## STANDARD OPERATING PROCEDURE (SOP)

The purpose of this appendix is to establish standard, uniform procedures for the implementation and oversight of the 287(g) delegation of authority program within the FOD area of responsibility. This appendix can be modified only in writing and by mutual acceptance of ICE and the CCSO.

Pursuant to this MOA, the CCSO has been delegated authorities under the Jail Enforcement Officer (JEO) model as outlined below. A 287(g) JEO model is designed to identify and process aliens amenable for removal within the CCSO's jail/correctional facilities pursuant to ICE's civil immigration enforcement priorities

### Prioritization:

ICE retains sole discretion in determining how it will manage its limited resources and meet its mission requirements. To ensure resources are managed effectively, ICE requires the CCSO to also manage its resources dedicated to 287(g) authority under the MOA. To that end, the CCSO shall follow ICE's civil immigration enforcement priorities.

### Authorized Functions:

Participating CCSO personnel performing immigration-related functions pursuant to this MOA will be CCSO officers assigned to detention operations supported by ICE. Those participating CCSO personnel will exercise their immigration-related authorities only during the course of their normal duties while assigned to CCSO jail/correctional facilities. Participating CCSO personnel will identify and process for removal aliens in CCSO jail/correctional facilities who fall within ICE's civil immigration enforcement priorities .

Participating CCSO personnel are delegated only those authorities listed below:

- The power and authority to interrogate any person detained in the participating law enforcement agency's detention center who the officer believes to be an alien about his or her right to be or remain in the United States, 8 U.S.C. § 1357(a)(1) and 8 C.F.R. § 287.5(a)(1), and to process for immigration violations any removable alien or those aliens who have been arrested for violating a Federal, State, or local offense;

- The power and authority to serve warrants of arrest for immigration violations pursuant to 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(e)(3);

- The power and authority to administer oaths and to take and consider evidence, 8 U.S.C § 1357(b) and 8 C.F.R. § 287.5(a)(2), to complete required alien processing, including fingerprinting, photographing, and interviewing of aliens, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

16

65

- The power and authority to prepare charging documents, 8 U.S.C. §§ 1225(b)(1), 1228, 1229, and 1231(a)(5); 8 C.F.R. §§ 235.3, 238.1, 239.1, and 241.8, including the preparation of a Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer;

- The power and authority to issue immigration detainers, 8 U.S.C. §§ 1226 and 1357, and 8 C.F.R. § 287.7, and I-213, Record of Deportable/Inadmissible Alien, for processing aliens; and

- The power and authority to detain and transport, 8 U.S.C. § 1357(g)(1) and 8 C.F.R. § 287.5(c)(6), arrested aliens subject to removal to ICE-approved detention facilities.

As previously noted in this Appendix, ICE requires the CCSO to follow ICE's civil immigration enforcement priorities.

### Additional Supervisory and Administrative Responsibilities:

Immigration enforcement activities conducted by the participating CCSO personnel will be supervised and directed by ICE supervisory officers. Participating CCSO personnel are not authorized to perform immigration officer functions except when working under the supervision or guidance of ICE. Additional supervisory and administrative responsibilities for each entity include, but are not limited to:

When issuing any immigration detainer, participating CCSO personnel must follow applicable DHS and ICE policies, and must notify the ICE supervisor of any immigration detainer issued under the authority conferred by the MOA within 24 hours.

The CCSO shall coordinate transportation of detainees processed under the authority conferred by the MOA in a timely manner, in accordance with the MOA and/or IGSA.

All alien processing in applicable ICE databases/systems and associated applications must be completed in accordance with established ICE polices and guidance.

The CCSO is responsible for ensuring proper record checks have been completed, obtaining the necessary court/conviction documents, and ensuring that the alien is served with the appropriate charging documents.

The CCSO must report all encounters with asserted or suspected claims of U.S. citizenship to the ICE FOD in Miami District through their chain of command within one hour of the claim. The FOD shall make the appropriate notification to ERO headquarters.

On a regular basis, the ICE supervisors are responsible for conducting an audit of the processing entries and records made by the CCSO's officers. Upon review and auditing of the entries and records, if errors are found, the ICE supervisor will communicate those errors in a timely manner to the responsible official for the CCSO and ensure that steps are taken to correct, modify, or prevent the recurrence of errors that are discovered.

17

**18**

Administrative files (A-files) are Federal records, subject to the Federal Records Act and applicable Federal confidentiality statues. It follows that the utilization and handling of the A-files must be consistent with applicable laws and DHS and ICE policy. The ICE supervisor is responsible for requesting A-files and reviewing them for completeness. A-files can be maintained at an CCSO facility as long as there are ICE personnel assigned to that facility and the personnel have a work area where documents can be adequately secured and stored by ICE personnel. Representatives from DHS must be permitted access to the facility where ICE records are maintained.

67