IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CITY OF SOUTH MIAMI, ET AL.,

          Plaintiffs,

                                        Civil Action File No.

v.

                                        1:19-cv-22927

RON DESANTIS, ET AL.,

          Defendants.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Local Rule 7.1(c) of the U.S. District Court for the Southern District of Florida, Plaintiffs hereby submit this response in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (DE 52, "Motion to Dismiss") with an incorporated memorandum of law and request that the Court deny Defendants' Motion to Dismiss, and state as follows:

## I.      Introduction

The Court reviews a motion to dismiss by construing the pleading broadly, and "the allegations in the complaint are viewed in the light most favorable to the plaintiff. *Watts v. Fla. Int'l Univ.*, 495 F.2d 1289, 1295 (11th Cir. 2007) (citations omitted). Plaintiffs' Amended Complaint not only meets but exceeds the standards governing the form of a complaint contemplated by Federal Rule of Civil Procedure 8(a). This Court has subject matter jurisdiction over this matter, the Amended Complaint sufficiently alleges the harm caused to Plaintiffs, and sufficiently alleges each cause of action.  Accordingly, Defendants' Motion to Dismiss should be denied.

1

**II.     Plaintiffs Have Standing to Bring this Action.**

Defendants concede that the Organizational Plaintiffs and the City of South Miami have standing to raise their claim that Section 908.105(1) ("Detainer Mandate") is preempted. DE 52, 3. Defendants also concede that Mayor Philip K. Stoddard has standing to assert his Fourteenth Amendment claim that SB 168 is unconstitutionally vague. *Id*.

Defendants focus their argument on the standing of Organizational Plaintiffs to challenge Section 908.104(4) ("Transport Provision") and Section 908.106 ("Reimbursement Provision") as preempted, as well as Section 908.104(1) ("Best Efforts" mandate) and Sections 908.103 and 908.102(6) ("Sanctuary Policy Prohibition") as unconstitutionally vague. Defendants are incorrect.

As Plaintiffs argue in their Reply to Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Defendants hinge their argument on the claims that the alleged harms are only to the federal government and that being subject to "greater federal immigration enforcement" is not a qualifying harm. DE 52, 5 ("the crux of the Organizational Plaintiffs' alleged injury-in-fact—that persons who lack immigration status may be subject to greater federal immigration enforcement—is not, at its core, fairly traceable to SB 168"). But Defendants mischaracterize the harms claimed by Plaintiffs. Each of the Organizational Plaintiffs has standing to challenge the Transport Provision, the Reimbursement Provision, the Sanctuary Policy Prohibition, and Best Efforts mandate because they are at imminent risk of the injury of continuing to have to divert resources from their regular activities to combat these illegal provisions. *See Ga. Latino Alliance*, 691 F.3d at 1259–60; *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d at 1165-66. The Organizational Plaintiffs have had to, and must continue to, divert resources toward educating their members about SB 168 and its possible effects on local law enforcement practices. *See* DE 5-3 ¶¶ 6-8, 11; DE 5-4, ¶¶ 4, 6, 9, 13-18; DE 5-5 ¶¶ 15-20;

2

DE 5-6, ¶¶ 6, 7; DE 5-7, ¶¶ 6-8, 14, 15; DE 5-8 ¶¶ 11-18; DE 5-9 ¶¶ 8, 9; DE 5-10 ¶¶ 6-13, 16; DE 5-11 ¶¶ 10-12. This is a cognizable injury that is traceable to the Defendants' challenged conduct, namely the enforcement of SB 168.

