## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-22927-BLOOM/Louis

CITY OF SOUTH MIAMI, et al.,

      Plaintiffs,

v.

RON DESANTIS, et al.,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** is before the Court on Plaintiffs'[1] Amended Motion for Preliminary Injunction and Request for Hearing. ECF No. [47] ("Amended Motion"). Defendants[2] filed a Response in Opposition to the Motion, ECF No. [19] ("Response"), to which Plaintiffs replied, ECF No. [39] ("Reply"). Defendants were also permitted to file a Surreply in Opposition, ECF No. [45] ("Surreply"), in order to respond to Plaintiffs' Amended Complaint, ECF No. [38] ("Amended Complaint"), which added one additional Plaintiff. The United States of America filed a Statement of Interest, ECF No. [23], to which Plaintiffs responded, ECF No. [50] ("SOI Response"). *Amici curiae* were permitted to file an amicus brief in support of Plaintiffs, ECF No. [61] ("Amicus Brief"). The instant Amended Motion requests that the Court grant a preliminary

---

[1] Plaintiffs include the City of South Miami; Philip K. Stoddard, Mayor of City of South Miami ("Mayor Stoddard"); Florida Immigrant Coalition, Inc. ("FLIC"), The Farmworker Association of Florida, Inc. ("FWAF"), Family Action Network Movement, Inc. ("FANM"), QLatinx, and WeCount!, Inc. ("WeCount"), on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc. ("AI Justice"), The Guatemalan-Maya Center, Inc. ("GMC"), Hope Community Center, Inc. ("Hope"), and Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster"), on behalf of their organizations (collectively, "Plaintiffs").

[2] Defendants include Ron DeSantis, Governor of the State of Florida ("Governor DeSantis"), and Ashley Moody, Attorney General of the State of Florida (collectively, "Defendants").

injunction enjoining Defendants from enforcing Chapter 908 of the Florida Statutes because the law is preempted by federal immigration law and is unconstitutionally vague. The Court has carefully considered the Amended Motion, all opposing and supporting submissions, the parties' arguments presented at the Hearing, the record in this case, and the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiffs' Amended Motion is granted in part and denied in part.

## I.        BACKGROUND

On May 2, 2019, the Florida legislature passed Senate Bill 168 ("SB 168"), which aimed to further the State of Florida's interest in "cooperat[ing] and assist[ing] the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101 (2019); ECF No. [5-1] at 2. The law was adapted from a model law originally drafted by organizations designated by the Southern Poverty Law Center to be hate groups, based on their anti-immigrant platforms. ECF No. [38] at 26. Moreover, SB 168 was described by its sponsors as an "anti-sanctuary cities law." *Id.* at 26, 27. On June 14, 2019, Governor DeSantis signed SB 168 into law, and it was enacted as Chapter 908 of the Florida Statutes. *See* Fla. Stat. ch. 908; ECF No. [5-1] at 7. Among other things, SB 168 prohibits so-called "sanctuary policies" that indicate certain jurisdictions' intent not to cooperate with Immigration and Customs Enforcement ("ICE"). ECF No. [19] at 4. The law delineates specific immigration enforcement efforts with which local jurisdictions must comply. These include complying with immigration detainers and transporting aliens to federal facilities. *Id.* at 4-5; *see* Fla. Stat. § 908.105; Fla. Stat. § 908.104(4). Furthermore, under SB 168, the Attorney General and the Governor are vested with enforcement authority to seek injunctive relief or to exercise the Governor's suspension power, should a government official

fail to comply with the law's mandates. Fla. Stat. § 908.107. This enforcement provision is scheduled to take effect on October 1, 2019. ECF No. [19] at 5.

The instant action challenges the constitutionality of numerous provisions of SB 168 and seeks injunctive and declaratory relief to prevent the law from taking effect. ECF No. [38] at 3.

**A.  Relevant SB 168 Provisions**

The provisions of SB 168 that are being challenged are reproduced in full below. Any supplemental provisions that are relevant to the Court's analysis are also set forth below.

SB 168 sets forth the definition of certain terms used in the statute in § 908.102. Plaintiffs Amended Complaint specifically challenges § 908.102(6)'s definition of "sanctuary policy" ("Sanctuary Definition"). Nevertheless, many of the other definitions in this section are relevant to the Court's analysis.

> Definitions.—As used in this chapter, the term:
>     (1)   "Federal immigration agency" means the United States Department of Justice and the United States Department of Homeland Security, a division within such an agency, including United States Immigration and Customs Enforcement and United States Customs and Border Protection, any successor agency, and any other federal agency charged with the enforcement of immigration law.
>     (2)   "Immigration detainer" means a facially sufficient written or electronic request issued by a federal immigration agency using that agency's official form to request that another law enforcement agency detain a person based on probable cause to believe that the person to be detained is a removable alien under federal immigration law, including detainers issued pursuant to 8 U.S.C. ss. 1226 and 1357 along with a warrant described in paragraph (c). For purposes of this subsection, an immigration detainer is deemed facially sufficient if:
>         (a)   The federal immigration agency's official form is complete and indicates on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law; or
>         (b)   The federal immigration agency's official form is incomplete and fails to indicate on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law, but is supported by an affidavit, order, or other official documentation that indicates that the federal immigration agency has probable cause to believe that the person to be detained is a removable alien under federal immigration law; and

(c)    The federal immigration agency supplies with its detention request a Form I-200 Warrant for Arrest of Alien or a Form I-205 Warrant of Removal/Deportation or a successor warrant or other warrant authorized by federal law.

(3)    "Inmate" means a person in the custody of a law enforcement agency.

(4)    "Law enforcement agency" means an agency in this state charged with enforcement of state, county, municipal, or federal laws or with managing custody of detained persons in this state and includes municipal police departments, sheriffs' offices, state police departments, state university and college police departments, county correctional agencies, and the Department of Corrections.

(5)    "Local governmental entity" means any county, municipality, or other political subdivision of this state.

(6)    "Sanctuary policy" means a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from:

(a)    Complying with an immigration detainer;

(b)    Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;

(c)    Providing a federal immigration agency access to an inmate for interview;

(d)    Participating in any program or agreement authorized under s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or

(e)    Providing a federal immigration agency with an inmate's incarceration status or release date.

(7)    "State entity" means the state or any office, board, bureau, commission, department, branch, division, or institution thereof, including institutions within the State University System and the Florida College System.

Fla. Stat. § 908.102.

Based on § 908.102(6)'s Sanctuary Definition, § 908.103 states, "Sanctuary policies prohibited.—A state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy." Fla. Stat. § 908.103 ("Sanctuary Prohibition").[3]

The requirement that state and local law enforcement entities and agencies cooperate with federal immigration enforcement efforts, § 908.104, states:

---

[3] Collectively, the Sanctuary Definition and the Sanctuary Prohibition will be referred to as "Sanctuary Provisions."

Cooperation with federal immigration authorities.—

(1)   A law enforcement agency shall use best efforts to support the enforcement of federal immigration law. This subsection applies to an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment.[4]

(2)   Except as otherwise expressly prohibited by federal law, a state entity, local governmental entity, or law enforcement agency, or an employee, an agent, or a representative of the entity or agency, may not prohibit or in any way restrict a law enforcement agency from taking any of the following actions with respect to information regarding a person's immigration status:

(a)   Sending the information to or requesting, receiving, or reviewing the information from a federal immigration agency for purposes of this chapter.

(b)   Recording and maintaining the information for purposes of this chapter.

(c)   Exchanging the information with a federal immigration agency or another state entity, local governmental entity, or law enforcement agency for purposes of this chapter.

(d)   Using the information to comply with an immigration detainer.

(e)   Using the information to confirm the identity of a person who is detained by a law enforcement agency.

(3)(a)   For purposes of this subsection, the term "applicable criminal case" means a criminal case in which:

1.   The judgment requires the defendant to be confined in a secure correctional facility; and

2.   The judge:

a.   Indicates in the record under s. 908.105 that the defendant is subject to an immigration detainer; or

b.   Otherwise indicates in the record that the defendant is subject to a transfer into federal custody.

(b)   In an applicable criminal case, when the judge sentences a defendant who is the subject of an immigration detainer to confinement, the judge shall issue an order requiring the secure correctional facility in which the defendant is to be confined to reduce the defendant's sentence by a period of not more than 12 days on the facility's determination that the reduction in sentence will facilitate the seamless transfer of the defendant into federal custody. For purposes of this paragraph, the term "secure correctional facility" means a state correctional institution as defined in s. 944.02 or a county detention facility or a municipal detention facility as defined in s. 951.23.

(c)   If the information specified in sub-subparagraph (a)2.a. or sub-subparagraph (a)2.b. is not available at the time the sentence is pronounced in the case, but is received by a law enforcement agency afterwards, the law enforcement agency shall notify the judge who shall issue the order described by paragraph (b) as soon as the information becomes available.

---

[4] Section 908.104(1) will be referred to as the "Best Efforts" provision.

(4)   When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.[5]

(5)   This section does not require a state entity, local governmental entity, or law enforcement agency to provide a federal immigration agency with information related to a victim of or a witness to a criminal offense if the victim or witness timely and in good faith responds to the entity's or agency's request for information and cooperation in the investigation or prosecution of the offense.

(6)   A state entity, local governmental entity, or law enforcement agency that, pursuant to subsection (5), withholds information regarding the immigration information of a victim of or witness to a criminal offense shall document the victim's or witness's cooperation in the entity's or agency's investigative records related to the offense and shall retain the records for at least 10 years for the purpose of audit, verification, or inspection by the Auditor General.

(7)   This section does not authorize a law enforcement agency to detain an alien unlawfully present in the United States pursuant to an immigration detainer solely because the alien witnessed or reported a crime or was a victim of a criminal offense.

(8)   This section does not apply to any alien unlawfully present in the United States if he or she is or has been a necessary witness or victim of a crime of domestic violence, rape, sexual exploitation, sexual assault, murder, manslaughter, assault, battery, human trafficking, kidnapping, false imprisonment, involuntary servitude, fraud in foreign labor contracting, blackmail, extortion, or witness tampering.

Fla. Stat. § 908.104.

Section 908.105 mandates that state and local law enforcement agencies comply with immigration detainers received by federal immigration authorities ("Detainer Mandate").

Duties related to immigration detainers.—

(1)   A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall:

(a)   Provide to the judge authorized to grant or deny the person's release on bail under chapter 903 notice that the person is subject to an immigration detainer.

---

[5] Section 908.104(4) will be referred to as the "Transport Requirement."

      (b)   Record in the person's case file that the person is subject to an immigration detainer.

      (c)   Upon determining that the immigration detainer is in accordance with s. 908.102(2), comply with the requests made in the immigration detainer.

      (2)   A law enforcement agency is not required to perform a duty imposed by paragraph (1)(a) or paragraph (1)(b) with respect to a person who is transferred to the custody of the agency by another law enforcement agency if the transferring agency performed that duty before the transfer.

      (3)   A judge who receives notice that a person is subject to an immigration detainer shall cause the fact to be recorded in the court record, regardless of whether the notice is received before or after a judgment in the case.

Fla. Stat. § 908.105.

Moreover, § 908.106 requires county correctional facilities to enter into agreements with the federal government for the reimbursement of costs incurred pursuant to honoring immigration detainer requests ("Cost Reimbursement").

> Reimbursement of costs.—Each county correctional facility shall enter into an agreement or agreements with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons. A compliant agreement may include any contract between a correctional facility and a federal immigration agency for housing or detaining persons subject to immigration detainers, such as basic ordering agreements in effect on or after July 1, 2019, agreements authorized by s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357, or successor agreements and other similar agreements authorized by federal law.

Fla. Stat. § 908.106.

Finally, in the event that state and local officers fail to comply with the immigration enforcement efforts specified in SB 168, § 908.107 sets forth the Governor and the Attorney General's ability to enforce Chapter 908.

> Enforcement.—
>       (1)   Any executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor in the exercise of his or her authority under the State Constitution and state law. Pursuant to s. 1(b), Art. IV of the State Constitution, the Governor may initiate judicial proceedings in the name of the state against such officers to enforce compliance with any duty under this chapter or restrain any unauthorized act contrary to this chapter.

