**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19-cv-22927-BLOOM/Louis**

CITY OF SOUTH MIAMI, et al.,

      Plaintiffs,

         v.

RON DESANTIS, et al.,

      Defendants.

                        /

**<u>BRIEF OF AMICI CURIAE</u>**

**INTERESTS OF AMICI**

Amici Human Rights Watch, the Center for Constitutional Rights, and LatinoJustice

PRLDEF are organizations with expertise on the domestic application and relevance of human

rights law.  Additional information regarding Amici's interests and expertise is set out in

Appendix A.

**INTRODUCTION**

SB 168 contravenes globally accepted human rights norms that ensure equality and non-

discrimination at every level of government, norms to which the United States has committed

through ratification of human rights treaties. Tying the hands of local authorities as they seek to

promote these fundamental norms and ameliorate the chilling effects of harsh federal

immigration policies negatively impacts all Florida residents and infringes upon their human

rights, particularly the rights of immigrants and non-citizens. By standing in the way of local

authorities' efforts to treat residents equally and ensure that all individuals can access basic

services, SB 168 transgresses applicable human rights laws and norms.

**ARGUMENT**

I.      **International Human Rights Standards Should Inform this Court's Consideration of SB 168's Constitutionality**

Human rights standards are pertinent to this case.  For more than two centuries, federal courts have considered, without hesitation, the position of the world community when construing the terms of the U.S. Constitution.[1] The Declaration of Independence explicitly calls for "a decent respect to the opinions of mankind,"[2] and from *Dred Scott v. Sanford,* 60 U.S. 393, 464, 556-57 (1857), *Reynolds v. United States,* 98 U.S. 145, 164 (1878), and *The Paquete Habana*, 175 U.S. 677, 700 (1900), Supreme Court Justices have engaged in comparative inquiries. Examining foreign and international laws and practices has been particularly valuable when common principles are at stake, and a global consensus can inform the interpretations of U.S. law.[3]

The laws and practices of the international community have been especially important when principles of liberty and equality are at issue. In *Lawrence v. Texas*, the U.S. Supreme Court looked to the "values we share with a wider civilization," concluding that international and foreign legal protections of individuals' liberty to engage in private intimate conduct were relevant to its decision.[4] Similarly in *Washington v. Glucksberg*, construing the 14th amendment, a majority of the Court referenced the practices "in almost every western democracy" that criminalize assisted suicide.[5]

---

[1] *See* Sarah Cleveland, *Our International Constitution*, 31 YALE J. INT'L L. 1, 5-6, 14, 99 (2006).
[2] The Declaration of Independence ¶ 1 (U.S. 1776).
[3] *See Graham v. Florida*, 560 U.S. 48, 80 (2010) (noting that the sentencing practice at issue has been "rejected the world over"); *see* Steven Calabresi & Stephanie Zimdahl, *The Supreme Court and Foreign Sources of Law: Two Hundred Years of Practice and The Juvenile Death Penalty Decision*, 47 WM. & MARY L.REV. 743, 886 (2005).
[4] *Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003).
[5] *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997).

In looking to human rights standards, human rights treaties provide a source of persuasive authority and guidance for judges. *See Medellin v. Texas*, 552 U.S. 491 (2008); Restatement (Fourth) of U.S. Foreign Relations Law § 308, Comment 3 ("although non-self executing treaty provisions are not themselves directly judicially enforceable, State and local courts may be able to facilitate or ensure compliance with a non-self-executing treaty obligation through their application of State or local law").

Because conflicts regarding local sanctuary policies have confronted nations across the globe and have been repeatedly addressed by international and regional bodies, review of international standards is particularly appropriate in this case.[6]

## II.    SB 168 Insists that Local Governments Violate the Nation's Human Rights Commitments

### A.    United States Human Rights Commitments Reinforce Rights to Equality and Non-Discrimination

The rights to be free from discrimination and to equality before the law are fundamental elements of human rights law.  *See, e.g.*, G.A. Res. 217 (III) A, Universal Declaration of Human Rights, arts. 2, 7 (Dec. 10, 1948); International Convention on the Elimination of All Forms of Racial Discrimination (CERD) art. 2(a), *opened for signature* Dec. 21, 1965, 660 U.N.T.S. 195 (ratified by U.S. in 1994); International Covenant on Civil and Political Rights (ICCPR) art. 2.1, 26, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171 (ratified by U.S. in 1992);

---

[6] *See, e.g.*, Moritz Baumgärtel & Barbara Oomen, *Pulling Human Rights Back In? Local Authorities, International Law and the Reception of Undocumented Migrants*, 51 J. LEGAL PLURALISM & UNOFFICIAL L. 172 (collecting cases that invoke international human rights law in defense of undocumented migrants); *see also* Nicola Delvino, *European Cities and Migrants with Irregular Status: Municipal Initiatives for the Inclusion of Irregular Migrants in the Provision of Services*, Global Exchange on Migrant and Diversity (Nov. 2017), https://www.compas.ox.ac.uk/wp-content/uploads/City-Initiative-on-Migrants-with-Irregular-Status-in-Europe-CMISE-report-November-2017-FINAL.pdf; Committee on Economic, Social and Cultural Rights, *Duties of States towards refugees and migrants under the International Covenant on Economic, Social and Cultural Rights*, E/C.12/2017/1 (March 13, 2017).

