## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-22927-BLOOM/Louis

CITY OF SOUTH MIAMI, et al.,

      Plaintiffs,

v.

RON DESANTIS, et al.,

      Defendants.

_____/

### ORDER

**THIS CAUSE** is before the Court on Defendants'[1] Motion to Dismiss Plaintiffs' Amended

Complaint, ECF No. [52] ("Motion"). Plaintiffs[2] filed a Response in Opposition to the Motion,

ECF No. [59] ("Response"), to which Defendants filed a Reply, ECF No. [62] ("Reply"). The

Court has carefully considered the Motion, all opposing and supporting submissions, the record in

this case, the applicable law, and is otherwise fully advised. For the reasons set forth below,

Defendants' Motion is granted in part and denied in part.

## I.    BACKGROUND

On May 2, 2019, the Florida legislature passed Senate Bill 168 ("SB 168"), which aimed

to further the State of Florida's interest in "cooperat[ing] and assist[ing] the federal government in

---

[1] Defendants include Ron DeSantis, Governor of the State of Florida ("Governor DeSantis"), and Ashley Moody, Attorney General of the State of Florida (collectively, "Defendants").

[2] Plaintiffs include the City of South Miami; Philip K. Stoddard, Mayor of City of South Miami ("Mayor Stoddard"); Florida Immigrant Coalition, Inc. ("FLIC"), The Farmworker Association of Florida, Inc. ("FWAF"), Family Action Network Movement, Inc. ("FANM"), QLatinx, and WeCount!, Inc. ("WeCount"), on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc. ("AI Justice"), The Guatemalan-Maya Center, Inc. ("GMC"), Hope Community Center, Inc. ("Hope"), and Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster"), on behalf of their organizations (collectively, "Plaintiffs").

the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101 (2019). The law was adapted from a model law originally drafted by organizations designated by the Southern Poverty Law Center to be hate groups, based on their anti-immigrant platforms. ECF No. [38] at 26. Moreover, SB 168 was described by its sponsors as an "anti-sanctuary cities law." *Id.* at 26, 27. On June 14, 2019, Governor DeSantis signed SB 168 into law, and it was enacted as Chapter 908 of the Florida Statutes. *See* Fla. Stat. ch. 908. Among other things, SB 168 prohibits so-called "sanctuary policies" that indicate certain jurisdictions' intent not to cooperate with Immigration and Customs Enforcement ("ICE"). The law delineates specific immigration enforcement efforts with which local jurisdictions must comply. These include complying with immigration detainers and transporting aliens to federal facilities. *See* Fla. Stat. § 908.105; Fla. Stat. § 908.104(4). Moreover, the Attorney General and the Governor are vested with enforcement authority to seek injunctive relief or to exercise the Governor's suspension power, should a government official fail to comply with the law's mandates. Fla. Stat. *See* Fla. Stat. § 908.107. This enforcement provision took effect on October 1, 2019.

Plaintiffs seek injunctive and declaratory relief, challenging the constitutionality of numerous provisions of SB 168. ECF No. [38] at 3 ("Amended Complaint").

**A.** **Relevant SB 168 Provisions**

The provisions of SB 168 that are being challenged are reproduced in full below. Any supplemental provisions that are relevant to the Court's analysis are also set forth below.

SB 168 sets forth the definition of certain terms used within the statute in § 908.102. Plaintiffs' Amended Complaint specifically challenges the definition of "sanctuary policy" ("Sanctuary Definition") under § 908.102(6).

Definitions.—As used in this chapter, the term:

(1) "Federal immigration agency" means the United States Department of Justice and the United States Department of Homeland Security, a division within such an agency, including United States Immigration and Customs Enforcement and United States Customs and Border Protection, any successor agency, and any other federal agency charged with the enforcement of immigration law.

(2) "Immigration detainer" means a facially sufficient written or electronic request issued by a federal immigration agency using that agency's official form to request that another law enforcement agency detain a person based on probable cause to believe that the person to be detained is a removable alien under federal immigration law, including detainers issued pursuant to 8 U.S.C. ss. 1226 and 1357 along with a warrant described in paragraph (c). For purposes of this subsection, an immigration detainer is deemed facially sufficient if:

(a) The federal immigration agency's official form is complete and indicates on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law; or

(b) The federal immigration agency's official form is incomplete and fails to indicate on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law, but is supported by an affidavit, order, or other official documentation that indicates that the federal immigration agency has probable cause to believe that the person to be detained is a removable alien under federal immigration law; and

(c) The federal immigration agency supplies with its detention request a Form I-200 Warrant for Arrest of Alien or a Form I-205 Warrant of Removal/Deportation or a successor warrant or other warrant authorized by federal law.

(3) "Inmate" means a person in the custody of a law enforcement agency.

(4) "Law enforcement agency" means an agency in this state charged with enforcement of state, county, municipal, or federal laws or with managing custody of detained persons in this state and includes municipal police departments, sheriffs' offices, state police departments, state university and college police departments, county correctional agencies, and the Department of Corrections.

(5) "Local governmental entity" means any county, municipality, or other political subdivision of this state.

(6) "Sanctuary policy" means a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from:

(a) Complying with an immigration detainer;

(b) Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;

(c)    Providing a federal immigration agency access to an inmate for interview;
(d)    Participating in any program or agreement authorized under s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or
(e)    Providing a federal immigration agency with an inmate's incarceration status or release date.
(7)    "State entity" means the state or any office, board, bureau, commission, department, branch, division, or institution thereof, including institutions within the State University System and the Florida College System.

Fla. Stat. § 908.102.

Based on § 908.102(6)'s Sanctuary Definition, § 908.103 states, "Sanctuary policies prohibited.—A state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy." Fla. Stat. § 908.103 ("Sanctuary Prohibition").[3]

The requirement that state and local law enforcement agencies cooperate with federal immigration enforcement efforts, § 908.104, states:

Cooperation with federal immigration authorities.—
(1)    A law enforcement agency shall use best efforts to support the enforcement of federal immigration law. This subsection applies to an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment.[4]
(2)    Except as otherwise expressly prohibited by federal law, a state entity, local governmental entity, or law enforcement agency, or an employee, an agent, or a representative of the entity or agency, may not prohibit or in any way restrict a law enforcement agency from taking any of the following actions with respect to information regarding a person's immigration status:
(a)    Sending the information to or requesting, receiving, or reviewing the information from a federal immigration agency for purposes of this chapter.
(b)    Recording and maintaining the information for purposes of this chapter.
(c)    Exchanging the information with a federal immigration agency or another state entity, local governmental entity, or law enforcement agency for purposes of this chapter.
(d)    Using the information to comply with an immigration detainer.
(e)    Using the information to confirm the identity of a person who is detained by a law enforcement agency.

---

[3] Collectively, the Sanctuary Definition and the Sanctuary Prohibition will be referred to as the "Sanctuary Provisions."
[4] Section 908.104(1) will be referred to as the "Best Efforts" provision.

(3)(a)    For purposes of this subsection, the term "applicable criminal case" means a criminal case in which:

1.    The judgment requires the defendant to be confined in a secure correctional facility; and

2.    The judge:

a.    Indicates in the record under s. 908.105 that the defendant is subject to an immigration detainer; or

b.    Otherwise indicates in the record that the defendant is subject to a transfer into federal custody.

(b)    In an applicable criminal case, when the judge sentences a defendant who is the subject of an immigration detainer to confinement, the judge shall issue an order requiring the secure correctional facility in which the defendant is to be confined to reduce the defendant's sentence by a period of not more than 12 days on the facility's determination that the reduction in sentence will facilitate the seamless transfer of the defendant into federal custody. For purposes of this paragraph, the term "secure correctional facility" means a state correctional institution as defined in s. 944.02 or a county detention facility or a municipal detention facility as defined in s. 951.23.

(c)    If the information specified in sub-subparagraph (a)2.a. or sub-subparagraph (a)2.b. is not available at the time the sentence is pronounced in the case, but is received by a law enforcement agency afterwards, the law enforcement agency shall notify the judge who shall issue the order described by paragraph (b) as soon as the information becomes available.

(4)    When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.[5]

(5)    This section does not require a state entity, local governmental entity, or law enforcement agency to provide a federal immigration agency with information related to a victim of or a witness to a criminal offense if the victim or witness timely and in good faith responds to the entity's or agency's request for information and cooperation in the investigation or prosecution of the offense.

(6)    A state entity, local governmental entity, or law enforcement agency that, pursuant to subsection (5), withholds information regarding the immigration information of a victim of or witness to a criminal offense shall document the victim's or witness's cooperation in the entity's or agency's investigative records related to the offense and shall retain the records for at least 10 years for the purpose of audit, verification, or inspection by the Auditor General.

---

[5] Section 908.104(4) will be referred to as the "Transport Requirement."

(7)   This section does not authorize a law enforcement agency to detain an alien unlawfully present in the United States pursuant to an immigration detainer solely because the alien witnessed or reported a crime or was a victim of a criminal offense.

(8)   This section does not apply to any alien unlawfully present in the United States if he or she is or has been a necessary witness or victim of a crime of domestic violence, rape, sexual exploitation, sexual assault, murder, manslaughter, assault, battery, human trafficking, kidnapping, false imprisonment, involuntary servitude, fraud in foreign labor contracting, blackmail, extortion, or witness tampering.

