**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**CITY OF SOUTH MIAMI**, *et al.*

      *Plaintiffs*,

v.                                                        CASE NO. 1:19-cv-22927-BB

**RON DESANTIS, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
STATE OF FLORIDA**, *et al.*

      *Defendants*.

_____/

<u>**DEFENDANTS' SUMMARY JUDGMENT MOTION AND MEMORANDUM OF LAW**</u>

Defendants move for summary judgment as to all of Plaintiffs' remaining claims.

The Florida Legislature explained its motivation in enacting Senate Bill 168 ("SB 168") on the first page of that legislation: "The Legislature finds that it is an important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within this state." § 908.101, Fla. Stat. This Court has already rejected most of Plaintiffs' claims, ECF No. 83, at 51, and even with respect to Plaintiffs' equal protection claims, the Court has already rejected Plaintiffs' suggestion that SB 168 is "discriminatory on its face." ECF No. 83, at 43, 48; *see* § 908.109, Fla. Stat. (prohibiting unlawful discrimination).

All that remains for this Court to adjudicate is whether Florida's elected representatives— although appearing to act in furtherance of law enforcement cooperation and public safety—used SB 168 as a Trojan horse for invidious discrimination. In attempting to establish that SB 168 has both a discriminatory purpose and a discriminatory effect, Plaintiffs argue that "anti-immigrant hate groups" drafted SB 168 and thereby "rope[d] Florida representatives into promoting their hateful ideals." ECF No. 38, at 29. But this assertion falls apart upon examination. And even if

Plaintiffs could show that these groups were materially involved in enacting SB 168 (they cannot), Plaintiffs cannot show that the Legislature and the Governor acted with an improper purpose.

## I.   FACTS AND PROCEDURAL HISTORY.

Federal immigration authorities "depend[], in part, on the assistance of local and state law enforcement agencies." Defendants' Statement of Material Facts ("SMF") ¶ 2. This cooperation focuses on suspected "criminal aliens": those arrested for criminal activity independent of their immigration status. SMF ¶ 3. By transferring custody of criminal aliens to federal immigration authorities once their state-law detention ends, immigration cooperation ensures that these individuals face the immigration law consequences of their crimes and cannot commit further crimes. SMF ¶ 4. This cooperation also reduces the need for at-large immigration arrests, which put "members of the public at greater risk" and can cause unintentional "officer-on-officer" violence. SMF ¶¶ 5–7.

Several states and localities, however, have passed laws that interfere with or withhold such cooperation. The debate over these laws, which are known as sanctuary policies, is not new. *See, e.g.*, *City of New York v. United States*, 179 F.3d 29, 30 (2d Cir. 1999). At least ten States have prohibited sanctuary policies and at least thirty-three have considered such legislation. SMF ¶¶ 8–9. Florida's elected officials—including some of SB 168's sponsors—have been seeking to prohibit sanctuary policies since at least 2015. SMF ¶ 10.

On June 17, 2019, Governor DeSantis signed SB 168 into law. The nine Organizational Plaintiffs then filed this suit,[1] in which they raised a variety of preemption, vagueness, and equal protection claims. *See* ECF No. 38, at 46–74. Although Plaintiffs sought a preliminary injunction based on their other claims, they declined to raise their equal protection claims as a basis for a

---

[1] The Court dismissed all claims brought by the other Plaintiffs. *See* ECF No. 83, at 51.

preliminary injunction. *See* ECF No. 47, at 2. With one exception, the Court denied the request for a preliminary injunction and dismissed Plaintiffs' preemption and vagueness claims. ECF No. 64; ECF No. 83, at 51. The Court, however, allowed the equal protection claims to proceed to discovery. ECF No. 83, at 43–51.

Plaintiffs challenge only two provisions of SB 168 on equal protection grounds: Section 908.104(1), which requires "law enforcement agenc[ies]" to "use best efforts to support the enforcement of federal immigration law," ECF No. 38, at 69–70, and Section 908.103, which prohibits defined "sanctuary policies." ECF No. 38, at 71–73.[2]

## II.    SB 168 DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

In general, a law is not "invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). As a narrow exception to this rule, a facially neutral law violates the Equal Protection Clause where a plaintiff can show both a discriminatory purpose and a discriminatory effect.[3] *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005) (en banc). But as this Court has noted, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." ECF No. 83, at 47 (quotations omitted).

Plaintiffs cannot meet their heavy burden. There "is no genuine issue as to" whether Florida acted with discriminatory intent in enacting SB 168 and Defendants are "entitled to a judgment as a matter of law." *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir. 1988)

---

[2] Defendants' prior briefing and this Court's prior orders provide further background on SB 168 and its specific requirements. *See* ECF No. 19, at 1–5; ECF No. 64, at 2–8.

