**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CITY OF SOUTH MIAMI, ET AL.,

       *Plaintiffs*,

v.                                           Civil Action File No. 1:19-cv-22927

RON DESANTIS, ET AL.,

       *Defendants*.

                                          /

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................. 1

II.    STANDARD OF REVIEW ................................................................................................... 1

III.   BACKGROUND LEADING UP TO THE PASSAGE OF SB 168 ....................................... 2

IV.    LEGAL FRAMEWORK ...................................................................................................... 3

V.     ARGUMENT ....................................................................................................................... 4

    A.   SB 168 Violates the Equal Protection Clause Because It Was Intended to Discriminate
    Against Floridians Based on Race, Color, or National Origin and Has Impacted These
    Protected Classes Since the Law Went Into Effect .............................................................. 4

       i. SB168 was drafted and proposed with invidious discriminatory intent ......................... 4

          1.   Historical background leading up to the passage of SB 168 ................................. 4

          2.   Specific sequence of events, including departures from normal procedures .......... 5

             *2.1 Events which occurred leading up to the challenged action.* .......................... 6

             *2.2 Departure from ordinary procedural sequence in reaching a decision.* ......... 6

             *2.3 Departure from an ordinary substantive approach.* ...................................... 7

          3.   Legislative History, Contemporary Statements and Actions of Key Legislators ... 8

       ii.   SB 168 Has Had an Intended and Foreseeable Negative Impact on Race, Color, and
       National Origin Minorities .......................................................................................... 94

          1.   *SB 168 Led to the Anticipated Increased Racial Profiling and Targeting of
             Immigrants Based on Race, Color, and National Origin* ..................................... 10

          2.   *SB 168's "Best Efforts" Led to the Inevitable Increase in Intimidation and
             Targeting by Law Enforcement of Based on Race and National Origin.* ............. 11

          3.   SB 168's Prohibition of Sanctuary Policies Has Had a Discriminatory Impact
             Based on Race, Color, and National Origin, Instilling Fear in Immigrants of Color
             While Preventing Beneficial Policy Changes ....................................................... 14

          4.   SB 168 Prevents Local Communities From Seeking Policy Changes That Are
             Best for their Communities ................................................................................... 20

    B.   Plaintiffs are Entitled to Summary Judgment on Their Claim That SB 168's
    "Transport Requirement" is Conflict Preempted .............................................................. 16

       i. Conflict Preemption Legal Standard ........................................................................... 17

       ii.   SB 168's Transport Requirement inappropriately attempts to regulate an area of law
       reserved for Federal immigration enforcement ........................................................... 18

VI.    CONCLUSION .................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Pages(s)**

**Cases**

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
429 U.S. 252, 267-68 (1977) ............................................................. 89, 11, 12, 13, 14

Adams v. Wainwright,
709 F.2d 1443, 1449 (11th Cir. 1983) .................................................................... 18

Arizona v. U.S.,
567 U.S. 387, 410 (2012).................................................................................. 15, 23

Baker v. City of Kissimmee, Fla.,
645 F.Supp.571, 587-588 (M.D. Fla. 1986) ................................................... 8, 14, 18

Columbus Bd. of Ed. v. Penick,
443 U.S. 449, 464–65, 99 (1979)................................................................. 14, 16, 18

Davis v. Schnell,
81 F. Supp. 872 (S.D. Ala.), aff'd per curiam, 336 U.S. 933 (1949) ......................... 9

Dowdell v. City of Apopka. Fla.,
698 F.2d 1181 (1983)............................................................................................ 12

Edwards v. Aguillard,
482 U.S. at 594 (1987)........................................................................................... 13

Greater Birmingham Ministries v. Sec'y for State of Ala.,
966 F.3d 1202 (11th Cir. 2020) ...................................................................... 7, 8, 19

Green v. Cnty Sch. Bd.,
391 U.S. 430, 438. (1968)........................................................................................ 9

Hunter v. Underwood,
471 U.S. 222, 227–28 ......................................................................................... 7, 8

Jean v. Nelson,
711 F.2d 1455, 1486 (11th Cir. 1983) ......................................................... 13, 18, 19

Keyes v. Sch. Dist. No. 1, Denver, Colo.,
413 U.S. 189, 207 (1973)......................................................................................... 9

Macone v. Town of Wakefield,
277 F.3d at 5 (C.A.1. 2002) ................................................................................... 11

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 586 (1986) ................................................................................................ 6

Miccosukee Tribe of Indians of Fla. v. U.S.,
    516 F. 3d 1235, 1243 (11th Cir. 2008) ........................................................................ 6, 8

NAACP v. Lansing Bd. of Ed.,
    559 F.2d 1042, 1046-47 (6th Cir. 1977) ......................................................................... 18

Palmer v. Thompson,
    403 U.S. 217, 224 (1971) ................................................................................................ 8

Pers. Adm'r of Mass. v. Fenney,
    442 U.S. 256, 277 (1979) ............................................................................................ 7, 14

Plyler v. Doe,
    457 U.S. 202, 241 (1982) .............................................................................................. 16

Sailboat Bend Sober Living v. City of Ft. Lauderdale,
    2020 WL 4736211 (S.D. Fla. 2020) ......................................................................... 10, 11

Tenney v. Brandhove,
    341 U.S. 367 (1951) ...................................................................................................... 12

This That & Other Gift & Tobacco, Inc. v. Cobb Cty., Ga.,
    285 F.3d 1319, 1322 (11th Cir. 2002) ........................................................................... 21

