**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

CITY OF SOUTH MIAMI, ET AL.,

     *Plaintiffs*,

v.                                      Civil Action File No. 1:19-cv-22927

RON DESANTIS, ET AL.,

     *Defendants*.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE THE TESTIMONY OF DR. ALLAN LICHTMAN**

## I.     INTRODUCTION

Defendants have moved to exclude the testimony of Plaintiffs' expert, Dr. Allan Lichtman, under the authority of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny. At bottom, Defendants simply disagree with Dr. Lichtman's conclusions, which is not the proper focus of a *Daubert* inquiry, *see* 509 U.S. at 595, and their motion should consequently be denied.

Dr. Lichtman is one of the nation's leading authorities on quantitative methodology and social science and is eminently qualified to conduct the analyses provided in his expert report. He co-authored a seminal textbook, now read by thousands of history students, on the appropriate use of historical methodology, and has incorporated historical methodology and quantitative analysis into many of his substantive books and articles. He published twice in what is arguably the world's leading scientific journal, *The Proceedings of the National Academy of Sciences*. He has written a monograph on quantitative methodology (Ecological Inference) that is part of the *Sage Series in Quantitative Applications in the Social Sciences* and published in *Political Methodology, Social Science History, Journal of Interdisciplinary History, Evaluation Review, and Encyclopedia of Social Measurement*, among numerous other publications. Dr. Lichtman was listed as #85 among

the 100 most influential geopolitical experts in the world. *See* Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 251-275 (Lichtman Report). There can be no serious dispute of Dr. Lichtman's qualifications.

There is also no question that his opinions are reliable and relevant to the disputed issues in this case and probative on those issues. Using the record available, he provided analyses and opinions regarding the discriminatory intent and impact of SB 168; a task similar to the one he has performed as an expert in nearly a hundred cases. Dr. Lichtman's report is based on his original research and qualitative and quantitative analysis. A court could not be expected to uncover and analyze as a historian and statistician all the documentary evidence found in Dr. Lichtman's expert report. The report not only includes reference to newspaper articles, but also scholarly studies, government reports, emails, transcripts, photographs, and videos. A court could not reasonably be expected to research the extensive quantitative evidence in the expert report and analyze it as a social scientist who is an expert in quantitative methodology, as Dr. Lichtman has done. Defendants' had the opportunity to present their own expert report to challenge Dr. Lichtman's work but choose not to do so.

Simply stated, Defendants have not come close to the kind of showing that would be required to render Dr. Lichtman's analysis inadmissible. To the contrary, the fact that they filed the motion only illuminates the quandary they face and the strategy they have adopted in seeking to defend the constitutionality of such blatantly discriminatory legislation. Defendants cannot produce any of their own expert analysis because to do so would only serve to buttress Plaintiffs' case. Accordingly, they attempt to prevent expert analysis by only offering criticisms of Dr. Lichtman's analysis that, at most, ought to be the subject of their cross-examination of him.

## II.      LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). The *Daubert* inquiry "is not intended to supplant" cross-examination and presentation of contrary evidence. *U.S. v. Ala. Power Co.*, 730 F.3d 1278, 1282-85 (11th Cir. 2013); *Costa v. Wyeth, Inc.*, No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *5 (M.D. Fla. Mar. 29, 2012). According to Rule 702's Advisory Committee Notes on the 2000 Amendments, since *Daubert* was decided, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702.

To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-563 (11th Cir. 1998) (*citing Daubert,* 509 U.S. at 589). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Although *Daubert* also applies in bench trials, the concern that the fact-finder will be misled there carries little weight. *See United States v. Brown*, 415 F. 3d 1257, 1269 (11th Cir.

3

2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself"); *see also R.L. v. Miami-Dade County School Bd*, 2010 WL 4982718, at *3 (S.D. Fla. 2010); *Landstar Global Logistics, Inc. v. Haskins*, 2011 WL 3584320, at *1 (M.D. Fla 2011); *Johnson & Johnson Vision Care v. CIBA Vision Corp,* 616 F.Supp.2d 1250, 1256 (M.D. Fla. 2009) ("Indeed, in the context of a non-jury trial, the district court may allow challenged expert testimony to be presented and then later determine issues of admissibility and reliability."). At the outset, it is "the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony." *Axiom Worldwide, Inc., v. Excite Medical Corp*, 591 Fed.Appx. 767, 777 (11th Cir. 2014) (*citing Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993). Accordingly, in a bench trial, such as here, probing the minutia of an expert's methodologies under *Daubert* to avoid misleading the court may not be an efficient use of judicial or party resources, because the court can simply consider the testimony and opinion and give it the weight it deserves.

