**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

CITY OF SOUTH MIAMI, ET AL.,

      *Plaintiffs*,

v.                              Civil Action File No. 1:19-cv-22927

RON DESANTIS, ET AL.,

      *Defendants*.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

The Motion for Summary Judgment filed by Defendants Ron DeSantis and Ashley Moody

("Defendants") should be denied. *See* ECF No. 111 ("Defs.' MSJ"). Plaintiffs' Motion for

Summary Judgment should be granted for the same reasons as those previously set forth in

Plaintiffs' Motion. *See* ECF No. 112 ("Pls.' MSJ").

**I.      Introduction**

Defendants allege all that remains to be adjudicated is whether legislators, "although

appearing to act in furtherance of law enforcement cooperation and public safety – used SB 168

as a Trojan horse for invidious discrimination." Defs.' Mot. for Summ. J., ECF. No. 111 at 1.

While Defendants may view SB 168 as a discriminatory Trojan horse, those who feel the brunt of

its impact see it more akin to a direct blow to Florida's Achilles heel. Defendants overestimate the

extent to which proponents of SB 168 successfully appeared to support the bill solely for the sake

of public safety. Statements by key legislators and collaborators reveal the disingenuous nature of

their public safety narrative. *See, e.g.,* Pls.' Statement of Facts, ECF No. 114 ¶ 59; *see also* Pls.'

Statement of Facts Ex. 47, ECF No. 120-1 at PLS003875 (showing that the "actual problem [Sen.

Gruters's office] is trying to solve is "an abundance of illegal aliens."). The rejection of numerous amendments that would have mitigated SB 168's foreseeable discriminatory impact on racial and national origin minorities demonstrate that the Florida Legislature, like the bill's outside supporters, was not concerned with, nor prioritized, the discrimination that would stem from this law. *See* Pls.' Statement of Facts, ECF No. 114 ¶¶ 65, 67, 87, 88. Close and constant collaboration with well-known anti-immigrant hate groups throughout the legislative process leading to the passage of the SB 168 reveals its sponsors' and proponents' xenophobic sentiments and invidious discriminatory intent. *See* Pls.' Statement of Facts, ECF No. 114 ¶¶ 49-50, 52-53, 65, 71,72. Additionally, Defendants do not fully address the transportation provision in their motion, providing no reason why summary judgment should not be granted in Plaintiffs' favor on Count II of the Amended Complaint, as the provision is conflict preempted. Defs.' Mot. for Summ. J., ECF No. 111 at 20; *infra* Section V, *Transportation Requirement*. Defendants attempt to diminish, and urge this Court to ignore, the substantial evidence demonstrating that Chapter 908 of the Florida Statutes was intended to further unlawful discrimination, cause discriminatory impact, and is therefore unconstitutional. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

## II.     Plaintiffs Have Substantiated Allegations That SB 168 Was Intended to Unlawfully Discriminate Against Floridians

Successful equal protection claims under the Fourteenth Amendment require proof of intent to discriminate and actual discriminatory effect. G*reater Birmingham Ministries v. Sec'y for State of Ala.*, 966 F.3d 1202 (11th Cir. 2020). Relevant evidence to consider when reviewing a facially neutral statute for discriminatory intent includes a specific sequence of events leading up to its passage; procedural and substantive departures; contemporary statements and actions of key legislators; foreseeability of disparate impact; knowledge of the impact; and availability of less

discriminatory alternatives. *Arlington Heights*, 429 U.S. at 267-68; *Greater Birmingham*, 966 F.3d at 1225. Here, Plaintiffs demonstrate discriminatory intent analyzing all listed factors.

 **A. Defendants Misinterpret the *Arlington Heights* Standards and *Greater Birmingham Ministries* in an Effort to Minimize the Discriminatory Intent Behind SB 168**

Defendants' interpretation of *Greater Birmingham Ministries* misrepresents the decision with respect to Plaintiffs' required showing. *Greater Birmingham*, 966 F.3d at 1228. Defendants contend that Plaintiffs "must present evidence on the Legislature as a whole, not just isolated legislators." Defs.' Mot. for Summ. J., ECF No. 111 at 6. In *Greater Birmingham Ministries*, the Eleventh Circuit acknowledged that discerning the intent of a legislature as a whole or even a single legislator is to look for something that probably does not exist. *Greater Birmingham*, 966 F.3d at 1227-28. This supports the reasoning for the numerous *Arlington Heights* factors. *Greater Birmingham*, 966 F.3d at 1225 (*citing Arlington Heights*, 429 U.S. at 267-8 (1977)). Specifically, the Eleventh Circuit expressed skepticism that the discriminatory intent could be ascertained from one legislator's statements and "[a]s a general matter, determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham,* 966 F.3d at 1227–28 (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and *Edwards v. Aguillard*, 482 U.S. 578, 636–37 (1987) (Scalia, J., dissenting) ("[D]iscerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite.")).

