## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-22927-BLOOM/Louis

CITY OF SOUTH MIAMI, *et al.*,

      Plaintiffs,

v.

RON DESANTIS, *et al.*,

      Defendants.

_____/

### OMNIBUS ORDER

    **THIS CAUSE** is before the Court upon Defendants'[1] *Daubert*[2] Motion, ECF No. [109] ("*Daubert* Motion"), and their Motion *in Limine* to Exclude Third-Party Sources that are Hearsay, ECF No. [108] ("Motion *in Limine*"), (collectively, the "Motions"). Plaintiffs[3] filed responses in opposition to both Motions, ECF Nos. [128] & [130], to which Defendants replied, ECF Nos. [134] & [133]. The Court has carefully considered the Motions, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' *Daubert* Motion is granted in part and denied in part consistent with this Omnibus Order, and Defendants' Motion *in Limine* is denied.

---

[1] Defendants include Ron DeSantis, in his official capacity as Governor of the State of Florida ("Governor DeSantis"), and Ashley Moody, Attorney General of the State of Florida (collectively, "Defendants").

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[3] Plaintiffs include Florida Immigrant Coalition, Inc. ("FLIC"), The Farmworker Association of Florida, Inc. ("FWAF"), Family Action Network Movement, Inc. ("FANM"), QLatinx, and WeCount!, Inc. ("WeCount"), on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc. ("AI Justice"), The Guatemalan-Maya Center, Inc. ("GMC"), Hope Community Center, Inc. ("Hope"), and Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster"), on behalf of their organizations (collectively, "Plaintiffs").

## I.   BACKGROUND

On May 2, 2019, the Florida Legislature passed Senate Bill 168 ("SB 168"), which aimed to further the State of Florida's interest in "cooperat[ing] and assist[ing] the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101 (2019). On June 14, 2019, Governor DeSantis signed SB 168 into law, and it was enacted as Chapter 908 of the Florida Statutes. *See* Fla. Stat. ch. 908. Among other things, SB 168 prohibits implementing so-called "sanctuary policies," which are policies evincing certain jurisdictions' intent not to cooperate with Immigration and Customs Enforcement ("ICE"). The law also delineates specific immigration enforcement efforts with which local jurisdictions must comply.

Following its enactment, on July 16, 2019, Plaintiffs initiated this action against Defendants for declaratory and injunctive relief, challenging the constitutionality of numerous SB 168 provisions. *See* ECF No. [1] ("Complaint"); *see also* ECF No. [38] ("Amended Complaint"). Relevant to the instant Motions are Plaintiffs' claims that § 908.103[4] and § 908.104(1)[5] violate the Equal Protection Clause because "SB 168 was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors, on the basis of race, color, and national origin." ECF No. [38] ¶¶ 395, 411.

---

[4] Section 908.103 states that "[a] state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy." Fla. Stat. § 908.103 ("Sanctuary Prohibition"). Further, "sanctuary policy" is defined as "a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency . . . ." Fla. Stat. § 908.102(6).

[5] Section 908.104 sets forth various ways in which state and local law enforcement agencies must cooperate with federal immigration enforcement efforts. *See* Fla. Stat. § 908.104. Section 908.104(1) applies to law enforcement agencies or "an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment," and mandates that law enforcement agencies and individuals acting on these agencies' behalf "use best efforts to support the enforcement of federal immigration law." *Id* § 908.104(1) ("Best Efforts Provision").

### A. Defendants' *Daubert* Motion

Defendants first seek to exclude the allegedly inadmissible expert testimony of Plaintiffs' expert witness, Allan J. Lichtman, Ph.D. ("Dr. Lichtman"). Dr. Lichtman is a Distinguished Professor of History at American University with significant expertise on the topics of American history, political history, voting rights, quantitative methodology, civil rights, historical methodology, social science, racial animus, and race relations. *See* ECF No. [109-2]. Plaintiffs retained Dr. Lichtman to provide his expert opinions on whether SB 168 "was adopted with the intent of discriminating against minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage, regardless of their possession of documentation." ECF No. [109-1] at 6 ("Report"). The Report opines on the discriminatory legislative intent that spurred SB 168's enactment—and the resulting discriminatory impact on minorities—based on his historical and statistical data analysis. *See id.*

In their *Daubert* Motion, Defendants argue that Dr. Lichtman's opinions are inadmissible because they are unhelpful legal conclusions and are founded upon irrelevant information. Defendants also assert that Dr. Lichtman's opinions are unreliable because they are not based on proper methodology; rather, they rely upon the legal factors used to establish discriminatory legislative intent, as set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Finally, although Defendants do not challenge his qualifications as a whole, they contend that Dr. Lichtman lacks the qualifications necessary to opine on the impact of SB 168 on law enforcement practices or issues of criminology. Plaintiffs take the opposing position, arguing that Dr. Lichtman is highly qualified to testify on all issues raised, he offers valuable and helpful opinions that do not pervade the role of the trier of fact, and his opinions are methodologically sound and relevant to the issue of discriminatory legislative intent.

With regard to the considerations on discriminatory intent under *Arlington Heights*, the United States Supreme Court has explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Accordingly, the Court identified, "without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268. The relevant factors include the following:

(1) "The impact of the official action whether it bears more heavily on one race than another may provide an important starting point." *Id.* at 266. "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* "Absent a [stark] pattern . . . , impact alone is not determinative, and the Court must look to other evidence." *Id.* (footnotes omitted).

(2) "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.

(3) "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.*

(4) "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* (footnote omitted).

(5) "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268.

(6) "Adherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance . . . is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.'" *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979) (citation omitted).

(7) Finally, "the availability of less discriminatory alternatives" may be a pertinent factor in assessing discriminatory intent. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985).

