UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-22927-BLOOM/Louis

CITY OF SOUTH MIAMI, *et al.*,

      Plaintiffs,

v.

RON DESANTIS, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendants'[1] Summary Judgment Motion, ECF No. [111] ("Defendants' Motion"), and Plaintiffs[2] Motion for Summary Judgment, ECF No. [112] ("Plaintiffs' Motion"), (collectively, the "Motions"). The Court has carefully considered the Motions, all opposing and supporting submissions of the parties, the brief of *Amici Curiae*,[3] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' Motion is denied, and Plaintiffs' Motion is granted in part and denied in part.

---

[1] Defendants include Ron DeSantis, in his official capacity as Governor of the State of Florida ("Governor DeSantis"), and Ashley Moody, Attorney General of the State of Florida (collectively, "Defendants").

[2] Plaintiffs include Florida Immigrant Coalition, Inc. ("FLIC"), The Farmworker Association of Florida, Inc. ("FWAF"), Family Action Network Movement, Inc. ("FANM"), QLatinx, and WeCount!, Inc. ("WeCount"), on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc. ("AI Justice"), The Guatemalan-Maya Center, Inc. ("GMC"), Hope Community Center, Inc. ("Hope"), and Westminster Presbyterian Church United of Gainesville, Florida, Inc. ("Westminster"), on behalf of their organizations (collectively, "Plaintiffs").

[3] *Amici Curiae* include Rural Women's Health Project, the Florida Council Against Sexual Violence, M.U.J.E.R., Tahirih Justice Center, Los Angeles Center for Law and Justice, Oxfam America, The Center for Gender & Refugee Studies, University of Miami School of Law Human Rights Clinic, Human Rights Watch, and Florida Legal Services (collectively, "*Amici Curiae*" or "*Amici*"). *See* ECF No. [149].

## I.   BACKGROUND AND PROCEDURAL HISTORY

On May 2, 2019, the Florida Legislature passed Senate Bill 168 ("SB 168"), which aimed to further the State of Florida's interest in "cooperat[ing] and assist[ing] the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101 (2019). On June 14, 2019, Governor DeSantis signed SB 168 into law, and it was enacted as Chapter 908, Florida Statutes. *See* Fla. Stat. ch. 908.

### A.   Relevant SB 168 Provisions

This action concerns the following provisions of SB 168:

**Detainer Mandate.** Section 908.105 requires state and local law enforcement agencies to comply with immigration detainers[4] received from federal immigration authorities, and sets forth the duties of these law enforcement agencies, as they relate to immigration detainers. *See* Fla. Stat. § 908.105 ("Detainer Mandate").

**Transport Requirement.** Section 908.104 sets forth various ways in which state and local law enforcement agencies must cooperate with federal immigration enforcement efforts. *See* Fla. Stat. § 908.104. Pursuant to § 908.104(4),

> When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody

---

[4] An "immigration detainer" is defined in SB 168 as

> a facially sufficient written or electronic request issued by a federal immigration agency using that agency's official form to request that another law enforcement agency detain a person based on probable cause to believe that the person to be detained is a removable alien under federal immigration law, including detainers issued pursuant to 8 U.S.C. ss. 1226 and 1357 along with a warrant described in paragraph (c).

Fla. Stat. § 908.102(2).

of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

Fla. Stat. § 908.104(4) ("Transport Requirement").

**Cost Reimbursement.** Section 908.106 requires county correctional facilities to enter into agreements with the federal government for the reimbursement of costs incurred pursuant to honoring immigration detainer requests. *See* Fla. Stat. § 908.106 ("Cost Reimbursement").

**"Best Efforts" Provision.** In requiring cooperation with federal immigration enforcement efforts, § 908.104(1) applies to law enforcement agencies or "an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment," and mandates that they "use best efforts to support the enforcement of federal immigration law." Fla. Stat. § 908.104(1) ("Best Efforts Provision").

**Sanctuary Provisions.** Section 908.102(6) defines a "sanctuary policy" as

a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from:
    (a)   Complying with an immigration detainer;
    (b)   Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;
    (c)   Providing a federal immigration agency access to an inmate for interview;
    (d)   Participating in any program or agreement authorized under s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or
    (e)   Providing a federal immigration agency with an inmate's incarceration status or release date.

Fla. Stat. § 908.102(6) ("Sanctuary Definition"). Based on SB 168's Sanctuary Definition, § 908.103 states that "[a] state entity, law enforcement agency, or local governmental entity may

not adopt or have in effect a sanctuary policy." Fla. Stat. § 908.103 ("Sanctuary Prohibition"). The Sanctuary Definition and the Sanctuary Prohibition will be collectively referred to as the "Sanctuary Provisions."

**Enforcement Provision.** Section 908.107 sets forth the authority of the Governor and the Attorney General to enforce SB 168, in the event that state and local officers fail to comply with the immigration enforcement efforts specified therein. *See* Fla. Stat. § 908.107 ("Enforcement Provision").

**Antidiscrimination Provision.** Section 908.109 prohibits state and local entities or their agents from discriminating (i.e., basing "actions under [SB 168] on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution") when acting pursuant to SB 168. *See* Fla. Stat. § 908.109 ("Antidiscrimination Provision").

## B.  This Action

Following its enactment, on July 16, 2019, Plaintiffs initiated this action for declaratory and injunctive relief against Defendants, challenging the constitutionality of numerous provisions of SB 168. *See* ECF No. [1] ("Complaint"); ECF No. [38] ("Amended Complaint"). Plaintiffs' Amended Complaint asserted eleven counts alleging that various sections of SB 168 were unconstitutional. *See generally* ECF No. [38].[5]

---

[5] Specifically, the Amended Complaint asserted the following eleven counts on behalf of the different Plaintiffs: Count I – § 908.105's Detainer Mandate violates the Supremacy Clause, U.S. Const. art. VI, § 2; Count II – § 908.104(4)'s Transport Requirement violates the Supremacy Clause; Count III – § 908.106's Cost Reimbursement violates the Supremacy Clause; Counts IV, V, and VI – § 908.102(6)'s and § 908.103's Sanctuary Provisions violate the Due Process Clause; Counts VII, VIII, and IX – § 908.104(1)'s Best Efforts Provision violates the Due Process Clause; Count X – § 908.104(1)'s Best Efforts Provision violates the Equal Protection Clause; and Count XI – § 908.103's Sanctuary Prohibition violates the Equal Protection Clause. *See* ECF No. [38].

On August 30, 2019, Plaintiffs filed an Amended Motion for Preliminary Injunction, seeking to enjoin SB 168's Detainer Mandate, Transport Requirement, Cost Reimbursement, Best Efforts Provision, and Sanctuary Provisions. ECF No. [47]. On September 26, 2019, the Court held a hearing on the Amended Motion for Preliminary Injunction, during which the parties argued their respective positions. On October 1, 2019, the Court granted in part and denied in part Plaintiffs' Amended Motion for Preliminary Injunction, (1) concluding that Plaintiffs lacked standing to bring the claims asserted in Counts III, V, and VIII, (2) denying a preliminary injunction against the Detainer Mandate, the Best Efforts Provision, and the Sanctuary Provisions, and (3) granting the request to preliminarily enjoin the Transport Requirement. ECF No. [64] ("Preliminary Injunction Order").