Further, Organizational Plaintiffs FLIC, FWAF, FANM, QLatinx, and WeCount! are member-based entities that have standing to enforce the rights of their members when 1) at least one of their members would otherwise have standing; 2) the interests the organization wants to protect are germane to the organization's purpose; and 3) neither the claim itself nor the relief requested requires the participation of individual member(s). *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180–81 (2000). Regarding the first requirement, at least one member of each membership-based Plaintiff Organization would have standing. *See* DE 5-3, ¶ 1; DE 5-4, ¶ 2; DE 5-5, ¶ 4; DE 5-7, ¶ 2; DE 5-8, ¶ 4. FLIC, FWAF, FANM, QLatinx, and WeCount! are comprised of both undocumented and documented members. *See* DE 5-3, ¶ 2; DE 5-4, ¶ 12; DE 5-5, ¶ 7; DE 5-7, ¶ 4; DE 5-8, ¶¶ 11-18.  Many of the members of the Organizational Plaintiffs are Black, Latinx, or indigenous. *See* DE 5-3, ¶ 5; DE 5-4, ¶ 7; DE 5-5, ¶¶ 6, 7; DE 5-6, ¶¶ 2, 5; DE 5-7, ¶ 2; DE 5-8, ¶ 4. An organization need not "name" the "names" of members who will be harmed. *Fla. State Conference of N.A.A.C.P.*, 522 F.3d at 1160-61.

At least one member of each organization will be unlawfully transported across state lines pursuant to the Transport Provision by undeputized law enforcement who are not authorized to do so, as a result of SB 168. This imminent harm is analogous to the harm that the Detainer Mandate will cause. Further, the other provisions of SB 168--specifically the "Best Efforts" mandate in § 908.104(1)--reinforce the likelihood that this harm will occur. *See* §§ 908.104(1), (4). As in *Ga. Latino Alliance*, where an individual had standing when she anticipated the harm of an

investigatory detention pursuant to probable cause of a criminal violation, the existence of probable cause does not render the anticipated injury too speculative. 691 F.3d at 1259.

At least one member of each organization will also be subject to unlawful arrest because of the vague "Best Efforts" and "Sanctuary Policy" provisions. Although Defendants state that the Organizational Plaintiffs' have argued that the injury-in-fact caused to them by the vagueness of these provisions is "greater federal immigration enforcement," this assertion misstates the imminent harm to members of the Organizational Plaintiffs caused by SB 168.

The second and third requirements are satisfied because the missions of each of the Organizational Plaintiffs include empowering immigrants and immigrant communities and advocating for their rights. *See* DE 5-3, ¶ 1; DE 5-4, ¶ 2; DE 5-5, ¶ 3; DE 5-7, ¶ 2-3; DE 5-8, ¶ 3. The Organizational Plaintiffs seek to protect the rights of their members to be free from unlawful enforcement of SB 168, including the right to be free from unlawful detentions, via their challenge to the Transport Provision, Best Efforts mandate, and Sanctuary Policy Prohibition. Thus, the Organizational Plaintiffs' claims are germane to their purposes. *Friends of the Earth*, 528 U.S. at 180–81. Further, "when the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.'" *Fla. State Conference of N.A.A.C.P.*, 522 F.3d at 1160 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996)).

### III.   SB 168 is Preempted by Federal Immigration Law.

Defendants misstate the occupied field. Plaintiffs do not contend that immigration enforcement is fully preempted or that the ability to cooperate with federal enforcement is precluded. Rather, the INA leaves "no room for the States to supplement" when, and by whom, an individual can be arrested and detained for a civil immigration violation, and how state and local

law enforcement may be authorized to carry out the functions of federal immigration agents. *See Arizona v. United States,* 567 US 387, 399 (2012); DE 38, 35.

Defendants continue to concede that the Detainer Mandate requires that counties and cities arrest people on suspicion of a civil immigration violation and that extending custody is a new arrest. Defendants argue, however, that the federal government has authorized these arrests under 8 U.S.C. § 1357(g)(10), which permits localities to "cooperate" with immigration authorities.

As explained in both Plaintiffs' Reply to Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction and Plaintiffs' Response to the United States' Statement of Interest, localities can "cooperate" with federal immigration authorities. DE 39, 6-7; DE 50, 8-9. But § 1357(g)(10) does not convey authority to exercise the functions statutorily reserved to deputized immigration agents, such as arrest and transport. Rather, by creating 287(g) Agreements, Congress created a statutory mechanism for local law enforcement officers to become deputized to arrest and transport people for a civil immigration violation. Without such an agreement, local law enforcement officers lack federal authority to arrest, even at the request of an immigration official.