(2)   In addition, the Attorney General may file suit against a local governmental entity or local law enforcement agency in a court of competent jurisdiction for declaratory or injunctive relief for a violation of this chapter.

(3)   If a local governmental entity or local law enforcement agency violates this chapter, the court must enjoin the unlawful sanctuary policy. The court has continuing jurisdiction over the parties and subject matter and may enforce its orders with the initiation of contempt proceedings as provided by law.

(4)   An order approving a consent decree or granting an injunction must include written findings of fact that describe with specificity the existence and nature of the sanctuary policy that violates this chapter.

Fla. Stat. § 908.107.

## B.   **This Action**

Following the enactment of SB 168, on July 16, 2019, Plaintiffs initiated this action against

Defendants, ECF No. [1] ("Complaint"), and filed their original Motion for Preliminary Injunction,

ECF No. [5], and accompanying memorandum of law, ECF No. [5-1]. Specifically, Plaintiffs

sought declaratory and injunctive relief, arguing that SB 168's Detainer Mandate, Transport

Requirement, and Cost Reimbursement provisions are preempted by federal law, and that the "Best

Efforts" provision and the Sanctuary Provisions are unconstitutionally vague.

On August 21, 2019, Plaintiffs amended their Complaint to include Mayor Stoddard as a

Plaintiff and added two counts relating to Mayor Stoddard's claims. ECF No. [38]; ECF No. [40].

The Amended Complaint asserts the following eleven counts on behalf of the different Plaintiffs:

Count I – § 908.105's Detainer Mandate violates the Supremacy Clause, U.S. Const. art. VI, § 2;

Count II – § 908.104(4)'s Transport Requirement violates the Supremacy Clause; Count III – §

908.160's Cost Reimbursement violates the Supremacy Clause; Counts IV, V, and VI – §

908.102(6)'s and § 908.103's Sanctuary Provisions violate the Due Process Clause; Counts VII,

VIII, and IX – § 908.104(1)'s "Best Efforts" provision violates the Due Process Clause; Count X

– § 908.104(1)'s "Best Efforts" provision violates the Equal Protection Clause; and Count XI – § 908.103's Sanctuary Prohibition violates the Equal Protection Clause.[6] *Id.*

On August 30, 2019, Plaintiffs amended their Motion for Preliminary Injunction to include additional arguments with regard to Mayor Stoddard's claims. ECF No. [47]. Plaintiffs' Amended Motion incorporated the arguments previously asserted in their Memorandum of Law attached to their original Motion, ECF No. [5-1], and their Reply, ECF No. [39]. Defendants filed their Response, ECF No. [19], and Surreply, ECF No. [45],[7] in opposition to the imposition of a preliminary injunction.

The Court held a hearing on September 26, 2019, ("Hearing"), which was attended by Plaintiffs' counsel, Defendants' counsel, and counsel for the United States of America, who sought the Court's leave to participate in the hearing, ECF No. [57]; *see also* ECF No. [60]. During the Hearing, Plaintiffs argued in support of a preliminary injunction that SB 168's challenged provisions are unconstitutional based on preemption and vagueness. Defendants argued that Plaintiffs lack standing and that a preliminary injunction is not warranted as SB 168 is neither preempted by federal law nor unconstitutionally vague. The United States of America participated and argued that federal immigration law does not preempt any of the challenged provisions of SB 168.

---

[6] It is relevant for the Court's standing analysis below to explain the relationship between each of the Plaintiffs and the counts asserted in the Amended Complaint. Count I is brought by the City of South Miami; FLIC, FWAF, FANM, QLatinx, and WeCount, on behalf of their members and their organizations as a whole; and AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Counts II, IV, VII, X, and XI are brought by FLIC, FWAF, FANM, QLatinx, and WeCount, on behalf of their members and their organizations as a whole; and AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Count III is brought by FLIC, FWAF, FANM, QLatinx, WeCount, AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Counts V and VIII are brought by the City of South Miami. Counts VI and IX are brought by Mayor Stoddard.

[7] Defendants' Surreply addresses arguments regarding the addition of Mayor Stoddard as a Plaintiff in the Amended Complaint.

## II.     LEGAL STANDARD

### A.  <u>Standing</u>

Standing is a threshold question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989) (en banc). "[S]tanding requirements 'are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "To establish standing, a plaintiff must have 'suffered an injury-in-fact that would be corrected by [a] favorable decision in the lawsuit.'" *Church*, 30 F.3d at 1335 (quoting *Cheffer v. McGregor*, 6 F.3d 705, 708 (11th Cir. 1993)).

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)).

### B.  <u>Preliminary Injunction</u>

"A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974);[8] *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("*NE Fla. CAGC of Am.*") ("The basis of injunctive relief in the federal courts has always

---

[8] The Court of Appeals for the Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted all decisions of the Court of Appeals for the Fifth Circuit that were rendered prior to September 30, 1981.

been irreparable harm and inadequacy of legal remedies." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))). District courts ultimately have discretion on whether or not to grant a preliminary injunction. *Callaway*, 489 F.2d at 572. However, "a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Id.* at 573. Accordingly, a movant must prove four factors in order to establish that a preliminary injunction is appropriate: (1) "a substantial likelihood of success on the merits," (2) "that the preliminary injunction is necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant," and (4) "that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (citing *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001)).

Because preliminary injunctions are drastic, often time-sensitive, remedies, they are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). As such, "all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

## III.   DISCUSSION

In their Amended Motion, Plaintiffs request that the Court preliminarily enjoin § 908.105(1)'s Detainer Mandate, § 908.104(4)'s Transport Requirement, § 908.106's Cost Reimbursement, § 908.104(1)'s "Best Efforts" provision, § 908.102(6)'s Sanctuary Definition, and § 908.103's Sanctuary Prohibition, based on their likelihood of success on the merits, the

irreparable harm they will suffer if SB 168 takes effect, and the equitable factors weighing in their favor. ECF No. [47]. Specifically, Plaintiffs contend that the Detainer Mandate, the Transport Requirement, and the Cost Reimbursement provisions violate the Supremacy Clause because they are preempted by the Immigration and Nationality Act ("INA"). *Id.* at 2. Additionally, Plaintiffs argue that the "Best Efforts" provision and the Sanctuary Provisions violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague. *Id.* Moreover, because Plaintiffs do not consider the provisions of SB 168 to be severable, they request that the Court preliminarily enjoin SB 168 in its entirety. *Id.*

Conversely, in their Response, Defendants argue that the Organizational Plaintiffs[9] lack standing to bring any of their claims, aside from the Detainer Mandate challenge; the City of South Miami lacks standing to bring its vagueness challenges; and Mayor Stoddard's[10] delay in joining this action rebuts any allegation that he will suffer irreparable harm under the preliminary injunction analysis. ECF No. [19]; *see also* ECF No. [45]. Defendants also assert that a preliminary injunction is not warranted because Plaintiffs cannot establish a likelihood of success on the merits on either their preemption claims or their vagueness challenges. ECF No. [19] at 10-18. Further, Defendants allege that the remaining equitable factors under the preliminary injunction analysis weigh in their favor. *Id.* at 19. Finally, if the Court determines that a preliminary injunction is warranted on any of the challenged provisions, Defendants request that the enjoined provisions be severed from the remainder of SB 168. *Id.* at 20.

---

[9] Any reference to the "Organizational Plaintiffs" includes FLIC, FWAF, FANM, QLatinx, WeCount, and AI Justice, GMC, Hope, and Westminster.
[10] Defendants' arguments as to Mayor Stoddard are set forth in their Surreply. ECF No. [45] at 2-3.

## A.  <u>Standing</u>

As an initial matter, the Court will address the issue of Plaintiffs' standing. Defendants argue that the Organizational Plaintiffs lack standing to challenge the Transport Requirement, Cost Reimbursement, "Best Efforts" provision, and Sanctuary Provisions. ECF No. [19] at 7-9. Additionally, Defendants contest Plaintiff City of South Miami's standing to assert its vagueness challenges. *Id.* at 9-10.

"A threshold question in every federal case is whether the plaintiff has made out a justiciable case or controversy within the meaning of article III." *NE Fla. CAGC of Am.*, 896 F.2d at 1287 n.1 (Tjoflat, C.J., specially concurring) (quoting *Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 606 (11th Cir. 1985)). As explained above, to establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Moreover, "[s]tanding cannot be waived or conceded by the parties." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

The United States Supreme Court has defined "injury in fact" as "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

> When, as here, plaintiffs file a pre-enforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing "'a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement.'" *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998) (quoting *Am. Civil Liberties Union v. The Fla. Bar (ACLU)*, 999 F.2d 1486, 1492 (11th Cir. 1993)). A plaintiff may meet this standard in any of three ways: "(1) [the plaintiff] was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application." *Id.* (citing *ACLU*, 999 F.2d at 1492).

*Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1257-58 (11th Cir. 2012) ("*GLAHR*"). Additionally, there must be a causal connection between a plaintiff's injury and a defendant's alleged illegal conduct. *Id.* at 1257. "Finally, it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Bennett*, 520 U.S. at 167).

## 1.   Organizational Plaintiffs' Standing

Defendants argue that the Organizational Plaintiffs do not have standing to assert any of their claims on behalf of themselves or their members. Defendants contend that the Organizational Plaintiffs will not suffer any irreparable injury as a result of SB 168's enactment because the law does not impose any obligation on the organizations or their members. ECF No. [19] at 7-9. Conversely, Organizational Plaintiffs contend that they have standing to represent themselves because they have had to, and will continue to need to, divert resources away from their core activities to respond to the increased concerns of their members and the community about SB 168's implications. ECF No. [39] at 2-5. Furthermore, these organizations assert that they can properly bring claims on behalf of their members, who have independent standing, because they have sufficiently pled that these members will be personally and adversely impacted by the heightened immigration enforcement efforts by state and local officials pursuant to SB 168. *Id.*

Organizations can establish standing to sue either on their own behalf or on behalf of their members. "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *GLAHR*, 691 F.3d at 1259-60 (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). An organization can establish injury for standing purposes

by showing either that it has already suffered a cognizable injury when it had to divert its resources, or that it reasonably anticipates that it will have to divert its resources in the future, to address the illegal conduct. *Billups*, 554 F.3d at 1350; *Browning*, 522 F.3d at 1165-66.

Additionally, "[i]t has long been settled that an organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). The Supreme Court has explained that an association may sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

> Accordingly, under *Hunt*, an association may bring suit on behalf of its members or constituents despite the fact that individual members have not actually brought suit themselves. Nor must the association name the members on whose behalf suit is brought. As we have stated, "neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are prerequisites."

*Doe*, 175 F.3d at 882 (quoting *Church of Scientology v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981)).

Each of the Organizational Plaintiffs has generally set forth facts in the Amended Complaint regarding the injuries the organizations and their members have sustained after the passage of SB 168. ECF No. [38]. The Organizational Plaintiffs' missions all center around immigrant communities and advocating for their rights. *Id.* at 6-23. Moreover, each of the Organizational Plaintiffs has detailed how SB 168 has forced it to divert its resources away from its core mission activities in order to address member concerns about the law and its implications.

*Id.* at 9, 11, 13-14, 15, 17, 18, 19-20, 21-22, 23. These diversions of resources in order to specifically address SB 168 include, for example, operating a toll-free hotline to address increased calls requesting information on the law, *Id.* at 10; additional volunteer training, *Id.* at 11; hosting community meetings, *Id.* at 13; hiring additional staff, *Id.* at 15; addressing heightened requests for referrals to immigration attorneys, *Id.* at 18; conducting Know Your Rights presentations, *Id.* at 11, 20; answering member requests for clarification on the law, *Id.* at 21; and organizing forums and legal clinics to aid in the preparation of power of attorney's for members, *Id.* at 23. They also contend that they will continue to have to divert their resources in the future, in response to SB 168's ultimate application. *Id.* at 10, 12, 14, 15, 17, 18-19, 20, 22, 23. Moreover, the Organizational Plaintiffs will suffer diminished membership and beneficiaries if SB 168 takes effect. ECF No. [5-1] at 19.