International Covenant on Economic, Social and Cultural Rights (ICESCR), art. 2.2, *opened for signature* Dec. 16, 1966, 993 U.N.T.S. 3 (signed by U.S. in 1977); Organization of American States (OAS), American Declaration of the Rights and Duties of Man art. II, May 2, 1948, O.A.S. Res. XXX, OAS/Ser.L/V/I.4 rev. 9.  The United States played a key role in shaping these standards.[7]

The U.S. has ratified the CERD and the ICCPR, two of the core international treaties that aim to ensure equality and eliminate discriminatory laws, policies, and practices.  Through ratification, the United States committed to guarantee equal enjoyment of rights regardless of race, color, ethnicity, or national origin. *See* CERD art. 5; ICCPR art 2.1. These ratified treaties constitute the "supreme Law of the Land." U.S. Const. art. VI.

The United States has repeatedly recognized the importance of implementing treaty provisions as a matter of domestic law and policy.  In 2016, for example, the United States committed to "continue our longstanding work to combat discrimination based on race, color, age, national origin, religion, gender, familial status, sexual orientation, gender identity, health status, and disability in various sectors in our society" and specifically to "work towards full racial equality" nationally and locally. *See* Permanent Mission of the U.S. to the U.N. *et al.,* Human Rights Commitments and Pledges of the United States of America: Commitment to Advancing Human Rights, Fundamental Freedoms, and Human Dignity and Prosperity Internationally, ¶¶ 4, 7 (Feb. 24, 2016). This included "ensuring that every American benefits from a local police force that protects and serves all members of the community," and "working with state and local authorities to improve police training and build community trust." *Id.* at ¶ 7.

---

[7] *See*, *e.g.*, Mary Ann Glendon, A WORLD MADE NEW: ELEANOR ROOSEVELT AND THE UNIVERSAL DECLARATION OF HUMAN RIGHTS (2001).

**B.      The Nation's Human Rights Obligations Extend to Citizens and Non-Citizens**

Human rights standards enshrine principles of equal protection and non-discrimination that apply to citizens and non-citizens. *See, e.g.*, Human Rights Comm., *ICCPR General Comment No. 15: The Position of Aliens Under the Covenant*, ¶ 2, U.N. Doc. HRI/GEN/1/Rev.1 (1994); *CERD General Recommendation XXX on Discrimination Against Non Citizens*, preamble, U.N. Doc. CERD/C/64/Misc.11/rev.3 (2005) (hereinafter *CERD Recommendation XXX*). Within the UDHR, only the articles that provide the rights of free movement and certain political rights – to vote and hold office – include language allowing for their limitation on the basis of citizenship.[8] The language of CERD and ICCPR reinforce that these are the only two areas where rights may be tethered to citizenship status.[9]  Governments can regulate the entry and removal of non-citizens from their territory, but measures relating to deportation and removal must "not discriminate among non-citizens on the basis of race, colour, or ethnic or national origin." *CERD General Recommendation XXX* at ¶ 25.

Both the ICCPR and CERD confirm the broad applicability of the rights to non-discrimination and equality in domestic law and policy. They emphasize, respectively, that States Parties "shall assure to *everyone within their jurisdiction* effective protection and remedies . . . against any acts of racial discrimination which violate his human rights and fundamental freedoms," CERD, art. 6 (emphasis added), and "undertake[] to respect and to ensure *to all individuals within its territory and subject to its jurisdiction* the rights recognized [herein]," ICCPR, art. 2, ¶ 1 (emphasis added).

---

[8] UDHR Article 13 provides the right of free movement and qualifies that "[e]veryone has the right to leave any country . . . and to return *to his country*." Article 21 provides, inter alia, that "[e]veryone has the right to take part *in the government of his country*, directly or through freely chosen representatives." (Emphases added).
[9] *CERD General Recommendation XXX on Discrimination Against Non Citizens*, ¶¶1-3, U.N. Doc. CERD/C/64/Misc.11/rev.3 (2005). Article 12 of the ICCPR provides for the right to enter and exit "[one's] own country" and Article 25 guarantees every "citizen" the right to vote, take part in elections, and to have access to public service.

U.N. officials have repeatedly called on the U.S. and other governments to recognize, protect, and affirmatively ensure the human rights of undocumented immigrants. *See, e.g.*, Louise Arbor, U.N. Special Representative of the Secretary General for International Migration and Secretary-General of the Intergovernmental Conference, *Opening remarks at the first informal thematic session on human rights of all migrants* (May 8-9, 2017) ("while states retain the sovereign prerogative to order their removal, the very presence of such migrants under their jurisdiction places certain obligations on national authorities.") (hereinafter U.N. Special Representative Remarks); Comm. on the Elimination of Racial Discrimination, *Concluding observations on the combined seventh to ninth periodic reports of United States of America*, ¶ 18, U.N. Doc. CERD/C/USA/CO/7-9 (Aug. 29, 2014) (calling on the U.S. "to ensure that the rights of non-citizens are fully guaranteed in law and practice" and citing particular concerns about U.S. treatment of undocumented immigrants).