Fla. Stat. § 908.104.

Section 908.105 mandates that state and local law enforcement agencies comply with immigration detainers received by federal immigration authorities ("Detainer Mandate").

Duties related to immigration detainers.—
(1)   A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall:
(a)   Provide to the judge authorized to grant or deny the person's release on bail under chapter 903 notice that the person is subject to an immigration detainer.
(b)   Record in the person's case file that the person is subject to an immigration detainer.
(c)   Upon determining that the immigration detainer is in accordance with s. 908.102(2), comply with the requests made in the immigration detainer.
(2)   A law enforcement agency is not required to perform a duty imposed by paragraph (1)(a) or paragraph (1)(b) with respect to a person who is transferred to the custody of the agency by another law enforcement agency if the transferring agency performed that duty before the transfer.
(3)   A judge who receives notice that a person is subject to an immigration detainer shall cause the fact to be recorded in the court record, regardless of whether the notice is received before or after a judgment in the case.

Fla. Stat. § 908.105.

Moreover, § 908.106 requires county correctional facilities to enter into agreements with the federal government for the reimbursement of costs incurred pursuant to honoring immigration detainer requests ("Cost Reimbursement").

Reimbursement of costs.—Each county correctional facility shall enter into an agreement or agreements with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons. A compliant agreement may

include any contract between a correctional facility and a federal immigration agency for housing or detaining persons subject to immigration detainers, such as basic ordering agreements in effect on or after July 1, 2019, agreements authorized by s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357, or successor agreements and other similar agreements authorized by federal law.

Fla. Stat. § 908.106.

In the event that state and local officers fail to comply with the immigration enforcement efforts specified in SB 168, § 908.107 sets forth the unique power that the Governor and the Attorney General to enforce Chapter 908.

Enforcement.—
(1) Any executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor in the exercise of his or her authority under the State Constitution and state law. Pursuant to s. 1(b), Art. IV of the State Constitution, the Governor may initiate judicial proceedings in the name of the state against such officers to enforce compliance with any duty under this chapter or restrain any unauthorized act contrary to this chapter.
(2) In addition, the Attorney General may file suit against a local governmental entity or local law enforcement agency in a court of competent jurisdiction for declaratory or injunctive relief for a violation of this chapter.
(3) If a local governmental entity or local law enforcement agency violates this chapter, the court must enjoin the unlawful sanctuary policy. The court has continuing jurisdiction over the parties and subject matter and may enforce its orders with the initiation of contempt proceedings as provided by law.
(4) An order approving a consent decree or granting an injunction must include written findings of fact that describe with specificity the existence and nature of the sanctuary policy that violates this chapter.

Fla. Stat. § 908.107.

Finally, § 908.109 contains a provision prohibiting discrimination ("Antidiscrimination provision"):

Discrimination prohibited.—A state entity, a local governmental entity, or a law enforcement agency, or a person employed by or otherwise under the direction or control of the entity or agency, may not base its actions under this chapter on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution.

Fla. Stat. § 908.109.

B. **The Pending Action**

Following the enactment of SB 168, on July 16, 2019, Plaintiffs initiated this action against Defendants, ECF No. [1] ("Complaint"), and filed their original Motion for Preliminary Injunction, ECF No. [5], and accompanying memorandum of law, ECF No. [5-1]. Specifically, Plaintiffs sought declaratory and injunctive relief, arguing that SB 168's Detainer Mandate, Transport Requirement, and Cost Reimbursement provisions are preempted by federal law, and that the "Best Efforts" provision and the Sanctuary Provisions are unconstitutionally vague. On August 21, 2019, Plaintiffs amended their Complaint to include Mayor Stoddard as a Plaintiff and added two counts relating to Mayor Stoddard's claims. ECF No. [38]; ECF No. [40]. Additionally, on August 30, 2019, Plaintiffs amended their Motion for Preliminary Injunction to include additional arguments regarding Mayor Stoddard's claims. ECF No. [47]. On September 26, 2019, the Court held a hearing on the Amended Motion for Preliminary Injunction ("Hearing"), during which the parties argued their supporting and opposing positions on the imposition of a preliminary injunction. On October 1, 2019, the Court granted in part and denied in part Plaintiffs' Amended Motion for Preliminary Injunction: (1) concluding that, aside from the Organizational Plaintiffs' Cost Reimbursement challenge and Plaintiff City of South Miami's vagueness challenges, Plaintiffs had standing to assert their claims; (2) denying the request for a preliminary injunction on the challenges to the Detainer Mandate, the "Best Efforts" provision, and the Sanctuary Provisions; and (3) granting Plaintiffs' request for a preliminary injunction on the Transport Requirement. ECF No. [64] ("Preliminary Injunction Order").

Plaintiffs' Amended Complaint asserts the following eleven (11) counts on behalf of the different Plaintiffs: Count I – § 908.105's Detainer Mandate violates the Supremacy Clause, U.S. Const. art. VI, § 2; Count II – § 908.104(4)'s Transport Requirement violates the Supremacy

Clause; Count III – § 908.106's Cost Reimbursement violates the Supremacy Clause; Counts IV, V, and VI – § 908.102(6)'s and § 908.103's Sanctuary Provisions violate the Due Process Clause; Counts VII, VIII, and IX – § 908.104(1)'s "Best Efforts" provision violates the Due Process Clause; Count X – § 908.104(1)'s "Best Efforts" provision violates the Equal Protection Clause; and Count XI – § 908.103's Sanctuary Prohibition violates the Equal Protection Clause.[6] *Id.*

On September 4, 2019, Defendants filed the instant Motion seeking to dismiss Plaintiffs' Amended Complaint, arguing that Plaintiffs lack standing to bring many of their claims. Moreover, Defendants claim that Plaintiffs have failed to state a claim upon which relief can be granted as to each asserted count, as required under Rule 12(b)(6). ECF No. [52].

## II.   LEGAL STANDARD

### A.  <u>Standing</u>

One element of the case-or-controversy requirement under Article III of the United States Constitution is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "'The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches,' and confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citations omitted) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Standing for Article III purposes requires a plaintiff to provide evidence of an injury

---

[6] It is relevant for the Court's standing analysis to explain the relationship between each of the Plaintiffs and the counts asserted in the Amended Complaint. Count I is brought by the City of South Miami; FLIC, FWAF, FANM, QLatinx, and WeCount, on behalf of their members and their organizations as a whole; and AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Counts II, IV, VII, X, and XI are brought by FLIC, FWAF, FANM, QLatinx, and WeCount, on behalf of their members and their organizations as a whole; and AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Count III is brought by FLIC, FWAF, FANM, QLatinx, WeCount, AI Justice, GMC, Hope, and Westminster, on behalf of their organizations. Counts V and VIII are brought by the City of South Miami. Counts VI and IX are brought by Mayor Stoddard.

in fact, causation and redressibility [sic]." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, "[t]o have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003); *see also Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005).

"The party invoking federal jurisdiction bears the burden of proving standing." *Fla. Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000)). A Rule 12(b)(1) motion challenges the district court's subject matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). "A 'factual attack,' on the other hand, challenges the existence of subject matter jurisdiction based on matters outside the pleadings." *Kuhlman v. United States*, 822 F. Supp. 2d 1255, 1256-57 (M.D. Fla. 2011) (citing *Lawrence*, 919 F.2d at 1529); *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.").

"In assessing the propriety of a motion for dismissal under Fed. R. Civ. P. 12(b)(1), a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). As such, "[w]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and 'may proceed as it never could under Rule 12(b)(6) or Fed. R. Civ. P. 56.'" *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x 879, 880 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).

## B. Failure to State a Claim

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Federal Rule of Civil Procedure 12(b)(6), which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor

of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682). A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002))).

## III. DISCUSSION

In their Motion, Defendants argue that Plaintiffs' Amended Complaint should be dismissed both because Plaintiffs lack standing to bring a number of their claims and because they fail to state a claim upon which relief can be granted for any of their claims. The Court will address each argument individually.

### A. <u>Standing</u>

Defendants first challenge Plaintiffs' Article III standing. ECF No. [52] at 4-7. Specifically, Defendants argue that the Organizational Plaintiffs lack standing to challenge the Transport

Requirement, Cost Reimbursement, "Best Efforts" provision, and Sanctuary Provisions. *Id.* at 4-6. Additionally, Defendants contest Plaintiff City of South Miami's standing to assert its vagueness challenges. *Id.* at 6-7. The Court addressed these standing arguments in its Preliminary Injunction Order. *See* ECF No. [64] at 13-26.

With regard to the Organizational Plaintiffs' standing, the Court concluded that they had sufficiently pled an injury in fact, causation, and redressability on their challenges to the Transport Requirement, "Best Efforts" provision, and Sanctuary Provisions, but failed to establish the requisite causation on their Cost Reimbursement challenge. *Id.* at 14-20. Thus, consistent with the reasoning in the Court's Preliminary Injunction Order, Count III of the Amended Complaint is dismissed because the Organizational Plaintiffs lack standing to assert this claim. *See id.* at 18-19. Defendants' challenges to the Organizational Plaintiffs' standing to assert their Transport Requirement, "Best Efforts" provision, and Sanctuary Provisions claims are otherwise denied.