[3] Defendants address Plaintiffs' discriminatory effect arguments under the disparate impact prong of the *Arlington Heights* analysis.

(quotations omitted). "No reasonable factfinder could conclude otherwise." *Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1330 (11th Cir. 2013).

*First*, the record does not support the inference that Floridians for Immigration Enforcement ("FLIMEN"), the Federation for American Immigration Reform ("FAIR"), or the Center for Immigration Studies ("CIS") infected SB 168 with discriminatory intent. Plaintiffs cannot show that SB 168 contains language originating from FLIMEN's 2016 draft bill because the recipient of that 2016 FLIMEN email used identical language in legislation he introduced in 2015. SMF ¶ 14. Nor is it material that a Senate staff analysis briefly cites data from these organizations. A number of respected judges and other government officials have done the same.

*Second*, even if the evidence were sufficient to support a finding that FLIMEN, FAIR, and CIS had a material role in SB 168, Plaintiffs cannot establish that the Legislature and the Governor acted with discriminatory intent. Plaintiffs can identify no "contemporary statements by members of the decisionmaking body" that reflect discriminatory intent, *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977), nor do the other *Arlington Heights* factors support Plaintiffs' argument. Two cases decided after this Court ruled on Defendants' motion to dismiss—both of which apply the *Arlington Heights* factors and find no equal protection violation—make that clear. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202 (11th Cir. 2020).

### A.    The *Arlington Heights* framework.

"As a general matter, determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham Ministries*, 966 F.3d at 1227. Moreover, "a strong state policy in favor of [the challenged practice], for reasons other than race"—such as the law enforcement cooperation and public safety concerns behind SB 168—"is evidence that the [practice] does not have a discriminatory intent." *United States v. Marengo Cty. Comm'n*, 731 F.2d

1546, 1571 (11th Cir. 1984). It is also relevant, if not dispositive, that SB 168 expressly prohibits discrimination. *See Greater Birmingham Ministries*, 966 F.3d at 1228 (giving weight to a provision that a "racially biased legislature" would not include). Finally, the Equal Protection Clause requires that Plaintiffs prove discriminatory intent with respect to race, national origin, or another suspect class. Although Defendants do not condone discrimination of any kind, allegations related only to immigration status are not enough. *See Estrada v. Becker*, 917 F.3d 1298, 1308–09 (11th Cir. 2019) (holding that "undocumented aliens" are not a "suspect class").

Beyond those threshold considerations, courts apply the *Arlington Heights* factors in evaluating intent under the Equal Protection Clause. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915 (discussing *Arlington Heights*, 429 U.S. at 266–68). The purpose of these factors is to root out attempts to achieve discriminatory ends under the false colors of a facially neutral law. The Supreme Court's decision in *Columbus Board of Education v. Penick*, 443 U.S. 449 (1979), illustrates the concern. In that case, the public schools in Columbus, Ohio had been "intentionally segregated on the basis of race" prior to the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954). *Penick*, 443 U.S. at 452 (quotations omitted). Following that decision, the Columbus Board implemented a number of facially neutral policies that had the effect of "maintain[ing] and enhanc[ing] racial imbalance." *Id.* at 453. Looking at all the facts, including that the Board had avoided any steps to dismantle segregation, despite promising to do otherwise, *id.* at 452–53, the Court found that the Board "was animated by an unconstitutional, segregative purpose." *Id.* at 455. No such facts are present here.

The *Arlington Heights* factors can be summarized as follows: (1) the "sequence of events leading up to [the challenged law's] passage," *Greater Birmingham Ministries*, 966 F.3d at 1225; (2) whether the law creates a "disparate impact" on a suspect class, *Regents of the Univ. of Cal.*,

140 S. Ct. at 1915; (3) "contemporary statements by members of the decisionmaking body," *id.* at 1915–16 (quotations omitted); (4) the "historical background" of the challenged law, *Greater Birmingham Ministries*, 966 F.3d at 1225; and (5) whether there were "procedural and substantive departures" from the norm. *Id.*

If the Court applies *Arlington Heights* and determines that race was a motivating factor in the law's enactment, the burden shifts to the State to show, "by a preponderance of the evidence, [that] it would have made the same decision notwithstanding" this motivation. *Greater Birmingham Ministries*, 966 F.3d at 1231 (quotations omitted). Because Plaintiffs cannot meet their burden, the Court need not reach this step. Even if it does, Defendants are entitled to summary judgment.