U.S. v. Alabama,
    691 F.3d 1296, 1281 (11th Cir. 2012) ........................................................................... 21

U.S. v. Oregon State Med. Soc.,
    343 U.S. 326, 332-333 (1952) ......................................................................................... 9

U.S. v. Texas Ed. Agency,
    564 F.2d 162, 168 (5th Cir.1977), cert. den., 443 U.S. 915 (1979) ............................... 14

Washington v. Seattle Sch. Dist. No. 1,
    458 U.S. 457, 471, 102 (1982) ................................................................................. 12, 14

Williams v. City of Dothan, Ala.,
    745 F.2d 1406 (11th Cir. 1984) ......................................................................... 14, 15, 18

Young Apartments, Inc. v. Town of Jupiter, Fla.,
    529 F.3d 1027, 1045 (11 Cir. 2008) ................................................................................ 7

**Statutes**

8 U.S.C. § 1357(g)(1) ........................................................................................................ 22

Fla. Sta. § 908.102(4)..................................................................................................... 14, 15

Fla. Stat. 908.102 ............................................................................................................. 4

Fla. Stat. 908.103 ............................................................................................................. 4

Fla. Stat. 908.104 (1)...................................................................................................... 4, 14

Fla. Stat. 908.104(4)......................................................................................................... 4

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 4

Pursuant to Fed. R. Civ. P. 56, Plaintiffs hereby move for summary judgment as to liability on Counts II, X, and XI, and seeks declaratory and injunctive relief.

## I. INTRODUCTION

This action challenges Chapter 908 of the Florida Statutes ("SB 168") as unconstitutional in its (1) prohibition of sanctuary policies by state or local government entities; (2) requiring local law enforcement's use of "best efforts to support the enforcement of federal immigration law;" and (3) attempt to regulate the transport of federal immigration detainees. Fla. Stat. 908.104 (1); 908.102; 908.103; 908.104(4). Plaintiffs are non-profit organizations throughout Florida whose members, clients, and communities experienced an immediate and sustained detrimental impact when SB 168 was introduced and then enacted. As intended by its drafters, SB 168 has had a disproportionate adverse impact on immigrants, and those perceived to be immigrants, based on race, color, and national origin. The two key issues raised in this case address are: (1) whether SB 168's "best efforts" mandate and prohibition of sanctuary policies violate the Equal Protection Clause of the Fourteenth Amendment, and (2) whether SB 168's requirement to transport immigration detainees across state lines conflicts with the Supremacy Clause of the U.S. Constitution. As set forth in this motion, there are no material facts in dispute and Plaintiffs are entitled to judgment as a matter of law on Counts II, X, and XI of the Amended Complaint.

## II. STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (Rule 56 authorizes partial summary judgment as to liability). An issue is genuine if a reasonable trier of fact could return judgment for the non-moving party and a fact is material if it "might affect the outcome of the suit under the governing law." *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F. 3d 1235,

1

1243 (11th Cir. 2008). A material fact is not in genuine dispute if there is only "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### III.    BACKGROUND LEADING UP TO THE PASSAGE OF SB 168

SB 168 is the poisoned fruit of years' worth of labor by anti-immigrant groups Floridians for Immigration Enforcement ("FLIMEN") and Federation for American Immigration Reform ("FAIR"). FLIMEN, a corporation previously touting itself as a non-profit (Statement of Undisputed Facts ("SOF") ¶¶ 33-34), has worked tirelessly to pass anti-immigrant legislation, including law focused on "ending sanctuaries" and requiring "cooperation of public officials with Federal Immigration Enforcement" since its founding in 2003. SOF ¶¶ 35-36. When asked to describe FLIMEN's mission, co-founder and Vice President David Caulkett stated the group was formed to "advocate for legal immigration at reduced levels and oppose illegal immigration." SOF ¶ 33. Caulkett served as FAIR's Florida state advisor, describing himself as being on their "board of advisors" for "eight or ten years," adding, "[f]or many years I talked with FAIR, I have been talking to FAIR, and I probably will talk to FAIR." Caulkett Dep. 18:19-22, 20:1-2. Caulkett admits that FLIMEN shares model legislation with Florida legislators as part of its mission. SOF ¶ 35.

In December 2016, FLIMEN shared SB 168-like "anti-sanctuary" legislation with Senator Aaron Bean's office, seeking his sponsorship. SOF ¶ 47. The bill did not pass. SOF ¶¶ 63-64. Undeterred, FLIMEN continued pushing "anti-sanctuary" legislation and ramped up efforts for the 2019 legislative session, sharing more model bills, FAIR analysis, and fact sheets with several legislators, including Senator Joe Gruters, the primary sponsor of SB 168. SOF ¶¶ 49-50, 52-53, 65, 71, 72. FLIMEN secured meetings and communicated directly about SB 168 with Senator Gruters, Representative Cord Byrd, Attorney General Ashley Moody's Director of Governmental

Affairs and Governor Ron DeSantis's Director of Legislative Affairs. SOF ¶¶ 49, 51-53, 60-62. FLIMEN leaders Kenneth Morrow and Caulkett shared other anti-immigrant legislation with Sen. Gruters' office, at one point confidently directing Sen. Gruters' legislative aide, Josh Barnhill, to "get the bills to Bill Drafting ASAP," a crucial step to getting their pre-written legislation officially introduced. SOF ¶ 53. Not only was Sen. Gruters' aide eager to oblige, but his response made evident that his office looked to FLIMEN for continuous advice on SB 168 after it was filed. SOF ¶ 54. Caulkett confirmed Sen. Gruters' office relied on advice from FLIMEN's attorneys for language adjustments to SB 168. SOF ¶ 55. When thoughtful concerns about or proposed amendments to SB 168 were shared with Sen. Gruters, rather than grapple with them directly, his office called on FLIMEN for assistance, requesting FAIR's input. SOF ¶¶ 58, 65. The staff analysis used by SB 168's sponsors relied on biased data from FAIR and the Center for Immigration Studies ("CIS"). SOF ¶¶ 59, 66. In short, Sen. Gruters' primary motive in sponsoring and advocating for SB 168 was not serving the well-being and safety of all Floridians, but rather, paying deference to xenophobic groups, FLIMEN and FAIR.