### III.   ARGUMENT

**A. Dr. Lichtman is a Leading Historian and Social Science Expert; He is Well Qualified to Opine on the Discriminatory Intent and Impact of SB 168**

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (*citing Furmanite Am., Inc. v. T.D. Williamson*, 506 F.Supp.2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. (*citing Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.") *See Clena Investments, Inc. v. XL Specialty Ins*. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (*citing Kilpatrick v. Breg, Inc.*, 2009 WL 2058384 (S.D. Fla.

June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at \*3 (*citing Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

### 1. Dr. Lichtman Has Had a Long and Distinguished Academic Career and Extensive Experience as an Expert in Federal Court

Dr. Lichtman received his PhD from Harvard University in 1973 with a specialty in modern American history and quantitative methods. He became an Assistant Professor of History at American University in 1973, a Full Professor in 1980, and a Distinguished Professor in 2011. Additionally, Dr. Lichtman is a Faculty Affiliate in American University's Department of Justice, Law & Criminology.[1] He was the recipient of the Scholar/Teacher of the year award for 1992-93. He has published eleven books and several hundred popular and scholarly articles. He has lectured in the US and internationally and provided commentary for major US and foreign networks and leading newspapers and magazines across the world. He has been an expert witness in some 100 civil rights and voting rights cases, many of which were cases challenging local and state legislation on constitutional grounds. In none of those cases has there ever been a successful *Daubert* motion to exclude Dr. Lichtman as an expert. Dr. Lichtman's full range of expertise is verified by the many books and articles listed on his *Curriculum Vitae*. *See* Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 251-275 (Lichtman Rep.)

### 2. In Asking the Court to Bar Dr. Lichtman's Testimony, Defendants are Asking the Court to Ignore Decades of Overwhelming Judicial Recognition Accorded to His Expertise.

---

[1] See https://www.american.edu/cas/faculty/lichtman.cfm

Numerous courts, including the Northern and Middle Districts of Florida, the Eleventh Circuit, and the Fifth Circuit, have recognized Dr. Lichtman as a leading expert in the country on issues of race and race-based impacts, legislative intent, history, statistical analysis, and analysis of demographic information. *See U.S. v. Dallas County Comm'n*, 850 F.2d 1433 (11th Cir. 1988); *see also Houston v. Lafayette Cnty*, 56 F.3d 606, 612 (5th Cir. 1995); *Johnson v. Mortham*, 926 F. Supp. 1460, 1474 (N.D. Fla. 1996); *Bradford Cnty NAACP v. City of Starke*, 712 F.Supp. 1523 (M.D. Fla. 1989); *LULAC v. North East Indep. Sch. Dist.*, 903 F.Supp. 1071, 1081 (W.D. Tex. 1995) (recognizing and relying on Dr. Lichtman's expertise regarding racial polarization.).[2]

Among his many accolades, Dr. Lichtman has been described by adjudicators as an expert in data analysis and a leading expert in the country in the field of quantitative analysis of political systems. *See supra* note 2; *see also Texas v. U.S.*, 802 F. Supp. 481, 486 (D.D.C. 1992) (recognizing Dr. Lichtman as an "expert[] in data analysis"); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1056 n.54 (D. Md. 1994) (describing Dr. Lichtman as a "renowned authority" and praising a textbook he authored devoted to a method of statistical analysis); *Garza v. County of Los Angeles*, 765 F. Supp. 1298, 1331 (C.D. Cal. 1990) (recognizing Dr. Lichtman "as an expert witness in bloc voting, political systems, and quantitative and