Here, despite Defendants' strained effort to minimize the discriminatory intent behind the law at issue, the record shows that the legislative sponsors and key proponents of SB 168 worked in concert with the explicitly anti-immigrant lobbying group, Floridians for Immigration Enforcement ("FLIMEN"), seeking repeated advice from them and their organizational affiliate,

Federation for American Immigration Reform ("FAIR"). Pls.' Statement of Facts, ECF No. 114 ¶¶ 33-72. Furthermore, Plaintiffs oppose Defendants' characterization of the evidence as showing only four contentions in support of the allegations that there was discriminatory intent behind SB 168. Defs.' Mot. for Summ. J., ECF No. 111 at 7. First, the timing of the contentions that Defendants list is significant. Rather than seeking analysis from a variety of resources, Florida legislators repeatedly relied on guidance from groups known for their racially charged rhetoric and xenophobic positions and even pushed forward with a press conference planned by these notorious groups. Pls.' Statement of Facts, ECF No. 114 ¶¶ 33-72.

Defendants also attempt to dismiss the discriminatory nature of the April 17, 2019 press conference, "Victims of Illegal Immigration Day," by describing the minority participants, namely the Latina woman and African American parents who spoke. Defs.' Statement of Facts, ECF No. 110 ¶¶ 49-58; Defs.' Mot. for Summ. J., ECF No. 111 at 10-11. However, the Latina woman referenced by Defendants is Amapola Hansberger, President of the radically anti-immigrant group known as LIFA, who expressly warns against "invasion" of inherently violent brown masses[1] and militant Muslims,[2] and calls for an end to birthright citizenship employing the racially charged slur "anchor babies."[3] The woman who spoke after the African American parents described by Defendants in their motion is Yvonne Larsen, an active member of the Remembrance Project—another xenophobic group that preys on unsuspecting community members' grief, recruiting them

---

[1] *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 9 (LIFA's website post referring to racist literature *The Camp of the Saints* drafted by Hansberger available at https://www.golifa.com/raspail-warned-us-what-do-we-do-now); *see also* Lichtman Report at 90-92,144-145, 185.

[2] *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 8 (LIFA website post drafted by Hansberger available at https://www.golifa.com/invasion-by-immigration-modern-day-trojan-horse/).

[3] *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 7 (Letter to Congress drafted by Hansberger and posted on LIFA website available at https://www.golifa.com/3924-2/).

in order to push an anti-immigrant agenda.[4] Defs.' Statement of Facts, ECF No. 110 ¶ 59. Finally, Defendants seriously mischaracterize the closing remarks from FLIMEN during the press conference stating, "The representative from FLIMEN emphasizes that her comments are not directed at all unlawfully present persons." Defs.' Mot. for Summ. J., ECF No. 111 at 11; Defs.' Statement of Facts, ECF No. 110 ¶ 60. However, the "representative from FLIMEN" Defendants reference is Karyn Morton, FLIMEN's Communications Director, whose exact quote is "to end the kind of anarchy that does exist with the criminal activity of some members of the illegal alien population." Pls.' Am. Compl., ECF No. 38 at 29, n.13, 11:36-13:23; *see also* Pls.' Statement of Facts Ex. 33, ECF No. 116-9.

Defendants also attempt to diminish the anti-immigrant motives of FAIR's sister organization, the Center for Immigration Studies ("CIS")[5] by referencing a single Washington Post article and the role of its Director of Research in *Bellitto v. Snipes,* 302 F. Supp. 3d 1335 (S.D. Fla. 2017). Defs.' Mot. for Summ. J., ECF No. 111 at 9. However, in *Bellitto* the CIS Director was only admitted and deemed to be minimally qualified to testify with respect to a narrow subject. *See Bellitto*, 302 F. Supp. 3d at 1348-49 (stating "[a]s is evident, Dr. Camarota has extensive experience and familiarity with analyzing data provided by the Census Bureau, including the

---

[4] *See* Pls.' Statement of Facts Ex. 27, ECF. No. 116-3 at 90-92; *see also* Pls.' Resp. to Defs.' Statement of Facts, Ex. 13 (Remembrance Project Twitter profile warning against "anchor babies" available at https://twitter.com/StolenLivesQlt/status/1019716518685405184); *see also* Ex. 15 at PLS029978 (Yvonne Larsen on Twitter, sharing "Maybe it's not a good idea to import tribal peoples from 3rd world countries and 'stress' Florida's educational system in the process" available at https://twitter.com/ylarsen/status/1141873522496745472); *see also* Ex. 1 ("We were used, abused and exploited" Kenneth P. Vogel, Politico, June 1, 2017 available at https://www.politico.com/story/2017/06/01/trump-immigrants-abuse-campaign-239006).
[5] *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 10 (Center on Extremism Report, *Mainstreaming Hate*, Anti-Defamation League, November 2018 available at https://www.adl.org/media/12249/download at p. 17 stating, "Initially pitched by Tanton as a 'project of FAIR' CIS now promotes itself as 'an independent think tank'").