## B. Defendants' Motion *in Limine*

Defendants' Motion *in Limine* seeks to preclude Plaintiffs from relying on any third-party sources cited in the Amended Complaint or in Dr. Lichtman's Report. Defendants argue that, under

Federal Rule of Evidence 802, these sources are inadmissible hearsay that do not fall into any hearsay exception. The Motion *in Limine* specifically lists a number of these challenged sources from Dr. Lichtman's Report and Plaintiffs' Amended Complaint, and briefly addresses why each item is inadmissible hearsay. However, Defendants note that the sources listed in the Motion *in Limine* are only some of the inadmissible sources that Plaintiffs have advanced in support of their claims, but that any other third-party sources should also be excluded for the same reasons.

Plaintiffs oppose the Motion *in Limine*, asserting that expert witnesses may properly base their opinions on inadmissible hearsay. *See* Fed. R. Evid. 703. Likewise, Plaintiffs address Defendants' individual objections concerning the admissibility of these third-party sources, and argue that all third-party sources relied upon either can be produced in an admissible form at trial or fall within a hearsay exception or exclusion.

*      *      *

The Court first addresses Defendants' *Daubert* Motion and Motion *in Limine* because the parties' pending cross-motions for summary judgment[6] are, at least in part, dependent upon the disposition of these Motions. *See Bouton v. Ocean Props., Ltd.*, No. 16-cv-80502, 2017 WL 4792488, at *7 (S.D. Fla. Oct. 23, 2017). As such, this Omnibus Order will first address Defendants' *Daubert* Motion to determine if Dr. Lichtman's opinions are admissible, and then turn to the issues of inadmissible hearsay in Defendants' Motion *in Limine*. The motions for summary judgment will be addressed in a separate order.

---

[6] *See* ECF No. [111] (Defendants' Summary Judgment Motion); ECF No. [112] (Plaintiffs' Motion for Summary Judgment).

## II.   LEGAL STANDARD

### A. *Daubert* Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). "The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility." *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 408 (D.D.C. 2017) (citing *Daubert*, 509 U.S. at 588).

To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each one. *Id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-cv-21089, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla.

2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-cv-10052, 2009 WL 2058384, at *1 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[7]

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). These factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.*

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted all decisions of the Court of Appeals for the Fifth Circuit that were rendered prior to October 1, 1981.

Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341. Thus, a court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's

weaknesses to ensure the jury properly evaluates the testimony's weight and credibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

### B.  Motions *in Limine*

The United States Supreme Court has defined a motion *in limine* as "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). "In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Rodriguez v. GeoVera Specialty Ins. Co.*, 426 F. Supp. 3d 1334, 1339 (S.D. Fla. 2019) (quoting *Gonzalez*, 718 F. Supp. 2d at 1345). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769-Orl-22DAB, 6:07-cv-15733-Orl-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009); *see also Stewart v. Hooters of Am., Inc.*, No. 8:04-cv-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007) ("Motions *in Limine* are disfavored; admissibility questions should be ruled upon as they arise at trial.").

Evidence is admissible if relevant, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence. Fed. R. Evid. 401, 402; Advisory Committee Notes, Fed. R. Evid. 401 ("The standard of probability under the rule is 'more probable than it would be without the evidence.'"); *United States v. Patrick*, 513 F. App'x 882, 886 (11th Cir. 2013). A district court may exclude relevant evidence under Rule 403 if "its probative value is substantially outweighed

by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In addition, "[m]otions

*in limine* may be filed to address potential evidentiary objections such as hearsay, privileges,

authentication, and the best evidence rule." *Whidden v. Roberts*, 334 F.R.D. 321, 323 (N.D. Fla.

2020). "Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and

the balance should be struck in favor of admissibility." *Patrick*, 513 F. App'x at 886 (citing *United

States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011)). Rule 403's "major function . . . is limited

to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of

its prejudicial effect." *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001).

Accordingly, "[m]otions in limine should be limited to specific pieces of evidence and not

serve as reinforcement regarding the various rules governing trial, or (re)-addressing substantive

motions such as motions for summary judgment." *Holder v. Anderson*, No. 3:16-cv-1307-J-39JBT,

2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018) (citing *Royal Indem. Co. v. Liberty Mut. Fire

Ins. Co.*, No. 07-80172-CIV, 2008 WL 2323900, at *1 (S.D. Fla. June 5, 2008)). A district court

may therefore deny a motion *in limine* when it "lacks the necessary specificity with respect to the

evidence to be excluded." *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, No. CIV. A. 99-D-

880-E, 2001 WL 617521, at *1 (M.D. Ala. Feb. 20, 2001) (quoting *Nat'l Union v. L.E. Myers Co.

Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996)). Likewise, a motion *in limine* "is not a substitute

for a motion for summary judgment," and it is not an appropriate mechanism for testing the law,

narrowing the issues to be tried, or attempting to resolve substantive issues. *Royal Indem. Co.*,

2008 WL 2323900, at *1 (citations omitted).

"In light of the preliminary or preemptive nature of motions in limine, 'any party may seek

reconsideration at trial in light of the evidence actually presented and shall make contemporaneous

objections when evidence is elicited.'" *Holder*, 2018 WL 4956757, at *1 (quoting *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01-cv-545-FtM-29DNF, 2004 WL 4054843, at *1 (M.D. Fla. July 22, 2004)); *see also Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1285 (11th Cir. 2000) ("Generally, a party must object to preserve error in the admission of testimony, even when a party or a court violates an *in limine* ruling."). Ultimately, "[t]he district court has broad discretion to determine the relevance and admissibility of any given piece of evidence." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1297 (11th Cir. 2018) (quoting *United States v. Clay*, 832 F.3d 1259, 1314 (11th Cir. 2016)).

## III.   DISCUSSION

As an initial matter, the Court notes that the parties in this case have consented to a bench trial. *See* ECF Nos. [106] & [107]. Where a judge, instead of a jury, serves as the trier of fact, concerns regarding the exclusion of inadmissible or prejudicial evidence in advance of trial are significantly reduced.