Moreover, on September 4, 2019, Defendants filed a Motion to Dismiss, arguing that Plaintiffs lacked standing to bring many of their claims and that the Amended Complaint failed to state a claim upon which relief can be granted on any count asserted. ECF No. [52]. On December 12, 2019, this Court granted Defendants' Motion to Dismiss in part and denied it in part, concluding that: (1) consistent with its Preliminary Injunction Order, Counts III, V, and VIII were dismissed for lack of standing; (2) Count I was dismissed because it failed to state a claim; (3) Counts IV, VI, VII, and IX were dismissed on grounds of ripeness; and (4) the facts alleged in Counts II, X, and XI sufficiently stated claims for relief. ECF No. [83] ("Dismissal Order").

**C. The Summary Judgment Motions**

The Motions presently before the Court address Plaintiffs' remaining claims—namely, the claims in Counts X and XI that Best Efforts Provision and the Sanctuary Prohibition violate the Equal Protection Clause because "SB 168 was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors,

on the basis of race, color, and national origin," ECF No. [38] ¶¶ 395, 411, and the claim in Count II that the Transport Requirement violates the Supremacy Clause because it is preempted by the Immigration and Nationality Act ("INA"), *id.* ¶¶ 277-84.

Defendants have filed their Motion, ECF No. [111], with their corresponding Statement of Material Facts, ECF No. [110] ("Defendant's SMF"). Plaintiffs filed a Response in Opposition, ECF No. [129] ("Plaintiffs' MSJ Response"), together with their Response to Defendants' SMF, ECF No. [131] ("Plaintiffs' SMF Response"). Finally, Defendants filed a Reply in Support of their Motion, ECF No. [136] ("Defendants' MSJ Reply"), and a Reply Statement of Material Facts, ECF No. [135] ("Defendants' SMF Reply").

Plaintiffs have filed their Motion, ECF No. [112], along with a corresponding Statement of Undisputed Material Facts in Support, ECF No. [114] ("Plaintiffs' SMF"). Defendants filed their Response to Plaintiffs' Motion, ECF No. [126] ("Defendants' MSJ Response"), and their Response to Plaintiffs' SMF, ECF No. [127] ("Defendants' SMF Response"). Plaintiffs also filed a Reply in support of their Motion, ECF No. [140] ("Plaintiffs' MSJ Reply"), and a Response to Defendants' Additional Facts, ECF No. [141] ("Plaintiffs' Reply SMF"). *Amici*[6] also collectively filed an *amicus* brief in support of Plaintiffs' positions. ECF No. [149] ("*Amicus* Brief").

The Motions are ripe for this Court's consideration.[7]

---

[6] *Amici Curiae* are organizations with expertise on domestic violence, sexual assault, human trafficking, and other forms of gender-based violence in immigrant communities. *See* ECF No. [149] (Appendix A).

[7] In advance of its consideration of the instant Motions, this Court issued an Omnibus Order, ECF No. [157], denying Defendants' Motion in Limine to Exclude Third-Party Sources that are Hearsay, ECF No. [108], and granting in part and denying in part Defendants' *Daubert* Motion, ECF No. [109], to the extent that Plaintiffs' expert witness, Allan J. Lichtman, Ph.D. ("Dr. Lichtman"), is precluded from offering expert testimony on the ultimate legal questions to be determined by the trier of fact.

## II. MATERIAL FACTS

Based on the parties' respective statements of material facts in support of and in opposition to the Motions, along with the  evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.[8]

Based upon the record, the following are relevant individuals and entities:

Floridians for Immigration Enforcement ("FLIMEN") is a Florida corporation that was founded in 2003 to "advocate for legal immigration at reduced levels and oppose illegal immigration." ECF No. [113-6] at 15:17-19, 17:14. The organization works to advance laws "ending sanctuaries" and requiring "cooperation of public officials with Federal Immigration Enforcement." *Id.* at 30:20-25, 31:15-18; ECF No. [116-7] (FLIMEN 2018 endorsement of Senator Gayle Harrell). It also advocates for certain bills and occasionally submits model bills as part of its mission. ECF No. [113-6] at 15:16-24.

David Caulkett ("Mr. Caulkett") is a founder of FLIMEN who currently serves as the organization's vice president—the highest position. ECF No. [113-6] at 14:3-5, 14:18-25, 15:1-10, 18:2-10; ECF No. [116-9] (FLIMEN website page, "About Us," dated Aug. 7, 2020). Mr. Caulkett previously created and ran a separate business, "reportillegals.com," which he ran for over ten years. ECF No. [113-6] at 65:9-20, 68:7-8; ECF No. [116-10]. In running reportillegals.com, Mr. Caulkett charged fees to report suspected undocumented people or their employers to federal immigration enforcement agencies. ECF No. [113-6] at 65:12-19; ECF No. [116-11]. Mr. Caulkett also actively runs the website, "illegalaliens.us." ECF No. [113-6] at 67:15-16; ECF No. [116-12].

---

[8] The Court only details the facts necessary to address the Motions at issue before it today. To the extent that the statements of material fact contained significant amounts of statistical data or additional, generalized facts where the applicability was not immediately apparent, the Court will recite those facts where necessary.

The Federation for American Immigration Reform ("FAIR") is a national organization that claims it "fights for a stronger America with controlled borders, reduced immigration and better enforcement." ECF No. [120-7]. FAIR also reports on FLIMEN's work around legislation "preempting local sanctuary policies" at least as far back as 2008. *See* ECF Nos. [131-2] & [131-3]. Relatedly, Center for Immigration Studies ("CIS") is an organization that was "[i]nitially pitched by Tanton as a 'project of FAIR,' . . . [which] now promotes itself as "an independent think tank." ECF No. [131-10].

On November 17, 2015, Florida Senator Aaron Bean ("Senator Bean") introduced a piece of legislation that would prohibit sanctuary policies. *See* ECF Nos. [110-3] & [110-4]. On December 13, 2016, Jack Oliver, the former Legislative Director for FLIMEN, shared model "anti-sanctuary" legislation with Senator Bean, seeking his sponsorship for the bill. ECF No. [116-15]. This FLIMEN draft legislation contained similar language to SB 168's draft. *See, e.g.*, ECF No. [38-4] (text highlighted).

In December 2018, Senator Bean filed SB 170, and Senator Joe Gruters ("Senator Gruters") filed its companion bill, SB 168. ECF No. [90] ¶ 157; ECF No. [91] ¶ 157. On January 18, 2019, FLIMEN's former president sent an e-mail to Representative Cord Byrd ("Representative Byrd") requesting assistance in promoting SB 168, who later became the House sponsor for the bill. ECF No. [116-16]. On the same day, FLIMEN's former president e-mailed Senator Gruters seeking sponsorship for a pre-drafted bill he wrote that "could be titled 'No ID's for Undocumented Persons'" and requesting a meeting with himself and FLIMEN's Vice President, Mr. Caulkett. ECF No. [116-17]. On January 23, 2019, Mr. Caulkett sent an e-mail to Senator Gruters' legislative aide, Mr. Barnhill, writing: "[i]t certainly was a pleasure to meet with you and Senator Gruters today. We are elated that Senator Gruters will sponsor the DOC287(g) and ID Preemption bills. .

. . Please get the bills to Bill Drafting ASAP." ECF No. [113-6] at 142. The e-mail attached a 154-page document prepared by FAIR on sanctuary jurisdictions, stating that, "Per Senator Gruter's request, the list of Sanctuaries in Florida, or as I call them Anarchy Cities, is attached." *Id.* at 142-298. Additionally,  Mr. Caulkett's e-mail noted that FLIMEN's attorneys "looked at SB168" and made the following suggestions: "1) drop State Attorneys so just the Attorney General handles prosecutions, and 2) remove several carve-outs." *Id.* at 142; ECF No. [120-8].