Defendants continue to insist that "cooperation" grants arrest power. As argued in Plaintiffs' prior pleadings, nothing in the statute supports the equation of cooperation with arrest authority. Moreover, Defendants' position would lead to an untenable result. Section 1357(g)(10)'s cooperation clause is not limited to state and local law enforcement. If Defendants were correct, "*any* employee of a State or political subdivision of a State" would also be authorized to make civil immigration arrests. 8 U.S.C. § 1357(g)(10) (emphasis added). Just as Congress did not grant civil immigration arrest authority to school superintendents, city commissioners, or

public pool lifeguards through this clause, it did not grant authority to undeputized state and local police.

Regarding the Transport Provision, Defendants point to Clay County Sheriff's Office's 287(g) Agreement, which delegates "the power and authority to detain and transport arrested aliens subject to removal to ICE-approved detention facilities." DE 52, 10. This clear federal delegation of immigration enforcement power to Clay County officers underscores the problem with Florida's attempt in 908.104(4) to grant these same powers to undeputized officers.

Regarding the Reimbursement Provision, Defendants argue that Congress's preclusion on reimbursing localities for work performed under 287(g) Agreements does not apply. In the view of Defendants, the phrase "may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law" contemplates paid or unpaid service. 8 U.S.C. § 1357(g)(1); DE 52, 12. "May" in this clause does not make reimbursement optional, but rather emphasizes that non-federal agencies may choose to participate only if authorized by their own state law to do so. 8 U.S.C. § 1357(g)(1). To read "may or may not" into the statute would also undermine the requirement for state and local authorization.

## IV.    SB 168 is Impermissibly Vague.

### A. Defendants Again Apply the Wrong Vagueness Test.

Defendants have once again erroneously applied the more lenient vagueness test that applies to civil regulations of merely economic conduct. DE 52, 13 (citing *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F 3d 1301, 1310 (11th Cir. 2009)). Because SB 168 is not a civil regulation of economic conduct, this standard does not apply. Where, as here, a statute "threatens to inhibit the exercise of constitutional rights," or where the law is criminal or "quasi-criminal" in nature, the appropriate test to apply is the more "stringent" vagueness test. *Vill. of Hoffman Estates*

6

*v. Flipside*, 455 U.S. 489, 498-499 (1982). SB 168's Best Efforts mandate and anti-sanctuary provisions qualify for the more "stringent" vagueness test on both counts. A "law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).

**B. SB 168's "Best Efforts" Mandate Fails to Provide Those Targeted by the Statute a Reasonable Opportunity to Know What Conduct is Prohibited and Is So Indefinite That it Allows Arbitrary and Discriminatory Enforcement.**

Law enforcement agencies and government entities cannot interpret with any certainty the meaning of "shall use best efforts to support the enforcement of federal immigration law." *See* DE 5-2, Stoddard Decl. ¶¶ 9-12, 22-23. "Best Efforts" is not defined anywhere in SB 168. Nor does SB 168 describe what the mandate requires or prohibits. Local government officials are left to speculate, leaving themselves vulnerable to the enforcement whims of both the Florida governor and attorney general. *See* § 908.107.

In their Motion to Dismiss, Defendants attempt to add a semblance of clarity into Section 908.104(1) by misstating the actual text. Defendants describe the best efforts mandate as requiring "best efforts to *cooperate* with federal officials" and "best efforts to *assist* federal immigration enforcement." *See* DE 52, 13, 14 (emphasis added). But this misstates the actual text of Section 908.104(1), which does not include the words "cooperate" or "assist." Defendants cannot supply their own terms. The text of this section states: "shall use best efforts to support the enforcement of federal immigration law." *See* § 908.104(1). Defendants attempt to clarify the Best Efforts mandate by rephrasing it to suggest that it is only operative following a request from the federal government to *assist* or *cooperate*. But this is not the case. Those tasked with abiding by this

mandate, like Mayor Stoddard, or with attempting to explain this mandate to their members, like the Organizational Plaintiffs, are placed in an impossible bind. If, for example, local officials decline to participate in a work place ICE raid so they can focus on disaster relief, or a homicide investigation, SB 168 does not provide enough guidance to Plaintiffs to determine whether or not they would be in compliance with the Best Efforts mandate. Section 908.104(1) is so vague that it is unclear whether "best efforts" encompasses unilateral state immigration enforcement. Given that Defendants understand "cooperate" to include arrest and "best efforts" to include cooperation, it is plausible that "best efforts" could be construed to include unilateral arrests.