Organizational Plaintiffs also explain how SB 168 has, and will continue to, injure their individual members. ECF No. [38] at 6-23. Specifically, Organizational Plaintiffs' assert that their members will suffer injuries "from racial and ethnic profiling, and unlawfully prolonged stops, arrests, and detentions on suspicion of civil immigration violations" by law enforcement. *Id.* at 14, 15, 22, 23; ECF No. [5-1] at 18. With SB 168 in force, Organizational Plaintiffs contend that these members will be reluctant to report crimes or act as witnesses due to their fear of interacting with law enforcement officers who may detain them. ECF No. [38] at 17, 20, 22; ECF No. [5-1] at 18. Further, they explain that members' fear and uncertainty about SB 168's implications "has and will continue to discourage members from accessing essential healthcare and government services, including shelter during a hurricane, enforcing their legal rights, including in cases of domestic violence, and applying to and enrolling in public schools and universities." ECF No. [38] at 15, 17, 19-20, 22; ECF No. [5-1] at 18.

a.   Detainer Mandate and Transport Requirement Challenges

In the preemption claims asserted in Counts I and II, Organizational Plaintiffs set forth the general injuries discussed above with regard to their present and future need to divert resources as a result of SB 168. ECF No. [38] at 6-23, 46-52. Additionally, they seek to protect the rights of their members to be free from unlawful immigration enforcement. ECF No. [39] at 4. Organizational Plaintiffs contend that at least one member of each membership-based organization will be unlawfully detained under SB 168's Detainer Mandate and will be unlawfully transported into federal immigration custody by un-deputized law enforcement officers. *Id.*

Defendants argue that the Organizational Plaintiffs lack standing because SB 168 does not impose any duties on the Organizational Plaintiffs upon which injury can be based. ECF No. [19] at 7-9.

> When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

*Warth*, 422 U.S. at 505 (1975) (citation omitted).

In the instant action, Organizational Plaintiffs have sufficiently pled injury in fact with regard to their preemption challenges in Counts I and II. The organizations have diverted, and will continue to have to divert, resources away from core activities in order to respond to member inquiries about SB 168's enactment, implications, and enforcement. Moreover, Organizational Plaintiffs face, among other things, decreased membership and participation due to SB 168's impact. *Browning*, 522 F.3d at 1165 ("an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts" (citing *Havens Realty Corp. v. Coleman*, 455 U.S.

17

363, 379 (1982))). Similarly, Organizational Plaintiffs have established an actual and imminent threat of injury to their members from the unlawful detention, transportation, and enforcement under SB 168. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923))). These asserted injuries to the organizations and their members arise directly from SB 168's enactment and can be redressed by enjoining these provisions. Accordingly, the Court concludes that the Organizational Plaintiffs have standing to assert their preemption challenges on behalf of themselves and their members.

b. Cost Reimbursement Challenge

In Count III, Organizational Plaintiffs assert that the Cost Reimbursement provision is preempted and have set forth their respective injuries. ECF No. [38] at 6-23, 52-55. Specifically, Organizational Plaintiffs have had to divert resources away from core mission activities in order to address SB 168's application with their members. *Id.* at 9, 11, 13-14, 15, 17, 18, 19-20, 21-22, 23. These organizations anticipate having to continue to divert additional resources in the future to respond to members' needs as SB 168 is enforced. *Id.* at 10, 12, 14, 15, 17, 18-19, 20, 22, 23. Moreover, these Organizational Plaintiffs will suffer diminished membership and beneficiaries if SB 168 takes effect. ECF No. [5-1] at 19.

When asked at the Hearing what specific injuries were sustained regarding the Cost Reimbursement provision, counsel for Plaintiffs indicated that, in addition to the diversion of resources, Organizational Plaintiffs were engaging in discussions with state and local law enforcement agencies and government agencies about how to respond to SB 168 and the Cost Reimbursement provision in particular. While these communications with local agencies were not

18

addressed in the Amended Complaint or in Plaintiffs' Amended Motion, it does not change the Court's analysis. Plaintiffs have not established any causal connection between SB 168's Cost Reimbursement provision and the injuries Plaintiffs have sustained and anticipate sustaining moving forward.

The Court finds that there is an insufficient nexus between the provision requiring local law enforcement agencies to seek reimbursement for costs incurred in complying with federal immigration efforts and Organizational Plaintiffs' diversion of resources. As alleged by the Organizational Plaintiffs, the diversion of resources to address the concerns and implications of SB 168 relate to the unlawful detention and transport of immigrants. *See generally* ECF No. [38] at 9-23. The injuries alleged stem directly from concerns and confusion regarding the legality and scope of the Detainer Mandate and the Transport Requirement, not the Cost Reimbursement provision. *See generally id.* Because Organizational Plaintiffs have failed to sufficiently establish a causal link between the injuries sustained and the Cost Reimbursement provision of SB 168, the Court concludes that Plaintiffs lack standing to assert this claim. *Browning*, 522 F.3d at 1160 ("a plaintiff must establish 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" (quoting *Babbitt*, 442 U.S. 289)). As such, this Court lacks jurisdiction to review the Cost Reimbursement challenge in Count III. *Warth*, 422 U.S. at 499 ("A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973))).

c.   Sanctuary Provisions and "Best Efforts" Provision Challenges

Under Counts IV and VII, the vagueness challenges to the Sanctuary Provisions and "Best Efforts" provision, Organizational Plaintiffs' delineate the general injuries sustained due to their

present and future need to divert resources as a result of SB 168. ECF No. [38] at 6-23, 55-57, 61-64. Additionally, they seek to protect the rights of their members to be free from unlawful immigration enforcement. ECF No. [39] at 4. Organizational Plaintiffs contend that at least one member of each membership-based organization will be subject to an unlawful, and potentially arbitrary, arrest pursuant to the "Best Efforts" provision and the Sanctuary Provisions. *Id.* at 5.

Similar to the preemption challenges in Counts I and II, Organizational Plaintiffs have sufficiently pled injury in fact with regard to their vagueness claims. The organizations have diverted, and will continue to have to divert, resources away from core activities in order to respond to member inquiries about SB 168's enactment, implications, and enforcement. Moreover, Organizational Plaintiffs face, among other things, decreased membership and participation due to SB 168's impact. *Browning*, 522 F.3d at 1165 ("an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts" (citing *Havens Realty Corp.*, 455 U.S. at 379)). Similarly, Organizational Plaintiffs have established an actual and imminent threat of injury to their members from the unlawful detention, transportation, and enforcement under SB 168, which will be aggravated by the enforcement of the Sanctuary Prohibition and the "Best Efforts" provision. *Babbitt*, 442 U.S. at 298 ("[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (quoting *Pennsylvania v. West Virginia*, 262 U.S. at 593)). These asserted injuries to the organizations and their members arise directly from SB 168's enactment and can be redressed by enjoining these provisions. Accordingly, the Court concludes that the Organizational Plaintiffs have standing to assert their vagueness challenges on behalf of themselves and their members.

### 2.   Plaintiff City of South Miami's Standing

Defendants concede the City of South Miami's standing to challenge the Detainer Mandate. However, Defendants argue that the City of South Miami lacks standing to assert its vagueness challenges in Counts V and VIII because Fourteenth Amendment protections only apply to "persons." ECF No. [19] at 9. Plaintiffs' Reply concedes that municipalities lack standing to raise Fourteenth Amendment claims. ECF No. [39] at 2. However, because "[s]tanding cannot be waived or conceded by the parties," *A&M Gerber Chiropractic LLC*, 925 F.3d at 1210, the Court must nevertheless examine whether the City of South Miami has standing to bring its claims.

"In assessing the standing to sue of a state entity, [courts] are bound by the Supreme Court's or [the Eleventh Circuit's] determination of whether any given constitutional provision or law protects the interests of the body in question." *United States v. State of Ala.*, 791 F.2d 1450, 1455 (11th Cir. 1986). Thus, a municipality's standing depends on the nature of the claim asserted. Political subdivisions have been permitted to challenge the constitutionality of state statutes under the Supremacy Clause. *See Rogers v. Brockette*, 588 F.2d 1057, 1071 (5th Cir. 1979). However, as the Supreme Court has explained, "Being but creatures of the State, municipal corporations have no standing to invoke . . . the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator." *Coleman v. Miller*, 307 U.S. 433, 441 (1939).

In examining whether a municipality has standing to assert a constitutional challenge to a state statute under the Supremacy Clause, the Fifth Circuit set forth three prerequisites that must be met: (1) "to sue in federal court, a plaintiff must allege 'a distinct and palpable injury' to itself"; (2) "ordinarily a plaintiff 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'"; and (3) "a claim must present a genuine,

live case or controversy under Article III." *Rogers*, 588 F.2d at 1060 (citations omitted) (footnotes omitted).

    a.  <u>Preemption Challenge</u>

The City of South Miami has alleged its injuries under SB 168. ECF No. [38] at 6-7. Specifically, the City of South Miami "believes SB 168 does not provide [the City], [the police department], or its residents any actual and understandable notice of the statutory requirements that apply to their conduct." *Id.* at 7. With regard to Count I, the City of South Miami is unsure which provisions of SB 168 apply to it, and it is concerned that the resolutions and policies currently in place may violate SB 168's requirements, especially the City's resolution providing that immigration detainers will not be honored as a matter of course. *Id.* The City of South Miami's potential noncompliance with SB 168 could result in the suspension without pay of its leadership and enforcement actions by the Governor and the Attorney General. *Id.* However, the City of South Miami's attempts to comply with SB 168 will expose the City to liability and damage lawsuits for local law enforcement officers' improper immigration enforcement pursuant to SB 168. *Id.*

As noted above, political subdivisions may establish standing to challenge the constitutionality of state statutes under the Supremacy Clause. *See Rogers*, 588 F.2d at 1071. Here, the City of South Miami asserts a "distinct and palpable injury to itself" because it faces liability and damage lawsuits if its agencies unlawfully comply or attempt to comply with SB 168's Detainer Mandate when its law enforcement officers do not have the authority to do so under federal law, but it faces enforcement actions by the Attorney General if it fails to comply with the Detainer Mandate. *See id.* at 1061. Moreover, the question of whether Congress intended to preempt the field of immigration enforcement dictates the City of South Miami's authority, or lack thereof, to refuse compliance with the Detainer Mandate. *See id.* at 1062-63. Finally, the City of

South Miami's preemption challenge presents a live case or controversy because the imposition of an injunction on the Detainer Mandate would directly remedy the City of South Miami's threatened injury of damage lawsuits by individuals whose constitutional rights were violated and enforcement actions by the Attorney General for noncompliance. *See id.* at 1063. Accordingly, the Court concludes that the City of South Miami has standing to bring its Detainer Mandate preemption claim.

   b.   Vagueness Challenges

In Count V, the City of South Miami asserts that the language of the Sanctuary Definition is so vague that it cannot determine what policies are prohibited and which immigration enforcement actions require law enforcement compliance. ECF No. [38] at 58. Similarly, in Count VIII, the City of South Miami argues that the lack of explicit standards in the "Best Efforts" provision fails to set forth any meaningful standard of conduct. *Id.* at 65. As a result, SB 168 will result in arbitrary and discriminatory enforcement. *Id.* Further, the City of South Miami is unable to determine what is prohibited or which local entities and agencies must comply with the "Best Efforts" provision due to SB 168's vague language and inconsistent references to local entities, agencies, and their employees. *Id.* at 66. The City of South Miami asserts that, because of the vague language in the Sanctuary Provisions and the "Best Efforts" provision, and the resulting inability to determine what conduct is proscribed, complying with SB 168 exposes the City to liability. *Id.* at 58, 66. Moreover, government entities that violate the requirements of SB 168 are subject to enforcement actions by the Attorney General. *Id.* at 58, 66. Furthermore, even if the City attempts to comply with SB 168, it may nonetheless face enforcement actions by the Attorney General due to SB 168's vagueness. *Id.* at 58, 66.

As noted above, "[b]eing but creatures of the State, municipal corporations have no standing to invoke . . . the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator." *Coleman*, 307 U.S. at 441. Vagueness claims, such as those asserted in Counts V and VIII, are rooted in the Due Process Clause of the Fourteenth Amendment. *See Lanzetta v. N.J.*, 306 U.S. 451, 454 (1939); *Alabama*, 791 F.2d at 1455. As such, the City of South Miami lacks standing to assert its vagueness challenges.