The regional human rights bodies that promote human rights in the Americas have also strongly cautioned against distinguishing human rights because of immigration status. The Inter-American Commission on Human Rights (IACHR) has emphasized that:

> 'the motive, cause or reason why the person is in the State's territory has no relevance as regards the State's obligation to respect and to ensure that her or his human rights are respected. In particular, *it has no significance whatsoever in this regard whether or not the entry of that person into the State's territory was in keeping with the provisions of its laws*. The respective State must, in all circumstances, respect the said rights, because they are based, precisely, on the attributes of the human personality . . . regardless of whether the person is a national or resident of its territory or whether the person is there temporarily, in transit, legally, or in an irregular migratory situation.'

Inter-Am. Comm'n. H.R., Human Rights Situation of Refugee and Migrant Families and Unaccompanied Children in the United States of America, U.N. Doc OAS/Ser.L/V/II. 155, No.

16, ¶147 (July 24, 2015) (quoting Rights and Guarantees of Children in the Context of Migration and/or in Need of International Protection, Advisory Opinion OC-21/14, Inter-Am. Ct. H.R. (ser. A) No.21, ¶ 62 (Aug. 19, 2014) (emphasis added) (hereinafter, "Unaccompanied Children")). The IACHR has further instructed federal and local governments to "refrain from . . . developing administrative or other practices that violate the fundamental principle of nondiscrimination and the immigrants' rights to due process of law, personal liberty, and humane treatment." *Id*. at ¶ 427.

To fulfill these obligations, human rights experts have called on the United States to evaluate how its immigration laws and policies infringe upon human rights of undocumented individuals. While noting the government's authority to regulate conditions of entry and the ability to remain in the U.S., the U.N. High Commissioner for Human Rights emphasized that, "[even] border management measures must comply with the State's human rights obligations and should not be based on narrow policies aimed only at detecting, detaining and expeditiously deporting irregular migrants." Press Release, U.N. High Commission for Human Rights, Bachelet appalled by conditions of migrants and refugees in detention in the U.S. (July 8, 2019). Indeed, "immigration policies, laws, and practices must be respectful of and guarantee the human rights of all persons, including migrants and other non-nationals and persons in an irregular migratory situation." Unaccompanied Children at ¶¶ 1 n.3, 39, 44.

Human Rights experts have also specifically recommended that the United States strengthen human rights protections for non-citizens by ensuring immigration enforcement measures comply with prohibitions on discrimination. In its most recent review of the United States' human rights record in 2014, the Committee on the Elimination of Racial Discrimination called on the United States "to effectively combat and end the practice of racial profiling by

federal, state and local law enforcement officials, including by . . . *[e]nding immigration enforcement programmes and policies, which indirectly promote racial profiling*." Comm. on the Elimination of Racial Discrimination, *Concluding observations on the combined seventh to ninth periodic reports of United States of America*, ¶ 8, U.N. Doc. CERD/C/USA/CO/7-9 (Aug. 29, 2014) (emphasis added). The IACHR has reached similar conclusions, emphasizing that "'the basic right to equal protection before the law and non-discrimination *requires* that States ensure that their immigration law enforcement policies and practices *do not unfairly target certain persons based solely on ethnic or racial characteristics*, such as skin color, accent, ethnicity, or a residential area known to be populated by a particular ethnic group.'" Unaccompanied Children, ¶ 204 (quoting *Nadege Dorzema et al. v. Dominican Republic*, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 12.688, ¶ 205 (Oct. 24, 2012); *Benito Tide Méndez et al. v. Dominican Republic*, Report on the Merits, Inter-Am. Ct. H.R. Report No. 64/12, Case No. 12.271 ¶¶ 261-74 (Mar. 29, 2012) (emphasis added)). In other words, even a government's right to establish and enforce immigration law must conform to equal protection and nondiscrimination principles, which protect documented and undocumented immigrants from discriminatory law, policy, and practice.  Applying these principles, in 2011 the IACHR specifically recommended that the U.S. Immigration and Customs Enforcement (ICE) disband the Task Force Enforcement regime under 287(g) agreements. Inter-Am. Comm'n. H.R., *Report on Immigration in the United States: Detention and Due Process*, ¶ 425, U.N. Doc. 78/10, OEA/Ser.L/V/II (Dec. 30, 2010).

Finally, assuring human rights to everyone in the U.S. requires governments at every level protect and promote the conditions under which undocumented immigrants can access courts, police stations, health care facilities, schools, and other social and public service

agencies. U.N. Special Representative Remarks ("irregular migration enhances the vulnerability of migrants in multiple ways. . . .  Putting in place 'firewalls' between immigration enforcement and public services is an effective way to facilitate access to justice, housing, health care, education, social protection and social and labour services for migrants."). Equal access to basic services and protections cannot be denied based on citizenship. CERD, art. 5 (e) (protecting enjoyment of workplace, housing, health, education, and public access rights without distinction as to national origin). Protecting human rights for undocumented persons requires governments to eliminate de jure and de facto barriers to ensuring that protections, such as labor and housing rights, can be protected and enforced through the courts. Press Release, Special Rapporteur on the Human Rights of Migrants, States Must Ensure all Migrants Enjoy Human Rights, U.N. Experts say on International Migrants Day (Dec. 18, 2018) ("migrants must be able to exercise their right to access justice without fear of being detained and deported and so States must ensure migrants' access to police stations, courts and other public services, such as health care without fear of being detained or reported to immigration authorities."); *see also* Human Rights Comm., *General Comment No. 32, Article 14: Right to Equality Before Courts and Tribunals and to a Fair Trial*, U.N. Doc. CCPR/C/GC/32 (2007) (hereinafter *Human Rights Comm., General Comment 32*).