Turning to Plaintiff City of South Miami's standing, the Court has previously concluded that because political subdivisions have no standing to invoke the provisions of the Fourteenth Amendment, the City lacked standing to assert its vagueness challenges. *Id.* at 21-24. Accordingly, Counts V and VIII are dismissed only as to Plaintiff City of South Miami.

## B. <u>Failure to State a Claim</u>

Having determined that the Organizational Plaintiffs have standing to sue, the Court now turns to the Rule 12(b)(6) arguments in Defendants' Motion — namely, that (1) Congress has not preempted the field of immigration cooperation; (2) SB 168's Sanctuary Provisions and "Best Efforts" provision are not unconstitutionally vague; and (3) SB 168 does not violate the Equal Protection Clause. Plaintiffs oppose each of these arguments.

**1. Preemption Challenges**

Regarding Plaintiffs' preemption challenges, Defendants argue that SB 168 is not field preempted because Congress has not preempted the field of immigration cooperation. ECF No. [52] at 7-9. Defendants further argue that the Detainer Mandate and the Transport Requirement[7] are not conflict preempted because neither provision stands as an obstacle to the accomplishment of Congress's goals for the INA. *Id.* at 9-13. In Response, Plaintiffs assert that the Amended Complaint clearly and sufficiently alleges enough facts to support their preemption claims. ECF No. [59] at 4-6. Specifically, Plaintiffs explain that Congress, through its enactment of the INA, intended to preempt the field of when and by whom aliens may be arrested and detained for civil immigration violations, and SB 168 unconstitutionally intrudes on that field. *Id.*

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). Nonetheless, the Supremacy Clause mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Thus, "[w]here the two conflict, federal law trumps state law; that was always clear. What constitutes a conflict is often less clear." *Browning*, 522 F.3d at 1167 (citations omitted).

Under the preemption doctrine, Congress has the power to preempt state law, and this preemption typically falls into one of "three categories: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Id.*; *Arizona*, 567 U.S. at 399-400. "Express preemption occurs when Congress manifests its intent to displace a state law using the text of a federal statute." *Browning*, 522 F.3d at 1167. "Implied preemption" has generally been used to encompass field

---

[7] As discussed above, the Court does not address Plaintiffs' arguments regarding the Cost Reimbursement provision's preemption, as they lack standing to assert that claim.

and conflict preemption. *Id.* "Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" *id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), or "where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). "Conflict preemption occurs either when it is physically impossible to comply with both the federal and state laws or when the state law stands as an obstacle to the objective of the federal law." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008).

Two main considerations guide district courts' preemption analysis: "First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, we assume that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *United States v. Alabama*, 691 F.3d 1269, 1281-82 (11th Cir. 2012) (citations and internal quotation marks omitted).

As the United States Supreme Court has explained,

> The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations. The federal power to determine immigration policy is well settled.

*Arizona,* 567 U.S. at 394-95 (citations omitted). The field of immigration governance "is extensive and complex." *Id.* at 395. As such, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* at 396. Nonetheless, the Supreme Court has emphasized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397.

The Executive Branch is tasked with the enforcement of immigration law, and immigration officials are given "broad discretion" in the exercise of their powers. *Id.* at 396-97. Although there are numerous agencies within the Department of Homeland Security ("DHS"), *id.* at 397, ICE is the agency relevant to the instant action. "ICE officers are responsible 'for the identification, apprehension, and removal of illegal aliens from the United States.'" *Id.*

"As a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* at 407. Moreover, "[r]emoval is a civil, not criminal, matter." *Id.* at 396.

> The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." [8 U.S.C.] § 1226(a). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. See 8 U.S.C. § 1357(a).

*Id.* at 407-08 (some citations omitted).

Congress has delineated specific, "limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408. Relevant to the instant case, the Attorney General may grant this authority to specific state or local law enforcement officers pursuant to a formal agreement, commonly referred to as a "287(g) Agreement,"[8] which allows

---

[8] The federal government's authorization to enter into 287(g) Agreements is codified in 8 U.S.C. § 1357(g):

> (1) Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

*Id.* § 1357(g)(1).

officers to perform the duties of a federal immigration officer under the direction and supervision of the Attorney General after completing adequate immigration training. 8 U.S.C. § 1357(g)(1); *Arizona*, 567 U.S. at 408-09. Without a 287(g) Agreement, local law enforcement agencies are not permitted to unilaterally perform the functions of federal immigration officers, such as detaining aliens for being removable, "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410.

Nevertheless, the Supreme Court has recognized that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Id.* at 411. Congress has explicitly stated that state and local law enforcement agencies do not need a 287(g) Agreement: (A) "to communicate with the [Federal Government] regarding the immigration status of any individual," or (B) "otherwise to cooperate[9] with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10); *Arizona*, 567 U.S. at 411-12.

There is only one reference to "detainers" in the INA. *See* 8 U.S.C. § 1357(d); *Arizona*, 567 U.S. at 410 ("State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody." (citing 8 U.S.C. § 1357(d))). At present, detainer requests are "written request[s] to state or local officials, asking them (1) to notify [DHS] as soon as practicable before an alien is released and (2) to maintain custody of the alien for up to 48 hours beyond the preexisting release date so that DHS may assume custody." *City of El Cenizo, Tex. v. Texas*, 890 F.3d 164, 174 (5th Cir. 2018). The Code of Federal Regulation also includes a Detainer Provision:

> (a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter 1. Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer – Notice of Action, to any other

---

[9] The Court will refer to the provision in 8 U.S.C. § 1357(g)(10)(B) as the "cooperation clause."

Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

. . . .

(d) Temporary detention at Department request. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

8 C.F.R. § 287.7.

In the instant Motion, Defendants argue that Plaintiffs' Amended Complaint fails to sufficiently allege facts to support their claims that SB 168 is preempted by federal law. Specifically, Defendants argue that "[c]onsultation between federal and state officials is an important feature of the immigration system," *Arizona*, 567 U.S. at 411, and that, by expressly including the cooperation clause under § 1357(g)(10)(B), Congress gave a clear indication that it sought to facilitate, not preempt, the type of cooperation that SB 168 mandates. Moreover, Defendants assert that cooperating with immigration detainer requests falls squarely within *Arizona*'s reasoning because this cooperation is done only pursuant to a federal request, rather than unilaterally.

Plaintiffs take the contrary position in their Response, arguing that holding an alien for an additional forty-eight hours pursuant to a federal detainer request constitutes a subsequent arrest performed by local law enforcement officers who lack Congressional authorization to make immigration arrests under the INA, absent a 287(g) Agreement. In addition, Plaintiffs contend that the Transport Requirement grants local officers the power to transport aliens across state lines, when the INA limits such power only to federal immigration officials, absent a 287(g) Agreement.

Thus, Plaintiffs assert that the Amended Complaint sufficiently alleges facts to support the claims that the Detainer Mandate, requiring that local law enforcement officers comply with detainer holds, and the Transport Requirement, authorizing local law enforcement agencies to transport aliens across state lines, are preempted by federal law.

### a. Field Preemption Challenges to the Detainer Mandate and Transport Requirement

Defendants argue that Plaintiffs have failed to establish that Congress communicated a clear intent to secure a "complete ouster of state power" in passing § 1357, given the express inclusion of the cooperation clause indicating the contrary. Thus, Defendants contend that SB 168's Detainer Mandate and Transport Requirement are not field preempted. Conversely, Plaintiffs argue that the Detainer Mandate and Transport Requirement are field preempted because the INA occupies the field of when state and local law enforcement can participate in detaining aliens and SB 168 encroaches upon this Congressional framework by granting state and local law enforcement agencies the authorization to make immigration arrests, to detain aliens, and to transport aliens into federal immigration custody.

"Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" *Browning*, 522 F.3d at 1167 (quoting *Rice*, 331 U.S. at 230), or "where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). "To determine the boundaries that Congress sought to occupy within the field, we look to 'the federal statute itself, read in the light of its constitutional setting and its legislative history.'" *Alabama*, 691 F.3d at 1281 (quoting *De Canas v. Bica*, 424 U.S. 351, 360 n.8 (1976)).

Considering the language of the INA itself, it is clear that Congress did not intend to preclude states from supplementing the field of how local law enforcement agencies can participate in federal immigration enforcement efforts. Specifically, the express language of the cooperation clause in § 1357(g)(10)(B) leaves numerous cooperative avenues open for law enforcement officers to participate in the immigration efforts of federal officers. 8 U.S.C. § 1357(g)(10)(B). "This provision indicates that Congress intended local cooperation without a formal agreement in a range of key enforcement functions." *City of El Cenizo*, 890 F.3d at 179.

Likewise, the Supreme Court has emphasized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Arizona*, 567 U.S. at 397. Further, the Court has also recognized that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Id.* at 411. The Court of Appeals for the Fifth Circuit, in *City of El Cenizo*, recently addressed the enactment of a law similar to SB 168. 890 F.3d at 173-75. In addressing the issue of field preemption, the Fifth Circuit enunciated a critical distinction between the Texas law at issue and the provisions of § 1357(g):

> To establish field preemption, moreover, the plaintiffs must prove that federal law evinces "the clear and manifest purpose of Congress" to preclude even complementary state legislation on the same subject. *De Canas*, 424 U.S. at 357. Federal law does not suggest the intent — let alone a "clear and manifest" one — to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all. And the savings clause allowing cooperation without a 287(g) agreement indicates that some state and local regulation of cooperation is permissible.