### B.      Plaintiffs' evidence regarding the sequence of events is insufficient as a matter of law.

Plaintiffs contend that FLIMEN, FAIR, and CIS were so involved in the enactment of SB 168 that they "rope[d] Florida representatives into promoting their hateful ideals." ECF No. 38, at 29. Plaintiffs must show three things: (a) that these groups advocated for SB 168 with an improper motive, (b) that the Legislature knew of that motive, and (c) that the Legislature *embraced and intentionally adopted* that motive. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("Discriminatory purpose . . . implies that the decisionmaker" selected "a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."). To make this showing, Plaintiffs must present evidence on the Legislature as a whole, not just isolated legislators. *See Greater Birmingham Ministries*, 966 F.3d at 1228 ("It is . . . questionable whether the sponsors speaks for all legislators [since] [t]he vote of a sponsor is only one vote."); *id.* (the "legally dispositive intent" is that "of the entire body of the . . . legislature"). Plaintiffs cannot do so.

6

Plaintiffs offer four contentions in support of their theory: (1) that SB 168's sponsors used draft legislation provided by FLIMEN as a model for SB 168, ECF No. 38, at 29; (2) that the Legislature relied on "biased data provided by" CIS and FAIR, *id.* at 25; (3) that one State Senator and one State Representative participated in "a press conference planned by FLIMEN," *id.* at 28; and (4) that members of FLIMEN lobbied for the enactment of SB 168, which resulted in FLIMEN meeting with a handful of legislators or their staff and one legislative aide having more detailed conversations with FLIMEN. *See* Ex. L to SMF, Report of Dr. Lichtman, at 156–65.[4] The first contention is belied by the record, and the other three are not probative of discriminatory intent.

  i.  *SB 168's sponsors did not use FLIMEN's draft legislation as a model.*

Plaintiffs' theory relies on two facts: (a) on December 13, 2016, a member of FLIMEN sent an email to State Senator Aaron Bean's office attaching draft legislation, SMF ¶ 11; and (b) that draft legislation has some text in common with SB 168. SMF ¶ 12.

But Plaintiffs fail to mention an additional fact, which is not in dispute and which disposes entirely of this theory. On November 11, 2015, *over a year* before FLIMEN sent the draft legislation to Senator Bean's office, Senator Bean introduced a bill that would prohibit sanctuary policies, SMF ¶ 13, and virtually every word that SB 168 has in common with FLIMEN's 2016 draft legislation also appears in Senator Bean's 2015 draft bill. SMF ¶¶ 14–17. In other words, Plaintiffs' theory is premised on the assumption that the Florida Legislature, through Senator Bean, used language from FLIMEN's 2016 draft legislation, but the legislative record shows that Senator Bean pulled that language from his own 2015 draft legislation. No reasonable factfinder could

---

[4] Defendants dispute that Plaintiffs' factual allegations are proper subjects of expert testimony. But because certain sections of Dr. Lichtman's expert report contain an amalgamation of Plaintiffs' principal allegations and evidence, Defendants cite it for ease of reference.

conclude otherwise—especially given Plaintiffs' admission that FLIMEN had no relevant contacts with legislators before 2016. SMF ¶ 18.

Out of an abundance of caution, Defendants also note that the similarities between FLIMEN's draft legislation and the final version of SB 168—which was enacted years after the 2016 email—are not only minimal but unremarkable. *See* SMF ¶¶ 19–23. As Plaintiffs admit, of the six full pages of single-spaced text, there are only "four near-identical sentences." SMF ¶¶ 19–20. And even the relatively few similarities are benign. For example, the highlighted language on the top of page three also appears in Senate Bill 4, the Texas law that the Fifth Circuit upheld in *City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018). SMF ¶¶ 21–22. Similarly, the highlighted language at the bottom of page four tracks almost verbatim the language of a federal statute governing immigration cooperation. SMF ¶ 23. These similarities are not surprising: on a topic like immigration, certain buzz words and phrases are going to appear in any draft legislation. The appearance of them in SB 168 is not evidence of discriminatory intent.

> ii.    *The lone citation to CIS and FAIR data in a staff-level analysis does not show discriminatory intent.*

Plaintiffs' second contention is that the "sponsors of SB 168 used biased data provided by" CIS and FAIR "in their staff analysis of the bill." ECF No. 38, at 25. According to Plaintiffs, CIS and FAIR "were both founded by John Tanton, an avowed white supremacist," *id.* at 26, and thus, in their view, the Legislature relied on information provided by "white supremacists" in enacting SB 168. *Id.* at 26–27. These claims do not withstand scrutiny.