## IV.    LEGAL FRAMEWORK

A facially-neutral statute is unconstitutional when enacted to further unlawful discrimination if (1) discrimination was a substantial or motivating factor, and (2) the government cannot show it would have been enacted absent such motive. *See Young Apartments, Inc. v. Town of Jupiter*, Fla., 529 F.3d 1027 (11 Cir. 2008); *Hunter v. Underwood*, 471 U.S. 222 (1985). Successful equal protection claims under the Fourteenth Amendment require proof of intent to discriminate and actual discriminatory effect. *Greater Birmingham Ministries v. Sec'y for State of Ala.*, 966 F.3d 1202 (11th Cir. 2020). Unlawful discrimination is not minimized if discrimination is of lesser magnitude. *Pers. Adm'r of Mass. v. Fenney*, 442 U.S. 256, 277 (1979). Relevant

3

evidence includes: (1) impact of the challenged law; (2) historical background; (3) specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) contemporary statements and actions of key legislators; (6) foreseeability of disparate impact; (7) knowledge of the impact, and (8) availability of less discriminatory alternatives. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977); *Greater Birmingham*, 966 F.3d at 1202.

## V.    ARGUMENT

### A. SB 168 Violates the Equal Protection Clause Because It Was Intended to Discriminate Against Floridians Based on Race, Color, or National Origin and Has Impacted These Protected Classes Since the Law Went Into Effect

#### i.    SB168 was drafted and proposed with invidious discriminatory intent.

The legislators responsible for introducing, passing and enacting SB 168 acted with discriminatory intent and purpose. *See Arlington Heights*, 429 U.S. at 265; *Hunter*, 471 U.S. at 225. Plaintiffs need not prove it rested *solely* on discriminatory intent or purpose. *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Essential intent factors include: (1) historical background leading up to the law's passage; (2) specific antecedent events and departures from normal procedures; and (3) contemporary statements by legislators. *Arlington Heights*, 429 U.S. at 267.

#### 1. Historical background leading up to the passage of SB 168.

SB 168's historical context provides relevant evidence of intentional discrimination. *Miccosukee*, 722 F. Supp. 2d at 1304, 716 F.3d 535 (11th Cir. 2013); *Baker v. City of Kissimmee, Fla.*, 645 F.Supp.571, 587-588 (M.D. Fla. 1986). FLIMEN[1] and FAIR,[2]

---

[1] A Florida corporation whose founder and current leader, Caulkett, admits to running the  business "reportillegals.com" for a decade, whereby he charged a fee to formally report suspected undocumented persons to federal immigration enforcement agencies. SOF ¶ 40-41. Caulkett also actively runs the website "illegalaliens.us." SOF ¶ 41 (showing quote from Garrett Hardin, a known eugenicist and FAIR board member, Lichtman Rep. 139).

[2] An organization that the Anti-Defamation League ("ADL") labels "an extreme anti-immigrant group founded by the racist John Tanton." *Anti-Immigrant Front Groups Used in Fight Against Immigration*

organizations rooted in hate whose explicit missions are to decrease immigration and who have a documented history of drafting and advocating for legislation targeting immigrants, are the groups responsible for the introduction of SB 168. SOF ¶¶ 33, 35-36, 43-44, 47; *see also supra* Section III; Lichtman Rep. 133-167. The most logical way to analyze causes of current racial disparities is to trace their history "from root to branch." *See Green v. Cnty Sch. Bd.,* 391 U.S. 430, 438. (1968); *U.S. v. Oregon State Med. Soc.,* 343 U.S. 326, 332-333 (1952); *see also Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala.), *aff'd per curiam*, 336 U.S. 933 (1949); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 207 (1973). Past conduct "explains the present and predicts the shape of things to come." *Id*. Historical background is especially relevant if it reveals a series of official actions taken for invidious purposes. Order, ECF No. 83 at 47-8 (citing *Arlington Heights,* 429 U.S. at 267). Here, the history of discrimination based on race and national origin in the Florida legislature reveals a long record of intentional invidious action through the present. *See* Lichtman Rep. Section IV. at 23-56.

### 2. Specific sequence of events, including departures from normal procedures.

The specific sequence of events leading up to the passage of SB 168 sheds light on its drafters and sponsors' purposes. *See Arlington Heights*, 429 U.S. at 267; Order, ECF No. 83 at 47-8. This *Arlington Heights* factor requires analyzing: (1) the events leading up to the challenged action; (2) whether decisionmakers departed from ordinary procedural sequence; and (3) whether decisionmakers departed from an ordinary substantive approach. *Id*.