---

[2]Additional cases in which Dr. Lichtman has been accepted as a qualified expert include: *Barnett v. City of Chicago*, 969 F. Supp. 1359, 1423 (N.D. Ill. 1997), *aff'd in part, vacated in part*, 141 F.3d 699 (7th Cir. 1998); *Vecinos de Barrio Uno v. City of Holyoke*, 926 F. Supp. 23, 27 (D. Mass. 1996); *Vecinos de Barrio Uno v. City of Holyoke*, 880 F.Supp. 911, 912 (D. Mass. 1995), *vacated on other grounds*, 72 F.3d 973 (1st Cir. 1995); *Jenkins v. Red Clay Consol Sch. Dist. Bd. of Educ.*, No. 89-230, 1996 WL 172327 (D. Del. Apr. 10, 1996), *aff'd*, 116 F.3d 685 (3d Cir. 1997); *Smith v. Board of Sup'rs of Brunswick County*, 801 F. Supp. 1513, 1522 n.11 (E.D. Va. 1992), *rev'd on other grounds*, 984 F.2d 1393 (4th Cir. 1993); *Perez v. Abbott*, SA-11-CV-360 (March 2017); *Veasey v. Perry*, CIVIL ACTION NO. 13-CV-00193 (Oct. 2014); *Gonzalez v. Madigan*, 403 F.Supp.3d 670 (N.D. Ill. 2019); *Pico Neighborhood Assoc. v. Santa Monica*, 51 Cal. App. 5th 1002 (Cal. Super. Ct. 2018); *Benisek v. Lamone*, 266 F.Supp.3d 799 (Dist. Ct. Md. 2017); and *Democratic Nat'l Comm. v. Reagan*, 329 F.Supp.824 (Dist. Ct. 2018).

socioeconomic analysis, among other matters…"). Dr. Lichtman has also been relied upon for his expertise in history and in drawing inferences from demographic information. *See supra* note 2; *see also Jordan v. City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984), *vacated on other grounds*, 711 F.2d 667 (5th Cir. 1983) (accepting and recognizing Dr. Lichtman as a qualified expert in the history of voting and the methodology for inferring voter behavior from election returns and demographic information). Furthermore, Dr. Lichtman has been recognized and relied upon as an expert regarding the effect of politics and race relations on the dilution of minority voting strength. *Houston*, 56 F.3d at 612 (Fifth Circuit finding that the lower court erred as it should have considered Dr. Lichtman's analysis of racial and political issues probative).

Dr. Lichtman's testimony has been accepted and relied upon by several courts on account of his specialized knowledge of Florida's historical and current demographics, politics, and race relations, and the impact of these issues on minorities. *Mortham*, 926 F. Supp. at 1474. For example, in *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015), the Florida Supreme Court accepted testimony from Dr. Lichtman as an expert witness via his report on the impact of proposed voting re-districting plans on Hispanic individuals in Florida. The Court stated he "systematically analyzed the subject matter with accepted scientific methodologies," and relied favorably upon his analysis in formulating its holding. *Id*. at 285. The Northern District of Florida accepted Dr. Lichtman as an expert witness regarding the analysis of racial polarization in state-wide elections. *Mortham*, 926 F. Supp. at 1474. The Middle District of Florida relied upon Dr. Lichtman's compilation, analysis, and presentation of statistical evidence, as well as his testimony at trial, in determining that "racial bias" had been corroborated and satisfied as an element by the plaintiffs utilizing him as an expert, and that Dr. Lichtman's expert testimony had shown "legally

significant" racial polarization. *Bradford Cnty NAACP v. City of Starke*, 712 F.Supp. 1523, 1541 (M.D. Fla. 1989).

Furthermore, Dr. Lichtman's analysis has been accepted and recognized by several federal courts in cases where alleged discriminatory intent by legislative bodies was a primary issue. Similar to his expert analysis in the instant case, Dr. Lichtman's expert analysis in this area has included determining whether a legislative body acted with racial animus, and/or discriminatory purpose or intent. *See Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 586 (N.D. Ill. 2011) (finding Dr. Lichtman's testimony "measuring citizenship at the state level" reliable, accepting him as an expert, and considering his testimony in determining whether lawmakers passed legislation with discriminatory intent against Latinos); *Texas v. U.S.*, 887 F. Supp. 2d 133, 228 (2012) (discriminatory effect or intent challenge to Texas post-2010 redistricting); *N.C. State Conference of the NAACP v. McCrory*, 182 F.Supp.3d 320, 494 (M.D.N.C. 2016) (accepting Dr. Lichtman as an expert witness, and finding that the state intentionally discriminated against minorities); *Perez v. Abbott*, 253 F.Supp.3d 864, 880 (W.D. Tex., 2017) (relying on Dr. Lichtman's testimony in finding Texas' state legislative and congressional redistricting plan intentionally diluted Latino and African-American votes); *Veasey v. Abbott*, 830 F.3d 216, 293, 332 (5th Cir. 2016); *Veasey v. Perry*, 71 F.Supp.3d 627, 658 (S.D. Texas, 2014) (crediting Dr. Lichtman's testimony including testimony that the challenged bill's sponsors justifications for the bill were disingenuous, and accepting Dr. Lichtman's testimony demonstrating "intentional discrimination against minorities to achieve a partisan political advantage"); *N.C. Conference of the NAACP v. Cooper*, 430 F.Supp.3d 15, 29, 39 (M.D.N.C. 2019) (relying on Dr. Lichtman's testimony in finding that racial discrimination was a motivating factor behind legislation and issuing a preliminary injunction); *Covington v. N.C.*, 316 F.R.D. 117,