Census Bureau's ACS. In light of that experience, the Court is satisfied that Dr. Camarota is at least minimally qualified."); *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F.Supp.2d 1126, 1129 (M.D. Fla. 2007) (stating "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand."). Moreover, CIS has a well-documented racist, anti-immigrant history. Pls. Statement of Facts, ¶118. For example, "CIS's weekly immigration roundup circulated over 1,700 articles from the explicitly racist website VDARE over a ten-year period, averaging the promotion of more than three VDARE articles per week.  CIS has gone so far as to commission Jason Richwine to write for the organization. Richwine is a disgraced researcher who resigned from the Heritage Foundation in May 2013 due to public backlash over his racist 2009 Harvard dissertation in which he asserted that the IQ of immigrants of Latino/a descent is biologically inferior to that of Caucasians."[6]

**B.     Defendants attempt to limit the evidence of discriminatory intent behind SB 168**

In addition to the four points that Defendants' raise in their motion, Plaintiffs also argue that Florida legislators or their staff were in regular communication with FLIMEN during the legislative process. Defs.' Mot. for Summ. J., ECF No. 111 at 7; Pls.' Statement of Facts, ECF No. 114 ¶¶ 33-72. Florida legislators ignored the anti-immigrant reputation of FAIR, FLIMEN, and CIS even after being put on public notice during a Senate hearing. *Id*. ¶ 66. Florida legislators also rejected over twenty amendments aimed at mitigating SB 168's discriminatory impact, and the bill's sponsors and supporters made no effort to ensure safeguards were in place to make the law less discriminatory despite concerns raised by numerous groups and members of the public. Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 166-181. Instead, legislators pushed forward with a

---

[6] *Id.* at 17-18.

cruel disregard for the concerns being raised by minority communities throughout Florida. *Id.* Speakers at the press conference cited in Defendants' Motion thanked Defendants for making SB 168 a priority and being ready to enforce it. Pls.' Am. Compl., ECF No. 38 at 29, n.13, 12:43-13:53. When Governor DeSantis signed SB 168, he acknowledged his role and support of SB 168 despite these public connections to anti-immigrant groups, proclaiming, "[t]he state legislature, at my urging, just passed a bill outlawing sanctuary cities and so we basically as a state said … we are going to work with them to help remove criminal aliens…" Pls.' Am. Compl., ECF No. 38 ¶ 165; Def. DeSantis Answer and Affirmative Defenses, ECF No. 90 ¶ 165.

Additionally, Defendants mischaracterize the extent to which Senator Gruters's office communicated and worked with FLIMEN throughout the 2019 legislative session. Defs.' Statement of Facts, ECF No. 110 ¶¶ 74-78. Moreover, "the actions and statements of legislators and staff … would be relevant on the issue of intent." *League of Women Voters of Fla. V. Detzner*, 172 So. 3d 363, 388 (Fla. 2015). Here, the record shows that Sen. Gruters's legislative aide, Mr. Barnhill, eagerly, swiftly, and consistently responded to FLIMEN's questions and requests on behalf of Sen. Gruters and that both he and Sen. Gruters forwarded FLIMEN communications to other legislative staff. Pls.' Statement of Facts Ex. 54, *ECF No. 120-8* (showing Barnhill communicating from his government e-mail address with FLIMEN's Caulkett on Sen. Gruters's behalf, Caulkett attaching draft legislation, stating, "Please get the bills to Bill Drafting ASAP. Per Sen. Gruters's request, the list of Sanctuaries in Florida, or as I call them Anarchy Cities, is attached," to which Barnhill replied, "Thanks for sending over, David. I put them both in bill drafting earlier this morning. Great to meet you and Ken, and thank you for the advice on 168."); *see also* Pls.' Statement of Facts Ex. 44, ECF No. 119-1;  Ex. 45, ECF No. 119-2;  Ex. 46, ECF No. 119-3 (showing Barnhill reaching out to FLIMEN via e-mail to inquire whether FAIR has any

response to the ACLU of Florida's request that senators vote "No" on SB 168, including his title in his signature line, "Legislative Assistant Senator Joe Gruters, District 23"); and Pls.' Statement of Facts Ex. 46, Ex. 52, ECF No. 120-6.