> In a bench trial, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for h[er]self." *U.S. v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). *See also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Ass Armor, LLC v. Under Armour, Inc.*, No. 15-cv-20853-CIV, 2016 WL 7156092, at *4 (S.D. Fla. Dec. 8, 2016) ("As this is a bench trial without a jury, however, the need for an advance ruling to exclude [expert] testimony is superfluous and unnecessary."). That is because the Court as a fact finder is "presumably competent to disregard what [s]he thinks [s]he should not have heard, or to discount it for practical and sensible reasons." *Ass Armor*, 2016 WL 7156092, at *4 (internal quotation marks and citations omitted). At trial, the Court as fact finder is free to later decide to disregard testimony in whole or in part and/or to decide how much weight to give it. *See Brown*, 415 F.3d at 1270; [*N.W.B. Imps. & Exps. Inc. v. Eiras*, No. 3:03-cv-1071-J-32-MMH, 2005 WL 5960920, at *1 (M.D. Fla. Mar. 22, 2005)]; *Ass Armor*, 2016 WL 7156092, at *4. As another court in this District has explained:
>
> > [T]he danger involved with such expert testimony, namely that the jury will be unduly influenced, is not implicated in a bench trial. The Court is confident that it can discern testimony that seeks to make

> legal conclusions from testimony that provides the Court with
> background, context and industry knowledge that are traditionally
> supplied by experts. . . .
>
> *Apple Glen Inv'rs, L.P. v. Express Scripts, Inc.*, No. 8:14-cv-1527-T-33EAJ, 2015
> WL 3721100, at *4 (M.D. Fla. June 15, 2015) (internal quotation marks and
> citations omitted)).

*GLF Constr. Corp. v. Fedcon Joint Venture*, No. 8:17-cv-1932-T-36AAS, 2019 WL 7423552, at

*3 (M.D. Fla. Oct. 15, 2019).

Moreover, "district courts conducting bench trials have substantial flexibility in admitting

proffered expert testimony at the front end, and then deciding for themselves during the course of

trial whether the evidence meets the requirements" of Rule 702. *Brown*, 415 F.3d at 1243-44

(quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J.,

dissenting)). "Alternatively, in a bench trial, it has been an acceptable method 'to admit evidence

of borderline admissibility and give it the (slight) weight to which it is entitled.'" *Nat'l Union Fire*

*Ins. Co. of Pittsburgh PA v. SPX Flow US, LLC*, No. 18-cv-80332, 2019 WL 1227987, at *3 (S.D.

Fla. Mar. 14, 2019) (internal quotation marks omitted).[8] Indeed, courts "can separate and disregard

any [improper or speculative] conclusions . . . from testimony which provides context and

evaluates the evidence in light of specialized expertise." *GLF Constr. Corp.*, 2019 WL 7423552,

at *4 (citing *Apple Glen Inv'rs, L.P.*, 2015 WL 3721100, at *4).

Thus, "[w]here a trial judge conducts a bench trial, the judge need not conduct a *Daubert*

(or Rule 702) analysis before presentation of the evidence, even though [s]he must determine

admissibility at some point." *Travelers Prop. Cas. Co. of Am. v. Barkley*, No. 16-61768-CIV, 2017

WL 4867012, at *1 (S.D. Fla. June 2, 2017) (quoting *Kan. City S. Ry. Co. v. Sny Island Levee*

---

[8] *See also Singh v. Caribbean Airlines Ltd.*, No. 13-20639, 2014 WL 4101544, at *1 (S.D. Fla. Jan. 28, 2014) ("When ruling on motions *in limine*, a court is forced to determine the admissibility of evidence without the benefit of the context of trial. The more prudent course in a bench trial, therefore, is to resolve all evidentiary doubts in favor of admissibility." (citations omitted)).

*Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016)). Nevertheless, "courts may still go through the individual analyses of the experts or motions, and have granted these motions to strike prior to the bench trial." *Broberg v. Carnival Corp.*, No. 17-cv-21537, 2018 WL 4778457, at *1 (S.D. Fla. June 11, 2018) (citing *Exim Brickell LLC*, 2011 WL 13131317, at *4; *Goldberg v. Paris Hilton Ent., Inc.*, No. 08-22261-CIV, 2009 WL 1393416, at *4 (S.D. Fla. May 18, 2009)), *report and recommendation adopted*, No. 17-21537-CIV, 2018 WL 4776386 (S.D. Fla. July 3, 2018).

Similarly, "courts are advised to deny motions *in limine* in non-jury cases." *In the Matter of Blue Crest Holding Asset, Inc.*, No. 17-21011-CIV, 2018 WL 1463644, at *1 (S.D. Fla. Jan. 24, 2018) (citing 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 3d § 2411 (3d ed. 2008)); *see also Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions"). As the Eleventh Circuit has explained,

> the part of Rule 403 that authorizes exclusion of evidence because of its unfair prejudicial impact has no logical relationship to bench trials. Rule 403 assumes a trial judge is able to discern and weigh the improper inferences that a jury might draw from certain evidence, and then balance those improprieties against probative value and necessity. Certainly, in a bench trial, the same judge can also exclude those improper inferences from his mind in reaching a decision.

*Woods v. United States*, 200 F. App'x 848, 853 (11th Cir. 2006).

Because courts are "almost always better situated during the actual trial to assess the value and utility of evidence," the "'better practice is to deal with questions of admissibility of evidence as they arise' during the trial." *Whidden*, 334 F.R.D. at 323 (quoting *Sperberg v. The Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975)); *see also United States v. Marino*, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence). In light of relaxed these standards, the Court will independently address each of the Motions below.

### A. Defendants' *Daubert* Motion

Defendants first move to exclude the expert testimony of Dr. Lichtman on grounds of unhelpfulness, irrelevance, unreliability, and lack of qualifications. Specifically, Defendants make the following arguments: (1) Dr. Lichtman's testimony improperly opines on ultimate legal conclusions that are unhelpful to the trier of fact; (2) his Report relies on irrelevant information with no connection to the issues in this case; (3) his expert opinions are unreliable because they are not based upon any proper methodology; and (4) Dr. Lichtman improperly seeks to opine on issues of law enforcement and criminology, but lacks the proper qualifications to do so. Plaintiffs oppose the *Daubert* Motion, arguing that Dr. Lichtman's testimony is admissible and relevant to the instant proceedings. The Court has reorganized the order in which these arguments were presented in its analysis below.