As the year progressed, FLIMEN continued to correspond with Representative Byrd and Senator Gruters on issues that arose with SB 168. *See* ECF Nos. [119-1], [119-2], [119-3], & [120-1]. FLIMEN also supplied the bill sponsors with statistical data that supported the bill, including FAIR's sanctuary report, *see* ECF No. [119-1],[9] and helped advocate for SB 168 in various ways, *see* ECF No. [116-8] (requesting calls to the senate judiciary committee in support of SB 168); ECF No. [116-14] (e-mail from FLIMEN forwarding input from FAIR on two proposed amendments to SB 168); ECF No. [119-1] (exchanging FAIR's sanctuary report); ECF No. [119-2] (testifying at a senate judiciary committee meeting). In addition, SB 168's sponsors hosted a press conference, called "Victims of Illegal Immigration Day," planned in part with FLIMEN's help, to promote the bill. *See* ECF No. [110] ¶ 35 (video link to press conference); *see also* ECF No. [38-7].

Ultimately, on May 2, 2019, the Florida Legislature passed SB 168, enacted as Chapter 908 of the Florida Statutes. *See* Fla. Stat. ch. 908. The stated purpose of SB 168 is as follows: "The

---

[9] This FAIR sanctuary report also ended up being cited, alongside data generated by CIS on sanctuary policies, and was included in a Senate staff analysis report on SB 168. *See* ECF No. [110-1] at 4. As a result, on March 12, 2019, Senator Janet Cruz addressed the issue with Senator Gruters at a senate committee hearing, asking him why information from organizations that were designated as hate groups were being relied upon in the judicial staff analysis. *See* ECF No. [38] at 28 n.10 (link to video footage of senate committee hearing). In response, Senator Gruters stated that he had never heard them characterized as hate groups.

Legislature finds that it is an important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101.

### III.  LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the

[non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). Courts do not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

Initially, the moving party bears the "responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at*

*5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) ("*One Piece of Real Prop.*"). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331).[10] In particular, where "the parties respond[] to

---

[10] Indeed, the Court of Appeals for the Eleventh Circuit has explained each party's respective burden at the summary judgment stage:

> When the *nonmoving* party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, in order to discharge this "initial responsibility." Instead, the moving party simply may "'show[]'—that is, point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 324. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331 (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. Fed. R. Civ. P. 56(e); *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.
>
> When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331 (Brennan, J., dissenting); *see also Chanel, Inc.*, 931 F.2d at 1477. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party.

each respective summary judgment motion with disputes as to the 'undisputed' facts, add[]

'material facts' of their own, and then repl[y] with subsequent objections to the other party's

additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.*

Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one

of the parties meets its burden of demonstrating that "there is no dispute as to any material facts

with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the

non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan*

*Fung*, 695 F.2d at 1296-97).

## IV. DISCUSSION

Defendants seek summary judgment on all of Plaintiffs' remaining claims and argue that

Plaintiffs have failed to demonstrate the existence of any genuine issue of material fact. With

regard to the Equal Protection claims in Counts X and XI, which challenge the constitutionality of

the Best Efforts Provision and the Sanctuary Prohibition, Defendants argue that Plaintiffs have

presented no evidence to satisfy their heavy burden of proving that the Legislature acted with

discriminatory intent in enacting SB 168. Additionally, Defendants remind the Court that they are

currently subject to a preliminary injunction on SB 168's Transport Requirement, and they

"preserve their argument that the provision is not conflict preempted." ECF No. [111] at 20. Aside

---

*See id.* at 1477. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.*; *see also* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (footnotes omitted) ("*Four Parcels*").

from this preservation, Defendants do not present any additional argument on the lawfulness of the Transport Requirement.

Plaintiffs seek summary judgment on Counts II, X, and XI of the Amended Complaint—each of the remaining claims in this case—and seek declaratory and injunctive relief, arguing that they are entitled to judgment as a matter of law on these claims. Plaintiffs contend that summary judgment is warranted on their Equal Protection claims because the evidence conclusively establishes SB 168's underlying discriminatory purpose and discriminatory effect. Specifically, Plaintiffs take the position that the discriminatory intent of SB 168 is evidenced by the fact that bill sponsors relied extensively on the assistance and input from known anti-immigrant hate groups in working to pass the bill, and even included their biased data on sanctuary jurisdictions in the Senate's staff analysis. They also cite to statistical studies and reports on racial profiling based on race, color, and/or national origin to show SB 168's discriminatory effect on minorities and immigrants. Plaintiffs further argue that they are entitled to summary judgment on their claim that the Transport Requirement is conflict preempted, consistent with this Court's reasoning in its Preliminary Injunction Order and Dismissal Order.

## A. Equal Protection Standard

In the instant Motions, the parties focus the majority of their arguments on the constitutionality of the Best Efforts Provision and the Sanctuary Prohibition under the Equal Protection Clause.[11] As such, the Court first sets forth the general framework necessary to address Equal Protection challenges before turning to the Motions.

"The Equal Protection Clause provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. Its central purpose

---

[11] Because the required analysis is the same for both of Plaintiffs' Equal Protection challenges, the Court will address these claims together in resolving the parties' Motions below.

Case No. 19-cv-22927-BLOOM/Louis

is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

The United States Supreme Court previously explained that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (citing *Davis*, 426 U.S. 229) ("*Arlington Heights*").[12] "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Davis*, 426 U.S. at 242. Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265.

In asserting a claim that a facially neutral law violates the Fourteenth Amendment based on mixed motives, a plaintiff must establish, by a preponderance of the evidence, that the alleged "racial discrimination was a substantial or motivating factor in the adoption of [the law at issue]. [The plaintiffs] shall then prevail unless the [defendants] prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered." *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (citing *Arlington Heights*, 429 U.S. at 252; *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "In this summary judgment context,

---

[12] Similarly, the Eleventh Circuit has elaborated that

> Equal protection claims can be divided into three broad categories. The first and most common type is a claim that a statute discriminates on its face. In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate state goal. When the statute facially discriminates against certain groups or trenches upon certain fundamental interests, courts have required a closer connection between the statutory classification and the state purpose.
> The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact. In such a case, a plaintiff must prove purposeful discrimination.
> The third type of claim is that defendants are unequally administering a facially neutral statute.

*E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citations omitted).

when the defendant has pointed to the absence of evidence of discriminatory intent, it becomes the plaintiffs' job to produce such evidence." *Citizens Concerned About Our Children v. Sch. Bd. of Broward Cty., Fla.*, 193 F.3d 1285, 1294-95 (11th Cir. 1999) (citing *Celotex Corp.*, 477 U.S. at 322-23). "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242.

A plaintiff need not prove that the law at issue rested solely on a discriminatory intent or purpose. *Id.* "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. "Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute." *Id.* at 265 n.11 (quoting *McGinnis v. Royster*, 410 U.S. 263, 276-277 (1973)). "When there is proof that a discriminatory purpose has been a motivating factor in [a legislature's] decision [to pass a law], [the] judicial deference [courts generally afford to lawmakers' decisions] is no longer justified." *Id.* at 265-66. "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citing *United Jewish Orgs. v. Carey*, 430 U.S. 144, 179 (1977)). "It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*[13] A plaintiff may also "demonstrate

---

[13] The Supreme Court has also cautioned that:

> This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are [] inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made

intentional discrimination if the 'decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens.'" *Hallmark Devs., Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006) (quoting *United States v. Yonkers*, 837 F.2d 1181, 1225 (2d Cir. 1987)); *see also Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1311 (M.D. Ala. 1999) ("If . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination.").