Defendants assertion that clarity could eventually be found by reference to ICE's publicly available documents is likewise unpersuasive. *See* DE 52, 15. Section 908.104(1) does not reference any such documents. Nor do defendants identify these documents in their motion. Rather, Defendants assert that these documents are well-known to cooperating jurisdictions. *Id.* Even if true, not only are these documents not well known to every other government entity and law enforcement agency in the state, but the inherent vagueness of the Best Efforts mandate cannot be cured by reference to external documents or polices that may, or may not, be adopted.

### 1. Defendants Cannot Ignore the Bill Title When Assessing Vagueness.

Defendants never address the confusion caused by the inconsistent language between the Bill Title, and Section 908.104(1). The Bill Title of SB 168 includes the following:

> An act relating to federal immigration enforcement … requiring *state entities*, *local governmental entities, and law enforcement agencies* to use best efforts to support the enforcement of federal immigration law. (emphasis added)

By comparison, Section 908.104(1) does not list state entities or local government entities within the Best Efforts mandate, but confusingly, it mentions employees of both *entities* and *agencies*.

8

the vagueness of 908.104(1) is thus exacerbated by the inconsistent language found in the Bill Title.

In Florida, special attention is given to the Bill Title, as an adequate description of the statue is constitutionally required.  *See* FL Const. Art. 3 § 6; *see also State v. Volusia County Indus. Development Authority*, 400 So.2d 1222, 1225 (1981) ("The test for adequacy of a [statute's] title is whether the title is so worded as not to mislead a person of average intelligence as to the scope of the enactment.") (internal citations omitted). When those tasked with interpreting SB 168 look to the Bill Title for clues to interpreting Section 908.104(1), they will only find this irreconcilable inconsistency. The scope of who must comply with the Best Efforts mandate is unclear to a person of average intelligence.

The term "Best Efforts" is left undefined in the statute. It is unclear when it is operative, and confusion exists as to whom it applies. These deficiencies render the Best Efforts mandate standardless and vague in every conceivable application. There is no set of circumstances in which Section 908.104(1) would not be constitutionally vague. Defendants' efforts to rewrite this section by supplying their own terms fail.

### C. SB 168's Anti-Sanctuary Policy Provisions Fail to Provide Those Targeted by the Statute a Reasonable Opportunity to Know What Conduct is Prohibited and is so Indefinite That it Allows Arbitrary and Discriminatory Enforcement.

The term "impede" in Section 908.102(6) and, by reference, Section 908.103 is unconstitutionally vague. The term is vague especially in light of its chilling effect on First Amendment rights. *Vill. Of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). "Sanctuary policies" as defined in SB 168 include not only a law or policy, but also a practice, procedure, or custom that is adopted, or even simply allowed, by state or local government entities. This expansive prohibition chills the exercise of government officials' First Amendment rights. If, for

9

example, Mayor Stoddard wishes to speak out against the entanglement of federal immigration enforcement with local law enforcement, or if he urges the South Miami police department to focus on local priorities like community policing rather than federal immigration enforcement, he may be deemed to be "impeding" communication with a federal immigration agency, and thus putting himself at risk of being suspended from office. *See* § 908.107(1).