### 3. Plaintiff Mayor Stoddard's Standing

In their Surreply, Defendants concede that Mayor Stoddard has standing to bring his vagueness challenges in Counts VI and IX. ECF No. [45] at 1. Nonetheless, as with the City of South Miami, this Court has an independent obligation to assess whether Mayor Stoddard has standing to assert his vagueness challenges.

While political subdivisions may not have standing to challenge the constitutionality of state statutes on vagueness grounds, the Supreme Court has recognized public officials' legitimate interest in challenging "the enforcement of statutes in relation to which they have official duties." *Coleman*, 307 U.S. at 441-42; *see also Finch v. Miss. State Med. Assoc., Inc.*, 585 F.2d 765, 773 (5th Cir. 1978) ("plaintiffs who sued in their official capacities may assert constitutional claims against the state." (quoting *City of New York v. Richardson*, 473 F.2d 923, 933 (2d Cir. 1973)). Moreover, the Supreme Court has explained that public officials have a sufficient personal stake in the outcome of a case for standing purposes when, believing a state statute to be unconstitutional, "they are in the position of having to choose between violating their oath [by complying with the statute] and taking a step — refusing to comply with [the statute] — that would be likely to bring their expulsion from office." *Bd. of Edu. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968).

24

In Count VI, Mayor Stoddard asserts that the language of the Sanctuary Definition is so vague that he has no way to determine what conduct or policy is prohibited and which immigration enforcement actions require law enforcement compliance. ECF No. [38] at 61. As a result, Mayor Stoddard's ability to establish policies and resolutions guiding local law enforcement agencies' conduct is undermined because he "is unable to determine whether any of the actions, resolutions, policies, or statements he makes place him in violation of SB 168." *Id.* at 60.

Similarly, in Count IX, Mayor Stoddard challenges the constitutionality of SB 168's "Best Efforts" provision because "[s]uch vague language fails to give Mayor Stoddard fair notice of what he must, and must not do, in order to be in compliance with SB 168 and to avoid an enforcement suit or removal from office." *Id.* at 67. Mayor Stoddard is unable to determine what conduct is prohibited or which local entities and agencies must comply with the "Best Efforts" provision due to SB 168's vague language and inconsistent references to local entities, agencies, and their employees. *Id.* at 68. SB 168's vague mandates undermine Mayor Stoddard's ability to establish policies and resolutions to guide police conduct on what actions satisfy "best efforts." *Id.*

Mayor Stoddard asserts that, because of the vague language in the Sanctuary Provisions and the "Best Efforts" provision, and his resulting inability to determine proscribed conduct, complying with SB 168 exposes him to liability. *Id.* at 61, 68. Moreover, officials who violate the requirements of SB 168 are subject to enforcement actions or suspension from office by the Governor. *Id.* at 68, 69. As such, Mayor Stoddard is now faced with the threat of suspension or removal for failing to comply with SB 168. *Id.* Alternatively, he faces political liability and damage lawsuits for improper immigration enforcement actions taken pursuant to SB 168. *Id.* at 61, 68-69. Furthermore, Mayor Stoddard's attempted, yet insufficient, compliance with SB 168 may result in suspension or removal from office. *Id.* at 61, 69.

Mayor Stoddard has sufficiently alleged a concrete, imminent, and "realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." *GLAHR*, 691 F.3d at 1257 (quoting *Socialist Workers Party*, 145 F.3d at 1245). Specifically, Mayor Stoddard is "in the position of having to choose between violating [his] oath [by complying with SB 168] and taking a step — refusing to comply with [SB 168] — that would likely bring [his] expulsion from office." *Allen*, 392 U.S. at 241 n.5. Accordingly, the Court concludes that Mayor Stoddard has satisfied the injury-in-fact requirement of the standing analysis. Moreover, the causal connection between the asserted injury and the alleged illegal conduct here is clear because Mayor Stoddard's injury stems directly from SB 168's application and enforcement. Finally, Mayor Stoddard's purported injury will be redressed if this Court ultimately enjoins SB 168. Therefore, Mayor Stoddard has standing to challenge the vagueness of the Sanctuary Provisions and "Best Efforts" provision.

### B. <u>Preliminary Injunction</u>

Having determined that Plaintiffs have standing to sue, the Court turns to the merits of Plaintiffs' request for a preliminary injunction. A movant must prove four factors in order to establish that a preliminary injunction is appropriate: (1) "a substantial likelihood of success on the merits," (2) "that the preliminary injunction is necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant," and (4) "that the preliminary injunction would not be averse to the public interest." *Chavez*, 742 F.3d at 1271 (citing *Parker*, 275 F.3d at 1034-35). "Failure to show any of the four factors is fatal" to the preliminary injunction inquiry. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

> When a federal court before trial enjoins the enforcement of a municipal ordinance adopted by a duly elected city council, the court overrules the decision of the elected representatives of the people and, thus, in a sense interferes with the processes of democratic government. Such a step can occasionally be justified by the

> Constitution (itself the highest product of democratic processes). Still, preliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.

*NE Fla. CAGC of Am.*, 896 F.2d at 1285.

Plaintiffs' Amended Motion requests that this Court grant a preliminary injunction to enjoin SB 168 from taking effect, pending the resolution of the instant case. ECF No. [47]. Plaintiffs assert that a preliminary injunction is appropriate because the challenged provisions of SB 168 are either preempted by federal law or are unconstitutionally vague. *Id.* Defendants contend that this Court should deny the Amended Motion because Plaintiffs' claims are meritless and unlikely to succeed, they have failed to sufficiently allege irreparable harm, and the equitable factors weigh in favor of denying the preliminary injunction. ECF No. [19].

## 1. Substantial Likelihood of Success on the Merits

With regard to the preliminary injunction factors, the Eleventh Circuit has stated that the substantial likelihood of success on the merits is "generally the most important [factor]." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Id.*

### a.   Preemption Challenges

Plaintiffs argue that the Detainer Mandate and the Transport Requirement[11] violate the Supremacy Clause because these provisions are preempted by federal immigration law. ECF No. [5-1] at 3-11.

---

[11] As discussed above, the Court does not address Plaintiffs' arguments regarding the Cost Reimbursement provision's preemption, as they lack standing to assert that claim.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). Nonetheless, the Supremacy Clause mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Thus, "[w]here the two conflict, federal law trumps state law; that was always clear. What constitutes a conflict is often less clear." *Browning*, 522 F.3d at 1167 (citations omitted).

Under the preemption doctrine, Congress has the power to preempt state law, and this preemption typically falls into one of "three categories: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Id.*; *Arizona*, 567 U.S. at 399-400. "Express preemption occurs when Congress manifests its intent to displace a state law using the text of a federal statute." *Browning*, 522 F.3d at 1167. "Implied preemption" has generally been used to encompass field and conflict preemption. *Id.* "Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" *id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), or "where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). "Conflict preemption occurs either when it is physically impossible to comply with both the federal and state laws or when the state law stands as an obstacle to the objective of the federal law." *Browning*, 522 F.3d at 1167.

Two main considerations guide district courts' preemption analysis: "First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, we assume that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear

and manifest purpose of Congress." *United States v. Alabama*, 691 F.3d 1269, 1281-82 (11th Cir. 2012) (citations and internal quotation marks omitted).

As the Supreme Court has explained,

> The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations. The federal power to determine immigration policy is well settled.

*Arizona,* 567 U.S. at 394-95 (citations omitted). The field of immigration governance "is extensive and complex." *Id.* at 395. As such, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* at 396. Nonetheless, the Supreme Court has emphasized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397.

The Executive Branch is tasked with the enforcement of immigration law, and immigration officials are given "broad discretion" in the exercise of their powers. *Id.* at 396-97. Although there are numerous agencies within the Department of Homeland Security ("DHS"), *id.* at 397, ICE is the agency relevant to the instant action. "ICE officers are responsible 'for the identification, apprehension, and removal of illegal aliens from the United States.'" *Id.*

"As a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* at 407. Moreover, "[r]emoval is a civil, not criminal, matter." *Id.* at 396.

> The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." [8 U.S.C.] § 1226(a). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U.S.C. § 1357(a).

*Id.* at 407-08 (some citations omitted).

Congress has delineated specific, "limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408. Relevant to the instant case, the Attorney General may grant this authority to specific state or local law enforcement officers pursuant to a formal agreement, commonly referred to as a "287(g) Agreement,"[12] which allows officers to perform the duties of a federal immigration officer under the direction and supervision of the Attorney General after completing adequate immigration training. 8 U.S.C. § 1357(g)(1); *Arizona*, 567 U.S. at 408-09. Without a 287(g) Agreement, local law enforcement agencies are not permitted to unilaterally perform the functions of federal immigration officers, such as detaining an alien for being removable, "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410.

Nevertheless, the Supreme Court has recognized that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Id.* at 411. Congress has explicitly stated that state and local law enforcement agencies do not need a 287(g) Agreement (A) "to communicate with the [Federal Government] regarding the immigration status of any individual," or (B) "otherwise to cooperate[13] with the [Federal Government] in the identification,

---

[12] The federal government's authorization to enter into 287(g) Agreements is codified in 8 U.S.C. § 1357(g):

> (1) Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1).
[13] The Court will refer to the provision in 8 U.S.C. § 1357(g)(10)(B) as the "cooperation clause."

apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10); *Arizona*, 567 U.S. at 411-12.

The parties in this case disagree on what the phrase "otherwise to cooperate" means, in the context of enforcing immigration detainers and transporting detained aliens into federal custody. Before examining each party's arguments, a brief history of immigration detainers is warranted.

*Amici curiae* in support of Plaintiffs provided the Court with an informative history on the evolution of the immigration detainer. ECF No. [61] at 17-23. There is only one reference to "detainers" in the INA. *See* 8 U.S.C. § 1357(d); *Arizona*, 567 U.S. at 410 ("State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody." (citing 8 U.S.C. § 1357(d))). *Amici* assert that detainers were historically understood to be requests for information about a suspected alien's expected release date and nothing more. ECF No. [61] at 18.

However, in 1997, federal immigration agencies began requesting that local law enforcement agencies, pursuant to detainer requests, hold suspected aliens in custody for up to forty-eight hours beyond their scheduled release from custody. *Id.* at 17. Specifically, the Code of Federal Regulation's Detainer Provisions state:

> (a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter 1. Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer – Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.
> . . . .
> (d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to

exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit
assumption of custody by the Department.

8 C.F.R. § 287.7. Based on this additional request to hold an individual beyond their custodial
sentence, a detainer has developed into "a written request to state or local officials, asking them
(1) to notify [DHS] as soon as practicable before an alien is released and (2) to maintain custody
of the alien for up to 48 hours beyond the preexisting release date so that DHS may assume
custody." *City of El Cenizo, Tex. v. Tex.*, 890 F.3d 164, 174 (5th Cir. 2018); 8 C.F.R. § 287.7;
*United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014) (holding that identifying an
alien, communicating with federal immigration officers, and detaining an alien until federal
officers could take custody was not unilateral conduct outside the scope of a local law enforcement
officer's authority); *see Corley v. United States*, 556 U.S. 303, 314 (2009) ("one of the most basic
interpretive canons, that "'[a] statute should be construed so that effect is given to all its provisions,
so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Hibbs v. Winn*,
542 U.S. 88, 101 (2004))); *see also Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d
959, 969 (S.D. Ind. 2017) ("'An immigration detainer is a piece of paper issued by immigration
officials that purports to command other law enforcement officials to hold a prisoner, who
otherwise would be released, in custody and deliver that person to federal immigration officials.'
It is 'the principle mechanism for [ICE] . . . to obtain custody over suspected immigration violators
in the custody of state or local law enforcement officials.'" (quoting Christopher N. Lasch, *Federal
Immigration Detainers After* Arizona v. United States, 46 Loy. L.A. L. Rev. 629, 634 (2013))). In
April 2017, ICE implemented an internal policy that required all detainer requests to be
accompanied by an administrative immigration warrant issued by a federal immigration officer
indicating the immigration officer's probable cause to believe an individual is removable. ECF
No. [19] at 3.