U.N. officials have criticized the current approach to immigration in the U.S., on the basis that it heightens the barriers that undocumented people face daily in exercising basic rights and meeting fundamental needs. These include "exploitation, abuse and wage theft," and refusal of access to utilities such as water, combined with the inability to seek assistance or protection for fear of deportation. Special Rapporteur on Extreme Poverty and Human Rights, *Report of the Mission to the United States of America*, ¶59, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018) (by

9

Philip Alston). Laws, policies, and practices that perpetuate these conditions impede due process and equal protection, and stand in stark contrast to the United States' international human rights obligations.

Ensuring access to justice for non-citizens has been of particular concern to the Human Rights Committee, which has emphasized that the ICCPR requires not only baseline legal protection but also the promotion of nondiscrimination and equal treatment, including before courts and tribunals. Equality and due process are of paramount importance:

> [t]he right of access to courts and tribunals and equality before them is not limited to citizens of States parties, but must also be available *to all individuals, regardless of nationality or statelessness, or whatever their status*, whether asylum seekers, refugees, migrant workers, unaccompanied children or other persons*, who may find themselves in the territory or subject to the jurisdiction of the State party*.

*Human Rights Comm., General Comment 32.*  Further, "[a] situation in which an individual's attempts to access the competent courts or tribunals are *systematically frustrated de jure or de facto* runs counter to the guarantee[s]" of the ICCPR.  *Id.*

### C.    States and Localities Are Critical to Compliance with U.S. Treaty Obligations and Commitments

Human rights treaties anticipate that within federal systems, state and local governments are vital to ensuring compliance with their provisions. The CERD states that national and local governments are bound by its provisions. CERD, art. 2.1 ("Each State Party undertakes to engage in no act or practice of racial discrimination against persons, groups of persons or institutions and to ensure that all public authorities and public institutions, national and local, shall act in conformity with this obligation."). The ICCPR also clearly indicates that its provisions "extend to all parts of federal States without any limitations or exceptions." ICCPR, art. 50.

The United States has emphasized specifically that state and local governments play an essential role in ensuring compliance with the United States' human rights commitments. Upon ratification of the CERD and the ICCPR, Congress included the understanding that these treaties "shall be implemented by the Federal Government to the extent that it exercises jurisdiction over the matters covered therein, and otherwise by the state and local governments." *See* 140 Cong. Rec. 14, 326-27 (daily ed. June 24, 1994); *see also* 138 Cong. Rec. 8068-71(daily ed. Apr. 2,1992) (regarding ICCPR). While the United States can determine the most efficacious means of implementing CERD and ICCPR protections (*i.e.,* through federal, state, and local efforts), government action at every level must be consistent with treaty provisions.

The United States federal government has consistently emphasized that U.S. state and local governments provide "complementary protections and mechanisms" that "reinforce the ability of the United States to guarantee respect for human rights."[10] The U.S. State Department Office of the Legal Adviser has specifically noted that human rights "obligations are implemented not only by the federal government, but also through the dedicated efforts of state, local, insular, and tribal governments throughout our country, in areas such as protecting the civil and political rights of our citizens, combating racial discrimination, and protecting children from harms such as pornography and prostitution," information that has been communicated to

---

[10] *See* Comm. on the Elimination of Racial Discrimination, *Reports submitted by States parties under article 9 of the Convention: International Convention on the Elimination of all Forms of Racial Discrimination: Seventh to ninth periodic reports of States parties due in 2011: United States of America* ¶ 31, U.N. Doc. CERD/C/USA/7-9 (13 June 2013), available at https://tbinternet.ohchr.org/_layouts/15/TreatyBodyExternal/Countries.aspx?CountryCode=USA&Lang=EN; *Common Core Document forming part of the reports of States parties: United States of America, Submitted With the Fourth Periodic Report of the United States of America to the United Nations Committee on Human Rights concerning the International Covenant on Civil and Political Rights,* ¶ 129, U.N. Doc. HRI/CORE/USA/2011 (Dec. 30, 2011), available at https://2009-2017.state.gov/documents/organization/251864.pdf; *See also Annex A to the Common Core Document forming part of the reports of States parties: United States of America: Submitted With the Fourth Periodic Report of the United States of America to the United Nations Committee on Human Rights concerning the International Covenant on Civil and Political Rights,*¶¶ 1-3, 124-26, U.N. Doc. HRI/CORE/USA/2011 (Dec. 30, 2011), available at https://2009-2017.state.gov/documents/organization/251864.pdf (emphasizing that state and local agencies play a "critical role" in human rights implementation).