*Id.* at 178; *see also id.* at 177 ("Federal law regulates *how* local entities may cooperate in immigration enforcement; [the Texas law] specifies *whether* they cooperate.").

Thus, Congress clearly did not intend to preempt the field of immigration law through the enactment of the INA. Instead, by explicitly allowing for cooperation without a 287(g) Agreement between state and federal agencies, the language of the statute suggests a legislative intent to leave

some room for states to supplement the field of immigration enforcement. Thus, the Court must limit its analysis of Plaintiffs' field preemption challenges to whether Congress intended to preclude any further state regulation of local law enforcement agencies' cooperation with federal immigration enforcement.

Here, like the law at issue in *City of El Cenizo*, the Detainer Mandate regulates *whether* local entities cooperate with the federal government's immigration enforcement efforts, stating that law enforcement agencies "shall . . . comply with the requests made in the immigration detainer." Fla. Stat. § 908.105(1)(c). Similar reasoning also applies to the Transport Requirement. Plaintiffs have not established Congress's clear and manifest intent to preclude any complementary state regulation on cooperating with immigration officials in the transport of aliens. As the Fifth Circuit held in *City of El Cenizo*, § 1357(g)(10)(B)'s cooperation clause indicates that Congress intentionally left the issue of state and local law enforcement's cooperation with federal immigration efforts open to further regulation. *See* 890 F.3d at 178. Therefore, the Court concludes that Plaintiffs' Amended Complaint fails to state a claim that SB 168's Detainer Mandate and Transport Requirement are field preempted.

### b. Conflict Preemption Challenge to the Detainer Mandate

Defendants further argue that the Amended Complaint fails to sufficiently allege a claim that SB 168's Detainer Mandate is conflict preempted. Conflict preemption can arise in two ways:

> First, conflict preemption can occur "when it is physically impossible to comply with both the federal and the state laws." Conflict preemption may also arise "when the state law stands as an obstacle to the objective of the federal law." We use our judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects."

*Alabama*, 691 F.3d at 1281 (citations omitted). "Congressional intent is the 'ultimate touchstone' in a preemption case, and this intent 'governs [a court's] determination of whether federal law

preempts state law.'" *This That & Other Gift & Tobacco, Inc. v. Cobb Cty., Ga.*, 285 F.3d 1319, 1322 (11th Cir. 2002) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1267 (11th Cir. 2000)).

In *Arizona*, the Supreme Court held that an Arizona law authorizing state and local police officers to make warrantless arrests of suspected aliens if they had probable cause to believe the alien was removable was conflict preempted by federal immigration law. 567 U.S. at 410. In so holding, the Supreme Court noted that the Arizona law would "provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." *Id.* at 408. The *Arizona* Court, in examining the statutory authorization for 287(g) Agreements and § 1357(g)(10)(B)'s cooperation clause, noted that Congress clearly accounted for some degree of federal-local cooperation in immigration efforts. *Id.* at 409-10. However, the Court found Arizona's law to be conflict preempted because it granted local officials the unilateral authorization to make immigration arrests — something Congress exclusively entrusted to the Federal Government. *Id.* The Supreme Court distinguished such unilateral state action from permissible cooperation under § 1357(g)(10)(B) by explaining that cooperation necessarily requires some sort of "request, approval, or other instruction from the Federal Government" in order for local law enforcement officers to properly participate in immigration enforcement actions. *Id.* at 410. A state law that attempts to achieve its own immigration policy by authorizing law enforcement's unilateral immigration action impermissibly stands as an obstacle to the objectives of the INA and frustrates federal immigration objectives, such as foreign relations. *Id.* at 409-10.

SB 168's Detainer Mandate states, in relevant part: "A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency

shall . . . comply with the requests made in the immigration detainer." Fla. Stat. § 908.105(1)(c).

Defendants argue that the Amended Complaint fails to state a claim that the Detainer Mandate is

conflict preempted because local law enforcement agencies' compliance with detainer requests

falls within the conduct that was explicitly contemplated in § 1357(g)(10)(B)'s cooperation clause.

Specifically, Defendants contend that the Detainer Mandate is within § 1357(g)(10)(B)'s purview

because it only grants local officers the power to temporarily detain suspected aliens pursuant to a

detainer request issued by a federal immigration official authorized to make such requests. *See*

*Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature

of the immigration system."). Plaintiffs, however, allege that requiring local law enforcement

agencies to honor detainer requests forces these local agencies to make civil immigration arrests

without a valid 287(g) Agreement. Thus, Plaintiffs contend that the Detainer Mandate

impermissibly stands as an obstacle to the objectives of the INA and frustrates federal immigration

objectives because it authorizes unilateral immigration enforcement efforts by local law

enforcement agencies.

Pursuant to § 1357(g), the federal government may enter into 287(g) Agreements with state

and local law enforcement agencies:

> (1) Notwithstanding section 1342 of Title 31, the Attorney General may
> enter into a written agreement with a State, or any political subdivision of a State,
> pursuant to which an officer or employee of the State or subdivision, who is
> determined by the Attorney General to be qualified to perform a function of an
> immigration officer in relation to the investigation, apprehension, or detention of
> aliens in the United States (including the transportation of such aliens across State
> lines to detention centers), may carry out such function at the expense of the State
> or political subdivision and to the extent consistent with State and local law.

8 U.S.C. § 1357(g)(1).

Nonetheless, Congress has explicitly indicated that state and local law enforcement

agencies do not need a 287(g) Agreement: (A) "to communicate with the [Federal Government]

regarding the immigration status of any individual," or (B) "otherwise to cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10); *Arizona*, 567 U.S. at 411-12. Moreover, the Supreme Court has also recognized that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411; *City of El Cenizo*, 890 F.3d at 179 ("Congress intended local cooperation without formal agreement in a range of key enforcement functions.").

Plaintiffs' Amended Complaint fails to set forth any facts in support of their claim that local law enforcement agencies' compliance with detainer requests in order to facilitate the transfer of suspected aliens into federal immigration custody frustrates Congress's intent in creating 287(g) Agreements. *See* 8 C.F.R. § 287.7. Rather, a reading of § 1357(g) as a whole, and construing the statute in a way that gives effect to each provision, indicates a clear Congressional intent to authorize cooperation between state and federal officials "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10); *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015) ("It is 'axiomatic that all parts of a statute must be read together in order to achieve a consistent whole.' 'Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'" (quoting *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 455 (Fla. 1992))). Plaintiffs allege no facts to support their reading of § 1357(g) that honoring detainer requests, pursuant to some sort of "request, approval, or other instruction from the Federal Government," impermissibly stands as an obstacle to the Congressional objectives of the INA. *Arizona*, 567 U.S. at 410.

Notably, as the Fifth Circuit in *City of El Cenizo* explained, officers acting pursuant to a 287(g) Agreement "become de facto immigration officers, competent to act on their own initiative." 890 F.3d at 180. Thus, these 287(g) officers are expressly granted the authority to make unilateral decisions on immigration enforcement issues, absent any predicate request from the federal government. *Arizona*, 567 U.S. at 410. Thus, officers acting pursuant to 287(g) Agreements are allowed to hold suspected aliens without receiving any prior detainer request from the federal government. *City of El Cenizo*, 890 F.3d at 180.

In contrast, officers operating under SB 168's Detainer Mandate are only permitted to hold a suspected alien for forty-eight hours if federal immigration officers explicitly request that they do so pursuant to a facially valid detainer request. Fla. Stat. § 908.105(1). Further, while requests for information and communications between federal and state officials without a 287(g) Agreement are expressly contemplated under § 1357(g)(10)(A), Congress's addition of § 1357(g)(10)(B)'s cooperation clause authorizes additional cooperative conduct, beyond communication, between federal immigration officers and local law enforcement agencies. Absent any clear indication of legislative intent to the contrary, the Court concludes Plaintiffs have failed to state a claim that the Detainer Mandate is conflict preempted based upon the argument that honoring federal immigration detainer requests falls outside the scope of the cooperation contemplated by Congress under § 1357(g)(10)(B).

Plaintiffs also provide no indication that local officers are taking any unilateral immigration action expressly reserved for federal immigration officials in honoring these detainer requests. Without any allegations to establish local law enforcement agencies' improper unilateral conduct that circumvents the explicit grants of power Congress gave only to federal immigration authorities, the Court finds no support for the argument of a Congressional intent to preempt SB

168's Detainer Mandate. Plaintiffs have not alleged sufficient facts to establish that honoring detainer requests is inconsistent with Congress's intent in drafting the INA and the Supreme Court's holding in *Arizona* that officers may not engage in such unilateral immigration enforcement actions, "*absent any request, approval, or other instruction from the Federal Government.*" 567 U.S. at 410; *see also id.* ("examples of what would constitute cooperation under federal law. . . . include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." (citing Dept. of Homeland Security, Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters 13-14 (2011))); *This That & Other Gift & Tobacco, Inc.*, 285 F.3d at 1322 ("Congressional intent is the 'ultimate touchstone' in a preemption case, and this intent 'governs [a court's] determination of whether federal law preempts state law.'" (quoting *Medtronic, Inc.*, 518 U.S. at 485; *Boyes*, 199 F.3d at 1267)). Giving full effect to all of the INA's provisions and construing these provisions in harmony with one another, the Court finds no indication that Congress intended to preclude this type of cooperation. *See Robbins*, 809 F.3d at 586.