As a threshold matter, there is nothing problematic per se with relying on information from CIS and FAIR.[5] The Washington Post has noted that "[t]he analyses the CIS cranks

---

[5] Defendants address CIS and FAIR together given Plaintiffs' allegation that CIS is the "sister organization" of FAIR. SMF ¶ 24; ECF No. 38, at 25.

out . . . resemble[] the standard think tank jousting that goes on in Washington." SMF ¶ 25. This explains why, if one Googles "list of sanctuary cities," the CIS data is the first result. SMF ¶ 26. It explains why Attorney General Loretta Lynch relied on a CIS report as a basis for asking the Office of the Inspector General to investigate sanctuary jurisdictions. *See State v. DOJ*, 951 F.3d 84, 97–98 (2d Cir. 2020); SMF ¶ 27. It explains why esteemed jurists like Justice Kennedy and Judge Posner have relied on CIS studies in their opinions. *See Arizona v. United States*, 567 U.S. 387, 398 (2012); *Bandak v. Eli Lilly and Co.*, 587 F.3d 798, 801 (7th Cir. 2009); SMF ¶ 27. And it explains why this Court once found CIS's Director of Research "qualified to offer [expert] testimony." *Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1349 (S.D. Fla. 2017) (Bloom, J.); SMF ¶ 27; *see also Bellitto*, 302 F. Supp. 3d at 1348 (referring to CIS as "a research institute that focuses on examining the consequences of immigration on the United States").

In any event, the two-sentence discussion of CIS and FAIR data on page 4 of the 15-page Senate staff analysis is innocuous. SMF ¶ 28.[6] The relevant section begins by noting that it is "difficult to determine how many sanctuary jurisdictions . . . exist in Florida." SMF ¶ 30. It then states that "organizations use different criteria for making these determinations," and cites the CIS and FAIR data. SMF ¶¶ 31–32. After this passing reference to the data, the analysis all but disavows them, stating that there are "more objective ways to measure whether an entity is a sanctuary jurisdiction," and spending the next page and a half discussing those superior methods. SMF ¶¶ 33–34.

This two-sentence discussion of the CIS and FAIR data is not probative of discriminatory intent. Even assuming that the data are inaccurate—a point Plaintiffs have not sought to prove—

---

[6] The one-page excerpt from this analysis attached to Plaintiffs' amended complaint makes this passing reference to CIS and FAIR data appear more prominent. SMF ¶ 29.

the staff-level analysis offered them for the sole purpose of discussing the number of sanctuary jurisdictions that existed in Florida. At most, this would show that the Legislature acted based on mistaken assumptions, not that they acted with the intent to discriminate.

       iii.    *The April 17, 2019 press conference does not show discriminatory intent.*

Plaintiffs' third contention involves an April 17, 2019 press conference at the Florida Capitol. ECF No. 38, at 28–29. Plaintiffs have presented documents suggesting that FLIMEN was involved in planning the press conference, although it was hosted by SB 168's sponsors. *See, e.g.*, ECF No. 38-7; *see* SMF ¶ 35. Regardless of FLIMEN's involvement in planning the press conference, however, FLIMEN's representative barely featured in it and nothing said at the press conference indicates that the Legislature acted with discriminatory intent. The press conference is 18-minutes long, and Defendants recommend watching it in its entirety. *See* SMF ¶ 35 (with link).

The press conference begins with statements from two of SB 168's sponsors, Senator Joe Gruters and Representative Cord Byrd. SMF ¶ 36. The sponsors emphasize the same points that Defendants have emphasized throughout this case: that SB 168 is about the rule of law and, in particular, cooperating with the federal government with respect to individuals arrested for crimes. SMF ¶¶ 37–41, 43–44. The sponsors emphasize that the bill is not anti-immigrant, SMF ¶ 42, and it is not about the larger immigration debate. SMF ¶ 45. The sponsors also thank Senator Bean for his work in the past on similar legislation. SMF ¶ 46. The remainder of the press conference features almost entirely statements by private citizens. SMF ¶ 47.

After the sponsors' opening remarks, a mother speaks about the death of her 21-year old son. SMF ¶¶ 48–49. She says that her son was killed by an individual who had already been removed twice by immigration authorities. SMF ¶ 50. The mother emphasizes that better law enforcement cooperation may have saved her son's life. SMF ¶ 51.

After that, a Latina woman speaks. SMF ¶¶ 52–53. She describes her difficult childhood in Nicaragua, including having to defend her home from criminals as a small child, and she describes her experience as an 18-year old lawfully immigrating to the United States. SMF ¶¶ 53–56. Contrary to Plaintiffs' allegations, she does not state that unlawfully present persons "will kill you." ECF No. 38, at 29. What she says is that "victimizers"—those who would commit violent crimes—"don't ask if you are legally here or illegally here, they will kill you anyhow." SMF ¶ 57. She also says that she supports SB 168 "out of love" for people who are victimized. SMF ¶ 58.

Finally, representatives from FLIMEN and an organization called the Remembrance Project speak briefly and express their support for SB 168. SMF ¶ 59. The representative from FLIMEN emphasizes that her comments are not directed at all unlawfully present persons. SMF ¶ 60.