---

*Reform*, ADL, May 3, 2013, available at https://www.adl.org/news/article/anti-immigrant-front-groups-used-in-fight-against-immigration-reform; The ADL further describes FAIR as "play[ing] a major role in promoting divisive, dangerous rhetoric and views that demonize immigrants." *Mainstreaming Hate: The Anti-Immigrant Movement in the U.S.*, ADL, 2018 report available at https://www.adl.org/the-anti-immigrant-movement-in-the-us.

*2.1 Events which occurred leading up to the challenged action.*

When reviewing a sequence of events leading up to official action, courts "often consider evidence of community animus preceding- and perhaps explaining (or even propelling)" official action. *See Sailboat Bend Sober Living v. City of Ft. Lauderdale*, 2020 WL 4736211 (S.D. Fla. 2020). Here, Plaintiffs have demonstrated that xenophobic lobbying groups had been plotting for years to introduce and pass legislation like Chapter 908 in Florida to serve their anti-immigrant agenda and were directly managing sponsors' proposal and drafting of the bill up until the date the groups finally secured its passage. *Supra* Section III. *See also* Lichtman Rep. 149-165.

*2.2 Departure from ordinary procedural sequence in reaching a decision.*

Departures from normal legislative procedural sequences may indicate purpose and intent. *Sailboat*, 2020 WL at \*19. The Eleventh Circuit established "procedural abnormalities are only relevant within a larger scope." *Sailboat*, 2020 WL 4736211. This Court has interpreted "larger scope" to mean the "broader process" involved and the full context of actions taken by decisionmakers during that process. *Sailboat*, 2020 WL at \*21.

Here, legislators intentionally introduced model legislation drafted by hateful anti-immigrant groups who recruited them to sponsor and advocate for the bill in furtherance of their own anti-immigrant agenda. *Supra* Section III; *see also* ECF No. 38 ¶¶ 150-57. These legislators deviated from normal procedural sequences by relying almost exclusively on these xenophobic groups (FLIMEN and FAIR) as key advisors from the introduction of SB 168 until it became law, influencing changes to the bill's proposed language and sponsors' refusals to consider at least twenty-four amendments proposed to curtail the bill's discriminatory impact and harmful effects on foreign born and racial minority Floridians. *Supra* Section III; *see also* SOF ¶¶ 54-55, 58-59, 65-67, 72; Lichtman Rep. 174-181. Egregiously, the primary legislative sponsor of SB 168

repeatedly sought advice, including legal counsel and structural analysis, from these infamous anti-immigrant groups. *Id*. The constant aberrations in collaborating with FAIR and FLIMEN show discriminatory intent. *Macone*, 277 F.3d at 5 (holding more than one comment may indicate discriminatory intent.)

*2.3 Departure from an ordinary substantive approach.*

Substantive departures during the legislative process may also be relevant in finding discriminatory intent, particularly if factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached. *See* Order, ECF No. 83 at 48*; see also Sailboat*, 2020 WL 4736211. The Court looks for a showing by plaintiffs that "any substantive criteria typically considered important by the [decisionmakers] strongly favors" a decision contrary to the one that was reached. *Arlington Heights*, 429 U.S. at 267.

During the legislative session Sen. Gruters and other key proponents of SB 168 departed from ordinary substantive approaches when putting forth staff analysis intentionally relying on biased data produced by well-known anti-immigrant hate groups, FAIR and CIS.[3] ECF No. 38 ¶¶ 151, 158-59. Use of this biased data in support of the bill was raised and questioned at a Florida Senate committee meeting. ECF No. 38 ¶ 159("[T]hese facts support and inference that, without the use of biased data created by anti-immigrant hate groups in the legislature's staff analysis, SB 168 may have lacked the requisite support needed to be enacted."); Order, ECF No. 83 ¶ 50; *see also Arlington Heights*, 429 U.S. at 265 n.11.

Discriminatory intent is not synonymous with racially discriminatory motive and does not require proof that racial discrimination is the sole purpose behind each failure to equalize services;

---

[3] The ADL details the ties between anti-immigrant groups FAIR and CIS with deep-rooted racist ideologies including eugenics, *Ties Between Anti-Immigrant Movement and Eugenics*, ADL, February 22, 2013 available at https://www.adl.org/news/article/ties-between-anti-immigrant-movement-and-eugenics.

it is cumulative evidence of action and inaction which objectively manifests discriminatory intent. *Dowdell v. City of Apopka. Fla.*, 698 F.2d 1181, 1185 (1983). The primary sponsor of SB 168 repeatedly met and communicated with xenophobic groups that call for an end to birthright citizenship,[4] in advancing the bill. *Supra* Section III. For example, in advocating for SB 168 during the legislative session, Sen. Gruters went as far as to co-host a press conference event titled "Victims of Illegal Immigration Day" on April 17, 2019 with FLIMEN and other local xenophobic groups. SOF ¶ 70; ECF No. 38 ¶ 161.

### 3. Legislative History, Contemporary Statements and Actions of Key Legislators

Legislative history may be highly relevant, especially where contemporary statements are made by members of the legislature during the 2019 Florida legislative session, minutes of committee meetings, or reports which reveal these invidious purposes. *Arlington Heights*, 429 U.S. at 266-68 (*citing Tenney v. Brandhove*, 341 U.S. 367 (1951)). In applying this factor, "statements made by . . . sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative." *See* Order, ECF No. 83 at 50; *See also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982).

In voting for SB 168, multiple legislators expressed a desire to supplant and correct the perceived failures of the federal immigration system by ensuring that local law enforcement agencies would engage in immigration enforcement activities. ECF No. 38 ¶¶ 165-69. "The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history . . . can control the determination of legislative purpose." *Edwards v. Aguillard,* 482 U.S.