170 (Dist. Ct. N.C. 2016) (accepting Dr. Lichtman as an expert and determining new maps should be drawn in accordance with the Constitution); *Democratic Nat'l Comm. v. Hobbs*, No. 18-15845 (9th Cir. 2020) (*en banc* 9th Circuit Opinion on Arizona ballot collection and provisional ballot rules); *Lee v. Va. State Bd. Elections*, 188 F. Supp. 3d 577, 595-596 (E.D. Va. 2016) (accepting Dr. Lichtman as an expert in determining whether a statute violated the Equal Protection Clause on the basis of race); *Terrebonne Parish NAACP v. Jindal*, 274 F. Supp. 3d 395, 433 (M.D. La. 2017) (accepting Dr. Lichtman as an expert and finding racially discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments); *One Wisconsin Inst., Inc. v. Nichol*, 186 F.Supp.3d 958, 977 (Dist. Ct. 2016) (relying on Dr. Lichtman's expertise in finding discriminatory motive); *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 427, 439, 445 (2006) (citing to Dr. Lichtman's expert analysis).

Moreover, Dr. Lichtman has been accepted and recognized as an expert on race and statistical evidence by the United States government. *See Abrams v. Johnson*, 521 U.S. 74, 1936 (1997) (acknowledging that Dr. Lichtman served as an expert on behalf of the U.S. Department of Justice in a case regarding racial polarization and statistical evidence); *see also U.S. v. Dallas Cnty Comm'n, Dallas Cnty*, Ala., 850 F.2d 1433 (11th Cir. 1988) (considering Dr. Lichtman's expert testimony on race and politics as an expert witness on behalf of the U.S. Department of Justice, Civil Rights Division and Voting Section.).

All told, Dr. Lichtman has been accepted as a qualified expert on issues such as statistical analysis, analysis of political systems, discriminatory legislative intent and impact, racial animus, data analysis, race relations, *etc.*, in courts across the country.

### 3.   Plaintiffs Are Challenging SB 168 on Equal Protection Grounds.

9

Defendants misconstrue this case as dealing with criminology, criminal justice, and law enforcement issues. *See* Defs.' Daubert Mot., ECF No. 109 at 2, 14. This is not a criminology case. At issue, is Plaintiffs' constitutional challenge to a civil statute under the Equal Protection Clause of the 14th Amendment. *See* Pls.' Am. Compl., ECF No. 38. Having his historical and statistical analysis accepted by courts across the country, it cannot be seriously disputed that Dr. Lichtman is well-qualified to opine on the discriminatory intent and impact of SB 168. During his deposition, Dr. Lichtman explained that he is indeed an expert on equal protection. When asked if he considers himself an expert on equal protection, Dr. Lichtman replied: "Absolutely. I've written about it. I wrote a whole book on voting rights in America from the founding to the present, which, of course, directly implicates equal protection. I've written numerous reports as well in my context as a witness that deal with that issue." Pls.' Statement of Facts Ex. 26, ECF No. 116-2, 60:4-20 (Lichtman Dep.)

### 4. Even If Construed as a Criminology/Criminal Justice Case, Dr. Lichtman is Still Well Qualified to Opine on the Intent and Impact of SB 168.

Defendants' misconstrue Dr. Lichtman's expertise as limited to political history and assert that he "has no expertise in immigration, criminology, criminal justice, or law enforcement." *See* Defs.' Daubert Mot., ECF No. 109, at 14. Although this case is more aptly described as an equal protection case than a criminology case, this assertion is simply untrue.