Defendants similarly mischaracterize the senate staff analysis of SB 168 that cites directly to FAIR and CIS. Defs.' Statement of Facts, ECF No. 110 ¶¶ 28-34. However, *cf.* Defs.' Statement of Facts Ex. A, ECF No. 110-1 at 4 ( "[p]erhaps one of the most objective ways to measure whether an entity is a sanctuary jurisdiction is to determine whether it is disqualified from receiving federal criminal justice grant funds due to perceived violations of federal immigration law."). Pertinently, to the extent that Defendants contend that *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) requires proof of FAIR, FLIMEN, or CIS's discriminatory motives, such a contention is incorrect. *Pers. Adm'r of Mass.*, 442 U.S. at 279. Instead, *Feeney* stands for the proposition that the "the purposes of the statute provide the surest explanation for its impact," but when this is not the case, the dispositive question becomes whether the government has shown that a discriminatory purpose "has, at least in some measure, shaped" SB 168. *Pers. Adm'r of Mass.*, 442 U.S. at 276.

**C.     The Evidence Supports an Inference That SB 168 Was Based on Model Legislation Prepared by Anti-immigrant Hate Groups Without Any Rational Basis for the Law**

Defendants' primary defense to this replete record, more than sufficient to meet the requisite standards enumerated *supra*, is to claim that SB 168's language was based on SB 308, a bill filed by Senator Aaron Bean in November 2015. Defs.' Mot. for Summ. J., ECF No. 111 at 7. However, this defense is akin to painting a target around a shot arrow and victoriously proclaiming bullseye. There is nothing in the record to disprove that FLIMEN shared FAIR model anti-sanctuary legislation with Senator Bean prior to late 2015. In fact, the evidence supports an

inference that Senator Bean based SB 308, at least in part, on model legislation prepared and promoted by these groups.[7] FLIMEN admits to being in operation since 2003, having members serve as FAIR advisors for "eight years, ten years," and proudly documents their legislative activism since at least 2004 on their website.[8] Pls.' Statement of Facts Ex. 22-A, ECF No. 113-6 at 15:2, 18:20-22. FAIR boasts of FLIMEN's work around legislation "preempting local sanctuary policies" as far back as 2008 in the publicly available newsletters on their website archive. *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 2 (FAIR March 2008 Newsletter at 13, available at https://www.fairus.org/sites/default/files/2017-08/March08_NL.pdf); *see also* Pls.' Resp. to Defs.' Statement of Facts, Ex. 3 (FAIR May 2008 Newsletter at 9 available at http://www.fairus.org/sites/default/files/2017-08/May08_NL.pdf).

Here, discriminatory intent was the primary motive behind the passage of SB 168 because there was no rational basis to pass anti-sanctuary legislation, even under the pretext of public safety.

First, it is undisputed that crime in Florida had gone down over several years before SB 168 was introduced, including in alleged sanctuary cities. *See* Pls.' Statement of Facts Ex. 27, ECF

---

[7] *See* Pls.' Resp. to Defs.' Statement of Facts, Ex. 14 (FAIR post explaining that the Immigration Reform Law Institute (IRLI) is their legal arm, available at https://www.fairus.org/about-fair/immigration-reform-law-institute); *see also* Ex. 6 (IRLI post describing Kobach as their Counsel, available at ; *see also* Ex. 12 (.*Private Prison Companies Behind the Scenes of Arizona's Immigration Law*, Prison Legal News, November 15, 2020 available at https://www.prisonlegalnews.org/news/2010/nov/15/private-prison-companies-behind-the-scenes-of-arizonas-immigration-law/).-presidential-commission-on-election-integrity/; *see also* Ex. 12 (*Private Prison Companies Behind the Scenes of Arizona's Immigration Law*, Prison Legal News, November 15, 2020 available at https://www.prisonlegalnews.org/news/2010/nov/15/private-prison-companies-behind-the-scenes-of-arizonas-immigration-law/).

[8] Pls.' Resp. to Defs.' Statement of Facts, Ex. 5 (FLIMEN website archive available at http://www.flimen.org/archive.htm); *see also* Pls.' Resp. to Defs.' Statement of Facts, Ex. 4 (FLIMEN 2008 legislation archive available at http://www.flimen.org/archive/Florida%202008%20Legislation%20Archive.htm).