### 1. Qualifications

Defendants concede, and the Court agrees, that Dr. Lichtman is generally qualified to serve as an expert in this case, given his credentials, training, experience, and extensive published work on issues similar to those presented here. Instead, Defendants seek to preclude Dr. Lichtman from opining on SB 168's impact on law enforcement practices or criminal justice because he is unqualified to offer expert testimony on such matters.

An expert may be qualified "by knowledge, skill, experience, training, or education." *J.G.*, 2013 WL 752697, at \*3 (citing *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129). "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Deputy v. Hartford Ins. Co. of the Midwest*, No. 8:19-cv-1697-T-33JSS, 2020 WL 5807997, at \*3 (M.D. Fla. June 1, 2020) (quoting *Clena Invs., Inc.*, 280 F.R.D. at 660). Further, "an expert must satisfy

a relatively low threshold, beyond which qualification becomes a credibility issue for the jury." *J.G.*, 2013 WL 752697, at *3 (citing *Martinez v. Altec Indus., Inc.*, No. 3:02-cv-1100-J-32TEM, 2005 WL 1862677, at *3 (M.D. Fla. Aug. 3, 2005)); *see also Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) (explaining that once there exists "reasonable indication of qualifications," those qualifications then "become an issue for the trier of fact rather than for the court in its gate-keeping capacity").

Yet, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *J.G.*, 2013 WL 752697, at *3 (citing *Maiz*, 253 F.3d at 665). Rather, "an expert 'may testify regarding narrow sub-topics within his broader expertise— notwithstanding a lack of specific experience with the narrower area—as long as his testimony would still assist a trier of fact.'" *Eldridge v. Pet Supermarket, Inc.*, No. 18-22531-CIV, 2020 WL 1076103, at *4 (S.D. Fla. Mar. 6, 2020) (quoting *Remington v. Newbridge Secs. Corp.*, No. 13-60384-CIV, 2014 WL 505153, at *4 (S.D. Fla. Feb. 7, 2014)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc.*, 280 F.R.D. at 661.

Dr. Lichtman has been recognized as an expert across a wide variety of different subjects, including historical analysis, statistical analysis, political analysis, discriminatory legislative intent and impact, racial animus, race relations, voting rights, redistricting, and data analysis. *See* ECF No. [109-1] at 18-21.[9] During the course of his career, Dr. Lichtman has also served as an expert witness in numerous cases where he was asked to conduct data collection analysis and provide opinions on issues specifically relating to the discriminatory intent of a legislative body. ECF No.

---

[9] *See, e.g.*, *United States v. Dallas Cty. Comm'n*, 850 F.2d 1433 (11th Cir. 1988) (considering Dr. Lichtman's expert testimony on an election plan's effect on race and politics); *Houston v. Lafayette Cty.*, 56 F.3d 606, 612 (5th Cir. 1995) (concluding that the district court should have considered Dr. Lichtman's expert testimony on his ecological regression analysis on black political cohesion and white bloc voting).

[109-3] at 9:20-11:22. In addition, some of the cases in which Dr. Lichtman served as an expert required him to address issues relating to immigration. *Id.* at 8:10-14, 11:23-12:5. Moreover, Dr. Lichtman has authored numerous expert witness reports addressing equal protection issues and has published a book on voting rights in America that directly implicated equal protection issues. *Id.* at 60:11-20.

Defendants contend that Dr. Lichtman should be precluded from opining on policing practices or crime rates for which he has no relevant training or experience. They assert that the opinions in his Report on these issues are inadmissible because he is unqualified to offer expert testimony on law enforcement practices or criminology. Specifically, Defendants argue that Dr. Lichtman's education, training, and scholarship are focused on political history, and any testimony on SB 168's purported effects on law enforcement practices, crime rates, or community interactions with police should be excluded.

During his deposition, when asked if he was an expert in the areas of criminal justice or law enforcement, Dr. Lichtman indicated that he had never taken any coursework on law enforcement, criminology, or criminal justice, *id.* at 7:18-23, but explained that he had "certainly studied law enforcement and criminal justice in the course of my work," *id.* at 7:1-3. He nevertheless stated:

> In the course of my work as an expert witness, I have frequently been called upon to examine historical background, which means that as part of that historical background I've looked at the history and present day reality of law enforcement in the jurisdiction that I'm looking at . . . . And obviously, in the course of my general writings, which broadly cover something like 11 or 12 books, broadly cover U.S. history, law enforcement has come into play.

*Id.* at 7:9-17; *see also* ECF No. [128] at 11 (noting that Dr. Lichtman's 2019 book, *Repeal the Second Amendment: The Case for a Safer America*, extensively analyzed law enforcement issues); ECF No. [109-2] at 5 (describing Dr. Lichtman's published works). In explaining his framework

for researching and reviewing data relating to law enforcement and racial discrimination, Dr. Lichtman also testified that he had prepared a number of other reports addressing discrimination in law enforcement in the past. ECF No. [109-3] at 46:4-22 ("I have done this before, this is not the first time I have looked at discrimination in law enforcement. I've done it for a number of other reports as well. And so I've looked at things like traffic stops, minor drug prosecution, sentencing, things of that nature that are the actual practice that truly affect people.").

The Court is satisfied that these credentials are sufficient to establish that Dr. Lichtman is "minimally qualified." *See Clena Invs., Inc.*, 280 F.R.D. at 661. In light of Dr. Lichtman's expansive experience and impressive qualifications on various topics and methods of data analysis, the Court fails to see how he is not similarly qualified to opine on the past and projected impact of SB 168 on law enforcement patterns and crime rates. Defendants present no justification for the alleged need to treat Dr. Lichtman's opinions on law enforcement or criminology differently from the rest of the opinions presented in his Report. Furthermore, although Defendants couch these opinions as ones relating to the effects of SB 168 on law enforcement and crime, Dr. Lichtman's opinions actually concern the discriminatory legislative intent behind SB 168 and the resulting impact on *immigrants and minorities*. Given his specialized knowledge and extensive background, the Court finds that Dr. Lichtman is qualified to testify on his expert opinions. Any further objections raised by the Defendants pertain only to the weight and credibility of Dr. Lichtman's testimony and are more appropriately addressed through cross examination. *See id.*

### 2. Reliability

Defendants also maintain that Dr. Lichtman must be precluded from testifying because his opinions are not based upon any reliable methodology. According to Defendants, instead of offering any generally accepted methodology to support his opinions, Dr. Lichtman vaguely states

that the Report employs a standard historical methodology without specifying any underlying principles, methods, or considerations that guide this methodology. Defendants point specifically to Dr. Lichtman's analysis of Florida history, and argue that he cherrypicked discriminatory policies without conducting any research into alternative, nondiscriminatory policies, and this selective and limited data is unreliable.