"Proving the motivation behind official action is often a problematic undertaking." *Hunter*, 471 U.S. at 228 (citing *Rogers v. Lodge*, 458 U.S. 613 (1982)). Moreover, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed, the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others

---

as it is under the Constitution—an inference is a working tool, not a synonym for proof. When . . . the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when . . . the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Pers. Adm'r of Mass.*, 442 U.S. at 279 n.25.

to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.* "Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters," because the law "would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." *Palmer*, 403 U.S. at 225.

The Supreme Court, in *Arlington Heights*, provided a non-exhaustive list of examples of what evidence might establish that a law was enacted with discriminatory intent.

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, 426 U.S. at 242, may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.
>
> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *See* [*Lane*, 307 U.S. at 268]; *Griffin v. School Board*, 377 U.S. 218 (1964); *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala.), *aff'd per curiam*, 336 U.S. 933 (1949); *cf.* [*Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 207 (1973)]. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. *Reitman v. Mulkey*, 387 U.S. 369, 373-376 (1967); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Arlington Heights*, 429 U.S. at 266-68 (footnotes omitted); *see also Pers. Adm'r of Mass.*, 442 U.S. at 279 n.24 ("Proof of discriminatory intent must necessarily usually rely on objective factors . . . . The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid.").

The Eleventh Circuit recently summarized this fact-intensitve inquiry into discriminatory legislative intent under *Arlington Heights* as follows:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1225 (11th Cir. 2020) (footnote omitted) (citing *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983), *rev'd in part on reh'g*, 727 F.2d 957 (11th Cir. 1984), *judgment aff'd*, 472 U.S. 846 (1985)).

It is worth reemphasizing, however, that at summary judgment, "the only required finding is that there is no genuine issue as to any material fact. If any fact issues exist a trial judge must not make findings but is required to deny the motion and proceed to trial." *Shook*, 713 F.2d at 665. Moreover, "[s]ummary judgment is generally inappropriate in intentional discrimination cases because the 'legislature's motivation is itself a factual question.'" *Greater Birmingham Ministries*, 966 F.3d at 1245 (Gayles, J., dissenting) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). Indeed, "[s]ummary judgment in [discrimination] cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and [the Eleventh Circuit's] precedent." *Ga. State Conf. of NAACP*, 775 F.3d at 1348 (citing *Nipper v. Smith*, 39 F.3d 1494, 1527 (11th Cir. 1994); *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994) (noting that "the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts")).

With this general framework in mind, the Court turns to the instant Motions.

## B. Defendants' Motion for Summary Judgment

As noted, Defendants' Motion seeks summary judgment on Plaintiffs' remaining two Equal Protection claims and their claim that the Transport Requirement is conflict preempted.

### 1. Equal Protection

Defendants first argue that because neither the Best Efforts Provision nor the Sanctuary Prohibition of SB 168 violate the Equal Protection Clause, summary judgment is warranted. Specifically, with regard to Plaintiffs' initial burden to show that SB 168 was enacted with a discriminatory purpose and effect, Defendants contend that none of Plaintiffs' evidence creates a triable issue of material fact. To support their argument, Defendants address the alleged insufficiencies in the evidence Plaintiffs present within the context of the various *Arlington Heights* factors. Because they allege that Plaintiffs cannot satisfy the initial prong of the Equal Protection analysis, Defendants argue that the Court need not address the second prong at all. Nonetheless, Defendants take the position that the second prong is also sufficiently established in this case because the Legislature would have still passed SB 168 without any alleged discriminatory intent. Plaintiffs oppose the Motion, arguing that there remain issues of material fact that preclude summary judgment in Defendants' favor. Relying on a wide variety of evidence in the record to satisfy the *Arlington Heights* factors, Plaintiffs contend that they have adequately demonstrated that SB 168 was enacted with discriminatory legislative purpose or intent.

As explained above, "[t]here are two prongs to an equal protection analysis under the Fourteenth Amendment[.]" *Greater Birmingham Ministries*, 966 F.3d at 1225 (citing *Hunter*, 471 U.S. at 227-28; *Johnson*, 405 F.3d at 1222-23; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999)). First, a plaintiff must demonstrate that the State's "decision or act had a discriminatory purpose and effect." *Burton*, 178 F.3d at 1188-89. "Thus, to get past summary

20

judgment on an equal protection claim, a plaintiff must produce enough evidence to allow a reasonable trier of fact to find racially discriminatory intent." *Hill v. Orange Cty. Sheriff*, 666 F. App'x 836, 840 (11th Cir. 2016). "If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Greater Birmingham Ministries*, 966 F.3d at 1225. Where, on the other hand, a plaintiff sufficiently shows the existence of discriminatory intent and effect, the inquiry proceeds to the second prong, and "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

Upon a thorough review of the briefing and consideration of all of the evidence submitted by the parties, it is abundantly clear to the Court that this case is rife with material disputes of fact regarding Plaintiffs' Equal Protection claims. By its very nature, the *Arlington Heights* framework suggests an in-depth, highly factual inquiry into the purported discriminatory legislative intent after a thorough examination of the various factors. *See Davis*, 426 U.S. at 242 ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"). Each parties' respective briefing on the Motions sets forth markedly different renditions of pertinent facts and the inferences that can be drawn from the record evidence. These highly contradictory—yet allegedly "undisputed"—fact patterns, on their own, demonstrate that granting summary judgment in either parties' favor would be inappropriate in this case.[14] In other words, given the outstanding issues in this case, the question of whether the Florida Legislature acted with discriminatory purpose or intent in enacting SB 168 is one that must necessarily be submitted to the trier of fact for credibility determinations and weighing of the evidence. *See Lewis*, 934 F.3d at 1179.

[14] Although the Court recognizes that a defendant can, through the burden-shifting framework on an equal protection claim, eliminate any lingering disputes of material fact by sufficiently rebutting a plaintiff's *prima facie* evidence of discriminatory intent, as will be addressed below, Defendants have failed to do so here.

Nevertheless, the Court will discuss the *Arlington Heights* considerations and highlight the significant disputes of material fact that exist.

### a.   Sequence of Events & Departures from the Norm[15]

Defendants first argue that the evidence Plaintiffs present on the specific sequence of events leading to SB 168's passage—namely, FLIMEN, FAIR, and CIS's alleged involvement in drafting SB 168—is insufficient as a matter of law because it fails to indicate any discriminatory intent. For this factor, Defendants note that although Plaintiffs have relied significantly on FLIMEN's e-mail to Senator Bean on December 13, 2016, ECF No. [116-5], which attached model legislation similar to the language of SB 168, Plaintiffs fail to recognize that Senator Bean had previously introduced a bill prohibiting sanctuary policies with similar wording to that of SB 168 and FLIMEN's model legislation on November 11, 2015, ECF Nos. [110-3] & [110-4]. Defendants argue that Senator Bean's 2015 bill refutes any allegation that FLIMEN drafted SB 168, and that Plaintiffs have no evidence to show that FLIMEN contacted legislators before 2016.

Defendants further assert that a single citation in the Senate staff analysis to data on sanctuary cities generated by CIS and FAIR cannot establish discriminatory intent, *see* ECF No. [110-1] at 5, especially in light of the fact that Attorney General Loretta Lynch initiated an investigation into sanctuary cities based on a CIS sanctuary city report, *see State v. DOJ*, 951 F.3d 84, 97-98 (2d Cir. 2020), and that the Supreme Court, the Court of Appeals for the Eighth Circuit, and this Court have relied on CIS studies in their opinions. ECF No. [111] at 9 (citing *Arizona v. United States*, 567 U.S. 387, 398 (2012); *Bandak v. Eli Lilly & Co.*, 587 F.3d 798, 801 (7th Cir. 2009); *Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1349 (S.D. Fla. 2017));[16] Defendants' SMF ¶ 27;

---

[15] Where appropriate based on the issues addressed, the Court has consolidated the analysis on multiple related *Arlington Heights* factors.