Like "best efforts," the term "impede" is impermissibly vague because it does not convey what conduct it prohibits. SB 168 forbids a "state entity, law enforcement agency, or local governmental entity" from adopting "a sanctuary policy." § 908.103. Under the definition of a "sanctuary policy," state and local government entities cannot adopt or allow a "custom" that "prohibits or impedes a law enforcement agency from complying with 8 U.S.C. § 1373." § 908.102(6) (emphasis added). The term "impede" is vague because it gives no guidance to cities and counties regarding the scope of prohibited actions relating to regulating communication with immigration authorities. *See Int'l Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 832 (5th Cir. 1979); *Ciccarelli v. City of Key W.,* 321 So. 2d 472, 473 (Fla. 3d DCA 1975) (striking down a loitering statute proscribing behavior that "impede[s] or tend[s] to impede passage"). Government officials will be left to hazard a guess, with the threat of enforcement actions and suspension from office hanging over their heads, whether quality control measures, some mandated by the INA itself, violate SB 168. For example, it is unclear whether Plaintiff City of South Miami's policy to refer communications from ICE to county police breaches § 908.102(6) and will trigger enforcement actions against the city. *See* DE 5-2 ¶¶ 12, 15. South Miami and other localities have no idea whether their policies and customs that protect immigrants in sensitive locations, such as schools, hurricane shelters, colleges, hospitals, or homeless shelters, impede

compliance with 8 U.S.C. § 1373. DE 5-2 ¶¶ 8, 10. SB 168 provides no meaningful guidance, but gives Defendants immense power to target officials and agencies.

**V.    SB 168 Violates the Equal Protection Clause of the Fourteenth Amendment.**

**A.  SB 168 Subjects Plaintiffs to Discrimination on the Basis of Race, Ethnicity, and National Origin.**

Plaintiffs' Amended Complaint details how SB 168 is discriminatory on its face and has a disproportionately adverse effect upon racial, ethnic, and national origin minorities in Florida. Plaintiffs allege that SB 168 subjects Plaintiffs to discrimination on the basis of race, ethnicity, and national origin by law enforcement officials seeking to use their "best efforts to support the enforcement of federal immigration law." DE 38, ¶¶ 393, 397-99. Defendants' argument that "undocumented aliens" are not a suspect class fails to address the discrimination at issue in this action. *See* DE 52 (citing *Estrada v. Becker*, 917 F.3d 1298, 1308–09 (11th Cir. 2019) and *Plyler v. Doe*, 457 U.S. 202, 223 (1982)).

SB 168 targets racial, ethnic, and national origin minorities in Florida. It is well established that immutable characteristics determined at birth, such as race, national origin, alienage, and ethnicity, create the basis for finding a suspect class. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (superseded by statute on other grounds); *Frontiero v. Richardson*, 411 U.S. 677 (1973); *Williams v. Pryor*, 240 F.3d 944 (11th Cir.2001) (identifying race and national origin as suspect classes); *Hernandez v. Texas,* 347 U.S. 475, 477–79 (1954) (finding that exclusion of Mexicans from jury service because of ancestry or national origin violates the Fourteenth Amendment). Classifications based on national origin or alienage "are a prime example of a 'discrete and insular' minority." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (holding that provisions of state welfare laws conditioning benefits on citizenship and imposing durational

11

residency requirement on alien were violative of equal protection clause) (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 152-153, n. 4, (1938) (citing *Oyama v. California*, 332 U.S. 633, 644-646, (1948); *Korematsu v. U.S.*, 323 U.S. 214, 216 (1944); *Hirabayashi v. U.S.*, 320 U.S. 81, 100, (1943)).

Defendants suggest that only a non-suspect class, "undocumented aliens," are affected by SB 168 and will be treated differently. But Defendants fail to acknowledge that suspected undocumented noncitizens, as well as documented noncitizens and U.S. citizens, will be singled out based on their presumed national origin or "alienage." *Graham v. Richardson*, 403 U.S. 365, 372 (1971). SB 168 not only targets a suspect class, but it aims to do so using a method that is faulty and depends on the historical racial animus that was the catalyst for federal immigration enforcement laws. SB 168's erroneous presumption that immigration status is "definite, not subject to nuance, and readily and quickly ascertained" inevitably requires a superficial method of identifying who may be an undocumented person for the purpose of implementing federal immigration law. DE 38, ¶ 216. That method invites invidious racial profiling based on race, national origin, and ethnicity. DE 38, ¶ 216.