*Amici* contend, and Plaintiffs agree, that this expansion of the detainer request is beyond the scope of power Congress intended to grant to federal immigration officers and the forty-eight-hour hold constitutes a subsequent arrest that requires probable cause that a criminal violation occurred. ECF No. [61]; *see Lopez-Aguilar*, 296 F. Supp. 3d at 972 ("Plainly, federal immigration law does not permit . . . every law enforcement officer employed by a state governmental body to engage in the enforcement of federal immigration law on the same terms and basis as federal officials, free from any restriction by the governmental body (even, presumably, as to enforcement priorities)."). Additionally, Plaintiffs and *amici* argue that detainer holds are arrests performed by local law enforcement officers who lack Congressional authorization under the INA, regardless of the detainer and accompanying administrative warrant. *Id.* As such, Plaintiffs assert that the Detainer Mandate requiring that local law enforcement officers comply with detainer holds is preempted by federal law.

In their Response, Defendants argue that "[c]onsultation between federal and state officials is an important feature of the immigration system," *Arizona*, 567 U.S. at 411, and that, by expressly including the cooperation clause under § 1357(g)(10)(B), Congress gave a clear indication that it sought to facilitate, not preempt, the type of cooperation that SB 168 mandates. ECF No. [19] at 12. Moreover, in its Statement of Interest, the United States of America asserts that local law enforcement agencies' compliance with detainer requests falls within the cooperation that Congress intended to allow under § 1357(g)(10)(B). ECF No. [23] at 12. Cooperating with immigration detainer requests falls squarely within *Arizona*'s reasoning because this cooperation is done only pursuant to a federal request, rather than unilaterally. *Id.* at 13 ("SB 168 provides for the very authorization Plaintiffs allude to in the form of federal immigration detainers.").

Thus, the precise issue before the Court is whether SB 168's Detainer Mandate and Transport Requirement are preempted by federal law or whether these provisions regulate conduct that falls within the meaning of the cooperation clause's "otherwise to cooperate" language.

  *i.*    *Field Preemption Challenge to the Detainer Mandate and Transport Requirement*

Plaintiffs argue that the Detainer Mandate and Transport Requirement are field preempted because the INA occupies the field of when state and local law enforcement can participate in detaining aliens and "SB 168 rejects the Congressional framework and creates its own authorization for immigration arrest, detention, and transport by undeputized local officers." ECF No. [50] at 3.

"Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" *Browning*, 522 F.3d at 1167 (quoting *Rice*, 331 U.S. at 230), or "where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). "To determine the boundaries that Congress sought to occupy within the field, we look to 'the federal statute itself, read in the light of its constitutional setting and its legislative history.'" *Alabama*, 691 F.3d at 1281 (quoting *De Canas v. Bica*, 424 U.S. 351, 360 n. 8 (1976)). Because neither provision is field preempted, the Court addresses these arguments first.

Considering the language of the INA itself, it is clear that Congress did not intend to preclude states from supplementing the field of how local law enforcement agencies can participate in federal immigration enforcement efforts. Specifically, the express language of the cooperation clause in § 1357(g)(10)(B) leaves numerous cooperative avenues open for law enforcement officers to participate in the immigration efforts of federal officers. 8 U.S.C. § 1357(g)(10)(B).

"This provision indicates that Congress intended local cooperation without a formal agreement in a range of key enforcement functions." *City of El Cenizo*, 890 F.3d at 179.

The Fifth Circuit's field preemption reasoning in *City of El Cenizo* is informative here. *See generally id.* at 164. *City of El Cenizo* centered around the enactment of a law similar to SB 168. *Id.* at 173-75. In addressing the issue of field preemption, the Fifth Circuit in *City of El Cenizo* enunciated a critical distinction between the Texas law and the provisions of § 1357(g):

> To establish field preemption, moreover, the plaintiffs must prove that federal law evinces "the clear and manifest purpose of Congress" to preclude even complementary state legislation on the same subject. *De Canas*, 424 U.S. at 357. Federal law does not suggest the intent — let alone a "clear and manifest" one — to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all. And the savings clause allowing cooperation without a 287(g) agreement indicates that some state and local regulation of cooperation is permissible.

*Id.* at 178; *see also id.* at 177 ("Federal law regulates *how* local entities may cooperate in immigration enforcement; [the Texas law] specifies *whether* they cooperate.").

Similarly, here, the Detainer Mandate regulates *whether* local entities cooperate in the federal government's immigration enforcement efforts by stating that law enforcement agencies "shall . . . comply with the requests made in the immigration detainer." Fla. Stat. § 908.105(1)(c). The Court must limit its analysis of Plaintiffs' field preemption challenges to whether Congress intended to preclude any further state regulation of local law enforcement agencies' cooperation with federal immigration enforcement. Similar reasoning also applies to the Transport Requirement. Plaintiffs have not established Congress's clear and manifest intent to preclude any complementary state regulation on cooperating with immigration officials for the transport of aliens. As the Fifth Circuit in *City of El Cenizo* held, § 1357(g)(10)(B)'s cooperation clause indicates that Congress intentionally left the issue of state and local law enforcement's cooperation

with federal immigration efforts open to further regulation. *See* 890 F.3d at 178. Therefore, SB 168's Detainer Mandate and Transport Requirement are not field preempted.

ii.    *Conflict Preemption Challenge to the Detainer Mandate*

Plaintiffs also argue that SB 168's Detainer Mandate is conflict preempted. ECF No. [5-1] at 8-10.

Conflict preemption can arise in two ways:

First, conflict preemption can occur "when it is physically impossible to comply with both the federal and the state laws." Conflict preemption may also arise "when the state law stands as an obstacle to the objective of the federal law." We use our judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects."

*Alabama*, 691 F.3d at 1281 (citations omitted).

The Supreme Court, in *Arizona*, held that an Arizona law authorizing state and local police officers to make warrantless arrests of suspected aliens if they had probable cause to believe the alien was removable was conflict preempted by federal immigration law. 567 U.S. at 410. In so holding, the Supreme Court noted that the Arizona law would "provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." *Id.* at 408. The *Arizona* Court, in examining the statutory authorization for 287(g) Agreements and § 1357(g)(10)(B)'s cooperation clause, noted that Congress clearly accounted for some degree of federal-local cooperation in immigration efforts. *Id.* at 409-10. However, the Court found Arizona's law to be conflict preempted because the law granted local officials the unilateral authorization to make immigration arrests — something Congress exclusively entrusted to the Federal Government. *Id.* The Supreme Court distinguished this unilateral state action from permissible cooperation under § 1357(g)(10)(B) by explaining that cooperation necessarily requires some sort of "request, approval, or other instruction from the

Federal Government" in order for local law enforcement officers to properly participate in immigration enforcement actions. *Id.* at 410. A state law that attempts to achieve its own immigration policy by authorizing law enforcement's unilateral immigration action impermissibly stands as an obstacle to the objectives of the INA and frustrates federal immigration objectives, such as foreign relations. *Id.* at 409-10.

Here, the Detainer Mandate states, in relevant part, "A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall . . . comply with the requests made in the immigration detainer." Fla. Stat. 908.105(1)(c). Defendants assert that the Detainer Mandate falls within the conduct that was explicitly contemplated in the cooperation clause because it only grants local officers the power to temporarily detain suspected aliens after a federal immigration official has made a probable cause determination as to removability and has explicitly requested that the individual be held. ECF No. [19] at 12; *Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Plaintiffs argue instead that the Detainer Mandate creates a system of enforcement where all local officers are authorized to make subsequent detainer arrests, absent a 287(g) Agreement granting them the power to do so.

The Court recognizes the body of case law across the nation that has determined that these immigration detainer holds are unconstitutional subsequent arrests in violation of the Fourth Amendment, two of which are in this District.[14] Plaintiffs rely on many of these cases for their preemption arguments. However, these cases concerned post-enforcement Fourth Amendment

---

[14] *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015); *Santos v. Frederick Cty. Bd. Of Comm'rs*, 725 F.3d 451, 465-66 (4th Cir. 2013); *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012); *C.F.C. v. Miami-Dade Cty.*, 349 F. Supp. 3d 1236 (S.D. Fla. 2018); *Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018); *Lopez-Aguilar*, 296 F. Supp. 3d 959; *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1153 (Mass. 2017); *People ex rel. Swenson v. Ponte*, 46 Misc. 3d 273, 278 (N.Y. Sup. Ct. 2014); *see also Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005, n.3 (N.D. Ill. 2016).

challenges to detainer holds, not a pre-enforcement facial challenge to a state statute mandating local officers' compliance with detainer requests. The Court believes this distinction to be critical.

As noted in *Creedle*,

The Fifth Circuit stresses throughout its opinion [in *City of El Cenizo*] that plaintiffs had a stringent burden, not only because of the preliminary injunction standard, but also because of the "exacting standard" of bringing a "pre-enforcement facial challenge." In *El Cenizo*, no discovery had yet been taken and no facts had been adduced other than those alleged in the complaint. The Fifth Circuit noted that "such a challenge is the most difficult to mount successfully" because "it is not enough for the plaintiffs to demonstrate that the ICE-detainer mandate will often cause Fourth Amendment violations." Instead, plaintiffs "must establish that the mandate is unconstitutional in all of its applications." In analyzing whether the "ICE-detainer mandate" in [the Texas law] facially violated the Fourth Amendment, the Fifth Circuit stated that "plaintiffs must establish that every seizure authorized by the ICE-detainer mandate violates the Fourth Amendment" and concluded that plaintiffs could not satisfy that "exacting standard."

*Creedle*, 349 F. Supp. 3d at 1298 (footnote omitted) (quoting *City of El Cenizo*, 890 F.3d at 187). Similarly, here, Plaintiffs assert a facial pre-enforcement challenge to SB 168's Detainer Mandate. Thus, Plaintiffs must satisfy a "stringent burden" in order to be successful on their claims. *City of El Cenizo*, 890 F.3d at 187.

Moreover, those cases present markedly different situations than the instant case — namely, the cases cited did not address the situation where a detainer request was issued alongside an administrative warrant alleging probable cause. The combination of the detainer and the administrative warrant rectify many of the issues presented in those prior cases.

The Court finds the reasoning of *Lopez-Lopez v. County of Allegan*, to be particularly persuasive on this point. 321 F. Supp. 3d 794 (W.D. Mich. 2018). There, the district court addressed a Fourth Amendment challenge to a hold based on a detainer request and an accompanying administrative warrant. *Id.* at 796. In finding that the detainer hold did not violate the defendant's Fourth Amendment rights, in *Lopez-Lopez*, the court reviewed and distinguished the previous line of cases holding that immigration detainers violated the Fourth Amendment. *Id.*

at 799-802; *id.* at 799 ("Plaintiff asserts that '[n]umerous federal district courts have found that detention by local authorities pursuant to ICE detainers alone violates the Constitutional rights of the detainee.' The problem is that Lopez-Lopez was not detained solely on the basis of an ICE detainer. Additionally, the detainers at issue in the cases he cites are substantively different from the detainer ICE issued in this case. Further, some of the cases are wholly irrelevant to the discussion because they determine only that cooperation with ICE detainers is discretionary rather than mandatory — a well-settled principle that does not bear on the outcome." (citation omitted)).[15] Specifically, the *Lopez-Lopez* court noted that, while a detainer alone or an administrative warrant alone may not comply with the Fourth Amendment's requirements because law enforcement officers "[e]ither [] lack probable cause (situations without an administrative warrant) or they lack a request to act (situations without a detainer)," the combination of the detainer and the administrative warrant rectifies these issues and complies with the Supreme Court's holding in *Arizona*. *Id.* at 801; *id.* ("ICE issued a facially valid administrative warrant for [defendant's] arrest, based on a determination that there was probable cause to believe he was removable. Then, ICE requested that the localities detain [defendant] through the use of an I-247 detainer — which also recited the basis for probable cause. [The] County cooperated by complying with the federal

---

[15] *See Lopez-Lopez*, 321 F. Supp. 3d at 800 (distinguishing *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905 (S.D. Ind. 2011), because *Buquer* involved a state law authorizing local officers to use their discretion in conducting warrantless immigration arrests); *id.* (distinguishing *Morales v. Chadbourne*, 996 F. Supp. 2d 19 (D. R.I. 2014), *aff'd in part, rev'd in part*, 793 F.3d 208 (1st Cir. 2015), because in *Morales*, ICE did not provide an arrest warrant with the detainer); *id.* at 800-01 (distinguishing *Santos*, 725 F.3d 451, because the plaintiff there was seized before ICE confirmed that a warrant had issued); *id.* at 801 (distinguishing *Ochoa v. Campbell*, 266 F. Supp. 3d 1237 (E.D. Wash. 2017), because ICE only presented an administrative warrant without a detainer); *see also Melendres*, 695 F.3d 990 (detention of aliens during a traffic stop "based on reasonable suspicion or knowledge that the person was unlawfully in the [country]," without a federal request); *C.F.C.*, 349 F. Supp. 3d 1236 (detainer not accompanied by an administrative warrant); *Creedle*, 349 F. Supp. 3d 1276 (detainer not accompanied by an administrative warrant); *Lopez-Aguilar*, 296 F. Supp. 3d 959 (no detainer issued).

government's request (as allowed pursuant to § 1357(g)(10)) 'by providing operational support' by holding [defendant] until ICE could take custody of him the following day.").