Governors, State Attorneys General, and Human Rights Commissions.[11] In 2015, speaking with the National Association of Attorneys General, the Acting Legal Adviser Mary McLeod highlighted that "When the United States ratifies a treaty, it becomes the supreme law of the land, like the Constitution and federal statutes. It is only through robust efforts at all levels of government – federal, state, territorial, and local – that we can live up to the obligations we have undertaken for ourselves."[12] Such shared human rights authority is consistent with treaty standards, which recognize that federal, state, and local governments bear responsibility for human rights implementation.

## III.    SB 168 Violates the Human Rights of Florida Residents

Human rights norms provide essential safeguards to ensure equality and due process in how federal immigration policies are carried out. Through SB 168, Florida has essentially mandated that localities cooperate in federal border enforcement efforts. Workplace raids, family separation, courthouse arrests, and other aggressive immigration enforcement measures create a chilling effect and an atmosphere of intense fear among undocumented immigrants and their families that seeps into virtually all aspects of life for immigrant communities. This "chilling effect" erodes "trust, cooperation and communication between police and immigrant

---

[11] Letter from Principal Deputy Legal Adviser McLeod to Governors of U.S. State and Territories (Feb. 18, 2014), *available at* https://2009-2017.state.gov/s/l/releases/2014/223238.htm (disseminated to the U.S. Conference of Mayors, National Association of Counties, National Governors Association, National Association of Attorneys General and IAOHRA); *see also* Letter from Harold Hongju Koh, Legal Adviser to the U.S. Dep't of State, to State and Local Human Rights Commissions (May 3, 2010), *available at* https://2009-2017.state.gov/s/l/releases/223235.htm ( "As you may be aware, implementation of U.S. human rights treaty obligations is carried out not only by the federal government, but also by state and local governments..."); Memorandum from Harold Hongju Koh, Legal Adviser to the U.S. Dep't of State, to State Governors on U.S. Human Rights Treaty Reports (Jan. 20, 2010), *available at* https://2009-2017.state.gov/documents/organization/137292.pdf.

[12] Mary E. McLeod, Acting Legal Adviser, U.S. Dep't of State, The Role of State, Territorial, and Local Government in Promoting, Respecting, and Defending Human Rights, Remarks to the National Association of Attorneys General National Conference (Feb. 25, 2015), *available at* https://2009-2017.state.gov/s/l/releases/remarks/239960.htm.

communities."[13] This erosion in trust leads both undocumented and documented immigrants to avoid encounters with law enforcement officers and other government services at all costs. Local sanctuary policies mitigate the harmful consequences that this "chilling effect" has on immigrant communities by restoring individuals' ability to access services such as public education and adequate housing; and to protect workplace integrity, public safety, and the health, which are essential to fulfilling the human rights of individual residents, and the community as a whole. In other states, recognizing the harmful and inhumane impacts of 287(g) cooperation agreements – described in greater detail below – Attorneys General have eliminated these agreements,[14] or sought to restrict their reach.[15] An array of local law enforcement officials have also expressed concern about the harms of policies that require cooperation between federal immigration enforcement and local officials.[16]

### A.     Harmful Impacts on Public Safety

When local law enforcement agencies engage in federal immigration enforcement, there is an increase in immigrant communities' social isolation and concern for personal safety.[17] This "chilling effect" impacts both undocumented and documented immigrants because many

---

[13] Mai Thi Nguyen & Hannah Gill, *Interior Immigration Enforcement: The Impacts of Expanding Local Law Enforcement Authority*, 53 Urb. Stud. J. 302, 305 (2016).

[14] *See NJ Abolishes Agreements with ICE That Divert Local Law Enforcement to Perform Federal Immigration Duties*, Am. Civ. Lib. Union (Sept. 27, 2019), https://www.aclu.org/press-releases/nj-abolishes-agreements-ice-divert-local-law-enforcement-perform-federal-immigration.

[15] *See, e.g.* Remarks by Illinois Attorney General Lisa Madigan, 49 Col. Human Rights L. Rev. 12, 16-17 (2017) (Noting that 287(g) agreements "divert badly needed resources away from traditional local law enforcement work and toward enforcement of federal immigration laws. Even worse, these agreements damage the already precarious relationship that local law enforcement has with its community. By having local law enforcement engage in federal immigration enforcement, the agreements further diminish the willingness of already marginalized individuals to come forward if they are a victim of or a witness to a crime. When someone is fearful that they or their family may be deported, they are less likely to engage with government, let alone law enforcement.")

[16] *See* Grace Meng, *Why Oregon should keep its landmark sanctuary law*, The Hill (July 19, 2018), https://thehill.com/opinion/immigration/397780-why-oregon-should-keep-its-landmark-sanctuary-law ("[P]rosecutors, sheriffs and police chiefs have spoken out against the administration precisely because they fear that its policies are imperiling entire communities, U.S. citizen and immigrant alike.").