Accordingly, the Court concludes that Plaintiffs' Amended Complaint fails to sufficiently state a claim that SB 168's Detainer Mandate is conflict preempted on its face based upon the plain language of § 1357(g)(10)(B) because the conduct it authorizes falls within the scope of "cooperat[ion] . . . in the . . . detention . . . of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B); *Arizona*, 567 U.S. 387; *City of El Cenizo*, 890 F.3d at 179. As such, Defendants' Motion is granted as to Count I.

c. **Conflict Preemption Challenge to the Transport Requirement**

Next, Defendants argue that Plaintiffs' Amended Complaint fails to sufficiently state a claim that SB 168's Transport Requirement is conflict preempted. The Transport Requirement states:

> When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

Fla. Stat. § 908.104(4).

The plain language of this provision authorizes local agencies to transport individuals subject to an immigration detainer across state lines into federal custody. Plaintiffs allege that this provision is conflict preempted because it frustrates Congress's objectives in creating 287(g) Agreements. Specifically, Plaintiffs note that § 1357(g)(1) expressly lists the transport across state lines as a power that can only be delegated to local officers pursuant to a 287(g) Agreement. *See* 8 U.S.C. § 1357(g)(1) ("Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (*including the transportation of such aliens across State lines to detention centers*), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." (emphasis added)).

The Amended Complaint sufficiently alleges facts to support the claim that SB 168's attempt to grant such transport powers to local officers frustrates Congress's objectives for immigration transport because it renders the express language of § 1357(g)(1) on the transport of aliens pursuant to a 287(g) Agreement meaningless. *Robbins*, 809 F.3d at 586 ("It is 'axiomatic that all parts of a statute must be read together in order to achieve a consistent whole.' 'Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'" (quoting *Forsythe*, 604 So. 2d at 455)).

Moreover, the facts alleged in the Amended Complaint support Plaintiffs' claim that the Transport Requirement's language explicitly grants local law enforcement agencies discretionary power to transport an alien into federal custody "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. This is precisely the type of unilateral conduct that *Arizona* expressly prohibited. *Id.* This unilateral decision by local officers, in effect, "allows the State to achieve its own immigration policy," which is not permitted. *Id.* at 408. Therefore, the Court concludes Plaintiffs have sufficiently alleged facts to state a claim that the Transport Requirement is conflict preempted because it frustrates the purpose of § 1357(g)(1). *See Browning*, 522 F.3d at 1167 ("Conflict preemption occurs [] when . . . when the state law stands as an obstacle to the objective of the federal law."). Accordingly, Defendants' Motion is denied as to Count II of Plaintiffs' Amended Complaint.

## 2. Vagueness Challenges

Next, Defendants argue that Plaintiffs have failed to establish that the terms "Impedes" in § 908.102(6) and, by reference, § 908.103, and "Best Efforts" in § 908.104(1) are unconstitutionally vague in every application, as required for a facial vagueness challenge. ECF No. [52] at 13-16. Defendants explain that, when read within the context of SB 168 as a whole,

the challenged provisions clearly indicate what conduct is prohibited or encouraged. *Id.* at 13-14. Conversely, Plaintiffs contend that the Sanctuary Provisions and the "Best Efforts" provision are unconstitutionally vague because they do not provide people of ordinary intelligence with any reasonable opportunity to understand what conduct is prohibited and because SB 168 authorizes the arbitrary and discriminatory enforcement of these provisions. ECF No. [59] at 6-11.

Although not raised by the parties, Plaintiffs' pre-enforcement facial challenges to the constitutionality of SB 168's provisions present serious concerns to this Court regarding justiciability. Further, while the Court, in its Preliminary Injunction Order, analyzed Plaintiffs' likelihood of success on their vagueness challenges, it ultimately declined to construe SB 168 in a way that conflicted with federal law without the benefit of a definitive interpretation from the state courts. ECF No. [64] at 48-49. In addressing the merits of the Amended Complaint for the instant Motion, however, the Court concludes that it must exercise judicial restraint in order to give deference to any state court adjudication on SB 168's meaning and scope before this Court can properly entertain Plaintiffs' vagueness challenges. As such, the issue of justiciability warrants discussion.

All federal courts are courts of limited jurisdiction, U.S. Const. art. III, § 2, and, as such, all federal courts must address "the threshold question [of] whether [the plaintiffs] have alleged a case or controversy within the meaning of Art. III of the Constitution or only abstract questions not currently justiciable by a federal court." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979).

In addressing the issue of justiciability, the Court of Appeals for the Eleventh Circuit has stated that a federal court's "power to review the constitutionality of governmental acts is derived from and limited by its responsibility for resolving concrete disputes brought before it for

decision." *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991) (citing *Marbury v. Madison*, 5 U.S. 137 (1803); *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 817 (5th Cir. 1979)).[10]

> Before rendering a decision, therefore, every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it.

*Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)). "To allege a justiciable cause of action, a plaintiff must plead facts that are sufficient to confer standing and demonstrate that the claim is ripe for determination." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Ass'n for Children for Enf't of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990)).

"Justiciability is a notably amorphous notion, 'a concept of uncertain meaning and scope.'" *Eaves*, 601 F.2d at 817 (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). Anticipatory challenges to the constitutionality of laws present justiciability concerns primarily related to the doctrine of ripeness, *Hallandale*, 922 F.2d at 760, which "asks whether an injury that has not yet happened is sufficiently likely to happen" to warrant federal review. *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002). And, in cases that raise questions of ripeness, the general justiciability analysis centers around two central inquiries: "Do the conflicting parties present a real, substantial controversy which is definite and concrete rather than hypothetical or abstract? If so, is the factual record nonetheless too undeveloped to produce a well-reasoned constitutional decision?" *Hallandale*, 922 F.2d at 760 (citing *Babbitt*, 442 U.S. at 300-01). "A claim is not ripe

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).

"[B]ecause issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' [courts] cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the 'Case or Controversy' sense." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 138 (1974) (footnote omitted). Further, "even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993); *Blanchette*, 419 U.S. at 138). "[T]o the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues, the Court must determine whether to exercise that restraint and cannot be bound by the wishes of the parties." *Blanchette*, 419 U.S. at 138 (footnote omitted).

As noted above, "ripeness is 'particularly relevant in the context of actions for pre-enforcement review of statutes,' because it 'focuses on the timing of the action.'" *Swift*, 284 F.3d at 205 (quoting *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997)). "The ripeness doctrine keeps federal courts from deciding cases prematurely," *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006). This "inquiry focuses on whether the claim presented is 'of sufficient concreteness to evidence a ripeness for review.' Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) (citing *Digital Props. Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997)). "Put another way, '[h]aste makes waste, and the premature adjudication of

legal questions compels courts to resolve matters, even constitutional matters, that may with time be satisfactorily resolved at the local level, and that may turn out differently in different settings.'" *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1356 (11th Cir. 2013) (quoting *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010)).

"Nevertheless, threats of enforcement of a vague statute can support a facial challenge to a statute when certain conditions are met. '[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.'" *Swift*, 284 F.3d at 206 (quoting *Babbitt*, 442 U.S. at 298). The question of whether a particular case satisfies the ripeness requirement must be assessed on a case-by-case basis. *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). "To determine whether the threat of enforcement of an allegedly vague statute is ripe for judicial review, [courts] examine [(1)] 'the fitness of the issues for judicial decision and [(2)] the hardship to the parties of withholding court consideration.'" *Swift*, 284 F.3d at 206 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

> As guidance in considering and applying the "fitness" and "hardship" prongs of the ripeness analysis, the Supreme Court has indicated that we must consider the following factors:
>
> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).[11] The first factor concerns the hardship element of the ripeness inquiry, whereas the second and third factors relate to the fitness of judicial review. *Id.*

---

[11] Additionally, in *Eaves*, the Fifth Circuit presented the ripeness analysis as follows:

The prong of fitness for judicial decision requires an assessment of "whether the parties raise an issue that [a court] can decide without further factual development and whether the institutional interests of the court . . . favor immediate review." *Club Madonna, Inc.*, 924 F.3d at 1380 (citing *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995)). "The fitness prong is typically concerned with questions of 'finality, definiteness, and the extent to which [the] resolution of the challenge depends upon facts that may not yet be sufficiently developed.'" *Harrell*, 608 F.3d at 1258 (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995)).

"In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009). However, cases are less likely to satisfy the element of fitness for adjudication "when they venture beyond purely legal issues or when they require 'speculation about contingent future events.'" *Pittman*, 267 F.3d at 1278 (quoting *Cheffer*, 55 F.3d at 1524).

The Supreme Court has cautioned that "District Court[s] should not be forced to decide . . . constitutional questions in a vacuum." *W.E.B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 312 (1967); *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 511 (9th

---

[T]he premise of *Marbury v. Madison* requires [courts] to insist that an anticipatory challenge to statute's constitutionality grow out of a "real, substantial controversy between parties . . . a dispute definite and concrete."