The comments at the press conference do not suggest that the Legislature had a discriminatory purpose in enacting SB 168. Even if the Court views some of the comments made by private persons as problematic, those stray statements are not probative of the Legislature's intent. *See* Section II.D.

        iv.    *FLIMEN's other interactions with legislators and their staff do not show discriminatory intent.*

Plaintiffs submitted a number of public records requests to the Florida Legislature regarding SB 168. The responsive documents paint an unsurprising picture of the types of communications elected officials sometimes receive from constituents:

- "WHAT THE HELL IS YOUR PROBLEM WITH NOT PASSING E-VERIFY . . . YOU ARE A DISGRACE!" SMF ¶ 61.
- "NO MATTER HOW FREELY ELECTED OUR GOVERNMENT IS THEY DO NOT RESERVE THE RIGHT TO DECIDE WHAT THE PEOPLE CAN OR CANNOT PUT IN THEIR BODY." SMF ¶ 62.

- "The, Devil's Devotees, will be smoked out; they will be spewing out, false deceptive and toxic venom, against the President." SMF ¶ 63.
- "WITH EVERY LAW YOU MORONS KEEP MAKING MORE CRIMINALS . . . WE WILL NOT TOLERATE YOUR TREASON." SMF ¶ 64.

These documents (which are just a sample) reflect the intuitive reality that elected officials receive unsolicited emails of every stripe, and such emails, alone, are not probative of legislative intent.

Among these constituent emails are a number of emails from members of FLIMEN, who lobbied in favor of SB 168. SMF ¶ 65. FLIMEN has a practice of sending unsolicited emails to individuals, including public officials, and subscribing the individuals to FLIMEN's email alerts without permission. SMF ¶¶ 66–67. There is no evidence that elected officials sent emails to members of FLIMEN soliciting their views on SB 168. SMF ¶ 74.

Members of FLIMEN also obtained meetings with a handful of legislators or their staff. SMF ¶ 68. This, too, is unremarkable because elected officials and their staff generally work to accommodate meeting requests from constituents. SMF ¶¶ 69–72. But taking a meeting does not indicate endorsement of the participant's views, and there is no evidence that elected officials or their staff made discriminatory statements at these meetings. SMF ¶¶ 69–73.

The one individual who had more significant contacts with members of FLIMEN is a legislative aide named Josh Barnhill. SMF ¶¶ 75–77. At most, Mr. Barnhill's emails suggest that he was interested in FLIMEN's views on SB 168. They do not suggest that he had discriminatory intent, much less that he had discriminatory intent that infected the legislative process. SMF ¶¶ 78–82. In fact, on March 27, 2019, Mr. Barnhill received an email with a news article detailing his interactions with FLIMEN. SMF ¶ 80. The email, tracking Plaintiffs' theory in this case, suggested that "anti-immigrant hate groups" were significantly involved in the legislative process for SB

12

168. SMF ¶ 81. Mr. Barnhill replied, "[r]ead that this morning, definitely a stretch. The bill is common sense." SMF ¶ 82.

Plaintiffs rely heavily on the fact that an email from a member of FLIMEN to Mr. Barnhill suggested removing a provision giving enforcement authority to State Attorneys, and that a version of SB 168 introduced three weeks later removed that provision. SMF ¶¶ 83–86; Ex. L, at 157. But Plaintiffs admit that the Florida Prosecuting Attorneys Association, the "association of State Attorneys," opposed that provision. SMF ¶ 84; Ex. L, at 157. Thus, Plaintiffs cannot show that the email was the cause of this change. And even if they could, this does not suggest that the Legislature acted with discriminatory intent in making this change, nor do Plaintiffs challenge the enforcement provisions of SB 168 on equal protection grounds. *See* ECF No. 38, at 69, 71.

Finally, Plaintiffs rely on alleged interactions between FLIMEN and legislators and their staff regarding other legislation, including a bill requiring the use of e-verify, a bill prohibiting the issuance of state identification to unlawfully present persons, and a bill requiring the Florida Department of Corrections to enter into a 287(g) agreement with the federal government. *See, e.g.*, Ex. L, at 159; SMF ¶¶ 87–89. Because those bills are unrelated to SB 168, any such interactions would be irrelevant as a matter of law. *See Greater Birmingham Ministries*, 966 F.3d at 1228 (finding irrelevant evidence that is "unconnected to the passage of the actual law in question").

* * *

Plaintiffs have no evidence to support their contention that "anti-immigrant hate groups . . . drafted" SB 168 and thereby "rope[d] Florida representatives into promoting their hateful ideals." ECF No. 38, at 29. Taking the evidence in the light most favorable to them, they can show at most that FLIMEN had one-sided interactions with a handful of legislators and that FLIMEN caught the attention of one legislative aide. Those interactions do not suggest that any

legislator had discriminatory intent, much less that the entire Legislature did. *See Greater Birmingham Ministries*, 966 F.3d at 1228.