---

[4] FLIMEN's Caulkett said, "there are all sorts of problems when you extend citizenship to the children of illegal aliens," adding "Birthright citizenship is what we need to fix." Lichtman Rep. 149; *see also* "Birthright Citizenship" post by FAIR, August 10, 2010, calling for an end to the "anchor baby" issue, available at https://www.fairus.org/issue/societal-impact/birthright-citizenship.

at 594 (1987). If the legislature's stated purpose is not actually furthered by the enactment, then the stated purpose is disregarded as being insincere. *Id.* at 586–87.

Tellingly, in preparing Representative Larry Metz, Sen. Bean, and Chair David Simmons for a judiciary hearing on SB 168, Sen. Gruters' Senior Legislative Aide put together and shared a binder which included staff analysis citing to data from FAIR and CIS as well as a series of talking points in anticipation of questions. SOF ¶ 59. One of the anticipated questions included "What is the actual problem we are trying to resolve?" Sen. Gruters' office drafted the following answer: "Nationally, there is an abundance of illegal aliens. This is because we have not had proper enforcement by the two administrations before Trump." *Id.* at PLS003875. His office also anticipated the question "Has there been data about crime because of undocumented immigrants?" Sen. Gruters' office recommended the answer to be: "It does not matter because either way they are illegal." *Id*. These facts show clear intention to discriminate based on national origin, belying alleged concerns for public safety expressed by proponents of SB 168. For example, Sheriff Gualtieri, a key SB 168 supporter, revealed similar disdain and intent. Gualtieri Dep. 68: 4-8 (referring to undocumented persons, "You know, what do they not get? Get out means get out but they keep coming back, so that means oh well you just had a driver's license, suspended driver's license so you shouldn't be told to get out again.").

   ii.   **SB 168 Has Had an Intended and Foreseeable Negative Impact on Race, Color, and National Origin Minorities**

Direct or circumstantial evidence of discriminatory impact showing the racial impact of the decision, knowledge and foreseeability of impact, and availability of less discriminatory alternatives can establish whether a law was enacted with discriminatory intent. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983); *Arlington Heights*, 429 U.S. at 266-68. Courts look to various kinds of evidence to examine the impact of official action. *Arlington Heights*, at 242,

9

253; *see also Washington*, 426 U.S. at 229; *Pers. Adm'r of Mass.*, 442 U.S. at 266–68, 277. Whether it "bears more heavily" on one racial group is a central consideration to determine whether discriminatory purpose was a motivating factor. *Id*. When facts reflecting discriminatory impact remain uncontradicted or unqualified, they support the conclusion that a law was enacted with discriminatory purpose. *Shaw v. Reno*, 509 U.S. 645. Here, SB168 impacts and harms black and brown immigrants and their families by (1) causing increased racial profiling and intimidation by law enforcement; (2) mandating action by law enforcement which has a discriminatory impact; and (4) instilling fear, making it impossible to engage in routine daily activities. Legislative proponents of SB 168 knew and expected the law's discriminatory and harmful impacts, yet deliberately ignored availability of less discriminatory alternatives.

1.  ***SB 168 Led to the Anticipated Increased Racial Profiling and Targeting of Immigrants Based on Race, Color, and National Origin***

Proof that discriminatory impact is a reasonably foreseeable consequence of challenged action may demonstrate discriminatory purpose. *See Baker*, 645 F.Supp. 571, 587 (M.D. Fla. 1986) (*citing Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464–65, 99 (1979); *U.S. v. Texas Ed. Agency*, 564 F.2d 162, 168 (5th Cir.1977), cert. den., 443 U.S. 915 (1979).). Thus, actions having foreseeable and anticipated disparate impact are relevant to prove forbidden purpose. *See Baker*, 645 F.Supp. 571 at 587; *Williams v. City of Dothan*, Ala. 745 F.2d 1406 (11th Cir. 1984) (*citing Columbus Bd. of Ed.*, 443 U.S. at 464.). More than one in five Florida residents is an immigrant; 22.5% are Latinx and make up the second-largest foreign-born black population in the U.S.[5]

---

[5] SOF ¶ 22; Ann Garcia and Philip E. Wolgin, The Top 10 *Things You Should Know about Florida's Latinos and Immigrants*, Center for American Progress (Jan. 27, 2012), available at https://www.americanprogress.org/issues/immigration/news/2012/01/27/10928/the-top-10-things-you-should-know-about-floridas-latinos-and-immigrants/; "Florida has the second-largest foreign-born black population" in the United States with 661,000 black immigrants. Monica Anderson, Statistical Portrait of the U.S. Black Immigrant Population, Pew Research Center (April 9, 2015), available at https://www.pewsocialtrends.org/2015/04/09/chapter-1-statistical-portrait-of-the-u-s-black-immigrant-population/.

Despite Florida's large immigrant population, anti-immigrant rhetoric has grown steadily.[6] The state has an "aggressive immigration enforcement regimen." *Id*. As the anti-immigrant climate and immigration enforcement policies in Florida intensify, targeting immigrants has become more common, increasing fear which creates limitations on mobility. *Id*. at p. 196; SOF ¶ 74, 75, 79.