Dr. Lichtman's expertise ranges far beyond just political history, as can be seen through his work as a Faculty Affiliate in American University's Department of Justice, Law & Criminology. As Dr. Lichtman testified during his deposition: "I'm an expert in voting rights. I'm an expert in historical methodology. I'm an expert in quantitative methods of methodology. I'm an expert in civil rights and social science." Pls.' Statement of Facts Ex. 26, ECF No. 116-2, 6:14-17.

Dr. Lichtman's testimony regarding law enforcement and criminal justice was that he was "not specifically" an expert in these areas, but that he has "certainly studied law enforcement and criminal justice in the course of [his] work." Pls.' Statement of Facts Ex. 26, ECF No. 116-2, 6:22-25, 7:1-5. Dr. Lichtman has extensively analyzed law enforcement issues, using both qualitative and quantitative methods, including, for example, in his 2019 book, *Repeal the Second Amendment: The Case for a Safer America*. Similarly, Dr. Lichtman's books *FDR and the Jews*, and *White Protestant Nation: The Rise of the American Conservative Movement and The Case for Impeachment* both deal extensively with immigration issues. Even without this extensive experience "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Furmanite,* 506 F.Supp.2d at 1129; *see also Waite v. All Acquisition Corp.,* 194 F.Supp.3d 1298, 1304 (S.D. Fla. 2016) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility.") (*quoting Clena Investments, Inc. v. XL Specialty Ins. Co.,* 280 F.R.D. 653, 661 (S.D. Fla. 2012)).

Therefore, Dr. Lichtman is more than qualified to offer his analysis and opinion on the intent and impact of SB 168, whether the instant matter is characterized as an equal protection case or a criminology/criminal justice case.

**B. Dr. Lichtman's Testimony is Both Relevant and Reliable.**

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62 (internal formatting, quotation, and citation omitted). To make this determination, the court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory

has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (*citing Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262 (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (*citing Kumho Tire Co*, 526 U.S. at 152). The Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (*citing Kumho*, 526 U.S. at 152).

### 1. Dr. Lichtman's Body of Work, and Expert Opinion Here, Can Both be Tested and are Subject to Extensive Peer Review.

"Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony. For nonscientific expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'") *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,* 555 F.3d 1331, 1338 (11th Cir. 2009) (quoting *Kumho,* 526 U.S. at 151) (internal citation omitted); *see also Frazier,* 387 F.3d at 1262.

That said, Dr. Lichtman's qualitative historical analyses, based on textual sources, are fully testable. Another authority could comb through the documentary data, as found in the expert report, to test his findings. Similarly, Dr. Lichtman's quantitative work is rigorously replicable in that another scholar using the same data (all of which is publicly available) and methods could

double-check his results. Defendants chose not to retain an expert to conduct such tests. The fully testable quantitative part of Dr. Lichtman's report includes some 31 Tables and Charts, never mentioned in Defendants' Motion. While the quantitative error rate is not relevant to documentary analysis, Dr. Lichtman nevertheless provides assessments of error rates through tests of statistical significance in his expert report. Pls.' Statement of Facts Ex. 27, ECF No. 116-3.

Dr. Lichtman's historical and quantitative work over the course of some 50 years has, in fact, been subject to extensive peer review, including through publication in various journals and through the review process for book publication with some of the world's leading publishers.

### 2. The Techniques and Methodologies Used by Dr. Lichtman are Widely Accepted in the Scholarly Community.

Dr. Lichtman's techniques are standard in the scholarly community, where Dr. Lichtman is a leader in the application of quantitative methodologies to substantive studies. Dr. Lichtman's historical work has been accepted at the highest levels of the scholarly community, as demonstrated by his array of publications. *See* Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 251-275. The social science and historical principles and methodologies applied by Dr. Lichtman are standard in historical and social scientific analysis - a field in which he is no doubt an expert. These very same techniques and methodologies have been applied by Dr. Lichtman as an expert witness in dozens of cases and accepted by courts across the country. *See supra* section III.A.2.

A respected academic and expert in historical methodology, Dr. Lichtman has co-authored a seminal textbook on the appropriate use of historical methodology, *Historians and the Living Past,*[3] and has since deployed these same methodologies in many books and articles. In his report, Dr. Lichtman applies the *Arlington Heights* factors, which, contrary to Defendants' assertion, are

---

[3] Allan J. Lichtman & Valerie French, Historians and the Living Past (1978).

not just a legal framework, but a substantive guide to the factors that an expert should analyze in assessing discriminatory intent and impact.