No. 116-3 at 120-126; *see also* Pls.' Statement of Facts Ex. 23, ECF No. 115-2 at 69:6-24. Defendants erroneously state that "Plaintiffs cannot decide whether the public safety rationale is a true but problematic one or an acceptable but false one, suggesting it is neither." Defs.' Mot. for Summ. J., ECF No. 111 at 16. Defendants' argument fails to understand that legislators' public safety rationale is both a pretext to create a non-racist reason for SB 168 that is grounded in the stereotype of the violent black and brown immigrant *and* evidence of discriminatory intent. For example, Defendants fail to view Senator Gruters's racially charged "Faces of Criminal Illegals" sign, his anti-immigrant campaign ad, and "immigration listening tour" for what they are—namely, contemporaneous statements that reveal the true intent behind SB 168. ECF No. 116-3 at 92-95, 130-131. These facts are distinguishable from *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867–68 (8th Cir. 2003) (noting that "an isolated, stray comment unrelated to the decisional process" did not establish discrimination).

Legislators' statements characterizing SB 168 as a public safety concern or rule of law issue that aims to "apply the same rules that we would apply to US Citizens to anyone else" further reflects the pretextual nature of this reason. Pls.' Am. Compl., ECF No. 38 at 29, n.13, 1:35-3:05; Defs.' Mot. for Summ. J., ECF No. 111 at 10. SB 168 seeks to t`reat immigrants differently by virtue of the fact that immigration detainers are mere requests that constitute a new seizure in violation of the Fourth Amendment by extending detention beyond the time a person would be released when they can no longer be held pursuant to state law. *Alcocer v. Mills*, No. 19-12360, 2020 WL 833051 (11th Cir. 2020) (unpublished) (finding that once there was an attempt to post bond . . . , "any further detention with respect to potential immigration investigations was a new seizure requiring a new probable-cause justification."); *Galarza v. Szalczyk*, 745 F.3d 634 (3rd Cir. 2014); Pls.' Statement of Facts Ex. 23, ECF No. 115-2, 29:12-24. SB 168 forces the application

of such unlawful requests by local law enforcement officers who have not been deputized as federal immigration authorities to seek out "suspected 'criminal aliens'" via the "best efforts" clause. Defs.' Mot. for Summ. J., ECF No. 111 at 2-3; Fla. Stat. § 908.104(1). In fact, SB 168 makes no distinction between a traffic infraction and murder. To equate the two when it comes to immigrants, but not U.S. citizens serves as a sign-post suggesting the unequal treatment of anyone perceived to be an immigrant, whether criminal or not. Pls.' Statement of Facts, ECF No. 114 ¶¶ 28-32. Imprisonment and family separation – the consequences of SB 168 – are not the consequence to a traffic infraction and such severe punishment has not been proposed by the Florida legislature. This begs the question why the Florida Legislature and Governor DeSantis seek to force immigrants, and those perceived to be immigrants, to live under threat of untrained and undeputized officers from these agencies using discretion in their "best efforts" to enforce Federal immigration law by using officer that inevitably takes race into account. Pls.' Statement of Facts, ECF No. 114 ¶ 27.

Second, Defendants erroneously rely on *U.S. v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) and *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178, 1182 (9th Cir. 2019) to support the contention that immigration enforcement serves a public safety purpose. Defs.' Mot. for Summ. J., ECF No. 111 at 4, 16. However, these cases do not support this contention and are also distinguishable from the instant case. The full context for the *dicta* relied on by Defendants in *City of Los Angeles* is for support of community policing as a way to address a Department of Justice (DOJ) determination that immigration enforcement is a public safety issue. *City of Los Angeles*, 929 F.3d at 1178, 1182 (stating "DOJ has reasonably determined that illegal immigration enforcement is a public safety issue [that] can be addressed most effectively through the principles of community policing."). Similarly, Defendants' reliance on the statement "a strong state policy

11

for a reason other than race is evidence of no discriminatory intent" in *Marengo* is misplaced. In *Marengo*, the Eleventh Circuit explained the following regarding circumstantial evidence immediately after the quoted statement:

> On the other hand, a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes. *See Robinson v. Commissioners Court,* 5 Cir.1974, 505 F.2d 674, 680; *Zimmer,* 485 F.2d at 1305, 1307. State policy is less important under the results test: "even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process". 1982 Senate Report at 29 n. 117, U.S.Code Cong. & Admin.News 1982, p. 207, n. 117. But state policy is still relevant insofar as intent is relevant to result: evidence that a voting device was intended to discriminate is circumstantial evidence that the device has a discriminatory result. *See Major v. Treen,* 574 F.Supp. at 354–55. Moreover, the tenuousness of the justification for a state policy may indicate that the policy is unfair. *Hendrix v. Joseph,* 5 Cir.1977, 559 F.2d 1265, 1269–70.