*Daubert*'s reliability inquiry concerns whether "the testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and methods,' which the witness applied 'reliably . . . to the facts of the case.'" *Off Lease Only, Inc. v. Lakeland Motors, LLC*, No. 6:18-cv-1555-Orl-37DCI, 2019 WL 6910162, at *1 (M.D. Fla. Dec. 19, 2019) (quoting Fed. R. Evid. 702).

> *Daubert*'s reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. *See Daubert*, 509 U.S. at 593-94; [*Allison*, 184 F.3d at 1312; *Carmichael*, 526 U.S. at 149.[10]]

---

[10] In addition, courts have generally recognized other relevant factors in determining whether expert testimony is sufficiently reliable under *Daubert*, including:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See* [*Joiner*, 522 U.S. at 146.]
> (3) Whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994)[.]
> (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See* [*Kumho Tire Co.*, 119 S. Ct. at 1176.]
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* [*Kumho Tire Co.*, 119 S. Ct. at 1175] (*Daubert*'s general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.")[.]

*McDowell*, 392 F.3d at 1298. In determining reliability, "court[s] should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *Id.* (citing *Allison*, 184 F.3d at 1312); *see also Coshap, LLC v. Ark Corp. Member Ltd.*, No. 1:16-cv-0904-SCJ, 2017 WL 9287017, at *2 (N.D. Ga. Dec. 12, 2017) ("The question is not whether the expert's opinion is correct, but whether the basis on which it rests is reliable.").

Ultimately, regardless of the specific guideposts considered in determining reliability, proposed testimony "must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.

> Usually the expert's testimony "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment). "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. [*Cook*, 402 F.3d at 1113]. And an expert's unexplained assurance that the opinions rely on accepted principles, standing alone, is insufficient. *McClain v. Metabolite Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005); *Frazier*, 387 F.3d at 1261.

*Lanzi v. Yamaha Motor Corp.*, No. 8:17-cv-2020-T-36AEP, 2019 WL 9553066, at *8 (M.D. Fla. Sept. 26, 2019). Generally, however, "if the principles, theories, and methodologies behind the opinion are scientifically valid and can be applied to the facts at issue in the case, then the opinion has a reliable basis." *Coshap, LLC*, 2017 WL 9287017, at *2 (citing *Daubert*, 509 U.S. at 592-93).

Notably, Defendants in this case do not assert that Dr. Lichtman applied an improper or flawed methodology in forming his opinions, nor do they argue that Dr. Lichtman relied on incorrect statistical evidence throughout his analysis that would undermine the Report's reliability. Instead, Defendants challenge Dr. Lichtman's opinions on the basis that he fails to specifically

---

Fed. R. Evid. 702 advisory committee notes (2000 amendments).

explain the methods or principles utilized in selecting, interpreting, and weighing sources, and he fails to explain what statistical methodology he uses in his quantitative statistical analysis.

Upon review of Dr. Lichtman's Report and deposition testimony, the Court concludes that Dr. Lichtman's opinions are sufficiently based on reliable methodological principles. At the outset, the Report explains in detail the sources of information or data relied upon, the underlying principles and methods used, the relevant analytical steps taken, and Dr. Lichtman's experiences and credentials, all of which serve as the foundation for his opinions. *See generally* ECF No. [109-1] at 6-8, 18-21.

Defendants take issue with Dr. Lichtman's use of the *Arlington Heights* factors in conducting his historical and statistical analysis, arguing both that these legal factors should not be included in an expert report and that Dr. Lichtman's analysis under *Arlington Heights* fails to meet the precise legal requirements of the framework. However, these arguments are unpersuasive because Defendants misinterpret Dr. Lichtman's use of the *Arlington Heights* factors in his Report. As Dr. Lichtman makes clear in his Report, the *Arlington Heights* guidelines are generally consistent with the analytical framework routinely employed by historians in his field in determining discriminatory intent. *See id.* at 6-7 ("In assessing intentional discrimination, historians follow methods that track the methodological guidelines of [*Arlington Heights*]. This report employs those guidelines, which are standard in my field of study. . . . [The Report] uses these factors methodologically only to assess intentional discrimination in the challenged legislation . . . . The methodology [] employ[ed] here and the opinions [] reached are the product of standard principles and methods used in my field of history, which are consistent with the *Arlington Heights* guidelines."). Yet, the fact that the two frameworks resemble each other does

not mean that Dr. Lichtman solely employed the legal standard of *Arlington Heights* as his methodology in this case.