[16] While the other cases cited do indeed appear to rely on reports or articles generated by CIS, Defendants'

ECF No. [136] at 4. Likewise, with regard to the Legislature's rejection of the proposed amendments to SB 168, Defendants contend that there is no evidence of any improper departures from the norm such that it would suggest improper conduct or discriminatory intent. Rather, Plaintiffs' objections merely take issue with the provisions of the bill on policy grounds.

Similarly, Defendants assert that the April 17, 2019, press conference about SB 168 fails to demonstrate any discriminatory purpose. *See* Defendants' SMF ¶ 35 (containing the hyperlink to the full video footage of the press conference). According to Defendants, the press conference—which was hosted by SB 168's sponsors, Senator Gruters and Representative Byrd, and was attended by various other legislators, organizational representatives (including representatives from FLIMEN), and speakers—fails to offer any support for the Legislature's alleged discriminatory intent. Defendants further argue that none of FLIMEN's e-mail and phone communications, meetings, or other interactions with legislators and their staff lend support to Plaintiffs' theory of discrimination. Ultimately, Defendants assert that Plaintiffs have failed to submit any evidence to support their allegations that anti-immigrant hate groups drafted SB 168.

Unsurprisingly, the issues of whether controversial groups like FLIMEN, FAIR, and CIS participated in drafting and developing SB 168, and to what extent, are among the most contentious in this litigation. Moreover, despite Defendants' representations to the contrary, Plaintiffs offer a wide array of evidence that, at the very least, raises reasonable inferences that these organizations

---

inclusion of *Bellitto* appears to have little logical connection. In *Bellitto*, this Court assessed the admissibility of an expert witness's opinions pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The expert was the Director of Research at CIS, which the Court acknowledged. That acknowledgement, however, was the extent of the Court's discussion of CIS. *Bellitto*, 302 F. Supp. 3d at 1348. Additionally, *Bellitto* did not present any question on the use or reliability of statistical data obtained from CIS. Instead, the *Bellitto* expert intended to opine on his own statistical calculations, which he derived using data provided by the U.S. Census Bureau—a source that the Court found was entitled to a presumption of accuracy and reliability. *Id.* at 1348, 1350. The Court also explicitly limited the expert testimony to the results of the calculations themselves, and precluded any testimony on the calculations' degree of accuracy. *Id.* at 1349. As such, the Court does not find the circumstances in *Bellitto* to be relevant to this case.

were actively involved in drafting, editing, and reviewing SB 168 leading up to its enactment. For example, Plaintiffs submit copies of e-mail communications between members of FLIMEN and various legislators involved with SB 168 and/or their staff members. These communications present evidence of FLIMEN's active involvement in the legislative efforts to enact SB 168. *See, e.g.*, ECF No. [116-14] (e-mail from FLIMEN forwarding input from FAIR on two proposed amendments to SB 168).[17]

At summary judgment, the Court accepts the non-movant's "version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant." *Crocker*, 886 F.3d at 1134. The evidence Plaintiffs submit is sufficient to draw a reasonable inference that FLIMEN was actively involved in SB 168's drafting and editing. Indeed, when looking at the evidence in the light most favorable to Plaintiffs, a colorable narrative of FLIMEN's ongoing involvement in the bill's development  is presented, which included FLIMEN offering its regular input, opinions, and suggestions on the bill language and proposed amendments, and providing useful data to support the bill's objectives.[18] Not only do these communications raise questions

---

[17] The extent to which FAIR participated in reviewing SB 168 is also subject to some dispute, as Plaintiffs note the close ties between many of the individuals that hold leadership positions in FAIR and FLIMEN. ECF No. [113-6] at 19:15-20:2; ECF No. [131-10] at 18-19. Moreover, in soliciting input on the ACLU's opposition to SB 168, Senator Gruter's legislative assistant, Mr. Barnhill, sent an e-mail to Kenneth Morrow, FLIMEN's former President, asking, "Does *fair* [sic] have any response to this?" ECF No. [119-3] at 2 (emphasis added).

[18] Likewise, the use of FAIR and CIS data in the Senate staff analysis strongly suggests the existence of some underlying racial animus, even where the problematic data is only cited once. Although the analysis proceeds to discuss the various ways to determine the presence of sanctuary cities, the data cited from FAIR and CIS is the only quantified estimate of the number of sanctuary cities in Florida contained in the staff analysis. *See generally* ECF No. [110-1].

Further, the use of data that is suspected to be unreliable or inaccurate, produced by two controversial organizations with anti-immigrant philosophies, in support of a bill that, on its face, aims to significantly increase immigration enforcement efforts, suggests the presence of discriminatory purpose. Assuming Plaintiffs' version of the facts, if the Legislature did permit organizations with obvious ties to discriminatory philosophies to intimately participate in the legislative process, this could reasonably raise an inference that the organization's conduct or racist views were attributable to the entire legislative body. *See Hallmark Devs., Inc.*, 466 F.3d at 1284. Thus, the propriety of rejecting the proposed amendments to

about FLIMEN's involvement in the bill drafting, ECF No. [120-8] at 2 (e-mail from FLIMEN to Mr. Barnhill indicating that FLIMEN's attorneys looked over SB 168 and suggested that certain changes be made), but they also suggest some awareness on the part of Senator Gruters and his staff about the controversial nature of FLIMEN. For example, these e-mail communications suggest that the list of sanctuary cities created by FAIR, which was e-mailed to Mr. Barnhill and was ultimately included in the Senate staff analysis, would be subject to some criticism. *See, e.g.*, ECF No. [117-1] at 2 (e-mail from FLIMEN stating, in part, that "[p]er Senator Gruter's request, the list of Sanctuaries in Florida, or as I call them Anarchy Cities, is attached. . . . FLIMEN suggests you consider not widely distributing the list as that would just create problems."). Taken together, the evidence is sufficient to withstand summary judgment on the issue of discriminatory intent.

Moreover, the April 17, 2019, press conference further bolsters the likely existence of discriminatory purpose in SB 168's enactment. Notably, although the event was hosted by the bill sponsors, Plaintiffs have provided e-mail correspondence between FLIMEN and Senator Gruter's office demonstrating that FLIMEN organized a large portion of the event, including naming the event "Victims of Illegal Immigration Day," selecting the intended speakers, and the event date and time. ECF No. [38-7]. Similarly, in addition to reinforcing FLIMEN's apparent connection to and involvement with SB 168 successfully getting passed, the press conference footage, taken in the light most favorable to Plaintiffs, could suggest that the bill sponsors and other legislators in attendance endorsed the anti-immigrant views expressed by the other speakers, including statements made by FLIMEN's Communications Director.[19]

---

SB 168 may turn on whether the trier of fact concludes that FLIMEN was involved in drafting the bill.

[19] Notably, as recognized by a district court in the Northern District of Florida,

"Drawing the line between facially race-neutral statements and racially charged code words is difficult." *Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at *9 (S.D.N.Y.

Taken together, the Court concludes that issues of material fact exist regarding the involvement of groups like FAIR and FLIMEN in SB 168's passage. Moreover, the course of events leading up to SB 168's passage, and the deviations from the norm in relying on these controversial organizations, when viewed in the light most favorable to Plaintiffs, could support drawing a reasonable inference of discriminatory purpose.