Racial animus rooted in anti-immigrant sentiment is central to SB 168 as a whole. Evidence of animus against undocumented people demonstrates the subordination of racial and ethnic minorities in violation of the equal protection clause because the "history of the criminalization of unauthorized migration demonstrates criminal immigration laws, like crime-based deportation laws generally, were not initially adopted in a race-neutral manner. Racial animus towards immigrants, first Chinese and then Mexican, explains in large part the impetus for the creation of the first immigration crimes." Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. 171, 194 (2018).

Data in localities that entangle local law enforcement with federal immigration functions shows that, even in the absence of a state mandate requiring local law enforcement officials to use their "best efforts to support the enforcement of federal immigration law," discretionary police stops for Black and Latino drivers are compounded by local efforts to perform immigration functions. DE 38, ¶¶ 172-178. The arrest rate for Latinos driving without a license increased by 136% in Davidson County, Tennessee following the county's implementation of a 287(g) agreement. DE 38, ¶ 174, n. 24 (citing *The Consequences and Costs of a 287(g) Jail Agreement: One Tennessee County's Story*, American Civil Liberties Union of Tennessee, (2013), *available at* https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/consequences-and-costs-287g-jail-agreement (last visited Sept. 16, 2019)). This same pattern of increased discretionary arrests of Blacks and Latinos occurs in jurisdiction after jurisdiction where local law enforcement takes on some form of immigration function. *Id*. In short, local jurisdictions seeking to enforce federal immigration laws clearly rely on national origin and race as a proxy for immigration status. *See, e.g., N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 222–23 (4th Cir. 2016) (finding that using race as a proxy for party constitutes discriminatory purpose in violation of the Fourteenth Amendment, even absent any evidence of race-based hatred or political dynamics.); *Perez v. Abbott*, 253 F. Supp. 3d 864, 953 (W.D. Tex. 2017) (finding violation of Equal Protection Clause that race was used as a proxy for political affiliation, and that this was done intentionally to dilute minority voting strength).

Plaintiffs such as FLIC, FANM, QLatinx, WeCount!, and Hope Community Center, and their members, are already fearful of being racially profiled and harassed by local law enforcement because of SB 168. DE 38, ¶¶ 49, 74, 93, 135. Many immigrant families have mixed immigration status that may include United States citizens, lawful permanent residents, Temporary Protected

Status ("TPS") recipients, or undocumented. DE 38, ¶¶ 65, 85, 121, 131. These mixed status families, all of non-U.S. national origin, are experiencing the fear of being stopped by local law enforcement due to their race or color and the detrimental effects of the exclusionary message that SB 168 was intended to send. DE 38, ¶¶ 56, 82, 92, 93, 125, 135. Therefore, SB 168 is discriminatory on its face with a disproportionately adverse effect on racial, ethnic, and national origin minorities, because as the data in similarly-situated jurisdictions shows, local jurisdictions seeking to enforce federal immigration laws will inevitably use national origin and race as a proxy for immigration status.

**B.  The Legislative Intent Behind SB 168 is Discriminatory.**

### 1.  Facially Neutral Laws May Still Violate the Equal Protection Clause of the Fourteenth Amendment.

SB 168 violates equal protection because it "is rooted in anti-immigrant animus and makes state and local agencies enforcers of immigration law." DE 38, ¶ 150. Plaintiffs' Amended Complaint alleges that SB 168 "was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors, on the basis of race, color, and national origin." DE 38, ¶¶ 395, 397-99. Defendants' position is that plaintiffs fail to state a claim for relief under the equal protection clause because the claim is not plausible on its face. DE 52, 17. Defendants' argue that there is no legislative intent to discriminate because the "plain text of SB 168 . . . expressly prohibits unlawful discrimination." DE 52, 16-17. While SB 168 may include a nominal prohibition on discrimination, such a clause does not change the genesis of the legislation as an anti-immigrant bill aimed at discriminating against individuals on the basis of their national origin, color, and ethnicity. Moreover, laws that appear to be neutral on their face may still be discriminatory in violation of the Fourteenth Amendment.