The reasoning in *Lopez-Lopez* presents a clear instance where complying with a detainer satisfies the Fourth Amendment's requirements.[16] Moreover, the current detainer practice and the mandates of SB 168 require that all detainer requests be accompanied by administrative warrants. ECF No. [19] at 3; ECF No. [19-1] at 15-20. Plaintiffs cannot satisfy their burden on a facial challenge of establishing "that every seizure authorized by the ICE-detainer mandate violates the Fourth Amendment." *City of El Cenizo*, 890 F.3d at 187.

The Fifth Circuit in *City of El Cenizo* also examined the cooperation clause under § 1357(g)(10)(B) and recognized that "Congress intended local cooperation without formal agreement in a range of key enforcement functions." *Id.* at 179. Moreover, the *City of El Cenizo* noted that officers acting pursuant to a 287(g) Agreement "become de facto immigration officers, competent to act on their own initiative." *Id.* at 180. Thus, these 287(g) officers are expressly granted the authority to make unilateral decisions on immigration enforcement issues, absent any predicate request from the federal government. *Arizona*, 567 U.S. at 410.

In contrast, here, officers acting pursuant to the Detainer Mandate are only authorized to detain suspected aliens after receiving such a detainer request from federal immigration officers. These detainers must be accompanied by a Form I-200 "Warrant of Arrest of Alien" or a Form I-205 "Warrant of Removal/Deportation." *See* Appendix. Form I-247A is titled "Immigration Detainer – Notice of Action," which requests that local officers "[m]aintain custody of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have

---

[16] Moreover, as the Eleventh Circuit has noted, "The Fourth Amendment does not require warrants to be based on probable cause of a crime, as opposed to a civil offense. Nothing in the original public meaning of 'probable cause' or 'Warrants' excludes civil offenses." *United States v. Phillips*, 834 F.3d 1176, 1181 (11th Cir. 2016).

been released from your custody to allow DHS to assume custody." *See* Appendix (emphasis in original); ECF No. [61] at 49. When questioned at the Hearing about acts local officers may properly conduct pursuant to a detainer request, Plaintiffs' counsel indicated that officers were limited to providing information about an inmate's release date. While a request for information is contained within the detainer, so is the request to temporarily detain. Further, while requests for information and communications between federal and state officials without a 287(g) Agreement are expressly contemplated in § 1357(g)(10)(A), Congress's addition of the § 1357(g)(10)(B) cooperation clause authorizes additional cooperative conduct, aside from communication, between federal immigration officers and local law enforcement. Absent any clear statutory indication to the contrary, and consistent with *City of El Cenizo*, the Court concludes that honoring federal immigration detainer requests falls within the scope of cooperation contemplated by Congress under § 1357(g)(10)(B).

Plaintiffs further argue that Defendants' examples of 287(g) Agreements with local law enforcement agencies reaffirm their interpretation that detainer holds fall within the purview of § 1357(g)(1). ECF No. [50] at 12. Specifically, Plaintiffs note that the 287(g) Agreement with Clay County, ECF No. [19-2], granting local officers the authority to "process [aliens] for immigration violations," "serve warrants of arrest for immigration violations," and "detain and transport" aliens, is rendered meaningless if officers can honor detainer requests under the cooperation clause absent such agreements. ECF No. [50] at 12. However, as the Fifth Circuit in *City of El Cenizo* explained, officers acting pursuant to a 287(g) Agreement "become de facto immigration officers, competent to act on their own initiative." 890 F.3d at 180. Thus, these 287(g) officers are expressly granted the authority to make unilateral decisions on immigration enforcement issues, absent any predicate request from the federal government. *Arizona*, 567 U.S. at 410. Conversely, officers

operating under SB 168's Detainer Mandate are only permitted to hold a suspected alien for forty-eight hours if federal immigration officers explicitly request that they do so pursuant to a facially valid detainer request. Fla. Stat. § 908.105(1). Officers acting pursuant to 287(g) Agreements are allowed to hold suspected aliens without any prior request from the federal government. *City of El Cenizo*, 890 F.3d at 180.

Plaintiffs also provide no indication that local officers are taking any unilateral immigration action in honoring these detainer requests, such as serving or executing the administrative immigration warrants. *See* 8 C.F.R. § 287.5 (listing which officials may serve and execute administrative warrants). Absent unilateral conduct that circumvents the explicit grants of power Congress gave only to federal immigration authorities, honoring a detainer request complies with the Supreme Court's holding in *Arizona* that officers may not engage in unilateral state immigration actions, "*absent any request, approval, or other instruction from the Federal Government*." 567 U.S. at 410; *see also id.* ("examples of what would constitute cooperation under federal law. . . . include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." (citing Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13-14 (2011))). The Detainer Mandate in this case is contingent upon the receipt of a detainer request issued by an authorized federal immigration officer that indicates the federal officer has probable cause to believe that the detainee is unlawfully in the United States. The Court concludes that this hold, pursuant to federal request, falls within the cooperation clause's scope under § 1357(g)(10)(B).

Based upon the plain language of § 1357(g)(10)(B), SB 168's Detainer Mandate on its face is not preempted because it falls within the scope of "cooperat[ion] . . . in the . . . detention . . . of aliens not lawfully present in the United States." 8. U.S.C. § 1357(g)(10)(B); *Arizona*, 567 U.S. 387; *City of El Cenizo*, 890 F.3d at 179. As such, the Court finds that Plaintiffs have failed to establish that SB 168's Detainer Mandate is conflict preempted.

    *iii.*    *Conflict Preemption Challenge to the Transport Requirement*

Moreover, Plaintiffs assert that SB 168's Transport Requirement is conflict preempted. ECF No. [5-1] at 8-10.

The Transport Requirement provides that,

> When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

Fla. Stat. § 908.104(4). The plain language of this provision authorizes local agencies to transport individuals subject to an immigration detainer across state lines into federal custody. Plaintiffs allege that this provision is conflict preempted because it frustrates Congress's objectives in creating 287(g) Agreements. ECF No. [5-1] at 10-11. Specifically, Plaintiffs correctly note that, unlike complying with detainers, § 1357(g)(1) expressly lists the transport across state lines as a power that can only be delegated to local officers pursuant to a 287(g) Agreement. *See* 8 U.S.C. § 1357(g)(1) ("Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified

to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (*including the transportation of such aliens across State lines to detention centers*), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." (emphasis added)). SB 168's attempt to grant this exact transport power to local officers frustrates Congress's objectives for immigration transport because it renders the express language in § 1357(g)(1) on the transport of aliens pursuant to a 287(g) Agreement meaningless. *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015) ("It is 'axiomatic that all parts of a statute must be read together in order to achieve a consistent whole.' 'Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'" (quoting *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 455 (Fla. 1992))).

Moreover, the Transport Requirement's language explicitly grants local law enforcement agencies discretionary power to transport an alien into federal custody "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. This is precisely the type of unilateral conduct that *Arizona* expressly prohibited. *Id.* Further, the mandate requiring law enforcement officers to obtain the prior judicial authorization does not rectify the issue of unilateral conduct in the Transport Requirement. Instead, this judicial authorization requirement seeks to vest additional powers in the state judiciary that could otherwise only be performed by federal immigration officials — namely, allowing state judges to unilaterally authorize transport across state lines into federal custody. *See* Fla. Stat. § 908.104(4). This unilateral decision by local officers and state judges, in effect, "allows the State to achieve its own immigration policy," which is not permitted. *Arizona*, 567 U.S. 408. Therefore, the Court concludes that the Transport Requirement is conflict preempted because it frustrates the purpose

of 1357(g)(1). *See Browning*, 522 F.3d at 1167 ("Conflict preemption occurs [] when . . . when the state law stands as an obstacle to the objective of the federal law.").

    b.   <u>Vagueness Challenges</u>

Plaintiffs also argue that SB 168's "Best Efforts" provision and Sanctuary Provisions are unconstitutionally vague because the terms "best efforts" in § 908.104(1) and "impedes" in § 908.102(6) and, by reference, § 908.103, do not provide people of ordinary intelligence with a reasonable opportunity to understand what conduct is prohibited and because SB 168 authorizes the arbitrary and discriminatory enforcement of these provisions. ECF No. [5-1] at 12.

The Supreme Court has explained that a statute is void for vagueness (1) if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute," and (2) if "it encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

On a facial vagueness challenge, a movant must establish that the law is "incapable of any valid application." *Vill. of Hoffman Estates v. Flip Side, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982). To sustain such a challenge, the movant "must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. Such a provision simply has *no* core.'" *Id.* at 495 n.7 (citations omitted). "The degree of vagueness that the Constitution tolerates — as well as the relative importance of fair notice and fair enforcement — depends in part on the nature of the enactment." *Id.* at 498. Therefore, courts must consider whether the law implicates civil penalties or criminal penalties, because the nature of the penalty affects the level of tolerance a court will have for the vague language. *Id.* at 489-90. Additionally, courts must examine whether the law "threatens to inhibit the exercise of constitutionally protected

rights," *id.* at 490, and whether it places "unfettered discretion . . . in the hands of the [] police." *Papachristou*, 405 U.S. at 168.

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Yet, when the words of a challenged statute "are marked by 'flexibility and reasonable breadth, rather than meticulous specificity,'" the Supreme Court has upheld the challenged law. *Id.* Moreover, the Supreme Court has explained that a statute is not impermissibly vague when it "give[s] fair warning as to what is prohibited," and "'defines boundaries sufficiently distinct' for citizens, policemen, juries, and appellate judges." *Id.* at 114 (citations omitted).

A pre-enforcement challenge for vagueness centers primarily around whether the statute gives fair warning of the prohibited conduct because the danger of arbitrary enforcement is still speculative. *Vill. of Hoffman Estates*, 455 U.S. at 503. "Although it is possible that specific future applications . . . may engender concrete problems of constitutional dimension, it will be time enough to consider such problems when they arise." *Id.* (citations omitted). As such, a statute is unconstitutionally vague on its face when "it is plagued with such 'hopeless indeterminacy' that it precludes 'fair notice of the conduct it punishes,'" and invites arbitrary enforcement. *City of El Cenizo*, 890 F.3d at 190. Moreover, "pre-enforcement facial challenges are 'disfavored' because they 'often rest on speculation' and 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Id.* at 191 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)). "In general, as-applied challenges brought in post-enforcement proceedings" are more appropriate for vagueness challenges because they are "the basic building blocks of constitutional adjudication." *Id.* (quoting *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007)).