[17] Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. of Ethnic and Migration Studies 970, 985 (2016).

documented immigrants have direct experience with the deportation of a family member, friend, or neighbor.[18] In the absence of local sanctuary policies, both documented and undocumented immigrants will be unlikely to contact authorities when they are victims of crimes as evidenced by a 2016 study focused on Alamance County, North Carolina. One legal permanent resident underscored her fear: "I am afraid to report crimes because I am afraid of police. I don't know what they will do to me or my family."[19] Further, many respondents reported increased levels of victimization within immigrant communities overall: over half of the respondents reported that they or their family members had been a victim of crime, predominantly robberies or muggings.[20]

Fear of deportation by local law enforcement further undermines local community-police relations in the short- and long-term.[21] In the short term, crimes become harder to learn about and solve as distrust between police and residents increases; and in the long-term, a substantial portion of the population withdraws and develops a fear of local law enforcement authorities.[22] A 2017 survey examined the behavioral change in members of the undocumented Mexican immigrant population based on whether they knew that local law enforcement worked with ICE, demonstrating that knowledge of such cooperation between local law enforcement and ICE significantly impacts crime reporting.[23] Respondents that were told that local law enforcement worked with ICE were 61% less likely to report crimes that they witnessed and 43% less likely to report crimes where they were the victim compared to respondents told that local law

---

[18] *Id.* at 986.
[19] Nguyen & Gill, *supra* note 13, at 316.
[20] *Id.*
[21] Theodore & Habans, *supra* note 17, at 986.
[22] *Id.*
[23] Laura Muñoz Lopez, *How 287(g) Agreements Harm Public Safety*, CENTER FOR AMERICAN PROGRESS (May 8, 2018), https://www.americanprogress.org/issues/immigration/news/2018/05/08/450439/287g-agreements-harm-public-safety/ (discussing study conducted by Tom K. Wong).

enforcement was not working with ICE.[24]  Sixty percent of respondents in a 2019 survey of

Latino residents in Tulsa, Oklahoma indicated they would not report a crime they witnessed.

Tulsa's Police Department has acknowledged that fear of deportation leads to lack of reporting

by undocumented immigrant communities.[25] The ways that local law enforcement engagement in

federal immigration enforcement erodes police-community relations across the country has been

well documented over the past over the past half decade.[26] These negative impacts that affect the

entire community can be mitigated through measures that focus local law enforcement on local

issues, such as sanctuary policies.

### B.     Interference with Access to Education

The current climate of fear of family separation and deportation in the United States

significantly impedes access to public education in immigrant communities. Undocumented

children have a right to equal access to education. *Plyer v. Doe*, 457 U.S. 202 (1982). In *Plyer*,

the Supreme Court reasoned that "education has a fundamental role in maintaining the fabric of

our society" and "provides the basic tools by which individuals might lead economically

productive lives to the benefit of us all." *Id.* at 221. But in the absence of local sanctuary policies,

parents with more tenuous legal statuses such as Temporary Protected Status (TPS) or no

documentation, are afraid to bring their children to school.[27] This is particularly true for mixed-

---

[24] *Id.*

[25] John Raphling, *"Get on the Ground!"*: *Policing, Poverty, and Racial Inequality in Tulsa, Oklahoma: A Case Study of US Law Enforcement,* HUMAN RIGHTS WATCH (Sept. 12, 2019), https://www.hrw.org/report/2019/09/12/get-ground-policing-poverty-and-racial-inequality-tulsa-oklahoma/case-study-us-law (discussing individual and community impacts of fear of police, and referencing a community survey by the Coalition for the American Dream).

[26] *US: Immigrants 'Afraid to Call 911',* HUMAN RIGHTS WATCH (May 14, 2014), https://www.hrw.org/news/2014/05/14/us-immigrants-afraid-call-911 (detailing the impacts of the Federal Secure Communities Program, and concluding "that hard-won trust is eroded every time an immigrant ends up in deportation proceedings after contacting the police.")

[27] Marissa Raymond-Flesch, *The Negative Health Consequences of Anti-Immigration Policies*, 62 J. OF ADOLESCENT HEALTH, 505, 505-06 (2018).

status families that face the threat of family separation, and the resulting harms to their children. Fueled by fear, these families opt to keep their children at home.[28]

Their fear is well founded.[29] On April 5, 2018, ICE raided a meatpacking plant in eastern Tennessee, arresting 97 immigrants for allegedly being in the United States illegally. The next day, approximately 530 students did not attend Hamblen County schools due to fear of family separation and deportation – about 5% of the district's 10,000 students, and almost a quarter of its Latino student population.[30] On August 7, 2019, ICE raided seven food processing plants in Mississippi and arrested at least 680 immigrants – a record setting number of arrests.[31] This raid happened on the first day of school, leaving students crying without their parents to pick them up from school or without their parents once they arrived home, which left all the students afraid for their parents' safety.[32]

In addition to school absences, immigration enforcement has detrimental effects on academic performance and classroom behavior of students – including immigrant and native-born students. According to a national survey conducted by the UCLA Civil Rights Project, 68% of administrators reported a decrease in school attendance, 90% noted behavioral or emotional issues among immigrant students, and 70% reported a decline in academic performance. Regions with the fewest local sanctuary policies have the highest percentage (70%) of schools reporting