In deciding whether such a dispute exists, courts have traditionally focused on each of the parties in turn. They have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure. Some courts have held that no case or controversy exists if either of these elements is missing. But . . . the second aspect of this inquiry focusing on the probability of enforcement is relevant only to the non-jurisdictional, "policy considerations" underlying justiciability and not to the existence of a case or controversy.

601 F.2d at 817-18 (citations omitted).

Cir. 1991). Rather, federal courts should exercise judicial restraint in cases "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Zwickler v. Koota*, 389 U.S. 241, 249 (1967) (citing *Harrison v. Nat'l Ass'n for the Advancement of Colored People*, 360 U.S. 167, 176-77 (1959)). Exercising judicial restraint, however, "contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Kusper v. Pontikes*, 414 U.S. 51, 55 (1973) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534 (1965)). "If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction." *Harman*, 380 U.S. at 534-35 (citing *Baggett v. Bullitt*, 377 U.S. 360, 375-79 (1964)).[12] Thus, even where a federal court has jurisdiction, it should not exercise such jurisdiction unless the case "tenders the underlying constitutional issues in clean-cut and concrete form, unclouded by any serious problem of construction relating either to the terms of the questioned legislation or to its interpretation by the state courts." *Rescue Army v. Mun. Court of City of L.A.*, 331 U.S. 549, 584 (1947); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972) ("Problems of prematurity and abstractness may well

---

[12] The Supreme Court has, on many occasions, "ordered abstention where state tribunals were thought to be more appropriate for resolution of complex or unsettled questions of local law," noting that it "ordinarily accepts the construction given a state statute in the local courts and also presumes that the statute will be construed in such a way as to avoid the constitutional question presented." *Baggett*, 377 U.S. at 375 (citing *Harrison*, 360 U.S. 167; *Poulos v. New Hampshire*, 345 U.S. 395 (1953); *Am. Fed'n of Labor v. Watson*, 327 U.S. 582 (1946); *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101 (1944); *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *Fox v. Washington*, 236 U.S. 273 (1915)). As the Court explained, however, abstention "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. . . . [that] must be made on a case-by-case basis." *Id.* (footnote omitted) (citing *Nat'l Ass'n for the Advancement of Colored People v. Bennett*, 360 U.S. 471 (1959); *Propper v. Clark*, 337 U.S. 472 (1949); *Railroad Comm'n of Tex.*, 312 U.S. at 500).

present 'insuperable obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present.").

Here, although Plaintiffs assert facial vagueness challenges, which are usually considered to be purely legal claims, the Court concludes that these claims necessarily still require further clarification and interpretation from state courts. As noted above, federal courts should give deference to state court adjudication "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Zwickler*, 389 U.S. at 249 (citing *Harrison*, 360 U.S. at 176-77). A state court may determine that certain limiting constructions on SB 168's language are appropriate, and this Court's resolution of Plaintiffs' vagueness claims in advance of such limiting constructions would be a premature adjudication of legal questions "that may with time be satisfactorily resolved at the local level, and that may turn out differently in different settings." *Temple B'Nai Zion, Inc.*, 727 F.3d at 1356 (quoting *Miles Christi Religious Order*, 629 F.3d at 537). This Court's assessment of SB 168's constitutional validity before state courts have had the opportunity to interpret the law "threaten[s] to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. [This Court] must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)). With regard to the terms "Impedes" and "Best Efforts," the Court finds that Plaintiffs' vagueness challenges are "dependent upon, or may be materially altered by," a state court determination as to the scope of these terms, and any potential limiting construction a state court may apply to such terms. *Harman*, 380 U.S. at 534.

Moreover, the Supreme Court previously addressed the justiciability of a pre-enforcement vagueness challenge to a state statute. *See Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972). In determining that abstention was warranted, the Court reasoned,

> The [challenged law] has not been construed in any Michigan court, and, as appellants themselves suggest in attacking it for vagueness, its terms are far from clear in particulars that go to the foundation of their grievance. . . . We do not know, of course, how far Michigan courts will go in interpreting the requirements of the state [law] in light of the [governing] federal [law] and the constraints of the United States Constitution. But we are satisfied that authoritative resolution of the ambiguities in the Michigan law is sufficiently likely to avoid or significantly modify the federal questions appellants raise to warrant abstention.

*Id.* at 511-12 (footnotes omitted).

Generally, "[t]he operation of [a challenged] statute is better grasped when viewed in light of a particular application." *Texas*, 523 U.S. at 301. "Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Renne v. Geary*, 501 U.S. 312, 323 (1991) (quoting *Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954)). Here, these issues of remoteness and abstraction are aggravated by the fact that Chapter 908 — and, specifically, the challenged Sanctuary Provisions and "Best Efforts" provision — has yet to be interpreted by the state courts. Further, while "[i]t is true that an established factual record and existing [state court] interpretation are not necessarily required . . . [to] entertain a facial challenge," at the pre-enforcement stage, "the challenged provisions present only 'harmless, empty shadows.'" *Thornburgh*, 970 F.2d at 512 (citing *Poe v. Ullman*, 367 U.S. 497, 508 (1961); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988)). Thus, "[p]ostponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe" these provisions. *Renne*, 501 U.S. at 323.

36

Likewise, the Eleventh Circuit has explained that where the claims presented "are based merely on assumed, potential invasions of [litigants'] constitutional rights," "the hypothetical and contingent nature of the questions raised . . . counsel against issuing an opinion premised on uncertain and contingent future events that may not occur as anticipated or may not occur at all." *Johnson v. Sikes*, 730 F.2d 644, 648-49 (11th Cir. 1984) (citing *Fed. Elec. Comm'n v. Lance*, 635 F.2d 1132, 1138 (5th Cir. 1981)). "Under these circumstances, where '[courts] have no idea whether or when such [a sanction] will be ordered,' the issue is not fit for adjudication." *Texas*, 523 U.S. at 300 (quoting *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967)). The "decision not to render an opinion advising what the law would be on an assumed set of facts is also consistent with the well-established rule that a court is never to 'anticipate a question of constitutional law in advance of the necessity of deciding it.'" *Johnson*, 730 F.2d at 649 (quoting *Ashwander v. TVA*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)).

At this juncture, the Court cannot give credence to the hypothetical scenario Plaintiffs present, where local officials are unsure of whether they are in violation of SB 168's provisions if, for example, "a police chief [] tell[s] officers to not perform the functions of federal immigration agents at hurricane shelters, colleges, court houses, or homeless shelters, so as to ensure that they do not deter access to necessary and, at times, life-saving civic resources," and "that federal immigration enforcement does not undermine community cooperation with [local] law enforcement officers." ECF No. ¶ 231. These "allegations amount to mere speculation about contingent future events." *Midrash Sephardi, Inc.*, 366 F.3d at 1224-25.

> Further, because the general nature of the language in these portions of [SB 168] makes it impossible to foretell precisely how these provisions may be applied, the issues presented in these challenges are less fit for adjudication, suggesting additional concerns as to their ripeness. [Courts] can hold a statute to be impermissibly vague on its face only if [they] conclude that it is capable of no valid application, *see Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S.

489, 495 (1982), and in the absence of an enforcement action either commenced or specifically threatened, [courts addressing these challenges] have no actual or imminent concrete application of the statute in which to anchor [their] inquiry into whether any valid application is possible.

*Navegar, Inc.*, 103 F.3d at 1001-02 (footnote omitted). Any conjecture as to specific examples of potential future scenarios that may be constitutionally impermissible are more appropriately addressed if and when they occur. Without any further clarity from the state courts as to SB 168's scope, or any present factual enforcement scenario within which to operate, the Court concludes that these challenges are currently unfit for judicial review. Thus, prudential concerns weigh in favor of delaying review of the unconstitutional vagueness of SB 168's provisions because these claims are not yet fit for judicial review. *See Baggett*, 377 U.S. at 375 (the Supreme Court "ordinarily accepts the construction given a state statute in the local courts and also presumes that the statute will be construed in such a way as to avoid the constitutional question presented.").

In addition to the fitness inquiry, "where there are strong [institutional judicial interests] militating in favor of postponement, [courts] must weigh the potential hardship of delay on the [plaintiff]." *AT&T Corp. v. Fed. Commc'n Comm'n*, 349 F.3d 692, 700 (D.C. Cir. 2003) (citing *City of Hous. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1430-31 & n.9 (D.C. Cir. 1994)). The question of hardship asks the parties "about the costs . . . of delaying review until conditions for deciding the controversy are ideal." *Harrell*, 608 F.3d at 1258. Further, this "prong is inherently fact-sensitive, and [courts] should look for actual prejudice to the plaintiffs from withholding adjudication." *Pittman*, 267 F.3d at 1281. "[I]f a party is to suffer an 'immediate and direct impact' from a challenged policy, a case is more likely to be considered ripe." *Id.* at 1280 (quoting *Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625, 631 (5th Cir. 1976)).[13] Thus, courts must examine

---

[13] However, "[a]s *Solomon* and *Eaves* demonstrate, indirect injury, in the absence of enforcement, may be sufficient to establish a justiciable controversy, as long as that indirect injury is specific." *Hallandale*, 922 F.2d at 764 n.7 (citing *Solomon*, 763 F.2d 1212; *Eaves*, 601 F.2d 809).

whether any "irremediable adverse consequences flow from requiring a later challenge." *Toilet Goods Ass'n*, 387 U.S. at 164.