### C.    Plaintiffs' evidence on disparate impact is insufficient as a matter of law.

"The Fourteenth Amendment does not regard neutral laws as invidious ones, even when their burdens purportedly fall disproportionately on a protected class." *Greater Birmingham Ministries*, 966 F.3d at 1231 (quotations omitted). Thus, disparate impact alone is not material evidence under the *Arlington Heights* disparate impact prong. Rather, any disparate impact must be indicative of discriminatory intent. Plaintiffs identify no such evidence.

Plaintiffs' disparate impact contentions fail because they are based on the fact that SB 168 addresses immigration. *See, e.g.*, Ex. L, at 60–66. In *Regents of the University of California*, the Supreme Court rejected an equal protection challenge to the decision by the Secretary of the Department of Homeland Security ("DHS") to rescind the Deferred Action for Childhood Arrivals ("DACA") policy. 140 S. Ct. at 1915–16. Even though "78% of" those affected by the challenged decision were "Latinos from Mexico," the Court applied *Arlington Heights* and held that the disparate impact factor did not weigh in the plaintiffs' favor because "Latinos make up a large share of the unauthorized alien population," and "one would expect them to make up an outsized share of" those affected by immigration policies. *Id.*

This rule makes sense. A different rule would call the entire immigration system into question because "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916. As the Eighth Circuit has noted in the more plaintiff-friendly context of Fair Housing Act disparate impact claims, "[i]t would be illogical to impose . . . liability based on the effect an otherwise lawful ordinance may have on" those "not lawfully present in this country." *Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013).

Finally, insofar as Plaintiffs argue that SB 168 will lead to "racial profiling," ECF No. 38, at 3, this argument ignores the plain text of the statute. *See* § 908.109, Fla. Stat. (prohibiting discrimination); SMF ¶ 91. And even if Plaintiffs could show that some officers will violate SB 168's anti-discrimination requirements,[7] this would not be relevant to Plaintiffs' facial challenge. *See* ECF No. 38, at 74 (asking the Court to "declare . . . unconstitutional" the challenged provisions in their entirety). Because Plaintiffs cannot show that *all officers* will violate SB 168's plain text, "circumstances exist[] under which the [challenged law] would be valid." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001) (quotations omitted).

### D. Plaintiffs' evidence regarding contemporary statements is insufficient as a matter of law.[8]

To qualify as relevant under this prong, a statement must be made by a member of the decisionmaking body—here, members of the Florida Legislature—and it must be "made about the law at issue in this case." *Greater Birmingham Ministries*, 966 F.3d at 1227. Plaintiffs identify three categories of statements: (1) statements by SB 168's sponsors regarding the public safety purpose of SB 168, *see* Ex. L, at 182–84; (2) statements by SB 168's sponsors unrelated to SB 168, *see id.* at 92–95, 131; and (3) statements by private citizens. *See, e.g.*, *id.* at 133–52 (discussing statements by members of FAIR); ECF No. 38, at 29 n.12 (discussing other statements by private citizens). None shows that the Legislature enacted SB 168 with discriminatory intent.[9]

---

[7] In fact, SB 168 gives Defendants enforcement authority to stop any such racial profiling. *See* §§ 908.109, 908.107(2), 908.107(1), Fla. Stat.

[8] Because Defendants' position is that most of the statements Plaintiffs identify are inadmissible hearsay, *see* ECF No. 108, Defendants discuss Plaintiffs' allegations but do not include them in their Statement of Material Facts.

[9] Plaintiffs also cite committee testimony by a private citizen. But Republican Senator Benacquisto interrupted that testimony to say that it was "not appropriate." *See* Ex. L, at 91–92.

**1.** Plaintiffs' argument that statements about the public safety purpose of SB 168 are evidence of discriminatory intent turns the law on its head. Statements to the effect that SB 168 advances public safety are affirmative evidence that the Legislature had a legitimate non-discriminatory purpose in enacting SB 168. *See Marengo Cty. Comm'n*, 731 F.2d at 1571. Moreover, as the Ninth Circuit Court of Appeals recently noted, the idea that "immigration enforcement is a public safety issue" has been endorsed by Congress, the Department of Justice, and the Supreme Court. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1178, 1182 (9th Cir. 2019) (quotations omitted); *accord Arizona*, 567 U.S. at 397–98; *Demore v. Kim*, 538 U.S. 510, 518 (2003); SMF ¶ 92.