### 2. *SB 168's "Best Efforts" Led to the Inevitable Increase in Intimidation and Targeting by Law Enforcement of Based on Race and National Origin.*

Local law enforcement officers' unchecked mandate to use their "best efforts" to support enforcement of federal immigration law triggered an inevitable increase in police intimidation, racial profiling, and detention of immigrants who previously would not have been detained. Fla. Sta. § 908.104(1); SOF ¶¶ 26, 73, 74. Fla. Sta. § 908.104(1) requires agencies' "best efforts" regardless of whether federal government has directed action. In *Arizona*, the Supreme Court expressly prohibited this type of unilateral conduct. *Arizona v. U.S.*, 567 U.S. 387, 410 (2012). Making matters worse, the "best efforts" clause is not specific to particular law enforcement activity and provides no safeguards against racial profiling. Under Fla. Sta. § 908.102(4) "law enforcement agency" includes "municipal police departments, sheriffs' offices, state police departments, state university and college police departments, county correctional agencies, and the Department of Corrections." *Id*. Immigrants, and those perceived to be immigrants, are under threat of untrained and undeputized officers from these agencies using their "best efforts" to enforce Federal immigration law. Associations between race and crime permeate proactive policing measures like SB 168. SOF ¶ 26. These associations may increase police contact that relies heavily on officer discretion, thereby increasing the potential for race to affect behavior. SOF ¶ 26. It is undisputed that officers use discretion when choosing to stop a driver, issue a

---

[6] Nolan Kline, Mary Vickers, Jeannie Economos, and Chris Furino, Ch. 12 Academic and Activist Collaboration in Turbulent Times, *Anthropology and Activism: New Contexts, New Conversations*, Anna J. Willow and Kelly A. Yotebieng, ed., p.195 (2020).

citation, or make an arrest. SOF ¶¶ 26, 75. Adherence to such widened discretionary practice and policy, "with full knowledge" of predictable effects of such adherence upon racial imbalance suggests an inference of discriminatory intent should be drawn. *Columbus Bd. of Ed.*, 443 U.S. at 465.

Here, the undisputed facts show more black and brown immigrants have reported intimidation and targeting by police during routine daily activities such as shopping and driving to work. SOF ¶¶ 74, 77. More immigrants throughout Florida are concerned about ending up in detention due to driving without a license, and also report being targeted in these scenarios and experiencing heightened law enforcement presence in spaces they visit and live since SB 168 went into effect. SOF ¶¶ 31, 77, 82, 91. Under the INA, a noncitizen's immigration status may be fluid and subject to change over time. *See Plyler v. Doe*, 457 U.S. 202, 241 (1982). Still the "best efforts" mandate requires untrained officers to make determinations, despite the impossibility of determining immigration status based on appearance; there is no visible way to know a person's immigration status when "[y]ou don't have your green card on your forehead, but you have your brown color everywhere." SOF ¶ 76.

The numerous immigrants throughout Florida who have been detained due to being stopped for no known violation and charged only with driving without a license also reflects law enforcement applying discretion in a discriminatory way. SOF ¶¶ 30, 31, 82. This connection between race and Fourth Amendment violations or the fact that "racial profiling depends on police discretion in choosing suspects" is not a new phenomenon; it was anticipated while SB 168 went through the legislative process based on data from counties that had cooperative agreements with ICE.[7]

---

[7] Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway,* 101 Mich. L.Rev. 651 (2002); *see Farag v. United States*, 587 F. Supp. 2d 436, 461 (E.D.N.Y. 2008).

12

Prior to SB 168, 94 percent of ICE arrests in Florida targeted race and national origin minorities – more than 10 points higher than the percentage these groups represent in the state's total undocumented immigrant population. SOF ¶¶ 13, 15, 16, 20. Individuals from South and Central America and the Caribbean represented ICE arrests in Florida at a rate of 12.9 percent higher than the percentage of this demographic while nationality groups from Europe, Canada, and Oceania were arrested at a rate of 55.6 percent less than the group's total population in Florida. SOF ¶¶ 13, 14, 15, 17. Moreover, arrests made pursuant to cooperation agreements with ICE that are now required, primarily impacted immigrants with no criminal record or only a record of minor offenses, with 72 percent stemming from stops by local law enforcement. SOF ¶¶ 18, 28, 29, 30.

Post-SB 168 data from several Florida counties confirms "SB 168 primarily targets minor and non-violent offenders" and accounts for twice as many immigration detainers as all violent crimes combined, with most charges being driving without a valid driver's license SOF ¶¶ 29, 30, 31, 80, 81, 82, 84. Since SB 168 passed, approximately forty percent of individuals in Florida immigration detention originated from interactions with local law enforcement. SOF ¶ 83. Both documented and undocumented immigrants are being stopped, and sometimes police call ICE from the road rather than making an arrest or issuing a citation. SOF ¶¶ 80, 81. This includes U.S. citizen drivers pulled over for unknown reasons only to have their passengers end up in ICE detention. SOF ¶ 80. Consequently, local law enforcement's enthusiastic compliance with SB 168 has resulted in more detained immigrants eligible for release and relief under immigration law because they never should have been detained and were ultimately only charged with nothing more than driving without a license. SOF ¶¶ 75, 84, 86.

Plaintiffs expected SB 168 to impact race and national origin minorities. SOF ¶ 74. Likewise, Florida legislators knew or should have known that SB 168 would cause this

13

discriminatory impact. *Baker*, 645 F.Supp. 571 at 588 (finding knowledge of anticipated discriminatory impact where reasonable investigation by lawmakers' would make the impact obvious). The data and reported incidents reflecting the prejudice against immigrants based on their color and national origin support a finding that SB 168 is unlawful due to its of discriminatory motives. *See, e.g., Adams v. Wainwright*, 709 F.2d 1443, 1449 (11th Cir. 1983); *see also Baker*, 645 F.Supp. 571 at 587; *see also Williams,* 745 F.2d at 1406 (citing *Columbus Bd. of Ed.,* 443 U.S. at 464.).