Defendants devote most of their motion to claiming that Dr. Lichtman improperly applied the *Arlington Heights* guidelines, a matter about which he has testified numerous times.[4] Nowhere, however, do Defendants demonstrate, or even contend, that Dr. Lichtman has applied an improper or flawed methodology. Defendants fail to demonstrate that Dr. Lichtman has misapplied statistical evidence or committed any other methodological error.

### 3.  Dr. Lichtman is Not Offering a Legal Conclusion.

Nowhere in Dr. Lichtman's report or deposition does he indicate that he is attempting to instruct the Court about the proper application of the *Arlington Heights* guidelines. Dr. Lichtman's report offers evidence and analysis that includes considerable documentary research and statistical analysis. Dr. Lichtman is simply providing expert analysis based on quantitative and documentary evidence helpfully organized according to each element of the non-exhaustive *Arlington Heights* factors. This is similar to the dozens of cases in which Dr. Lichtman has provided expert analyses of the three *Gingles* requirements and Senate Factors in a Section 2 vote dilution analysis. *See Thornburg v. Gingles*, 478 U.S. 30 (1986).

As Dr. Lichtman explains in his report: "My analyses and developed opinions in this matter are based on historical, political, and statistical information gathered and reviewed in my capacity as an expert in political history, social science, and historical and statistical methodology. My analyses and opinions are provided from that perspective and are not intended to provide a legal conclusion but, rather, to provide the Court with facts and context for the ultimate legal

---

[4] Defendants also claim Dr. Lichtman selectively used evidence in his analysis of the history of discrimination and discriminatory effect, but they cite only a small fraction of the analysis that is presented in his report.

determination on intent that it must make." Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 5 (Lichtman Rep.). Dr. Lichtman goes on to explain:

> The report draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports, government documents; and scientific surveys. In assessing intentional discrimination, historians follow methods that track the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). [The expert] report employs those guidelines, which are standard in my field of study.

Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 5,6, (Lichtman Rep.).

Simply put, the methodology Dr. Lichtman has employed, and the opinions he has reached, are the product of standard principles and methods used in his field of history, which are consistent with the *Arlington Heights* guidelines. *See* Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 6 (Lichtman Rep.).

### C.  Dr. Lichtman has Provided a Helpful Analysis of SB 168.

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 Fed.Appx. 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (*quoting Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (*citing Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (*citing General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

### 1. Dr. Lichtman's Discriminatory Intent and Impact Analysis Should Prove Helpful to the Court.

Defendants' argument that Dr. Lichtman should not be able to offer an opinion on whether SB 168 was enacted with discriminatory intent should be rejected. *See* Defs.' Daubert Mot., ECF No. 109 at 8 ("Because Dr. Lichtman opines on intent—the ultimate issue in this case—his testimony will not help the trier of fact and is inadmissible."). While there is no question that the ultimate determination on discriminatory intent is a decision for the Court, Federal Rule of Evidence 704(a) makes clear that "[a]n opinion is not objectionable just because it embraces an ultimate issue." *See also* Adv. Comm. Notes for Fed. R. Evid. 704 Proposed Rules ("The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, **the so-called "ultimate issue" rule is specifically abolished** by the instant rule."). *Id*. (emphasis added).[5]

Here, Dr. Lichtman thoroughly, and in an orderly fashion, assembles the requisite, lengthy, and complex information (historical background, present pattern of impacts, sequence of events, usual procedures and deviations therefrom, and contemporary statements of legislators) to allow the factfinder to more easily locate the available pieces of evidence - a permissible function of an expert. *See* Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 2-4 (Lichtman Rep.); *see also KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 691 (2000). Dr. Lichtman's opinion as to discriminatory intent and impact assists the Court by offering a perspective, informed by an exhaustive review of

---

[5] "The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.' 7 Wigmore § 1920, p. 17.". *See* Adv. Comm. Notes for Fed. R. Evid. 704, Proposed Rules.

the facts, as to how historians will likely view the purpose behind SB 168. This perspective is particularly valuable from Dr. Lichtman, a noted historian who has served as an expert in many cases in which he has given an opinion about the discriminatory intent of a legislative body. Pls.' Statement of Facts Ex. 26, ECF No. 116-2, 9:20-25, 10:1-25, 11:1-18 (Lichtman Dep.). In addition, Plaintiffs note that Defendants do not appear to argue—and have not developed any argument— that the Court cannot consider Dr. Lichtman's opinions regarding intent aside from his ultimate conclusion that SB 168 was enacted with discriminatory intent and has had a discriminatory impact. Defendants have thus waived any such argument.