*U.S. v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) citing *Hendrix v. Joseph,* 559 F.2d 1265, 1269–70 (5th Cir. 1977); *Robinson v. Commissioners Court,* 505 F.2d 674, 680 (5th Cir. 1974); *Zimmer v. McKeithen,* 485 F.2d 1297, 1305, 1307 (5th Cir. 1973); 1982 Senate Report at 29 n. 117, U.S.Code Cong. & Admin.News 1982, p. 207, n. 117; *Major v. Treen,* 574 F.Supp. 325, 354–55 (E.D. La. 1983).

In sum, a facially neutral statute is unconstitutional when enacted to further unlawful discrimination if discrimination was a substantial or motivating factor and the government cannot show it would have been enacted absent such motive. *See Young Apartments, Inc. v. Town of Jupiter*, Fla., 529 F.3d 1027, 1045 (11th Cir. 2008); *Hunter v. Underwood*, 471 U.S. 222 (1985). Here, Defendants cannot show that SB 168 would have passed without the insidious, pervasive intervention of xenophobic actors discussed *Supra*.

**III.    Plaintiffs Have Shown SB 168's Foreseeable and Intended Negative Impact on Race, Color, and National Origin Minorities**

Whether a law impacts a greater proportion of one race is a factor in determining whether that law was passed for a discriminatory purpose and therefore unconstitutional. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Impact is not determinative on its own, but whether the challenged law's impact is greater on one protected group than another "may provide an important starting point." *Vill. Of Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). In this case, SB 168 has exacerbated and normalized the disproportionate 287(g) arrests of minority immigrants, thereby increasing the number of black and brown immigrants who are held in immigration detention or deported.

Immigration status is fluid and no visible indicators exist that could identify an individual's immigration status. Pls.' Statement of Facts, ECF No. 114 ¶ 77. Without a visible indicator, the overwhelming number of persons arrested by local law enforcement for traffic violations, in combination with the increase in local law enforcement calling ICE to a traffic stop without issuing a citation and arresting undocumented passengers in U.S. citizens' vehicles post-SB 168 show that local law enforcement officers are profiling individuals while using their "best efforts" to support the enforcement of federal immigration law. Pls.' Statement of Facts, ECF No. 114 ¶¶ 79-82.

Defendants rely on *DHS v. Regents* for the proposition that a rule making it unfeasible for any immigration policy to be the basis for an equal protection claim "makes sense" because any other rule would call the entire immigration system into question. Defs.' Mot. for Summ. J., ECF No. 111 at 14; *DHS v. Regents*, 140 S.Ct. 1891, 1915-6 (2020).  This reliance is misplaced because SB 168 is a state law aimed to deprive people of freedom using the unpredictable and undirected use of discretion by law enforcement rather than the broad rescission of federal immigration relief addressed in *Regents*. *Regents*, 140 S.Ct. at 1901. The *Regents* opinion briefly disposed of the

initial pleadings challenging the Deferred Action for Childhood Arrivals (DACA) program recission on equal protection grounds because it would be expected for Latinos, to be an "outsized share of recipients of any cross-cutting immigration <u>relief</u> program." *Regents*, 140 S.Ct. at 1915-6 (emphasis added). The Supreme Court addressed this fact alone, without any further explanation, to conclude that if this fact were "sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id*.

The fact that a change to federal immigration policy will have an outsized impact on Latinos, who "make up a large share of the unauthorized alien population," is distinguishable from the case at hand because SB 168 (1) requires law enforcement to use their discretion to use their "best efforts" to support immigration enforcement and (2) eliminates the possibility for state, local, and municipal governments to establish "sanctuary policies" to establish a more nuanced approach to address community concerns without underpinning discriminatory profiling. *Regents*, 140 S.Ct. at 1915. SB 168 is not a federal immigration policy. Instead, SB 168 is a state law that calls on Florida law enforcement officers to use their "best efforts to support the enforcement of federal immigration law," without requiring any training, understanding, guidelines, or other guiding principles to prevent local law enforcement from using only superficial methods of identifying potential undocumented immigrants – race and ethnic features. Fla. Stat. § 908.104(1). The present case involves substantiated allegations that racial minorities are more likely to be targeted, intimidated, questioned, and detained by local law enforcement officers since SB 168 went into effect. Pls.' Statement of Facts, ECF No. 114 ¶¶ 75, 77, 80. Still, Defendants rely on the concept that SB 168 will only be applied to undocumented immigrants without recognizing the fluidity of immigration status. Defs.' Mot. for Summ. J., ECF No. 111 at 14; Pls.' Statement of Facts, ECF No. 114 ¶ 11.