Moreover, Dr. Lichtman's Report emphasizes that he reached his conclusions by reviewing standard statistical and historical sources and applying generally accepted principles and methods within his field of expertise—i.e., history. *See, e.g.*, *id.* at 6 ("[The] analyses and developed opinions in this matter are based on historical, political, and statistical information gathered and reviewed in [Dr. Lichtman's] capacity as an expert in political history, social science, and historical and statistical methodology. . . . The report draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports, government documents; and scientific surveys."). Moreover, the Report lists the numerous books and scholarly publications that Dr. Lichtman has authored on these same methodological principles and explains the many areas of expertise he has developed over the course of his career that are relevant to this case. *See id.* at 18-21. He then explains the importance of each *Arlington Heights* factor in determining discriminatory intent and applies the pertinent facts of this case.[11]

In the same vein, Defendants argue that Dr. Lichtman's opinions should be excluded because neither his Report nor his deposition testimony specifically explain the statistical analysis

---

[11] *See, e.g.*, ECF No. [109-1] at 7-8 ("The *Arlington Heights* guidelines and standard historical methodology establish a framework for the proof of intentional discrimination. [(1)] The examination of historical background, with a focus on recent events, explains why the adoption of SB 168 was consistent with a pattern of discrimination in the state of Florida. This history is ongoing and includes the same legislature that adopted SB 168. [(2)] The analysis of discriminatory impact demonstrates that SB 168 has a clear, significant and foreseeable impact on minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage. [(3)] The study of the sequence of events explains why decision-makers would be influenced to adopt SB 168 in 2019. [(4)] The examination of procedural and substantive deviations explores the discriminatory departures evident in the bill, including the rejection of ameliorating amendments. [(5)] The scrutiny of contemporary statements shows that justifications for the bill are misleading and pretextual.").

he used or the methodology guiding his selection and interpretation of relevant data. The Court

disagrees. As noted above, Dr. Lichtman's Report sets forth the types of sources he reviewed, the

standard historical and statistical analyses employed, his experience and areas of expertise and

their applicability, his published scholarly and academic works on the methodologies at issue here,

and the applicable facts or information in this case that he used to form his opinions. *See generally*

*id.* at 6-8, 18-21.

The Report also explains the basis for Dr. Lichtman's selection and reliance on certain

sources that he believes are noteworthy. *See, e.g.*, *id.* at 130 ("The ties between white support for

Republicans and anti-immigrant views is documented by the 2012 results of questions about

immigrants asked in the 2012 Cooperative Congressional Election Survey, *a standard source for*

*political analysis*." (emphasis added)). Similarly, when discussing the results of his own statistical

analysis in the Report, rather than the data he compiled from other historians and statisticians, Dr.

Lichtman expressly notes the statistical methods used.[12] During his deposition, Dr. Lichtman

testified that, in selecting and reviewing potentially discriminatory Florida laws, his focus was on

the discriminatory impact and practices arising from these statutory provisions, not the statutes

themselves, and noted certain types of events that were especially pertinent to his analysis of these

laws because they revealed instances of racial profiling.[13] Finally, Dr. Lichtman gave an example

---

[12] *See, e.g.*, ECF No. [109-1] at 191 (discussing analysis of crime rates in alleged sanctuary jurisdictions and explaining that, "[t]o achieve statistical control, *the analysis uses the standard methodology of multiple regression analysis*, which estimates the independent effects of predictor variables on a dependent variable, in this case crime rates." (emphasis added)); *see also City of Tuscaloosa*, 158 F.3d at 566 (concluding that expert's compilations of relevant data and his testimony on estimated damages, "are the products of simple arithmetic and algebra and of multiple regression analysis, a methodology that is well-established as reliable."); *Askew v. City of Rome*, 127 F.3d 1355, 1365 n.2 (11th Cir. 1997) (in voting rights case, district court admitted expert statistical testimony based, in part, on multiple regression analysis).

[13] *See, e.g.*, ECF No. [109-3] at 46:13-21 ("Well, for the most part, I wasn't so much concerned with the statutes, frankly I was much more concerned with practices. And I have done this before, this is not the first time I have looked at discrimination in law enforcement. I've done it for a number of other reports as well. And so I've looked at things like traffic stops, minor drug prosecution, sentencing, things of that nature that

of the analytical steps he used in opining that Florida's anti-discriminatory profiling policy, Fla. Stat. § 166.0493, which applies to municipal law enforcement agencies in the State, is ineffective and only exists on paper due to its lack of enforcement.[14]

"There is an important distinction between scrutinizing the reliability of an expert opinion's underlying methodology (or principles) and scrutinizing the expert's application of that methodology. Challenging the underlying methodology in general is an admissibility issue; challenging the expert's application of that methodology is an accuracy issue." *Coshap, LLC*, 2017 WL 9287017, at *3 (citing *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1343-45, 1344 n.11). The Court's gatekeeping function is to ensure that the expert testimony is sufficiently reliable and founded upon sound underlying methods and principles. *Daubert*, 509 U.S. at 590. Based on his deposition testimony and the standard historical and statistical methodologies discussed in the Report, the Court is satisfied that Dr. Lichtman's opinions were derived from sufficiently reliable analytical principles. The remaining arguments Defendants raise regarding the alleged unreliability of Dr. Lichtman's opinions are challenges to the weight and credibility of his testimony and are therefore not appropriately resolved on a *Daubert* motion. "The identification of [alleged] flaws in generally

---

are the actual practice that truly affect people."); *see also* ECF No. [109-1] at 61 ("Similarly, an analysis by two Arizona State University professors notes the importance of racially disparate outcomes in law enforcement, even if the exact causes may not be ascertainable: 'At an institutional level, contemporary racism can occur within structures that make room for differentiated enforcement and also by practices and policies that exclude or target particular groups through force of habit or by rules of thumb. The racial impact of such policies and practices is usually evident in the outcomes they produce, even if the discriminatory mechanisms that produce them remain obscure.'").

[14] *See, e.g.*, ECF No. [109-3] at 49:23-50:16 ("One thing I did do is look through the internet to see if there were any stories about enforcement. Stories about police racial profiling, disciplining of police, that would make the news, and I saw nothing about that. Secondly, we have all of this information about racial profiling that's going on right up to the present. And thirdly, I read reports and none of these reports indicated any kind of enforcement action against any law enforcement officials for racial profiling. . . . And I think it would probably make the news, certainly if it was any kind of significant disciplinary action against police officers. That's big news. And there were two other elements of my analysis that I also presented as well. It wasn't limited to that."); *see also* ECF No. [109-1] at 54.

reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345 (citing *Daubert*, 509 U.S. at 596).