### b. Disparate Impact

Another factor noted in *Arlington Heights* is disparate impact, which occurs where a decision, though neutral on its face, has a disproportionate impact on a protected group. *See Hallmark Devs., Inc.*, 466 F.3d at 1284. Disparate impact is ordinarily not determinative on its own, but may be used to supplement other evidence of discriminatory intent. *Arlington Heights*, 429 U.S. at 266. Statistical evidence may be used to establish a discriminatory pattern that can create an inference of discriminatory intent. *See Cooper v. S. Co.*, 260 F. Supp. 2d 1258, 1267 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th Cir. 2004).

With regard to this factor, Defendants contend that there is no disparate impact as a result of SB 168's enactment and that, even if there were, any alleged disproportionate burden is a natural consequence of implementing immigration policies and does not violate the Equal Protection

---

Dec. 17, 2013). "[C]ertain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness—[including] words like . . . 'illegal alien.'" *Id.* Whether one of these terms evinces racial animus "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

*Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282-MW/GRJ, 2016 WL 375102, at *11 (N.D. Fla. Jan. 28, 2016).

Collectively, the fact that the other speakers were affiliated with controversial, xenophobic or racist organizations, coupled with the repeated use of "illegal alien," a term that has racist undertones, and the characterization of undocumented immigrants as "murderers" and "victimizers" during the press conference, all present evidence of racial animus. Further, because the press conference was hosted by SB 168's sponsors and was attended by numerous other legislators, a question of fact exists as to whether the racially motivated viewpoints expressed were reflective of the Legislature's discriminatory intent.

Clause. Moreover, Defendants argue that, contrary to Plaintiffs' position, SB 168 will not lead to increased racial profiling by law enforcement officers because SB 168 contains an explicit provision that prohibits discrimination. *See* Fla. Stat. § 908.109.

For their part, Plaintiffs rely on declarations and deposition testimony of their organization representatives, which describe the disproportionate impact that SB 168 has on minorities. *See* Plaintiffs' SMF ¶¶ 74-86 (collective citations to exhibits). Plaintiffs also point to the extensive statistical data presented in Dr. Lichtman's Report and discussed in his deposition, which describe the negative effects of anti-sanctuary policies, proactive policing policies, and immigration partnerships between ICE officers and local law enforcement agencies. *See* ECF No. [109-1]. Finally, *Amici Curiae* submitted a brief in support of Plaintiffs in this case that provided the Court with valuable and informative evidence on how a law like SB 168 has a particularly harmful impact on victims of gender-based violence. *See* ECF No. [149]. The combination of evidence Plaintiffs rely upon presents consistent conclusions on the disparate impact of laws like SB 168—namely, that immigrants are subject to increased racial profiling, arbitrary police stops, and arrests; they are more reluctant to perform routine daily activities; they stop using critical heath and social services in their communities; and they live in constant fear, to name a few—and Plaintiffs' representatives further report that their members have been experiencing the increasing burdens of this as a result of SB 168's enactment. After reviewing the extensive statistical data presented, the Court finds that this evidence arguably raises an inference of discriminatory intent sufficient to withstand summary judgment .

### c.   Contemporary Statements & Historical Background

Next, Defendants argue that various statements presented in this case cannot, as a matter of law, raise an inference of discriminatory intent. First, Defendants assert that statements made

by SB 168's sponsors that the bill aimed to promote public safety cannot be used to demonstrate discriminatory intent. In addition, Defendants argue that any statements made by legislators that are unrelated to SB 168 are either not contemporaneously made or they are irrelevant as a matter of law and thus cannot present circumstantial evidence of discriminatory purpose. These include, for example, Senator Gruters's comment about planning a "listening tour" after SB 168's enactment to hear concerns with the new legislation, his poster outside his office with pictures of undocumented immigrants who were recently subject to removal proceedings, and his anti-illegal immigration campaign advertisement. Lastly, Defendants contend that statements made by private citizens, including individuals from FAIR, CIS, and FLIMEN, do not qualify as contemporary statements made by members of the decisionmaking body. Plaintiffs oppose each of Defendants' arguments.

In terms of the statements made by SB 168's sponsors that the bill was enacted with public safety purposes in mind, Plaintiffs have submitted relevant record evidence that could reasonably suggest that this stated nondiscriminatory purpose was pretextual. Specifically, Plaintiffs point to Sheriff Gualtieri's deposition testimony, along with Dr. Lichtman's testimony, which both indicate that crime rates had been decreasing in the years leading up to the enactment of SB 168. *See* ECF No. [115-2] at 70:6-24; ECF No. [116-3] at 120-26. Because the "historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, the testimony regarding decreasing crime rates in Florida is directly relevant. When reviewed at the summary-judgment stage, Plaintiffs' evidence can sufficiently call into question the bill's legitimate, nondiscriminatory purpose as explained by SB 168's sponsors.

With regard to the remaining statements that Defendants argue fail as a matter of law, the Court cannot fully assess, at this stage, whether such statements rise to the level of suggesting racial animius on the part of the entire legislative body. The resolution of outstanding factual questions, like the extent of FLIMEN's involvement in drafting SB 168, will necessarily affect whether certain pieces of evidence can sufficiently lead a reasonable trier of fact to find discriminatory intent. As such, resolution of these issues would be premature. Nonetheless, the Court concludes that Plaintiffs have presented enough evidence to raise triable questions of fact about SB 168's stated purpose.

### d.  Defendants' Rebuttal

Based on the discussions above on the different *Arlington Heights* factors and their application in this case, Plaintiffs have produced enough evidence to raise material issues of fact regarding SB 168's discriminatory purpose and effect. Accordingly, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. Defendants argue that, even if Plaintiffs met their burden, granting summary judgment in Defendants' favor is still appropriate because the elected officials involved in enacting SB 168 have supported and submitted multiple similar anti-sanctuary bills since 2015. *See* ECF Nos. [110-3] – [110-10]. Plaintiffs respond that there is no evidence in the record disproving the assertion that FLIMEN shared model legislation with Senator Bean prior to 2015. Indeed, Plaintiffs argue that FLIMEN's history of legislative activism dates back to 2004, which lends further support to the possibility that it sent Senator Bean a model anti-sanctuary bill before the December 2016 correspondence.

The Court is unpersuaded by these arguments. Specifically, with regard to Defendants' burden to offer rebuttal evidence that the law would have been enacted regardless of discriminatory

intent, they must satisfy this burden by a preponderance of the evidence. *See Greater Birmingham Ministries*, 966 F.3d at 1231. Yet, Defendants fail to offer any explanation as to why the evidence submitted in support of their rebuttal—i.e., the proposed text of certain draft bills and their corresponding bill histories—establishes by a preponderance of the evidence that SB 168 would have been passed, even absent the alleged discriminatory intent. Moreover, after reviewing Defendants' Motion and taking the facts in the light most favorable to Plaintiffs at the summary-judgment stage, the Court sees no basis to conclude that these four *unsuccessful* attempts to introduce anti-sanctuary bills now support Defendants' position that SB 168 would have been successfully passed, regardless of discriminatory purpose. At best, this argument presents additional issues of fact that further support denying summary judgment. Accordingly, Defendants' Motion is denied as to Counts X and XI.