For example, in *Gomillion v. Lightfoot*, the Alabama legislature changed Tuskegee's city boundaries from a square to a twenty-eight sided figure. 364 U.S. 339 (1960). Although the statute was neutral on its face, the Supreme Court held that altering the shape of city from a square to a twenty-eight sided figure—which had the effect of removing from the city of all but four or five of its 400 Black voters while not removing a single white voter or resident—constituted discrimination in violation of the Fourteenth Amendment. *Id*. The Court recognized that "[a] statute which is alleged to have worked unconstitutional deprivations of petitioners' rights is not immune to attack simply because the mechanism employed by the legislature is a redefinition of municipal boundaries." *Id*. at 347.

Likewise, in *Shaw v. Reno*, 509 U.S. 630 (1993), the Supreme Court found that an oddly shaped legislative district was, in the Court's view, "so extremely irregular on its face that it rationally [could] be viewed only as an effort to segregate the races for purposes of voting." *Shaw v. Reno*, 509 U.S. at 642; *see also McCreary County v. ACLU of Ky.*, 545 U.S. 844, 861–62 (2005) ("The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act.") (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)); *see also Wallace v. Jaffree*, 472 U.S. 38, 56–57 (1985) (relying on legislative history to support a finding that the legislature acted with a constitutionally forbidden purpose of promoting prayer in public schools). While the plain text of the laws in *Shaw* and *Gomillion* did not explicitly provide for segregation or the disenfranchisement of Black voters and may have appeared neutral on their face, the laws in and of themselves were so irregular that the only objective reason for them was discriminatory.

The Supreme Court has examined the legislative intent of a law that is facially neutral by examining "governmental hostility which is masked, as well as overt." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Legislative intent can be determined by reviewing both direct and circumstantial evidence, including "among other things, the historical background of the decision under challenge, the specific sequence of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-268 (1977).

Defendants' argument that the boilerplate anti-discrimination provision in Section 908.109 insulates SB 168 from an equal protection challenge fails because this clause merely provides a veil of neutrality. Section 908.109 does not convert SB 168 into a law with a substantive anti-discriminatory intent. Section 908.109's sole sentence that prohibits local governments and law enforcement from basing their "[a]ctions under this chapter on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution," does not provide any safeguards to prevent discrimination and disparate impact.

Discriminatory legislative intent may also be determined by inquiry into whether a reasonable person would view the statute as sending an exclusionary message to those affected by the challenged legislation. In *Santa Fe Independent School District v. Doe*, the Supreme Court ascertained legislative intent by analyzing whether non-adherents of a favored religion considered the statute a message "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 309-310 (2000) (quoting

16

*Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)). The exclusionary effect of SB 168 is already being felt in Florida communities with large percentages of racial, ethnic, and national origin minorities. SB 168 sends the message that noncitizens, and people perceived as noncitizens because of their race or ethnicity, are "outsiders" and "not fully members of the political community." DE 38, ¶¶ 49, 74, 93, 135; *Santa Fe Independent School District v. Doe*, 530 U.S. at 309-10.

### 2.   Plaintiffs Have Pled the Discriminatory Intent Behind SB 168.

The historical background leading up to SB 168 shows that SB 168's sponsor, Florida Senator Joe Gruters, and the Florida legislature passed SB 168 knowing the bill's discriminatory origins. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-268 (1977). Defendants do not dispute SB 168's legislative origins and ignore the historical background leading up to SB 168's passage. The law not only originated with Federation for American Immigration Reform ("FAIR") and their Florida-state affiliate, Floridians for Immigration Enforcement ("FLIMEN"), but  the legislative staff analysis distributed in support of SB 168 relied on information from FAIR's sister organization, Center for Immigration Studies ("CIS").  FAIR and CIS were both founded by white nationalist John Tanton, and both have issued numerous reports that promote racist views of immigrants by blaming immigrants for disease and crime.  DE 38, ¶ 152-154, n. 3-5.