Plaintiffs contend that the terms "best efforts" in § 908.104(1) and "impedes" in § 908.102(6) and, by reference, § 908.103, are unconstitutionally vague because they do not provide people of ordinary intelligence with a reasonable opportunity understand what conduct is prohibited and because SB 168 authorizes the arbitrary and discriminatory enforcement of these provisions. ECF No. [5-1] at 12. Conversely, Defendants argue that Plaintiffs have failed to establish that these provisions are unconstitutionally vague in every application, as required for a facial vagueness challenge. ECF No. [19] at 16. Additionally, Defendants explain that, when read within the context of SB 168 as a whole, the challenged provisions clearly indicate what conduct is prohibited or encouraged. *Id.*

   i.   *Unconstitutional Vagueness of "Best Efforts" Under § 908.104(1)*

Plaintiffs contend that the "Best Efforts" provision is unconstitutionally vague because it does not give fair notice as to what conduct falls short of "best efforts" and it encourages arbitrary and discriminatory enforcement.[17] ECF No. [5-1] at 12-16. Specifically, Plaintiffs assert that "best efforts" does not provide individuals the reasonable opportunity to understand what conduct is prohibited and enforceable, nor does the phrase provide law enforcement agencies any clarity about what efforts are sufficient under the statute. *Id.* at 12-13. Moreover, the lack of standards of conduct under "best efforts" encourages arbitrary and discriminatory enforcement against individuals and law enforcement agencies. *Id.* at 14-15. In response, Defendants argue that the

---

[17] Plaintiffs also argue that the "Best Efforts" provision's vagueness is aggravated by the language in the bill title. ECF No. [5-1] at 15. This argument is meritless. Although the bill title does state that "[a]n Act relating to federal immigration enforcement . . . requiring state entities, local governmental entities, and law enforcement agencies to use best efforts to support the enforcement of federal immigration law," *id.*, it clearly references § 908.104's application as a whole. Specifically, while the mandates of § 908.104(1) explicitly apply to "law enforcement agenc[ies]," § 908.104(2) then goes on to regulate the conduct of "a state entity, local governmental entity, or law enforcement entity, or an employee, an agent, or a representative of the entity or agent." Fla. Stat. § 908.104(1)-(2). Accordingly, when read in the context of the statute as a whole, the "Best Efforts" provision is sufficiently clear on who it applies to.

"Best Efforts" provision is not unconstitutionally vague because the phrase "best efforts" is used in numerous Florida Statutes. ECF No. [19] at 17. Additionally, Defendants assert that ICE policies detail the extent of the agency's desired cooperation from local law enforcement agencies, which provides sufficient context to rebut any vagueness. *Id.*

The "Best Efforts" provision states, in relevant part, "A law enforcement agency shall use best efforts to support the enforcement of federal immigration law." Fla. Stat. § 908.104(1). Moreover, *Black's Law Dictionary* defines "best efforts" as

> Diligent attempts to carry out an obligation; esp., all actions rationally calculated to achieve a usu. stated objective, to the point of leaving no possible route to success untried. As a standard, a best-efforts obligation is stronger than a good-faith obligation. Best efforts are measured by the measures that a reasonable person in the same circumstances and of the same nature as the acting party would take.

BEST EFFORTS, *Black's Law Dictionary* (11th ed. 2019). This definition, while marked by "flexibility and reasonable breadth, rather than meticulous specificity," provides sufficient notice as to what efforts are required of law enforcement agencies. *Grayned*, 408 U.S. at 110.

Moreover, on a pre-enforcement facial challenge for vagueness, the Court's examination centers primarily around whether the statute gives fair warning of the prohibited conduct because the danger of arbitrary enforcement is still speculative. *Vill. of Hoffman Estates*, 455 U.S. at 503. With regard to Plaintiffs' assertion that "best efforts" encourages arbitrary and discriminatory enforcement, on a pre-enforcement challenge, "There is a basic uncertainty about what the law means and how it will be enforced. . . .[W]ithout the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [the "Best Efforts" provision] will be construed in a way that creates a conflict with federal law." *Arizona*, 567 U.S. at 415; *cf. Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." (citation omitted)). This type of speculative

constitutional challenge is more appropriately brought under an as-applied challenge at the post-enforcement stage. *City of El Cenizo*, 890 F.3d at 191. Therefore, at this pre-enforcement stage, this Court will not "adopt limiting constructions that are not strictly necessary to preserve the constitutionality of a statute." *Id.* Accordingly, the Court believes "best efforts" to be sufficiently clear as to what conduct is or is not required for a facial pre-enforcement vagueness challenge.

ii.  *Unconstitutional Vagueness of "Impede" Under § 908.102(6) and Unconstitutionality, by Reference, of § 908.103*

Plaintiffs also assert that the Sanctuary Provisions are unconstitutionally vague because individuals are not provided a reasonable opportunity to understand what conduct constitutes "imped[ing]." ECF No. [5-1] at 16-17. The Court concludes that, when read in context, the term "impedes" in the Sanctuary Definition is not unconstitutionally vague. Specifically, the Sanctuary Definition states in full,

> (6)  "Sanctuary policy" means a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from:
> (a)  Complying with an immigration detainer;
> (b)  Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;
> (c)  Providing a federal immigration agency access to an inmate for interview;
> (d)  Participating in any program or agreement authorized under s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or
> (e)  Providing a federal immigration agency with an inmate's incarceration status or release date.

Fla. Stat. § 908.102(6). Reading this provision as a whole, subsections (a) through (e) clearly set forth specific actions that state and local government entities are not allowed to "impede" or "prohibit." *Id.* § 908.102(6)(a)-(e).

"Impedes" is not so vague, when read in the context of the Sanctuary Definition as a whole, that it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by statute. *Papachristou*, 405 U.S. at 162. Moreover, because Plaintiffs assert a facial pre-enforcement vagueness challenge, they must establish that the Sanctuary Definition "is plagued with such 'hopeless indeterminacy' that it precludes 'fair notice of the conduct it punishes.'" *City of El Cenizo*, 890 F.3d at 190. The Court concludes that Plaintiffs have failed to sufficiently establish that the Sanctuary Definition is plagued with "hopeless indeterminacy" as to proscribed conduct. *Id.* "Impedes" does not render SB 168's Sanctuary Definition unconstitutionally vague, when read alongside the explicit list of immigration efforts set forth in subsections (a) through (e), because it "give[s] fair warning as to what is prohibited," and "'defines boundaries sufficiently distinct' for citizens, policemen, juries, and appellate judges." *Grayned*, 408 U.S. at 114.

### 2. Irreparable Injury

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray,* 415 U.S. 61, 88 (1974). "A showing of irreparable harm is 'the *sine qua non* of injunctive relief.' The injury must be 'neither remote nor speculative, but actual and imminent.' An injury is 'irreparable only if it cannot be undone through monetary remedies." *NE Fla. CAGC of Am.*, 896 F.2d at 1285 (quoting *Frejlach v. Butler,* 573 F.2d 1026, 1027 (8th Cir. 1978); *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 973 (2d Cir. 1989)). Courts have stated that the purpose of a preliminary injunction is to preserve the status quo when, absent the preservation of the status quo, a movant will suffer irreparable harm. *See Callaway*, 489 F.2d at 576.

Plaintiffs state that they will suffer irreparable harm if SB 168 is not enjoined because their injuries cannot be redressed through an award of monetary damages. ECF No. [5-1] at 17; *NE Fla. CAGC of Am.*, 896 F.2d at 1285. Plaintiffs' allegations regarding their irreparable injuries are the same injuries discussed above with regard to standing. ECF No. [5-1] at 17-19. Organizational Plaintiffs have had to divert resources away from core mission activities to respond to SB 168 and anticipate having to divert more resources in the future to address SB 168's enforcement. *Id.* Organizational Plaintiffs' individual members will face an actual and imminent threat of irreparable harm from racial profiling, ethnic profiling, and unlawful detentions and transport across state lines by local law enforcement officers once SB 168 takes effect. *Id.* at 18.

Defendants argue that Plaintiffs have not sufficiently alleged any actual or imminent threat of irreparable injury. ECF No. [19] at 19. Further, Defendants assert that any allegation that Mayor Stoddard will suffer irreparable injury from SB 168 is rebutted by his delay in joining this action as a Plaintiff. ECF No. [45] at 2. However, because Plaintiffs have only established a substantial likelihood of success on the Transport Requirement, the Court will not address Defendants' arguments with regard to Mayor Stoddard's irreparable injury.

Organizational Plaintiffs face, among other things, decreased membership and participation due to SB 168's impact. *Browning*, 522 F.3d at 1165 ("an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts" (citing *Havens Realty Corp.*, 455 U.S. at 379)). Similarly, Organizational Plaintiffs have established an actual and imminent threat of injury to their members from the unlawful detention, transportation, and enforcement under SB 168. *Babbitt*, 442 U.S. at 298 ("[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending,

that is enough." (quoting *Pennsylvania v. West Virginia*, 262 U.S. at 593)). These injuries to the organizations and their members arise directly from SB 168's enactment and can be redressed by enjoining the conflict-preempted Transport Requirement. Accordingly, the Court concludes that the Plaintiffs have established that the enactment of the Transport Requirement will cause them immediate, irreparable harm sufficient to satisfy this component of the preliminary injunction test.

### 3. Threatened Injury Outweighs the Harm of Imposing a Preliminary Injunction

The third preliminary injunction factor requires that the movant prove that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant. *Chavez*, 742 F.3d at 1271. "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" paying particular attention to "the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

"The equities weigh in favor of enjoining those provisions that are preempted by federal law. The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301. Conversely, "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012).

Where, as here, Plaintiff has demonstrated a substantial likelihood of success on the merits of their preemption challenge to SB 168's Transport Requirement, the State's interest in enforcing its statutes is outweighed by the injury sustained by the United States "when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301. Additionally, absent a preliminary injunction to preserve the status quo, Plaintiffs

have established that they will suffer serious and irreparable harm. *See Callaway*, 489 F.2d at 576. Therefore, the Court concludes that Plaintiffs' threatened injuries outweigh the harm a preliminary injunction would cause Defendants.

### 4. Preliminary Injunction is not Averse to the Public Interest

Finally, in establishing that a preliminary injunction is appropriate, a movant must prove that the injunction would not be averse to the public interest. *Chavez*, 742 F.3d at 1271. "Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301. Furthermore, because Plaintiffs' threatened injuries implicate the State's infringement upon significant constitutional and civil rights, a preliminary injunction that protects these rights pending a decision on the merits is in the public interest. *Alabama*, 691 F.3d at 1301; *Melendres*, 695 F.3d at 1002 ("it is always in the public interest to prevent the violation of a party's constitutional rights." (citations omitted)).

### C. Severability

Plaintiffs argue that, if the Court enjoins any provision of SB 168, it must enjoin SB 168 in its entirety because the individual provisions are not severable. ECF No. [5-1] at 3. Conversely, Defendants contend that, as a matter of law, the Court should sever any enjoined clauses from SB 168 because Florida law "clearly favors" severability. ECF No. [19] at 20.

The Eleventh Circuit has previously explained the issue of severability.

> Severability of a local ordinance is a question of state law. And Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones. According to the Florida Supreme Court, "[s]everability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." The doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is 'designed to show great deference to the legislative prerogative to enact laws.'"

> Severability is not possible, however, when "the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail." Whether a statute is severable is determined by "its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent." The doctrine of severability, thus, "recognizes that federal courts have an affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so."

*Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) (citations omitted).

As discussed above, the Court finds that the Transport Requirement is preempted by federal immigration law. Accordingly, the Court must assess whether this provision is severable from SB 168. The "taint" of SB 168's Transport Requirement does not "infect the entire enactment" because the unconstitutional authorization to transport aliens across state lines into federal custody does not implicate any of the other statutory provisions of SB 168. Thus, given the "affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so," the Court concludes that the Transport Requirement is severable from the rest of SB 168. *Id.*

**D.  Posting a Bond**

Plaintiffs request that this Court issue the preliminary injunction without requiring them to post a bond. ECF No. [5-1] at 20. Defendants make no mention of any opposition to Plaintiffs' request in their Response and Surreply.

Before a district court may issue a preliminary injunction, Federal Rule of Civil Procedure 65(c) requires that a movant "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The Eleventh Circuit has explained that "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quoting *City of Atlanta v. Metro.*

*Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981)); *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 302-03 (5th Cir. 1978) ("Rule [65(c)] requires security only in 'such sum as the court deems proper.' The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." (citations omitted)). Moreover, where plaintiffs "seek only to vindicate their federal statutory and constitutional rights, this case implicates the public interest and the balance of hardships tips sharply in favor of plaintiffs," district courts have exercised their discretion in not requiring plaintiffs to give security. *Campos v. Immigration and Naturalization Serv.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998).