---

[28] *Id.* at 505.
[29] *Id.* at 505-06.
[30] Catherine E. Shoichet, *ICE Raided a Meatpacking Plant. More than 500 Kids Missed School the Next Day*, CNN (Apr. 12, 2018), https://www.cnn.com/2018/04/12/us/tennessee-immigration-raid-schools-impact/index.html.
[31] *Id.*
[32] Meg Wagner, Elise Hammond & Veronica Rocha, *Mass Immigration Arrests in Mississippi*, CNN (Aug. 8, 2019), https://www.cnn.com/us/live-news/mississippi-immigration-raids-august-2019/index.html; Miriam Jordan, *ICE Arrests Hundreds in Mississippi Raids Targeting Immigrant Workers*, N.Y. TIMES (Aug. 7, 2019), https://www.nytimes.com/2019/08/07/us/ice-raids-mississippi.html.

student stress, absenteeism, and other problems due to immigration enforcement and consequent student fear of deportation.[33]

## C. Exacerbating Housing Insecurity

Barring local sanctuary policies exacerbates immigrant communities' vulnerability to unlawful housing discrimination, and eviction.[34] Predatory housing schemes place immigrants at high risk for being house-poor (*i.e.* when a significant portion of an individual's income is spent on home ownership), losing their homes, and experiencing poverty.[35] Additionally, according to a 2015 Migration Institute Policy report, immigrants are often rejected from rentals based on assumptions about their legal status; thus, some immigrants must resort to renting uninhabitable dwellings such as tool sheds or overcrowded housing.[36] Further, landlords may use their knowledge of a non-paying tenant's undocumented status to threaten deportation. In September 2019, a Queens landlord threatened to report her tenant from Guyana to ICE if the tenant did not pay her rent.[37] Hearing a rare legal challenge to the practice, a New York City court ruled that the landlord violated New York City's human rights laws and ordered the landlord to pay $17,000 in fines and damages.[38] This case offers an example of local government taking action to address the threat of deportation. Absent local government protection of basic rights, including sanctuary policies, few immigrants will risk challenging unfair or discriminatory practices.

---

[33] Carolyn Jones, *Fear, Absenteeism, Falling Grades Among Impacts of Immigration Crackdown, Study Finds,* EDSOURCE (Mar. 4, 2018), https://edsource.org/2018/fear-absenteeism-falling-grades-among-impacts-of-immigration-crackdown-study-finds/594222.

[34] Cecilia Ayón, *Economic, Social, and Health Effects of Discrimination on Latino Immigrant Families*, MIGRATION POLICY INSTITUTE, 7, 8 (2015), https://www.migrationpolicy.org/research/economic-social-and-health-effects-discrimination-latino-immigrant-families.

[35] *Id.*

[36] *Id.*

[37] Christina Goldbaum, *Threat to Report Tenant to Ice May Cost Landlord $17,000*, N.Y. TIMES (Sept. 23, 2019), https://www.nytimes.com/2019/09/23/nyregion/immigrants-tenants-rights.html.

[38] Tyler Blint-Welsh, *New York Judge Fines Landlord $17,000 for Threatening to Call ICE on Tenant*, WALL ST. J. (Sept. 19, 2019), https://www.wsj.com/articles/new-york-judge-fines-landlord-17-000-for-threatening-to-call-ice-on-tenant-11568931010

### D.      Impeding Workplace Integrity

The "chilling effect" that individuals experience as a result of the threat of immigration enforcement also has a detrimental impact on workplace integrity. Employers can and often do, threaten deportation to discourage immigrant workers from asserting their workers' rights.[39] Without the mitigation of local sanctuary policies, immigrant workers, who may already have debts from migration and financial obligations to their families in their countries of origin,[40] are the most at risk for exploitation because they fear deportation if they report inappropriate working conditions and sexual harassment to their employers.

### E.      Damaging Public Health

Aggressive and punitive immigration policies can make immigrants feel "hunted" by law enforcement, resulting in intense feelings of anxiety, fear, and depression.[41] The increase in anti-immigrant policymaking creates a toxic environment for Latino families, regardless of immigrant status.[42] Fear is experienced by undocumented individuals as well as children in mixed status families with consequences for child health.[43] Negative health outcomes that stem from fear and anxiety include high blood pressure and diabetes.[44] Children of undocumented immigrants are especially susceptible to high levels of stress involving legal status and hostile anti-immigrant environment.[45]

Barring local sanctuary policies will increase healthcare disparities and human rights concerns. Fear of deportation has already led to the decline in healthcare coverage by

---

[39] Jayesh M. Rathod, *Beyond the Chilling Effect: Immigrant Worker Behavior and the Regulation of Occupational Safety and Health*, 14 EMP. RTS. & EMP. POL'Y J. 267, 272 (2010).
[40] *Id.* at 280-81.
[41] Edward D. Vargas & Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, 19 J. IMMIGR. MINORITY HEALTH 913, 914 (2017).
[42] *Id.* at 914.
[43] *Id.* at 913.
[44] *Id.*
[45] *Id.*

discouraging all immigrants from applying for and using government health care programs like Medicaid.[46] Local sanctuary policies can mitigate these impacts, and protect the public health of the entire community, by ensuring that immigrant communities do not isolate themselves from health care systems.