"Hardship can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe civil sanctions." *Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006) (citing *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (holding, in a case where prosecution was threatened but not pending, that to require arrest before issuing declaratory relief would place "the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding")). "In such a case, however, plaintiffs must still demonstrate a 'credible threat of prosecution.'" *Id.* (quoting *Babbitt*, 442 U.S. at 298). Likewise, a party may establish the hardship element when it shows that a challenged law has a direct impact on the party's day-to-day operations and threatens substantial sanctions for the party's noncompliance. *Texas*, 523 U.S. at 301 (citing *Abbott Labs.*, 387 U.S. 136). The Supreme Court has further held that "a plaintiff could bring a preenforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (quoting *Babbitt*, 442 U.S. at 298); *Solomon v. City of Gainesville*, 763 F.2d 1212 (11th Cir. 1985); *Eaves*, 601 F.2d 809. This intent to engage in a course of conduct prohibited by the challenged law, and the plaintiffs' resultant fear of prosecution, was deemed to be sufficient to establish hardship that was not "imaginary or wholly speculative." *Driehaus*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 302).

Here, Plaintiffs do not allege any intent to engage in a course of conduct that is proscribed by the challenged provisions of SB 168. *Cf. Driehaus*, 573 U.S. at 160; *Babbitt*, 442 U.S. at 298; *Solomon*, 763 F.2d 1212; *Eaves*, 601 F.2d 809. Rather, "[i]n all of the vagueness counts, the main hardship alleged by the plaintiffs is the threat of prosecution. A threatened prosecution is only immediate enough to satisfy the hardship prong of the ripeness inquiry when 'the challenged action creates a "direct and immediate" dilemma for the parties.'" *Swift*, 284 F.3d at 206 (quoting *W.R. Grace & Co.—Conn. v. U.S. Envtl. Prot. Agency*, 959 F.2d 360, 364 (1st Cir. 1992); *Abbott Labs.*, 387 U.S. at 152).

Plaintiffs allege that SB 168's unconstitutional vagueness will subject Organizational Plaintiffs and their members to arbitrary or discriminatory immigration enforcement by local law enforcement agencies, *see* ECF No. [38] ¶¶ 311, 314, 351, 353-54, and will subject law enforcement agencies and Mayor Stoddard to either enforcement actions for failing to comply with SB 168's vague mandates or damages lawsuits for improperly enforcing federal immigration law, *see id.* ¶¶ 313-14, 330, 334-38, 353-55, 377, 381-82. The Court, however, notes that the arguments regarding the risk that SB 168 may be enforced in an arbitrary or discriminatory manner are not proper for a pre-enforcement facial vagueness challenge. "[*Village of Hoffman Estates*] teaches that regardless of the risk of discriminatory enforcement, a court may not hold that this risk invalidates the statute in a pre-enforcement facial attack. Such a claim takes on due process dimensions only when the 'possibility ripens into a prosecution.'" *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 503 n.21 (1982)). As noted above, with a pre-enforcement facial challenge, "[t]here is a basic uncertainty about what the law means and how it will be enforced. . . . [W]ithout the benefit of a definitive interpretation from the state courts, it would be

40

inappropriate to assume [SB 168] will be construed in a way that creates a conflict with federal law." *Arizona*, 567 U.S. at 415; *cf. Fox*, 236 U.S. at 277 ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." (citation omitted)).

Moreover, these allegations, at their core, are entirely hypothetical and speculative. Presently, the Court is unable to determine whether SB 168 will be enforced in an arbitrary or discriminatory manner, or how it will be enforced, if enforced at all. Absent a more concrete indication that Defendants intend to immediately prosecute any state or local official who fails to comply with SB 168, such allegations amount merely to generalized, hypothetical threats, which are insufficient for justiciability purposes. *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 88 (1947) ("The threats which menaced the [plaintiffs] . . . are closer to a general threat by officials to enforce those laws which they are charged to administer than they are to the direct [justiciable] threat of punishment against a [particular plaintiff] for a completed act." (citing *Watson v. Buck*, 313 U.S. 387, 400 (1941)); *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224-25 (11th Cir. 2004) (concluding that plaintiff's claims were not ripe because they were premised on "allegations [that] amount[ed] to mere speculation about contingent future events," the impact of which was "not sufficiently direct and immediate as to render the issue appropriate for judicial review"); *Eaves*, 601 F.2d at 817-18. "Where, as here, the record is devoid of any [enforcement action] whatsoever, and there exists the possibility that none will ever arise . . . the prudential concerns underlying the ripeness doctrine counsel [the Court] to refrain from decision." *W.R. Grace & Co.—Conn.*, 959 F.2d at 365 (footnote omitted); *id.* at 366 ("[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues

unnecessarily, wasting time and effort." (quoting *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1034, 1040 (1st Cir. 1982)).

> The power of courts . . . to pass upon the constitutionality of acts of [government] arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. . . . It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other.

*Mitchell*, 330 U.S. at 89-90.

To establish the hardship prong based on the fear of prosecution, Plaintiffs' claims must be premised on the fact that this threatened prosecution under the challenged provisions "is genuine and imminent; without such a threat the enforcement of these provisions against [Plaintiffs] would be too remote and speculative to render their challenges justiciable." *Navegar, Inc.*, 103 F.3d at 1001. Where, as here, a plaintiff's allegations regarding the threat of prosecution are based on portions of a challenged law that could potentially be enforced against a large group of actors, even where the government has demonstrated an interest in enforcing the challenged law generally, the threat of enforcement is not sufficiently concrete. *Id.* In such a case, "the threat of prosecution becomes far less imminent." *Id.*; *see Mitchell*, 330 U.S. at 88 ("The threats which menaced the [plaintiffs] . . . are closer to a general threat by officials to enforce those laws which they are charged to administer than they are to the direct [justiciable] threat of punishment against a [particular plaintiff] for a completed act." (citing *Watson*, 313 U.S. at 400)); *see also Midrash Sephardi, Inc.*, 366 F.3d at 1224-25 (concluding that plaintiff's claims were not ripe because they were premised on "allegations [that] amount[ed] to mere speculation about contingent future events," the impact of which was "not sufficiently direct and immediate as to render the issue appropriate for judicial review").

This Court's review of the vagueness challenges in this case indicates "that postponing decision on the merits until there exists an actual dispute . . . is necessary to ensure fair, focused, and intelligent analysis of the issues presented." *W.R. Grace & Co.—Conn.*, 959 F.2d at 365. Therefore, as a matter of judicial restraint, Plaintiffs' facial pre-enforcement vagueness challenges under Counts IV, VI, VII, and IX of the Amended Complaint are dismissed for lack of ripeness.

### 3. Equal Protection Challenges

Regarding Plaintiffs' Equal Protection challenges, Defendants argue that Plaintiffs have failed to allege any facts to support the assertion that SB 168 was enacted with a discriminatory purpose or intent or that any purportedly improper private motives were attributable to the State in enacting SB 168. ECF No. [52] at 16-17. In opposition, Plaintiffs contend that they have satisfied their pleading requirements in establishing that SB 168 is discriminatory on its face, it has a disproportionately adverse effect on minorities, and it was enacted with discriminatory legislative intent in violation of the Equal Protection Clause. ECF No. [59] at 11-18.[14]

At the outset, on the issue of ripeness, the Court finds Plaintiffs' Equal Protection challenges to be distinguishable from the vagueness challenges discussed above. First, with regard to the prong of fitness for judicial review, the Court notes that these claims do not present any issues of remoteness or abstraction that generally underlie ripeness concerns, *Renne*, 501 U.S. at 323, because they do not require any speculation as to contingent future events, *Pittman*, 267 F.3d at 1278. Similarly, the resolution of Plaintiffs' Equal Protection claims will not depend on any state court adjudication, nor would these constitutional questions be materially altered by any

---

[14] The Amended Complaint asserts two separate counts for SB 168's Equal Protection violations: Count X asserts that § 908.104(1)'s "Best Efforts" provision violates the Equal Protection Clause; and Count XI asserts that § 908.103's Sanctuary Prohibition violates the Equal Protection Clause. However, the analysis required to resolve the Equal Protection arguments under Counts X and XI in Defendants' Motion and Plaintiffs' Response is the same for both counts. As such, the Court will analyze these two counts simultaneously.

Louis


subsequent state court determination. *Harman*, 380 U.S. at 534; *id.* at 534-35 ("If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction." (citing *Baggett*, 377 U.S. at 375-79)). Rather, these Equal Protection challenges "tender[] the underlying constitutional issues in clean-cut and concrete form, unclouded by any serious problem of construction relating either to the terms of the questioned legislation or to its interpretation by the state courts." *Rescue Army*, 331 U.S. at 584. Thus, "the institutional interests of the court . . . favor immediate review" of these Equal Protection challenges. *Club Madonna, Inc.*, 924 F.3d at 1380 (citing *Harrell*, 608 F.3d at 1258; *Cheffer*, 55 F.3d at 1524).