Plaintiffs' argument is also internally inconsistent. On one hand, they argue that statements regarding the public safety purpose of SB 168 are discriminatory because they advance the "immigrant threat narrative." *See* Ex. L, at 86. On the other hand, they argue that the public safety rationale is "pretextual." *Id.* at 185. Plaintiffs cannot decide whether the public safety rationale is a true but problematic one or an acceptable but false one, suggesting it is neither.

**2.** Statements by legislators unrelated to the enactment of SB 168 are irrelevant as a matter of law. Plaintiffs identify three statements: (a) Senator Gruters's comments regarding a sign posted outside his office with pictures of unlawfully present persons who have been removed from Sarasota by immigration authorities, Ex. L, at 92–94; (b) Senator's Gruters's anti-illegal immigration campaign ad, *id.* at 131; and (c) Senator Gruters's comments about a "listening tour"—which he planned after the enactment of SB 168 to hear concerns regarding the new legislation, but which he canceled, *id.* at 95.

The first two statements are irrelevant as a matter of law because they were not made about SB 168. Courts are "confined to an analysis of discriminatory intent as it relates to" the challenged

legislation, and statements that "were not made about the law at issue . . . do not evidence discriminatory intent behind it." *Greater Birmingham Ministries*, 966 F.3d at 1227; *accord Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867–68 (8th Cir. 2003) (noting that "an isolated, stray comment unrelated to the decisional process" did not establish discrimination); *Truss v. Harvey*, 179 F. App'x 583, 588 (11th Cir. 2006) (similar). The third statement, regarding the listening tour, is irrelevant as a matter of law because it was made over three months after the Florida Senate voted on SB 168. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (holding that statements that are "remote in time and made in unrelated contexts . . . do not qualify as 'contemporary statements' probative of the decision at issue" (citing *Arlington Heights*, 429 U.S. at 268)).

Regardless, these statements do not show discriminatory intent. As to the sign, Plaintiffs argue that it is problematic because—although it features people of many races—in their view, it disproportionately features people of color. Ex. L, at 92–94. But as the Supreme Court has recognized, "one would expect [Latinos] to make up an outsized share of" those affected by immigration enforcement. *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915–16. And Plaintiffs allege that, when confronted about the sign, Senator Gruters made the following statement: "Why is that racist? Over 500 people from 35 countries have been detained from Sarasota. All are and should be equal under the law." Ex. L, at 93–94. Rather than demonstrating discriminatory intent, this statement disavows it.

Plaintiffs quote the campaign ad as follows: "STOP THE INVASION . . . the Federal government MUST stop the caravan invasion and lock down our borders." *Id.* at 131. At most, the statement is anti-illegal immigration. It is not discriminatory. *See Estrada*, 917 F.3d at 1308–09 (holding that "undocumented aliens" are not a "suspect class").

Finally, Plaintiffs identify the following statement regarding the "listening tour": "The rhetoric is so charged across the political spectrum that in order to have a truly productive listening tour we've decided to delay the tour to a later date." Ex. L, at 95. This statement is not evidence of discriminatory intent.

**3.** Plaintiffs identify a variety of statements made by private citizens, including by individuals associated with FAIR, FLIMEN, and CIS. *See, e.g.*, *id.* at 133–152; ECF No. 38, at 29 n.12. None qualify as contemporary statements by members of the decisionmaking body.

In *Regents of the University of California*, the Court held that "[t]he relevant actors were" the DHS Secretary and the Attorney General. 140 S. Ct. at 1916. Even though these cabinet-level officials report to the President, are tasked with implementing his agenda, and would likely have been communicating with the White House regarding their decision, the Court rejected the argument that the President's statements were "probative of the decision at issue." *See id.* Under *Regents of the University of California*, statements by individuals from FAIR, CIS, and FLIMEN—particularly those that do not address SB 168, but even those that do—are not relevant to the *Arlington Heights* analysis, even if Plaintiffs could establish that FAIR, CIS, or FLIMEN were materially involved in enacting SB 168. *Accord Greater Birmingham Ministries*, 966 F.3d at 1227 (declining to consider a problematic statement by a legislator about a similar bill because he was "not a member of the" legislature when the "law was passed").

None of the statements Plaintiffs identify suggest discriminatory intent.

**E.  Plaintiffs' evidence regarding historical background is insufficient as a matter of law.**

Plaintiffs' argument under this prong relies on what they refer to as Florida's "history of discrimination." *See* Ex. L, at 23. This argument fails because "past discrimination cannot, in the manner of original sin, condemn governmental conduct that is not itself unlawful." *Hall v. Holder*,

117 F.3d 1222, 1227 (11th Cir. 1997) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)). The evidence Plaintiffs rely on—which relates to subjects like voting and education—is not specific enough to be relevant to this factor. *See* Ex. L, at 23–56. As the Eleventh Circuit recently held, "[t]he Plaintiffs' position is weakened significantly by the fact that the evidence presented in this case is largely unconnected to the passage of the actual law in question." *Greater Birmingham Ministries*, 966 F.3d at 1228.