### 3. SB 168's Prohibition of Sanctuary Policies Has Had a Discriminatory Impact Based on Race, Color, and National Origin, Instilling Fear in Immigrants of Color While Preventing Beneficial Policy Changes

Chapter 908 bars any "sanctuary policy" using an expansive definition that prohibits state and local government entities, including civil agencies from communicating with federal immigration authorities.[8] Likewise, "law enforcement agency" is defined broadly to include a wide array of state, county, and municipal agencies. Fla. Stat. 908.102 (4). This broad scope led to a chilling effect on immigrant communities reporting crime, interacting with police and public officials, and even nonprofit service providers. SOF ¶¶ 86, 90, 91, 92, 93.

A presumption of discriminatory purpose arises when plaintiffs establish that natural, probable, and foreseeable results of public officials' action or inaction resulted in disparate impact. *Jean v. Nelson*, 711 F.2d at 1490 *citing NAACP v. Lansing Bd. of Ed.*, 559 F.2d 1042, 1046-47 (6th Cir. 1977) (presuming discriminatory purpose where official action led to perpetuated segregation). A prima facie case of discriminatory intent or purpose is made when government action under scrutiny does not further governmental policy or ignores less discriminatory options

---

[8] Section 908.102(7) defines a "state entity" as any "any office, board, bureau, commission, department, branch, division, or institution thereof, including institutions within the State University System and the Florida College System." This could include agencies such as the Department of Health, Department of Children and Families, school resource officers employed by law enforcement agencies, and public hospitals.

that would have furthered policy as effectively. *See Greater Birmingham*, 966 F.3d at 1231. With SB 168, legislators ignored less discriminatory options and imposed a law that hinders public safety.

Florida legislators rejected over twenty proposed amendments that would reduce the law's discriminatory effect, at times with FLIMEN's full support and recommendation. SOF ¶¶ 65, 67, 87, 88. In doing so, they deliberately and knowingly rejected less discriminatory alternatives. Because exceptions for essential public services such as schools and healthcare were not adopted, immigrants in Florida are more fearful of going to the hospital, seeking life-sustaining medication, and taking their children to school due to fear of racial profiling by law enforcement, resulting in detention or deportation. SOF ¶¶ 67, 88, 90, 92, 93.

The exception for victims of crime included in Section 908.104(5) created additional barriers for victims rather than fully protect them. SOF ¶¶ 87, 88, 90, 92, 93. This sections has resulted in confusion among immigration attorneys and social service providers as to which victims it protects, and fewer immigrant victims of domestic violence, trafficking, and other crimes seeking help from law enforcement out of fear that doing so would lead to immigrant detention and deportation for themselves or a close family member. SOF ¶¶ 89-93.

4. **SB 168 Prevents Local Communities From Seeking Policy Changes That Are Best for their Communities**

Although Florida did not have any official sanctuary jurisdictions at the time SB 168 was introduced, counties with policies that placed safeguards on honoring detainer requests have historically been safer than jurisdictions without such policies with an 8.6 percent lower than average county crime rate. SOF ¶¶ 22-25; *see also, Jean*, 711 F.2d 1455, 1490 (11th Cir. 1983)(discussing historical patterns under *Arlington Heights*).

15

SB 168's prohibition of sanctuary policies "stripped local governments of their discretion to change detainer policies" and do what is best for their own black and brown immigrant communities. SOF ¶ 95. This includes advocating for policies that require law enforcement to focus on serving the local communities instead of using limited resources to deputize officers as federal immigration enforcement officers. SOF ¶ 96. Partnerships between immigrant communities and law enforcement built over decades that culminated in actions, such as the Orange County Trust Act to cooperatively and effectively report incidents, resolve crimes, and promote safety, were destroyed with the onset of SB 168. SOF ¶¶ 90, 91, 94, 96. Local law enforcement departments in many counties no longer feel comfortable engaging in such collaboration and unable to speak out against SB 168 despite sharing concerns about its impact. SOF ¶ 94. This leads to non-white immigrant communities suffering the negative consequences of a broken relationship with law enforcement and the higher rates of detention and deportation on families, victims, and entire communities. *See* SOF ¶¶ 13-18, 91-94, 96. Under these facts, SB 168 has had a discriminatory impact that that was foreseeable by its sponsors and therefore supports the inference that SB 168 was enacted with discriminatory intent.

**B. Plaintiffs are Entitled to Summary Judgment on Their Claim That SB 168's "Transport Requirement" is Conflict Preempted.**

In granting, in part, Plaintiffs' Motion for Preliminary Injunction and denying, in part, Defendants' Motion to Dismiss, this Court was correct in finding that § 908.104(4) is conflict preempted. ECF No. 64 at 44-45 ("Therefore, the Court concludes that the Transport Requirement is conflict preempted because it frustrates the purpose of 1357(g)(1)"); ECF No. 83 at 28 ("Therefore, the Court concludes Plaintiffs have sufficiently alleged facts to state a claim that the Transport Requirement is conflict preempted because it frustrates the purpose of § 1357(g)(1)"). Since these two orders were issued, the legal landscape has remained the

16

same.  Plaintiffs are aware of no additional case law or factual disputes that would change this result.