> **2. For Good Reason, Courts Have Long Accepted the Expertise of Historians in Analyzing Legislative Racial Animus and Discriminatory Intent and Impact.**

In support of their argument that intent is not a proper subject for expert testimony, Defendants cite to a string of mostly product liability cases, none of which deal with discriminatory intent, let alone legislative intent and impact. *See* Defs.' Daubert Mot., ECF No. 109 at 8. In doing so, Defendants ignore the litany of cases in which courts have relied upon the expert analysis of historians when assessing legislative intent. The Supreme Court itself has relied upon the expertise of historians in analyzing discriminatory legislative intent. *See e.g., Hunter v. Underwood*, 471 U.S. 222, 228-30 (1985) (the Supreme Court expressly relied upon the opinions of expert historians regarding the motives of delegates to the 1901 Alabama Constitutional Convention on the precise element of "intent."). In *Hunter*, Justice Rehnquist held:

> "The evidence of legislative intent available to the courts below consisted of the proceedings of the convention, **several historical studies, and the testimony of two expert historians**. Having reviewed this evidence, we are persuaded that the Court of Appeals was correct in its assessment. The court's opinion presents a thorough analysis of the evidence and demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks."

17

*Hunter*, 471 U.S. at 228 (emphasis added). The Supreme Court's unanimous opinion in *Hunter* affirmed a decision of the Eleventh Circuit which "conclude[d] that the district court's finding of lack of discriminatory intent in the adoption of section 182 [was] clearly erroneous," largely because the district judge had ignored extensive expert testimony about the racial animus that motivated that provision's adoption. *Underwood v. Hunter*, 730 F.2d 614, 617, 620 (11th Cir. 1984), aff'd 471 U.S. 222 (1985). Indeed, the Eleventh Circuit relied upon the expert historical testimony heard by the district judge when holding that "race was a substantial or motivating factor":

> **Applying the *Arlington Heights* test to the case at hand**, the first step is to inquire whether intent to deny the franchise on the basis of race was a substantial or motivating factor in the enactment of section 182. **In conducting this inquiry we are mindful of the testimony by expert witnesses for both sides that the purpose of section 182 must be considered** in light of the overall purpose of the 1901 constitutional convention and the suffrage article, taken as a whole.

*Id*. at 618 (emphasis added). The opinions of the Eleventh Circuit and Supreme Court in *Hunter* extensively utilized the expert historical evidence as to motivation in their respective analyses of the intent element of an equal protection claim. *See, e.g., Hunter*, 471 U.S. at 228-33 (citing extensively from expert historian testimony, and concluding that the enactment of the challenged provision to the Alabama Constitution "was motivated by a desire to discriminate against blacks on account of race").

Both of the *Hunter* opinions are binding precedent upon this court, and both militate inexorably in favor of rejecting this aspect of Defendants' Daubert Motion. This conclusion is further confirmed by several other cases in which the Eleventh Circuit has either expressly approved of, or itself relied upon, the opinion testimony of expert historians about the racial animus motivating certain legislative or constitutional enactments. *See, e.g., Johnson v. Governor of State*

*of Florida*, 405 F.3d 1214, 1219-20 & n.10, 1223, 1225 (2005) (*en banc*) (accepting, without qualification as to admissibility, plaintiffs' expert testimony that a contested provision of the Florida constitution was motivated by racial animus, and referring several times to expert's opinion of racial animus, or the lack thereof, as probative evidence on the issue of the existence or non-existence of discriminatory intent); *id*. at 1245 n.1 (Barkett, J., dissenting) (noting with approval the district court's reliance upon expert testimony regarding racially discriminatory intent); *United States v. Dallas County Commission*, 739 F.2d 1529, 1541 (11th Cir. 1984) ("To aid the district court in its consideration on remand, we note that, in analyzing the intent issue, it stated: '[T]he plaintiff's witness testified to the opinion that race was the sole or predominant motivation.'").

Other Circuits agree. *See, e.g., Vander Linden v. Hodges*, 193 F.3d 268, 270 (4th Cir. 1999) (relying, in part, upon expert historian's testimony regarding the existence of a discriminatory intent behind the enactment of a South Carolina statutory scheme); *Price v. Austin Independent School District*, 945 F.2d 1307, 1317-18 (5th Cir. 1991) (rejecting contention that admission of opinion regarding the existence of discriminatory intent was an error where the district court had not "shirked the burden of determining, based on the evidence presented, whether the plan had been adopted with discriminatory intent").