14

Defendants go on to argue that imposing liability on the effect a law may have on those "not lawfully present in this county" is illogical. Defs.' Mot. for Summ. J., ECF No. 111 at 14 (citing *Keller v. City of Fremont*, 719 F.3d 931, 949 (8th Cir. 2013)). However, SB 168 targets racial, ethnic, and national origin minorities via the presumption that immigration status is definite and easily ascertainable. The "best efforts" clause, specifically, inevitably calls for a superficial method of identifying potential undocumented immigrants – by immutable characteristics determined at birth, such as race, national origin, alienage, and ethnicity. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Frontiero v. Richardson*, 411 U.S. 677 (1973); *Graham v. Richardson*, 403 U.S. 365, 372 (1971); *Hernandez v. Texas,* 347 U.S. 475, 477–79 (1954) (holding that exclusion of Mexicans from jury service because of ancestry or national origin violates the Fourteenth Amendment); *U.S. v. Carolene Products Co.*, 304 U.S. 144, 152-153, n. 4 (1938).

Defendants ignore that <u>all</u> officers have the discretion to interpret SB 168's "best efforts" as they see fit. Defs.' Mot. for Summ. J., ECF No. 111 at 15. This makes SB 168 "susceptible to abuse and can be employed in a discriminatory manner" against national origin and racial minorities because it invites officer discretion, the cornerstone of racial profiling, in its application. *See Hernandez v. State of Tex.*, 347 U.S. 475, 478–79 (1954) (finding that although the challenged statute did not make any explicit discriminatory statements, the system of selecting jurors via jury commissions was susceptible to abuse and those administering the law discriminated against Mexicans). Likewise, Defendants attempt to diminish the historical racial discrimination in Florida in voting, education, housing, and law enforcement. Pls.' Statement of Facts Ex. 27, ECF No. 116-3 at 3-37. The immigrant community has also experienced this discrimination and hostility, particularly since SB 168 went into effect. Pls.' Statement of Facts Ex. 12, ECF No. 114-12 40:15-

15

25; Pls.' Statement of Facts Ex. 7, ECF No. 114-7 at ¶ 6; Pls.' Statement of Facts Ex. 13, ECF No. 114-13 at 10:11-17; 11:3-25; 121-2; Pls.' Statement of Facts Ex. 14, ECF No. 114-14 at 31:12-24. For example, immigrants have been unwelcome in parts of Palm Beach County for years and after SB 168 went into effect, the Guatemalan-Maya Center was the subject of a hate crime when their building was defaced with swastikas for the first time in its history. Pls.' Statement of Facts Ex. 12, ECF No. 114-12 at 40:15-25; 41:4-12.

Finally, Defendants' contention that the plain text of the statute eliminates the possibility that SB 168 leads to racial profiling neglects "[t]he fact that the written words of a state's laws hold out a promise that no such discrimination will be practiced is not enough. The Fourteenth Amendment requires that equal protection to all must be given—not merely promised." *Smith v. State of Texas*, 311 U.S. 128, 130, (1940) (overturning conviction when state law called for use of jury commissioners that resulted in the exclusion of Black people from jury service); *see also Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (finding neutral statute changing city boundaries violated Fourteenth Amendment due to effect of removing from city all but a few Black voters while not removing any white voters). Moreover, SB 168's potential for discriminatory impact was purposefully not abated when the Florida legislature rejected over twenty amendments, including amendments aimed at minimizing the law's discriminatory impact. Pls.' Statement of Facts Ex. 12, ECF No. 114 ¶ 67.

## IV. Defendants' Disagreement with Plaintiffs' Expert Is Not a Basis for Avoiding Judicial Consideration and Defendants' Failure to Counter Dr. Lichtman's Report and Testimony

Defendants disagreement with the conclusions of Plaintiff's expert, Dr. Allan Lichtman, is an insufficient basis for ignoring Dr. Lichtman's conclusions in his expert report and deposition testimony. *See* ECF No. 109; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

Dr. Lichtman is qualified to be an expert in this case because he is one of the nation's leading authorities on quantitative methodology and social science with an academic career spanning nearly fifty years, and extensive experience as an expert. *See League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258 (Fla. 2015) (accepting Dr. Lichtman's expert report on the impact of proposed voting districting plans on Hispanic individuals in Florida); *U.S. v. Dallas County Comm'n*, 850 F.2d 1433 (11th Cir. 1988) (considering Dr. Lichtman's expert testimony on race and politics as an expert witness on behalf of the U.S. government.); *see also Houston v. Lafayette Cnty*, 56 F.3d 606, 612 (5th Cir. 1995); *Johnson v. Mortham*, 926 F. Supp. 1460, 1474 (N.D. Fla. 1996); *Texas v. U.S.*, 802 F. Supp. 481, 486 (D.D.C. 1992) (recognizing Dr. Lichtman as an "expert[] in data analysis"); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F. Supp. 1022, 1056 n.54 (D. Md. 1994) (praising Dr. Lichtman's textbook regarding a method of statistical analysis); *Bradford Cnty NAACP v. City of Starke*, 712 F.Supp. 1523 (M.D. Fla. 1989) (relying on Dr. Lichtman's analysis and presentation of statistical evidence, and testimony at trial to find corroboration of "racial bias" and "legally significant" racial polarization); *LULAC v. North East Indep. Sch. Dist.*, 903 F.Supp. 1071, 1081 (W.D. Tex. 1995) (recognizing and relying on Dr. Lichtman's expertise regarding racial polarization.).