### 3. Helpfulness

Defendants also argue that Dr. Lichtman should be precluded from testifying as to his expert opinions because they are inadmissible and unhelpful to the trier of fact. In particular, Defendants contend that Dr. Lichtman's Report impermissibly opines on the ultimate legal issue to be decided—namely, the discriminatory legislative intent. Plaintiffs, however, maintain that Dr. Lichtman's opinion that SB 168 was enacted with discriminatory intent is not objectionable simply because it embraces an ultimate issue. *See* Fed. R. Evid. 704. Rather, Plaintiffs argue that Dr. Lichtman's opinions will be helpful to the trier of fact because they provide informed historical and statistical analyses based on an exhaustive review of a wide variety of sources.

Expert testimony aids the trier of fact when it "logically advances a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312. "To do this, the expert's testimony must constitute either direct or circumstantial evidence that, if believed, will prove or make more likely an element of the proponent's case." *Parton v. United Parcel Serv.*, No. 1:02CV2008-WSD, 2005 WL 5974445, at *6 (N.D. Ga. Aug. 2, 2005) (citing *City of Tuscaloosa*, 158 F.3d at 562). However, the Eleventh Circuit has made it clear that expert witness testimony on an ultimate legal conclusion is not helpful to the trier of fact. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Thus, "[a]n expert may not . . . merely tell the jury what result to reach." *Id.* "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Id.* (citing *United States v. Poschwatta*, 829 F.2d 1477, 1483 (9th Cir. 1987); *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980)). Nevertheless, "[a]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but

he may not testify as to whether the legal standard has been satisfied." *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015).

Dr. Lichtman's Report states that, "[a]fter a methodological analysis based on my experience and the evidence, I have reached the opinion that SB 168 was adopted with the intent to discriminate against minorities in Florida, based on their perceived or actual national origin, race, and alienage." ECF No. [109-1] at 8. Dr. Lichtman's opinion on the legislature's discriminatory intent improperly invades the province of the trier of fact by opining on the ultimate legal question in this case. *See Quevedo v. Iberia, Lineas Aereas De Espana, S.A. Operadora Unipersonal*, No. 17-21168-CIV, 2018 WL 4932097, at *4 (S.D. Fla. Oct. 11, 2018) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony . . . [T]he question of intent is a classic jury question and not one for the experts." (citation omitted)); *see also Knight ex rel. Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 808-09 (11th Cir. 2017) (stating that "proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments" (quotation marks omitted)). As such, Defendants' *Daubert* Motion is granted in part. Dr. Lichtman will be precluded from offering any opinions at trial as to the ultimate issue of discriminatory legislative intent.

Additionally, as mentioned above, the helpfulness prong of the *Daubert* inquiry "turns on whether the proffered testimony 'concern[s] matters that are beyond the understanding of the average lay person.'" *Bouton*, 2017 WL 4792488, at *8 (quoting *Edwards*, 580 F. App'x at 823). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Edwards*, 580 F. App'x at 823 (quoting *Cook ex rel. Est. of Tessier*, 402 F.3d at 1111). To satisfy *Daubert*'s relevance requirement,[15] a "fit" must exist

---

[15] The Eleventh Circuit has explained the relevance inquiry under *Daubert* as follows:

between the offered opinion and the facts of the case. *McDowell*, 392 F.3d at 1299 (citing *Daubert*,

509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between

the facts and the opinion." *Id.* (citing *Gen. Elec. Co.*, 522 U.S. 136). "Thus, the court may exclude

otherwise reliable testimony if it does not have sufficient bearing on the issue at hand to warrant a

determination that it [is 'helpful' to the trier of fact]." *Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374,

1386-87 (M.D. Ga. 2014) (footnotes omitted); *see also Schenone v. Zimmer Holdings, Inc.*, No.

3:12-cv-1046-J-39MCR, 2014 WL 9879924, at *2 (M.D. Fla. July 30, 2014).

Defendants' *Daubert* Motion asserts that Dr. Lichtman's opinions should also be excluded

because they lack fit and rely on irrelevant information at each step of the *Arlington Heights*

analysis. Consistent with the reliability analysis above, the Court also finds that Dr. Lichtman's

opinions have the requisite fit because the analytical framework employed in the Report, along

with the underlying data reviewed, is pertinent to Plaintiffs' claims that SB 168 violates the Equal

Protection Clause because it was enacted with discriminatory intent. Indeed, the studies and

investigations cited in Dr. Lichtman's Report provide the trier of fact in this case with informed,

---

The party offering the expert testimony has the burden of demonstrating that the testimony is "relevant to the task at hand" and "logically advances a material aspect" of its case. *See Daubert*, 509 U.S. at 597; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotation marks omitted). The "basic standard of relevance . . . is a liberal one," *Daubert*, 509 U.S. at 587, but if an expert opinion does not have a "valid scientific connection to the pertinent inquiry" it should be excluded because there is no "fit." *See id.* at 591-92; *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence. *See Rink*, 400 F.3d at 1292.

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Frazier*, 387 F.3d at 1263 ("Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, *see* [*United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)], or if the expert testimony is cumulative or needlessly time consuming. *See, e.g.*, *Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir. 1985) (per curiam) (finding that admission of speculative and 'potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702'")).

exhaustive analyses on the historical and statistical circumstances surrounding SB 168's passage. Undoubtedly, the analysis is logically connected to the facts of this case and satisfies *Daubert*'s helpfulness requirement, because the trier of fact "could not possibly examine every single letter, note, article, and publication reviewed and analyzed" by Dr. Lichtman in his Report. *Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1311 (S.D. Fla. 2016). "Certainly, research such as that presented can serve the purpose of providing context and grounding scientific information integral to the determination of this case." *Id.* Further, in light of the bench trial in this case, the Court finds no indication that the probative value of Dr. Lichtman's opinions are substantially outweighed by their potential to mislead trier of fact. *See Frazier*, 387 F.3d at 1263.