### 2. Conflict Preemption

Next, with regard to whether § 908.104(4)'s Transport Requirement is unconstitutional and conflict preempted by federal law, the Court notes that the entirety of Defendants' arguments on this issue are as follows: "Defendants are currently subject to a preliminary injunction with respect to Section 908.104(4). Defendants preserve their argument that the provision is not conflict preempted." ECF No. [111] at 20 (citations omitted). Because Defendants do not raise any specific arguments challenging the Court's analysis in its prior Preliminary Injunction Order or asserting a basis for granting summary judgment in their favor on this issue, Defendants' Motion is denied on the issue of conflict preemption.[20] *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("the onus is upon the parties to formulate arguments").

---

[20] Additionally, as will be addressed in more detail in the analysis on Plaintiffs' Motion, the Court concludes that SB 168's Transport Requirement is conflict preempted by federal immigration law and is therefore unconstitutional. As such, Defendants' Motion is also denied on the merits. *See City of S. Miami v. Desantis*, 408 F. Supp. 3d 1266, 1301-02 (S.D. Fla. 2019) (Preliminary Injunction Order).

### C.  Plaintiffs' Motion for Summary Judgment

Plaintifffs also seeks summary judgment on the Equal Protection claims in Counts X and XI of the Amended Complaint, and on the preemption claim in Count II.

#### 1.  Equal Protection

With regard to their Equal Protection claims, Plaintiffs argue that they have adequate circumstantial proof on each of the *Arlington Heights* factors. Plaintiffs assert that there is no genuine issue of material fact precluding summary judgment in this case. However, in light of the Court's analysis on Defendants' Motion, summary judgment is inappropriate here because there are genuine disputes of material fact that remain. Although the *Arlington Heights* considerations will largely turn on the same disputes of fact as those discussed  in Defendants' Motion, the Court will briefly address them here.

##### a.  Sequence of Events & Departures from the Norm

With regard to whether the sequence of events leading up to SB 168's enactment, and whether any procedural or substantive departures from the norm contributed to its enactment, Plaintiffs maintain that all of the record evidence demonstrates that xenophobic lobbying groups, i.e., FLIMEN and FAIR, had been trying to introduce anti-sanctuary legislation in Florida for years to no avail. Plaintiffs argue that, as SB 168 was proceeding through the legislative process in 2019, FLIMEN and FAIR were able to secure sponsors for SB 168 and to help draft the bill throughout the legislative process. As a result, according to Plaintiffs, SB 168's sponsors, in a deliberate departure from the procedural norms, introduced model legislation prohibiting sanctuary policies that was drafted by known anti-immigrant hate groups. Plaintiffs explain that these sponsors ultimately relied on these groups as key advisors on any proposed changes to SB 168, including more than two dozen rejected amendments attempting to curtail the bill's discriminatory impacts.

Moreover, Plaintiffs contend that the bill sponsors also departed from the substantive norms by providing Senate staff analysis that relied on biased data supporting the ban on sanctuary cities that was produced by FAIR and CIS, and the issue of this flawed data was raised at a Senate committee meeting. Despite being alerted that these organizations were characterized as anti-immigrant hate groups, Plaintiffs point out that a few weeks later, the sponsors of SB 168 nonetheless co-hosted a press conference with FLIMEN and other known xenophobic groups. Plaintiffs thus contend that this cumulative evidence, along with additional circumstantial evidence, warrants granting judgment as a matter of law on the issue of discriminatory intent.

However, as Defendants point out, the evidence in the record contains many contradictions to the factual assertions recited above, thus creating genuine issues of material fact. In construing all facts in the light most favorable to Defendants, and in drawing all reasonable inferences in their favor as the non-movants, the Court concludes that the record evidence contains significant disputes of fact, which are more appropriately submitted for resolution by a trier of fact. Indeed, Mr. Caulkett, FLIMEN's vice president, testified that FLIMEN "did not draft the bill," ECF No. [113-6] at 22:17-23, which is also buttressed by evidence of Senator Bean's 2015 draft bill and history introducing similar legislation, *see* ECF Nos. [110-3] & [110-4]. The ultimate resolution of this issue turns on nuanced credibility determinations and weighing of evidence, which cannot be done at summary judgment.

Moreover, turning to the erroneous inclusion of data produced by FAIR and CIS on sanctuary policies within the Senate staff analysis, Defendants note the complete absence of evidentiary support establishing that either the Legislature as a whole, or even a single legislator, mistakenly relied on the improper data in deciding on SB 168. Nor do Plaintiffs indicate that the data was of any significance in the ultimate decision to pass SB 168. *See Arlington Heights*, 429

U.S. at 267. Furthermore, the existence of any noteworthy procedural or substantive abnormalities, or the implications of these abnormalities, is dependent upon the trier of fact's determination as to FLIMEN's involvement in drafting SB 168. Accordingly, any remaining arguments on departures from the norm are more appropriately resolved by the trier of fact.

### b.  Contemporary Statements & Historical Background

Plaintiffs also rely on statements made by Senator Gruters during the legislative proceedings as evidence of an intent to discriminate on national origin. Likewise, they argue that the discriminatory legislative intent is informed by Florida's long history of discrimination.

First, with regard to the contemporary statements made by Senator Gruters, which suggest racial animus, the Court concludes, as it did on Defendants' Motion, that these statements must be submitted to the trier of fact. The resolution of other outstanding factual questions, like the extent of FLIMEN's involvement in drafting SB 168, will necessarily affect whether certain pieces of evidence can reasonably lead to an inference of discriminatory intent.

Likewise, with regard to Plaintiffs' attempt to attribute Florida's history of discrimination to the Legislature that passed SB 168, the Court finds these arguments to be unpersuasive and unsupported by law. The Supreme Court has made it clear that while specific historical background may be relevant when tailored to the issue at hand,

> "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." [*Mobile v. Bolden*, 446 U.S. 55, 74 (1980)]. The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Ibid.* The "historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977). But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018).

Based on the express guidance from the Supreme Court about the use of generalized historical data of past discrimination to establish discriminatory intent, any attempt to do so here necessarily fails.

### c.   Intended & Foreseeable Disparate Impact

Finally, Plaintiffs' Motion, relying on extensive statistical data and materials, argues that both the Best Efforts Provision and the Sanctuary Prohibition under SB 168 have resulted in a significant disparate impact on minorities on the basis of race, color, or national origin. Plaintiffs claim that this impact was both foreseeable and known at the time of the bill's passage, Thus, Plaintiffs contend that SB 168's foreseeable disparate impact supports an inference that SB 168 was enacted with discriminatory intent.

Yet, before addressing the merits of Plaintiffs' Motion on the issue of dispate impact, it is worth noting that, "in *Washington v. Davis*, 426 U.S. 229 (1976), [the Supreme Court] made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264; *see id.* at 265 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."). Rather, "proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim." *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 616 (11th Cir. 1995).

In light of this guidance, the Court does not see the need to delve into the issue of disparate impact at this stage, as Plaintiffs are not entitled to summary judgment on their Equal Protection claims based on any other *Arlington Heights* factors.

### 2.   Conflict Preemption

Plaintiffs also requests that the Court grant summary judgment on the issue of whether the Transport Requirement, Fla. Stat. § 908.104(4), is conflict preempted. As discussed above, this

Court previously granted a preliminary injunction against the enforcement of the Transport Requirement and concluded that the provision was conflict preempted. *See Desantis*, 408 F. Supp. 3d at 1301-02. The Court also found that this provision was severable from the rest of SB 168. *Id.* at 1309. Plaintiffs urge the Court to apply the same reasoning as the Preliminary Injunction Order because SB 168's Transport Requirement is conflict preempted by federal immigration law and is therefore unconstitutional. Defendants do not present any arguments in response, but rather refer back to their Motion, preserving their position on the lawfulness of the Transport Requirement.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). Nonetheless, the Supremacy Clause mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Thus, "[w]here the two conflict, federal law trumps state law; that was always clear. What constitutes a conflict is often less clear." *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008) (citations omitted).