The "specific series of events leading to the enactment" of SB 168 also point to the discriminatory intent behind SB 168. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-268 (1977). The Florida Legislature was made aware that CIS and FAIR are anti-immigrant hate groups and that the Senate staff analysis of the bill used biased CIS data. DE 38, ¶ 159. During a Florida Senate Committee meeting regarding SB 168 held on March 12,

2019, a Senator questioned Senator Gruters, SB 168's sponsor, about the use of CIS and FAIR data in the staff analysis in support of the bill, including the fact that both groups have been identified as anti-immigrant hate groups. DE 38, ¶ 159. Senator Gruters avoided answering the question.  Although Senator Gruters stated that he did not know that FAIR and CIS were anti-immigrant hate groups, Senator Gruters, Representative Cord Byrd, and the Florida Legislature did not disavow the anti-immigrant and discriminatory origin of SB 168 or the biased data used in the legislative staff analysis. DE 38, ¶ 170. To the contrary, Senator Gruters and Representative Byrd sponsored and participated in a April 17, 2019 press conference planned by FAIR's Florida affiliate, FLIMEN, and stood side-by-side with anti-immigrant activists who use and promote hateful and racist rhetoric against immigrants. DE 38, ¶ 161, n. 12.

The authorities that Defendants cite in their Motion to Dismiss do not support dismissal, and Plaintiffs have set forth sufficient allegations showing the discriminatory intent or purpose behind SB 168. Defendants' reference to *City of Cuyahoga Falls* is distinguishable because the plaintiffs in that action disavowed their claim that the mayor had acted in concert with private citizens to prevent the building of a multifamily, low-income housing complex because of the race and family status of its likely residents. *City of Cuyahoga Falls, Ohio v. Buckeye. Cmty. Hope Found.*, 538 U.S. 188, 197, (2003). Defendants fail to cite any authority to support their contention that SB 168 is on solid footing under the Fourteenth Amendment in view of the facts that the law was drafted by anti-immigrant hate groups founded by white nationalists, analyzed by legislative staff using these groups' biased data, and celebrated by Florida legislators at the side of the same extremist groups, even after they learned of the groups' white nationalist connections.  Defendants' Motion to Dismiss Plaintiffs' equal protection claims should be denied.

## VI.    Conclusion

Plaintiffs respectfully request that Defendants' Motion to Dismiss, DE 52, be denied because Plaintiffs' Amended Complaint sufficiently sets forth claims for violations of the Supremacy, Due Process, and Equal Protection Clauses of the Fourteenth Amendment. Plaintiffs have set forth the basis for standing and demonstrated that SB 168 is preempted by federal immigration law, portions of SB 168 are too vague to withstand due process scrutiny, and SB 168 is discriminatory on the basis of race, ethnicity, and national origin.

Respectfully submitted this 18th day of September, 2019.

By: /s/Anne Janet Hernandez Anderson
Anne Janet Hernandez Anderson (Fla. Bar No. 0018092)
E-mail: aj.hernandez@splcenter.org
Paul R. Chavez*
E-mail: paul.chavez@splcenter.org
Mich Gonzalez*
E-mail: mich.gonzalez@splcenter.org
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037
Miami, FL 33137-0037
Telephone: (786) 810-5673
Fax: (786) 237-2949

Rebecca Sharpless (Fla. Bar No. 0131024 )
E-mail: rsharpless@law.miami.edu
IMMIGRATION CLINIC
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive, E273
Coral Gables, FL 33146
Tel.: (305) 284-6092
Fax: (305) 284-6093

Alana Greer (Fla. Bar No. 92423)
Email: alana@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33145
Tel.: (305) 907-7697 ext. 1

*Attorneys for Plaintiffs*

* Admitted pro hac vice

19

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF system, which provides notice to all parties, on this September 18, 2019.

By: /s/ Anne Janet Hernandez Anderson
Anne Janet Hernandez Anderson (Fla. Bar No. 0018092)
SOUTHERN POVERTY LAW CENTER