In requesting that the Court issue a preliminary injunction, Plaintiffs seek only to vindicate their federal statutory and constitutional rights. *Id.* Moreover, as discussed above, the equitable factors weigh heavily in Plaintiffs' favor. *Id.* Accordingly, the Court will not require Plaintiffs to post a security bond.

## IV.     CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Plaintiffs' Amended Motion, ECF No. [47], is **GRANTED in part and DENIED in part** consistent with this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 30, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

55

Case No. 19-cv-22927-BLOOM/Louis

## APPENDIX
## Form I-247A

DEPARTMENT OF HOMELAND SECURITY
### IMMIGRATION DETAINER - NOTICE OF ACTION

| | |
|---|---|
| Subject ID:<br>Event #: | File No:<br>Date: |

| | |
|---|---|
| TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) | FROM: (Department of Homeland Security Office Address) |

Name of Alien: _____

Date of Birth: _____   Citizenship: _____   Sex: _____

**1. DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON** *(complete box 1 or 2).*

☐ A final order of removal against the alien;
☐ The pendency of ongoing removal proceedings against the alien;
☐ Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or
☐ Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE ALIEN TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION** *(complete box 1 or 2).*

☐ Upon completion of the proceeding or investigation for which the alien was transferred to your custody, DHS intends to resume custody of the alien to complete processing and/or make an admissibility determination.

**IT IS THEREFORE REQUESTED THAT YOU:**

• **Notify DHS** as early as practicable (at least 48 hours, if possible) before the alien is released from your custody.  Please notify DHS by calling ☐ U.S. Immigration and Customs Enforcement (ICE), or ☐ U.S. Customs and Border Protection (CBP) at _____. If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.
• **Maintain custody** of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien **must be served with a copy of this form** for the detainer to take effect. This detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters.
• Relay this detainer to any other law enforcement agency to which you transfer custody of the alien.
• Notify this office in the event of the alien's death, hospitalization or transfer to another institution.

☐ If checked: please cancel the detainer related to this alien previously submitted to you on _____ (date).

_____         _____
(Name and title of Immigration Officer)              (Signature of Immigration Officer) (Sign in ink)

| |
|---|
| **Notice:** If the alien may be the victim of a crime or you want the alien to remain in the United States for a law enforcement purpose, notify the ICE Law Enforcement Support Center at (802) 872-6020.  You may also call this number if you have any other questions or concerns about this matter. |

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE:**

Please provide the information below, sign, and return to DHS by mailing, emailing or faxing a copy to _____ .

Local Booking/Inmate #: _____   Estimated release date/time: _____

Date of latest criminal charge/conviction: _____   Last offense charged/conviction: _____

This form was served upon the alien on _____ , in the following manner:

☐ in person   ☐ by inmate mail delivery   ☐ other (please specify): _____

_____         _____
(Name and title of Officer)              (Signature of Officer) (Sign in ink)

DHS Form I-247A (3/17)              **Apx-21**              Page 1 of 3

Case No. 19-cv-22927-BLOOM/Louis

### NOTICE TO THE DETAINEE

The Department of Homeland Security (DHS) has placed an immigration detainer on you. An immigration detainer is a notice to a law enforcement agency that DHS intends to assume custody of you (after you otherwise would be released from custody) because there is probable cause that you are subject to removal from the United States under federal immigration law.  DHS has requested that the law enforcement agency that is currently detaining you maintain custody of you for a period not to exceed 48 hours beyond the time when you would have been released based on your criminal charges or convictions. **If DHS does not take you into custody during this additional 48 hour period, you should contact your custodian** (the agency that is holding you now) to inquire about your release. **If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

### NOTIFICACIÓN A LA PERSONA DETENIDA

El Departamento de Seguridad Nacional (DHS) le ha puesto una retención de inmigración. Una retención de inmigración es un aviso a una agencia de la ley que DHS tiene la intención de asumir la custodia de usted (después de lo contrario, usted sería puesto en libertad de la custodia) porque hay causa probable que usted está sujeto a que lo expulsen de los Estados Unidos bajo la ley de inmigración federal. DHS ha solicitado que la agencia de la ley que le tiene detenido actualmente mantenga custodia de usted por un periodo de tiempo que no exceda de 48 horas más del tiempo original que habría sido puesto en libertad en base a los cargos judiciales o a sus antecedentes penales. **Si DHS no le pone en custodia durante este periodo adicional de 48 horas, usted debe de contactarse con su custodio** (la agencia que le tiene detenido en este momento) para preguntar acerca de su liberación. **Si usted cree que es un ciudadano de los Estados Unidos o la víctima de un crimen, por favor avise al DHS llamando gratuitamente al Centro de Apoyo a la Aplicación de la Ley ICE al (855) 448-6903.**

### AVIS AU DETENU OU À LA DÉTENUE

Le Département de la Sécurité Intérieure (DHS) a placé un dépositaire d'immigration sur vous. Un dépositaire d'immigration est un avis à une agence de force de l'ordre que le DHS a l'intention de vous prendre en garde à vue (après cela vous pourriez par ailleurs être remis en liberté) parce qu'il y a une cause probable que vous soyez sujet à expulsion des États-Unis en vertu de la loi fédérale sur l'immigration. Le DHS a demandé à l'agence de force de l'ordre qui vous détient actuellement puisse vous maintenir en garde pendant une période ne devant pas dépasser 48 heures au-delà du temps après lequel vous auriez été libéré en se basant sur vos accusations criminelles ou condamnations. **Si le DHS ne vous prenne pas en garde à vue au cours de cette période supplémentaire de 48 heures, vous devez contacter votre gardien (ne)** (l'agence qui vous détient maintenant) pour vous renseigner sur votre libération. **Si vous croyez que vous êtes un citoyen ou une citoyenne des États-Unis ou une victime d'un crime, s'il vous plaît aviser le DHS en appelant gratuitement le centre d'assistance de force de l'ordre de l'ICE au (855) 448-6903**

### NOTIFICAÇÃO AO DETENTO

O Departamento de Segurança Nacional (DHS) expediu um mandado de detenção migratória contra você. Um mandado de detenção migratória é uma notificação feita à uma agência de segurança pública que o DHS tem a intenção de assumir a sua custódia (após a qual você, caso contrário, seria liberado da custódia) porque existe causa provável que você está sujeito a ser removido dos Estados Unidos de acordo com a lei federal de imigração. ODHS solicitou à agência de segurança pública onde você está atualmente detido para manter a sua guarda por um período de no máximo 48 horas além do tempo que você teria sido liberado com base nas suas acusações ou condenações criminais. **Se o DHS não leva-lo sob custódia durante este período adicional de 48 horas, você deve entrar em contato com quem tiver a sua custódia** (a agência onde você está atualmente detido) para perguntar a respeito da sua liberação. **Se você acredita ser um cidadão dos Estados Unidos ou a vítima de um crime, por favor informe ao DHS através de uma ligação gratuita ao Centro de Suporte de Segurança Pública do  Serviço de Imigração e Alfândega (ICE) pelo telefone (855) 448-6903.**

DHS Form I-247A (3/17)

Apx-22

Page 2 of 3

**THÔNG BÁO CHO NGƯỜI BỊ GIAM**

Bộ Nội An (DHS) đã ra lệnh giam giữ đối với quý vị. Giam giữ di trú là một thông báo cho cơ quan công lực rằng Bộ Nội An sẽ đảm đương việc lưu giữ quý vị (sau khi quý vị được thả ra) bởi có lý do khả tín quý vị là đối tượng bị trục xuất khỏi Hoa Kỳ theo luật di trú liên bang. Sau khi quý vị đã thi hành đầy đủ thời gian của bản án dựa trên các tội phạm hay các kết án, thay vì được thả tự do, Bộ Nội An đã yêu cầu cơ quan công lực giữ quý vị lại thêm không quá 48 tiếng đồng hồ nữa. Nếu Bộ Nội An không đến bắt quý vị sau 48 tiếng đồng hồ phụ trội đó, quý vị cần liên lạc với cơ quan hiện đang giam giữ quý vị để tham khảo về việc trả tự do cho quý vị. Nếu quý vị là công dân Hoa Kỳ hay tin rằng mình là nạn nhân của một tội ác, xin vui lòng báo cho Bộ Nội An bằng cách gọi số điện thoại miễn phí (1855) 448-6903 cho Trung Tâm Hỗ Trợ Cơ Quan Công Lực Di Trú.

被拘留者通知書

國土安全部(Department of Homeland Security，簡稱DHS)已經對你發出移民拘留令。移民拘留令為一給予執法機構的通知書，闡明DHS意欲獲取對你的羈押權(若非有此羈押權，你將會被釋放)；因為根據聯邦移民法例，並基於合理的原因，你將會被遞解離美國國境。DHS亦已要求現正拘留你的執法機構，在你因受到刑事檢控或定罪後，而在本應被釋放的程序下，繼續對你作出不超過四十八小時的監管。若你在這附加的四十八小時內，仍未及移交至DHS的監管下，你應當聯絡你的監管人(即現正監管你的機構)查詢有關你釋放的事宜。若你認為你是美國公民或為罪案受害者，請致電ICE執法部支援中心**(Law Enforcement Support Center)**知會**DHS**，免費電話號碼：**(855)448-6903**。

DHS Form I-247A (3/17)

Apx-23

Page 3 of 3

**Form I-200**

**U.S. DEPARTMENT OF HOMELAND SECURITY**    **Warrant for Arrest of Alien**

File No. _____

Date: _____

**To:**    **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____ is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☐ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

_____
(Printed Name and Title of Authorized Immigration Officer)

| **Certificate of Service** |
|---|
| I hereby certify that the Warrant for Arrest of Alien was served by me at _____ <br> (Location) <br><br> on _____ on _____, and the contents of this <br> (Name of Alien)   (Date of Service) <br><br> notice were read to him or her in the _____ language. <br> (Language) <br><br> _____    _____ <br> Name and Signature of Officer    Name or Number of Interpreter (if applicable) |

Form I-200 (Rev. 09/16)

**22**

Case No. 19-cv-22927-BLOOM/Louis

## Form I-205

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

### WARRANT OF REMOVAL/DEPORTATION

File No: _____

Date: _____

**To any immigration officer of the United States Department of Homeland Security:**

_____
(Full name of alien)

who entered the United States at _____ on _____
　　　　　　　　　　　　　　　　　　　(Place of entry)　　　　　　　　　　(Date of entry)

is subject to removal/deportation from the United States, based upon a final order by:

☐ an immigration judge in exclusion, deportation, or removal proceedings

☐ a designated official

☐ the Board of Immigration Appeals

☐ a United States District or Magistrate Court Judge

and pursuant to the following provisions of the Immigration and Nationality Act:

I, the undersigned officer of the United States, by virtue of the power and authority vested in the Secretary of Homeland Security under the laws of the United States and by his or her direction, command you to take into custody and remove from the United States the above-named alien, pursuant to law, at the expense of:

_____
(Signature of immigration officer)

_____
(Title of immigration officer)

_____
(Date and office location)

ICE Form I-205 (8/07)　　　　　　　　　　　　　　　　　　　　　　　　　Page 1 of 2

**24**

Case No. 19-cv-22927-BLOOM/Louis

To be completed by immigration officer executing the warrant: Name of alien being removed:

_____

**Port, date, and manner of removal:** _____

Photograph of alien
removed

Right index fingerprint
of alien removed

_____
(Signature of alien being fingerprinted)

_____
(Signature and title of immigration officer taking print)

Departure witnessed by: _____
(Signature and title of immigration officer)

If actual departure is not witnessed, fully identify source or means of verification of departure:

_____

_____

_____

If self-removal (self-deportation), pursuant to 8 CFR 241.7, check here.   ☐

Departure Verified by: _____
(Signature and title of immigration officer)

ICE Form I-205 (8/07)                                                                    Page 2 of 2

25