### F.   Limiting Access to Courts

The right to access courts is a fundamental right, which promotes other constitutional rights such as due process and the equal protection of the law, and is integral to our constitutional democracy.[47] The justice system cannot operate effectively when people do not feel safe going to court.[48] According to a survey conducted by the Immigrant Defense Project (IDP), in New York in 2017, ICE courthouse arrests have increased by 1200%.[49] Additionally, a recent survey conducted by the National Immigrant Women's Advocacy Project in partnership with the American Civil Liberties Union reveals that fear of deportation, inspired by immigration arrests in courthouses, prevents immigrants from participating in court proceedings.[50]

One undocumented Honduran immigrant in the Bronx, New York, decided not to pursue an opportunity to get a visa because it required that she go to court, explaining, "I understood about the visa…But I couldn't sleep because I was fearful to go to the courthouse."[51] As courthouse arrests increase, attorneys across the country have reported decreases in the number of immigrants going to court to report wage theft, domestic violence, and workplace sexual

---

[46] Jacob Knutson, *Fear over Trump's immigration crackdown may be linked to rise in uninsured*, AXIOS (Sept. 15, 2019), https://www.axios.com/immigrants-fears-rise-health-uninsured-3e341843-0db9-489f-91e4-150301167641.html.
[47] *Freezing Out Justice: How Immigration Arrests at Courthouses are Undermining the Justice System*, AM. CIV. LIB. UNION, 3 (2018), https://www.aclu.org/report/freezing-out-justice.
[48] *Id.*
[49] *Id.* at 2.
[50] *Id.* at 3.
[51] RJ Vogt, *With Courthouse Arrests, Is Justice Too Risky for Immigrants?*, LAW 360 (Mar. 3, 2019), https://www.law360.com/articles/1133777.

assault.[52] The arrests often begin with surveillance from inside the courtroom.[53] Immigrants' fear surrounding courthouse arrests is heightened because ICE officials are not always identifiable – they many appear in plainclothes and unmarked vans.[54] The immigrant community has reported witnessing ICE arrests that look like kidnappings.[55] As New York Attorney General Letitia James observed, "[t]he chilling effect of ICE's 2018 directive, allowing for arrests in and around court proceedings, are real and as a result valid prosecutions have been abandoned or in some cases they've never been pursued."[56]

## IV.    Conclusion

SB 168 contravenes basic principles of justice and fundamental human rights. It ties the hands of local authorities seeking to promote and protect community safety, and significantly harms local communities, with disproportionately negative impacts on immigrant communities. Accordingly, amici urge this Court to permanently enjoin the operation of SB 168, thereby permitting local governments in Florida to ensure the human rights to equality and non-discrimination to all residents.

Date: December 6, 2019                 Respectfully submitted,

                                       Kevin A. Gregg
                                       KEVIN A. GREGG, ESQ.
                                       Fla. Bar. No.: 121852
                                       kgregg@kktplaw.com

                                       Kurzban Kurzban

---

[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] Frank G. Runyeon, *NY Sues ICE to Stop Courthouse Arrests*, LAW 360 (Sept. 25, 2019), https://www.law360.com/articles/1202593/ny-sues-ice-to-stop-courthouse-arrests.

Tetzeli and Pratt, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
(305) 444-0060
*Counsel for amici curiae*

Martha F. Davis
Program on Human Rights and the Global Economy
Northeastern University School of Law
416 Huntington Avenue
Boston, MA  02115
(617) 373-8921
(Pro hac vice motion pending)

JoAnn Kamuf Ward
Human Rights Institute
Columbia University Law School
435 West 116th Street
New York, NY  10027
jward@law.columbia.edu\
(Pro hac vice motion pending)

Attorneys for Amici

*Lucinda Gulino and MacKenzie Speer, students at Northeastern University School of Law and Meg Gould, a student at Columbia Law School provided important assistance in preparing this brief.

## APPENDIX A: AMICI

Human Rights Watch is a non-profit, independent organization and the largest international human rights organization based in the United States. Since 1978, Human Rights Watch has investigated and exposed human rights violations and challenged governments to protect the human rights of citizens and noncitizens alike. Human Rights Watch investigates allegations of human rights violations in more than 100 countries around the world, including in the United States, by interviewing witnesses, gathering information from a variety of sources, and issuing detailed reports. Where human rights violations have been found, Human Rights Watch advocates for the enforcement of those rights with governments and international organizations and in the court of public opinion.

The Center for Constitutional Rights ("CCR") is a national non-profit legal and educational organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international human rights law. Founded in 1966 to provide legal support for the civil rights movement, CCR has a long history of litigating landmark civil and human rights cases fighting for racial justice and immigrant rights. CCR's litigation challenging abusive immigration practices includes cases such as *East Bay Covenant v. Barr*, 19-cv-04073 (N.D. Ca); *Al Otro Lado v. Neilsen*, 17-cv-05111 (C.D. Ca); and *Make the Road v. Cuccinelli*, 19-cv-07993 (S.D.N.Y).

LatinoJustice PRLDEF, formerly known as the Puerto Rican Legal Defense & Education Fund, is a national non-profit civil rights legal defense fund that has advocated for and defended the constitutional rights of all Latinos to ensure their equal protection under the law since 1972.  LatinoJustice has engaged in and supported law reform litigation challenging local and state immigration enforcement policies and practices that illegally seek to usurp federal

22

immigration authority.  LatinoJustice has also conducted advocacy at the United Nations and the Inter-American Commission on Human Rights.