Similarly, with regard to the hardship prong of the ripeness analysis, the Court concludes that delaying the resolution of these Equal Protection challenges poses significant "irremediable adverse consequences," *Toilet Goods Ass'n*, 387 U.S. at 164, that are both "immediate and direct," *Pittman*, 267 F.3d at 1280. Specifically, the application and enforcement of a law that was allegedly enacted with a discriminatory purpose and intent will concretely harm all those to whom it is applied. *Reno*, 509 U.S. at 57 ("In some cases, the promulgation of a regulation will itself affect parties concretely enough to satisfy [the hardship] requirement."). Likewise, this harm is substantial and irremediable "because the [law] was adopted with discriminatory purpose and/or with disparate impact. Thus the adoption of the [law itself] is claimed to have been illegal, and any and all applications of the [law] would be illegal." *Jackson v. Okaloosa Cty., Fla.*, 21 F.3d 1531, 1541 n.16 (11th Cir. 1994). Accordingly, the Court concludes that the fitness and hardship prongs of the ripeness analysis both weigh in favor of immediate judicial resolution of Plaintiffs' Equal Protection challenges.

"The Equal Protection Clause provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

The Supreme Court has explained that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (citing *Davis*, 426 U.S. 229).[15] "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Davis*, 426 U.S. at 242. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights*, 429 U.S. at 265.

In asserting a claim that a facially neutral law violates the Fourteenth Amendment based on mixed motives, a plaintiff must establish, by a preponderance of the evidence, that the alleged "racial discrimination was a substantial or motivating factor in the adoption of [the law at issue]. [The Plaintiff] shall then prevail unless the [defendants] prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered." *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (citing *Underwood v. Hunter*, 730 F.2d 614, 617

---

[15] As the Eleventh Circuit has stated,

> Equal protection claims can be divided into three broad categories. The first and most common type is a claim that a statute discriminates on its face. In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate state goal. When the statute facially discriminates against certain groups or trenches upon certain fundamental interests, courts have required a closer connection between the statutory classification and the state purpose.
>
> The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact. In such a case, a plaintiff must prove purposeful discrimination.
>
> The third type of claim is that defendants are unequally administering a facially neutral statute.

*E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citations omitted).

(11th Cir. 1984); *Vill. of Arlington Heights*, 429 U.S. 252; *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

A plaintiff need not prove that the law at issue rested solely on a discriminatory intent or purpose. *Id.* "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Vill. of Arlington Heights*, 429 U.S. at 265. "Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute." *Id.* at 265 n.11 (quoting *McGinnis v. Royster*, 410 U.S. 263, 276-277 (1973)). "When there is a proof that a discriminatory purpose has been a motivating factor in [a legislature's] decision [to pass a law], [the] judicial deference [courts generally afford to lawmakers' decisions] is no longer justified." *Id.* at 265-66. "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citing *United Jewish Orgs. v. Carey*, 430 U.S. 144, 179 (1977)). "It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*[16]

---

[16] Notably, however, as the Supreme Court explained,

> This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are [] inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry — made as it is under the Constitution — an inference is a working tool, not a synonym for proof. When . . . the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when . . . the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Pers. Adm'r of Mass.*, 442 U.S. at 279 n.25.

"Proving the motivation behind official action is often a problematic undertaking." *Hunter*, 471 U.S. at 228 (citing *Rogers v. Lodge*, 458 U.S. 613 (1982)). Moreover, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.* "Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters," because the law "would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." *Palmer*, 403 U.S. at 225.

Importantly, however, the Supreme Court, in *Village of Arlington Heights*, provided some examples of what evidence might establish that a law was enacted based on a discriminatory intent.

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, 426 U.S. at 242, may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *See Lane v. Wilson*, *supra*; *Griffin v. School Board*, 377 U.S. 218 (1964); *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala.), *aff'd per curiam*, 336 U.S. 933 (1949); *cf.* [*Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 207 (1973)]. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. *Reitman v. Mulkey*, 387 U.S. 369, 373-376 (1967); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Vill. of Arlington Heights*, 429 U.S. at 266-68 (footnotes omitted).

Defendants first argue that Plaintiffs' Amended Complaint fails to state a claim that SB 168 authorizes unlawful discrimination on its face because the statute expressly includes an antidiscrimination provision. ECF No. [52] at 16-17. Plaintiffs, on the other hand, assert that they have sufficiently alleged their Equal Protection claims by alleging that "SB 168 is discriminatory on its face with a disproportionately adverse effect on racial, ethnic, and national origin minorities, because as the data in similarly-situated jurisdictions shows, local jurisdictions seeking to enforce federal immigration laws will inevitably use national origin and race as a proxy for immigration status." ECF No. [59] at 14. That SB 168 is discriminatory on its face, however, is belied by the plain text of the statute itself. SB 168 contains no express classifications based on race or national origin; instead, it includes an explicit Antidiscrimination provision. *See* Fla. Stat. § 908.109. Thus, the Court concludes that SB 168 is neutral on its face.

Next, Defendants contend that undocumented aliens are not a suspect class and that, regardless, any disparate effect on undocumented aliens is built into the federal immigration system. ECF No. [52] at 17. Additionally, Defendants assert that the Amended Complaint fails to allege that SB 168 was enacted with any discriminatory intent or purpose that is attributable to the

State. *Id.* In their Response, Plaintiffs argue that SB 168 does not just target undocumented immigrants; rather, the law will disproportionately affect undocumented aliens, documented aliens, and United States citizens based on their presumed race, national origin, or "alienage." ECF No. [59] at 12. Further, Plaintiffs contend that the Amended Complaint sufficiently states a claim that SB 168, even if facially neutral, nonetheless violates the Equal Protection Clause because it was enacted with discriminatory legislative intent and will have a disproportionately adverse impact on racial, ethnic, and national origin minorities. *Id.* at 14-18.

Plaintiffs' Amended Complaint alleges in detail facts supporting their Equal Protection challenges. Specifically, the Amended Complaint explains that SB 168 was modeled after a bill drafted by anti-immigrant hate groups, who recruited Florida legislators to sponsor the bill. ECF No. [38] ¶¶ 150-57. Additionally, Plaintiffs set forth facts detailing how the staff analysis used by the bill's sponsors relied on biased data produced by those hate groups. *Id.* ¶¶ 151, 158-59. The use of this biased data in support of the bill was raised and questioned at a Florida Senate committee meeting. *Id.* ¶ 159. Likewise, Plaintiffs' allege that, in voting for the bill, multiple legislators expressed a desire to supplant and correct the perceived failures of the federal immigration system by ensuring that state and local law enforcement agencies participate in identifying and detaining undocumented aliens in local Florida communities. *Id.* ¶¶ 165-69. Moreover, the Amended Complaint sets forth statistics and data indicating that racial minorities are more likely to be targeted, questioned, and detained by local law enforcement following the implementation of formal collaborations with ICE. *Id.* ¶¶ 172-74. The fear of being targeted makes immigrants less likely to contact the police, file civil or criminal cases, or go to court for any reason, which undermines public safety. *Id.* ¶¶ 176-78. Finally, Plaintiffs allege that "U.S. citizens have been wrongfully arrested pursuant to immigration detainers because of law enforcement

officers' assumptions based on the individual's appearance and language," which will only increase with SB 168's enforcement. *Id.* ¶ 175.

"If these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration," that SB 168 was enacted with an underlying discriminatory purpose *and* that SB 168 will disproportionately impact a suspect class. *Shaw*, 509 U.S. at 645 (quoting *Gomillion*, 364 U.S. at 341); *see Vill. of Arlington Heights*, 429 U.S. at 266-68 (explaining that discriminatory purpose can be established through direct or circumstantial evidence of discriminatory effect, historical background on the law's passage, and legislative history, among others); *cf. Palmer*, 403 U.S. at 224 ("no [Supreme Court] case . . . has held that a legislative act may violate equal protection *solely* because of the motivations of the men who voted for it" (emphasis added)). These facts, under the liberal pleading standard, imply "that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass.*, 442 U.S. at 279 (citing *United Jewish Orgs.*, 430 U.S. at 179); *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (considering statements of initiative sponsors in subjecting enacted referendum to equal protection scrutiny).

Moreover, these facts support an inference that, without the use of biased data created by anti-immigrant hate groups in the legislature's staff analysis, SB 168 may have lacked the requisite support needed to be enacted. *Vill. of Arlington Heights*, 429 U.S. at 265 n.11 ("Legislation is

frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute." (quoting *McGinnis*, 410 U.S. at 276-277)). The Court concludes that the allegations in the Amended Complaint are sufficient to assert an Equal Protection challenge. *Cf. Hand v. Scott*, 888 F.3d 1206, 1210 (11th Cir. 2018) (noting that the plaintiffs, in asserting a facial challenge under the Equal Protection Clause, did not allege "that Florida's constitutional and statutory scheme had as its purpose the intent to discriminate on account of, say, race, national origin, or some other insular classification; or that it had the effect of a disparate impact on an insular minority" (emphasis in original)). Accordingly, Defendants' Motion is denied as to Counts X and XI.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss, **ECF No. [52]**, is **GRANTED in part and DENIED in part** consistent with this Order. Plaintiffs are permitted to file a Second Amended Complaint **by no later than December 27, 2019**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on December 12, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record