Even if Plaintiffs had evidence that Florida had previously discriminated in the area of immigration, this would not be sufficiently specific. *See id.* at 1229 ("[I]t cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting."). Rather, Plaintiffs must identify historical evidence that suggests that the Legislature's motivations in enacting SB 168 were problematic. *See Penick*, 443 U.S. at 455 (finding a "segregative purpose" where Columbus had previously segregated schools and its facially neutral actions perpetuated that segregation). Plaintiffs identify none.

F.     **Plaintiffs' evidence regarding departures from the norm is insufficient as a matter of law.**

Plaintiffs take issue with the content of SB 168 and the Legislature's rejection of certain amendments. *See* Ex. L, at 168–81. This argument is nothing more than a criticism of SB 168 on policy grounds. For example, Plaintiffs disagree with the federal government's immigration enforcement criteria, *see id.* at 170–71, and they believe that SB 168 should have prohibited discrimination above and beyond what the Equal Protection Clause prohibits, *see id.* at 176–77. But neither Plaintiffs' policy objections nor the Legislature's rejection of amendments that would have codified Plaintiffs' policy preferences suggest discriminatory intent. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1901, 1913, 1915–16 (rejecting an equal protection claim even though the government failed to consider the significant reliance interests of "700,000 aliens," 78% of whom

were "Latinos from Mexico"); *Greater Birmingham Ministries*, 966 F.3d at 1230 (holding that the "use of cloture," the fact that "no black legislators voted for" the challenged bill, and the fact that "the vote was a strictly party-line vote" were not evidence of discrimination).

### G. Plaintiffs cannot overcome their lack of evidence of discriminatory intent with expert testimony.

Dr. Lichtman's 218-page report concludes that "Republican[s]" passed SB 168 to "crack[] down on the Democratic minority base and appeal[] to the Republican anti-immigrant white base." Ex. L, at 10, 119, 217. He makes the broad generalization that the "white political base" is "anti-immigrant in their views." *Id.* at 126. He argues that the federal government's immigration enforcement is discriminatory and only "cloaked in facial neutrality." *Id.* at 86. And he even attempts to link Defendant DeSantis and one of SB 168's sponsors to the horrific hate crime in El Paso, Texas that killed over 20 people. *Id.* at 94–95. The report is not fit for judicial consideration. *See* ECF No. 109. Further, the principal evidence that the report discusses is addressed above.

\* \* \*

Even if the Court finds that race was a motivating factor, Plaintiffs' evidence relates only to a handful of elected representatives, and those representatives supported bills like SB 168 years before the events in question. SMF ¶ 10. No reasonable factfinder could conclude that the State would not have made the same decision.

### III. THE TRANSPORTATION PROVISION IS LAWFUL.

Defendants are currently subject to a preliminary injunction with respect to Section 908.104(4). Defendants preserve their argument that the provision is not conflict preempted. *See* 8 U.S.C. § 1357(g)(10); *City of El Cenizo*, 890 F.3d at 179–81; ECF No. 19, at 12–13.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Defendants.

20

Respectfully submitted this 28th of August, 2020.

| | |
|---|---|
| **ASHLEY MOODY** <br> **ATTORNEY GENERAL** | **RON DESANTIS** <br> **GOVERNOR** |

*/s/ James H. Percival*

*James H. Percival* (FBN 1016188)
CHIEF DEPUTY SOLICITOR GENERAL
*Elizabeth Teegen* (FBN 833274)
CHIEF ASSISTANT ATTORNEY GENERAL
*Karen Brodeen* (FBN 512771)
SENIOR ASSISTANT ATTORNEY GENERAL
*Anita Patel* (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com
elizabeth.teegen@myfloridalegal.com
karen.brodeen@myfloridalegal.com
anita.patel@myfloridalegal.com

*Counsel for Attorney General Moody*

*/s/ Colleen Ernst*

*Joe Jacquot* (FBN 189715)
GENERAL COUNSEL
*Colleen Ernst* (FBN 112903)
DEPUTY GENERAL COUNSEL
Executive Office of the Governor
The Capitol, PL-05
Tallahassee, Florida 32399-0001
Phone: (850) 717-9310
joe.jacquot@eog.myflorida.com
colleen.ernst@eog.myflorida.com

*Counsel for Governor DeSantis*

21

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF system, which provides notice to all parties, on this 28th day of August, 2020.


/s/ *James H. Percival*
James H. Percival
CHIEF DEPUTY SOLICITOR GENERAL