### i.     Conflict Preemption Legal Standard

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. 387 at 398. Nonetheless, the Supremacy Clause mandates federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Thus, "[w]here the two conflict, federal law trumps state law; that was always clear. What constitutes a conflict is often less clear." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008).

Under the preemption doctrine, Congress has the power to preempt state law, and this preemption typically falls into one of "three categories: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Id.*; *Arizona*, 567 U.S. at 399-400. Conflict preemption can arise in two ways:

> First, conflict preemption can occur "when it is physically impossible to comply with both the federal and the state laws." Conflict preemption may also arise "when the state law stands as an obstacle to the objective of the federal law." We use our judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects."

*U.S. v. Alabama*, 691 F.3d 1296, 1281 (11th Cir. 2012) (citations omitted); *See also Browning*, 522 F.3d 1153 at 1167. "Congressional intent is the 'ultimate touchstone' in a preemption case, and this intent 'governs [a court's] determination of whether federal law preempts State law.'" *This That & Other Gift & Tobacco, Inc. v. Cobb Cty., Ga.*, 285 F.3d 1319, 1322 (11th Cir. 2002) (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

**ii.      SB 168's Transport Requirement inappropriately attempts to regulate an area of law reserved for Federal immigration enforcement.**

8 U.S.C. § 1357(g)(1) allows for delegation of federal immigration agents' function to transport "aliens across state lines to detention centers" only through 287(g) Agreements. Yet SB 168's Transport Requirement attempts to grant this very same power to undeputized officers by permitting them to transport a person subject to an immigration detainer to federal custody, including outside of the officers' own jurisdiction. Fla. Stat. § 908.104(4). SOF ¶¶ 7-11. The Requirement is conflict preempted because it frustrates Congress's objectives in creating 287(g) Agreements. § 1357(g)(1) expressly lists transport across state lines as a power that can only be delegated to local officers pursuant to a 287(g). *See* 8 U.S.C. § 1357(g)(1) ("Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (*including the transportation of such aliens across State lines to detention centers*), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law." (emphasis added)). SB 168's attempt to grant transport power to local officers frustrates congressional objectives for immigration transport because it renders the express language in § 1357(g)(1) on transport of aliens pursuant to a 287(g) meaningless. *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015) ("It is 'axiomatic that all parts of a statute must be read together in order to achieve a consistent whole.' 'Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'"

(*quoting Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 455 (Fla. 1992))).

Moreover, the Transport Requirement's language explicitly grants local law enforcement discretionary power to transport aliens into federal custody "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. This is precisely the type of unilateral conduct that *Arizona* expressly prohibited. *Id.* Further, this mandate requiring law enforcement officers to obtain the prior judicial authorization does not rectify the issue of unilateral conduct in the Transport Requirement. Instead, the judicial authorization requirement seeks to vest additional powers in the state judiciary that could otherwise only be performed by federal immigration officials — namely, allowing state judges to unilaterally authorize transport across state lines into federal custody. *See* ECF No. 64 at 44. This unilateral decision by local officers and state judges, in effect, allows Florida "to achieve its own immigration policy," which is not permitted. *Arizona*, 567 U.S. 408. Because SB 168 Section 908.104.(4), codified at Florida Statues Ch. 908.104(4), is conflict preempted, Plaintiffs are entitled to summary judgment on Count II of their Amended Complaint.

## VI.   CONCLUSION

For the foregoing reasons, summary judgment as to declaratory and permanent injunctive relief should be granted to Plaintiffs.

Dated: August 28, 2020

Respectfully submitted,

By: /s/  Anne Janet Hernandez Anderson

Anne Janet Hernandez Anderson
Florida Bar No. 18092
Email: aj.hernandez@splcenter.org
Paul R. Chavez*

Alana Greer
Florida Bar No. 92423
Email: alana@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT, INC.

19

Florida Bar No. 1021395
E-mail: paul.chavez@splcenter.org
Mich Gonzalez*
E-mail: mich.gonzalez@splcenter.org
Victoria Mesa-Estrada
Florida Bar No. 076569
Email: victoria.mesa@splcenter.org
SOUTHERN POVERY LAW CENTER
4770 Biscayne Blvd, Suite 760
Miami, FL 33137
Tel.: (786) 347-2056

Rebecca Sharpless
Florida Bar No. 0131024
E-mail: rsharpless@law.miami.edu
IMMIGRATION CLINIC
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive, E273
Coral Gables, FL 33146
Tel.: (305) 284-6092
Fax: (305) 284-6093

3000 Biscayne Blvd. Suite 106
Miami, Florida 33145
Tel.: (305) 907-7697 ext. 1

\* Admitted *pro hac vice*

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs' Motion For Summary Judgment and Memorandum of Law in Support was served via the U.S. District Court for the Southern District of Florida's electronic filing system on August 28, 2020, on counsel for Defendants listed in the attached service list.

Dated: August 28, 2020

/s/ _Anne Janet Hernandez Anderson_____

## SERVICE LIST

James H. Percival
Email: James.Percival@myfloridalegal.com
Colleen M. Ernst
Email: Colleen.ernst@eog.myflorida.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE GENERAL COUNSEL
The Capitol, Suite 203
Tallahassee, Florida 32399-1050
Telephone: (850) 717-9310
*Counsel for Defendant Governor Ron DeSantis*

Elizabeth Teegen
Email: Elizabeth.Teegen@myfloridalegal.com; complexlitigation.eservice@myfloridalegal.com
James H. Percival
Email: James.Percival@myfloridalegal.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Fax: (850) 410-2672
*Counsel for Defendant Attorney General Ashley Moody*

22