There can be little doubt that Dr. Lichtman's testimony satisfies the final requirement of Rule 702 – that is, that it will assist this Court in determining the issues in this case. Dr. Lichtman's expert report and testimony bears directly on the exact issues at stake. But even if there were some question as to the reliability of his conclusions, or the "fit" between his conclusions and the case at hand, the proper response would hardly be to exclude Dr. Lichtman's report and testimony before it has been presented. The purpose of the court's "gatekeeping" function under *Daubert* is to ensure that the expert's testimony is sufficiently reliable so that it will aid the jury in reaching

19

accurate results. In a bench trial, as is the case here, where the court is at once the "gatekeeper" and the finder of fact, the gatekeeping function is far less essential. *See United States v. Brown*, 415 F. 3d 1257, 1269 (11th Cir. 2005); *see also Gibbs v. General Am. Life Ins. Co.*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Braggs v. Dunn*, 317 F.R.D. 634, 643 (M.D. Ala. Nov. 25, 2016) ("Ordinarily, [t]he safeguards outlined in *Daubert* are less essential in a bench trial; a judge need not gatekeep for herself.") (citations and internal quotation marks omitted); *One Hour Air Conditioning Franchising, LLC v. Dallas Unique Indoor Comfort, Ltd.*, 2015 WL 5316866, *4 (M.D. Fla. Sept. 11, 2015) ("Importantly, in the case of a bench trial, the court's gatekeeping function is even more constrained…. It is widely accepted that the importance of the pretrial exclusion process contemplated by *Daubert* is lessened in that situation.").

*Daubert* is about the admissibility of an expert's testimony, not the weight that testimony should carry with the trier of fact. Defendants dress up their upcoming cross examination of Dr. Lichtman as a *Daubert* motion in an attempt to have the court exclude testimony that would otherwise be helpful to the Court in its analysis of the intent and impact of SB 168.

## IV.    CONCLUSION

For the foregoing reasons, the motion to exclude Dr. Lichtman's expert testimony should be denied.

Dated: September 15, 2020

Respectfully submitted,

By: /s/_Anne Janet Hernandez Anderson_____

Anne Janet Hernandez Anderson
Florida Bar No. 18092
Email: aj.hernandez@splcenter.org
Paul R. Chavez*
Florida Bar No. 1021395
E-mail: paul.chavez@splcenter.org
Mich Gonzalez*
E-mail: mich.gonzalez@splcenter.org
Victoria Mesa-Estrada
Florida Bar No. 076569
Email: victoria.mesa@splcenter.org
SOUTHERN POVERY LAW CENTER
P.O. Box 12463
Miami, FL 33101
Tel.: (786) 347-2056

Rebecca Sharpless
Florida Bar No. 0131024
E-mail: rsharpless@law.miami.edu
IMMIGRATION CLINIC
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive, E273
Coral Gables, FL 33146
Tel.: (305) 284-6092
Fax: (305) 284-6093

Alana Greer
Florida Bar No. 92423
Email: alana@communityjusticeproject.com
Oscar Londoño
Florida Bar No. 1003044
E-mail: oscar@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33145
Tel.: (305) 907-7697 ext. 1

*   Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Exclude Testimony of Dr. Allan Lichtman was served via the U.S. District Court for the Southern District of Florida's electronic filing system on September 15, 2020, on counsel for Defendants listed in the attached service list.

Dated: September 15, 2020

/s/ _Anne Janet Hernandez Anderson___

21

*Case No. 1:19-cv-22927-BLOOM/Louis*

## SERVICE LIST

James H. Percival
Email: James.Percival@myfloridalegal.com
Colleen M. Ernst
Email: Colleen.ernst@eog.myflorida.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE GENERAL COUNSEL
The Capitol, Suite 203
Tallahassee, Florida 32399-1050
Telephone: (850) 717-9310
*Counsel for Defendant Governor Ron DeSantis*

Elizabeth Teegen
Email: Elizabeth.Teegen@myfloridalegal.com; complexlitigation.eservice@myfloridalegal.com
James H. Percival
Email: James.Percival@myfloridalegal.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Fax: (850) 410-2672
*Counsel for Defendant Attorney General Ashley Moody*