Dr. Lichtman has not only been published in in the world's leading scientific journal and numerous other peer reviewed journals, but also published books that incorporate quantitative analysis. *See* ECF No. 116-3 at 251-275. Moreover, Defendants' failure to present their own expert report to challenge Dr. Lichtman's work should not preclude the Court from relying on the extensive quantitative evidence that Dr. Lichtman analyzes as a social scientist and expert in qualitative methodology in his expert report. *See generally* Pls.' Statement of Facts Ex. 27, ECF No. 116-3.

## V. Defendants Fail to Contest this Court's Finding That the Transportation Provision is Conflict Preempted

Defendants do not fully address the transportation provision in their Motion for Summary Judgment (ECF No. 111) and rely on 8 U.S.C. 1357(g)(10), *City of El Cenizo*, and the argument set forth in Defendants' Opposition to Plaintiffs' Motion for A Preliminary Injunction without any further specificity. *City of El Cenizo, Tex. V. Tex.*, 890 F.3d 164 (5th Cir. 2018). Furthermore, Defendants do not address or contest this Court's findings in the Order on Plaintiffs' Amended Motion for Preliminary Injunction and Request for Hearing and Order on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. Order on Pls.' Motion for Prelim. Inj., ECF No. 64 at 44; ECF No. 83 at 27-8. Therefore, summary judgment in favor of Plaintiffs as to Count II of the Amended Complaint should be granted because SB 168's Transport Requirement is conflict preempted.

## VI. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 111) should be denied and Plaintiffs' Motion for Summary Judgment should be granted.

Dated: September 15, 2020

Respectfully submitted,

By: /s/ Anne Janet Hernandez Anderson

Anne Janet Hernandez Anderson
Florida Bar No. 18092
Email: aj.hernandez@splcenter.org
Paul R. Chavez*
Florida Bar No. 1021395
E-mail: paul.chavez@splcenter.org
Mich Gonzalez*
E-mail: mich.gonzalez@splcenter.org

Alana Greer
Florida Bar No. 92423
Email: alana@communityjusticeproject.com
COMMUNITY JUSTICE PROJECT, INC.
3000 Biscayne Blvd. Suite 106
Miami, Florida 33145
Tel.: (305) 907-7697 ext. 1

18

Victoria Mesa-Estrada
Florida Bar No. 076569
Email: victoria.mesa@splcenter.org
SOUTHERN POVERY LAW CENTER
P.O. Box 12463
Miami, FL 33101
Tel.: (786) 347-2056

Rebecca Sharpless
Florida Bar No. 0131024
E-mail: rsharpless@law.miami.edu
IMMIGRATION CLINIC
UNIVERSITY OF MIAMI SCHOOL OF LAW
1311 Miller Drive, E273
Coral Gables, FL 33146
Tel.: (305) 284-6092
Fax: (305) 284-6093

\*   Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Response and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was served via the U.S. District Court for the Southern District of Florida's electronic filing system on September 15, 2020, on counsel for Defendants listed in the attached service list.

Dated: September 15, 2020

/s/ _Anne Janet Hernandez Anderson_____

## SERVICE LIST

James H. Percival
Email: James.Percival@myfloridalegal.com
Colleen M. Ernst
Email: Colleen.ernst@eog.myflorida.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE GENERAL COUNSEL
The Capitol, Suite 203
Tallahassee, Florida 32399-1050
Telephone: (850) 717-9310
*Counsel for Defendant Governor Ron DeSantis*

Elizabeth Teegen
Email: Elizabeth.Teegen@myfloridalegal.com; complexlitigation.eservice@myfloridalegal.com
James H. Percival
Email: James.Percival@myfloridalegal.com
Karen Brodeen
Email: karen.brodeen@myfloridalegal.com
Anita J. Patel
Email: Anita.Patel@myfloridalegal.com
OFFICE OF THE ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Fax: (850) 410-2672
*Counsel for Defendant Attorney General Ashley Moody*