Each of Defendants' examples of purportedly irrelevant evidence used in forming the opinions in the Report is, at bottom, an objection to the specific facts and data Dr. Lichtman included in his analysis. Such objections go to the weight to be given to Dr. Lichtman's testimony, not the admissibility. *Cf. Perau v. Barnett Outdoors, LLC*, No. 8:17-cv-550-T-JSS, 2019 WL 2145513, at *3 (M.D. Fla. Apr. 24, 2019) ("Arguments attacking the absence of specific factors considered in an expert's methodology often bear on the weight, not the reliability, of the methodology."). "On cross-examination, the opposing counsel [will be] given the opportunity to ferret out the opinion's weaknesses to ensure the [trier of fact] properly evaluates the testimony's weight and credibility." *Jones*, 861 F.2d at 662. Therefore, Defendants' *Daubert* Motion is denied on the issue of "fit."

### B.  Defendants' Motion *in Limine*

In their Motion *in Limine,* Defendants argue that Plaintiffs rely on a variety of third-party sources in their Amended Complaint, as does Dr. Lichtman in his Report, that are inadmissible hearsay. Defendants contend that Plaintiffs should be precluded from offering these sources as

evidence at trial because they do not satisfy any hearsay exception. Plaintiffs respond that none of the sources should be excluded at this stage because each one either satisfies a hearsay exception or exclusion or it can be introduced in admissible form at trial. Plaintiffs also briefly address a number of the third-party sources specifically at issue in Defendants' Motion *in Limine*. Finally, Plaintiffs contend that the challenged sources from Dr. Lichtman's Report should not be excluded because Federal Rule of Evidence 703 allows an expert to base his opinions on inadmissible sources if they are the types of sources  reasonably relied upon by experts in the field.

At the outset, the Court reiterates its position that motions *in limine* are significantly less valuable in cases that are to be tried by bench trial. In these circumstances, motions *in limine* only serve to deprive the presiding judge of a meaningful opportunity to consider properly raised objections in the context presented at trial. There is very little to be gained from securing strained, preliminary rulings on speculative issues, especially considering that the purpose of rulings *in limine* is to avoid highly prejudicial evidence from reaching the jury. That this case will be tried by bench trial weighs strongly against granting Defendants' Motion *in Limine*.

Moreover, generally speaking, to be appropriate, motions *in limine* should address specific pieces of evidence that are inadmissible on any relevant ground. Importantly, motions *in limine* should not be used as vehicles to secure substantive rulings on issues in a case, nor should they attempt to ensure that the rules of court will be enforced at trial. Therefore, to the extent that Defendants broadly request that any third-party sources be excluded, regardless of whether these sources were specifically enumerated in the Motion, this request is denied as premature and speculative at this stage. Defendants may raise proper objections to specific pieces of evidence introduced at trial, where appropriate.

Additionally, with regard to the sources in Dr. Lichtman's Report that Defendants challenge, these items are not inadmissible on any relevant ground. The Court cannot exclude the sources cited in Dr. Lichtman's Report preliminarily because it cannot determine how these sources will be introduced at trial, if introduced at all. Moreover, it is well established that experts may rely on inadmissible hearsay evidence in forming their opinions if the evidence is reasonably relied upon by professionals in the same field. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *see also Bouton*, 2017 WL 4792488, at *13. Indeed, Defendants seemingly concede that the newspaper articles and studies at issue are the types of sources generally relied upon by historians, statisticians, political scientists, and social scientists like Dr. Lichtman. The Court agrees. As such, to the extent that Defendants seek to narrow the scope of issues upon which Dr. Lichtman may testify at trial, these arguments are misplaced. The Motion *in Limine* is therefore denied as to the sources in Dr. Lichtman's Report. Defendants may object to the introduction of any of these third-party sources at trial, if presented.

Finally, Defendants assert that the third-party sources cited in Plaintiffs' Amended Complaint are inadmissible hearsay that should not be introduced at trial. Plaintiffs respond that these sources cannot be excluded as inadmissible hearsay at this point, and they offer specific responses to many of the challenged sources that demonstrate various ways through which this evidence could be properly introduced at trial. However, this Court is severely limited in its ability to determine the admissibility of these third-party sources at this stage because, until these items are introduced, it cannot assess the purpose for which the evidence is presented (i.e., to prove its effect or to prove the truth of the matter asserted). Because these third-party sources could be admissible if offered for certain purposes other than establishing the truth of their contents, the

Court will not exclude them in the abstract. *See White v. City of Birmingham, Ala.*, 96 F. Supp. 3d 1260, 1274 (N.D. Ala. 2015), *as amended* (May 27, 2015) ("News articles are generally not admissible to establish the truth of their contents. *See United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005). However, news articles may be admissible if offered for other purposes." (citing *United States v. Michtavi*, 155 F. App'x 433, 435 (11th Cir. 2005) (to show articles existed); *Est. of O'Connor v. United States*, No. 8:12-cv-02070-T-27MA, 2013 WL 1295925, at *2 n.8 (M.D. Fla. Mar. 28, 2013) (to show party had notice of allegations in article); *Carter v. District of Columbia*, 795 F.2d 116, 126 (D.C. Cir. 1986) (to show notice of pattern of police misconduct))).[16]

Therefore, Defendants' Motion *in Limine* is denied as to this issue and if the challenged newspaper articles are offered for an impermissible purpose at trial, Defendants are free to raise the proper objection.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' *Daubert* Motion, **ECF No. [109]**, is **GRANTED in part and DENIED in part** consistent with this Order.

2. Defendants' Motion *in Limine*, **ECF No. [108]**, is **DENIED**.

---

[16] *See also Mehta v. Foskey*, No. CV 510-001, 2013 WL 1890709, at *3 (S.D. Ga. May 6, 2013) (admitting newspaper articles that were "not offered to prove the truth of the matters asserted therein . . . but rather [were] offered to show the existence of local newspaper articles reporting the events at-issue which characterized Plaintiffs in an allegedly unflattering light" (citing *Michtavi*, 155 F. App'x at 435-436)), *aff'd*, No. CV 510-001, 2013 WL 1966152 (S.D. Ga. May 10, 2013); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1385 (M.D. Ala. 2014) (admitting newspaper articles that were not offered to prove the truth of the matter asserted, but to show their effect on Alabama readers).

Case No. 19-cv-22927-BLOOM/Louis

**DONE AND ORDERED** in Chambers at Miami, Florida, on December 3, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record