Under the preemption doctrine, Congress has the power to preempt state law, and this preemption typically falls into one of "three categories: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Id.*; *Arizona*, 567 U.S. at 399-400. "Express preemption occurs when Congress manifests its intent to displace a state law using the text of a federal statute." *Browning*, 522 F.3d at 1167. "Implied preemption" has generally been used to encompass field and conflict preemption. *Id.* "Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it,'" *id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), or "where

there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona*, 567 U.S. at 399 (quoting *Rice*, 331 U.S. at 230). "Conflict preemption occurs either when it is physically impossible to comply with both the federal and state laws or when the state law stands as an obstacle to the objective of the federal law." *Browning*, 522 F.3d at 1167.

Two main considerations guide courts' preemption analysis: "First, the purpose of Congress is the ultimate touchstone in every pre-emption case. Second, we assume that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *United States v. Alabama*, 691 F.3d 1269, 1281-82 (11th Cir. 2012) (citations and internal quotation marks omitted).

> With regard to immigration law, the Supreme Court has explained that
>
> [t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations. The federal power to determine immigration policy is well settled.

*Arizona,* 567 U.S. at 394-95 (citations omitted). Moreover, the field of immigration governance "is extensive and complex." *Id.* at 395. As such, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* at 396. Nonetheless, the Supreme Court has emphasized that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397.

The Executive Branch is tasked with the enforcement of immigration law, and immigration officials are given "broad discretion" in the exercise of their powers. *Id.* at 396-97. Although there are numerous agencies within the Department of Homeland Security ("DHS"), *id.* at 397, the agency relevant to the instant action is Immigration and Customs Enforcement ("ICE"). "ICE

officers are responsible 'for the identification, apprehension, and removal of illegal aliens from the United States.'" *Id.*

"As a general rule, it is not a crime for a removable alien to remain present in the United States." *Id.* at 407. Moreover, "[r]emoval is a civil, not criminal, matter." *Id.* at 396.

> The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." [8 U.S.C.] § 1226(a). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. *See* 8 C.F.R. § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. *See* §§ 241.2(b), 287.5(e)(3). If no federal warrant has been issued, those officers have more limited authority. *See* 8 U.S.C. § 1357(a).

*Id.* at 407-08 (some citations omitted).

Congress has delineated specific, "limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 408. Relevant to the instant case, the Attorney General may grant this authority to specific state or local law enforcement officers pursuant to a formal agreement, commonly referred to as a "287(g) Agreement,"[21] which allows officers to perform the duties of a federal immigration officer under the direction and supervision of the Attorney General after completing adequate immigration training. 8 U.S.C. § 1357(g)(1); *Arizona*, 567 U.S. at 408-09. Without a 287(g) Agreement, local law enforcement agencies are not

---

[21] The federal government's authorization to enter into 287(g) Agreements is codified in 8 U.S.C. § 1357(g):

> (1) Notwithstanding section 1342 of Title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

*Id.* § 1357(g)(1).

permitted to unilaterally perform the functions of federal immigration officers, such as detaining an alien for being removable, "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410.

Nevertheless, the Supreme Court has recognized that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Id.* at 411. Congress has explicitly stated that state and local law enforcement agencies do not need a 287(g) Agreement (A) "to communicate with the [Federal Government] regarding the immigration status of any individual," or (B) "otherwise to cooperate[22] with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10); *Arizona*, 567 U.S. at 411-12.

> The Transport Requirement provides that,
>
> When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

Fla. Stat. § 908.104(4).

The plain language of this provision authorizes local agencies to transport individuals subject to an immigration detainer across state lines into federal custody. Plaintiffs allege that this provision is conflict preempted because it frustrates Congress's objectives in creating 287(g) Agreements. Critically, § 1357(g)(1) expressly lists transportation across state lines as a power that can only be delegated to local officers pursuant to a 287(g) Agreement. *See* 8 U.S.C.

---

[22] The Court will refer to the provision in 8 U.S.C. § 1357(g)(10)(B) as the "cooperation clause."

§ 1357(g)(1) ("an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (*including the transportation of such aliens across State lines to detention centers*), may carry out such function at the expense of the State or political subdivision" (emphasis added)). As such, consistent with its conclusion in the Preliminary Injunction Order, here, the Court finds that the Transport Requirement in SB 168 impermissibly encroaches upon the Crongressional objectives set forth in § 1357(g)(1). *See Desantis*, 408 F. Supp. 3d at 1302.

Indeed, SB 168's attempt to grant this specifically enumerated transport power to local officers frustrates Congress's objectives for the transportation of undocumented immigrants because it renders the express language in § 1357(g)(1) on the transport of aliens pursuant to a 287(g) Agreement meaningless. *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015) ("It is 'axiomatic that all parts of a statute must be read together in order to achieve a consistent whole.' 'Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.'" (quoting *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 455 (Fla. 1992))). The Transport Requirement's language explicitly grants local law enforcement agencies discretionary power to transport an undocumented immigrant into federal custody "absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. This is precisely the type of unilateral conduct that *Arizona* expressly prohibited. *Id.*

Likewise, the mandate requiring law enforcement officers to obtain prior judicial authorization does not rectify the issue of unilateral conduct. Instead, this judicial authorization requirement seeks to vest additional powers in the state judiciary that could otherwise only be

performed by federal immigration officials—namely, allowing state judges to unilaterally authorize the transport of undocumented immigrants across state lines into federal custody. *See* Fla. Stat. § 908.104(4). This unilateral decision by local officers and state judges, in effect, "allows the State to achieve its own immigration policy," which is not permitted. *Arizona*, 567 U.S. at 408. The Court therefore concludes that the Transport Requirement is conflict preempted because it frustrates the purpose of § 1357(g)(1). *See Browning*, 522 F.3d at 1167 ("Conflict preemption occurs [] when . . . when the state law stands as an obstacle to the objective of the federal law.").

Moreover, as the Court explained in its Preliminary Injunction Order, the Transport Requirement is severable from the remainder of SB 168 because this authorization to transport aliens across state lines into federal custody does not implicate any other statutory provision. *See Desantis*, 408 F. Supp. 3d at 1309. "Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004); *see also id.* (noting that "federal courts have an affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so"). Therefore, the Transport Requirement is severable from the remainder of SB 168. *Id.*

The Court concludes, as it did in its Preliminary Injunction Order, that the Transport Requirement is conflict preempted and is therefore unconstitutional. Thus, Plaintiffs' Motion is granted on Count II of the Amended Complaint. *See Associated Builders & Contractors Fla. E. Coast Ch. v. Miami-Dade Cty., Fla.*, 594 F.3d 1321, 1323-24 (11th Cir. 2010) ("Once an order of permanent injunction is entered, any preliminary injunction merges with it[.]" (citing *Sec. & Exch. Comm'n v. 1st Fin. Grp. of Tex.*, 645 F.2d 429, 433 (5th Cir. 1981))).

Case No. 19-cv-22927-BLOOM/Louis

## V.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Summary Judgment Motion, **ECF No. [111]**, is **DENIED**.

2. Plaintiffs' Motion for Summary Judgment, **ECF No. [112]**, is **GRANTED in part and DENIED in part**. Defendants are **PERMANENTLY ENJOINED** from enforcing the Transport Requirement, Fla. Stat. § 908.104(4), because this statutory provision is preempted by federal immigration law and is therefore unconstitutional.

**DONE AND ORDERED** in Chambers at Miami, Florida, on December 14, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record