IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

City South Miami, et al.

        Plaintiffs,

v.                                           Case No:  19-cv-22927

Ron DeSantis, et al.,

        Defendants.

_____

**EXPERT REPORT OF DR. ALLAN J. LICHTMAN**

1

EXHIBIT
P-1

Table of Contents

I. STATEMENT OF PURPOSE .................................................................................... 5

II. EVIDENCE AND METHODOLOGY ................................................................... 5

III. SUMMARY OF OPINIONS AND FINDINGS .................................................. 6

IV. QUALIFICATIONS ............................................................................................. 17

V. SUMMARY OF SB 168, SIGNED INTO LAW JUNE 14, 2019, FLA. STAT. § 908.101..... 20

VI. HISTORICAL BACKGROUND: RACIAL DISCRIMINATION IN FLORIDA................. 23

    A.  Racial Discrimination in Voting ........................................................................ 23
    B.  Racial Discrimination in Education ................................................................... 34
    C.  Racial Discrimination in Housing...................................................................... 39
    D.  Law Enforcement ............................................................................................... 44

VII. DISCRIMINATORY EFFECT OF SB 168 ON MINORITIES IN FLORIDA................. 56

    A.  SB 168 is a Proactive Police Measure That is Likely to Trigger the Racial Profiling of Non-whites in Florida ........................................................... 56

    B.  The Pattern of Florida and Nationwide Arrests by Immigration and Customs Enforcement ("ICE") Demonstrates SB 168 Will Disparately Impact Suspected Removable Immigrants From Latin America and the Caribbean ..................................... 60

    C.  The Pattern of Arrests in Florida and Nationwide under Cooperative Immigration Enforcement Agreements with ICE Demonstrates that SB 168 Will Primarily Ensnare Suspected Removable Immigrants with Clean Criminal Records or Convictions Only for Minor Crimes ..................................... 66

    D.  Data from ICE Referrals After the Implementation of SB 168 Confirms the Targeting of Suspected Removable Immigrants Arrested for Minor and Non-Violent Offenses, Especially Traffic Offenses........................................................ 70

    E.  SB 168 Will Ensnare U.S. Citizens, Based on Their Race or Ethnicity, Not Just Removable Undocumented Immigrants............................................. 73

    F.  The Immigrant "Threat Narrative" Advanced in Support of SB 168 Made Its Discriminatory Impact Foreseeable ................................................... 86

    G.  SB 168 Will Likely Have a Chilling Effect on Immigrant Communities on Reporting Crime and Interacting with Police and Other Public Officials ........................................... 95

2

    H.  Proactive Policing Measures on Immigration Like SB 168 Elsewhere Have Had
Disparate Negative Effects on Minorities ..................................................... 103

    I.  SB 168 Arrests, Detentions and Removals Will Negatively Impact Family Members,
Including U.S. Citizens ................................................................................. 110

VIII. SEQUENCE OF EVENTS ........................................................................ 119

    A.  A. Crime Was Falling in Florida in Tandem with Increases in Undocumented
Immigration and Most Steeply in Alleged Sanctuary Jurisdictions .................. 120

    B.  Shifts in Florida's Demography and Voting Patterns Gave Republicans Motivation to
Adopt SB 168 ............................................................................................. 126

    C.  The Election of Joe Gruters to the Florida Senate and Ron DeSantis to the Governorship,
Facilitated the Enactment of SB 168 ............................................................ 130

    D.  The anti-Immigrant hate Groups FAIR and FLIMEN became Intimately Involved in the
Crafting, Strategy, and Promotion of SB 168 ................................................ 133

IX. SUBSTANTIVE DEVIATIONS ................................................................. 168

X. CONTEMPORARY STATEMENTS ........................................................... 181

    A.  Decision-makers and Advocates Falsely Claimed that SB 168 Would Improve Public
Safety by Protecting Floridians from Criminals ............................................. 182

        1.  Senator Joe Gruters ................................................................... 183

        2.  Representative Cord Byrd ........................................................... 184

        3.  Governor Ron DeSantis .............................................................. 184

        4.  Republican Representative Bob Rommel, Chair Subcommittee on Civil Justice 184

        5.  FLIMEN ................................................................................... 185

        6.  Amapola Hansberger, Head of LIFA, appeared at an event with Gruters and Byrd
promoting SB 168 and testified for it .......................................... 185

        7.  The Public Safety Rationale Behind Legislators' Support for SB 168 is
Demonstrably False and Pretextual ............................................. 185

    B.  Alleged Sanctuary Jurisdictions are Likely Safer and no Less Safe Than Other
Jurisdictions ............................................................................................... 186

    C.  Adoption of 287(g) Agreements Do Not Make Jurisdictions Safer ................... 194

    D.  Undocumented immigrants commit crime at lower rates than native-born Americans ..... 197

    E.  Proponents' of SB 168 Falsely Claimed the Law Would Impact Only Dangerous, Violent
Criminals, Not Minor Offenders ................................................................... 206

        1.  Senator Joe Gruters ................................................................... 207

        2.  Senator Joe Gruters ................................................................... 207

        3.  Pinellas County Sheriff Bob Gualtieri, the chief law enforcement advocate for SB
168 ........................................................................................... 208

XI. CONCLUSIONS..................................................................................................... 213

APPENDIX A: FLIMEN MODEL BILL DECEMBER 2016 ....................................... 219

APPENDIX B: SENATOR JOE GRUTERS FILED BILL, SB 168, 21 FEBRUARY 2019 ....... 223

APPENDIX C: HOUSE ENACTED BILL HB 9, 2018.................................................. 229

APPENDIX D: CURRICULUM VITAE ...................................................................... 251

APPENDIX E: CASES SINCE 2015, DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY   276

## I.    STATEMENT OF PURPOSE

I have been asked by Plaintiffs' counsel in this case to consider and offer my opinions on whether Florida Senate Bill 168 ("SB 168"), enacted as Chapter 908 of Florida Statutes, was adopted with the intent of discriminating against minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage, regardless of their possession of documentation. I have also been asked to respond to any material presented by plaintiffs, including reports submitted by plaintiffs' experts.  I have enclosed an updated CV (Appendix D) which fairly and accurately describes my training, education and experience.  In addition, I have enclosed a table of cases (Appendix E) in which I have been involved as an expert witness since 2015. My fee in this matter is $500 per hour.

My analyses and developed opinions in this matter are based on historical, political, and statistical information gathered and reviewed in my capacity as an expert in political history, social science, and historical and statistical methodology. My analyses and opinions are provided from that perspective and are not intended to provide a legal conclusion but, rather, to provide the Court with facts and context for the ultimate legal determination on intent that it must make.

## II.    EVIDENCE AND METHODOLOGY

The report draws upon sources standard in historical and social scientific analysis. These include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports, government documents; and scientific surveys. In assessing intentional discrimination, historians follow

methods that track the methodological guidelines of the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). This report employs those guidelines, which are standard in my field of study.  In the *Arlington Heights* case, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) historical background, (2) discriminatory impact, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. This report will consider each of these factors in turn. It uses these factors methodologically only to assess intentional discrimination in the challenged legislation, not to reach any legal conclusions. Similarly, the citations of judicial decisions in this report are in reference to their substantive findings and are not for purposes of legal analysis. Sources are footnoted in the report. The methodology I employ here and the opinions I have reached are the product of standard principles and methods used in my field of history, which are consistent with the *Arlington Heights* guidelines.

### III.   SUMMARY OF OPINIONS AND FINDINGS

The *Arlington Heights* guidelines and standard historical methodology establish a framework for the proof of intentional discrimination. The examination of historical background, with a focus on recent events, explains why the adoption of SB 168 was consistent with a pattern of discrimination in the state of Florida. This history is ongoing and includes the same legislature that adopted SB 168. The analysis of discriminatory impact demonstrates that SB 168 has a clear, significant and foreseeable impact on minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage. The study of the sequence of events explains why decision-makers would be influenced to adopt SB 168 in

6

2019. The examination of procedural and substantive deviations explores the discriminatory departures evident in the bill, including the rejection of ameliorating amendments. The scrutiny of contemporary statements shows that justifications for the bill are misleading and pretextual.

These guidelines recognize that it is unusual for those involved in adopting a challenged measure to provide "smoking gun" evidence of discriminatory intent by openly expressing racial and ethnic biases. An absence of such overt expression does not mean that a measure is not intentionally discriminatory. Such an omission, however, is not the case here. As will be demonstrated in Section VIII on the sequence of events, two groups that were intimately involved in the enactment of SB 168 have openly expressed their racially-charged anti-immigrant agenda driven by the conviction that non-white immigrants, whether legal or not, are besmirching the racial, cultural, and political legacy of white America.

These groups, Federation for American Immigration Reform (FAIR) and Floridians for Immigration Enforcement (FLIMEN), were much more than advocates for the adoption of SB 168. They were insider players who worked with decision-makers in the legislature on bill drafting, strategy, and promotion. Sponsors of SB 168 in the legislature continued working with these groups after being warned that FAIR was designated as a "hate group," by the Southern Poverty Law Center, a designation that the evidence presented in this report demonstrates is well-founded.

After a methodological analysis based on my experience and the evidence, I have reached the opinion that SB 168 was adopted with the intent to discriminate against minorities in Florida, based on their perceived or actual national origin, race, and alienage. This opinion is based on key findings summarized as follows:

- **A long, significant and ongoing history of discrimination against Hispanics and African Americans has persisted in Florida, in social, political, and legislative treatment of such individuals,[1] including in:**

  1) Voting;

  2) Education;

  3) Housing; and

  4) Law Enforcement.

- **This pattern of discrimination demonstrates that SB 168 as an act of intentional discrimination is not an outlier but is consistent with the past and recent history of Florida.**

- **Like other prior state laws and practices, SB 168 has a substantial discriminatory effect on Hispanics and African Americans in Florida:**

  1) SB 168 is a Proactive Police Measure That is Likely to Trigger the Racial Profiling of Non-whites in Florida.

  2) The Pattern of Florida and Nationwide Arrests by Immigration and Customs Enforcement ("ICE") Demonstrates That SB 168 Will Disparately Impact Suspected Removable Immigrants from South and Central America and the Caribbean.

  3) From FY 2015 to May 2018, *94 Percent* of ICE Arrests in Florida Targeted Members of These Groups, More Than 10 Points Higher Than the Percentage They Represent the State's Total Undocumented Immigrant Population.

---

[1] Throughout this report I use Hispanic and Latino and black and African American interchangeably. White refers to non-Hispanic whites unless otherwise indicated.

4) Patterns of ICE Florida and National Arrests, Including under Cooperative Agreements Now Mandated by SB 168, Show That the Law Will Primarily Impact Suspected Removable Immigrants with Clean Criminal Records or a Record of Only Minor Offenses.

5) 73 Percent of Florida ICE Arrests Under Cooperative Agreements from FY 2015 to FY 2018 Involved Persons with No Criminal Convictions or a Record of Only Minor Offenses. Only 0.4% Involved Persons Convicted of Homicide or Sexual Assault/Rape.

6) Data from ICE Referrals *After* the Implementation of SB 168 Confirms that it Targets Those with Arrests for Minor and Non-Violent Offenses, Especially Traffic Offenses.

7) A Record of 227 Referrals From 8 Counties Shows No Referrals for Charges of Homicide or Rape and Only One Referral for Sexual Assault.

8) All Violent Crimes Combined Accounted for Only 13.2 Percent of Referrals, Only Half the Percentage of Referrals for Charges of Traffic Violations (26.4 percent).

9) SB 168 Will Ensnare U.S. Citizens, Based on Their Race and Ethnicity, Not Just Removable Immigrants.

10) In Miami-Dade County from Early 2017 to 2019, ICE Issued Detainers for 418 U.S. Citizens, *94 Percent of Whom Were Black or Hispanic*.

11) The Immigrant "Threat Narrative" Advanced in Support of SB 168 Made Its Discriminatory Impact Foreseeable.

12) SB 168 Will Likely Have a Chilling Effect on Immigrant Communities on Reporting Crime and Interacting with Police and Other Public Officials.

13) Proactive Policing Measures on Immigration Elsewhere Have Had Disparate Negative Effects on Minorities.

14) Arrests, Detentions, and Removals Under SB 168 Will Have a Negative Ripple Effect on Families and Communities.

- **The sequence of events leading to the adoption of SB 168 in 2019, illuminate Republican motivation, means, and opportunity for passing a law that cracked down on the Democratic minority base and appealed to the Republican anti-immigrant white base.**

    1) There Was No Crime Crisis in Florida at the Time of SB 168's Enactment.

    2) Crime Was Falling in Florida in Tandem with Increases in Undocumented Immigration and Most Steeply in Alleged Sanctuary Jurisdictions.

    3) Shifts in Florida's Demography and Voting Patterns Gave Republicans Motivation to Adopt SB 168.

    4) In Florida, White Citizen Voting Age Population (CVAP) was Falling and Minority CVAP was Rising.

    5) Hispanics had Switched Their Voting from Majority Republican to Majority Democratic.

    6) From 2008 to 2016 as Compared with 2000 to 2004, Mean Hispanic Voting for Republican presidential candidates in Florida Dropped from 53.5% to 39%.

    7) The Republican Party Had Become Increasingly Dependent on Votes from a White

10

Base, Whose Mean Voting for Republicans During These Two Periods Rose from 58.5 Percent to 62 Percent.

8) The White Republican Base is Staunchly Anti-Immigrant.

9) Survey Data Shows That 72 Percent of White Republicans in Florida, Compared to Just 24 Percent of White Democrats, Would Allow Police to Question Anyone They Think May Be in America Illegally.

10) 59 Percent of White Republicans, Compared to Just 19 Percent of White Democrats, Would Deny Automatic Citizenship to American-born Children of Undocumented Immigrants.

11) The Election of Joe Gruters to the Florida Senate and Ron DeSantis to the Governorship, Facilitated the Enactment of SB 168.

- **The anti-immigrant groups FAIR and FLIMEN became intimately involved in the crafting, strategy, and promotion of SB 168.**

- **These groups, based on their positions and the statements of their leaders and organizations, are accurately described as hate groups who claim that non-white immigrants, whether documented or not, are besmirching the racial, cultural, and political legacy of white America.**

  1) FAIR was founded in 1979 by John Tanton, a proponent of "passive eugenics" to limit population growth and allegedly improve the quality of the human race.

  2) Its leadership has invoked fears of an immigrant invasion, of a third-world capture of the United States, and of the decline of the white race and its traditional culture and values.

11

3) FAIR leaders have endorsed and participated in the development of overtly white supremacist books and articles.

4) FAIR has been funded by the white supremacist Pioneer Fund, founded for "race betterment," and most prolifically by heiress Cordelia Scaife May, a supporter of eugenics who worried about white America being "invaded" by dark-skinned immigrants who "breed like hamsters."

5) FLIMEN engaged in vigilante justice against alleged "illegal immigrants."

6) Its co-founder mocked Republican Senator John McCain as "Juan McCain" because he supported immigration reform. He called sanctuary cities, "anarchy cities," saying, "not only do they disobey the law, but I question their loyalty to this country,"

7) Another co-founder denounced "illegal alien invader[s] who worked to demolish my once U.S. held English speaking Miami-Dade County."

8) FLIMEN in its alerts to supporters said that "'White Nationalist' to many it means a Caucasian who supports the concept of America First. It should be noted that America's Founding Fathers were White, and they were decidedly Nationalists."

9) In another alert FLIMEN racially profiled Hispanics who came to testify in Tallahassee against SB 168, denouncing them as "illegal aliens and their supporters."

10) In an email to some nine recipients, FLIMEN's president Kenneth Morrow Jr. promoted overtly racist literature that warned about Mexican immigrant "hordes" turning America into a "dump."

12

- **These groups were intimately involved on the inside in the process that led to SB 168.**

  1) FLIMEN provided model legislation for an anti-sanctuary law to Republican legislators in December 2016.

  2) FLIMEN provided further drafting and strategic advice on SB 168.

  3) The SB 168 version that Senator Gruters filed on February 21, 2019, closely matched FLIMEN's model bill.

  4) FLIMEN jointly sponsored a "Victims of Illegal Immigration Day" with Senator Gruters, House sponsor of SB 168 Cord Byrd, and representatives of anti-immigrant groups.

  5) FLIMEN leaders met personally with legislative leaders and corresponded frequently with aides to Senator Gruters.

  6) FAIR provided through FLIMEN a list of 15 alleged sanctuary jurisdictions in Florida that were included in the Senate staff analysis of SB 168.

  7) Throughout the legislative process FAIR provided significant input on bill drafting, strategy, and information to legislative decision-makers, typically through FLIMEN.

  8) Legislative decision-makers were aware of FAIR's involvement and sought its advice and analyses.

  9) Several legislators consciously ignored warnings that FAIR was a hate group with ties to white supremacy.

- **These groups were tied ideologically and strategically to the Republican Party.**

  1) In 2001, FAIR switched from non-partisanship to alliance with Republicans who would be threatened by the "massive invasion" of would-be Democratic immigrants.

13

2)  All nine board members and leaders of FLIMEN had Republican affiliations, including official party positions.

3)  FLIMEN attributed the passage of SB 168 to "patriotic officials, all Republicans, who actually support the rule of law and oppose Sanctuary Cities (AKA Anarchy Cities)."

- **There were important substantive deviations in SB 168.**

1)  For the first time in Florida history, SB 168 requires Florida law enforcement officials to automatically honor administrative, not judicial, warrants from a federal agency over which they have no control or even input.

2)  Republicans in the legislature rejected an amendment to limit Florida ICE referrals to person's convicted of or charged with a felony offense in Florida or elsewhere.

3)  Republicans in the legislature rejected an amendment that would require "a valid judicial warrant" for immigration retainer requests issued by ICE for Florida officials.

4)  The anti-racial profiling section of SB 168 has no enforcement mechanism and Republicans in the state legislature rejected an amendment to give it teeth.

5)  For the first time, SB 168 requires local law enforcement officials in Florida to hold persons arrested for up to 48 hours, including persons that they would not so hold under ordinary circumstances.

6)  SB 168 explicitly authorizes the governor and attorney general to take punitive action against local officials who do not exercise their "best efforts" to cooperate fully with the mandates of the new law.

7) Although SB 168 exempts from coverage witnesses to crime or victims of crime, unlike the enforcement of detainer requests, it does not impose an affirmative duty for local officials to inquire into these matters.

8) Republicans in the state legislature rejected an amendment that would impose such an affirmative duty.

9) Republicans in the state legislature rejected numerous other ameliorative amendments.

- **With respect to contemporary statements, Senator Gruters, the chief sponsor of SB 168 said "Banning sanctuary cities is about one thing and one thing only - public safety."**

- **Other backers of SB 168 likewise claimed that the purpose of SB 168 was to improve public safety by reducing crime.**

- **Neither Senator Gruters nor any other backer of SB 168 provided data or studies to show that the bill would reduce crime and make communities safer.**

- **The evidence demonstrates that SB 168 would have no such effect.**

1) Alleged sanctuary jurisdictions are no less safe and likely safer than other jurisdictions.

2) Adoption of cooperative agreements with ICE on immigration enforcement does not make jurisdictions safer.

3) Undocumented immigrants commit crime at lower rates than native-born Americans.

- **Backers of SB 168 incorrectly claimed that the bill would only take dangerous, violent criminals, not minor offenders off the Florida streets.**

  1) Senator Gruters admitted that SB 168 covered anyone arrested in Florida, regardless of the suspected crime.

  2) Senator Gruters admitted that SB 168 includes persons arrested for such minor non-violent offenses like "speeding, driving with a broken taillight, or driving without a license."

  3) Undocumented immigrants in Florida face a Catch-22 because they cannot obtain legal driver's licenses but driving without a license is a crime in Florida.

  4) Gruters' remedy that undocumented immigrants should "do public transportation" is both discriminatory and impractical.

  5) ICE arrests in Florida primarily impact persons with no criminal convictions or convictions for minor crime. In fiscal year 2018, nearly two-thirds of arrests fell into these two categories.

  6) ICE arrests in Florida from local law enforcement referrals under 287(g) agreements – the model on which SB 168 is based– show a greater impact on persons with no criminal convictions or convictions for minor offenses – 73 percent of arrests from fiscal years 2015 to 2018.

  7) Only 0.4 percent of 287(g) referral arrests in Florida involved persons convicted of homicide or sexual assault/rape.

8) Florida is not an outlier. 73 percent of national arrests under 287(g) agreements involved persons with no criminal convictions or convictions for minor offenses and just 1.1 percent involved persons convicted of homicide or sexual assault/rape.

## IV.   QUALIFICATIONS

This study draws on my experience serving as an expert in voting rights litigation and my expertise in political history, political analysis, and historical and statistical methodology. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 45 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*.  In addition, I have coauthored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information.  I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and *National Law Journal*. My scholarship also includes the use of quantitative and qualitative methods to conduct contemporary and historical studies, published in academic journals such as *Proceedings of the National Academy of Sciences*, *American Historical Review*,

17

*International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including, *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co-authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books are *The Case for Impeachment*, *The Embattled Vote in America: From the Founding to the Present* and *Repeal the Second Amendment: The Case for a Safer America. The Embattled Vote in America*, published in September 2018 by Harvard University Press, examines the history and current status of voting rights in America.

My book *White Protestant Nation* was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My book *FDR and the Jews* was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the New York Times in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history. My book *The Case for Impeachment* was an independent bookstore bestseller. In 2018, I was the winner of the Alfred Nelson Marquis Life-Time Achievement Award for the top five percent of persons included in Marquis WHO'S WHO.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than 90 voting and civil rights cases, providing testimony on several issues, including on intentional discrimination in the adoption of state redistricting plans and photo identification laws. My work

18

includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness numerous times for state and local jurisdictions. My work also includes several cases in the state of Florida, including the voter identification and redistricting cases brought by the state of Florida before the Federal District Court in the District of Columbia, the 2011-2017 redistricting litigation before a three-judge court in San Antonio, and the voter identification litigation before Judge Nelva Gonzales Ramos, and the voting rights case before Judge Fitzwater in 2018. In the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work.

I have testified numerous times on the issue of intentional discrimination by legislative bodies. For example, the three-judge court in the District of Columbia in the Section 5 litigation on the 2011 State of Texas Senate redistricting plan cited my work in support of their finding that the State's redistricting plans intentionally discriminated against minority voters *(State of Texas v. United States and Eric H. Holder*, 887 F. Supp. 2d 133, 138-39 (D.ED. 2012), as did the San Antonio Court (*Shannon Perez v. Greg Abbott*, SA-11-CV-360 (2017), and Judge Ramos in her opinion on intentional discrimination in the adoption of the Texas's voter ID law (*Veasey v. Perry*, 71 F.Supp.3d 627 (2014). In *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) the Fourth Circuit Court of Appeals accepted my opinion that the state intentionally discriminated against minorities in adopting the omnibus legislation known as the Voter Information and Verification Act (VIVA).  In another ruling issued in August 2017, a federal District Court accepted my opinion that Louisiana had intentionally discriminated against African American voters in maintaining an at-large system for elected judges of the 32nd Judicial District in

Terrebonne Parish (*Terrebonne Parish NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017). In *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, a three-judge court accepted my opinion that the state of Illinois did not discriminate against Hispanic voters in its 2011 congressional redistricting plan. (835 F. Supp. 2d 563 (N.D. Ill. 2011).

I also have experience as an expert witness in litigation involving the state of Florida and its subdivisions. Most recently I have served as an expert witness in litigation involving the post-2010 redistricting plans for the Florida State Legislature and its congressional seats. These cases include the successful defense of a voting rights lawsuit brought by former Representative Corrine Brown against drawn Congressional District 5 which was approved by the Florida State Supreme Court (*Congresswoman Corrine Brown v. Ken Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012). The cases also included successful challenges to the congressional and state senate lines drawn by the Florida State Legislature (*League of Women Voters of Fla. v. Ken Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018).

## V.    SUMMARY OF SB 168, SIGNED INTO LAW JUNE 14, 2019, FLA. STAT. § 908.101.

Before delving into the *Arlington Heights* factors, this section describes the key provisions of SB 168. The Florida State Legislature enacted this legislation with the following purported intent: "The Legislature finds that it is an important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within this state."[2] As summarized by the Florida Senate Committee on Judiciary, SB 168 has the following key provisions still in force:

---

[2] Fla. Stat. § 908.101 (2019).

- Prohibits a state entity, local governmental entity, or law enforcement agency from having a sanctuary policy, which is "a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. § 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from (a) Complying with an immigration detainer," and other forms of compliance with immigration officials.

- Requires that any "law enforcement agency shall use best efforts to support the enforcement of federal immigration law. This subsection applies to an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment."

- "A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall … [r]ecord in the person's case file that the person is subject to an immigration detainer" and "Upon determining that the immigration detainer is in accordance with § 908.102(2), comply with the requests made in the immigration detainer."

- Compliance "does not apply to any alien unlawfully present in the United States if he or she is or has been a necessary witness or victim of a crime of domestic violence, rape, sexual exploitation, sexual assault, murder, manslaughter, assault, battery, human

21

trafficking, kidnapping, false imprisonment, involuntary servitude, fraud in foreign

labor contracting, blackmail, extortion, or witness tampering."

- "Each county correctional facility shall enter into an agreement or agreements with a

  federal immigration agency for temporarily housing persons who are the subject of

  immigration detainers and for the payment of the costs of housing and detaining those

  persons."

- For "any executive or administrative state, county, or municipal officer who violates his

  or her duties under this chapter … the Governor may initiate judicial proceedings in the

  name of the state against such officers to enforce compliance with any duty under this

  chapter or restrain any unauthorized act contrary to this chapter."

- "The Attorney General may file suit against a local governmental entity or local law

  enforcement agency in a court of competent jurisdiction for declaratory or injunctive

  relief for a violation of this chapter."

- Enforcement cannot be based "on the gender, race, religion, national origin, or physical

  disability of a person except to the extent authorized by the United States Constitution

  or the State Constitution."

- Any sanctuary policies currently in effect must be repealed within 90 days after the

  effective date of the act.[3]

---

[3] Fla. Stat. § 908.103 (2019), http://www.leg.state fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0900-0999/0908/0908ContentsIndex html&StatuteYear=2019&Title=%2D%3E2019%2D%3EChapter%20908.

Under federal law, an immigration detainer that Florida officials must now honor is a request for immigration officials of the Department of Homeland Security to take custody of an arrested individual for purposes of deportation proceedings. "Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department."[4]

## VI.     HISTORICAL BACKGROUND: RACIAL DISCRIMINATION IN FLORIDA

This element of the *Arlington Heights* guidelines is important because it demonstrates that SB 168 was not an outlier, but is part of a deeply woven pattern of discrimination against minorities by the state of Florida. This pattern extends far into the state's past, but is also ongoing into the present. It includes discriminatory initiatives by the state legislature that adopted SB 168. This section will focus on more recent acts of discrimination, but also includes references to earlier actions. This section will examine the ongoing history of discrimination, in voting, education, housing, and law enforcement.

### A.  Racial Discrimination in Voting

In 1915, the Florida legislature enacted a literacy test along with a grandfather clause, which exempted from the test citizens who had a relative who was eligible to vote on Jan. 1, 1867. At that time, no non-whites were eligible to vote so the exemptions applied to whites only. Moreover, election officials administered the test in a racially discriminatory way so that non-whites were

---

[4] 8 C.F.R. § 287.7(d)(2020).

much more likely to fail than whites. Although circumstances for African American potential voters in Florida improved in the twentieth century, at the time of the enactment of the Voting Rights Act in 1965, the black registration rate in Florida was only 51 percent.[5]

The passage of the Voting Rights Act did not end voting discrimination against minorities in Florida. Since the mid-1970s, five counties in Florida were covered under Section 5 of the Act that required preclearance by the U.S. Department of Justice ("DOJ") or a declaratory judgment by the D.C. District Court for any changes in voting laws, rules, and regulations. These counties included Collier, Hardy, Hendry, Hillsborough, and Monroe.[6]

Under the preclearance provision, prior to its invalidation by the U.S. Supreme Court in June 2013, the DOJ objected to post-1990 Florida's statewide redistricting plan for the State Senate and to its post-2000 redistricting plan for the State House of Representatives. It found that both plans restricted minority opportunities to participate fully in the political process and to elect candidates of their choice.[7]

In 1998, the DOJ also issued a statewide objection to Florida's law on the certification of absentee ballots. It found that "with the new state law requirements … minority voters were more likely to fail to meet one of the State's new requirements than were white voters."[8] Then, after the controversial 2000 presidential election in Florida, the NAACP, the ACLU, and other groups sued

---

[5] Robert B. McKay, *Racial Discrimination in the Electoral Process*, 407 ANNALS AM. ACAD. POL. & SOC. SCI. 113 (1973).

[6] U.S. Dep't of Justice, JURISDICTIONS PREVIOUSLY COVERED BY SECTION 5,(2020), *available at* https://www.justice.gov/crt/jurisdictions-previously-covered-section-5.

[7] *See* Letter from John R. Dunne, Assist. Att'y Gen., Civil Rights Div. to Robert A. Butterworth, Fla. Att'y Gen.(Jun. 16 1992), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1020.pdf; *see also* Letter from Ralph F. Boyd, Jr., Assist. Att'y Gen., Civil Rights Div. to John M. McKay President of the Fla. Sen. and Tom Feeney Speaker of the Fla. H.R., (Jul. 1, 2002).

[8] Bill Lann Lee, Assist. Att'y Gen., Civil Rights Div. to Robert A. Butterworth Fla. Att'y Gen., (Aug. 14, 1998), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf.

Florida for violating the Voting Rights Act by inaccurately purging or otherwise impeding disproportionately minority persons voting in the election.

An analysis by the Palm Beach Post found that ultimately 88 percent of those removed from the rolls through this list were African American, compared to 11.1 percent of African Americans on the registration rolls.[9] In 2002, Florida reached a settlement with plaintiffs that among other provisions required greater accuracy in the maintenance of registration rolls, greater availability of provisional ballots, adequate polling place staffing and training of workers, state supervision to assure that counties carry out list maintenance in non-discriminatory ways.[10]

Controversy over voter purging in Florida did not end with this settlement. In 2004, Florida's Republican government attempted another purge of voter registration rolls with a flawed list of allegedly ineligible voters that disproportionately included African Americans. According to a New York Times report, the list was inaccurate in identifying ineligible former felons: "after a state judge last week ordered the release of the current list, it became clear that thousands of felons who had been granted clemency were still on it." After the flaws in the purge list became known, the state withdrew the purge list. Local officials, however, could still conduct their own voter purges.[11]

---

[9] *See* Lisa Getter, *Florida Net Too Wide in Purge of Voter Rolls*, *Los Angeles Times*, (May 21, 2001), *available* at https://www.latimes.com/archives/la-xpm-2001-may-21-mn-620-story html; *see also* Scott Hiaasen, Gary Kane and Elliot Jaspin, *Felon Purge Sacrificed Innocent Voters*, Palm Beach Post, (May 27, 2001), *available at* https://archive.commondreams.org/headlines01/0527-03.htm.

[10] *See* ACLU, *Settlement Reached in Florida Election Lawsuit*, ACLU.org, (Sep. 3, 2002) *available at* "https://www.aclu.org/press-releases/settlement-reached-florida-election-lawsuit-punch-card-system-continues-face-scrutiny see also" *see also* Lloyd Vries, *Presidential Election Lawsuit Ends*, CBS News, (Sep. 3, 2002), *available at* https://www.cbsnews.com/news/presidential-election-lawsuit-ends/.

[11] Amanda Luker, *Concerns Remain After Florida Nixes Voter Purge List*, THE NEW STANDARD (Jul. 15, 2004), *available at* http://newstandardnews.net/content/?action=show_item&itemid=689.

Despite these two flawed efforts, in 2012, Florida's Secretary of State Ken Detzner engaged in yet another systematic voter purging program. This time the state shifted from removing allegedly ineligible felons to removing alleged non-citizens from the registration rolls. This shift to alleged non-citizens came at a time when Hispanics were trending more Democratic than in earlier years. In a June 2012 letter, the DOJ informed Detzner that the purge violated the Voting Rights Act and the National Voter Registration Act.[12] After the Secretary defied the DOJ and continued the purge, the DOJ and private plaintiffs filed suit. Eventually, the Eleventh Circuit Court of Appeals reversed an erroneous legal finding from the district court and ruled against the Secretary's purge."[13]

After the U.S. Census of 2000, Florida's Republicans gerrymandered congressional and state legislative district lines to favor Republican candidates and officeholders. However, in 2010, 63 percent of Florida voters backed state constitutional amendments 5 and 6 to restrict partisan gerrymandering in their state for Congress and the state legislature.[14] Even before Florida voters had an opportunity to vote on these amendments, the Republican majority in the state legislature sought to sow voter confusion on the matter by putting on the ballot another deceptive redistricting amendment (Amendment 7). In July 2010, Florida Circuit Court Judge James Shefler struck Amendment 7 from the ballot. He ruled that it "would allow this or any future legislature, if it

---

[12] *See* Marc Caputo, *58 Percent of Voters Targeted In Noncitizen Hunt Are Hispanic. Whites, GOP Least Likely To Face Purge*, MIAMI HERALD (May 13, 2012), *available at* https://miamiherald.typepad.com/nakedpolitics/2012/05/58-percent-of-voters-targeted-in-noncitizen-hunt-are-hispanic-whites-gop-least-likely-to-face-purge.html; *see also* Mackenzie Weinger, *Secretary Defies DOJ on Voter Purge*, POLITICO, (Jun. 7, 2002), *available at* https://www.politico.com/story/2012/06/florida-defies-doj-on-voter-purge-077164; Rachel Weiner, *Florida's Voter Purge Explained*, WASHINGTON POST, (Jun. 18, 2002), *available at* https://www.washingtonpost.com/blogs/the-fix/post/floridas-voter-purge-explained/2012/06/18/gJQAhvcNlV_blog html.
[13] *Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1343–48 (11th Cir. 2014).
[14] Fla. Const. art. III, § 20, 21.

chose to do so, to gerrymander districts guided by no mandatory requirements or standards and subject to no effective accountability."[15] The Florida State Supreme Court affirmed this ruling.[16]

Still, after passage of Amendments 5 and 6 the Republican majority in the state legislature acted intentionally to circumvent these constitutional amendments and maintain their gerrymanders for Congress and the state legislature, to the detriment of black and Hispanic voters. In a 5 to 2 ruling, the State Supreme Court upheld a trial court finding that the state legislature's congressional redistricting plan was "taint[ed]' by unconstitutional intent."[17] The Supreme Court extended the trial court's finding that rejected two of the congressional districts, to find that eight were infected with unconstitutional taint and that in essence the entire plan needed to be redrawn.

The legislature's intentional partisan gerrymandering in violation of Florida's constitution diminished opportunities for minority voters to influence the election of candidates of their choice to Congress. The Supreme Court noted that the legislature needlessly packed black persons into one district to the detriment of their influence in other districts.[18]

In 2012, a Federal District Court Judge struck down most provisions of a 2011 election law amendment that sharply limited the opportunities for groups to conduct voter registration drives in the state. The judge found violations of the U.S. Constitution and the National Voter Registration

---

[15] *See* Summ. J. Order, *Fla. State Conf. of NAACP Branches v. Fla. Dep't of State*, (Fla. 2010) (No. 2010-CA-1803), 2010 WL 10873404.

[16] *Id*. at 669.

[17] *League of Women Voters of Fla. v. Detzner*, 172 So.3d 363 (Fla. 2015).

[18] *See id.* (noting that I testified on behalf of the Coalition Plaintiffs that their plan provided Hispanics reasonable opportunities to elect congressional candidates of their choice. There was no dispute over the opportunities for black voters to elect candidates of their choice. In approving the Coalition Plaintiffs' plan the Florida Supreme Court noted, "Additionally, in contrast to the trial court's findings regarding the Legislature's experts, the trial court found Professor Lichtman's opinions to be persuasive.").

Act. He concluded, "The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition. And allowing responsible organizations to conduct voter-registration drives—thus making it easier for citizens to register and vote—promotes democracy."[19] Voter registration drives are particularly important for minorities. According to a 2016 analysis by the U.S. Census Bureau, 6.8 percent of African Americans and 5.7 percent of Hispanics reported registering through a voter registration drive, far higher than the 3.1 percent of non-Hispanic whites who reported so registering. These differences are statistically significant, well beyond standard levels in social science.[20]

In 2016, the League of Women Voters and the Florida Democratic Party sued Florida Governor Rick Scott after he refused to extend the state's October 11 voter registration deadline in the wake of the devastation from Hurricane Matthew. In its complaint, the League of Women voters noted that the parts of the state most impacted by the Hurricane have large populations of African American and Hispanic voters who disproportionately would be likely to register late. In his decision Judge Mark E. Walker sided with plaintiffs and ordered an extension of the registration deadline. He found that, "this case is about the right of aspiring eligible voters to register and to have their votes counted. Nothing could be more fundamental to our democracy."[21]

---

[19] *League of Women Voters v. Browning*, 863 F. Supp. 2d 1155, 1167-1168 (N.D. Fla. 2012).
[20] U.S. Census Bureau, *Voting and Registration in the Election of November 2016*, Table 12, (May 2017) *available at* https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.
[21] *See* Order Granting T.R.O at 9, 10, 15, *Fla. Democratic Party v. Richard Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016) (No. 4:16cv626-MW/CAS); *see also* Order Granting Preliminary Injunction *id*. at 12;
Joseph Ax, *Judge Gives Florida Voters More Time to Register After Hurricane*, REUTERS (Oct. 12, 2016*), available at* https://www.reuters.com/article/us-usa-election-florida-registration-idUSKCN12C1Y2; *see also* William Wan, *Florida Voter Registration Extended to Next Week After Hurricane Matthew*, WASHINGTON POST, (Oct. 12, 2016), *available at* https://www.washingtonpost.com/news/post-nation/wp/2016/10/12/voter-registration-in-florida-extended-to-next-week-after-hurricane-matthew/.

In 2018, the League of Women Voters filed a lawsuit challenging an edict of Florida's Secretary of State that early voting sites could not be located on college and university campuses. On July 24, 2018, a federal district court issued a preliminary injunction, striking down the Secretary's regulation. Following the guidelines established by the U.S. Supreme Court in *Arlington Heights*,[22] the court found that the regulation was intentionally discriminatory on account of age. In its ruling the court cited instances of seemingly race-neutral regulations that had the intent of discriminating against minority voters:

> "This court has 's[ought] in vain for any ground which would sustain' a non-discriminatory interpretation of the [Secretary of State's] Opinion both under the flexible Anderson-Burdick standard and now the Twenty-Sixth Amendment. *Id*. But the Opinion's scope and effects are clear abridgements of voting rights justified by, at best, weak interests. While Oklahoma in 1910 abridged voting rights by choosing an invidious date to exclude African-Americans from voting, Florida in 2014 limited places to stymie young persons from voting."[23]

Although racial issues were not raised in the lawsuit, the prohibition on early voting sites at institutions of higher learning had a disproportionate impact on minorities who comprised 52 percent of such enrollments according to five-year U.S. Census estimates for 2015. The impact would have been especially severe for Hispanics and African Americans who lack financial resources and access to vehicles as compared to Whites in Florida (*see* Table 5).

Yet, even after this injunction Florida persisted in its efforts to restrict early voting sites on campuses. In May of 2019, the same legislature that adopted SB 168 placed into an omnibus election law (SB 7066), a provision that required "sufficient non-permitted parking" for early voting sites. The League again sued. It charged that the provision would disproportionately impact

---

[22] *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).
[23] Order Granting Pls.['] Mot. for Prelim. Inj. at 33, *League of Women Voters of Fla. v. Lee*, (No. 4:18-cv-00251) (N.D. Fla. 2018).

college and university campuses and dense urban areas with polls that "voters disproportionately access on foot, on public transit, or through cars with parking permits."[24]

In 2018, plaintiffs filed a federal lawsuit charging that 32 of Florida's 67 counties had violated the Voting Rights Act by failing to provide Spanish-language ballots and other language assistance to U.S. citizens of Puerto Rican origin residing in those counties. In granting in part plaintiffs' motion for a preliminary injunction, federal district court judge Walker wrote, "Here we are again. The clock hits 6:00 a.m. Sonny and Cher's 'I Got You Babe' starts playing. Denizens of and visitors to Punxsutawney, Pennsylvania eagerly await the groundhog's prediction. And the state of Florida is alleged to violate federal law in its handling of elections."[25] He concluded, "It is remarkable that it takes a coalition of voting rights organizations and individuals to sue in federal court to seek minimal compliance with the plain language of a venerable 53-year-old law. Due to the timeline of this lawsuit and the looming deadlines Florida election officials face, this Court does not order all of Plaintiffs' requested relief."[26]

Florida also had a stringent signature verification law under which election officials could reject ballots filed by mail or provisional ballots on the ground that the signature on the ballot did not match the signature on file in the registration records. There were no standards for signature rejection, no requirement for the training of election officials, and no readily available mechanism to cure a rejected ballot.[27] On October 15, 2016 Judge Walker issued a preliminary injunction

---

[24] Dara Kam, *Legal Battle Resumes Over Early Voting Sites on Florida College Campuses*, MIAMI HERALD (Jul. 9, 2019), *available at* https://www.miamiherald.com/article232439002.html.
[25] *See* Order Granting Mot. for Prelim. Inj. in Part, *Madera v. Detzner*, 325 F. Supp. 3d 1269 (N.D. Fla. 2018) (No. 1:18-cv-152-MW/GRJ).
[26] *Ibid*.
[27] *See Fla. Democratic Party v. Detzner*, (N.D. Fla. 2016) (No. 4:16cv607-MWCAS) 2016 WL 6090943 at 1.

against enforcement of this law. He noted, "For years, the State of Florida has consistently chipped away at the right to vote. It limits the time allotted to register to vote to the greatest extent permissible under federal law. See 52 U.S.C. § 20507(a)(1) (2012) (requiring each state to allow voters to register, at a minimum, up to thirty days prior to Election Day); § 97.055(1)(a), Fla. Stat. (2016) (closing the Florida voter registration books twenty-nine days prior to Election Day). It limits the methods for voter registration. See § 97.053, Fla. Stat. (2016) (disallowing online voter registration and same-day registration on Election Day). It limits the number of early voting days. See id. § 101.657 (allowing only seven days for early voting). This is just a sampling."[28] In response to this adverse decision, the Florida legislature – again the same legislature that enacted SB 168 – amended election law to allow mail-in voters to cure a rejected ballot for signature-mismatches by submitting a cure affidavit and an accepted form of identification not later than 5pm on the day before the election. It did not, however provide a cure for rejected provisional ballots.[29]

After the case was stayed, on November 15, 2018, the district court struck down the signature-verification law, even as amended, as an unconstitutional restriction of the right to vote. The court noted, "the precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection— passes constitutional muster. The answer is simple. It does not."[30]

---

[28] *Ibid*.
[29] Fla. Stat. § 101.68(4)(2019).
[30] *Democratic Exec. Comm. of Fla. v. Ken Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) (No. 4:18-CV-520-MW/MJF) at 3.

In February 2019, the Eleventh Circuit Court of Appeals upheld the district court's decision. It ruled in a 2 to 1 decision that the signature matching requirement imposed "a serious burden on the right to vote."[31] A study by Daniel A. Smith, Professor and Chair of the Political Science Department at the University of Florida, found "voters from racial and ethnic minorities, are much more likely to cast VBM ballots that are rejected, and are less likely to cure their VBM ballots if SOE staff flag them for having signature problems."[32] In response to the circuit court's ruling upholding Judge Walker's preliminary injunction, the Florida legislature, with bipartisan support finally agreed to effective remedial legislation.[33]

The day after Republicans in the State Legislature enacted SB 168, they inserted into the omnibus election bill 7066 a provision to vitiate a constitutional amendment that Florida voters had passed by a supermajority of 64.5 percent in November 2018 to provide voting rights to former felons who had completed, "the terms of their sentences," including probation and parole.

Until recently, Florida has had one of the most restrictive of legal systems for denying voting rights to former convicted felons. As of 2018, it was one of only four states that permanently disenfranchised former felons, with limited case-by-case restoration. Between 2010 and 2016, the disenfranchised population of Floridians grew by nearly 150,000 to a staggering estimated total of 1,686,000, leading the nation by far.[34]  The burden of disenfranchisement, however, falls most

---

[31] *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) (No. 4:18-cv-00520-MW-MJF) (February 15, 2019), at 11-14, 18.

[32] Daniel A. Smith, *Vote-By-Mail Ballots Cast in Florida*, ACLU OF FLA., Sep. 19, 2018, at 2, 5, *available at* https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

[33] Fla. Sen., Bill Summary, CS/SB 7066 — Election Administration, 2019, available at https://www.flsenate.gov/Committees/BillSummaries/2019/html/2038.

[34] Brennan Center for Justice, *Voting Rights Restoration Efforts in Florida*, BRENNAN CENTER.ORG, May 31, 2019, *available at* https://www.brennancenter.org/our-work/research-reports/voting-rights-restoration-efforts-florida.

heavily on minorities. *The African American disenfranchisement rate in Florida is more than double the rate for all groups, reaching 21.4 percent in 2016.* The lack of reliable data on Hispanic former felons precludes analysis of rates for this minority group. Florida's lifetime felon ban was intentionally discriminatory against African Americans. It was adopted after the Civil War as part of a package of Jim Crow legislation.[35]

In an attempt to vitiate the amendment to re-enfranchise former felons the amendment adopted by the same legislature that enacted SB 168 redefined "term of sentence" to include all monetary fines, fees, and restitutions, even those which a court has determined should be converted from criminal penalties to civil liens. A preliminary study of many hundreds of thousands of former felons in 48 Florida counties by Professor Smith found that more than 80 percent of former felons who would otherwise be eligible to vote under the constitutional amendment have outstanding fines, fees, or restitutions ("LFO") and will likely be disenfranchised by SB7066."[36]

In February 2020, the Eleventh Circuit Court of Appeals found that SB 7066 violated the U.S. Constitution. The court noted that "contemporary media reports suggested that as many as 1.4 million felons could be eligible for re-enfranchisement under the law. Accounts differed as to whether this figure made Amendment 4 the single largest act of enfranchisement since the Nineteenth Amendment in 1920, the Voting Rights Act in 1965, or the Twenty-Sixth Amendment in 1971. By any measure, Amendment 4's enfranchisement was historic." [37] The Court brushed

---

[35] The Sentencing Project, *6 Million Voter Lost: Stat-Level Estimates of Felony Disenfranchisement*, SENTENCING PROJECT.ORG, Oct. 6, 2016, *available at* https://www.sentencingproject.org/publications/6-million-lost-voters-state-level-estimates-felony-disenfranchisement-2016/.
[36] Expert Report of Daniel A. Smith, *Kelvin Jones v. Ron DeSantis*, 410 F. Supp. 3d 1284 (N.D. Fla. 2019) (No. 4:19-cv-300) at 44, *available at* https://www.aclu.org/legal-document/gruver-v-barton-expert-report-daniel-smith.
[37] *Jones v. Governor of Fla.*, (No. 4:19-cv-00300-RH-MJF), (11th Cir. 2020), at 2.

aside the state's pretextual rationale that withholding voting rights would give former felons and incentive to pay fees, fines, and restitution.[38] The case has now been heard again by the district court upon remand from the Eleventh Circuit. After the court issues its decision, that will likely be in the plaintiffs' favor, Republicans in the State Legislature will likely try to slow walk the case through the 2020 elections by an appeal to the U.S. Supreme Court.

The ruling only covered the 17 former felons included in the case, but the reasoning extends beyond their individual circumstances. The Court did not rule on the racially discriminatory aspects of SB 7066 since that issue was not raised in the litigation. However, Professor Smith found in his study, that white former felons who were otherwise eligible to vote were substantially more likely than similarly situated blacks to have no outstanding obligations."[39] Analysis of the impact of SB 7066 on Hispanics was not possible because of the lack of differentiated data on this group. However, not just African American but also Hispanic former felons are likely to be disproportionately impacted by SB 7066 because both groups in Florida have substantially less income than whites and are much more likely to fall under the poverty line (*see* Table 5).

### B.  Racial Discrimination in Education

In the 1979 decision of *Debra P. v. Turlington*, a federal district court opinion noted the long duration of Florida's invidious system of public-school segregation. This system endured long beyond the landmark Supreme Court decision in *Brown v. Board of Education* which found that legal segregation violated the Constitution.

"From 1890 to 1967 Florida public education operated a dual school system; dual in the sense that there were two complete and separate school systems for black and

---

[38] *Id*. at 18-19.
[39]*Supra* note 36 at 44.

34

white Florida public school children ... Likewise, there was absolute segregation of school faculty on a racial basis. Black and white teachers even maintained separate professional associations and unions. The physical facilities, the size and scope of the curricula, the libraries, the duration of the school day and year, the supplies, and the texts in black schools were inferior to those in white schools. Black schools during this period were obviously inferior. The dual school system and its inherent inequality was perpetuated not only by the policies and practices of local school boards, but also by the Florida Constitution and statutes. Although the Supreme Court's holding of separate but equal was the law of the land during the bulk of this period, the corresponding component of equality was constantly overlooked and never enforced in relation to black Florida public schools."[40]

The court further noted that Florida maintained segregation statewide until 1971 and that African American students in the state still suffered from the effects of the dual system. The Fifth Circuit Court of Appeals in a 1981 decision agreed that "the trial judge was, therefore, correct in holding that the immediate use of the diploma sanction [a test required for graduation] would punish black students for deficiencies created by the dual school system."[41]

Until the 1960s, Florida maintained segregation in its state university system. In a notable 1949 case, Virgil Hawkins, a member of the faculty at the historically black Bethune-Cookman College, was denied admission to University of Florida law school on the ground that only white students could lawfully be admitted to the school. The Florida Supreme Court upheld this denial on the grounds that Hawkins could be admitted to the newly established law school for black students at Florida A & M University. For nine more years Hawkins battled for admission to the University of Florida law school through several reiterations of his litigation. In 1954, after *Brown v. Board of Education*, the U.S. Supreme Court overruled the Florida decision in light of *Brown* and "conditions that now prevail." Nonetheless, the state supreme court continued its opposition,

---

[40] *Debra P. v. Turlington*, 474 F. Supp. 244, 250 (M.D. Fla. 1979) (internal citations omitted).
[41] *Debra P. v Turlington*, 644 F.2d 397, 407 (5th Cir. 1981).

35

backed by Governor Leroy Collins and his two opponents in the 1956 election for governor. [42] In an extraordinary concurring opinion to this latest denial of Hawkins' application, Justice Terrell wrote: "It is and has always been the unvarying law of the animal kingdom. The dove and the quail, the turkey and the turkey buzzard, the chicken and the guinea, it matters not where they are found, are segregated .... [W]hen God created man, he allotted each race to his own continent according to color, Europe to the white man, Asia to the yellow man, Africa to the black man, and America to the red man, but we are now advised that God's plan was in error and must be reversed."[43]

Finally, in 1958 a federal district court ruled that the University could not limit law school admissions only to white students.[44] Although formal segregation in education is no longer present in Florida there is still considerable segregation by race in its public-school system. According to a 2019 study by the Civil Rights Project and the Center for Education and Civil Rights, Florida ranked 10th among the states for the lowest exposure of Hispanic students to white students in its public-school system.

The study found that 26.6 percent of Hispanic students were exposed to white students in Florida. In addition, Florida also ranked 10th in the highest percentage of Hispanic students in 90% to 100% non-white schools; 33.5 percent of Hispanic students attended such schools. For black students, the study found that Florida ranked 11th among the states for the lowest exposure of black students to white students in its public-school system. The study found that 25.3 percent of black students were exposed to white students in Florida. Florida also ranked 17th in the highest

---

[42] *See State ex rel. Hawkins*, 47 So. 2d 608, 609 (Fla. 1950); *see also Darryl Paulson, Desegregating the University of Florida Law School: Virgil Hawkins v. The Fla. Bd. of Control, Fla. State Univ. Law Review,* (1984), at 59-71.
[43] *State ex rel. Hawkins v. Bd. of Control*, 83 So. 2d 20, 24, 27-28 (Fla. 1955).
[44] *Hawkins v. Bd. of Control of Fla.*, 162 F. Supp. 851 (N.D. Fla. 1958).

percentage of black students in 90% to 100% non-white schools; 35.6 percent of black students attended such schools.[45]

Another study, in 2017, for the LeRoy Collins Institute, Florida State University, found little improvement in recent years in school segregation in Florida.[46] As indicated in Chart 1,

---

[45] Erica Frankenberg, et al., *Harming our Common Future: America's Segregated Schools 65 Years after Brown*, CIVIL RIGHTS PROJECT AND THE CTR. FOR EDUC. AND CIVIL RIGHTS, May 19, 2019, at 27-30, *available at* https://www.civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/harming-our-common-future-americas-segregated-schools-65-years-after-brown/Brown-65-050919v4-final.pdf.

[46] *See* Gary Orfield and Jongyeon Ee, *Patterns of Resegregation in Florida's Schools*, LEROY COLLINS INST., FLA. STATE UNIV., Sep. 27, 2017, *available at* https://www.civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/patterns-of-resegregation-in-floridas-schools/LCI-Tough-Choices-Patterns-of-Resegregation_FINAL.pdf.

**CHART 1**
**CHANGES IN SCHOOL SEGREGATION, FLORIDA, 2004-2015, NON-WHITE SCHOOLS**



the study found that the only positive development from 2004 to 2015, was a slight rise in the percentage of nonwhite students in multiracial schools in Florida, from 30.4 percent to 36.3 percent, which still left nearly two-thirds of nonwhite students in non-multiracial schools. Otherwise, the percentage of nonwhite students in 50 to 100 percent nonwhite schools increased from 44.2 percent to 54.8 percent and the percentage of nonwhite students in 90 to 100 percent highly segregated schools rose from 15.2 percent to 20.2 percent.[47]

African Americans and Hispanics in Florida also have substantially lower levels of educational attainment and achievement than whites. As indicated in Table 1, the disparities between minorities and whites extend to high school and college attainment, English language ability, and to proficiency scores in mathematics and reading for 8th grade students.

### C.  Racial Discrimination in Housing

In 1983, 15 years after passage of the federal Fair Housing Act, Florida passed its own Fair Housing Act, which it amended in 1989. However, the Act was poorly written so that several courts have interpreted its provisions to sharply limit remedies by requiring that alleged victims could not bring their case to court until they had exhausted all administrative remedies, meaning that the case must have been investigated by either a federal or state executive agency.[48] Since 2012, the Florida Commission on Human Relations (FCHR), has repeatedly proposed model legislation to remedy ambiguity and confusion in the existing law. Just as repeatedly the state legislature has refused to act. Michelle Wilson, Executive Director, Florida Commission on Human Rights warned in

---

[47] *Id.* at 10.
[48] Fla. Comm'n on Human Relations, *History of the Commission*, FCHR, *available at* https://fchr.myflorida.com/history-of-the-florida-commission-on-human-relations.

39

January 2018, that "because Florida law has been interpreted differently from federal law, the

FCHR stands to lose its eligibility to accept these cases from HUD [U.S. Housing and Urban

Development], resulting in the loss of hundreds of thousands of federal dollars for the state each

**TABLE 1**
**EDUCATIONAL MEASURES BY RACE, FLORIDA, 2018 US CENSUS, AMERICAN COMMUNITY SURVEY**

| MEASURE | HISPANIC | BLACK | WHITE |
|---|---|---|---|
| | | | |
| HIGH SCHOOL GRADUATES AGE 25+ | 80.1% | 83.8% | 93.1% |
| | | | |
| BACHELOR'S DEGREE OR HIGHER AGE 25+ | 25.5% | 20.1% | 33.9% |
| | | | |
| SPEAK ENGLISH LESS THAN "VERY WELL" | 35.3% | 7.2% | 1.9% |
| | | | |
| PERCENT AT OR ABOVE BASIC PROFICIENCY, 8TH GRADE READING | 68% | 57% | 82% |
| | | | |
| PERCENT AT OR ABOVE BASIC PROFICIENCY, 8TH GRADE MATH | 64% | 46% | 77% |
| | | | |
| Educational Proficiency Data From: National Center for Educational Statistics, Florida, Reading, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020014FL8.pdf; National Center for Educational Statistics, Florida, Mathematics, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020013FL8.pdf. | | | |

year and ultimately diminishing the rights of all Florida citizens."[49] Finally, in March 2020, the state legislature passed legislation designed to remedy this situation.

A study by Governing, a non-partisan research and publishing organization that studies state and local government, found that much de facto residential segregation persists in Florida. Sixteen metropolitan areas in Florida are substantially segregated, with segregation indexes above 40 percent for blacks and Hispanics, using 2017 5-year U.S. Census data. This level of residential segregation means that at least 40 percent or more minority residents would have to relocate to another neighborhood to become fully integrated with white residents.[50]

Table 2 reports segregation indices for blacks and whites in Florida metropolitan areas. There are 12 metropolitan areas with black/white indices above 40 percent. These areas include most of the black population in Florida. Six indices are greater than 50 percent and the Miami-Fort Lauderdale-Pompano Beach region, which has by far the largest black population, has an index of 63.9 percent, which means that nearly two-thirds of black residents would have to relocate to become fully integrated with white residents.

Residential segregation for Hispanics is generally lower than for blacks, with a national median segregation index that is about 14 percent lower than for black students (40.7 percent versus 52.6 percent).

---

[49] Michelle Wilson, *Florida Citizens Could Lose State Protection for Housing Discrimination*, NAPLES DAILY NEWS, Jan. 15, 2018, *available at* https://www.naplesnews.com/story/opinion/2018/01/15/commentary-florida-citizens-could-lose-state-protection-housing-discrimination/1019099001/.

[50] Governing, *School Segregation Data for U.S. Metro Areas, 2015-2016 Common Core of Data, available at* https://www.governing.com/gov-data/education-data/school-segregation-dissimilarity-index-for-metro-areas.html.

**TABLE 2**
**RESIDENTIAL SEGREGATION INDEXES FOR BLACKS AND NON-HISPANIC WHITES ABOVE 40 PERCENT, FLORIDA METROPOLITAN AREAS, 2017 FIVE-YEAR CENSUS AMERICAN COMMUNITY SURVEY**

| Metropolitan Area | Black Population | Dissimilarity Index |
|---|---|---|
| | | |
| Miami-Fort Lauderdale-Pompano Beach | 1,217,737 | 63.9% |
| Cape Coral-Fort Myer | 57,549 | 61.0% |
| North Port-Sarasota-Bradenton | 49,328 | 58.3% |
| Naples-Marco Island | 24,395 | 56.8% |
| Tampa-St. Petersburg-Clearwater | 338,273 | 54.8% |
| Jacksonville | 306,301 | 53.7% |
| Sebastian-Vero Beach | 13,103 | 52.6% |
| Orlando-Kissimmee-Sanford | 366,969 | 49.8% |
| Port St. Lucie | 65,902 | 47.5% |
| Ocala | 42,355 | 47.3% |
| Panama City | 19,358 | 47.1% |
| Deltona-Daytona Beach | 63,643 | 47.0% |
| Palm Bay-Melbourne-Titusville | 55,543 | 46.9% |
| Pensacola-Ferry Pass-Brent | 76,510 | 46.5% |
| Tallahassee | 123,067 | 43.2% |
| Gainesville | 55,978 | 42.3% |
| | | |
| Source: Governing, "Residential Segregation Data for U.S. Metro Areas," *2015-2016 Common Core of Data,* https://www.governing.com/gov-data/education-data/school-segregation-dissimilarity-index-for-metro-areas.html. | | |

Nonetheless, as indicated in Table 3 below, the Governing study indicate that there are 7 metropolitan areas with Hispanic/non-Hispanic white indices above 40 percent. The Miami-Fort Lauderdale-Pompano Beach region, which has by far the largest Hispanic population has an index of 56.2 percent, which means that 52.6 percent of Hispanic students would have to relocate to become fully integrated with white residents.

42

**TABLE 3**
**RESIDENTIAL SEGREGATION INDEXES FOR HISPANICS AND WHITES, ABOVE 40 PERCENT, METROPOLITAN AREAS, 2017 FIVE-YEAR CENSUS AMERICAN COMMUNITY SURVEY**

| Metropolitan Area | Hispanic Population | Dissimilarity Index |
|---|---|---|
| | | |
| Miami-Fort Lauderdale-Pompano Beach | 2,663,235 | 56.2% |
| Naples-Marco Island | 96,948 | 47.3% |
| Cape Coral-Fort Myer | 141,544 | 44.9% |
| North Port-Sarasota-Bradenton | 93,345 | 42.1% |
| Orlando-Kissimmee-Sanford | 693,930 | 41.9% |
| Port St. Lucie | 74,701 | 40.4% |
| Tampa-St. Petersburg-Clearwater | 549,477 | 40.2% |
| | | |
| Source: *Governing*, "Residential Segregation Data for U.S. Metro Areas," 2013-2017 U.S. Census Estimates, https://www.governing.com/gov-data/education-data/residential-racial-segregation-metro-areas.html. | | |

A study of the state's largest county, Miami-Dade, demonstrated that long-standing policies of both the federal government and local officials contributed to racial segregation: "Joint early efforts of the federal government and Dade County to redline metropolitan Miami continue to have a profound effect on Dade County at the end of the twentieth century … [leaving] a legacy of intensified racial segregation that has persisted to the present."[51] The researcher described how officials in Miami-Dade continued to use their control over public housing, zoning, urban renewal, and transportation planning to perpetuate racial segregation.[52] A report on the history of housing discrimination in Florida's most populous county, Miami-Dade, examined changes in the

---

[51] Raymond A. Mohl, *Whitening Miami: Race, Housing, and Government Policy in Twentieth-Century Dade County, Florida Historical Quarterly*, 79, 328 (2001).
[52] *Id*. at 334-345.

dissimilarity indices from 1980 to 2010.[53] As indicated in Chart 2 below, the results show only minimal improvement during this three-decade period.

### D.  Law Enforcement

Through most of its history, Florida, like most other southern states, had a white-dominated system of law enforcement, encompassing police, prosecutors, judges, and juries. During the period of Jim Crow, there were two systems of justice, one for white people and another for black people. Although progress has been made since the Jim Crow era, racial discrimination in law enforcement lingers through the present day.

---

[53] Housing Opportunities Project for Excellence, Inc., *Analysis of Impediments to Fair Housing Choice, Miami-Dade County*, Dec. 1, 2015, at 14, *available at* http://www.miamidade.gov/housing/library/reports/2015-caper/2015-analysis-of-impediments-report.pdf.

44

## CHART 2
## CHANGES IN RESIDENTIAL SEGREGATION METROPOLITAN AREA WITHIN MIAMI-DADE COUNTY, DISSIMILARITY INDEXES FOR BLACKS & HISPANICS, 1980-2010



45

In 2005, Florida pioneered for the nation the adoption of a "stand your ground" law that authorizes the use of force, including lethal force, rather than retreating to prevent death, great bodily harm, or commission of a forcible felony like robbery. For the five years prior to Florida's enactment of its stand your ground law in 2005, justifiable homicides in the state averaged 12 per year, but the numbers tripled in the five years following 2005, to an average of 36 per year.

Analysis demonstrates that this law is administrated in a racially disparate way in Florida that disproportionately affects minorities. A study of Florida's stand your ground cases from 2003 to 2013 found "race of the *victim* to be a significant predictor of case outcome in this data set." The results showed that the defendant is twice as likely to be convicted when the victim is white as compared to when the victim is non-white.[54] Later, for 2017, Florida expanded its stand- your-ground law to shift the burden of proof to prosecutors. That year, the number of justified homicides reached 78. According to data from the Florida Department of Law Enforcement, whites killed a black victim in 19.2 percent of civilian justifiable homicides, compared to just 2.5 percent of all non-justified civilian homicides, a ratio of nearly 8 to 1.[55]

This law, with its disparate impact on minorities, did not make Floridians safer. To the contrary, studies showed that the law had the effect of increasing, not decreasing, homicide rates in Florida. A controlled study that examined homicides in Florida from 1999 to 2014 found that after

[54] Nicole Ackerman, et al., *Race, law, and health: Examination of 'Stand Your Ground' and defendant convictions in Florida*, SOCIAL SCIENCE AND MEDICINE, 142, 194-201 (2015).
[55] Jim Saunders, *Florida Appeals Court Upholds 'Stand Your Ground' Law Changes*, TALLAHASSEE DEMOCRAT, 14 (May 2018), *available at* https://www.tallahassee.com/story/news/2018/05/14/stand-your-ground-law-florida-court-upholds-change-burden-proof/608046002/; *see also* Fla. Dep't of Law Enforcement, Supplemental Homicide Reports, FDLE, *available at* http://www.fdle.state.fl.us/FSAC/Crime-Data/SHR; Michael Spanbauer, *Self-defense Policy, Justified Homicides, and Race, Working Papers 1708*, TULANE UNIVERSITY, DEP'T OF ECON. (Mar. 2018), https://ideas.repec.org/p/tul/wpaper/1708.html; Stand Your Ground, AMERICAN BAR ASSOCIATION, (Sep. 2015), *available at* https://www.americanbar.org/groups/diversity/racial_ethnic_justice/projects/SYG/.

accounting for underlying trends, these results estimate that after the law took effect "there was an abrupt and sustained increase in the monthly homicide rate of 24.4%" and also in "the rate of homicide by firearm of 31.6%." The researchers reported that "no evidence of change was found in the analyses of comparison states for either homicide or homicide by firearm." They also found "no changes" in "control outcomes" that included suicide and suicide by firearm." Through a follow-up study, the researchers found that when subtracting out justifiable homicides, the rate of increase in Florida's homicide rate was a closely comparable 21.7 percent.[56] In September 2019, the RAND corporation reported that "Since publication of RAND's report, at least four additional studies meeting RAND's standards of rigor have reinforced the finding that "stand your ground" laws increase homicides. None of them found that "stand your ground" laws prevent violent crime. No rigorous study has yet determined whether "stand your ground" laws promote legitimate acts of self-defense."[57]

Police forces in Florida have engaged in racial profiling in stops, detentions, and arrests. Analysis of publicly available data on the enforcement of a Florida law that authorized police officers to stop and cite drivers solely for violating safety belt requirements demonstrates a disproportionate impact on black drivers and passengers.[58] Safety belt violations, because they

---

[56] DK Humphreys, A. Gasparini, and DJ Wiebe, *Evaluating the Impact of Florida's Stand Your Ground Self-Defense Law on Homicide and Suicide by Firearm: An Interrupted Time Series Study*, JAMA INTERN MED., 44-50, 177 (2017); *see also Stand Your Ground Self-Defense Law and Unlawful Homicides in Florida: An Interrupted Time Series Study*, JAMA INTERN MED. 177, 1523-1524 (2017).

[57] Florida data compiled from Florida Dep't of Law Enforcement, Supplemental Homicide Reports, FDLE http://www.fdle.state.fl.us/FSAC/Crime-Data/SHR; David K. Humphreys, Antonio Gasparrini, and Douglas J. Wiebe, "Evaluating the Impact of Florida's 'Stand Your Ground' Self-defense Law on Homicide and Suicide by Firearm," 44-50; *see also* Association Between Enactment of a Stand Your Ground Self-defense Law and Unlawful Homicides in Florida, *Journal of the American Medical Association*, 177 (2017); *see also* Andrew R. Morral and Rosanna Smart, *'Stand Your Ground' Laws May be Causing More Harm Than Good*, RAND Corporation, Sep. 12 2019, *available at* https://www.rand.org/blog/2019/09/stand-your-ground-laws-increase-violence.html.

[58] Police stop information on Hispanics in Florida is not reliable, because Hispanics could be classified as white.

involve little discretion, provide a naturally controlled setting for assessing racial profiling. As indicated in Table 4, after introducing controls for driving age by race, the availability of vehicles by race, and surveys on seatbelt use by race, there remains a racial disparity between blacks and whites. Blacks are overrepresented by 7.1 percentage points and whites are underrepresented by 7.1 percentage points in seatbelt citations. These disparities are statistically significant at a level beyond a chance probability of one in one-hundred thousand.

**TABLE 4**
**WHITE V. BLACK DISPARITIES IN FLORIDA SEATBELT CITATIONS 2018**

| Whit | White | Black | White % | Black % |
|---|---|---|---|---|
| Citation for no Seatbelt Use | 40,533 | 25,942 | **61.0%** | **39.0%** |
| Population 15 Years + White & Black Only | 9,873,802 | 2,636,290 | 78.9% | 21.1% |
| Difference in 15+ Population | | | -17.9% | -+17.9% |
| Percent With no Vehicle in Household | 4.8% | 12.2% | | |
| 15+ Population Adjusted for Vehicles | 9,399,860 | 2,314,663 | 80.2% | 19.8% |
| Difference in Adjusted 15+ Population for Vehicles | | | -19.2% | -19.2% |
| % No Seatbelt Use | 7.5% | 14.2% | | |
| 15+ Population Adjusted for no Vehicle and Seatbelt Use | 700,490 | 328,862 | **68.1%** | **31.9%** |
| Difference in Adjusted 15+ Population for Vehicles & Seatbelt Use | | | **-7.1%** | **+7.1%** |
| Sources: Department of Highway Safety and Motor Vehicles Seatbelt Violation Data Collection 316.614(9), F.S. Annual Report 2018, p. 3, https://www.flhsmv.gov/pdf/cabinetreports/sbv2018.pdf; Safety Belt Use in Florida, Final Report," Florida Office of Economic & Demographic Research, April 1, 2018 Estimates, p. 13, http://edr.state.fl.us/Content/population-demographics/data/Medium_Projections_ARSH.pdf; https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/safety/4-reports/seat-belt-use-reports/2018.pdf?sfvrsn=9c540d07_0. | | | | |

Some out-of-state drivers may have been cited for seatbelt violations. It is likely, however, that the percentage of white out-of-state drivers is greater than in-state drivers. The national ratio of whites to blacks is greater than in Florida. Moreover, about 15 million foreigners visit Florida each year with 88 percent coming from Latin America, Europe, and Canada, not predominantly black nations.[59]

Other data confirms racial disparities in Florida police stops. The Stanford Computational Policy Lab conducted a large-scale study of more than 100 million police traffic stops in numerous jurisdictions, including police stops in 14 states, including 3.5 million in Florida from 2011 to 2015. The study examined the rates by race at which drivers were searched during such stops. Results for Florida for 2011 to 2015 show that search rates for Hispanic and black drivers were higher in every year than searches for white drivers. In most cases, the search rates for black drivers were several multiples higher than the search rates for white drivers. Racial disparities were particularly wide for the latest year and were statistically significant well beyond standard levels in social science.[60] Given that most searches were likely for drug offenses,[61] racial disparities in search rates is not attributable to racial differences in drug use and sale. A 2016 study by the Hamilton Project of the Brookings Institution found that "Black and white Americans sell and use drugs at similar rates."[62]

---

[59] *Florida Tourism by the Numbers, Calendar Year 2014*, VISIT FLA., *available at* https://fvrma.wildapricot.org/resources/Documents/tourismbynumbers.pdf.
[60] Emily Pearson, et al., "A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States, *Stanford Computational Policy Lab*, 13 March 2019
[61] The sharp drop in searches reported in the study for Colorado and Washington after the legalization of marijuana indicates that most such searches were drug related., pp. 6-8.
[62] Brookings Institution, *Rates of Drug Use and Sales by Race; Rates of Drug Related Criminal Justice Enforcement, by Race*, HAMILTON PROJECT (Oct. 21, 2016) *available at* https://www.hamiltonproject.org/charts/rates_of_drug_use_and_sales_by_race_rates_of_drug_related_criminal_justice.

In Broward County Florida, the state's second most populous county with a current population of more than 1.9 million, a study by CBS4 found vast racial disparities in arrests and convictions for minor marijuana offenses. The study noted that while the number of such arrests "are going down, one fact remains, the overwhelming majority of those arrested were black." From 2010 through fall 2015 the study found that of 7,000 misdemeanor marijuana arrests, 69 percent of persons arrested for such charges were black. This is in a county that was 28 percent black according to the U.S. Census, American Community Survey, 2015 five-year estimates.[63]

The researchers noted that "when the arrests are broken down by individual police agencies, the numbers become even more revealing:

Seventy-six percent of the people arrested by the Broward Sheriff's Office (BSO) in the unincorporated areas were black.

- In Pompano Beach, where blacks make up less than 29 percent of the population, 73 percent of the people BSO arrested were black.

- In Deerfield Beach, which has an even smaller black population, 69 percent of the people BSO arrested were black.

- In Hollywood, a town where blacks are just 17 percent of the population, more than half, 52 percent, of the people arrested by the police department were black.

- And in Miramar, where blacks comprise 45 percent of the population, they make up 76 percent of the people arrested.

---

[63] Jim DeFede, *Race Matters: A Look Inside Broward Pot Arrests*, CBS4, MIAMI, (Oct. 5, 2015), *available at* https://miami.cbslocal.com/2015/10/05/race-matters-a-look-inside-broward-pot-arrests/.

- The one city however that stood out above all the rest was Fort Lauderdale, where 80 percent of the people arrested for misdemeanor marijuana possession were black despite the black population in the city being 31 percent.

Howard Finkelstein, the Broward County Public Defender said, "when you look at these numbers if they don't make you sick then you aren't paying attention," adding, "You know what these stats show you? There is no war on drugs. There is a war on poor black people. That's exactly what this shows." Public Defender Finkelstein concluded, "This isn't about marijuana this is about institutional racism, this is about equal justice. If you are poor and you are a minority you do not get equal justice in Broward County."[64]

Marsha Ellison, president of the Fort Lauderdale Broward branch of the NAACP noted that even an arrest record can ruin the lives of young people. It can keep them from getting a good job, joining the military, getting loans, or renting an apartment. "That takes away a lot of opportunity and it doesn't matter that you were a kid or you were a young guy, or it's been five years," she said. "The long-term effects are just devastating communities."[65]

Conviction rate for marijuana possession in Broward County are also racially disparate. CBS4 found that "Broward had a conviction rate seven times higher than Dade. And 80 percent of the people convicted in Broward for misdemeanor pot possession were black."

 A study by professors at the University of Miami and Loyola Marymount universities for the ACLU examined racial differences at every stage of the law enforcement process from arrest to sentencing in Miami-Dade, Florida's largest county. They examined data for individuals and

---

[64] *Id.*
[65] *Id.*

neighborhoods. They found substantial racial disparities between blacks and whites in Miami at every level of law enforcement, with the greatest disparities for Hispanic blacks, despite their small representation in the population of some 1.9 percent. The researchers found the following:

DISPROPORTIONATE. Black defendants who are not Hispanic are disproportionately represented in Miami-Dade County's criminal justice system. Relative to their share of the county population, these defendants experience:

• 2.2 times greater rates of arrest

• 2.3 times greater rates of pretrial detention

• 2.5 times greater rates of conviction

• 2.5 times greater rates of incarceration

MOST DISPROPORTIONATE. Black defendants who are Hispanic are even more disproportionately represented in the county's criminal justice system. Relative to their share of the county population, these defendants experience:

• 4.0 times greater rates of arrest

• 4.5 times greater rates of pretrial detention

• 5.5 times greater rates of conviction

• 6.0 times greater rates of incarceration[66]

The early decisions of arrest and pre-trial detention are particularly significant because studies show it is at these stages of the process where the exercise of discretion is especially great.[67]

---

[66] Nick Petersen, et al., *Unequal Treatment: Racial and Ethnic Disparities in Miami-Dade Criminal Justice*, ACLU, Fla. Greater Miami, Jul. 2018, at 5.
[67] *Id*. at 41.

52

After introducing non-racial statistical controls that could possibly explain disparate outcomes, the researchers "still found stark racial and ethnic disparities even after controlling for other factors."[68] The researchers did not find disproportionate treatment of white as opposed to black Hispanics. They note that "white Hispanics are underrepresented in the criminal justice system compared with their proportion of the county population. This may be because the White Hispanic population represents by far the largest population (nearly 60 percent) in Miami-Dade County and holds significant local economic and political power in the area."[69]

The researchers conclude:

"Racial and ethnic disparities can be seen at both the individual defendant level and the neighborhood level due to the geographic concentration of arrests, prosecutions, and convictions in Black neighborhoods. Taken together, these patterns illustrate that Black Hispanic defendants tend to be the most overrepresented in the Miami-Dade County criminal justice system, and Black non-Hispanic defendants tend to be penalized the most severely ... Criminal cases are also disproportionately drawn from Black neighborhoods, thus suggesting the possibility of racial profiling and over-policing of those neighborhoods."[70]

Racially disparate law enforcement practices in Florida have persisted even though since 2001, Florida law, like SB 168, has had on paper an official "anti-discriminatory profiling policy." Under the law: "On or before January 1, 2002, every municipal law enforcement agency shall incorporate an antiracial or other anti-discriminatory profiling policy into the agency's policies and practices, utilizing the Florida Police Chiefs Association Model Policy as a guide."[71] This law exists on paper only and has not generated enforcement efforts.

---

[68] *Id.*
[69] *Id.* at 39.
[70] *Id.*
[71] Fla. Stat. § 166.0493.

The lingering effects of this ongoing pattern of discrimination against minorities has had the present-day legacy of leaving blacks and Hispanics, who overwhelmingly comprise the immigrant population in Florida, as especially vulnerable populations in Florida, with a socio-economic position well below that of whites.

According to the 2018 Census Bureau American Community Survey estimates, there were 4,475,431 immigrants living in Florida, 21 percent of the population. Of these immigrants, the Census reported that 15.9 percent were black, 57.8 percent were Hispanic, and 16.5 percent were white. Among the foreign-born, 1,929,546 million or 43.1 percent were non-citizens.[72] Table 4 above, documented substantial differences between blacks, and Hispanics and whites in Florida on measures of educational attainment, English fluency, and educational achievement. Further socio-economic disparities are indicated in Table 5 below. As compared to whites in Florida, Hispanics and African Americans had substantially lower median household and per-capita incomes. They had much higher rates of poverty and an even higher dependence on food assistance. As compared to whites, Hispanics and African Americans were much less likely to own homes, to have health insurance coverage, or to be high school graduates. Hispanics, in particular, face serious language barriers. That is especially true of the foreign-born Hispanics in Florida. For this population, about half speak English "less than very well."

---

[72] U.S. Census Bureau, *Explore Census Data*, (2020), *available at* https://data.census.gov/cedsci/ (showing that census data is now available on the Bureau's new website).

54

**TABLE 5**
**ECONOMIC & EDUCATIONAL INDICATORS, HISPANICS, BLACKS, WHITES,
FLORIDA, 2018 US CENSUS, AMERICAN COMMUNITY SURVEY**

| MEASURE | HISPANIC | BLACK | WHITE |
|---|---|---|---|
| Median Household Income | $49,903 | $41,416 | $61,446 |
| Per Capita Income | $23,017 | $20,139 | $39,116 |
| Poverty Rate For Persons | 17.0% | 21.2% | 9.8% |
| Food Stamp Recipient | 23.5% | 27.9% | 7.6% |
| Percent Owner Occupied | 52.0% | 45.7% | 75.3% |
| No Health Insurance | 19.0% | 15.1% | 9.5% |
| Less Than High School Ed | 19.9% | 16.2% | 6.9% |
| Speak English "Less than Very Well" Foreign Born Only | 35.3% | 7.2% | 1.9% |
| Commuting, Vehicle | 89.2% | 88.5% | 87.9% |
| Source: U.S. Census Bureau, American Community Survey, Estimates, 2018 | | | |

There are 2.6 million foreign-born Hispanics in Florida according to the 2018 U.S. Census American Community Survey estimates.

The discriminatory effect of SB 168, which will be documented in the next section, follows this pattern established by Florida's ongoing history of discriminating against minorities in such basic areas of life as education, housing, voting, and law enforcement. At one time, Democrats

perpetrated racial discrimination, but in recent years the initiative switched to Republicans, who like Democrats of past years, depend upon a white voter base as will be explained in Section VIII on the sequence of events leading to the adoption of SB 168.

### VII.    DISCRIMINATORY EFFECT OF SB 168 ON MINORITIES IN FLORIDA

Discriminatory impact does not by itself prove discriminatory intent, but it is a powerful indicator when combined with other elements of the *Arlington Heights* guidelines. In this instance, the discriminatory impact of SB 168 was readily foreseeable based on the history of discrimination in law enforcement in Florida and other information presented in this report.

There are multiple reasons why SB 168 has a disparate, discriminatory impact on minorities in Florida as detailed in this section. As will be demonstrated in Section X, these discriminatory effects of SB 168 are not counterbalanced by any prospects of improved public safety for the people of Florida, the foundational purported rationale for the bill.

### A. SB 168 is a Proactive Police Measure That is Likely to Trigger the Racial Profiling of Non-whites in Florida

A Committee of the National Academies of Sciences, the nation's premier scientific organization, recently investigated the impact of proactive policing measures like SB 168 on non-white peoples.[73] The Committee noted that, "The high rates at which non-Whites are stopped, questioned, cited, arrested, or injured by the police present some of the most salient criminal justice policy phenomena in the United States … these kinds of police contact are associated with at least

---

[73] National Academies of Sciences, Engineering, and Medicine, *Proactive Policing: Effects on Crime and Communities*, THE NATIONAL ACADEMIES PRESS (2018).

some forms of what is known as proactive policing." The Committee said that racial profiling is associated with proactive policing because of differential views, whether conscious or not, that police have regarding the likely criminality of non-white persons. It notes that "although overt expressions of biased behavior have declined in society and among police, racial animus has not disappeared. Rather, it has evolved." The committee cites a study which showed that "when the officers were thinking about issues of crime and criminality, they tended to ascribe the crime to suspects with more stereotypical Black or Afrocentric (less Eurocentric) faces."[74]

In another study, "Researchers analyzed reports from observers who rode with police officers in two cities for almost 6,000 hours, controlling statistically for an "extensive set of factors" that may objectively justify the use of force, "police used greater force with non-White suspects." In a follow-up study "[t]he authors suggested that the tendency to use greater force with non-White suspects may be driven by the fact that, in certain parts of town, officers expected greater levels of danger or reduced accountability. This suggestion is consistent with laboratory-based evidence on when people are most likely to behave in a way that is consistent with racial animus."[75]

Another study that looked at a "random sample of booking photos," found that, "controlling for type of arrest, reported level of resistance, and the presence of drugs and alcohol in a suspect's system, ratings of White suspects' phenotypic stereo-typicality were negatively associated with likelihood and severity of force. That is, the more stereotypically "White" a suspect looked, the less force was used (statistically controlling for all the other variables)."[76]

_____

[74] *Id*. at 251, 277, 280.
[75] *Id*. at 281.
[76] *Id*.

The Committee noted that "associations between race and concepts such as danger, crime, and negativity are notoriously difficult to "undo" in a permanent sense." They indicate that "[i]t is particularly important to consider these factors in light of the nature of proactive policing, which may increase the frequency and extent of an officer's contact with citizens and which may also rely heavily on officer discretion. To the extent that some proactive policies may increase the scope for officer discretion, they may increase the potential for cues such as race to affect behavior."  It cites a study which "revealed that social-dominance orientation tends to be relatively higher in police officers compared to members of the general public, college students, and also public defenders, even after controlling for differences in gender, income, social class, age, education, and ethnicity."[77]

The Committee cites several studies that show "when faced with a complex situation requiring difficult decisions, people often rely on superficial cues, hunches, and intuitions, which increases the likelihood of biased behaviors … The liability associated with task complexity is often exacerbated by time pressure, fatigue, and emotions such as fear or anger. These factors are endemic to policing and can undermine the ability to engage in complex or controlled thought."

The Committee notes the existence of a feedback loop between those stereotypically seen as criminal and their response to policing. It points to "a growing body of research suggesting that those concerned with being seen as criminal will respond with behaviors that objectively attract police suspicion (Najdowski, 2011; Najdowski, Bottoms, and Goff, 2015). Conversely, those concerned with being stereotyped as motivated by racial animus can respond negatively to

---

[77] *Id*. at 284-285.

individuals who evoke that concern (Frantz et al., 2004; Goff, Steele, and Davies, 2008)—a finding of potential concern for police officers in the current climate."[78]

In their careful and circumspect analysis, the Committee acknowledges that studies have demonstrated patterns of the disparate treatment of non-whites as compared to whites in proactive policing in the United States. However, they cautioned that there was a lack of a reliable base of studies on the precise causes of such police behavior. It "calls for scholars to produce research that will expand the conceptual map of what causes police behavior; what the consequences of those behaviors are; and how race, gender, class, and other vulnerable identities may play a role in both."[79] Nonetheless, based on available evidence the Committee reached the following conclusions about proactive policing and its impact on non-whites regardless of causal pathways:

"**CONCLUSION 7-1 There are likely to be large racial disparities in the volume and nature of police–citizen encounters when police target high-risk people or high-risk places, as is common in many proactive policing programs.**

**CONCLUSION 7-2 Existing evidence does not establish conclusively whether, and to what extent, the racial disparities associated with concentrated person-focused and place-based enforcement are indicators of statistical prediction, racial animus, implicit bias, or other causes. However, the history of racial injustice in the United States, in particular in the area of criminal justice and policing, as well as ethnographic research that has identified disparate impacts of policing on non-White communities, makes the investigation of the**

---

[78] *Id*. at 286-287
[79] *Id*. at 300.

**causes of racial disparities a key research and policy concern."[80]** (emphases in original)

Similarly, an analysis by two Arizona State University professors notes the importance of racially disparate outcomes in law enforcement, even if the exact causes may not be ascertainable: "At an institutional level, contemporary racism can occur within structures that make room for differentiated enforcement and also by practices and policies that exclude or target particular groups through force of habit or by rules of thumb. The racial impact of such policies and practices is usually evident in the outcomes they produce, even if the discriminatory mechanisms that produce them remain obscure." They point out that, "[w]hat is distinctive about the current period is the formal rejection of race as a criterion for exclusion at the same time that policies and practices that racialize immigrants are being created and appear to be gaining momentum."[81]

**B. The Pattern of Florida and Nationwide Arrests by Immigration and Customs Enforcement ("ICE") Demonstrates SB 168 Will Disparately Impact Suspected Removable Immigrants From Latin America and the Caribbean.**

Data from the TRAC program at Syracuse University on ICE arrests in Florida established ICE's disproportionate arrests of suspected undocumented immigrants from predominantly Latin America and the Caribbean. It further documents the underrepresentation of ICE Florida arrests on suspected undocumented immigrants from predominantly white Canada, Europe and Oceania (primarily Australia and New Zealand). Arrests are tabulated according to the state where the

---

[80] *Id*. at 301.
[81] Doris Marie Provinel and Roxanne Lynn Doty, *The Criminalization of Immigrants as a Racial Project*, JOURNAL OF CONTEMPORARY CRIMINAL JUSTICE, 73, 264 (2011).

apprehension takes place, so the data is specific to Florida, whereas people detained in Florida detention centers could have been sent to the state from elsewhere in the nation.

As indicated in Table 6 and Chart 3, undocumented immigrants from South and Central America and the Caribbean comprised 83.2 percent of all undocumented immigrants in Florida according to the Migration Policy Institute. However, of 19,746 ICE arrests within Florida of suspected removable immigrants, 93.9 percent targeted suspected removable immigrants from South and Central America and the Caribbean.[82]

**TABLE 6**
**ICE ARRESTS IN FLORIDA BY NATIONALITY GROUP COMPARED TO PERCENTAGE OF NATIONALITY GROUP AMONG UNDOCUMENTED IMMIGRANTS IN FLORIDA, FISCAL 2015 THROUGH MAY 2018**

| Nationality Group | % Arrests | % of Unauth. Imm. Group in Florida | Difference in Percentage Points | Difference in Percent |
|---|---|---|---|---|
| | | | | |
| Latin America & Caribbean | 93.9% | 83.2% | +10.7 Points | +12.9% |
| | | | | |
| Europe/Canada/Oceania | 3.2% | 7.2% | -4.0 Points | -55.6% |
| | | | | |

---

[82] TRAC Immigration, *Immigration and Customs Enforcement Arrests*, UNIVERSITY OF SYRACUSE, *available at* https://trac.syr.edu/phptools/immigration/arrest/; Migration Policy Institute, "Profile of the Unauthorized Population: Florida," https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/FL.

**CHART 3**
**ICE ARRESTS IN FLORIDA BY NATIONALITY GROUP COMPARED TO PERCENTAGE OF NATIONALITY GROUP AMONG UNDOCUMENTED IMMIGRANTS IN FLORIDA, FISCAL 2015 THROUGH MAY 2018**



Thus, persons from South and Central America and Caribbean residents are overrepresented by 10.7 percentage points and 12.9 percent. Persons from Europe, Canada, and Oceania comprised 7.2 percent of undocumented immigrants in Florida but only 3.2 percent of ICE arrests. This group is underrepresented by 4 percentage points and 55.6 percent.[83] The differences between population and arrest percentages for both groups are statistically significant at a level beyond one in one thousand.

Florida is not an outlier when it comes to ICE's disproportionate arrests of suspected undocumented immigrants from Latin America and the Caribbean as compared to Europe, Canada, and Oceania. As reported in Table 7 and Chart 4, national TRAC data confirms the emphasis of immigration enforcement efforts nationally on suspected undocumented immigrants from Latin America and the Caribbean as compared to Europe, Canada, and Oceania. As indicated in Chart 4 persons from South and Latin America and the Caribbean comprised 76.4 percent of undocumented immigrants, but 93.4 percent of 480,987 ICE arrests from FY 2015 to May 2018 Thus, Latin Americans and Caribbean residents are overrepresented by 17 percentage points and 22.3 percent. Suspected persons from Europe and Canada comprised 5.1 percent of undocumented immigrants but only 1.8 percent of ICE arrests. This group is underrepresented by 3.3 percentage points and 64.7 percent. (*see* Table 7). The differences between the predominantly non-white and the predominantly white groups are statistically significant at a level beyond one in one million.

---

[83] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, available at https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

**TABLE 7**
**ICE ARRESTS NATIONWIDE BY NATIONALITY GROUP COMPARED TO
PERCENTAGE OF NATIONALITY GROUP AMONG UNDOCUMENTED
IMMIGRANTS NATIONWIDE, FISCAL 2015 THROUGH MAY 2018**

| Nationality Group | % Arrests | % of Unauth. Imm. Group in Nation | Difference in Percentage Points | Difference in Percent |
|---|---|---|---|---|
| | | | | |
| Latin America & Caribbean | 93.4% | 76.4% | +17 Points | **+22.3%** |
| | | | | |
| Europe/Canada/Oceania | 1.8% | 5.1% | -3.3 Points | **-64.7%** |
| | | | | |

**CHART 4**

**ICE ARRESTS NATIONWIDE BY NATIONALITY GROUP COMPARED TO PERCENTAGE OF NATIONALITY GROUP AMONG UNDOCUMENTED IMMIGRANTS IN FLORIDA, FISCAL 2015 THROUGH MAY 2018**



**C. The Pattern of Arrests in Florida and Nationwide under Cooperative Immigration Enforcement Agreements with ICE Demonstrates that SB 168 Will Primarily Ensnare Suspected Removable Immigrants with Clean Criminal Records or Convictions Only for Minor Crimes.**

SB 168 makes no distinction between persons arrested for murder or for minor traffic violations. Moreover, changes in immigration enforcement mandated under SB 168 in Florida jurisdictions will minimally impact dangerous, violent criminals who commit murder, rape or mayhem. These serious offenders will be detained in jail far longer than the 48 hours required under the immigration detainers that SB 168 requires law enforcement agencies to honor. Rather stepped up enforcement will impact precisely those who are not serious "bad guys" but are arrested for minor offenses and would otherwise be released quickly from local jails or issued a citation.

The TRAC program has compiled data for ICE arrests in Florida through 287(g) cooperative referrals from county governments with ICE. These referrals mirror what is mandated for all Florida jurisdictions, under penalty, by SB 168. They require law local enforcement to turn over to ICE any arrested person at the local jail – regardless of the charge—who is allegedly subject to removal from the U.S. Now, to comply with SB 168, most counties in Florida have signed a 287(g) agreement with ICE.[84]

TRAC data demonstrates that for fiscal year 2015 through May 2018, 1,910 Florida ICE arrests from county 287(g) referrals (predominantly from Collier, Duval, and Lee) were not primarily of dangerous, violent criminals, but of persons with no criminal conviction or with what ICE defines as minor Level 3 convictions for such non-violent transgressions as traffic violations,

---

[84] ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, available at* https://www.ice.gov/287g.

DUIs, drug possession, or illegal entry. The TRAC 287(g) Florida arrests data primarily reflect arrests for 2017 and 2018 (1,295) as compared to 2015 and 2016 (615)

As indicated in Chart 5, *73 percent* of ICE 287(g) arrests from local law enforcement referrals in Florida were for persons with no convictions or conviction only for minor Level 3 crimes. Only *12.8 percent* of ICE arrests from local law enforcement 287(g) referrals involved persons with a serious Level 1 crime conviction. Level 1 crimes although deemed serious by ICE are not necessarily violent crimes, but include, for example, types of fraud and financial crime. And the crime could have been committed any time during the previous 20 years. Only *0.4 percent* of ICE referral arrests involved persons with a conviction for homicide (including negligent manslaughter, not just murder), sexual assault or rape (including statutory). *Thus, the 287(g) programs in Florida, on which SB 168 is based, did not primarily ensnare dangerous, violent criminals, but overwhelmingly persons with no criminal convictions or convictions for minor crimes only.*

Although the three counties from which most ICE 287(g) referrals were made do not reflect the full Florida population, it is still noteworthy that 96.4 percent of referrals involved persons from South and Central America and the Caribbean. Only 1.8 percent involved referrals from Europe, Canada, or Oceania.

A similar pattern of arrests of persons with no convictions or only minor crime convictions applies to the larger sample persons arrested under 287(g) programs nationwide (21,261) from fiscal 2015 to 2018. As indicated in Chart 6, *72.9 percent* of ICE 187(g) arrests from local law enforcement referrals nationwide were for persons with no convictions or conviction only for minor Level 3 crimes. Only *18.6 percent* of ICE arrests from local law enforcement involved persons with

a serious Level 1 crime conviction and only *1.1 percent* involved persons with a conviction for

homicide (including negligent manslaughter), sexual assault or rape (including statutory).

**CHART 5**
**ICE ARRESTS IN FLORIDA THROUGH 287(g) REFERRALS, FY 2015-2018,**
**PERCENTAGE IN EACH CATEGORY**



**CHART 6**
**ICE ARRESTS NATIONWIDE THROUGH 287(g) REFERRALS, FY 2015-2018,
PERCENTAGE IN EACH CATEGORY**



**D. Data from ICE Referrals *After* the Implementation of SB 168 Confirms the Targeting of Suspected Removable Immigrants Arrested for Minor and Non-Violent Offenses, Especially Traffic Offenses**

Public records from eight Florida counties – Alachua, Gilchrist, Hernando, Leon, Flagler, Miami-Dade, Seminole, and Walton – on persons arrested and issued ICE detainers after the implementation of SB 168 on July 1, 2019 provides additional confirmation that SB 168 primarily targets minor and non-violent offenders - not violent criminals.

As indicated in Table 8 and Chart 7, however, none of the analyzed 227 post-SB 168 detainers involved *anyone charged with homicide or rape, and only one with sexual assault*. Charges for all violent crimes under Florida law, mostly aggravated assault or battery, accounted for *only 13.2 percent* of ICE detainers. Charges for traffic violations – most for driving without a valid license, the Catch-22 for undocumented immigrants – *accounted twice as many detainers (26.4 percent) as all violent crimes combined.* Charges for all non-violent violations accounted for *72.7 percent* of detainers, more than five times as many detainers as for all violent crimes combined. It is important to note that these are charges only pursuant to an arrest; they do not necessarily represent convictions for the crimes charged or any prior crime.[85]

---

[85] There was insufficient information to ascertain the race, ethnicity or national origin of these ICE referrals.

**TABLE 8**
**ARRESTS WITH ICE DETAINERS AFTER IMPLEMENTATION OF SB 168 ON JULY 1, 2019, INFORMATION PROVIDED BY ALACHUA, GILCHRIST, HERNANDO, LEON, FLAGLER, MIAMI-DADE, SEMINOLE, AND WALTON COUNTIES**

| Crime | Number | Percent |
|---|---|---|
|  |  |  |
| Homicide | 0 | 0% |
| Rape | 0 | 0% |
| Sexual Assault | 1 | 0% |
|  |  |  |
| All Violent | 30 | 13.2% |
|  |  |  |
| Traffic | 60 | 26.4% |
| DUI | 28 | 12.3% |
| Other Non-Violent | 77 | 33.9% |
|  |  |  |
| Total Non-violent | 165 | 72.7% |
|  |  |  |
| Crime non-specified, Warrant, CAPIAS, Failure to Appear, Probation | 32 | 14.1% |
|  |  |  |
| Total All | 227 |  |
|  |  |  |
| Source: Submissions in response to requests for production from Alachua, Leon, Flagler, Miami-Dade, and Walton Counties. Violent crimes from State of Florida, "VIOLENT OFFENSE LIST," http://www.djj.state.fl.us/docs/probation-policy-memos/violent-offense-list-statue-number.pdf?Status=Master&sfvrsn=2. | | |

**CHART 7**
**ARRESTS WITH ICE DETAINERS AFTER IMPLEMENTATION OF SB 168 ON JULY 1, 2019, INFORMATION PROVIDED BY ALACHUA, GILCHRIST, HERNANDO, LEON, FLAGLER, MIAMI-DADE, SEMINOLE, AND WALTON COUNTIES**



### E. SB 168 Will Ensnare U.S. Citizens, Based on Their Race or Ethnicity, Not Just Removable Undocumented Immigrants

SB 168 is also premised on the supposition that ICE detainers, which do not require a judicial warrant, are accurate in their identification of undocumented immigrants. Evidence, however, indicates that this is often not the case, exacerbating the harm to the predominantly non-white persons impacted by SB 168. Contrary to what backers of SB 168 have claimed, this problem was not corrected by an Executive Order issued by President Donald Trump in January 2017 which required an administrative warrant of probable cause by ICE officials for the issuance of an immigration detainer.[86]

Subsequent to this order, ICE still relies for the assessment of citizenship on the same flawed databases that are not necessarily accurate or up-to-date as citizenship status changes. Timothy S. Robbins, the Acting Executive Associate Director Enforcement and Removal Operations for ICE testified before Congress on October 22, 2019 that, "When an individual is booked into custody by a law enforcement agency, his or her biometric data is automatically routed through federal databases to the Federal Bureau of Investigation (FBI), which shares this information with ICE. ICE uses this information to develop probable cause that the subject is a removable alien to support the issuance of an immigration detainer to the federal, state, or local law enforcement agency that has custody of the alien."[87] Further, the Executive Order did not change

---

[86] White House, *Executive Order: Enhancing Public Safety in the Interior of the United States*, WHITE HOUSE.GOV, Jan. 25, 2017, https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-public-safety-interior-united-states/.
[87] Timothy S. Robbins, *'Sanctuary Jurisdictions: The Impact on Public Safety And Victims'*, U.S. Sen. Comm. on the Judiciary, at 6, Oct. 22, 2019, *available at*
https://www.ice.gov/sites/default/files/documents/Testimony/2019/191022robbins.pdf.

the complexities in determining citizenship status or assure that the databases were up-to-date or

fully accurate.  In addition to native-born Americans, citizenship can also derive through

naturalization, derivative citizenship, and acquisition of citizenship.

Derivative citizenship can be especially difficult to ascertain. It is given to children who are

lawful permanent residents, are under the age of 18 and at least one of whose natural or adopted

parents become naturalized U.S. citizens. Derivative citizenship does not require an application. So,

individuals will not have documentary proof of citizenship unless they specifically apply to U.S.

Citizenship and Immigration Services for a certificate. The maze of requirements for derivative

citizenship with some 35 components can be found in "Chart C: Derivative Citizenship -- Lawful

Permanent Resident Children Gaining Citizenship Through Parents' Citizenship, by the

Immigration Legal Resource Center. [88] The U.S. Department of Homeland Security has estimated

that of legal permanent residents who entered the United States between 1980 and 2014, 1.51

million had obtained derivative citizenship.[89]

Citizenship by acquisition applies to children of both U.S. citizen parents born outside of

the United States. Citizenship can also be acquired under this circumstance if only one parent is a

U.S. citizen, provided that  the "U.S. citizen parent has been physically present in the United States

or one of its outlying possessions prior to the person's birth for the period required by the statute in

effect when the person was born." That period varies depending on the date of birth. There are yet

---

[88] *See* USCIS, *Citizenship Through Parents* (Apr. 17, 2019) *available at* https://www.uscis.gov/us-citizenship/citizenship-through-parents; *see also* Immigrant Legal Res. Ctr., *Chart C: Derivative Citizenship -- Lawful Permanent Resident Children Gaining Citizenship Through Parents' Citizenship, Immigration Legal Resource Center*, ILRC (2020), *available at* https://www.ilrc.org/sites/default/files/resources/natz_chart-c-2020-2-20.pdf.
[89] Bryan Baker, *Estimates of the Lawful Permanent Resident Population in the United States,* at 4, DHS (Jan. 2015) *available at* https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015.pdf.

other requirements for out-of-wedlock births, where one or both parents are U.S. citizens. Again, there are no papers for acquisition citizenship, unless the person makes special application to U.S. Citizenship and Immigration Services. The matter becomes yet more complex because acquisition citizenship may not apply if the child lives abroad. These guidelines have changed in the past and may change again, adding another level of complexity. There are also exceptions for children of military parents.[90] According to a U.S. State Department estimate some 9 million U.S. citizens were living abroad. In addition, Americans took some 80 million trips abroad.[91]

An ACLU study of Miami-Dade County, Florida found serious errors in removal assessments by ICE for a period that post-dated President Trump's Executive Order. The ACLU found that for this one Florida county, from "February 2017 to February 2019, ICE sent to the jail 420 detainer requests for people listed as U.S. citizens, only to later cancel 83 of those requests—evidently because the agency determined, after the fact, that its targets were in fact U.S. citizens. The remaining individuals' detainers were not canceled, and so they continued to be held for ICE to deport them."[92] Thus, even for U.S. citizens ICE does not necessarily cancel detainers or cancel them promptly. Moreover, those counted in the records as U.S. citizens does not fully capture the

---

[90] *See Acquisition of U.S. Citizenship at Birth by a Child Born Abroad*, U.S. DEP. OF STATE – BUREAU OF CONSULAR AFF., (2020) *available at* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Acquisition-US-Citizenship-Child-Born-Abroad.html; *see also Chart A: Determining Whether Children Born Outside The U.S. Acquired Citizenship At Birth,* ILRC (2020) (https://www.ilrc.org/sites/default/files/resources/natz_chart-a-2020-2-20.pdf (demonstrating the complexities of acquired citizenship); *Id.* at *Chart B: Determining If Children Born Abroad And Out Of Wedlock2 Acquired U.S. Citizenship At Birth*, ILRC (2020), *available at* https://www.ilrc.org/sites/default/files/resources/natz_chart_b-20200218.pdf.
[91] U.S. Dep't. of State – Bureau of Consular Aff., *CA by the Numbers*, *available at* https://web.archive.org/web/20160616233331/https://travel.state.gov/content/dam/travel/CA_By_the_Numbers.pdf.
[92] *Citizens On Hold: A Look at Ice's Flawed Detainer System in Miami-Dade County*, ACLU OF FLA, Mar. 20, 2019, *available at* https://www.aclufl.org/en/publications/citizens-hold-look-ices-flawed-detainer-system-miami-dade-county.

number of such citizens detained by ICE, given that ICE has also erroneously designated U.S.

citizens as removable unauthorized immigrants as is demonstrated below.

Detailed information on ICE detainer requests from Miami-Dade County over this

approximately same two-year period from the county's cooperation with ICE in early 2017 through

February 2019 is consistent with the findings of the ACLU study.  This data demonstrates that ICE

issued detainer requests for 418 U.S. citizens, which comprise 16.7 percent of 2,496 detainer

requests during this period with a citizenship indicated (181 do not have a citizenship indicated).

These requests disproportionately target Hispanics and African American U.S. citizens, providing

clear evidence of the discriminatory effect on members of these minority groups of the ICE

cooperation required under SB 168.

As indicated in Table 9 and Chart 8, Hispanics and African Americans comprised *93.8

percent* of these detainer requests of U.S. citizens in Miami-Dade County. This percentage is 11.9

percentage points and 14.5 percent greater than the 81.9 percent of Hispanics and African

American adult citizens in the county. In contrast, all others comprised only *6.2 percent* of these

detainer requests in Miami-Dade County. This percentage is 11.9 percentage points and 65.7

percent greater than the 18.1 percent of other adult citizens in the county.

**TABLE 9**
**MIAMI-DADE COUNTY ICE DETAINER REQUESTS, UNITED STATES CITIZENS, 2017-FEB. 2019**

| Group | Ice Detainer Requests US Citizens | % Of Ice Requests | % Of All Citizens | Difference In Percentage Points | Difference In Percent |
|---|---|---|---|---|---|
| | | | | | |
| Total | 418 | 100% | 100% | NA | NA |
| | | | | | |
| Hispanic +Black | 392 | 93.8% | 81.9% | +11.9 Percentage Pts. | +14.5% |
| | | | | | |
| All Others | 26 | 6.2% | 18.1% | -11.9 Percentage Pts. | -65.7% |
| | | | | | |

Source: Miami-Dade County, Corrections and Rehabilitation Department, Jail Population Statistics,  ICE (Hold for Immigration) Report, Detainers Received Between 01/27/2017 to Present, February 2019. U.S. Census, American Community Survey, CVAP, 2014-2018.

**CHART 8**
**MIAMI-DADE COUNTY ICE REFERRALS, UNITED STATES CITIZENS, 2017-FEB. 2019**



Such errors in Florida are not limited to Miami-Dade County. Information on persons with ICE detainer requests provided by Walton County that cover 2018 through February 2020, again after Trump's January 2017 Executive Order, confirm the inclusion of U.S. citizens. Walton with a population of just 74,071 is a much less populated county than Miami-Dade and provided only 89

records. However, of the 81 records with a citizenship listed, 5 are listed as U.S. citizens, which is 6.2 percent of these listings. Four of these five U.S. citizens (80%) are listed as Hispanic or black in a county that is just 10.3 percent black and Hispanic in its adult citizen population. The remaining U.S. citizen is listed as white. However, his Florida offender record lists his race as "ALL OTHERS/UNKNOWN," indicating that he is likely of mixed race which is also consistent with his name (Mouthout Laddavanh) and his mug shot photograph.[93]

Another case that demonstrates ICE errors based on faulty information arises out of Monroe County, Florida. In April 2018, Peter Sean Brown was detained by ICE. Yet, Brown was a native-born U.S. citizen, born in Philadelphia. In his lawsuit against the Monroe County Sheriff, Brown said that the Monroe County Sheriff 's Department ignored his "repeated protest, to offer to produce proof [of citizenship]. Brown claimed that he repeatedly called ICE during his three week detention but could not reach them. Finally, once at the ICE Krome Detention Center, ICE finally looked into his situation and verified that he was a U.S. citizen and ordered his release.[94]

Monroe County had an agreement with ICE to cooperate in the enforcement of immigration laws including the honoring of a facially valid detainer request. In responding to Brown's lawsuit, Richard Ramsay, the Monroe County sheriff, acknowledged that ICE "ultimately vacated the warrant," because Brown was a U.S. citizen. Sheriff Ramsay said that local law enforcement had

---

[93] Laddavanh Mouthouta, *DC Number: Q07416*, *available at* http://www.dc.state.fl.us/offenderSearch/detail.aspx?Page=Detail&DCNumber=Q07416&TypeSearch=IR.
[94] *See* Compl., *Brown v. Ramsay*, 185 F.2d 225 (8th Cir. 1950), *available at* https://www.documentcloud.org/documents/5396793-1-Main.html#document/p2/a469039; *see also* Maria Castillo, *Immigration Detention – For US Citizens*, COLUMBIA POLITICAL REVIEW, Feb. 27, 2019, *available at* http://www.cpreview.org/blog/2019/2/immigration-detentionfor-us-citizens-gd5nd.

no choice but to rely on a facially valid detainer request and had no obligation to conduct an independent investigation of citizenship. Thus, there was no local remedy to an ICE error.[95]

Errors in the detaining of U.S. citizens is further found outside of Florida. The libertarian CATO Institute studied ICE detainers in Travis County, Texas. It found that "From October 2005 to August 2017, 814 targets of ICE detainers in Travis County—3.3 percent of all requests—claimed U.S. citizenship and presented officers with a Social Security number (SSN). ICE subsequently canceled or declined to execute about a quarter of those detainer requests. Based on statements from ICE officials, the best explanation for not executing these detainers is that ICE targeted *at least* 228 U.S. citizens in the county before canceling or declining to execute those detainers." CATO additionally found that "applying the rate of wrongful detainers in Travis County to all detainers in the state of Texas from 2006 to 2017 implies that ICE wrongfully placed detainers on at least 3,506 U.S. citizens statewide. Other evidence shows that "ICE regularly releases U.S. citizens after it executes a detainer, meaning that the true number of U.S. citizens initially targeted is likely even higher than that estimate." CATO also projected this error rate nationwide, concluding that "The rate of wrongful detainer issuances in Travis County implies that ICE targeted at least 3,506 U.S. citizens in Texas and 19,873 nationwide with detainers that were subsequently canceled."

CATO confirmed that it is difficult to establish U.S. citizenship. People may not have ready access to the necessary papers, databases are flawed and out-of-date, and citizenship can be

---

[95] Def.['s] Reply Memo. in Supp. of Mot. Final Summ. J. *Brown v. Ramsay*, Doc. No. 127, *available at* https://www.docketbird.com/court-documents/Brown-v-Ramsay/Defendant-s-REPLY-to-127-MOTION-for-Summary-Judgment-by-Richard-A-Ramsay/flsd-4:2018-cv-10279-00152?user_id=guest. (showing that the case remains pending).

difficult to determine for naturalized citizens, derivative and acquired citizens. CATO further indicated that "ICE detained Lorenzo Palma in Texas for almost two years while he attempted to prove his derivative citizenship claim. These cases can be so difficult that even the Board of Immigration Appeals admitted in 2015 that it had misinterpreted citizenship law and wrongfully denied some people's U.S. citizenship claims for seven years."[96]

In Rhode Island, pursuant to a lawsuit by Ada Morales, a U.S. citizen who was detained under an immigration detainer despite being a U.S. citizen, plaintiffs pored over records for the Rhode Island Department of Corrections (RIDOC). They found that, "according to RIDOC's statistics, between 2003 and 2014, 462 detainers issued to RIDOC were lodged against individuals identified in RIDOC's system as U.S. citizens." They noted that "ICE did not always cancel detainers that had been issued against U.S. citizens or other non-removable people, or log them as such in ICE's record-keeping system."  In deposition, ICE Agent Edward Donaghy testified as follows: "Q. So there may be situations where you issue a detainer, you later determine that it's a citizen, but no cancellation is ever given. Right? . . . A. Yes. Just within our system." In his deposition, ICE Supervisory Detention and Deportation Officer John Drane testified that a cancellation for a U.S. citizen "could be one day. It could be 20 years."[97]

In 2017, based on undisputed facts in the case, a federal district court granted Ms. Morales summary judgement against Donaghy, ICE Field Director Bruce Chadbourne, and the United

---

[96] David J. Bier, *U.S. Citizens Targeted by ICE: U.S. Citizens Targeted by Immigration and Customs Enforcement in Texas,* CATO INSTITUTE, Aug. 29, 2018, *available at* https://www.cato.org/publications/immigration-research-policy-brief/us-citizens-targeted-ice-us-citizens-targeted.

[97] Pl.[s'] Stat. of Undisputed Facts, *Morales v. Chadbourne*, 793 F.3d 208, (1st Cir. 2015), 27-28 (No. 12-cv-301-M-DLM).

States. The court found that "She has a social security number and a United States passport. Despite this, Ms. Morales was held at the state prison on an Immigration and Customs Enforcement ("ICE") detainer that was issued solely based on her Hispanic last name and her Guatemalan birthplace." It found that, "the facts of this case are disturbing on many levels. The fact that a United States citizen was held in prison on an erroneous immigration detainer without probable cause for even one night should concern all Americans. Law enforcement agencies that are charged with enforcing immigration laws need to go above and beyond in crafting and executing constitutional policies and procedures to prevent and avoid the egregious errors that happened in this case."[98]

In 2014, after the court finding in the Morales case, Governor Lincoln Chafee issued an executive order limiting compliance with ICE detainers to only when they accompanied by a court order. His successor has let this order stand.[99]

A recent federal court decision on September 27, 2019 offers a painstaking analysis of grievous flaws in the accuracy of ICE detainer requests. In response to a class action lawsuit—*Geraldo Gonzalez v. ICE*, a federal district court judge in California ruled that ICE detainers violated the Fourth Amendment of the Constitution.[100] The judge made important findings of fact that apply all detainer requests, which rely on the same processes and databases nationwide. He noted that "No judicial process is undertaken before or after a detainer is issued; however, detainers are issued along with an ICE arrest warrant."[101] But this administrative process determined only by

---

[98] Mem. and Order, *Id*. at 392 (No. 12-301-M-LDA, 01-24-20).
[99] *See* R.I. Gov., *Governor Chafee Requires Executive Agencies in Rhode Island to Adopt Immigration Detainer Policy*, RI.GOV, Aug. 14, 2014, *available at* https://www.ri.gov/press/view/22691; *see also* Letter from ACLU to Governor Gina Raimondo, (May 9, 2017), *available at* http://riaclu.org/images/uploads/Immigration_Letter_to_Governor_Raimondo_FINAL_red.pdf.
[100] *Gonzalez v. ICE*, 416 F. Supp. 3d 995 (C.D. Cal. 2019).
[101] *Ibid*.

ICE itself, lacks "many of the backstops that exist in the criminal justice system."[102] There is "(no right to pre-trial release on bail or bond) … (no right to an attorney at the government's expense in removal proceedings)" and "(no judge or neutral arbiter ever reviews an ICE official's probable cause determination to issue a detainer or make an arrest)."[103]

The court noted that "determining a person's immigration status may be a complex inquiry requiring a thorough examination of the individual's history" and that "the databases on which ICE relies for information on citizenship and immigration status often contain *incomplete data, significant errors, or were not designed to provide information that would be used to determine a person's removability … In addition to the numerous errors in the databases discussed above, a number of immigration and citizenship statuses are either not captured, or captured on databases with dubious reliability*."[104] (emphasis added) Thus, "all told, the collection of datapoints ICE gathers from the various databases does not provide affirmative indicia of removability to satisfy probable cause determination because *the aggregation of information ICE receives from the databases is largely erroneous and fails to capture certain complexities and nuances of immigration law*."[105] (emphasis added)

The court cited Senior ICE official David Marin, who wrote: "For the past couple of months, AFOD Martinez has noticed an increase in the volume of biometric Immigration Alien Responses (IAR) for individuals that are determined, via agency database checks, to be removable, only to later discover that the person is a United States citizen … Unfortunately, these types of

---

[102] *Ibid*.
[103] *Ibid*.
[104] *Ibid*.
[105] *Ibid*.

cases occur frequently."[106] It noted that "data produced by ICE during the period of May 2015 to February 2016 reveals that of the 12,797 detainers issued during that time frame, 771 were lifted because the individuals were either U.S. citizens or otherwise not subject to removal."[107]

The court found that "none of the databases on which ICE depends necessarily reflect a person's immigration status at the time when a detainer is set to be issued." Moreover, "CIS—the central database ICE relies upon in its determination of immigration status—provides no information on derivative citizenship. CIS regularly reports incorrect information about derivative citizens. See Trial Tr. 258:4-14, 261:12-15. The result is a potential misclassification of '[*t]housands and thousands of people, potentially even millions*' given the various requirements for derivation of citizenship, their dynamism, and the failure of immigration officials to adequately or properly track those changes in status."[108] (emphasis added)

The court concluded that "finally, and perhaps most tellingly, *the databases ICE uses are unreliable* because no single database used was intended to provide any indication of probable cause of removability." [109] (emphasis added) It found that "immigration and citizenship law are complex and require a taxing examination of a person's history—the databases ICE uses were not created to track those complexities. The evidence before the Court shows ICE relies on the databases to cobble together information from disparate systems that are not at all intended to establish probable cause of removal."[110] As a result, "The class members here face days of

---

[106] *Ibid*.
[107] *Ibid*.
[108] *Ibid*.
[109] *Ibid*.
[110] *Ibid*.

unconstitutional imprisonment as a result of immigration detainers. Such injury is not adequately compensated by monetary damages."[111]

On February 5, 2020, the court issued an order that enjoined detainers based on database checks (the commonly used check) issued from the Central District of California, including by ICE's Pacific Enforcement Response Center (PERC), from which ICE issues orders not only within California, but also across the nation, although not currently Florida. However, the faulty databases used by ICE's PERC are national, not local, and as noted above, significant errors have occurred in Florida and other stats as well. The same lack of independent review or other backstops regarding immigration detainers would apply to Florida as well. The Monroe County Florida case, referenced above, regarding the alleged erroneous detention of Peter Sean Brown remains pending.[112]

Following the initial ruling in the *Gonzalez* case, the city of Las Vegas announced that it was ending its 287(g) agreement with ICE. It did so not because of legal compulsion, but as a matter of policy. Clark County Sheriff Joe Lombardo said that the Las Vegas Police Metropolitan Department will "continue to work with ICE at the Clark County Detention Center in removing persons without legal status who have committed violent crimes." But Las Vegas is not going to pass on to ICE non-criminals or persons guilty only of minor, non-violent crimes, like traffic violations, drug possession, immigration violations, and driving under the influence, which constitute the vast majority of 287(g) arrests in Florida and nationwide.[113]

---

[111] *Ibid*.
[112] *Gonzalez v. ICE*, Judgement, 5 February 2020; United States Customs and Immigration Enforcement, Pacific Enforcement Response Center (PERC), 12 June 2018, https://www.ice.gov/video/pacific-enforcement-response-center-perc.
[113] Michael Lyle, "Following Metro, Las Vegas Ends Its 287(g) Agreement," *Nevada Current*, 24 October 2019, https://www.nevadacurrent.com/blog/following-metro-las-vegas-ends-its-287g-agreement/.

In September 2018, a report by the Office of Inspector General (OIG) for the Department of Homeland Security identified major flaws in the operations of ICE. In this report headlined, "Lack of Planning Hinders Effective Oversight and Management of ICE's Expanding 287(g) Program," the OIG concluded:

> "ICE approved the 40 additional applicants without planning for a corresponding increase in program management staffing, determining how to promptly deliver needed information technology (IT) equipment to participants, or ensuring participants are fully trained. Specifically, ICE did not analyze program needs to determine how many additional 287(g) program managers should be hired and was not able to hire enough to keep up with the quick expansion. In addition, a lack of IT support staff and a lengthy installation process have hampered prompt delivery and installation of IT equipment that law enforcement agencies in the 287(g) program need to carry out their immigration enforcement-related duties. Finally, ICE may not be training law enforcement officers efficiently and is not monitoring the officers to ensure they complete required training."[114]

### F. The Immigrant "Threat Narrative" Advanced in Support of SB 168 Made Its Discriminatory Impact Foreseeable

Although SB 168 makes no mention of race and on paper prohibits racial profiling (which, as noted above, Florida law had already prohibited), in practice, it is a proactive police measure targeted at a particular demographic group – undocumented immigrants. This is a group clearly associated with the much broader population of non-white citizens and legal residents, especially Hispanics. Kevin R. Johnson, professor of law and Chicana/o studies at the University of California, Davis, noted in 2000 that "race-based immigration enforcement, while in some ways unique in its express use of racial classifications, also constitutes part of a body of immigration law replete with disparate racial impacts cloaked in facial neutrality." He said, "Race-based enforcement deserves special scrutiny

---

[114] Office of Inspector General, Department of Homeland Security, "Lack of Planning Hinders Effective Oversight and Management of ICE's Expanding 287(g) Program." 19 September 2018, p. 1, https://www.oig.dhs.gov/sites/default/files/assets/2018-09/OIG-18-77-Sep18.pdf.

because it disproportionately burdens persons of Latin American ancestry in the United States, the vast majority of whom are U.S. citizens or lawful immigrants."[115]

In her case study of the passage of an anti-immigration ordinance in Hazelton, Pennsylvania and in her literature review, Professor Hilary Parsons Dick of Arcadia University, found that "champions of local immigration restrictions make recourse to overt indexicality in claiming that the laws are not racist because their denotational content targets illegal aliens and not any specific racial group."  Rather, the "category 'illegal alien' does *indirectly* index race, increasingly over time, by disproportionately affecting some immigrant groups and not others—a process of racialization and criminalization that is not evident in the denotational content of the law. Rather, the racializing effects of these laws dwell in the indirect racial indexicality— the conflation of "illegal alien" and 'criminal Mexican immigrant.'" Moreover, "*this conflation is a prime source for the racialization of not only Mexican immigrants, but other Latin American immigrants as well, where racialization is understood as a form of social differentiation that marks people as inherently threatening and foreign.*"[116] (emphasis in original)

Professor Amada Armenta of the UCLA Luskin School of Public Affairs, notes in her 2015 book on policing and immigration enforcement, the intersection and reinforcing relationship between racial stereotyping and anti-immigration laws like SB 168: "ideas about race shape anti-immigration legislation, and laws produce racial inequality, foster racial stereotypes, and imbue legal categories with racial meaning." She writes that "as a result, the terms *Latino, immigrant,* and

---

[115] Kevin R. Johnson, "The Case Against Race Profiling in Immigration Enforcement," *Washington University Law Quarterly*, 78 (2000). 677-679, 735.
[116] Hilary Parsons Dick, "Making Immigrants Illegal in Small-Town USA," *Journal of Linguistic Anthropology*, 21 (2011): E35-55, quotes on E35, E50.

*undocumented immigrant* are often treated as interchangeable social categories. In the popular imagery to be *Mexican* or *Latino* is to be 'illegal.'"[117] (emphasis in original)

Another study by professors at Princeton University analyzed the rise of the immigrant "threat narrative" that is focused on Hispanics and is "associated over time with the passage of increasingly restrictionist immigration legislation and the implementation of ever more stringent enforcement policies."[118] Like other states, in Florida, most of the state's approximately 800,000 undocumented immigrants are non-whites. The problem is that the vast majority of the target population of non-whites in Florida – more than 90 percent – are not undocumented immigrants.

A 2012 study by Professor Xia Wang of Arizona State University found that although the weight of evidence suggests that immigration does not cause more crime, this finding has not, it seems, affected public perceptions of immigrant criminality because public opinion about immigrants seems to be driven more by stereotype than by empirical fact. For example, the results of the 2000 General Social Survey suggest that 73 percent of respondents believe that more immigrants are somewhat or very likely to cause higher crime rates." The researcher found that their controlled statistical analysis of perceived immigrant threat and characteristics of zip codes in the southwestern United States, supported the proposition of immigrants as a perceived criminal threat. He found that "the perceived size of undocumented immigrants is likely to prompt perceptions of undocumented immigrants as a criminal threat for native respondents."[119] The

---

[117] *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (University of California Press, 2017), 6-7.
[118] Douglas R. Massey and  Karen A. Pren, "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America," *Population Development Review*, 38 (2012): 1-29, quote on p. 6, 8-9
[119] Xia Wang, Undocumented Immigrants as Perceived Criminal Threat: A Test of the Minority Threat Perspective," *Criminology*, 50 (2012): 743-776, quotes on pp. 744,763.

researcher also linked this perceived immigrant threat to "the media and politicians who desire to restrict immigration have portrayed undocumented immigrants as undeserving criminals."[120] This finding is particularly instructive to Florida's adoption of SB 168. As demonstrated in Section X, backers of SB 168 emphasized the criminal threat to Floridians from criminal undocumented immigrants and the need for this legislation to advance public safety and take dangerous violent criminals off the streets.

This threat narrative has its practical manifestation in the data already presented on the targeting of persons from South and Central America and the Caribbean by ICE arrests in Florida and nationwide, including through cooperative referrals from local officials. The threat narrative as explained in these many studies also featured prominently in the advocacy for SB 168. The bill originated in model legislation from racialist and nativist anti-immigrant groups that viewed all non-white immigrants, whether legal or not, as a threat to the safety, culture, values, and racial dominance of white America. These groups then became intimately involved on the inside in for adopting SB 168. Republican decision-makers in the Florida decision-makers repeatedly reiterated the threat claimed that their bill was designed to snare dangerous, predatory criminals in Florida (*see* Section X below on contemporary statements).

This threat narrative in Florida was amplified by President Donald Trump. On October 29, 2018, shortly before the Florida State Legislature began considering SB 168, Trump tweeted: "Many Gang Members and some very bad people are mixed into the Caravan heading to our Southern Border. Please go back, you will not be admitted into the United States unless you go

---

[120] Ibid., p. 765.

through the legal process. This is an invasion of our Country and our Military is waiting for you!"[121]

At a campaign rally on May 9, 2019 in Panama City Beach, Florida, five weeks before Governor Ron DeSantis signed SB 168, Trump raised the prospect of deploying deadly force against migrants trying to enter America. He said, "And don't forget — we don't let them and we can't let them use weapons. We can't," Trump said. "Other countries do. We can't. I would never do that. But how do you stop these people? You can't. There's—." When a woman reportedly shouted, "shoot them," Trump responded, "That's only in the Panhandle, you can get away with that statement. Only in the Panhandle!"[122]

In Florida, Republican State Senator Joe Gruters, the primary sponsor of SB 168 said, "*Banning sanctuary cities is about one thing and one thing only - public safety.*'" (emphasis added)[123] To drive home the threat narrative, Gruters, Republican Representative Cord Byrd, the House sponsor, and other legislative backers of SB 168, held a public press event on April 17, 2019, to show the dangers allegedly posed by undocumented immigrants. The event featured parents of a child killed by an allegedly illegal immigrant drunk driver and representatives of groups dedicated to publicizing deadly violence by illegal immigrants. It featured Yvonne Larson of the Remembrance Project and Amapola Hansberger, head of Legal Immigrants for America (LIFA).[124] Hansberger warned that, "the consequences of permitting open borders and allowing

---

[121] https://twitter.com/realDonaldTrump/status/1056919064906469376?s=20.
[122] Aaron Rupar, "Trump Turns Shooting Migrants Into a Punchline at Florida Rally," *Vox*, 9 May 2019, https://www.vox.com/2019/5/9/18538124/trump-panama-city-beach-rally-shooting-migrants.
[123] Jacob Ogles, "Joe Gruters Slams South Miami Challenge to So-Called Sanctuary Cities Ban," *Florida Politics*, 11 July 2019, https://floridapolitics.com/archives/300797-gruters-slams-south-miami.
[124] The Florida Channel, "4/17/19 Press Conference on HB 527 [the House equivalent of SB 168] Sanctuary Cities," https://thefloridachannel.org/videos/4-17-19-press-conference-on-hb-527-sanctuary-cities/.

people that have never been vetted to come in — they will kill you."[125] She made similar points in an interview with Channel 9 Orlando, that is featured on the LIFA website. "Sanctuary cities should be to protect American lives not to protect those who want to kill Americans … Are Americans to sacrifice their own children to make foreign criminals comfortable … Sanctuary cities are like a magnet for the worst type of elements."[126]

The Remembrance Project is dedicated to showing that illegal immigrants are dangerous murderers by compiling list of Americans allegedly killed by such immigrants. The project's founder Maria Espinoza wrote in a 2102 mission statement, "No one is immune to the illegal who drives wildly drunk, or the wanna-be gang-banger who needs to machete innocent citizens to gain entry and respect into the Latino or other gangs… "We have uncovered the fact that Americans are under assault." [127]

On March 6, 2019, the Remembrance Project's Larsen retweeted a warning from FAIR about Central Americans, and later she tweeted that "Maybe it's not a good idea to import tribal peoples from 3rd world countries."[128] She testified about SB 168 before the Senate Rules Committee, saying that she had move to Ft. Meyers Florida "from a real sanctuary city that would be Houston, Texas." She said, "I heard a lot of concern today about sexual assault and domestic assault in the Miami-Dade area. I'd like to thank the Senators for pointing out why I'm really glad I

---

[125] Ibid, 0.9-0.10 min.
[126] Press, Interview, Channel 9 News, Orlando, available at https://www.youtube.com/watch?v=uAHpcyS0UBY.
[127] David Noriega, BuzzFeed News, "We Have Uncovered The Fact That Americans Are Under Assault'" 17 November 2015, https://www.buzzfeednews.com/article/davidnoriega/this-is-the-anti-immigration-activist-who-set-the-stage-for.
[128] https://twitter.com/ylarsen/status/1141873522496745472

did not choose to live in Miami." The Committee Chair, Republican Senator Lizbeth Benacquisto

interrupted her to say, "that testimony is absolutely not appropriate."[129]

In a moment of candor at the event, Representative Byrd made it clear that backers of SB

168 were concerned not just illegal immigrants but all immigrants in Florida. He said, the

legislation is "about not putting *either legal or illegal immigrants* over American citizens ... It is

about public safety."[130] (emphasis added)

In 2019, covering the period in which the Florida legislature was considering SB 168, the

Federation for American Immigration Reform FAIR, one of the groups involved in the adoption of

SB 168, published a list of "Examples of Serious Crimes by Illegal Aliens." Every alleged offender

on the list was identified as coming from a Latin American or African nation or had a Hispanic

surname.[131]

Senator Gruters has a large sign outside his office door (see below) proclaiming "Faces of

Criminal Illegals Deported from Sarasota County" which shows 35 people who allegedly have been

deported. The sign does not indicate how he selected these 35 persons, the crime with which they

were charged, whether they only charged or found guilty, and the country to which they were

---

[129] Steve Bosquet, "'Sanctuary City' Ban Demonizes Immigrants," *Sun-Sentinel*, 19 April 2019, https://www.sun-sentinel.com/opinion/fl-op-com-bousquet-demonizing-immig-20190419-story.html; Jerry Ianelli, "After Complaints, About Hate-Group Ties, Florida GOP Chair Held Event With More Extremists," *Miami New Times*, 24 April 2019, https://www.miaminewtimes.com/news/florida-republican-chair-joe-gruters-held-press-conference-with-extremist-groups-11155339; Yvonne Larsen, 20 June 2019, May 18, 2019, March 6, 2019, https://twitter.com/ylarsen?lang=en; The Florida Channel, Video, Senate Rules Committee Hearing, 17 April 2019, 1.0-1.03. https://thefloridachannel.org/videos/4-17-19-senate-rules-committee/
[130] Florida Channel, "Press Conference 17 April 2019," 0.2-0.3 min.
[131] Federation for American Immigration Reform, "Examples of Serious Crimes by Illegal Aliens." 2019, https://www fairus.org/issue/border-security/examples-serious-crimes-illegal-aliens.

FROM *HERALD TRIBUNE*, 10 AUGUST 2019



deported. When a *Miami New Times* reporter charged that the sign was "absurdly racist," Gruters

did not supply this information. Instead, he instead responded, "Why is that racist? Over 500 people

from 35 countries have been detained from Sarasota. All are and should be equal under the law." The adult population (18-years-old+) of Sarasota County is 86 percent non-Hispanic white, but a substantial majority of the faces on his sign, depicted below, look black or Hispanic. The faces chosen from 500 deportees from 35 countries include 6 persons who look black, which is 17 percent of the 35 faces, in a county that is about 4 percent black in its adult population, 93 percent of whom are citizens.[132]

Despite Gruters claim about 500 criminal illegal immigrants detained from Sarasota, data compiled by the TRAC program at the Syracuse University discloses that from fiscal year 2015 to the first eight months of fiscal year 2018, ICE had arrested – not necessarily deported -- only 58 suspected undocumented immigrants from Sarasota County, an average of just under 16 per year. Of these, 59 percent had no conviction or only a conviction for a minor crime; none had been convicted of the violent crimes of homicide, assault, or sexual assault/rape.[133]

The threat narrative directed against Latino immigrants turned deadly in El Paso, Texas on August 3, 2019, when a gunman killed 22 persons (as of April 2020, now 23), including a four-month-old infant, and injured 23 others. The shooter intentionally targeted Hispanics. In a manifesto attributed to the killer, posted shortly before the massacre he railed against the Hispanic threat. It said, "This attack is a response to the Hispanic invasion of Texas. They are the instigator,

---

[132] Benjamin Fearnow, "Florida GOP Chair Celebrates Deportations With 'Faces Of Criminal Illegals' Poster In Office," *Newsweek*, 24 April 2019, https://www.newsweek.com/florida-republican-joe-gruters-criminal-illegals-office-sign-sarasota-1405105; Zac Anderson, "Florida immigration debate has echoes of El Paso shooting, which could hinder future legislation," *Herald Tribune*, 10 August 2019, https://www.heraldtribune.com/news/20190808/florida-immigration-debate-has-echoes-of-el-paso-shooting-which-could-hinder-future-legislation. Includes picture below. United States Census Bureau, "Citizen Voting Population by Race and Ethnicity," 2014 to 2018 Estimates, https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2018.html.

[133] TRAC, Syracuse University, "Immigration and Customs Enforcement Arrests," https://trac.syr.edu/phptools/immigration/arrest/.

not me. I am simply defending my country from cultural and ethnic replacement brought on by an invasion." It railed against Democrats who "intend to use open borders, free health care for illegals, citizenship and more to enact a political coup by importing and then legalizing millions of new voters ... At least with Republicans the process of mass immigration and citizenship can be greatly reduced." It warned of "white genocide," "race mixing," and of the high birth rates of the immigrant "invaders," who threatened to swamp America. It said that "if we can get rid of enough people, then our way of life can be more sustainable."[134]

After Governor Ron DeSantis signed SB 168 in June, Senator Gruters' was planning a "listening tour" across Florida to advance his efforts to crack down on alleged illegal immigrants. However, after El Paso, he postponed the tour, saying, "The rhetoric is so charged across the political spectrum that in order to have a truly productive listening tour we've decided to delay the tour to a later date."[135]

### G. SB 168 Will Likely Have a Chilling Effect on Immigrant Communities on Reporting Crime and Interacting with Police and Other Public Officials

An important part of public safety is reporting crime to the police and cooperating with the police officers in their crime-fighting efforts. In her book on immigration enforcement, Marie Gottschalk of the University of Pennsylvania notes that "Some police chiefs have championed Secure Communities and related programs. Others have warned that drawing police officers into immigration enforcement jeopardizes the ties that they have cultivated with immigrant

---

[134] Manifesto available at https://www.latinorebels.com/2019/08/03/manifestoelpasoterrorist/.

[135] Jacob Ogles, "On second thought, Joe Gruters postpones immigration 'listening tour'" *Florida Politics*, 11 August 2019, https://floridapolitics.com/archives/302999-on-second-thought-joe-gruters-postpones-immigration-listening-tour.

communities. They contend that these programs have a "chilling effect" on the willingness of immigrants to report crime and to aid police investigations."[136]

The Major Cities Chiefs Association that represented police departments in the nation's 56 largest cities issued the following statement in 2006 about the chilling effect of immigration enforcement by local police:

> "Immigration enforcement by local police would likely negatively effect and undermine the level of trust and cooperation between local police and immigrant communities. If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation. Distrust and fear of contacting or assisting the police would develop among legal immigrants as well ... Any initiative to involve local police agencies in the enforcement of immigration laws should be completely voluntary."[137]

A 2012 survey of 2,204 Latinos from Cook (Chicago), Harris (Houston), Los Angeles, and Maricopa (Phoenix) demonstrated the following results from increased immigration enforcement:

- 44 percent of Latinos surveyed reported they are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know.

- 45 percent of Latinos stated that they are less likely to voluntarily offer information about crimes, and 45 percent are less likely to report a crime because they are afraid the police will ask them or people they know about their immigration status.

---

[136] Marie Gottschalk, *Caught: The Prison State and the Lockdown of American Politics* (Princeton University Press: 2015), p. 229.
[137] Major Cities Chiefs, "Enforcement of Immigration Laws by Local Police Agencies," June 2006, pp. 6, 9, http://www.houstontx.gov/police/pdfs/mcc_position.pdf.

- 70 percent of undocumented immigrants reported they are less likely to contact law enforcement authorities if they were victims of a crime.

- 28 percent of US-born Latinos said they are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know.[138]

A later 2019 nationwide survey of 1,000 respondents in mixed immigrant families that fear of ICE led respondents to avoid appearances in court and contact with law enforcement:

- 60% of respondents avoid attending court as witnesses when they have been a victim of a crime.

- 41% of respondents avoid domestic violence-related hearings when they have been a victim. 9

- 37% of respondents avoid appearing in a child welfare hearing when involved in dependency court.

- 40% of respondents avoid appearing in adult criminal court when they are a defendant or have a bench warrant.

- 35% of respondents avoid attending youth court when their children are appearing.

- 33% of survey respondents who are court-involved avoid all types of hearings because they are afraid that ICE will take their children away.[139]

---

[138] Nick Theodore, "Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," *Department of Urban Planning and Policy, University of Illinois at Chicago*, May 2013, https://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.
[139] Angela Irvine, et al., "The Chilling Effect of ICE Courthouse Arrests," *Ceres Policy Research*, October 2019, https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65642ea5d1cef9705/1571711914510/ice re port.final.21oct2019.pdf.

A 2018 study by the ACLU and the American University Washington College of Law's National Immigrant Women's Advocacy Project surveyed "232 law enforcement officers in 24 states; 103 judges … in 25 states and 50 prosecutors in 19 states. The researchers found the following results for 2017 when courthouse arrests of suspected undocumented immigrants soared:

- Among police officers "69 percent said domestic violence was harder to investigate, 64 percent said this applied to human trafficking, and 59 percent said this was true about sexual assault … Sixty-seven percent reported an impact on their ability to protect crime survivors generally and 64 percent reported an adverse impact on officer safety.."

- "Fifty-four percent of judges participating in this survey reported court cases were interrupted due to an immigrant crime survivor's fear of coming to court, representing a significant disruption in the justice system compared with 43 percent of judges reporting this effect in 2016."

- "82 percent of prosecutors reported that since President Trump took office, domestic violence is now underreported and harder to investigate and/or prosecute. Seventy percent of prosecutors reported the same for sexual assault, while 55 percent stated the same difficulties for human trafficking and 48 percent for child abuse."[140]

Leslye Orloff, Adjunct Professor at the Washington College of Law and the study's principal investigator said that "Eroding trust that law enforcement has built with immigrant crime survivors is particularly dangerous. Our prior research has found that when survivors find the courage to seek immigration relief, perpetrators of domestic violence and workplace-based sexual assault are

---

[140] Leslie Orloff, "Freezing Out Justice: How Immigration Arrests at Courthouses Are Undermining the Justice System," *ACLU*, 2018, pp. 1-2, https://www.aclu.org/sites/default/files/field_document/rep18-icecourthouse-combined-rel01.pdf.

actively involved in reporting survivors for deportation to ICE and CBP [Customs and Border Protection]."[141]

The results of a survey conducted by Tom K. Wong, a professor of political science at the University of California, San Diego, and his co-researchers, yielded similar results. Professor Wong surveyed a representative sample of 594 undocumented immigrants in San Diego County, California. For a random half of the sample his survey elicited responses regarding the reporting of crime and contact with public officials and services under two different conditions: if the respondents believed that ICE was working together with local officials on deportation raids or if they believed that ICE will not work with local officials. The results of his analysis reported in Chart 9 demonstrates dramatic differences in willingness to report crime and use public services.[142]

---

[141] Ibid, p. 5

[142] Tom K. Wong, et al., "The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants," *US Immigration Policy Center, UC San Diego*, 19 April 2019, survey results on p. 13 are for 2017, https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf.

**CHART 9**
**WONG 2017 SURVEY RESULTS REPORTING CRIME AND TAKING SOCIAL SERVICES WITH AND WITH ICE LOCAL L LAW ENFORCEMENT WORKING WITH ICE**



Other analyses rely not on surveys but on data on the reporting of crime and the rates of crime as correlated with police legitimacy. A 2006 study used controlled statistical analysis to assess "whether indicators of compromised police legitimacy explained variations in violent crime within New York City police precincts from 1975 to 1996." They found "First, net of other measured factors, increases in police misconduct predicted increases in violent crime in precincts characterized by high structural disadvantage. Next, also net of other measured factors, increases in

both police misconduct and over enforcement of violent crime predicted increases in the violent crime rates of precincts characterized by extreme disadvantage." They found "no significant relationships between the indicators of police legitimacy and violent crime rates of precincts characterized by low structural disadvantage."[143] As indicated in Table 5 above, relative to whites in Florida, minorities are characterized by structural disadvantage on such key indicators as poverty, income, education, home ownership, reliance on social welfare, and lack of health insurance.

Another study examined the relationship between crime rates and "legal cynicism," which "refers to a cultural frame in which people perceive the law as illegitimate, unresponsive, and ill equipped to ensure public safety." The study draws upon "a unique assemblage of data on the sociodemographic, social-interactional, and cultural characteristics for every neighborhood in Chicago." The researchers found that "the mean level of legal cynicism is positively associated with neighborhood rates of homicide, and this relationship holds when accounting for neighborhood structural conditions, social-interactional mechanisms, and the confounding effects of prior violence. Values— in this case, related to a tolerance of violence and deviance—have little bearing on neighborhood violence."[144]

In 2017, after Texas adopted a stringent new law, requiring cooperation between local police and ICE, the city of Houston experienced a 16 percent falloff in domestic violence reports from Hispanics. "Undocumented immigrants and even lawful immigrants are afraid to report

---

[143] Robert J. Kane, "Compromised Police Legitimacy as a Predictor of Violent Crime in Structurally Disadvantaged Communities," *Criminology* 43 (2205): 461-498, quotes on:.469, 491.
[144] David S. Kirk and Andrew V. Papachristos, "Cultural Mechanisms and the Persistence of Neighborhood Violence,") *American Journal of Sociology* 116 (2011): 1190-1233, quotes on: 1190,1193, 1222.

crime," said Houston Police Chief Art Acevedo. In contrast, according to a *New York Times* report, "the Houston Area Women's Center, which received 33,692 calls to its domestic violence hotline last year, saw an increase in Hispanic women seeking help."[145]

Beyond law enforcement and courts, health care researchers found that strict interior (not border) immigration enforcement measures had a chilling effect on enrolling in the Medicaid program for low income persons. Such enrollment is especially important for Hispanics in Florida, 19 percent of whom have no medical insurance coverage, compared to 9.5 percent of whites. The researchers compared Medicaid enrollment for individuals from 2009 to 2012 with immigration enforcement measures. They found through controlled statistical analysis that "the propensity to participate in Medicaid among immigrants is very sensitive to the level of sComm [interior immigration] enforcement." In addition, "an individual's proximity to other immigrants as measured by their number of foreign-born parents increases their sensitivity to immigration enforcement."[146] These findings compliment an earlier study which found "robust evidence that heightened federal immigration enforcement reduces Medicaid participation among children of noncitizens, even when children are themselves citizens. The decline in immigrant Medicaid participation around the time of welfare reform is largely explained by a contemporaneous spike in

---

[145] Cora Engelbrecht, "Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation." *New York Times*, 3 June 2018, https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html.
[146] Francisco I. Pradraza and Ling Zhu, "Immigration Enforcement and the "Chilling Effect" on Latino Medicaid Enrollment," Stanford Center on Poverty & Inequality, January 2015, pp. 33-35, https://inequality.stanford.edu/publications/media/details/immigration-enforcement-and-%E2%80%9Cchilling-effect%E2%80%9D-latino-medicaid-enrollment. Also available at https://pdfs.semanticscholar.org/4f6f/3ac412800f26ac8bf6b00f23e0f797d9c835.pdf

enforcement activity. The results imply that safety net participation is influenced not only by program design, but also by a broader set of seemingly unrelated policy choices."[147]

### H. Proactive Policing Measures on Immigration Like SB 168 Elsewhere Have Had Disparate Negative Effects on Minorities

Studies show that measures in jurisdictions designed to crack down on undocumented immigrants have led to disproportionate and detrimental impacts on non-whites especially Hispanics, including those who are U.S. citizens.

A large-scale study by Stanford University researchers, examined documented outcomes of heightened immigration enforcement through 287(g) cooperative agreements between local law enforcement and ICE. The researchers focused on "the impact of ICE partnerships by focusing on the measured enrollment of Hispanic students in U.S. public schools." They noted that "the data from universe surveys of school enrollment by Hispanic ethnicity may provide a more reliable indicator of the demographic impact of local immigration enforcement." In particular, "roughly half of undocumented adults lived with their own children, most of whom were themselves U.S. citizens. The enforcement induced changes we observe in local Hispanic student enrollment would reflect the displacement of such children due to the outflow of threatened families as well as the inhibited inflow of potential new families."

The researchers used "data acquired from DHS through Freedom of Information Act (FOIA) requests." They identified "the counties in which a law enforcement agency applied for an ICE partnership as well as those counties where applications were approved. We estimate the impact of ICE partnerships on Hispanic enrollment and other outcomes." They covered the period

---

[147] Tara Watson, "Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation" *American Economic Journal*, 6 (2014): 313-338, quote on p. 333.

from 2000 to 2011, when such partnerships began to appear. They found "robust evidence that partnerships between ICE and local law-enforcement agencies led to substantial reductions in Hispanic student enrollment (i.e., a 7.3 percent reduction overall but one that grew to about 10 percent within two years).

The researchers found "that these ICE partnerships eventually displaced around 320,000 students. As noted earlier, the displacement observed in our enrollment measure can operate through encouraging threatened families to leave a community, dropping out of school, and discouraging other families from entering." Through the introduction of controls the researchers found that the effects of displacement fell uniquely on Hispanic students. For non-Hispanic enrollments, there were only "small and statistically insignificant effects." The researchers concluded:

> "At the most basic level, the evidence from these unique administrative data indicates that local partnerships with ICE seemed to create highly unattractive environments for undocumented residents (and perhaps Hispanic citizens as well). However, a second key feature of our enrollment-based results is to underscore the presumably unintended consequences of ICE partnerships for students and schools. In particular, the literature clearly suggests that causing "reactive" mobility (i.e., moves under duress) or dropping out of school harms students, while inhibiting moves towards economic opportunity can also be detrimental … and, it should be noted, that most of the students with an undocumented parent are themselves U.S. citizens."[148]

A study of heightened immigration enforcement in Alamance County, North Carolina under a 287(g) agreement, which authorizes police offers to check the immigrant status of arrested persons, found that disparate, harmful effects rippled across the county's Hispanic community. The study

---

[148] Tomas Dee and Mark Murphy, "Vanished Classmates: The Effects of Local Immigration Enforcement on School Enrollment," *American Educational Research Journal*, online, 2 July 2019, https://cepa.stanford.edu/content/vanished-classmates-effects-local-immigration-enforcement-school-enrollment.

deployed multiple methodologies, including participant observations, interviews, focus groups, archival research, and scrutiny of arrest records.[149]

The researchers found that "the types of crimes that individuals were charged with under 287(g) varied widely. Notably, almost 40% of the charges were traffic-related offences, which include driving with a broken taillight or making an illegal turn, which are considered infractions and not crimes per se. The second highest category of charges was driving while intoxicated (DWI), representing 14.1% of all charges. The third most frequent charge (10.7%) involved drug-related offences, which can range in severity from possession of small amounts of drugs to drug trafficking." They noted that "violent crimes, had very low incidence rates" and that "a majority of the charges, 80.4%, were misdemeanors." That is, the program was primarily impacting minor offenders rather than dangerous criminals.[150] These findings are consistent with the analysis of ICE arrests in Florida under the 287(g) programs documented above.

The researchers found that stepped up immigration enforcement led to the profiling of Hispanic communities. For example, "traffic checkpoints routinely appeared in front of a field where Mexican and Salvadorian migrants play soccer on a weekly basis." Also, "three church pastors with Spanish-speaking congregations reported the presence of traffic checkpoints near their churches on Sunday mornings." Persons they interviewed reported that police officials checked the immigration status not just of drivers, but also of passengers in vehicles.[151]

---

[149]Mai Thi Nguyen and Hannah Gill, "Interior Immigration Enforcement: The Impacts of Expanding Local Law Enforcement Authority," *Urban Studies*, 53 (2016): 302–323.
[150] Ibid, p. 312.
[151] Ibid, p. 314-315.

A DOJ study confirms these findings of the discriminatory profiling of Hispanics in Almance County. The DOJ found "reasonable cause to believe that ACSO [Almance County Sheriff's Office] engages in a pattern or practice of discriminatory policing against Latinos," including:

• ACSO deputies target Latino drivers for traffic stops;

• A study of ACSO's traffic stops on three major county roadways found that deputies were between four and 10 times more likely to stop Latino drivers than non-Latino drivers;

• ACSO deputies routinely locate checkpoints just outside Latino neighborhoods, forcing residents to endure police checks when entering or leaving their communities;

• ACSO practices at vehicle checkpoints often vary based on a driver's ethnicity. Deputies insist on examining identification of Latino drivers, while allowing drivers of other ethnicities to pass through without showing identification;

• ACSO deputies arrest Latinos for minor traffic violations while issuing citations or warnings to non-Latinos for the same violations;

• ACSO uses jail booking and detention practices, including practices related to immigration status checks, that discriminate against Latinos;

• The sheriff and ACSO's leadership explicitly instruct deputies to target Latinos with discriminatory traffic stops and other enforcement activities;

• The sheriff and ACSO leadership foster a culture of bias by using anti-Latino epithets; and

- ACSO engages in substandard reporting and monitoring practices that mask its discriminatory conduct.[152]

The Alamance County researchers found that such discriminatory practices had a harmful effect on the Hispanic community, regardless of immigration status. They found that in immigrant neighborhoods "public activity decreased," and that "a healthcare provider at a local clinic reported that Hispanic patients were missing appointments, or not bringing their children to appointments, out of fear of being stopped by police." In addition, "our interviews with 15 business owners revealed that all had lost revenue in the months after the adoption of 287(g). Nearly all business owners attributed losses to less shopping activity by Hispanics, and more than 50% cited law enforcement's increased focus on Hispanics as contributing to decreases in consumer activity." They found that the profiling of Hispanics led to "growing distrust of law enforcers [that] was not only prevalent among unauthorised immigrants, but also among the larger Hispanic community, who are often members of mixed-immigration status families." It also made Hispanics less likely to report abuse or discrimination.[153]

The DOJ investigation confirmed these negative, discriminatory effects on Hispanics in Almance County. It reported that "taken together, these practices undermine ACSO's ability to serve and protect Alamance County's Latino residents and the community at large." The Assistant Attorney General, Thomas E. Perez said that "the Alamance County Sheriff's Office's egregious pattern of racial profiling violates the Constitution and federal laws, creates distrust between the

---

[152] United States Department of Justice, "Justice Department Releases Investigative Findings on Almance County, N.C., Sheriff's Office," 18 September 2012, https://www.justice.gov/opa/pr/justice-department-releases-investigative-findings-alamance-county-nc-sheriff-s-office.
[153] Nguyen and Gill, "Interior Immigration Enforcement," pp. 315-317.

police and the community and inhibits the reporting of crime and cooperation in criminal investigations."[154]

In 2010, Arizona enacted SB 1070, at the time the most stringent anti-immigration law in the nation. Among other provisions it required immigration checks pursuant to police stops. Similar to the debates over SB 168 in Florida (see Section VIII and X below), a study of the enactment of SB 1070 found that backers of SB 1070 used fear of the alleged danger posed by illegal immigrants clearly identified as Hispanics. "Undoubtedly, elected officials were central to the policy outcomes that raised questions about the place of immigrants and Latinos/as in Arizona." The researchers found that proponent of SB 1070, engaged "in a discourse that perpetuated racialized threat and called to the presumed threatened (white) Americans to fuel anti-immigrant legislation … they actively and selectively fueled a white injury ideology and placed Latinos/as discursively outside of the protected citizenry."[155] Although the U.S. Supreme Court struck down three other provisions of the law in 2012, it let stand this provision.[156] Maricopa County Sheriff Joe Arpaio hailed the ruling as validating what had been his long-standing practice of cracking down on alleged "illegal immigrants."

In 2013, a federal district court found that Maricopa County Sherriff Joe Arpaio and the Maricopa County Sheriff's Office ("MCSO") that he headed violated the constitutional rights of Hispanics by targeting them based on ethnicity and race during raids and traffic stops. The Court

---

[154] United States Department of Justice, "Justice Department Releases Investigative Findings on the Alamance County, N.C., Sheriff's Office" 18 September 2012, HYPERLINK "https://www.justice.gov/opa/pr/justice-department-releases-investigative-findings-alamance-county-nc-sheriff-s-office"https://www.justice.gov/opa/pr/justice-department-releases-investigative-findings-alamance-county-nc-sheriff-s-office.
[155] Cassaundra Rodriguez, "Fueling White Injury Ideology: Public Officials' Racial Discourse in Support of Arizona Senate Bill 1070," Sociology of Race and Ethnicity 4, (2014): 86, 93.
[156] *Arizona v. United States*, 567 U.S. 387 (2012).

found that "[t]he MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Fourth Amendment." It additionally found that "[t]he MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons have violated state laws relating to immigration status violates the Equal Protection Clause of the Fourteenth Amendment."[157] On May 13, 2016, the federal district court found Sheriff Arpaio and three of his top aides in civil contempt of court for failing to obey the court's order to cease the racial profiling of Hispanics. In 2016, he lost his bid for reelection as sheriff. In September of the election year, as part of a settlement with immigrant rights groups, Arizona ended the practice of requiring immigration checks in police stops. However, in July 2017, the court found Arpaio to be guilty of criminal contempt for willfully violating the court's order.[158]

A month later, President Donald Trump pardoned Arpaio, giving a presidential imprimatur to his practices of racial profiling. Trump praised Arpaio for "protecting the public from the scourges of crime and illegal immigration." Arpaio exulted, "Watch out world! We are back!"[159]

---

[157] *Melendres v. Arpaio*, 989 F. Supp. 2d 822,895-96, 899 (D. Ariz. 2013).
[158] Nigel Duara, "Arizona's Once Feared Immigration Law, SB 1070, Loses Most of its Power in Settlement," Los Angeles Times, 15 September 2016, https://www.latimes.com/nation/la-na-arizona-law-20160915-snap-story html; Megan Cassidy, "Ex-Sheriff Joe Arpaio Found Guilty of Criminal Contempt of Court," *Arizona Republic*, 31 July 2017, https://www.azcentral.com/story/news/nation-now/2017/07/31/joe-arpaio-verdict/526253001/; United States v. Arpaio, United States District Court, Eastern District Arizona, Case No. 2:16-cr-01012-SRB.
[159] Alex Johnson, "Ex-Sheriff Arpaio, Pardoned by Trump, Wants His Old Job Back," NBC News, 26 August 2017, https://www.nbcnews.com/politics/politics-news/ex-sheriff-joe-arpaio-pardoned-trump-wants-his-old-job-n1046226; White House, "President Trump Pardons Sheriff Joe Arpaio," 25 August 2017, https://www.whitehouse.gov/briefings-statements/president-trump-pardons-sheriff-joe-arpaio/.

### I. SB 168 Arrests, Detentions and Removals Will Negatively Impact Family Members, Including U.S. Citizens

The adverse consequences of immigration arrests, detentions and removals fall heavily not only upon the individual involved, but also upon family members, including U.S. citizens. The impact will fall disproportionately on Hispanics who are the primary target of immigration enforcement.[160] Even the fear of arrest, detention and deportation has an adverse ripple effect.

A 2015 study by researchers at the Urban Institute, the Migration Policy Institute, the University of Texas, Austin, and the University of North Carolina, Chapel Hill provided an overview of the work on the impact of immigration enforcement on the well-being families and children.[161] The researchers found a prevalence of "family economic hardship," associated with deportation, which "may be the principal reason these children come into contact with health and human service programs." However, "unauthorized immigrant families with eligible US-citizen children confront a range of access barriers including lack of interpretation, difficulties documenting eligibility, education and literacy levels, cultural beliefs and practices, and lack of

---

[160] There is ample literature documenting Latinos, especially Latino men, as the disproportionate target of interior immigration enforcement. See, for example, Mary Romero, "Racial Profiling and Immigration Law Enforcement: Rounding Up of Usual Suspects in the Latino Community," *Critical Sociology*, 32 (2006): 447-473; Tanya Golash-Bozaa and Pierrette Hondagneu, "Latino immigrant men and the deportation crisis: A gendered racial removal program," *Latino Studies* 11 (2013): 271-292; David Scott FitzGerald, Gustavo López, and Angela Y. McClean, "Mexican Immigrants Face Threats to Civil Rights and Increased Social Hostility," *Center for Comparative Immigration Studies University of California, San Diego*, 28 February 2019, https://ccis.ucsd.edu/_files/conference_papers_present/CNDH-final-3.4.19.pdf; Leo R. Chavez, The Latino Threat: Constructing Immigrants, Citizens, and the Nation (Stanford University Press: 2013); Daniel Manuel Hernandez, "Carceral Shadows: Entangled Lineages and Technologies of Migrant Detention," in Robert T. Chase, ed. *Caging Borders and Carceral States: Incarcerations, Immigrant Detentions, and Resistance* (University of North Carolina Press, 2019), pp. 57-92; Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (University of California Press, 2017).

[161] Randy Capps, et al., "Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature," *Urban Institute, Migration Policy Institute*, September 2015, https://www.urban.org/sites/default/files/alfresco/publication-exhibits/2000405/2000405-Implications-of-Immigration-Enforcement-Activities-for-the-Well-Being-of-Children-in-Immigrant-Families.pdf.

transportation to offices in remote locations." The researchers additionally reported that "children separated from their parents are more likely to report depressive symptoms than children who have not experienced separation." This problem is compounded by the fact "mental health services for children with deported parents are harder to come by."[162]

In addition, the vast majority of deported persons are men who are typically the breadwinners in Hispanic families, with mothers often having little work experience. The result is that the families become one-parent families. They note that, "economic hardship in these families can put children at risk for reliance on public benefits, poor psychological and developmental outcomes, and child welfare system involvement. Older children may have to work to offset losses in parental income, leading to declines in school performance and academic completion." In some cases, the families of deported persons "become permanently disrupted and parents lose custody or contact with their children." When fathers are deported, "mothers generally remain with their children but may be unable to provide for them either economically or emotionally."[163]

Another recent study examined the effect of children's living arrangements on interior immigration enforcement. The researchers examined "data from the 2005 through 2015 American Community Surveys (ACS) and detailed information on the intensification of immigration enforcement merged at the Metropolitan Statistical Area (MSA)." Through their controlled statistical analysis, they found "that the average increase in immigration enforcement during the 2005 to 2015 period has contributed to raising the likelihood that Hispanic U.S.-born children might live without their parents in households headed by naturalized relatives or friends

---

[162] Ibid.
[163] Ibid.

unthreatened by deportation by 19 percent." Similarly, this increase "appears to have raised these children's propensity to live with likely undocumented mothers with absent spouses by 20 percent." They note that these detrimental results for children are "directly associated to apprehensions and deportations of undocumented migrants, as opposed to employment verification mandates that also have the potential to affect household structure through financial constraints." In addition, "the findings prove robust to a number of identification and falsification checks."[164]

The authors note that "Children growing up without their biological parents often find themselves at a disadvantage" and "are more likely to engage in criminal activities." The "negative consequences of parental deportation in children …range from an inferior schooling progression to worse health and future employment outcome. Also, it is well-known that children raised in single-parent households are more likely to experience teenage pregnancies, drop out of school, have worse cognitive skills, and endure more frequent and longer unemployment spells later on in life."[165]

A policy statement by the Society for Community Research and Action: Division 27 of the American Psychological Association provides a 2018 review of the literature on the impact of deportation and also fear of deportation on families and communities. These authorities reached the following conclusions:

- "Deportation has numerous detrimental impacts on individuals who are deported, and on the families and communities they are forced to leave behind.

- Deported individuals often find it challenging to support their families, and coupled

---

[164] Catalina Amuedo-Dorantes and Esther Arenas-Arroyo, "Immigration Enforcement and Children's Living Arrangements," *Journal of Policy Analysis and Management*, 38 (2019): 11-40, quotes on p. 13.
[165] Ibid, p. 37.

112

with the trauma and stigma of the deportation, may find it difficult to maintain contact with family members; this often leads to severed relationships.

• Family members left behind suffer multiple psychosocial consequences. Separation of a child from a parent due to deportation is associated with economic hardship, housing instability, and food insecurity.

• Following deportation of a family member, children demonstrate numerous emotional and behavioral challenges, such as eating and sleeping changes, anxiety, sadness, anger, and withdrawal. Even if the family is ultimately reunited, the consequences of their forced family separation often remain.

• Moreover, the broader community suffers negative consequences of deportation regardless of first-hand experience. Following immigration raids and deportations, community members are often more fearful and mistrustful of public institutions, less likely to participate in churches, schools, health clinics, cultural activities, and social services, and more reluctant to report crime to the police.

• Studies have also demonstrated that immigrant adults are emotionally taxed following deportations and the threat of deportations in their communities; associated anxiety and psychological stress has been linked to cardiovascular risk factors.

• Moreover, children—regardless of immigration status—experience fear and shame regarding deportation, which impacts their sense of self and well-being."[166]

---

[166] Policy Statement by the Society for Community Research and Action: Division 27 of the American Psychological Association, "Statement on the Effects of Deportation and Forced Separation on Immigrants, their Families, and Communities," *American Journal of Community Psychology*, 62 (2018): 3-12.

Despite reporting requirements and a requirement that ICE assign a Child Welfare Coordination to assess the disposition of detained parents or legal guardians, a December 2019 report by the Government Accountability Office found that "While ICE collects information on detained parents or legal guardians, including those of U.S. citizens and legal permanent resident minors, this information is not maintained in a readily available format that would allow ICE to systematically identify such detained parents and ensure officers are collecting information on this population as required by policy ... Therefore, ICE does not know how many detained parents or legal guardians are in custody, including parents of U.S. citizen and legal permanent resident minors, during any given time."[167]

A 2017 study by researchers from Arizona State and Johns Hopkins Universities used objective biological markers to assess stress from fear of deportation among Mexican-Americans. They studied a sample of 65 children and 46 adults living in Mexican-origin families in Phoenix, Arizona with at least one immigrant parent. After taking a survey and non-invasive biological samples, the researchers found that after controlling for social support and socio-economic factors that reported fear of deportation was associated with elevated levels of biological markers associated with stress and "increased risk of chronic disease."[168] The researchers recognize limitations in their study including "the small sample size" and "lack of longitudinal data," but

---

[167] Government Accountability Office, "IMMIGRATION ENFORCEMENT Arrests, Detentions, and Removals, and Issues Related to Selected Populations," December 2019, p. 43, https://www.gao.gov/assets/710/703032.pdf.
[168] Airin D. Martinez, Lillina Ruelas, and Douglas A. Granger, "Household Fear of Deportation in Mexican-Origin Families: Relation to Body Mass Index Percentiles and Salivary Uric Acid," *American Journal of Human Biology*," 29 (2017):

importantly note that their findings "support prior research finding adverse health effects from fear of immigration enforcement policies."[169]

In a follow-up 2018 study, the researchers examined the relationship between fear of immigration enforcement in their sample and biological indicators on oral health, with is associated with risk of chronic disease. They found "that fear of immigration enforcement is related to a chronic disease risk, increased oral inflammation, in documented persons and citizens in mixed-status families."[170]

Another 2017 study used different methods to assess the relationship between immigration enforcement and the mental health of Latinos generally, not just immigrants. The researchers drew upon the "Robert Wood Johnson Foundation (RWJF) Center for Health Policy at the University of New Mexico's Latino National Health and Immigration Survey (LNHIS), which is a unique survey designed for the specific purpose of examining the relationship between immigrant policy and Latino health and well-being," with a sample size of 1,493.[171]

The researchers examined with statistical controls the relationship between reported mental health problems and reported perceptions of state immigration policy. They tested whether the perception that laws in their state are unfavorable to immigrants "are associated with the health outcomes of the Latino population and find consistent evidence that they are." They note that, "most importantly, our work suggests that the consequences of these laws are not limited to the

---

[169] Ibid.

[170] Airin D. Martinez, Lillina Ruelas, and Douglas A. Granger, "Household Fear of Deportation in Relation to Chronic Stressors and Salivary Proinflammatory Cytokines in Mexican-Origin Families Post-SB 1070" *Population Health*, 5 (2018): 188-200, quote on 198.

[171] Edward D. Vargas, Gabriel R. Sanchez, and Melina Juárez, "Fear by Association: Perceptions of Anti-Immigrant Policy and Health Outcomes, *Journal of Health Politics, Policy and Law* 42 (2017): 459–483.

immigrant community, as our sample is inclusive of the entire Latino population." They add "that even though Latino citizens may not be directly harmed by punitive immigration policies, they recognize that friends and family members are going to be directly impacted."[172]

Other studies document different aspects of the adverse impact of immigration enforcement on families. A 2017 study focused specifically on the effects not on children, but on older Hispanic persons, age 55-years or more. The researchers drew on the 2007 Pew Hispanic Center National Survey of Latinos, which included 326 individuals in this age group. The survey included questions about immigration enforcement. For foreign-born, but not for U.S. born, older Latinos, the researchers found that after introducing statistical controls, "the results of this study suggest that older Latinos in the United States who have greater hardships as a result of increased attention to immigration issues and immigration enforcement, may be at greater risk for negative health and social outcomes because of the perception of a worse situation for Latinos in the United States, a lower use of government services, and lower reported quality of life."[173]

A 2016 study found a connection between immigration enforcement and the foreclosure of family homes. The researchers examined "variation in county applications for 287(g) immigration enforcement agreements with Immigration and Customs Enforcement and data on foreclosure filings from 2005–2012."[174] The researchers found that for their best statistical models, "in the two years following adoption, Latino foreclosure rates in 287(g) counties were about 0.68 percentage points higher than in non-287(g) counties (or 0.39 standard deviations larger than the mean).

---

[172] Ibid., 473-474.
[173] David Beccara, et al., "How Immigration Enforcement Affects the Lives of Older Latinos in the United States," *Journal of Poverty*, 19 (2015): 237-376, quote on pp. 371-372.
[174] Jacob S. Rugh and Matthew Hall. "Deporting the American Dream: Immigration Enforcement and Latino Foreclosures." *Sociological Science*, 3(2016): 1053-1076.

Consistent with our expectations, the magnitude of this association is nearly twice as large in counties where more immigrants are identified for deportation and where a higher share of the undocumented population resides in owner-occupied homes."[175]

The researchers noted that there are limitations to their data and "caution that we cannot interpret our estimates to be strictly causal. However, the results may be interpreted as reasonably close to causal if we assume that counties with accepted and rejected 287(g) applications are similar in terms of unobservable characteristics that predict foreclosure. This assumption seems reasonable in light of previous scholarship that employs similar strategies of statistical inference to infer causality." They conclude that the results of this analysis underscore the emergence of legal status as an axis of stratification *that uniquely disadvantages Latinos through racially disproportionate rates of deportation.* (emphasis added)[176]

There will be also pressure from public officials on police forces to crack down on immigrant communities to justify SB 168 and conform to its requirements of cooperation with ICE. Erin C. Heil, a criminal studies professor at Arizona State University, conducted an in-depth study of the town of Immokalee Florida, published in 2012.  She noted that "despite the concentration of undocumented immigrants in the community, crime has gone down so much in the past few years in Immokalee that the town now operates with only one jail."[177] However, Immokalee is part of Collier County, which well before SB 168 had entered into a 287(g) agreement with the federal

---

[175] Ibid., 1068.
[176] Ibid., 1069-1070.
[177] Erin C. Heil, *Sex Slaves and Serfs: The Dynamics of Human Trafficking in a Small Florida Town* (Rienner, 2012), p. 80.

117

government. This agreement led to pressure on police officers from higher-level officials to target suspected illegal immigrants:

> "As one officer explained to me, the 'higher-ups' were putting pressure on District 8 [sheriff's office] to follow through with their duties of immigration enforcement … If the individual is residing in Immokalee illegally, the deportation process is initiated regardless of the crime that actually took place. Therefore, more and more individuals face the threat of deportation for activities that are practically unavoidable due to the nature of illegal immigration (e.g., no valid driver's license). Unfortunately, this legal responsibility is bureaucratically forced and conflicts with the attitudes of the majority of the local officers regarding the illegal status of the migrants in the community."[178]

TRAC data reveals that despite, or perhaps because, of this pressure, from fiscal years 2015 through 2018, 73 percent of ICE arrests in Collier County involved suspected undocumented immigrants with no conviction or only conviction for a minor Level 3 crime.[179] Only 12 percent involved persons convicted of serious Level 1 crime. Only two persons arrested by ICE in Collier County during these years had been convicted for homicide or sexual assault/rape.[180]

The pressure is likely to be heightened under SB 168. Under prior agreements, this new legislation requires local officials to use their "best efforts" to enforce the law. It also explicitly places local officials under the threat of removal or lawsuits.[181]

Analysis further needs to consider the feedback loop between police views of non-whites and persons' responses that may, especially under conditions of proactive policing that may lead to suspicious behaviors even among law-abiding persons. All it takes is one arrest, no matter how

---

[178] Ibid., p. 92.
[179] TRAC, Syracuse University, "Immigration and Customs Enforcement Arrests," https://trac.syr.edu/phptools/immigration/arrest/.
[180] Ibid.
[181] Florida Statute, 908.104, 107.

trivial or shaky, to trigger the provisions of SB 168. Already community leaders are reporting a climate of fear among minorities after the enactment of SB 168.[182]

## VIII.   SEQUENCE OF EVENTS

This analysis is important for documenting the events that gave Republicans the motivation, the means, and the opportunity to pass a law that cracked down on the Democratic minority base and appealed to the Republican anti-immigrant white base. First, the minority citizen voting age population (CVAP) in Florida rose while the white CVAP fell. Simultaneously, Hispanics shifted from majority Republican to majority Democratic in their voting choices. Second, the anti-immigrant leader Joe Gruters gained election to the Senate, where previous anti-sanctuary legislation had failed, and election as head of the state's Republican Party. Third, a staunch supporter of SB 168, Ron DeSantis was elected governor, replacing the more reluctant Rick Scott. Fourth, the anti-immigrant hate groups FAIR and FLIMEN became intimately involved in the process for drafting, promoting, and enacting SB 168. This sequence of events laid the foundation for the adoption of a measure that intentionally discriminates against discriminating against minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage, regardless of their possession of documentation.

Before delving into this sequence of events, however, it is critical to document what did not occur during this period – a rise in Florida crime, an association between crime and the undocumented immigrant population or the so-called sanctuary jurisdictions. To the contrary, crime

---

[182] See, for example, the declarations filed in this litigation by Antonio Tovar, Christopher J. Cuevas, and Reverend Larry Green.

had fallen steeply in Florida over the long- and short-term, it had fallen dramatically as undocumented immigration in the state had increased by orders of magnitude, and in recent years crime had fallen more steeply in alleged sanctuary jurisdictions than in the rest of Florida. These facts are pivotal given the "threat narrative" promoted by advocates for SB 168 and the insistence of its key legislative sponsors that the bill was all about public safety in Florida

**A. Crime Was Falling in Florida in Tandem with Increases in Undocumented Immigration and Most Steeply in Alleged Sanctuary Jurisdictions**

As indicated in Chart 10, crime in Florida as in the nation had been falling steadily from 2000 to 2018. In 2018, the state's crime rate was less than a half of what it had been in 2000 and a third lower than it had been in 2010. There was no public safety crisis in Florida from rising crime at the time of the adoption of SB 168. To the contrary, the state was becoming much safer than before. The violent crime rate followed the same declining pattern over time.

**CHART 10**
**FLORIDA CRIME RATE PER 100,000, 2000 TO 2018**



Moreover, crime was falling in Florida at the same time that undocumented immigration was rising from just an estimated 240,000 in 1990 to an estimated peak of 1,050,000 in 2007.[183] As indicated in Chart 11, from 1990 to 2007, the number of undocumented immigrants in Florida rose by nearly five times, whereas the Florida crime rate fell by 44 percent. A similar pattern applies to violent crime in Florida as indicated by Chart 12.

Finally, there is no indication that alleged sanctuary jurisdictions in Florida as identified by the Senate Staff Report on SB 168 posed a threat to public safety. Anti-sanctuary city bills had failed to gain Senate approval in 2017 (HB 697 and 2018 (HB 9). In both those years, an anti-sanctuary city bill had passed the State House but stalled in the State Senate. During the period from 2016 to 2018, not only had crime declined sharply in Florida (from a rate of per 3,181.4 100,000 to a rate of 2,721.4), but crime in the 15 alleged sanctuary jurisdictions had declined even more sharply.

Table 10 examines changes in crime rates for Florida and the 15 sanctuary jurisdictions between 2016 and 2018. The Table is arranged from the highest to the lowest drop in crime.

---

[183] Pew Research, "Estimates of Unauthorized Immigrant Population By State, Selected Years, 1990-2016," https://www.pewresearch.org/hispanic/2018/11/27/unauthorized-immigration-estimate-appendix-c-additional-tables/.

**CHART 11**
## CHANGES IN UNDOCUMENTED IMMIGRANTS IN FLORIDA (IN THOUSANDS) AND FLORIDA CRIME RATES (IN TEN THOUSANDS, FOR COMPARABLE SCALE)



**CHART 12**
**CHANGES IN UNDOCUMENTED IMMIGRANTS IN FLORIDA (IN THOUSANDS)**
**AND FLORIDA VIOLENT CRIME RATES (PER 100,000, NO SCALE)**



**TABLE 10**
**CHANGES IN CRIME RATES 2016 TO 2018, FAIR IDENTIFIED SANCTUARY JURISDICTIONS COMPARED TO FLORIDA**

| Sanctuary Jurisdiction of FAIR Designation | 2016 | 2018 | Change 2016 to 2018 | Percent Change 2016 to 2018 |
|---|---|---|---|---|
| | | | | |
| St. Petersburg City | 5590.9 | 3925.2 | -1665.70 | **-29.79** |
| Gulf County | 1617.8 | 1139.5 | -478.30 | **-29.56** |
| Flagler County | 2037.7 | 1545.0 | -492.70 | **-24.18** |
| West Palm Beach City | 6017.7 | 4672.0 | -1345.70 | **-22.36** |
| Leon County | 5655.4 | 4455.9 | -1199.50 | **-21.21** |
| St. Lucie County | 2202.7 | 1740.6 | -462.10 | **-20.98** |
| Washington County | 1530.9 | 1217.7 | -313.20 | **-20.46** |
| Volusia County | 3561.8 | 2860.4 | -701.40 | **-19.69** |
| Seminole County | 2652.1 | 2138.7 | -513.40 | **-19.36** |
| Palm Beach County | 3493.0 | 2845.0 | -648.00 | **-18.55** |
| Key West City | 4418.4 | 3704.8 | -713.60 | **-16.15** |
| **Florida** | **3181.4** | **2721.4** | **-460.00** | **-14.46** |
| Broward County | 3581.6 | 3090.6 | -491.00 | **-13.71** |
| Highlands County | 2948.9 | 2641.3 | -307.60 | **-10.43** |
| Bradford County | 1745.6 | 1706.8 | -38.80 | **-2.22** |
| Alachua County | 3582.8 | 3706.2 | 123.40 | **+3.44** |
| | | | | |
| Source: Florida Department of Law Enforcement, UCR Offense Data, https://www.fdle.state.fl.us/FSAC/Data-Statistics/UCR-Offense-Data.aspx. | | | | |

As indicated in Table 10, in 14 of 15 sanctuary jurisdictions the crime rate fell during this period as it did in Florida overall. In 11 of the sanctuary jurisdictions, the crime rate dropped by a greater percentage than for Florida overall, typically by a substantial margin.

**B. Shifts in Florida's Demography and Voting Patterns Gave Republicans Motivation to Adopt SB 168**

In terms of what did happen in the sequence of events to culminate in the adoption of SB 168 in 2019, is the rise in minorities citizens of voting age, the fall in white citizens of voting age, the shift of Hispanic voters from Republican to Democratic and the rising support for Republicans by white voters. The changing demography of Florida preceding the adoption of SB 168 in 2019 is documented in Table 11. As indicated in the Table, from estimates for 2000 to estimates for 2014 to 2018, the white lead over minorities in Florida declined by about one-half, from 48.2 percent to 25 percent. Just from estimates for 2005 to 2009 to estimates for 2014 to 2018, the white lead over minorities declined by 14.6 percentage points.

During this same time period, Hispanics switched their voting behavior from majority Republican to majority Democratic, while whites increased their support for Republicans. Republicans in the state legislature, whose jobs depend on understanding and responding to changes in voting patterns could not miss these dramatic changes in the demography of Florida voting. More than before, their party was now dependent on a white political base, which, as will be demonstrated below was anti-immigrant in their views.

As indicated in Table 12, in the base election years of 2000 and 2004 an average of 53.5 percent of Hispanics voted for the Republican candidates for president. However, this average declined sharply to just 39 percent for the election years of 2008 to 2016.

126

**TABLE 11**
**CHANGES IN CVAP IN FLORIDA, MINORITIES & WHITES**

| Group | % Of CVAP 2000 Estimates | % Of CVAP 2005-2009 Estimates | % Of CVAP 2014-2018 Estimates |
|---|---|---|---|
| | | | |
| Hispanics & Blacks | 25.9% | 30.2% | 37.5% |
| | | | |
| Whites | 74.1% | 69.8% | 62.5% |
| | | | |
| Difference | **White +48.2 Percentage Pts.** | **White +39.6 Percentage Pts.** | **White +25.0 Percentage Pts.** |
| | | | |
| All data is from U.S. Census estimates for years indicated. | | | |

**TABLE 12**
**TWO-PARTY VOTE BY RACE, FLORIDA, EXIT POLLS, PRESIDENT, 2000-2016**

| Election & Candidate | White % | Hispanic % | Black % |
|---|---|---|---|
| | | | |
| 2000 | | | |
| Bush  (R) | 59% | 51% | 7% |
| Gore (D) | 41% | 49% | 93% |
| | | | |
| 2004 | | | |
| Bush  (R) | 58% | 56% | 13% |
| Kerry (D) | 42% | 44% | 87% |
| | | | |
| 2008 | | | |
| McCain (R) | 57% | 43% | 4% |
| Obama (D) | 43% | 57% | 96% |
| | | | |
| 2012 | | | |
| Romney (R) | 62% | 39% | 4% |
| Obama (D) | 38% | 61% | 96% |
| | | | |
| 2016 | | | |
| Trump (R) | 67% | 36% | 9% |
| Clinton (D) | 33% | 64% | 91% |
| | | | |
| Mean 2000-2004 | | | |
| Republican | 58.5% | 53.5% | 10% |
| Democrat | 41.5% | 46.5% | 90% |
| Mean 2008-2016 | | | |
| Republican | 62% | 39% | 6% |
| Democrat | 38% | 61% | 94% |

In 2016, the most proximate presidential election to 2019, the Hispanic vote for the Republican presidential candidate had declined to just 36 percent.

Simultaneous with this decline in Hispanic Republican support was an increase in white support for Republican presidential candidates. As indicated in Table 12 above, for 2000 and 2004 an average of 58.5 percent of whites voted for the Republican candidates for president. However, this average rose to 62 percent for the election years of 2008 to 2016. In 2016, the white vote for the Republican presidential candidate had increased to 67 percent.

The ties between white support for Republicans and anti-immigrant views is documented by the 2012 results of questions about immigrants asked in the 2012 Cooperative Congressional Election Survey, a standard source for political analysis. The Florida sample included 943 white Republican identifiers and 772 white Democratic identifiers. The results reported in Table 13 disclose compelling differences between the views of white Republicans and white Democrats on two critical questions that tapped views on immigration and particularly undocumented immigration.

As indicated in Table 13, only 23.4 percent of white Republicans would "grant legal status to all illegal immigrants who have held jobs and paid taxes for at least 3 years, and not been convicted of any felony crimes. This compares to 65.7 percent of white Democrats, for a difference of +42.3 percentage points and +181 percent. In addition, 71.9 percent of white Republicans would "allow police to question anyone they think may be in the country illegally." This compares to only 23.7 percent of white Democrats, for a difference of -48.2 percentage points and -67.0 percent. Finally, 58.9 percent of Republicans would change the U.S. Constitution as construed by the U.S. Supreme

Court and "deny automatic citizenship to American-born children of illegal immigrants. This

compares to only 18.9 percent of white Democrats, for a difference of -40 percentage points and –

67.9 percent.

**TABLE 13**
**POSITIONS ON IMMIGRATION ISSUES, WHITE REPUBLICANS IN FLORIDA**
**COMPARED TO WHITE DEMOCRATS, 2012**

| Question | White Republican % Yes | White Democrat % Yes | Difference Percentage Points. | Difference Percent |
|---|---|---|---|---|
| Grant legal status to all illegal immigrants who have held jobs and paid taxes for at least 3 years, and not been convicted of any felony crimes. | 23.4% | 65.7% | +42.3% | +181% |
| | | | | |
| Allow police to question anyone they think may be in the country illegally. | 71.9% | 23.7% | --48.2% | -67.0% |
| | | | | |
| Deny automatic citizenship to American-born children of illegal immigrants. | 58.9% | 18.9% | -40.0% | -67.9% |
| | | | | |
| Republican N=943; Democratic N=772. All party differences are statistically significant well beyond standard levels in social science. Source: Cooperative Congressional Election Study (CCES), 2012, https://dataverse.harvard.edu/dataset.xhtml?persistentId=hdl:1902.1/21447. | | | | |

**C. The Election of Joe Gruters to the Florida Senate and Ron DeSantis to the Governorship,**

**Facilitated the Enactment of SB 168**

After anti-sanctuary bills had failed in the State Senate in 2017 and 2018, backers of the

legislation gained a critical Senate ally, Republican Senator Gruters, who was first elected to the

Senate in 2018. Gruters had been a long-serving member of the State House and had backed the

chamber's prior anti-sanctuary city bills. Although a first-term Senator, he was Chair of the

Committee on Commerce and Tourism. He was also Chair of the Republican Party of Florida and had served as co-chair of Donald Trump's 2016 campaign in Florida and co-chair of the 2016 Republican National Committee's Platform Committee on Restoring the American Dream.[184]

Gruters was not just an influential Republican leader. He was also a staunch anti-immigrant advocate, who had posted a sign with faces of alleged deported criminal immigrants from his Sarasota County, Gruters and ran a Facebook ad during his State Senate campaign proclaiming in capital letters: "STOP THE INVASION." It said, "the Federal government MUST stop the caravan invasion and lock down our borders!"[185]

Senator Gruters has political ambitions beyond the Florida State Senate and could not have missed the importance of SB 168 to his political future. With respect to a potential run for Congress, he said, "That's sitting out there like a big piece of chocolate cake... And I really love chocolate cake. I don't think I could resist taking a bite out of it if I get the opportunity."[186] He fully recognized the political value for Republicans like himself in the fight for SB 168. He said, "'Not only is this the right thing to do from my party's perspective, but the right thing to do for Florida."[187]

Also, in 2018, Florida elected a new governor Ron DeSantis, who was more favorable to an anti-sanctuary law than his Republican predecessor, Rick Scott. After first running on a hardline

---

[184] The Florida Senate, "Joe Gruters," http://www flsenate.gov/Senators/s23?pref=full; "Where Are They Now: Former Florida State University Alum/Florida State Senator/Chairman Of The Florida Republican Party Joe Gruters," *Collegiate Water Polo Association*, 27 December 2019, https://collegiatewaterpolo.org/where-are-they-now-former-florida-state-university-alum-florida-state-senator-chairman-of-the-florida-republican-party-joe-gruters/.
[185] Joe Gruters, *Facebook*, 24 October 2018, https://www.facebook.com/JoeGrutersFL/photos/the-federal-government-must-stop-the-caravan-invasion-and-lock-down-our-borders-/2384650981563304/. (Added Hyperlink)
[186] David Hackett, "How Far Will Joe Gruters Go," *Sarasota Magazine*, 30 December 2019, https://www.sarasotamagazine.com/news-and-profiles/2019/12/joe-gruters.
[187] News Service of Florida, "Joe Gruters Targets 'Sanctuary Cities'" *Florida Politics*, 9 February 2019, https://floridapolitics.com/archives/287854-joe-gruters-targets-sanctuary-cities. (Added Hyperlink)

anti-immigration platform in his first 2010 campaign for governor, Scott then moderated his views. The liberal *American Prospect* noted that in 2010, Scott "ran as a self-described party outsider, pushing for laws mandating police officers to check the immigration status of any suspect and forcing all employers to adopt E-Verify systems to stop the hiring of undocumented immigrants. After being elected governor, however, Scott dropped both."[188]

According to *Politifact*, by the time of his reelection in 2014, "Scott abandoned promises to get tough on illegal immigration." [189]  When the Florida House passed HB 9 on sanctuary jurisdictions which the Senate rejected in 2018, FAIR noted that Governor Scott stayed aloof: "If anti-sanctuary legislation passes both chambers this session, Governor Rick Scott has not indicated whether he would sign it."[190]

However, in 2018 Florida elected Republican Ron DeSantis as governor, who fully backed efforts to ban sanctuary cities in his state. In his inauguration address Scott declared, "We won't allow sanctuary cities. And we will stop incentivizing illegal immigration, which is unfair to our legal immigrants, promotes lawlessness and reduces wages for our blue-collar workers."[191] According to *Florida Daily*, when the 2019 legislature passed its legislation "banning sanctuary cities in the Sunshine State– Gov. Ron DeSantis is fully on board."[192]

---

[188] Manuel Madrid, "Rick Scott's Double-Speak on Immigration," *American Prospect*, 24 October 2018, https://prospect.org/power/rick-scott-s-double-speak-immigration/.
[189] "Rating Gov. Rick Scott on His 2010 Campaign Promises," *PolitiFact*, undated 2014, https://www.politifact.com/article/2014/sep/05/rating-gov-rick-scott-his-campaign-promises/.
[190] David Jaroslav, "Florida House of Representatives Passes anti-Sanctuary Bill," FAIR, 15 January 2018, https://www.fairus.org/legislation/state-local-legislation/florida-house-representatives-passes-anti-sanctuary-bill.
[191] "Read the Full Transcript of DeSantis' Inauguration Speech," WFTS Digital Staff, 8 January 2019, https://www.abcactionnews.com/news/state/ron-desantis-inaugural-speech-read-the-full-transcript.
[192] "Ron DeSantis Gets Ready to Ban Sanctuary Cities in Florida," Florida Daily, 3 May 2019, https://www.floridadaily.com/ron-desantis-gets-ready-to-ban-sanctuary-cities-in-florida/.

**D. The anti-Immigrant hate Groups FAIR and FLIMEN became Intimately Involved in the Crafting, Strategy, and Promotion of SB 168**

Both FAIR and FLIMEN became inside players in the process for adopting SB 168. They worked in constant and close coordination with its primary sponsors Senator Gruden and Republican Representative Cord Byrd. They were involved in the drafting of the legislation, in the strategic planning for its adoption, and in the effort to gain public support. It is this important to examine in depth the history and current status of both groups, which documents that they function as anti-immigrant hate groups dedicated to the belief that immigration, particularly non-white immigration from third-world nations jeopardizes the culture, values, economy, politics, and racial integrity of the United States.

In 1979, John Tanton, a proponent of "passive eugenics" to limit population growth and elevate the human race, founded the Federation for American Immigration Reform, generally known by the acronym FAIR. This group is profoundly racialist and nativist. Its leadership has invoked fears of an immigrant invasion, of a third-world capture of the United States, and of the decline of the white race and its traditional culture and values. They denigrated immigrants as "low IQ" and dangerously prolific "breeders" and warned against "Latino ethnic tribalism." FAIR leaders have endorsed collaborated white supremacist books and articles and collaborated in their research and writing. FAIR and its leaders opposed not just undocumented immigration but all immigration as a dire threat to the United States.

Founder Tanton, who continued to be influential into the twenty-first century, feared that immigration to the United States, dangerously grew the population through a proliferation of non-white immigrants with high fertility rates that threatened to overwhelm America's traditional,

133

white, European-based society and culture. "To govern is to populate," Tanton wrote in the so-called "Witan Memo" prepared for a conference of anti-immigration activists in 1986. Witan roughly translates from Old English as "Council of Wise Men." He wrote, "Will the present majority peaceably hand over its political power to a group that is simply more fertile? … Can homo contraceptivus compete with homo progenitiva if borders aren't controlled?" He said, "Perhaps this is the first instance in which those with their pants up are going to get caught with their pants down." He asked, "As Whites see their power and control over their lives declining, will they simply go quietly into the night? Or will there be an explosion? … Will Latin American migrants bring with them the tradition of the *mordida* (bribery): the lack of involvement in public affairs." He worried about immigrants' Roman Catholicism with its potential to "pitch out" the separation of church and state. After the press disclosed the memo, Republican Linda Chavez, who served as Director of Public Liaison in the Ronald Reagan White House and later as George W. Bush's Labor Secretary, resigned in outrage as president of U.S. English, one of Tanton's spinoffs from FAIR.[193]

Tanton continued to express similar racialist and nativist grievances. In a 1993 letter, Tanton wrote, "I've come to the point of view that for European-American society and culture to persist requires a European-American majority, and a clear one at that." During the controversy over California's 1994 Proposition 187 in California, which would have denied most public services to illegal immigrants, Tanton wrote to donor Lawrence Kates that they should "keep the

---

[193] The memo *was obtained by the Arizona Republic in 1988:* "Proposition's Foes Assail Advocate, label memo Racist," *Arizona Republic*, 9 October 1988, p. A17 and James Crawford, "Split Tongue: Self-Appointed Guardians Hide Official English's Real Agenda," *Arizona Republic*, 30 October 1988, p. C3; Larry Lopez, "Head of U.S. English Group Steps Down Amid Resignations of Chavez, Cronkite," *Arizona Daily Star*, 18 October 1988, p. 1.

heat on the issue" and work together against "the decline of European-American majority and the resultant cultural consequences." He said, "You and I owe it to our kids, to our culture, and to ourselves to team up on this."[194] In an interview with the Detroit Free Press on March 14, 1967, Tanton said that unless America seals her borders the nation will be overrun by people "defecating and creating garbage and looking for jobs."[195]

Tanton founded offshoots of FAIR dedicated to the same goal of protecting white, European civilization in the United States, notably its think tank, the Center for Immigration Studies (CIS). It gained funding support through the mid-1990s from the Pioneer Fund, which textile heir Wickliffe Preston Draper founded in 1937 for "race betterment." The Fund took the lead in backing scholarship premised on inherent racial differences in intelligence and moral capacities. After Draper died in 1972, his Pioneer Fund lived on to sustain the scientific racism that purported to show the unshakable inferiority of non-white peoples, which it claimed the Jewish-controlled media and academy had suppressed. Pioneer spent about $350,000 on the Fund for Human Understanding, which published books on black inferiority and white supremacy that mainstream presses rejected. It granted more than $1 million to Roger Pearson, founder of the Northern League for North European Friendship, which aimed "to make Whites aware of their forgotten racial heritage, and cut through the Judaic fog of lies about our origin and the accomplishments of our race and our Western culture." J. Philippe Rushton, who became Fund President in 2002, used Pioneer funds in 1999 to send 30,000 social scientists an edition of his book *Race, Evolution, and*

---

[194] Gustavo Arellano, "Prop. 187 flopped, but it taught the nation's top immigration-control group how to win", *Los Angeles Times*, 8 November 2019, https://www.latimes.com/california/story/2019-11-08/proposition-187-alan-nelson-harold-ezell-fair

[195] "Opponent of Immigration Aims to Challenge Abraham," *Detroit Free Press*, 14 March 1967, p. 9.

*Behavior*. The book argued that genetics doomed black people to life with smaller brains, larger
genitals, less mental capacity and parenting ability. Genetics also accounted for a racial proclivity
to crime, promiscuity, and sexually transmitted diseases. The Fund provided small grants to the
*American Renaissance* journal, which espoused race as the basis for American citizenship.[196]

The most prolific financier of FAIR and its offshoots was Cordelia Scaife May, an heiress
to the Mellon family fortune, who contributed many tens of millions of dollars to these groups both
in her lifetime and enduringly on her death through the Colwell Foundation. Like Tanton, May
embraced eugenics and worried about white America being "invaded" by dark-skinned immigrants
who "breed like hamsters." Her comments about non-white immigrants, merit quotation:

> "When we hear of immigrants, we instinctively think of Mexicans … In truth, we are
> being invaded on all fronts. Filipinos are pouring into Hawaii. Almost anyone from
> the Caribbean countries and Eastern South America … can eventually make it to the
> U. S. mainland. Orientals and Indians come across the long stretches of unmanned
> border we share with Canada. (No mention of white Canadians coming across that
> border.) She added, that when Cubans arrived in Florida, "much was made of the
> possibly deleterious impact they might have on American life … criminal habits,
> radical political thought, exotic diseases, neighborhood disruption, etc., … but no
> reporter, columnist, nor commentator cited their most dangerous contribution of all: a
> birth rate far higher than our native population. They breed like hamsters."[197]

Tanton's influence on the immigration debates through FAIR and its offshoots has been
profound. In 2011, Chavez called him "the most influential unknown man in America." By that
time FAIR's strategies and tactics had shifted under Tanton's direction. For its first two decades
FAIR had positioned itself as a centrist, non-partisan organization. In his 1989 oral history Tanton

---

[196] William H. Tucker, *The Funding of Scientific Racism: Wickliffe Draper and the Pioneer Fund* (University of Illinois
Press, 2002); Bruce Lincoln, *Theorizing Myth: Narrative, Ideology, and Scholarship*. (University of Chicago Press,
1999), quote from Northern League publication on p. 122.
[197] "A letter to a young cousin in the 1980s." Quoted in Nicholas Kulish and Mike McIntire, "In Her Own Words: The
Woman Who Bankrolled the Anti-Immigration Movement," New York Times, 14 August 2019,
https://www.nytimes.com/2019/08/14/us/cordelia-scaife-may-anti-immigration html.

said, "So one reason that we succeeded is that it was not a rock-hard conservative group, which would have carried us off probably into ridiculous and untenable positions. It was, in fact, a centrist group that had some staff and some board that were a little bit on one side of the center, some a little bit on the other."[198]

That changed with a memo that Tanton wrote in 2001 in which he abandoned his previous caution and proposed an alliance with the conservative Republican Party, whose future was endangered by immigrants that the Democratic Party would win over with promises of lavish welfare handouts. He wrote, "*While we are working on other ideas to move Democrats*, this one involves using the recently released census data to show Republican members of Congress, the Administration, and the party's leadership how massive immigration imperils their political future. The goal is to change Republicans' perception of immigration so that when they encounter the word 'immigrant,' their reaction is 'Democrat.'" (emphasis in original) He added, "Our plan is to hire a lobbyist who will carry the following message to Republicans on Capitol Hill and to business leaders: Continued massive immigration will soon cost you political control of the White House and Congress, given the current, even division of the electorate, and the massive infusion of voters about to be made to the Democratic side."[199]

In another strategic maneuver FAIR broadened its advocacy from a focus on federal issues to include state and local initiatives as well. Dan Stein, FAIR's executive director said in his 1994 oral history interview conducted by John Tanton: "In the immigration issue there is absolutely no

---

[198] "A Skirmish in a Wider War: An Oral History of John H. Tanton," Interviewed by Otis L. Graham, Jr. 20-21 April 1989, p. 38, https://www.documentcloud.org/documents/4521027-A-Skirmish-in-a-Wider-War-an-Oral-History-of.html.

[199] Vipul Naik, "The Tanton Memo and Restrictionism Among U.S. Republicans," *Open Borders*, 24 June 2013. (This memo was found at the University of Michigan's Bentley Historical Library, which houses Tanton's papers).

pattern of local activism established. That is because immigration is exclusively a federal power, a federal responsibility. Congress in the ... well the Supreme Court has designated Congress as the entity with plenary and total authority over immigration policy."[200] In the twenty-first century, however, FAIR abandoned this position and began working to enact so-called anti-sanctuary legislation in the states.

Although an aging Tanton remained an influential board member, new leaders propelled the new strategy during the last decade, including long-time executive director and now vice president Dan Stein, long-serving board member and current chair, Donald A. Collins Jr., and Dr. Stephen Steinlight, a fellow of the FAIR spinoff Center for Immigration Studies and prominent spokesperson for FAIR's positions. The new leadership remained true to Tanton's racialist and nativist opposition to non-white immigration, whether illegal or not. In his 1994 oral history interview Stein said, "we have to convince the twenty percent of the American people whose opinion really matters in the world, that we've reached the end of the migration epoch, that immigration is really not a phenomenon that is in the national interest, that the same factors that can lead to the success of a nation or an entity can also lead to its demise. That immigration was an idea that outlived itself."[201] He added, I don't think anybody in this country is clamoring to scoop up Haitians and bring them here, or to scoop up Rwandans and Somalis or Nigerians, or anybody else for that matter."[202]  He didn't mention immigrants from any predominantly white nations. He "blame[d]ninety-eight percent of responsibility for this country's immigration crisis on Ted

---

[200] "Oral History of Dan Stein, Interviewed by John Stanton, Petoskey, Michigan, August 1994, p. 35, https://www.splcenter.org/sites/default/files/tanton_-_daniel_stein_oral_history.pdf
[201] Ibid. p. 63
[202] Ibid. p. 66.

Kennedy and his political allies, who decided some time back in 1958, earlier perhaps, that immigration was a great way to retaliate against White-Saxon dominance and hubris, and that the immigration laws from the 1920s were just this symbol of that, and it's a form of *revengism*, or revenge…"[203]

Stein put no distance between FAIR and the Pioneer Fund and Cordelia Scaife May. In his oral history Stein said, "FAIR has lost very few of its major donors in its career, and has never, that I'm aware of, ever lost a major donor as a result of dissatisfaction with the quality of our work or our output." Of the Pioneer Fund, Stein said in 1993, "My job is to get every dime of Pioneer's money."[204] Stein lauded Ms. May, saying, "We occupied the space before anybody, and the people who helped found the organization and fund the organization, including Ms. May, were people of enormous foresight and wisdom."[205]

In a 1997 Wall Street Journal interview with Tucker Carlson, Stein responded to a quote from FAIR board member eugenicist Garrett Hardin, who had warned that "breeders" were reproducing uncontrollably "in Third World countries," and that the "less intelligent" should be discouraged from "breeding." Stein's response: "Yeah, so what? What is your problem with that? Should we be subsidizing people with low IQs to have as many children as possible, and not subsidizing those with high ones? … Certainly, we would encourage people in other countries to have small families. Otherwise they'll all be coming here, because there's no room at the Vatican."

---

[203] Ibid, p. 80.
[204] Tucker Carlson, "The Intellectual Roots of Nativism," *Wall Street Journal*, 17 October,1997, https://www.wsj.com/articles/SB875739465952259500.
[205] Nicholas Kulish and Mike McIntire, "How a Deceased Heiress is Still Influencing Anti-Immigration Policies in the U.S.," *Independent,* 15 August 2019, https://www.independent.co.uk/news/world/americas/us-politics/cordelia-scaife-may-mellon-banking-heiress-anti-immigration-organisations-fair-us-a9061336 html

Stein added, "Immigrants don't come all church-loving, freedom-loving, God-fearing. Some of them firmly believe in socialist or redistributionist ideas. Many of them hate America, hate everything the United States stands for. Talk to some of these Central Americans."[206] In 2006, he told *USA Today*, "The size and make-up of the immigration flow will be a determining factor in whether America remains a nation with a solid middle class, or increasingly becomes a nation of haves and have-nots like much of the rest of the world."[207]

In this interview he bragged about how FAIR had backed and aided overtly racialist books and articles. "We have helped play a role in development of a lot of the cultural debates and understandings, even though we ourselves haven't necessarily been at the forefront of them. Larry Auster wrote a book called *Path to National Suicide* which relied heavily on data and research that we helped him provide... It was an important book."

In this 1991 book, Auster rails against current immigration policies that place us under "an obligation to all the peoples in the world to let them migrate here en masse and recreate American society in their image," which imperils "the very basis of our national existence" (p. 2) and will lead to "national suicide." (p. 75).[208] He wrote that those who back the immigration reform bill of 1965 that ended the national quota system of 1924 must recognize their complicity in "a revolution in our culture and way of life, and the gradual submergence of our current population by Hispanic and Caribbean and Asian peoples.'" America faces an "*actual choice*" between those who "favor a

[206] Tucker Carlson, "The Intellectual Roots of Nativism," *Wall Street Journal*, 17 October,1997, https://www.wsj.com/articles/SB875739465952259500.
[207] "Will the US Population Reach One Billion/" *USA Today*, Vol. 134, No. 2732 (2006).
[208] Lawrence Auster, *The Path to National Suicide: An Essay on Immigration and Multiculturalism* (American Immigrant Control Foundation: 1991).

radical change in America's ethnic and cultural identity and those who think this nation should preserve its way of life and its predominant, European-American character." (p. 8)

He warned against an immigration policy that would have us "absorb all the peoples of the world into our society and submerge our historic character as a predominantly Caucasian, Western society." (pp. 71-72) He said that we should not ignore the "ethnic and racial character" of any community any more than we would ignore its political traditions, its way of life, its language, its religion. … This ethnic and racial dimension of human identity is an obvious fact that everyone intuitively recognizes, yet which is censored by our equalitarian ideology." (p. 74) Worldwide Auster wrote, "if other Western nations continue their openness to Third World immigration, we may be witnessing the beginning of the end of Western civilization as a whole." (p. 63)

Later, in 2009, Auster would openly admit what was evident from this FAIR-assisted book, that he is a "racialist," who privileges the so-called "white race" above other peoples: "I have always called myself a racialist, which to me means two things. First, as a general proposition, I think that race matters in all kinds of ways. Second, I care about the white race. It is the source of and is inseparable from everything we are, everything we have, and everything our civilization has achieved … when I contemplate today's systematic campaign, organized and backed by all the ruling powers of society, to put down, demonize, disempower, and marginalize the white race, I think it is shaping up as the greatest crime in the history of mankind."[209]

In his oral history Stein also refers to FAIR's contribution to Peter Brimelow's 1992 *National Review* article on immigration. Stein said "he spent quite a bit of time interviewing Ira

---

[209] Lawrence Auster, "The Cause of the White Race Will Not Go Away," View From the Right," 5 March 2009, http://www.amnation.com/vfr/archives/012647.html.

Mehlman [FAIR communications director] and myself. We supplied him with a tremendous amount of data, and worked through with him a lot of the arguments that ultimately found their way into his article."[210]

Brimelow's article, like Auster's book is filled with hateful racialist and nativist bias. He warned that through immigration "above all, the American ethnic mix has been upset. In 1960, the U.S. population was 88.6 per cent white; in 1990, it was only 75.6 per cent white—a drop of 13 percentage points in thirty years." He said that, "A change in public policy opened the Third World floodgates after 1965. A further change … could even restore the status quo ante 1965, which would slowly shift the ethnic balance back."  He chided "American commentators" for "losing sight of the concept of the "nation-state"—a sovereign structure that is the political expression of a specific ethno-cultural group." He lamented that, "Americans are now being urged to abandon the bonds of a common ethnicity and instead to trust entirely to ideology to hold together their state (polity). This is an extraordinary experiment, like suddenly replacing all the blood in a patient's body. History suggests little reason to suppose it will succeed."[211]

Three years later, Brimelow amplified these themes in his 1995 book *Alien Nation*. He wrote, "Race and ethnicity are destiny in American politics. The racial and ethnic balance in America is being radically altered through public policy. This can only have the most profound effects." He said that immigration "is bringing about an ethnic and racial transformation in America without precedent in the history of the world – an astonishing social experiment launched with no

---

[210] Stein, "Oral History," p. 72.
[211] Reproduced in "Peter Brimelow's "Time To Rethink Immigration"—The Twenty Year Anniversary Edition," https://vdare.com/articles/peter-brimelow-s-time-to-rethink-immigration-the-twenty-year-anniversary-edition.

particular reason to expect success." He pointed to "a plain historical fact: that the American nation has always had a specific ethnic core. And that core has been white."[212]

Later, in 2017, at the white supremacist American Renaissance conference Brimelow said, "There's ethnic specialization in crime. And Hispanics do specialize in rape, particularly of children. They're very prone to it, compared to other groups."[213] In a 2018 interview Brimelow said, *"my heart is with civic nationalism, but my head is with racial nationalism. Because I think that's the way things are going-I think the country is precipitating out on racial lines."*[214]

In 1999, Brimelow founded VDARE, which he named after Virginia Dare, the first white child born in America, and which has a white doe as its symbol VDARE says that is stands for these foundational principles:

"**America is Real**. America is not a <u>melting pot</u>, or a tossed salad or any other fashionable dietary metaphor that strips our nation of its rightful identity.

**Demography is destiny***:* Human differences are not <u>social constructs</u>. It is only with an honest consideration of race and ethnicity, the foundations of human grouping, that human differences can be explained and their social consequences understood, whether those differences are philosophical, cultural or biological. VDARE.com stands on the side of science in publishing coverage of the <u>ongoing discovery and research</u> in the realm of human differences.

---

[212] Peter Brimelow, *Alien Nation: Common Sense About America's Immigration Disaster* (Random House, 1995), pp. xvii, 10, 11.

[213] Quoted in James Fulford, "Yes, Virginia (DARE), There IS Hispanic "Ethnic Specialization" In Child Rape. The Totalitarian Left Just Doesn't Want You To Know," *VDARE.com*, 18 March 2019, https://archive.is/zMIvQ#selection-649.19-649.150.

[214] Osita Nwanevu "A Brief Conversation With White Nationalist Peter Brimelow at CPAC," *Slate*, 23 February 2018, https://slate.com/news-and-politics/2018/02/a-brief-conversation-with-a-white-nationalist-at-cpac html.

***_The racial and cultural identity of America is legitimate and defensible:_*** Diversity per se is not strength, but a vulnerability. It is a luxury that we can only afford as long as we preserve our breadwinner, the American people. VDARE.com recognizes that mass immigration both legal and illegal has driven America to the verge of bankruptcy …" (emphases in original).[215]

Donald A. Collins Jr, the Board Chairman of FAIR, is a listed contributor to the blogs of VDARE.[216] In a 2009 VDARE post, Collins warned that "our current immigration policies leave the door wide open for too many migrants of all races and religions…"[217] In a 2014 post he accused Democrats of having betrayed their working class base in favor of "Latino ethnic tribalism."[218] In a 2015 post he wrote, "Are we on the verge of a Civil War? If Coulter's dire prediction that the Left's plan is to turn our country into just another part of the Third World comes true, we may well be."[219] In another 2015 post, Collins mused about the 1973 novel *The Camp of the Saints*, by Jean Raspail, "which complacent Open-Borders supporters called 'racist' but which appears more and more prophetic with every passing week. And as the 'refugees' keep arriving one in what used to be the First World, another question comes to mind: *Will Americans be turned into refugees as well?*"[220]

---

[215] VDARE, Mission Statement. https://vdare.com/about
[216] FAIR, Board of Directors, https://www.fairus.org/about-fair/board-directors; Peter Brimelow, The Role of VDARE.COM After 9/ll: It's The Immigration, Stupid, 16 September 2011, https://vdare.com/articles/the-role-of-vdare-com-after-9-ll-it-s-the-immigration-stupid.
[217] Donald A. Collins, "Jihad Via Immigration," *VDARE.com*, 19 November 2009, https://vdare.com/articles/jihad-via-immigration.
[218] Donald A. Collins, *VDARE.com*, "Times Up: Democrats and Republicans! Immigration Has to be Fixed Now," 24 June 2014, https://vdare.com/articles/time-s-up-democrats-and-republicans-immigration-has-to-be-fixed-now.
[219] Donald A. Collins, "Democrat Says ADIOS AMERICA May be the 'Common Sense' Bombshell Of Our Time," Net *VDARE.com*, 21 June 2015, https://vdare.com/articles/democrat-says-adios-america-could-be-the-common-sense-bombshell-of-our-time.
[220] Donald A. Collins, "Democrat Asks: Are we All Becoming Immigration Refugees Now," Net *VDARE.com*, 31 March 2015, https://vdare.com/articles/democrat-asks-are-we-all-becoming-immigration-refugees-now.

This work referenced by Collins, which the Social Contract Press, an offshoot of FAIR, published in a softcover version and still sells, is a lurid and racist novel that tells of dark skin masses destroying western civilization in complicity with deluded liberals. The onslaught comes from "[a]ll the kinky-haired, swarthy-skinned, long-despised phantoms; all the teeming ants toiling for the white man's comfort; all the swill men and sweepers, the troglodytes, the stinking drudges, the swivel-hipped menials, the womanless wretches, the lung-spewing hackers; all the numberless, nameless, tortured, tormented, indispensable mass."[221]

*Kirkus Reviews*, compared the *Camp of the Saints* to Mein Kampf, saying, "Raspail covers all bases of hatred. The *Camp of the Saints* can be said to make you think. So did the My Lai massacre."[222] According to a retrospective in the *New York Times*, "Raspail's book helped inspire "The Great Replacement," the idea that white populations of Western countries could soon be supplanted by newer arrivals. Another French writer, Renaud Camus, developed the theory, which has become increasingly popular in white supremacist circles over recent years."[223] The New Republic reported that "*The Camp of the Saints* is a veritable fixture on alt-right forums across the internet. It stars in Stormfront[neo-Nazi] threads and appears on reading lists disseminated on 8chan's /pol/ board ...  Matthew Heimbach, founder of the [neo-Nazi] Traditionalist Worker's Party,

---

[221] Jean Raspail, *Camp of the Saints* at p.115, available at https://www.jrbooksonline.com/PDFs/Camp_of_the_Saints_2col%20.pdf.
[222] Nicolas Kulish, "Dr. John Tanton, Quiet Catalyst in Anti-Immigration Drive, Dies at 85," *New York Times*, 18 July 2019, https://www.nytimes.com/2019/07/18/us/john-tanton-dead.html;Carly Goodman, "John Tanton Has Died. He Made America Less Open To Immigrants — And More Open To Trump," *Washington Post*, 18 July 2019, https://www.washingtonpost.com/outlook/2019/07/18/john-tanton-has-died-how-he-made-america-less-open-immigrants-more-open-trump/; *An Historical Encyclopedia: Anti-Immigration in the United States*, vol. 1, Kathleen Arnold, ed.  (Greenwood, 2011), p. 512; "The Camp of the Saints," *Kirkus Reviews*, https://www.kirkusreviews.com/book-reviews/a/jean-raspail-2/the-camp-of-the-saints/.
[223] Elian Peltier and Nicolas Kulish "A Racist Book's Malign and Lingering Influence," *New York Times*, 22 November 2019, https://www.nytimes.com/2019/11/22/books/stephen-miller-camp-saints html.

recommends the novel to his followers; so does Jared Taylor, founder of American Renaissance, which bills itself as 'the internet's premier race-realist site.'"[224]

In a private speech to Texas Republicans that an observer videotaped and posted, CIS's Dr. Steinlight expressed similar hate-filled, racialist and nativist ideas. He brought to his audience a message about how an onslaught of Mexican immigrants imperiled America. "It's about Mexicans," he said, "It's about immigration." Throughout Steinlight interweaved "Mexican" with "illegal" and "criminal" as though they were all equivalent. He warned that "current levels of immigration are much too high," and will "radically transform who and what we are." He said, "we cannot fix the entire Third World or even Mexico by bringing them all here … we start out with one person from Mexico and that person beings in a relative and it goes on and on until we have a whole village here … This is lunacy." He asked, "what about the Mexican peasant who has come here in numbers so great that they outnumber the next 8 countries … The issue in the United States is really Mexican and to a lesser degree Central American, that's the real issue." He warned that "if you legalize 11.75 million people you are going to get 66 to 100 million people from Mexico in 20 years." Instead, we should "make life untenable for illegal immigrants." He even made light of white supremacy and the Ku Klux Klan, saying, "I've been called a white supremacist.  By the way, I'm a Jew, so I didn't know I was white until about 30 years ago.  A white supremacist – I don't think the KKK would take me, well really, they're short of members now so maybe."[225]

---

[224] Sarah Jones, "The Notorious Book That Ties the Right to the Far Right," *New Republic*, 2 February 2018, https://newrepublic.com/article/146925/notorious-book-ties-right-far-right.
[225] Video available at https://www.texasgopvote.com/immigration/anti-immigration-groups-founded-and-backed-radical-environmentalists-and-005712.

Steinlight painted a lurid picture of the Mexican threat to America. "What do they want?" he asked "They want a big, fat entitlement state.  That's what they want.  They don't want the vision of America that you want.  It's different needs, different desires.  They're not looking for this entrepreneurial system showing how the markets work, they want to be taken care of." Yet, a Stanford University study found that despite financial and other barriers, "Between 2007 and 2012, the number of Latino-owned businesses increased by 47 percent, while the number of non-Latino-owned businesses decreased by two percent. Post-recession, the growth rate of Latino-owned businesses continues to outpace that of any other demographic group."[226]

Steinlight invoked the immigrant threat narrative by claiming that "one third of our prison population is composed of illegal aliens. Yet, a study by the libertarian CATO Institute found that for 2014, the year of his speech, only 5.6 percent of prison inmates in the United States were illegal aliens.[227] He advanced in this speech FAIR's recent strategy of allying with Republicans. He warned that because of Democratic welfare handouts "Mexicans register Democrat 4 to 1 or (correcting himself) 5 to 1." The Republican future, he stressed, must be in solidarity with anti-immigrant groups.

---

[226] Claire Kramer Mills, et al., "Latino Owned Businesses*," Stanford Graduate School of Business*, November 2018, p. 4, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/slei-report-2018-latino-owned-businesses-shinging-light-national-trends.pdf.
[227] Michelangelo Landgrave and Alex Nowrasteh, "Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin," 15 March 2017, *CATO Institute*, https://www.cato.org/publications/immigration-reform-bulletin/criminal-immigrants-their-numbers-demographics-countries.

As the above analysis makes clear, FAIR was concerned not about the threat of illegal immigration per se, but of "mass immigration," whether legal or not. In 2016 FAIR ran a television ad that "urges the phasing down of mass immigration:"

*"Immigration. For decades, America has had the highest levels in our history.*

*Higher than any other country. The result? Most new American jobs have gone to immigrants. American workers are undervalued, losing out to cheap foreign labor. Wages have stagnated, while the national debt has skyrocketed. Mass immigration has jammed our schools, hospitals and highways. Maybe it's time to phase down immigration, so we can phase Americans back in."[228]*

In its work the state level for anti-sanctuary legislation, FAIR was joined in Florida by a new organization, Floridians for Immigration Enforcement, known as FLIMEN that was co-founded in 2004 by David Caulkett, the current vice president, and Enos Schera, a current board member. Since then, FLIMEN, like FAIR, has emerged as a hate-filled racialist and nativist group.

In 2004, FLIMEN engaged in vigilante justice against alleged undocumented immigrants. It set up a for-profit tip line website, where for a $10 fee to FLIMEN, anyone could report on a suspected undocumented immigrant not limited to alleged criminals. This unverified information, which could implicate documented immigrants and even naturalized citizens and native-born Americans would supposedly be passed on to the appropriate authorities. Caulkett organized protests at a hiring center in Jupiter, Florida that the town and the El Sol Neighborhood Resource Center had set up to provide itinerant laborers a safe space to get work. Caulkett provoked a confrontation by filming a man who was leaving with day workers that he had hired. Caulkett

---

[228] FAIR, "New Television Ad Urges Phasing Down of Mass Immigration, Phasing In Americans," https://www.fairus.org/press-releases/new-television-ad-urges-phasing-down-mass-immigration-phasing-americans.

claimed that, "Jupiter is blatantly complicit in felonious hiring transactions. In a democracy, you cannot have towns violating federal laws." Of course, there is no federal law that requires local officials to enforce federal immigration statutes. To the contrary, only federal officials are empowered to enforce the laws on immigration. As Sheriff Bob Gualtieri of Pinellas County, a forceful backer of SB 168 said during debates on the bill, "we don't enforce immigration law."[229] Thus, the bill had an intent other than to enforce immigration law, which is a strictly federal responsibility.

Contrary to the Fourteenth Amendment of the U.S. Constitution, co-founder Caulkett would also deny citizenship to American-born children of undocumented immigrants, which require investigations into the birth of everyone claiming native-born citizenship. Caulkett said, "there are all sorts of problems when you extend citizenship to the children of illegal aliens, including issues of deportation. Birthright citizenship is what we need to fix."[230] In 2007, Caulkett argued against permitting the use of Spanish in a presidential debate. "This is a very, very bad precedent," he said. "It's already difficult to keep track of politicians in English." English "is the official language of Florida and the de facto language of our country."[231]

When John McCain, who had worked on crafting a bipartisan immigration reform bill, became the presumptive Republican nominee in 2008, Caulkett let slip his animosity towards

---

[229] Diana Cahn, "Protesters in Jupiter target center that helps immigrant laborers," *South Florida Sun-Sentinel*, 5 January 2008, https://doctorbulldog.wordpress.com/2008/01/12/protesters-in-jupiter-target-center-that-helps-immigrant-laborers/; Sandra Lazo De La Vega and Timothy J. Steigenga, *Against the Tide: Immigrants, Day Laborers, and Community in Jupiter, Florida* (University of Wisconsin Press, 2013), pp. 117-121; Florida Channel, House Subcommittee on Civil Justice, 20 March 2019, 0.52-0.54, https://thefloridachannel.org/videos/3-20-19-house-civil-justice-subcommittee/.
[230] Scott Travis, "Lawsuit: Some Legal Florida Residents Denied In-State Tuition," South Florida Sun-Sentinel, 20 October 2011, p. B1.
[231] al Abbady, Ruth Morris and Elizabeth Baier, "Debate en EspaM-qol", South Florida Sun-Sentinel, 10 September 2007, https://www.sun-sentinel.com/news/fl-xpm-2007-09-10-0709090188-story.html.

Hispanics. He derided him "Juan" McCain, writing, "I will NEVER, NEVER, NEVER, vote for Juan McCain … enclosed is half of my Republican voters registration card." (emphasis in original) Caulkett wrote to Florida Republican leaders. "I have registered as a Lou Dobbs Independent."[232] Lou Dobbs was a soon to depart CNN personality, known for his inflammatory denigration of Hispanics.

FLIMEN co-founder Schera posted on his Facebook page his disgust with the "Dade County Commissioners [who] came in the waves of hundreds of thousands of illegal alien Cuban refugee exiles who came to Miami and overtook our English language, culture and politics and substituted it with their Spanish language, culture and politics." He decried the "illegal alien invader who worked to demolish my once U.S. held English speaking Miami-Dade County in the country I fought for as a U.S. Marine in WW2 against the Japanese, only to find it taken away by hundreds of thousands of 'uninvited illegal Cuban refugee invasions' that came and stole Miami-Dade County in their demand to recreate a North Cuba of their own, on U.S. land in Miami.... Join me and we shall beat the 'enemy anti-American illegal alien lawbreakers stealing the USA' by outstrategizing their tactics."[233]

During the debates over SB 168, FLIMEN demeaned and racially profiled Hispanics who came to testify against the bill in a Senate Judiciary Committee hearing.  A FLIMEN ALERT said of a Senate Judiciary Hearing on February 11, 2019, "Anti-Sanctuary Hearing Overrun by kids, crying mother, illegal aliens and their supporters." This portrayal is part of the threat narrative of immigrants and dangerous and unruly and of the association of Hispanics with illegality; no one

---

[232] Jose Cardenas, "Immigration Foes Offer No Amnesty to McCain," *St. Petersburg Times*, 3 March 2008, p. 1A.
[233] Enos Schera, "About Enos," and "Favorite Quotes," Facebook, https://www.facebook.com/enos.schera.

identified themselves as an "illegal alien," and the video of the hearing shows none of the disorder implied by FLIMEN.[234] The ALERT posted "photos of some of those who testified" against the Anti-Sanctuary bill SB168, including three that showed young children and another a Hispanic-looking woman holding a small child, who also appeared pregnant, apparently to advance the additional threat narrative of prolifically breeding Hispanic immigrants.[235]

 FLIMEN also twists reality to justify anti-Hispanic bigotry as "non-racist" by definition. In a web post it said: "In order to gain sympathy anti-enforcement immigration advocates have resorted to redefinition of the word 'racism' in order to piggyback on black American's civil rights movement.  The major flaw in the comparison to black Americans is Hispanic/Latino is an ethnicity, not a race.   Another flaw with the comparison as applied to Hispanic illegal aliens is that aliens are not citizens, whereas black Americans are citizens … *Linguistically it is impossible for a person who allegedly makes an anti-Hispanic statement to be a racist but that's the path we've been on."* (emphasis added) In opposition to America as a land of diverse peoples, FLIMEN added, "Perhaps a more accurate word for diversity might be 'divisity' because diversity tends to break American unity into bickering factions."[236]

 FLIMEN also sought to erase the term "white nationalism" from an anti-racist bipartisan resolution that the Florida State legislature was considering in 2020. It said, "a resolution denouncing 'White Nationalists' is naïve, inaccurate, misguided, dangerous, without merit and

---

[234] See, The Florida Channel, Senate Judiciary Committee, February 11, 2019.
[235] FLIMEN ALERT, "Anti-Sanctuary Bill Hearing Overrun
By Kids, Crying Mother, Illegal Aliens and Their Supporters," 17 February 2019,
http://www flimen.org/archive/Florida%202019%20Legislation%20Archive.htm; Florida Channel, Senate Committee on Rules, 11 February 2019.
[236] FLIMEN Commentary, "Racist -Stigma or Spitball," 18 September 2018,
http://www flimen.org/articles/Racist%20-%20Stigma%20or%20Spitball htm.

divisive." It said that "This resolution is flat-out racist.  Only the white race was targeted."[237]

FLIMEN did not reject white nationalism, only how they believed their political opponents had

exploited it. Their statement said, "So, what is a "White Nationalist?" To many it means a

Caucasian who supports the concept of America First. It should be noted that America's Founding

Fathers were White, and they were decidedly Nationalists." FLIMEN said, "The major problem

with the term 'White Nationalist' is that it is the Democrats' way of redefining terminology to

smear Republicans." In a later ALERT, FLIMEN openly embraced a version of "white

nationalism," which "should mean a caucasian who supports the rule of law and America First but

to the Immigration Anarchists it means *You Are a Nazi, white supremacist, KKK, etc.*."[238]

(emphasis in original)

Although FAIR and FLIMEN have no official affiliation, the groups are aligned by more

than common goals and outlook. According to a 2010 report, "The FLIMEN website indicates that

the organizations president, Janet Renner, and vice president, David Caulkett, serve as Florida state

advisors for FAIR." FAIR spokesperson Kristen Williamson indicated that "We have worked with

[Caulkett] before. We do have people called state advisers, but they are volunteers."[239] In that year

FAIR also listed FLIMEN as one of four Florida organizations listed under the rubric "Join a Local

---

[237] FLIMEN, "Horrible Resolution SR214 Is Not Yet Dead!" undated, http://www flimen.org/.
(No longer on the FLIMEN home page; found it here: https://www.golifa.com/call-your-florida-representatives-this-is-a-bad-bill/)
[238] Ibid., FLIMEN ALERT, 12 April 2019, in FLIMEN ALERT to Josh Barnhill," Immigration Anarchists + Fake and Despicable News = Behaving Badly this Session," 12 April 2019. As of this writing, the resolution was passed by the State Senate but is still pending in the House, https://www.flsenate.gov/Session/Bill/2020/214.
[239] Marcos Restrepo, "FAIR Denies Ties to Floridians for Immigration Enforcement; Scott Camp Silent on Endorsement," Florida Independent, 25 October 2010,
https://web.archive.org/web/20110111035328/http://floridaindependent.com/11366/fair-denies-ties-to-floridians-for-immigration-enforcement-rick-scott-camp-silent-on-endorsement.

Immigration Reform Group."[240]  FLIMEN's current website highlights past president and current board member Janet Renner as "a former Missouri State Advisor for the Federation for American Immigration Reform (FAIR)" who "was a featured immigration activist in FAIR's 2008 newsletter. *Janet serves as a Florida State Advisor for FAIR*. (emphasis added)[241] As of 2019, during the debates over SB 168, Caulkett continued to serve as an advisor for FAIR and the FLIMEN website includes links to FAIR. Throughout the process for adopting SB 168, as demonstrated, below FLIMEN and FAIR worked together in concert and coordination.[242]

The final critical element in the sequence of events was the inside involvement of FAIR and FLIMEN in the process leading to adoption of SB 168. During the period in which the State Legislature was considering anti-sanctuary city legislation in 2019, there was a direct pipeline between FAIR and FLIMEN and, in turn, between FLIMEN and Gruters and other key legislators. FLIMEN took the lead in communicating directly with Senator Gruters and his aides and other decision-makers, using information provided by FAIR. Aides to Senator Gruters were well aware of the involvement of FAIR, even though FAIR operated clear of public recognition. It should be noted that the contacts documented below through email evidence do not necessary capture all or even most contacts between the advocacy groups and decision-makers in the State Legislature. The available email record may not reflect all emails and there are no available records of phone contacts or in-person meetings. The requests for information from defendants were almost entirely non-responsive.

---

[240] FAIR, "Take Action: Join a Local Immigration Reform Group,"
https://web.archive.org/web/20100211135913/http:/www.fairus.org/site/PageNavigator/action/local_group.
[241] FLIMEN, "About Us: Janet Renner," http://www flimen.org/about_us.htm (accessed April 6, 2020).
[242] FLIMEN ALERT to Josh Barnhill, "Immigration Anarchists + Fake and Despicable News = Behaving Badly this Session," 12 April 2019; FLIMEN, "National Links," http://www flimen.org/links.htm..

The sequence of events demonstrates that SB 168 and the inflammatory anti-immigrant rhetoric justifying its enactment created a perfect marriage of ideological and political intent between Senator Gruters and the anti-immigrant groups. As demonstrated above, FAIR and FLIMEN were not concerned with the legality of immigration per se, but with the threats to white America posed by an alleged onslaught of non-white immigrants from less developed nations. Strategically and politically they had also aligned their aims with those of the Republican Party in Florida.

During the proximate sequence of events leading to the enactment of SB 168 in 2019, FLIMEN and FAIR were not just outside advocates for anti-sanctuary legislation. They were intimately involved on the inside of the legislative process. Through its direct access to decision-makers, FLIMEN provided model legislation, drafting and strategic advice, and promotional ideas, including its proposal for a co-sponsored public event held in April 2019 that featured Senator Gruters, Representative Byrd, Senator Aaron Bean, FLIMEN board member Karyn Morton, and representatives of other anti-immigration groups. It provided through FAIR a list of alleged sanctuary jurisdictions in Florida. Through FLIMEN, FAIR provided significant input on bill drafting, strategy, and supporting information to decision-makers. As documented below, key decision-makers in the state legislature were aware of FAIR's involvement and sought its advice and opinions.

As early as 2016, even before the State Legislature began to consider anti-sanctuary bills and when Gruters was still in the State House, FLIMEN began advocating for anti-sanctuary laws and provided model legislation to decision-makers. On December 13, 2016, Jack Oliver, then legislative director for FLIMEN emailed Senator Bean's office. "Floridians for Immigration

154

Enforcement is seeking sponsorship for our mandatory E-Verify bill and our anti-sanctuary city bill," Oliver wrote. "I know you have taken a stand for the citizens of Florida on immigration issues in the past and hope that you will take a stand this legislative session by being a sponsor for these important bills." He attached model legislation for both bills.[243]

In December 2018, after his election to the Senate, Senator Gruters (SB 168) and Senator Bean (SB 170) filed the same anti-sanctuary bills that ultimately became SB 168. An article by David Jaroslav, the State and Local Legislative Manager for FAIR, hailed the filing of these bills.[244] The Gruters/Bean bill was not identical to the model bill that FLIMEN had submitted two years earlier and as would be expected of an actual rather than a model bill, was much more detailed in its provisions and contained additional elements. However, the filed bill closely tracked many key provisions of the model legislation. These included a prohibition on sanctuary policies, full compliance with federal immigration law, honoring detainer requests, sharing information with federal officials, and turning persons with detainer requests over to federal officials. In addition, both the model and later filed bills authorized any person to make a complaint about a sanctuary policy. Both bills provided for enforcement by the Attorney General. Both bills authorized a person injured by an illegal immigrant to have a cause of action against state or local entities who failed to comply with the anti-sanctuary law. Both bills required public officials in Florida to report any violation of the legislation and provided whistleblower protection. Both bills prohibited consideration of an "individual's race, color or national origin, except to the extent permitted by the

---

[243] Jack Oliver to Austin Nicklas [aide to Senator Aaron Bean], "Fw: Request to sponsor bills," 13 December 2018, enclosure to Senator Bean. "Attachments: image001.jpg, image002.jpg, florida e-verify legislaHon (SR).docx, Flimen FL AnH-Sanctuary LegislaHon.docx."

[244] David Jaroslav, "E-Verify and Anti-Sanctuary Bills Passed in Florida," *FAIR*, 21 December 2018, https://fairus.org/legislation/state-local-legislation/e-verify-and-anti-sanctuary-bills-filed-florida.

United States or Florida constitutions." Neither bill contained any enforcement mechanism for this anti-profiling provision.[245]

The extensive behind-the-scenes email contact between FLIMEN and legislative decision-makers began with the launching of the 2019 legislative session.  On January 18, 2019, Kenneth C. Morrow Jr. the President of FLIMEN, emailed Senator Gruters. He said "my associate and I met with several Senators and Representatives the week of January 7, 2019. Our purpose was to request assistance in promoting legislation recently filed" that included "Eliminating Sanctuary Cities" and "Furthering Cooperation with Law Enforcement and ICE." He said that he and Caulkett would be in Tallahassee on January 23, 2019 and requested a meeting "with you to discuss our proposed remedy regarding 'Special ID's' and discuss other matters related to Immigration Enforcement."[246]

A January 23, 2019 email from Caulkett to Gruters' Legislative Assistant Josh Barnhill, who was dealing with immigration matters, provided specific advice on SB 168. The email confirmed that the meeting with Senator Gruters had taken place that day and Gruters' willingness to sponsor FLIMEN's legislative proposals. "It certainly was a pleasure to meet with you and Senator Gruters today," Caulkett wrote. Caulkett deemed the meeting a success, saying, "We are elated that Senator Gruters will sponsor the DOC 287(g) and ID Preemption bills. FLIMEN will seek House sponsors tomorrow." He enclosed copies of "The two bills" and said, "please get the bills to Bill Drafting ASAP." Barnhill replied "Thanks for sending over, David. I put them both in

---

[245] Florida Senate, SB 168, Senator Gruters, 18 December 2018, https://www.flsenate.gov/Session/Bill/2019/168/BillText/Filed/PDF; Oliver to Nicklas, Flimen FL AnH-Sanctuary LegislaHon.docx."
[246] Kenneth Morrow Jr. to Joe Gruters, "No ID for Undocumented Persons," 18 January 2019.

bill drafting earlier this morning. Great to meet you and Ken, and thank you for the advice on 168."[247]

Caulkett further said that "Per Senator Gruters' request, the list of Sanctuaries in Florida, or as I call them Anarchy Cities is attached. Refer to pages 52-55. Beware that other lists exist as well." This list was prepared not by FLIMEN, but by FAIR as the attachment indicates. Caulkett cautioned Barnhill about publicizing list: "FLIMEN suggests you consider not widely distributing the list as that would just create problems. FLIMEN's approach will be to promote and distribute a statement explaining how the Anti-Sanctuary bill works. We plan on extracting and modifying a summary from a previous Bill Analysis."[248]

Caulkett proposed modifications for the final bill. He said, "our attorneys looked at SB168. The suggestions were to; 1) drop State Attorneys so just the Attorney General handles prosecutions, and 2) remove several carve-outs. We understand that the association of State Attorneys, FPAA, will oppose the bill as written. Looking forward to success."[249]

The new version of SB 168 that Gruters submitted after the receipt of this email on 21 February 2019 did indeed drop the state attorneys from enforcement authority, leaving the matter to the attorney general. The revised bill also eliminated many features of the initial bill that were not in the model legislation that FLIMEN had submitted.[250] Copies of FLIMEN's December 2016 model anti-sanctuary bill and SB 168 as filed on February 21, 2019 showing the close parallelism are enclosed in Appendix A and B of this report.

---

[247] David Caulkett to Josh Barnhill, "2 bills for bill drafting + Sanctuary List," 23, January 2019; Barnhill to Caulkett, "RE: 2 bills for bill drafting + Sanctuary List," 24 January 2019.
[248] Ibid.
[249] Ibid.
[250] Florida Senate, SB 168, 21 February 2019, https://www.flsenate.gov/Session/Bill/2019/168/BillText/c1/PDF.

The following day on January 24, 2019, Josh Barnhill sent to Senator Gruters the FAIR report listing 15 "sanctuary counties and cities" in Florida. On February 2, Gruters sent the report to Senate Judiciary Chair, Republican Senator David Simmons.[251] Then, On Feb. 5, Barnhill sent the list to breaking news reporter Bianca Padró Ocasio of the *Orlando Sentinel*.[252] She replied, "Hi Josh, Thanks for this list.  I wanted to circle back because I see Seminole County is listed. However, Seminole Sheriff's Office said their policy has changed since they signed the Basic Ordering Agreement with ICE in June 2018, which means ICE pays them $50 for every inmate they agree to hold for up to 48 hours after their arrest time. From the list you provided, Gulf, St. Lucie and Flagler have also signed this agreement. Is this the latest version of this list? Would these counties still be considered "sanctuary" jurisdictions under the language in the bill?"[253]

There is no indication that Barnhill or anyone else made any corrections to the list in response to this information. The list was cited unchanged in the April 19, Senate Staff Report on SB 168, although the report did cite another list from the Center for Immigration Studies that listed only three sanctuary jurisdictions. It also noted that "Only one Florida municipality, the City of West Palm Beach, appeared on a compliance review list released by DOJ in January 2018," and that the city now appears to be "in compliance."[254]

On February 19, 2019, FLIMEN acknowledged its involvement with legislators to enact anti-sanctuary city legislation: "FLIMEN, Floridians for Immigration Enforcement is working with

---

[251] Josh Barnhill to Joe Gruters, "Sanctuary-Report-FINAL-2018.pdf," 24 January 2019, Joe Gruters to David Simmons, "FWD: Sanctuary-Report-FINAL-2018.pdf," 2 February 2019.
[252] Josh Barnhill to bpadro@orlandosentinel.com, "Fair sanctuary list," 5 February 2019. The reporter at the *Orlando Sentinel* is Bianca Padró Ocasio.
[253] Bianca Padró Ocasio to Josh Barnhill, "RE: Fair sanctuary list," 5 February 2019.
[254] The Florida Senate, "Bill Analysis and Fiscal Impact Statement, SB 168," 18 April 2019, p. 5, http://www.flsenate.gov/PublishedContent/Committees/2018-2020/RC/MeetingRecords/MeetingPacket_4604.pdf.

Senator Gruters and Senator Bean to seek passage of SB 168 Federal Immigration Enforcement. This is the 'Rule of Law' anti-sanctuary proposal for the State of Florida." The email included as an attachment an article "5-Million-Strong Wave of Illegals Plans to Storm the Border," with overtly racist content:

- "What would be the effect of a rapid influx of 5 million low-wage peasants on America? What would we do with them? Where would they live?

- If you take in *all* of Mexico's population, the end result that you get is not America – it's Mexico.

- You no longer have to visit a Third World country to see what an actual slum looks like firsthand. Just pay a visit to Los Angeles County. But be sure to bring some hand sanitizer if you do visit.

- In other words, many parts of California now look like the Third World dumps that the illegal aliens thought they were getting away from. It turns out that they brought the dump with them. Now that California is nearly uninhabitable by American standards, where do you suppose the horde of 5 million will want to move when they get here later this year?"[255]

   In February 2019, David Caulkett of FLIMEN met with Republican Representative Mike Beltran to discuss immigration legislation. At his request he passed on two bills, one of which related to identification for undocumented immigrants and the other was the anti-sanctuary city bill. Caulkett later wrote to Representative Beltran and Gruters' Legislative Assistant Barnhill that

---

[255] Kenneth Morrow Jr. to George Schroeder and others, "Re: Invasion?" 19 February 2019.

"Rep. Toby Oberdorf extended the courtesy to submit the bills to Bill Drafting. Senator Gruters submitted both bills to Bill Drafting but may not have yet filed the bills in the Senate." He stressed that "If you have only one slot FLIMEN believes the billdraft65280.docx Fl Dept of Corrections ICE Co-operation [anti-sanctuary city bill] potentially could have more of an impact than the ID bill but both are needed bills.[256]

Two months later, in the wee hours at 12:49am on April 15, 2019, FLIMEN board member and communications director Karyn Morton urgently wrote to Barnhill to "follow up with our conversation last week." She requested Senator Gruters to be a co-sponsor of FLIMEN's "Victims of Illegal Immigration Day" that week. "We will be joined by Legal Immigrants for America (LIFA), The Remembrance Project & Angel Parents, Kiyan & Bobby Michael." These are the parents of a child killed by an undocumented immigrant driver. She added, "Can we get it done? What do you need from me? Just let me know." In addition, "we did also reach out to Katherine Woodby in Rep Byrd's office to try and coordinate from that end as well." Barnhill responded promptly at 9:08 am, "I will run it by the Senator and let you know what he says. Thank you."[257] Two days later on April 17, 2019, as indicated above, Senator Gruters did indeed hold the event with Republican Representative Cord Byrd, the House sponsor of a parallel anti-sanctuary city bill, and FAIR's Karyn Morton, and representatives of anti-immigrant groups.

FLIMEN board member and Republican party official Robert Windham emailed directly to Gruters and to the Senator's aide. His aim was to help Gruters justify FAIR's list of 15 so-called

---

[256] David Caulkett to Rep. Beltran via Clay Gunther, CC: Josh Barnhill, "2 bills for filing consideration," 26 February 2019.
[257] Karyn Morton to Josh Barnhill, "FLIMEN Victims Day/SB168 Press Conference," 15 April 2019; Barnhill to Morton, 15 April 2015.

sanctuary cities in Florida. He wrote to Barnhill, saying, "he will most surely be asked to name any sanctuary cities and counties in FL and he can use the info below." He noted, "You can contact David J. at FAIR and ask him what the other counties listed and the city of West Palm are doing to qualify them as sanctuary counties/cities."[258]  The Senate Staff Report on SB 168 cited FAIR's 15 alleged sanctuary cities as part of its justification for the bill.[259]

Further demonstrating the linkages between FLIMEN, FAIR, and Senator Gruters, FLIMEN President Kenneth Morrow wrote the following to Barnhill on April 24, 2019, "Ok, thanks. FYI! Supporters of SB 168 may want to be in the gallery on both Thursday and Friday for the second and third readings … I will ask David J. to clarify the status of SB 168 to determine if any activity will carry over to the following week. I will advise all on his reply."[260] The David J. referenced in both these emails is FAIR's David Jaroslav, demonstrating a close relationship between the two organizations. Jaroslav would be referenced several times again in FLIMEN emails.

As hearings began on SB 168, Morrow wrote to Barnhill that "This email confirms our brief discussion this morning regarding the Judiciary Committee meeting scheduled for Monday, February 11, 2019 as referenced below … Thank you for your assistance in this matter" and "let me know if you need anything else."[261]

Also, on February 11, 2019, Barnhill acknowledged the early involvement of FAIR in the efforts to enact SB 168. He wrote to FLIMEN president Kenneth Morrow, Jr. about the American

---

[258] Robert Windham to Josh Barnhill, "Sanctuary cities & counties in FL," 23 April 2019.
[259] The Florida Senate, "Bill Analysis," 18 April 2019, p 4.
[260] Kenneth C. Morrow Jr. to Josh Barnhill, Re: SB 168 Status, 24 April 2019.
[261] Kenneth Morrow Jr. to Josh Barnhill, SB 168 "Meeting Appearance Request," 6 February 2019, Barnhill to Morrow, 6 February 2019.

Civil Liberty Union's (ACLU) critique of SB 168 which he enclosed. He asked Morrow, "Does fair have any response to this?"[262]

The next month, in an email to Barnhill, FLIMEN president Morrow further documented the involvement of FAIR. He wrote, "Please find the comments from David Jaroslav, FAIR, regarding the Pre-Meeting Analysis for SB 168. Please also review the information listed below regarding the two amendments submitted by Senator Annette Taddeo. FYI, take note that Sen. Annette Taddeo (D-Miami-Dade) has timely filed two amendments to SB 168 in advance of tomorrow's Infrastructure & Security meeting.   One would create a duty to inquire on the part of law enforcement whether someone is a victim or witness, and if they are, exempt them from the bill.  This could basically give anyone the ability to lie their way out of the bill's provisions applying to them: the bill currently does have a victim/witness carve-out (unfortunately), but it's much narrower and essentially defers to law enforcement to determine who's really a victim or witness. Taddeo's other amendment would make 'educational institutions' into non-enforcement zones where the bill's terms do not apply, not just by agents of the school, but by ANY law enforcement. I would think Sen. Gruters would regard these amendments as hostile." As this email indicates FAIR and FLIMEN opposed any duty for Florida officials to inquire about a persons' status as witness or victim. The amendment to which they objected was defeated (see Section IX below), but the narrower exception for witnesses and victims remained in the final legislation.[263]

---

[262] Josh Barnhill to Kenneth Morrow Jr., "Fwd: ACLU of Florida Opposition to SB 168 - Senate Judiciary Committee on 2/11/19," 11 February 2019.
[263] Kenneth Morrow Jr. to Josh Barnhill, "Fwd: FL SB 168 Infrastructure & Security staff analysis," 11 March 2019.

Yet other emails establish FAIR's role as an insider in the legislative process. Earlier on
March 11, 2019, Morrow had written to FAIR's Jaroslav, "I plan to send your comments regarding
SB 168 on the two amendments and the pre-meeting analysis to Josh Barnhill, Senator Gruters
Legislative Assistant. I will also include a copy of your comments on the bill analysis for Senator
Gruters to review Your input has been extremely beneficial, and I am sure that Senator Gruters will
gladly accept any recommendations you can offer."[264]

The following day during a March 12, 2019 meeting of the Senate Committee on
Infrastructure and Security, Democratic Senator Janet Cruz asked Senator Gruters about FAIR and
its offshoot CIS. She noted that the Southern Poverty Law Center had listed both groups as "hate
groups" with "foundational principles in white nationalism and connections to white supremacy."
Gruters responded that he opposed "bigotry," but "that's the first time I've heard them
characterized as anti-immigrant hate groups."[265]

Yet Senator Gruters had previously used a Southern Poverty Law Center hate group
designation to remove Peter Gemma from the executive committee of Sarasota County Republican
Party. The Southern Poverty Law Center had described Gemma as "a white nationalist with deep
ties to a whole array of racist hate groups." Gruters said, "There's no room for that in the party."[266]
Among the information that SPLC cited on Gemma were his contributions to VDARE, which is

---

[264] Kenneth Morrow Jr. to David Jaroslav, "Re: FL SB 168 Infrastructure & Security staff analysis," 11 March 2019.
[265] Florida Channel, Senate Committee on Infrastructure and Society, 12 March 2019, 1:28-1:30 min.
[266] Zac Anderson, "Sarasota GOP Leaders Move to Oust Peter Gemma From Party Committee," *Herald-Tribune*, 10
September 2018, https://www.heraldtribune.com/news/20180910/sarasota-gop-leaders-move-to-oust-peter-gemma-
from-party-committee.

also an outlet for FAIR's board chair Collins.[267] As the correspondence below reveals, Senator Gruters office continued to work with FAIR after his exchange with Cruz in the Infrastructure Committee.

On March 22, 2019, Morrow noted FAIR's help in trying to discredit the Southern Poverty Law Center's critique of the sources that Senator Gruters relied on in justifying SB 168: "Senator Cruz was critical of sources that Senator Gruters used during the Infrastructure and Security Meeting on CS/CS/SB 168. Senator Cruz commented that both CIS (Center for Immigration Studies) and FAIR (Federation for American Immigration Reform) are anti-immigrant. Her source of reference was the SPLC (Southern Poverty Law Center). Please review the information from David Jaroslav from FAIR regarding the recent problems being experienced by the favorite reference source for the Democrats."[268]

Despite this documentation of FAIR and FLIMEN's involvement with Senator Gruters and other backers of SB 168 in the State Legislature, Gruters claimed that they were only outside advocates and that "There were zero changes between" the bill that passed "last year and this year."[269] What Senator Gruters fails to mention is that FLIMEN first proposed model legislation for Sanctuary cities in December 2016. Moreover, the bill that Senator Gruters introduced on February 21, 2019 differed fundamentally from the House enacted 2018 bill. In the crucial enforcement

---

[267] Southern Poverty Law Center, "Long-time Racist Joins Constitution Party's Executive Committee," 16 September 2013, https://www.splcenter.org/hatewatch/2013/09/16/longtime-racist-joins-constitution-party%E2%80%99s-executive-committee.

[268] Kenneth Morrow Jr. to ken@flimen.org, "Fwd: SPLC," 22 March 2019

[269] Zac Anderson, "Members of Alleged Hate Groups Linked to Sarasota Legislator's Immigration Bill," Herald-Tribune, 27 March 2019, https://www.heraldtribune.com/news/20190327/members-of-alleged-hate-group-linked-to-sarasota-legislators-immigration-bill.

164

section, the 2018 bill placed primary responsibility for enforcement on the state attorneys. The 2019 bill switched responsibility to the Attorney General. The 2019 bill eliminated the specification of dollar amount civil penalties for violations and the forfeiting of grant aid to violating jurisdictions. In these regards, the February 2019 SB 168 bill, more closely followed the 2016 FLIMEN bill than it did the House enacted 2018 bill, which is enclosed as Appendix C of this report.

FLIMEN too, sought to downplay publicly its role in the enactment of SB 168. "Of course we helped," Caulkett said. "How influential we were? I don't know. I can't say."[270] However, in an email to Barnhill, FLIMEN told a very different story: "FLIMEN was at the beginning of this effort in Tallahassee with top-notch activists promoting the bill throughout the Session.  FLIMEN was at the bill signing.  FLIMEN was at the federal hearing where the City of South Miami and others attempted to find a loophole to stop enforcement." Consistent with its history of vigilantism, FLIMEN added that it "now looks forward to monitoring compliance which goes into effect today, October 1, 2019."[271]

FLIMEN also attributed the passage of the bill exclusively to Republicans: "This ruling is a huge victory over anarchy and open borders.  Florida is very fortunate to have patriotic officials, all Republicans, who actually support the rule of law and oppose Sanctuary Cities (AKA Anarchy Cities)."[272]

---

[270] Ana Ceballos, "Hardline Anti-Immigration Group Works to Sway Anti-Sanctuary Bill," *Orlando Sentinel*, 26 March 2019, https://www.orlandosentinel.com/politics/os-ne-group-sancuary-city-bill-20190326-story.html.
[271] FLIMEN ALERT to Josh Barnhill, "Florida Anti-Sanctuary Bill Upheld, with minor exception," 1 October 2019.
[272] Ibid.

Case 1:19-cv-22927-BB   Document 170-1   Entered on FLSD Docket 02/29/2020   Page 166 of 276

Although FLIMEN claims to be a non-partisan advocacy group, as illustrated above it was tightly tied to Gruters' Republican Party. For nine leaders and board members listed on its website, all have ties to the Republican Party, including some with leadership positions, as indicated by Table 14. During the 2018 elections, FLIMEN issued an overtly partisan alert saying, "everything that we have worked for in the last 15 years could be destroyed by Anti-ICE Democrats. Can you imagine what will happen if the Republicans lose the House or Senate? Can you imagine what will happen if Anti-ICE Gillum becomes Governor?"[273]

A 2019 study by UCLA and USC professors, that examined county participation in immigration detention from 1983 to 2013, sustains the finding of the confluence between Republican Party interest, anti-immigrant ideology, and heightened immigration enforcement through mandatory cooperation with ICE.[274] Through controlled statistical analysis the professors found that "Republican Party strength in presidential elections also predicts a higher likelihood of participating in immigration detention."[275] They noted that "Our findings are consistent with research that shows that political partisanship plays an important role in immigration policymaking. Wong (2017:212), for example, finds in his study of congressional voting on immigration-related legislation that Republican representatives are 3.7 times more likely than Democrat representatives to vote for restrictive immigration-related legislation."[276]

---

[273] FLIMEN, "Shocking racism and arrogance in Gillum inner circles. DeSantis must win!, FLIMEN <wmaster2@flimen.org> to :james.varnado@myfloridalegal.com, 1 November 2018.
[274] Emily Ryo and Ian Peacock, "Jailing Immigrant Detainees: A National Study of County Participation in Immigration Detention, 1983-2013," (November 13, 2019), forthcoming, in *Law & Society Review*, pp. 1-55, quote on p. 1. Available at SSRN: https://ssrn.com/abstract=3486094 or http://dx.doi.org/10.2139/ssrn.3486094.
[275] Ibid, p. 30.
[276] Ibid, p. 32.

**TABLE 14**
**POLITICAL AFFILIATIONS OF FLIMEN LEADERSHIP**

| FLIMEN  Leader | Position | Evidence of Republican Affiliation |
|---|---|---|
| | | |
| David Caulkett | Co-founder & VP | Registered Republican, "Donald Trump would make a great president, a great negotiator, and [is] obviously somebody who is not going to waver in the face of an enemy. He's right on everything from a conservative's viewpoint." |
| Kenneth Morrow Jr. | President | Treasurer, Republican Liberty Caucus of Northeast Florida – Duval, Volunteer, Team Florida, Donald J. Trump for President |
| Janet Renner | Former President, Board Member | Registered Republican, contributed $250 to Donald Trump for President, 2016; $150 to Republican candidate Carey Baker for Agriculture Commissioner, 2010 |
| Enos Schera | Co-founder, Board Member | Registered Republican, says the he belongs to "about 10 Tea Party groups." |
| John Parsons | Board Member | Former county Republican State Committeeman. |
| Barry Carson | Board Member | Lists as favorites on Facebook, Occupy Democrats, Prepare to Take America Back. |
| Julie Dunstan | Board Member | Contributed $250 to Allen West, Republican for Congress, 2010. |
| Robert Windham | Board Member | Member of the South Walton Republican Club and the Walton County Republican Executive Committee. |
| Karyn Morton | Board Member | Former Chairman of the Republican Liberty Caucus of NE FL and the Immediate Past Chairman of the Republican Party of Duval County, FL. |
| | | |

Sources: FLIMEN, "About Us," http://www flimen.org/about_us.htm; https://www.linkedin.com/in/kenneth-c-morrow-jr-b90a2b99; *Sun Sentinel*, 22 October 2015, https://www.sun-sentinel.com/news/fl-donald-trump-president-florida-20151022-story html. https://flvoters.com/pages/c105341 html;
https://www.facebook.com/enos.schera. https://flvoters.com/pages/s104047.html;
https://www.facebook.com/barry.carlson.37; CampaignMoney.com,
https://www.campaignmoney.com/finance.asp?type=in&cycle=10&criteria=dunstan&fname=julie;
https://www.campaignmoney.com/finance.asp?type=in&cycle=16&criteria=renner&fname=janet. Those who were not listed as registered Republican, registration could not be found.

The final steps in the sequence of events was the enactment of the bill in the Florida Legislature, its signing by the governor, followed by a lawsuit against the bill. The bill was passed in both chambers in late April and early May 2019 by close to party-line votes. SB 168 was presented to the governor on June 13, 2019 and signed by Governor DeSantis on the next day.[277]

## IX.     SUBSTANTIVE DEVIATIONS

There were important substantive deviations in the legislation. For the first time in Florida history, SB 168 requires Florida law enforcement officials to honor automatically a detention request by a federal agency over which they have no control or even input. The Florida officials have no authority or capacity to verify the accuracy of detainer requests. Such requests do not require a judicial warrant. Rather they represent only an administrative assessment by ICE that a person is in the U.S. illegally and is subject to removal. As noted above, such requests are often inaccurate and as in the *Morales* and *Brown* cases discussed above could subject local officials to liability in lawsuits.

This issue was raised during debates in the House Criminal Justice Committee by Democratic Representative Anika Tene Omphroy. She referred to the Monroe County case discussed above regarding the detention of U.S. citizen, Peter Sean Brown. She said, "these things are going to happen more is we go forward with what you are proposing." She said that we will be posing local officials to liability because "we are getting into enforcing laws [*e.g.*, immigration laws] that they don't understand or completely control." Bill sponsor Representative Byrd's answer

---

[277] "SB 168, Florida Senate," Open States, https://openstates.org/fl/bills/2019/SB168/.

was non-responsive. He said, "Local governments and jurisdictions tasked with enforcing the law will enforce it correctly. If not, that is why we have a functioning court system. That happens every day with a myriad of state laws that this body knows. So, I don't see how this law will be any different."[278]

In fact, SB 168 is fundamentally different from these other laws. When Florida police officials enforce state law, they are dealing with laws over which they maintain responsibility and for which they are trained to understand and enforce. Under SB 168, they are required to enforce federal law which they have no training and over which they have no control. Sheriff Gualtieri, the strongest law enforcement advocate for an anti-sanctuary city bill,[279] affirmed this distinction in his March 12, 2019 testimony before the House Subcommittee on Civil Justice. He was asked about checking identity of persons alleged to be deportable and responded, "In no way shape or form has this anything to do with local law enforcement. It has to do with our deferring legality in country." He said that local law enforcement officers like himself have "absolutely no knowledge of that person's immigration status … we don't enforce immigration law."[280] Senator Gruters admitted that the criteria that ICE uses to issue immigration detainer are "is all confidential, we don't know what's in it.[281]

In additionally responding to charges that detainer requests are subject to error because they are just administrative assessments with no judicial warrant or court order, Byrd responded as

---

[278] Florida Channel, House Subcommittee on Civil Justice, 20 March 2019, 40-42 min.
[279] See, for example, the declaration that Sheriff Gualtieri filed in this litigation.
[280] Florida Channel, House Subcommittee on Civil Justice, 20 March 2019, 0.52-0.54 min., available at https://thefloridachannel.org/videos/3-20-19-house-civil-justice-subcommittee/.
[281] The Florida Channel, Video, Senate Rules Committee Hearing, 17 April 2019, 0.6-0.8 min., available at .https://thefloridachannel.org/videos/4-17-19-senate-rules-committee/.

follows. He said that under the Obama administration, "warrants were not being issued along with the ICE detainer." He said that "the Executive Order issued [by President Donald Trump] has corrected that issue" and ICE detainers are now reliable. It is correct that the Executive Order required certification of an ICE warrant of arrest based on probable cause that the individual was deportable. However, what Representative Byrd did not disclose was that this was a change in name only, because the warrant was not one issued by a judge or magistrate, but only an administrative finding by ICE officials themselves that they had probable cause to believe an individual is removable from the U.S..

According to ICE's own documentation from November 2019, "Detainers are placed on aliens arrested on criminal charges for whom *ICE possesses probable cause* to believe that they are removable from the United States."[282] (emphasis  added) A December 2019 report by the Congressional Research Service made clear that ICE has broad, unchecked discretion to make what they *believe* is a probable cause determination and that they use the same databases and methodology as before President Trump's Executive Order: "Under ICE's current detainer guidelines … The probable cause must be based on (1) the existence of a final order of removal against the alien; (2) the pendency of removal proceedings against the alien; (3) biometric confirmation of the alien's identity and a records match in federal databases indicating that the alien is subject to removal; or (4) the alien's voluntary statements and other reliable evidence showing that the alien is removable. Additionally, the detainer must come with either an

---

[282] U.S. Immigration and Customs Enforcement, "Detainers," 13 November 2019, https://www.ice.gov/detainers.

*administrative arrest warrant* or a warrant of removal (if the alien has been ordered removed)

signed by an authorized immigration officer."[283]

The order subjected the following individuals to ICE detainers:

(a) Have been convicted of any criminal offense;

(b) Have been charged with any criminal offense, where such charge has not been resolved;

(c) Have committed acts that constitute a chargeable criminal offense;

(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;

(e) Have abused any program related to receipt of public benefits;

(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or

(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.[284]

Criterion *a)* does not require conviction of a dangerous offense or a felony. Any conviction, no matter how minor the crime, suffices. Criterion *b)* does not require a criminal conviction, but only the charging of a crime. Criterion *c)* is yet more encompassing. It requires only the suspicion that someone has committed any "chargeable criminal offense." Criterion *d)* does not single out dangerous or violent offenders and does not specify that the "misrepresentation" must be criminal. The same analysis applies to criterion *e)*. Criterion *f)* refers only to a civil violation of immigration

[283] Congressional Research Service, "Immigration Detainers" Background and Recent Legal Developments," 19 December 2019, p. 2, https://fas.org/sgp/crs/homesec/LSB10375.pdf.
[284] Ibid.

law and criterion *g)* essentially gives ICE a blank check for deportation based on its own assessment. In short, every person arrested in Florida, including those with no prior record and suspected only of minor crime, would be covered by at least one of these seven criteria, at a minimum under criteria b) and c). Florida officials have no input into the criteria used by ICE for immigration detainers or any knowledge of the rationale for any given detainer request.

The current ICE immigration detainer form is reproduced below.[285] It shows that an ICE officer simply has to check off the boxes indicating that he has probable cause to believe that the person was subject to removal under the standards listed above and has issued an arrest warrant. This is a civil warrant with no independent review of the ICE officer's determination. The named persons have the burden of proving that they are not removable (*e.g.*, because they are U.S. citizens) and have no of the safeguards, such as a court-appointed lawyer pursuant to a criminal arrest warrant (see the discussion of *Geraldo Gonzalez v. ICE* above*).*

It is notable that as compared to the last 15 months of the Obama administration, the percentage ICE's Florida arrests of suspected removable immigrants with no convictions or convictions for only minor Level 3 convictions, increased substantially during the first 15 months of the Trump administration. As indicated in Chart 13, the percentage of such Florida ICE arrests rose from 47 percent under the Obama administration to 63 percent under the Trump administration.

---

[285] U.S. Immigration and Customs Enforcement, "Immigration Detainer Form," https://www.ice.gov/doclib/secure-communities/pdf/immigration-detainer-form.pdf.

DEPARTMENT OF HOMELAND SECURITY
**IMMIGRATION DETAINER - NOTICE OF ACTION**

| Subject ID:<br>Event #: | | File No:<br>Date: |
|---|---|---|

| TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) | FROM: (Department of Homeland Security Office Address) |
|---|---|

**MAINTAIN CUSTODY OF ALIEN FOR A PERIOD NOT TO EXCEED 48 HOURS**

Name of Alien: _____

Date of Birth: _____ Nationality: _____ Sex: _____

THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS) HAS TAKEN THE FOLLOWING ACTION RELATED TO THE PERSON IDENTIFIED ABOVE, CURRENTLY IN YOUR CUSTODY:

☐ Determined that there is reason to believe the individual is an alien subject to removal from the United States. The individual (*check all that apply*):

☐ has a prior a felony conviction or has been charged with a felony offense;

☐ has three or more prior misdemeanor convictions;

☐ has a prior misdemeanor conviction or has been charged with a misdemeanor for an offense that involves violence, threats, or assaults; sexual abuse or exploitation; driving under the influence of alcohol or a controlled substance; unlawful flight from the scene of an accident; the unlawful possession or use of a firearm or other deadly weapon, the distribution or trafficking of a controlled substance; or other significant threat to public safety;

☐ has been convicted of illegal entry pursuant to 8 U.S.C. § 1325;

☐ has illegally re-entered the country after a previous removal or return;

☐ has been found by an immigration officer or an immigration judge to have knowingly committed immigration fraud;

☐ otherwise poses a significant risk to national security, border security, or public safety; and/or

☐ other (specify): _____.

☐ Initiated removal proceedings and served a Notice to Appear or other charging document. A copy of the charging document is attached and was served on _____ (date).

☐ Served a warrant of arrest for removal proceedings. A copy of the warrant is attached and was served on _____ (date).

☐ Obtained an order of deportation or removal from the United States for this person.

*This action does not limit your discretion to make decisions related to this person's custody classification, work, quarter assignments, or other matters. DHS discourages dismissing criminal charges based on the existence of a detainer.*

**IT IS REQUESTED THAT YOU:**

☐ Maintain custody of the subject for a period **NOT TO EXCEED 48 HOURS**, excluding Saturdays, Sundays, and holidays, beyond the time when the subject would have otherwise been released from your custody to allow DHS to take custody of the subject. This request derives from federal regulation 8 C.F.R. § 287.7. For purposes of this immigration detainer, **you are not authorized to hold the subject beyond these 48 hours.** As early as possible prior to the time you otherwise would release the subject, please notify DHS by calling _____ during business hours or _____ after hours or in an emergency. If you cannot reach a DHS Official at these numbers, please contact the ICE Law Enforcement Support Center in Burlington, Vermont at: (802) 872-6020.

☐ Provide a copy to the subject of this detainer.

☐ Notify this office of the time of release at least 30 days prior to release or as far in advance as possible.

☐ Notify this office in the event of the inmate's death, hospitalization or transfer to another institution.

☐ Consider this request for a detainer operative only upon the subject's conviction.

☐ Cancel the detainer previously placed by this Office on _____ (date).

_____ _____
(Name and title of Immigration Officer) (Signature of Immigration Officer)

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE SUBJECT OF THIS NOTICE:** Please provide the information below, sign, and return to DHS using the envelope enclosed for your convenience or by faxing a copy to _____. You should maintain a copy for your own records so you may track the case and not hold the subject beyond the 48-hour period.

Local Booking/Inmate #: _____ Latest criminal charge/conviction: _____ (date) Estimated release: _____(date)

Last criminal charge/conviction: _____

**Notice:** Once in our custody, the subject of this detainer may be removed from the United States. If the individual may be the victim of a crime, or if you want this individual to remain in the United States for prosecution or other law enforcement purposes, including acting as a witness, please notify the ICE Law Enforcement Support Center at (802) 872-6020.

_____ _____
(Name and title of Officer) (Signature of Officer)

DHS Form I-247 (12/12) Page 1 of

173

The legislature rejected, largely along party-line votes, amendment proposed by Democrats to remedy the deficiencies of the immigrant detainers process and ensure that Florida would refer to ICE only serious criminals:[286]

**Senate Amendment 503106**: "Delete line 49 and insert: enforcement agency who is arrested for, charged with, or convicted of a felony offense in this state or any other jurisdiction."[287]

**Senate Amendment 106948** would require "a valid judicial warrant" for immigration retainer requests issued by ICE for Florida officials.[288]

Similarly, **House Amendment 159253** stipulated that "an immigration detainer is deemed facially sufficient only if accompanied by a valid warrant supported by probable cause issued by a judge or magistrate."[289]

Second, for the first time, SB 168 requires local law enforcement officials in Florida to hold persons arrested for 48 hours, including persons that they would not so hold under ordinary circumstances. This hold under an immigration detainer that local officials must honor under SB 168 would include persons arrested for minor crimes like driving without a license who otherwise would not be subject to such detention or persons who would otherwise be released through bail. It is important to stress that such detention would ensnare those who are only arrested and have not necessarily been convicted or even charged with a crime.

---

[286] A guide to amendments can be found at The Florida Senate, CS/CS/CS/SB 168: Federal Immigration Enforcement, "Amendments," available at https://www flsenate.gov/Session/Bill/2019/00168/?Tab=Amendments.
[287] Senate Amendment 503106, available at https://www.flsenate.gov/Session/Bill/2019/168/Amendment/503106/PDF.
[288] Senate Amendment to Amendment 384318, available at
https://www.flsenate.gov/Session/Bill/2019/168/Amendment/106948/PDF.
[289] House Amendment 159253, available at https://www flsenate.gov/Session/Bill/2019/168/Amendment/716479/PDF.

**CHART 13**

**PERCENTAGE ICE ARRESTS IN FLORIDA WITH NO CONVICTION OR MINOR LEVEL 3 CONVICTION, LAST 15 MONTHS OBAMA ADMINISTRATION, FIRST 15 MONTHS SINCE TRUMP EXECUTIVE ORDER OF JANUARY 2017**



Third, SB 168 explicitly authorizes the governor and attorney general to take punitive action against local officials who do not in their view fully cooperate with the mandates of the new law. These requirements have real teeth because of the additional mandate that county and city officials must use their "best efforts to support the enforcement of federal immigration law." The enforcement provisions could subject such officials to removal or to findings of judicial contempt. Again, along largely party-line votes, the legislature rejected remedial amendments:

**Senate Amendment 413924:** Would strike the clause of the bill declaring an "affirmative duty" and an "important state interest" for officials to act affirmatively in supporting federal immigration enforcement. It would replace this clause with alternative language that prohibits contravening federal law, 8 U.S.C. § 1373(a) or (b). Rather than imposing affirmative obligations and suggesting retribution, this statute prohibits local officials from acting in a way that would prohibit or restrict the maintenance or intergovernmental exchange of such information regarding a person's immigration status.[290]

Fourth, although the bill on paper prohibits "actions under this chapter: based "on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution."  In debates on April 17, 2019 before the Senate Rules Committee, Democratic Senator Gary Farmer noted that because the U.S. Supreme Court had authorized the use of "Mexican appearance" as one factor in drug enforcement, the wording of this prohibition made it essentially inoperative. He proposed instead for immigration enforcement under SB 168 that in Florida we should "be better" by not using

---

[290] Senate Amendment to Amendment 384318, available at
https://www.flsenate.gov/Session/Bill/2019/168/Amendment/413924/PDF.

176

"issues of Latin or Hispanic appearance, for example, and allow people to use that excuse to detain

people in question on immigration status." Senator Gruters rejected the amendment, saying that,

"removing the ability of law enforcement to take action based on national origin would make the

bill nonsensical." The Republicans on the Committee voted down the amendment.[291]

In this same meeting Senator Rodriguez noted that the anti-profiling provision had no

enforcement, so a violator would suffer no consequences. He proposed an amendment that "would

add teeth" to the provision by authorizing an aggrieved person "to bring a civil action with attorney

fees to make sure there is an actual remedy and not just rhetoric." Senator Gruters rejected the

amendment, saying, that it is "designed to shout down immigration enforcement by encouraging

endless litigation and class-action lawsuits," – precisely the remedies for violating an individual's

rights. The Committee voted down the amendment.[292]

The full wording of Senator Rodriguez's amendment was a follows: "A person aggrieved

by a violation of this section may enforce any provision of this section by a civil action in any court

of competent jurisdiction on behalf of themselves or others similarly situated, and in addition to any

judgment awarded the appropriate court must allow reasonable attorney fees to be paid to the

aggrieved person. The remedies in this section are cumulative of other remedies and this section

may not be construed as a limitation."[293]

Fifth, although SB 168 exempts from coverage witnesses to crime or victims of crime,

unlike the enforcement of detainer requests, it does not impose an affirmative duty for local

---

[291] Florida Channel, Senate Committee on Rules, 17 April 2019, 45-47 min.
[292] Ibid, 47-49 min.
[293] Senate Amendment 695286, available at https://www.flsenate.gov/Session/Bill/2019/168/Amendment/695286/PDF.

177

officials to inquire into these matters. Again, along nearly party-line votes, the legislature rejected

an amendment that would strengthen protections for witnesses and victims:

**Senate Amendment 616122**: Would provide that "certain entities or agencies have an

affirmative duty to inquire whether or not a person is a victim of or a witness to a criminal offense,

and if so, prohibiting the person from being subject to the act."[294]

The State Legislature, also largely along party lines, also rejected many other amendments

designed to ease the most restrictive aspects of SB 168. These include:

**Senate Amendment 478986**: "This chapter does not apply to law enforcement agencies or

local governmental entities while operating at any educational facility or institution."[295]

**Senate Amendment 268432**: "A person who is the subject of an immigration detainer may

not be temporarily housed in a privately managed correctional facility."[296]

**Senate Amendment 969240**: "providing for future legislative review and repeal; requiring

a [at a minimum] fiscal impact study; specifying minimum requirements for the study; providing a

completion date for the study; requiring the submittal of a report to the Governor and the

Legislature by a specified date; requiring repeal."[297]

**Senate Amendment (589678):** "This act does not apply to an undocumented person who

has served in the Armed Forces of the United States or a family member of such

servicemember."[298]

---

[294] Senate Amendment 616122, available at https://www.flsenate.gov/Session/Bill/2019/168/Amendment/616122/PDF.
[295] Senate Amendment 486978, available at https://www.flsenate.gov/Session/Bill/2019/168/Amendment/478986/PDF.
[296] Senate Amendment 268432, available at https://www.flsenate.gov/Session/Bill/2019/168/Amendment/268432/PDF.
[297] Senate Amendment 969240: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/969240/PDF.
[298] Senate Amendment 589678: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/589678/PDF.

Senate Amendment (943906): "This act does not apply to a person who has applied for refugee status under Title 8 of the United States Code before July 1, 2019, during the pendency of such application, and including any appeals."[299]

Senate Amendment 248466: "This act does not apply to a recipient of Temporary Protected Status under federal law or of Deferred Action for Childhood Arrivals under federal law."[300]

House Amendment 159253: "Remove line and insert: enforcement agency who is charged with or convicted of a violent felony offense in this state or any other jurisdiction."[301]

House Amendment 536943: 908.1091 "Exemption.—This chapter does not apply to the Division of Emergency Management or its employees."[302]

House Amendment 551777: "Children of persons detained; counseling.—A minor child of a person detained under this chapter, who is in the custody of the Department of Children and Families pursuant to chapter, shall be eligible to receive counseling services from a licensed mental health professional in this state without charge during the period of such detention."[303]

House Amendment 283467: "Human trafficking victims exempt.—The provisions of this chapter concerning persons subject to immigration detainers do not apply to a victim of human trafficking, as defined in s. 787.06."[304]

---

[299] Senate Amendment 943906:, https://www flsenate.gov/Session/Bill/2019/168/Amendment/943906/PDF.
[300] Senate Amendment 248466: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/248466/PDF.
[301] House Amendment 159253: https://www flsenate.gov/Session/Bill/2019/168/Amendment/634673/PDF.
[302] House Amendment 536943: https://www flsenate.gov/Session/Bill/2019/168/Amendment/536943/PDF.
[303] House Amendment 551777: https://www flsenate.gov/Session/Bill/2019/168/Amendment/551777/PDF.
[304] House Amendment 283467: https://www flsenate.gov/Session/Bill/2019/168/Amendment/283467/PDF.

**House Amendment 051735**: "Institutions exempt.—This chapter does not apply to the Department of Children and Families or any employees or contractors thereof."[305]

**House Amendment 315213**: "A state entity, local governmental entity, or law enforcement agency implementing this chapter has an affirmative duty to inquire whether a person is a victim of or a witness to a criminal offense, and, if so, the person is not subject to this chapter."[306]

**Senate Amendment 334394:** "System and the Florida College System. The term does not include the Department of Education or the employees of that department. 908.1025 Chapter applicability.—This chapter does not apply to school resource officers, participants of a school guardian program, or any law enforcement agencies or local governmental entities while operating at any education facility or institution, including public, private, and charter K-12 schools 13 in this state."[307]

**Senate Amendment 736146**: "Delete line 233 and insert: 908.108 Middle schools; education records.—This chapter does not apply to middle schools, whether the middle school is a public, private, or charter school."[308]

**Senate Amendment 381352**: "908.1085 Chapter applicability.—This chapter does not apply to any teacher or guidance counselor in this state."[309]

**Senate Amendment 420482**: "Emergency medical technicians.—This chapter does not apply to emergency medical technicians as defined in s. 401.23."[310]

---

[305] House Amendment 051735: https://www flsenate.gov/Session/Bill/2019/168/Amendment/051735/PDF.
[306] House Amendment 315213: https://www flsenate.gov/Session/Bill/2019/168/Amendment/315213/PDF.
[307] Senate Amendment 334394: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/334394/PDF.
[308] Senate Amendment 736146: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/736146/PDF.
[309] Senate Amendment 381352: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/381352/PDF.
[310] Senate Amendment 420482: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/420482/PDF.

**Senate Amendment 941876:** "Firefighters.—This chapter does not apply to firefighters as defined in s. 633.102."[311]

**Senate Amendment 564172**: "Every employee of a law enforcement agency, a local governmental entity, or a state entity must successfully complete 8 hours of a nationally recognized and accredited training program on implicit bias."[312]

**Senate Amendment 268980**: "This act does not apply to a person who has applied for asylum under Title 8 of the United States Code before July 1, 2019, or during the pendency of such application, including any appeals."[313]

**Senate Amendment 654200**: "This act does not apply to the Department of Veterans' Affairs."[314]

**Senate Amendment 917264**: "This act does not apply to a recipient of Deferred Action for Childhood Arrivals under federal law."[315]

**Senate Amendment 193264**: "This act does not apply to a recipient of Temporary Protected Status under federal law."[316]

## X.    CONTEMPORARY STATEMENTS

Legislative sponsors of SB 168, Governor DeSantis, and key advocates made it clear that despite falling crime in Florida, the fundamental justification for SB 168 was to improve public safety, what Senator Gruters said was the *one thing and one thing only* that the bill was about.

---

[311] Senate Amendment 941876: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/941876/PDF.
[312] Senate Amendment 564172: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/564172/PDF.
[313] Senate Amendment 268980: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/268980/PDF.
[314] Senate Amendment 654200: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/654200/PDF.
[315] Senate Amendment 917264: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/917264/PDF.
[316] Senate Amendment 193264: https://www.flsenate.gov/Session/Bill/2019/168/Amendment/193264/PDF

Gruters and other backers assured members of the state legislature and the public that the bill would reduce crime by taking dangerous violent criminals off the streets, while sparing suspected removable immigrants with clean criminal records or only a record of minor offenses.

They made these claims without evidence and in contradiction to the readily available data on ICE arrests in Florida, including from the local law enforcement referrals that SB 168 would mandate. Despite the resources of the state at their command, majority Republicans in the legislature made no effort to research this material, relevant scholarly literature, or other evidence. They likewise did not examine the flaws in ICE's immigration enforcement that was evident at the time from studies and lawsuits in Florida and elsewhere and the report of the Inspector General for Homeland Security. The 15-page Senate Staff Report of April 19, 2019 on SB 168 draws on information from FAIR and its offshoot the Center for Immigration Studies, but provides no references to scholarly studies that would cast light on the likely impact of the bill. It does not analyze the data on prior immigration enforcement in Florida or assess the accuracy of ICE's procedures.[317]

As the following analysis demonstrates, the evidence-free, foundational claims for SB 168 are false, misleading, and pretextual.

**A.   Decision-makers and Advocates Falsely Claimed that SB 168 Would Improve Public Safety by Protecting Floridians from Criminals**

---

[317] The Florida Senate, "Bill Analysis," 19 April 2019.

1.   **Senator Joe Gruters:**

In response to the lawsuit filed against his bill, Senator Gruters made it unmistakably clear that the purpose of his bill was to protect the public from criminals, nothing else. He said: "*Banning sanctuary cities is about one thing and one thing only - public safety*.'" (emphasis added)[318]

This forthright admission followed a consistent theme for Senator Gruters throughout his advocacy for SB 168. On February 11, 2017, he told the Senate Judiciary Committee that his bill is about "keeping our communities safe and making sure we keep criminals off the streets." It would "give taxpayers public safety in return for the funding" of the legislation.[319]

Upon the signing of the bill in June 2019 by Governor DeSantis, Senator Gruters said, "We passed the strongest ban on sanctuary cities in the entire country." His bill was "about criminal illegal aliens who have broken other laws."[320]

Senator Gruters later criticized the lawsuit challenging SB 168 as "reckless" and "irresponsible." He said former Plaintiff City of South Miami's commissioners "think they can prioritize illegal immigrants over the safety and security of their community and get away with it. 'Wasting tax dollars to protect criminals? Not on my watch." On Facebook, Senator Gruters wrote, "disgusting to see a city in Florida use tax-dollars to protect criminals who are in our country illegally!" He went on to write, "My Sanctuary City Ban, which was signed into law by our

---

[318] Jacob Ogles, "Joe Gruters Slams South Miami Challenge to So-Called Sanctuary Cities Ban," *Florida Politics*, 11 July 2019, https://floridapolitics.com/archives/300797-gruters-slams-south-miami. (Added hyperlink)
[319] The Florida Channel, Senate Judiciary Committee, 11 February 2019, 0.18-0.19, 0.24-0.25.
[320] A.G. Gancarski, "'We Ran On This': Ron DeSantis Signs Anti-'Sanctuary Cities' Bill," *Florida Politics*, 18 June 2019, https://floridapolitics.com/archives/298822-desantis-sanctuary-ban.

Governor Ron DeSantis, isn't just legal - it's the right thing to do! Who is ready for this legal fight? It's time to protect our communities from Criminal Illegal Aliens!'" [321]

### 2. Representative Cord Byrd

On April 16, 2019, Representative Byrd told members of the House Judiciary Committee that it was "important not to place citizens of this state at a disadvantage with respect to criminal aliens. And that's what opponents of this law actually does."[322]

At the bill signing, Representative Byrd said, "It has been my honor to stand with Governor DeSantis and Senator Gruters to ensure that Florida is a state that respects the rule of law and the public safety of its citizens."[323]

### 3. Governor Ron DeSantis

Upon signing SB 168 into law, Governor DeSantis said, "This is about public safety, not about politics. We must do everything within our power, and use all the tools available to us, to ensure that our communities are safe.[324]

### 4. Republican Representative Bob Rommel, Chair Subcommittee on Civil Justice

At the conclusion of his subcommittee's SB 168 hearing on March 20, 2019, Chairman Rommel said, "If we don't have the courage to take up tough bills like this, when the next person is

---

[321] Jacob Ogles, "Joe Gruters Slams South Miami Challenge to So-Called Sanctuary Cities Ban," *Florida Politics*, 11 July 2019, https://floridapolitics.com/archives/300797-gruters-slams-south-miami. (Added hyperlink)
[322] Florida Channel, House Committee on the Judiciary, April 16, 2019, 2:23-2:24.
[323] Ron DeSantis, "Florida Gov. DeSantis Signs SB 168: Federal Immigration Enforcement," 14 June 2019, https://flgov.com/2019/06/14/governor-ron-desantis-signs-sb-168-federal-immigration-enforcement/. (Added hyperlink)
[324] Ibid.

killed by an undocumented person, our citizens, that have been here for all their lives, they are going to come and ask why we did nothing."[325]

### 5. FLIMEN

During the debates over SB 168, co-founder and Vice President David Caulkett blasted the 15 so-called sanctuary cities listed by FAIR as "anarchy cities," where presumably crime ranged unchecked. "Not only do they disobey the law, but I question their loyalty to this country," he said.[326] In an April 12, 2019 Alert, FLIMEN headlined: "Immigration Anarchy Defined." It said that sanctuary jurisdictions "allow criminal rapists, murderers, and others to reside in our midst."[327]

### 6. Amapola Hansberger, Head of LIFA, appeared at an event with Gruters and Byrd promoting SB 168 and testified for it.

Before the Senate Rules Committee on April 17, 2019 Hansberger testified: "I was raised in Nicaragua. It was similar to a sanctuary city. I was afraid to walk in the streets. We had to surround ourselves with walls and have bars on our windows and have to sleep with a gun under the bed. That's what worries me, sanctuary cities, having criminals that come there even from my country. I don't like to live like that."[328]

### 7. The Public Safety Rationale Behind Legislators' Support for SB 168 is Demonstrably False and Pretextual

---

[325] Florida Channel, House Subcommittee on Civil Justice, 20 March 2019, 1.44 -1.45.
https://thefloridachannel.org/videos/3-20-19-house-civil-justice-subcommittee/.
[326] Mathew Vadum, "Florida's Crackdown on Illegal Immigrants Begin," *FrontPage Magazine*, 25 April 2019,
https://www.frontpagemag.com/fpm/2019/04/floridas-crackdown-sanctuary-cities-begins-matthew-vadum/.
[327] FLIMEN Alert to carolyn.snurkowski@myfloridalegal.com, "Immigration Anarchists + Fake and Despicable News = Behaving Badly this Session" 12 April 2019.
[328] Florida Channel, Senate Rules, 17 April 2019, 1.05 – 1.06.

These foundational justifications for SB 168, made without evidence are pretextual and misleading. The evidence indicates that SB 168 will not make Floridians any safer from crime and might have the opposite effect. First, so-called sanctuary cities in Florida are no less safe than other jurisdictions in the state. Second, undocumented immigrants are not a criminal threat, but commit crimes at lower rates than documented immigrants or native-born Americans. Third, immigration enforcement laws like SB 168 have a chilling effect on immigrant communities that can undermine efforts to fight crime.

B.  **Alleged Sanctuary Jurisdictions are Likely Safer and no Less Safe Than Other Jurisdictions.**

Despite rhetoric about the need to crack down on crime in alleged sanctuary jurisdictions, analysis shows that such jurisdictions are no less safe than other Florida jurisdictions and may, in fact, be more safe. The CATO Institute examined policies adopted in Clay County, Florida in December 2014 and Alachua County, Florida in September 2015 that they "will not honor ICE detainers without a judicial order or a criminal warrant." CATO drew on crime rate changes in these counties to assess the effects of these policies on crime, using as a control crime rates in surrounding counties.[329]

CATO found that that "the crime rates in Clay and Alachua counties have fallen just like in their neighboring counties, except for Baker County, from 2010 through 2017.  If sanctuary policies in Clay and Alachua counties affected crime rates, there is no obvious indication of that." The Institute also found that Alachua and neighboring counties "crime rates were roughly parallel

---

[329] Alex Nowrasteh and Andrew Forrester, CATO Institute, "Sanctuary Jurisdictions in Florida Do Not Have Higher Crime Rates," CATO, 29 March 2019, https://www.cato.org/blog/sanctuary-jurisdictions-florida-do-not-have-higher-crime-rates.

before the enactment of the sanctuary policy and stayed parallel afterward, meaning that the change

in policy likely had no effect on crime rates.  The results look nearly identical if trends in property

or violent crime rates are compared separately." The findings were the same for Clay and

surrounding counties.[330]

CATO cautioned that these Alachua (5.2%) and Clay (2.3%) counties had only small

percentages of non-citizens. It noted that "in different jurisdictions like Miami-Dade County, where

23.3 percent of the population were non-citizens in 2017, the effect of sanctuary city policies might

be different although there is no evidence of that during the brief period when it had a sanctuary

policy."[331]

A study of crime rates in Miami-Dade County shows that the adoption of a sanctuary

jurisdiction, non-cooperative police there was associated with reductions in overall and violent

crime. From 2013 to early 2017, Miami-Dade, like Alachua and Clay did not honor ICE detention

requests. It changed that policy on February 17, 2017 through a vote by the County Commission

upon the recommendation of the mayor. Chart 14 compares changes in the total crime rate for

Miami-Dade County and the state of Florida for the three years prior and the three years during the

sanctuary city period of non-cooperation. A comparison statewide is most appropriate. There are

only two bordering counties and they have different sanctuary policies, so it is not possible to

establish a baseline of comparison with Miami-Dade. The FAIR compilation included in the Senate

Staff Report, lists Broward as a sanctuary jurisdiction and in contrast, Collier has long maintained a

cooperative arrangement for ICE detainers.

---

[330] Ibid.
[331] Ibid.

Chart 14 demonstrates that the crime rate in Miami Dade has always been higher than in the rest of Florida. However, relative to Florida crime rate, crime in Miami-Dade dropped much more substantially after the adoption of the non-cooperation policy than before. Crime both in Miami-Dade and Florida declined during this period of non-cooperation. However, the decline in crime in Miami-Dade relative to Florida was substantially greater during the so-called sanctuary city period than in the period after the ending of that policy.[332]

Chart 15 replicates this analysis for the violent crime rate. It demonstrates the same pattern for the total crime rate. Violent crime both in Miami-Dade and Florida declined during this period of non-cooperation with ICE. However, the decline in violent crime in Miami-Dade relative to Florida was substantially greater during the so-called sanctuary city period than in the period commencing in 2017 when Miami-Dade began automatically honoring ICE detainer requests.

---

[332] Daniel Rivero, From 'Sanctuary City' And Back Again: Inside Miami-Dade's Five Year Journey, *WLRN News*, 19 December 2018, https://www.wlrn.org/post/sanctuary-city-and-back-again-inside-miami-dades-five-year-journey#stream/0.

**CHART 14**
**CRIME RATES: 2010 to 2016, MIAMI-DADE COUNTY COMPARED TO FLORIDA**



189

**CHART 15**
**VIOLENT CRIME RATES: 2010 to 2016, MIAMI-DADE COUNTY COMPARED TO FLORIDA**



An analysis of 2018 crime rates shows that crime is no higher in alleged sanctuary jurisdictions in Florida and again that it might actually be lower. When the crime rates in 2019 for the 12 counties listed by FAIR as Florida sanctuary jurisdictions are compared to other Florida counties, the listed sanctuary jurisdictions had less overall crime and less violent crime. To achieve statistical control, the analysis uses the standard methodology of multiple regression analysis, which estimates the independent effects of predictor variables on a dependent variable, in this case crime rates. The analysis includes a variable coded as 1 for a sanctuary county and 0 for other counties. Other independent variables introduced as controls include age (65+), per capita income, poverty and unemployment rates, high school and college graduation rates, home ownership, population, density, percent Hispanic and black, and percent non-citizens.

As reported in Table 15, for total crime, under these controlled conditions, the best estimate indicates that sanctuary cities had a rate that that was lower than the county average by 75.2 crimes per thousand. That translates into an 8.6 percent reduction in the average county crime rate. For violent crime, sanctuary cities had a rate that that was lower by 31.6 crimes per thousand. That translates into a 8.6 percent reduction in the average county violent crime rate. Although these best estimates point to lower crime in alleged sanctuary jurisdictions, the results were not statistically significant at standard levels in social science.

**TABLE 15**
**STATISTICALLY CONTROLLED EFFECT OF FAIR IDENTIFIED SANCTUARY COUNTIES ON CRIME RATES, 2018**

| Crime Rate | Effect of Sanctuary V. Non-Sanctuary Counties | % Change in Average County Rate | Statistical Significance |
|---|---|---|---|
| | | | |
| All Crime Rate Per 100,000 | -75.2 | -3.5% | NS |
| | | | |
| Violent Crime Rare Per 100,00 | -31.6 | -8.6% | NS |
| | | | |

Sources: Florida Department of Law Enforcement, "Statewide County Offense Report," 2018, https://www.fdle.state.fl.us/FSAC/UCR-Reports.aspx; U.S. Census Quick Facts for Florida Counties,  U.S. Census, Citizen Voting Age Population by County, 2014-2018, American Community Survey Estimates, https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2018.html; Florida Department of Economic Opportunity, "Unemployment Rates by County," 2018, http://www.floridajobs.org/workforce-statistics/data-center/statistical-programs/local-area-unemployment-statistics.

Other studies from outside Florida provide additional indication that sanctuary jurisdictions are no less safe and likely safer than other jurisdictions. A 2019 study by professors from Notre Dame University and the University of Arizona examined 107 cities across two decades of analysis, from 1990 to 2010.  The researchers probed the effects of the adoption of sanctuary city policies on rates

of homicide and robbery. The researchers note that for this time-series study they relied "on a multivariate regression approach that allows us to control for relevant time-varying characteristics while also accounting for time-invariant unobserved characteristics that may bias estimates of sanctuary policy effects." They report "that our longitudinal multivariate analysis finds no evidence that the adoption of a sanctuary ordinance is associated with shifts in homicide counts in any meaningful way. That is, the coefficient for *Sanctuary Policy* is not (statistically) significantly different from zero." With respect to robberies the researchers found that "the adoption of a sanctuary policy is associated with *an 11 percent decline in robberies*, net of immigration measures and criminogenic structural factors." (emphasis added)[333]

A 2017 study, published in *Justice Quarterly*, matched cities with sanctuary policies to otherwise "similarly situated cities where key variables are the same across the cities except the sanctuary status of the city." Thus, "differences between the treatment and control in crime rates following the enactment can then be attributed to the policy—as opposed to economic conditions, differences in the size of the Latino population, and other characteristics that might predict why a city may initially invoke sanctuary policies." They buttressed their matching analysis by also using regression analysis to control for factors not included in the matching. The researchers found "no statistically discernible difference in violent crime, rape, or property crime rates across the cities." They concluded that "*our findings provide evidence that sanctuary policies have no effect on crime*

---

[333] Ricardo D. Martínez-Schuldt and Daniel E. Martínez, "Sanctuary Policies and City-Level Incidents of Violence, 1990 to 2010" *Justice Quarterly*, 36 (2019): 567-593.

*rates, despite narratives to the contrary*." Thus, an attempt to crack down on alleged sanctuary jurisdictions is the wrong way to fight crime. (emphasis added) [334]

Professor Tom K. Wong of the University of California, San Diego, conducted a study for the Committee for American Progress (CAP) that compared crime rates across the nation for so-called sanctuary counties (608 of 2492 counties designated by ICE) that ICE designates as non-cooperative with counties that ICE designates as cooperative. Professor Wong used advanced statistical matching techniques to match sanctuary with non-sanctuary counties. Professor Wong found that the results of this controlled analysis demonstrated "that crime is statistically significantly lower in sanctuary counties compared to non-sanctuary counties when statistically matching and then controlling for population characteristics, including total population and the foreign-born percentage of the population." The results "show that there are, on average, 35.5 fewer crimes per 10,000 people in sanctuary counties—a result that is highly statistically significant."[335]

Thus, multiple analyses indicate that alleged sanctuary jurisdictions are no less safe and likely safer than other jurisdictions. These findings are not surprising given the studies showing diminished cooperation with police among immigrants and family members when there is heightened fear deportation. As Professor Wong notes, "The data support arguments made by law enforcement executives that communities are safer when law enforcement agencies do not become

---

[334] Benjamin Gonzalez O'Brien, Loren Collingwood, and Stephen Omar El-Khatib, "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration" *Urban Affairs Review*, 55 (2019): 3-40.
[335] Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," *Center for American Progress*, 26 January 2017, https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.

entangled in federal immigration enforcement efforts."[336]  Therefore, such studies ultimately

contradict statements regarding an alleged public safety purpose and intention behind SB168

claimed by legislators, who have the resources to access the aforementioned research in advance of

proposing legislation, as well as other local public figures who advocate for SB168.

### C. Adoption of 287(g) Agreements Do Not Make Jurisdictions Safer.

As noted above from 2015 to 2018 three counties – Collier, Duval, and Lee – have provided

nearly all ICE referrals under 287(g) agreements. Chart 16 tracks changes in overall crime rates for

the average of these three counties compared to Florida overall. As indicated in Chart 16, from

2015 to 2018 crime declined much more steeply in Florida overall than in the three 287(g)

counties. As indicated in Chart 17, the same pattern of change applies to rates of violent crime as

well.

---

[336] Ibid.

**CHART 16**
**CRIME RATES 287(g) COUNTIES (COLLIER, LEE, DUVAL) COMPARED TO FLORIDA OVERALL, 2015-2018**



**CHART 17**
**VIOLENT CRIME RATES 287(g) COUNTIES (COLLIER, LEE, DUVAL) COMPARED TO FLORIDA OVERALL, 2015-2018**



Other studies show that cooperation with ICE may make a county less safe. A 2018 CATO study compared North Carolina counties with 287(g) memoranda of agreements to cooperate with federal immigration authorities with counties that did not have such agreements. "To test a proposed linkage between the 287(g) program and crime rates," the researchers used "a panel of yearly observations for the state of North Carolina, including index crime rates, demographic characteristics, and economic indicators." They found that "removals under 287(g) did not translate into lower crime rates for North Carolina counties. Given the prior justifications for 287(g)

programs as a means to assist law enforcement to reduce violent crime, no statistical change in violent crime rates associated with 287(g) removals suggests that this goal was not achieved." They also found no reduction in property crime associated with the 287(g) program, but did find "a *significant uptick* in the average number of assaults against officers with nearly 5 additional assaults in 287(g) counties."[337] (emphasis added)

### D.  Undocumented immigrants commit crime at lower rates than native-born Americans

Despite the public safety arguments advanced by advocates of SB 168, the evidence shows that both undocumented and documented immigrants commit crimes at lower rates than native-born Americans. A 2019 study by the libertarian CATO Institute used data from the U.S. Census American Community Survey to examine incarceration rates in the United States for 2017. CATO found "The incarceration rate for native-born Americans was 1,471 per 100,000; 756 per 100,000 for undocumented immigrants; and 364 per 100,000 for documented immigrants in 2017. This means that "illegal immigrants are *49 percent less likely* to be incarcerated than native-born Americans. Legal immigrants are 75 percent less likely to be incarcerated than natives. If native-born Americans were incarcerated at the same rate as illegal immigrants, about 943,000 fewer natives would be incarcerated."[338]

CATO further noted that the incarceration rate for undocumented immigrants is overstated because substantial numbers are incarcerated only for immigration offenses, which do not apply to

---

[337] Andrew Forrester and Alex Nowrasteh, CATO Institute, "Do Immigration Enforcement Programs Reduce Crime?," *CATO*, 22 April 2018, pp. 3,8-9, https://www.cato.org/sites/cato.org/files/pubs/pdf/working-paper-52-updated.pdf.
[338] Michelangelo Landgrave and Alex Nowrasteh ,CATO Institute, "Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin," 4 March 2019, https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-2017-their-numbers-demographics.

other groups. That is, they are in prison for being undocumented immigrants, not because they are criminals. "Removing the immigration offenders by subtracting the 13,000 convicted for immigration offenses and the 38,000 in ICE detention facilities on any given day lowers the illegal immigrant incarceration rate to 397 per 100,000," less than a third of the rate for native-born Americans and nearly equal (9 percent higher) to the rate for legal immigrants.[339]

CATO also conducted an in-depth study of criminal conviction rates in Texas using a unique data set from the "Texas Department of Public Safety (DPS) obtained through a Public Information Act (PIA) request." The results of this study tracked CATO's national findings that illegal immigrants were less crime prone than native-born Americans. CATO found that for 2015 in Texas, "there were 1,797 criminal convictions of natives for every 100,000 natives, 899 criminal convictions of illegal immigrants for every 100,000 illegal immigrants, and 611 criminal convictions of legal immigrants for every 100,000 legal immigrants. As a percentage of their respective populations, there were 50 percent fewer criminal convictions of illegal immigrants than of native-born Americans in Texas in 2015. The criminal conviction rate for legal immigrants was about 66 percent below the native-born rate."[340]

The Texas data also enabled CATO to examine homicide convictions, which was important because advocates for stringent immigrant enforcement rely on anecdotes of murders committed by illegal immigrants. CATO found that in 2015, "the homicide conviction rate for native-born Americans was 3.1 per 100,000, 2.6 per 100,000 for illegal immigrants, and 1 per 100,000 for legal

---

[339] Ibid.
[340] Alex Nowrasteh ,CATO Institute, "Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," 26 February 2018, https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant.

immigrants." Thus, "homicide conviction rates for illegal and legal immigrants were 16 percent and 67 percent below those of natives, respectively. Illegal immigrants made up about 6.4 percent of the Texas population in 2015 but only accounted for 5.9 percent of all homicide convictions."[341] Moreover, as noted above, fewer than 1 percent of ICE arrestees in Florida under 287(g) agreements had convictions for homicide, or sexual assault/rape, with convictions extended over a 20-year period, with most convictions extended back five years or more.

CATO also studied drunk driving deaths committed by illegal immigrants. This is important because advocates for SB 168 have cited the 2007 death of Brandon Michael by an undocumented immigrant drunk driver as justification for the bill. Brandon's parents spoke at the April 17, 2018 press conference with Senator Gruters, Representative Byrd, and other advocates for SB 168.

CATO studied the "raw data on traffic deaths from the NHTSA Fatality Analysis Reporting System (FARS) database for the 2010-2017 period." Then "to determine whether deaths were the result of alcohol impairment, we use data on drivers' blood alcohol concentrations (BACs) and whether the police reported alcohol involvement through FARS." In addition, "To test whether larger illegal immigrant population shares correlate with increased deaths in drunk driving accidents" CATO conducted a controlled statistical analysis.[342]

CATO concluded:

"For both the overall level of traffic deaths and alcohol-related deaths, we find a negative partial correlation with the state population share of illegal immigrants. Interestingly, we find that places with larger illegal immigrant shares are significantly associated with fewer per capita traffic deaths. However, this result falls out of significance after accounting for state trends. We find no significant evidence for a relationship between illegal immigrant population share and the alcohol-related drunk

---

[341] Ibid.
[342] Alex Nowrasteh and Andrew C. Forrester, "Do Illegal Immigrants Increase Drunk Driving Deaths," *CATO*, 18 October 19, 2019, https://www.cato.org/blog/do-illegal-immigrants-increase-drunk-driving-deaths.

driving death rate. Considering Hispanic noncitizens as a proxy for likely illegal immigrants yields similar results (Table 2). We continue to find no statistically significant association with an increased risk of death through alcohol-related crashes. Other recent studies validate the relatively low crime rate for undocumented immigrants."

The Institute noted that, "although our regressions results are correlative and not causal in nature, they suggest that illegal immigrants do not affect overall drunk driving deaths."[343]

A 2018 study in the journal *Criminology* examined an extensive database that "combine[s] newly developed estimates of the unauthorized population with multiple data sources to capture the criminal, socioeconomic, and demographic context of all 50 states and Washington, DC, from 1990 to 2014 to provide the first longitudinal analysis of the macro-level relationship between undocumented immigration and violence." The researchers used this database to conduct controlled statistical analyses of the relationship between the percentages of illegal immigrants in states and violent crime rates as well as rates separately for the categories of murder, robbery, assault and rape. They found that across "every model" of statistical control, "*increased concentrations of undocumented immigrants are associated with statistically significant decreases in violent crime.*" (emphasis added) The researchers further found that, "despite substantial differences in official reporting rates across these offenses, as undocumented immigration increased in recent decades, there was a significant, concomitant decrease in each measure of violent crime," including murder, rape, robbery, and assault.[344]

The researchers conclude: "Although ardent skeptics may remain unconvinced, the weight of the evidence presented here and in supporting work challenges claims that unauthorized

---

[343] Ibid.
[344] Michael T. Light and Ty Miller, "Does Undocumented Immigration Increase Violent Crime," *Criminology*, 76 (2018): 370-401.

immigration endangers the public. At a minimum, the results of our study call into question claims that undocumented immigration increases violent crime. If anything, the data suggest the opposite."[345]

An earlier study published in Social Science Research in 2017 noted that "the weight of evidence suggests the most recent wave of U.S. immigration has not increased crime, and may have actually helped reduce criminal violence." They write that their study "brings to bear the first longitudinal data set to test the relationship between immigration and racial/ethnic homicide in U.S. metropolitan areas between 1990 and 2010." They further note that "however, with recent shifts in immigrant settlement patterns away from traditional receiving destinations, a series of contemporary studies suggests a more complicated immigration-crime relationship, whereby Latino immigration is said to increase violence in newer immigrant destinations (but not in established destinations) and has varied effects for different racial/ethnic groups." They point out that "with few exceptions, these more recent studies rely on cross-sectional analyses, thus limiting their ability to examine the longitudinal nexus between Latino immigration and violent crime." Their study, in contrast, "brings to bear the first longitudinal data set to test the relationship between immigration and racial/ethnic homicide in U.S. metropolitan areas between 1990 and 2010." The researchers found that after introducing statistical controls, "results from bivariate longitudinal associations and multivariate fixed effects models are contrary to recent findings - Latino immigration is generally associated with decreases in homicide victimization for whites, blacks, and Hispanics in both

---

[345] Ibid., p. 396.

established and non-established immigrant destinations, though these associations are not significant in all cases."[346]

A study for *Governing* also examined the relationship between the percentage of unauthorized immigrants in metropolitan areas. Rather than looking at changes in crime the researchers examined average crime rates from 2013 to 2015. They ran three separate controlled statistical analyses that compared multiple regression analyses that unauthorized immigration with rates of violent crime, property crime, and murder. They found that for murder, "shares of unauthorized immigrants had a statistically significant relationship with slightly lower crime rates." In addition, "unauthorized immigrant populations were also correlated with lower property crime rates," at statistically significant levels. Finally, for murder they found a negative relationship that was not statistically significant, "suggesting that it's highly unlikely that unauthorized immigrants contribute to higher murder rates."[347]

Powerful evidence of the low crime rate for unauthorized immigrants and immigrants generally comes from data on the percentage of these groups among incarcerated inmates. For Florida, we do not have data on incarceration rates for undocumented immigrants, but the DOJ, Bureau of Justice Statistics has provided data on incarceration rates for non-citizens. As indicated in Chart 18, in Florida for 2017, non-citizens comprised 5.9 percent of state and federal prisoners, but 10.5 percent of the Florida adult population (18-years-old+), according to the U.S. Census Bureau, American Community Survey, 2014-2018 estimates. Thus, the total non-citizen population

[346] Michael T. Light, Re-examining the relationship between Latino immigration and racial/ethnic violence *Social Science Research*, 65 (2017): 222-239, quotes on 222.
[347] Michael Maciak, "Analysis: Undocumented Immigrants Not Linked With Higher Crime Rates," *Governing*, 2 May 2017, https://www.governing.com/gov-data/safety-justice/undocumented-immigrants-crime-effects-study html.

is 4.6 percentage points and 78 percent higher than the non-citizen incarcerated population. The difference is larger for men, who comprise nearly all the incarcerated population in Florida.

**CHART 18**
**PERCENT OF NON-CITIZENS IN FLORIDA STATE AND FEDERAL INCARCERATION COMPARED TO NON-CITIZEN IN THE FLORIDA ADULT (18-YEARS-OLD+) POPULATION**



Non-citizens comprised 5.7 percent of the male incarcerated non-citizen population compared to 10.9 of the male Florida adult population. Thus, the total non-citizen male population is 5 percentage points and 85 percent higher than the non-citizen incarcerated population.[348]

Another study that examined the relationship between undocumented immigration and "drug and alcohol problems: drug arrests, drug overdose fatalities, driving under the influence (DUI) arrests, and DUI deaths" found that no significant relationship exists.[349] This analysis is important because advocates for SB 168 prominently cited the case of a child killed by a drunk driver who was an undocumented immigrant (see above). The researchers relied on "combined newly developed state-level estimates of the undocumented population between 1990 and 2014 from the Center for Migration Studies with arrest data from the Federal Bureau of Investigation Uniform Crime Reports and fatality information from the Fatality Analysis Reporting System and the Centers for Disease Control and Prevention Underlying Cause of Death database."[350] They used the standard statistical technique of "fixed-effects regression models to examine the longitudinal association between increased undocumented immigration and drug problems and drunk driving."[351]

---

[348] Jennifer Brunson and E. Anne Carson, Bureau of Justice Statistics, Statisticians, "Prisoners in 2017," United States Department of Justice, Bureau of Justice Statistics, April 2019, pp. 7,18, https://www.bjs.gov/content/pub/pdf/p17.pdf. (Added hyperlink)

[349] Michael T. Light, Ty Miller, and Brian C. Kelly, Undocumented Immigration, Drug Problems, and Driving Under the Influence in the United States, 1990–2014, *American Journal of Public Health*, 9 (2017), available at https://pubmed ncbi nlm nih.gov/28727520/.

[350] Ibid.

[351] Michael T. Light, Ty Miller, and Brian C. Kelly, Undocumented Immigration, Drug Problems, and Driving Under the Influence in the United States, 1990–2014, *American Journal of Public Health*, 9 (2017), 1448–54, quotes on p. 1448.

The researchers found that "[i]ncreased undocumented immigration was significantly associated with reductions in drug arrests, drug overdose deaths, and DUI arrests, net of other factors. There was no significant relationship between increased undocumented immigration and DUI deaths." They concluded that, "[t]his study provides evidence that undocumented immigration has not increased the prevalence of drug or alcohol problems, but may be associated with reductions in these public health concerns."[352]

Thus, multiple studies for Florida and the nation, based on several different bases of data all demonstrate that undocumented immigrants and immigrants in general commit crimes at lower rates than U.S. born citizens despite the public safety narratives to the contrary. The reason is simple. Vulnerable undocumented immigrants and documented immigrants seeking naturalization have additional incentives to succeed in America and avoid engagement with law enforcement. According to Michael Tonry, the McKnight Presidential Professor of Criminal Law and Policy at the University of Minnesota Law School, "First-generation economic immigrants are self-selected risk takers who leave their homes, families, and languages to move to a new country to improve their and their children's lives. They have good reasons to work hard, defer gratifications, and stay out of trouble."[353]

As a collateral to their central argument about public safety, the legislative sponsors of SB 168 also claimed that they were just following the rule of law. In testifying before the House Civil Justice Subcommittee on March 12, 2019, Representative Byrd called the anti-sanctuary bill, "the

---

[352] Ibid.
[353] Michael Tonry, "Race, Ethnicity, Crime, and Immigration," in Sandra M. Bucerius and Michael Tonry, eds., *The Oxford Handbook of Ethnicity, Crime, and Immigration* (Oxford University Press, 2014), p. 2.

adherence to the rule of law act."[354] At the April 17, 2019 press conference on sanctuary jurisdictions Representative Byrd reiterated that "Florida is now going to respect the rule of law." Senator Gruters added that "this bill is about respecting the rule of law."[355]

However, this argument is circular. There is no federal "rule of law" requiring local law enforcement to cooperate with federal officials in the enforcement of immigration law. It was in recognition that in the absence of such a law, that President Trump sought to compel local jurisdictions to cooperate with ICE by threatening to withhold federal funds from alleged sanctuary jurisdictions.[356] Similarly, prior to SB 168 there was no "rule of law" in Florida compelling law enforcement to cooperate with federal officials on the enforcement of immigration law. If such a law had been on the books in Florida, then SB 168 would have been superfluous.

### E.  Proponents' of SB 168 Falsely Claimed the Law Would Impact Only Dangerous, Violent Criminals, Not Minor Offenders

As an adjunct to their public safety claim, key backers of SB 168 said that the bill was designed only to get dangerous, violent criminals off the streets of Florida. They insisted that it would not impact non-dangerous persons who might be arrested for minor offenses like traffic violations.

---

[354] Florida Channel, House Civil Justice Subcommittee, 12 March 2019, 28-29.
[355] Florida Channel, "Press Conference on HB 527, Sanctuary Cities, 17 April 2019, 1-2.
[356] Brett Samuels, "Trump: Government Will Start Withholding Funds From Sanctuary Cities After Court Ruling," *The Hill*, 5 March 2020, https://thehill.com/homenews/administration/486078-trump-government-will-start-withholding-funds-from-sanctuary-cities.

### 1.  Senator Joe Gruters

In his February 11, 2017 testimony before the Senate Judiciary Committee, Senator Gruters said that his bill was targeting only "bad people" to "make sure they are held accountable and can't go back into society." ICE is "not going to send out a detainer for someone who is jaywalking or a simple non-violent crime," he said. Immigration officials are not "after the minor traffic violator" like people who "drive without a license" or "with a broken taillight." It is after those who "have a violent record."[357]

Later, he told the Senate Committee on Infrastructure and Security that SB 168 "is intended for criminal illegal aliens," not law-abiding persons. "This is for protecting everyone," including "an illegal alien working hard to make ends meet, to put your kids through school."[358]

Then in April, before the Senate Rules Committee, Senator Gruters again insisted that ICE was "not after those minor traffic violators," but was looking for those who "have a violent type of activity in your background, gang activity."[359]

### 2.  Representative Cord Byrd

In his April 16, 2019 testimony before the House Judiciary Committee Representative Byrd said "this bill only applies to criminal aliens." If a person is arrested for a minor crime in Florida

---

[357] The Florida Channel, Senate Judiciary Committee, 11 February 2017, Video, 0.18-0.28; Jacob Ogles "Joe Gruters' 'Sanctuary Cities' Bill Tabled Amid Immigrant Outcry," *Florida Politics*, 11 February 2019, https://floridapolitics.com/archives/288043-joe-gruters-sanctuary-cities-bill-tabled-amid-immigrant-outcry.

[358] Jacob Ogles, "Joe Gruters' sanctuary cities ban advances on party line vote" *Florida Politics*, 12 March 2019, https://floridapolitics.com/archives/290787-joe-gruters-sanctuary-cities-ban-advances-senate-after-party-line-vote. (Added hyperlink)

[359] The Florida Channel, Video, Rules Committee Hearing, 17 April 2019, 0.6-0.8.

like driving without a valid license, "ICE will determine whether that person is a danger beyond what could be classified as a minor crime in Florida."[360]

### 3.   Pinellas County Sheriff Bob Gualtieri, the chief law enforcement advocate for SB 168.

Testifying at the House Subcommittee on Civil Justice hearing on March 20, 2019, he said, that SB 168 applied only to "people who are criminal illegals ... This has nothing to do with a person who is here illegally, has lived here for 15 years, has kids in school and has assimilated into the community. He added, that you "have to have committed a crime and be in jail. You have to be a criminal illegal."[361]

Despite these assurances that SB 168 would take only violent, dangerous criminals off the streets and not burden minor offenders, Senator Gruters admitted that it covered anyone arrested in Florida, regardless of the suspected crime. In Senate hearings, Democratic Senator Annette Taddeo noted the contradiction between the claims of bill supporters and the lack of any distinction among serious and minor offenders in the bill. Senator Taddeo then asked Senator Gruters whether "you would be willing to consider applying this bill to those who have committed felonies." He responded under his bill, if there is a detainer request from ICE "you will be detained no matter what your crime is." That includes persons arrested for such minor non-violent offenses like "speeding, driving with a broken taillight or driving without a license." As noted above, the

---

[360] Florida Channel, House Committee on the Judiciary, 16 April 2019, 2:22-2:24.
[361] Florida Channel, House Subcommittee on Civil Justice, 20 March 2019, 0.44-0.46.

majority Republicans in the legislature rejected the Democratic proposed amendment that would have limited SB 168 to felony arrests.

Undocumented immigrants in Florida face a Catch-22 when it comes to minor traffic violations that would subject them to ICE detainers. Under Florida law they cannot lawfully obtain a driver's license. However, driving without a valid license in Florida is a misdemeanor criminal offense under Florida statue 322.03.[362] An undocumented immigrant arrested for driving without a license is hardly a dangerous criminal. Yet, under SB 168, police can arrest persons driving without a license and ICE can issue a detainer against individuals with the cooperation of local law enforcement, bring the person into federal custody and begin the deportation process.

Senator Gruters sought to explain away this conundrum by saying that "If people don't have driver's licenses, my guess is to do your best to do public transportation." This response places a discriminatory burden on this group of Florida residents, including assimilated law-abiding persons, with long residence in Florida and children in schools. It also fails to consider that public transportation may not cover persons who drive to work, which includes nearly 90 percent of Hispanics and African American according to Table 5 in Section VII. It does not cover those who drive to get health care, child care, and education, or visit friends and family. A study of transportation and health found that "Transportation barriers lead to rescheduled or missed appointments, delayed care, and missed or delayed medication use. These consequences may lead to poorer management of chronic illness and thus poorer health outcomes …  Overall, the evidence

---

[362] Florida Statutes, 322.03, http://www.flsenate.gov/Laws/Statutes/2014/322.03.

supports that transportation barriers are an important barrier to healthcare access, particularly for those with lower incomes or the under/uninsured."[363]

It does not account for persons who may need vehicles to conduct their business as, for example, landscapers or home service workers. It does not consider the costs of abandoning persons' vehicles and switching to public transit. It also fails to consider that Florida has an inadequate system of public transportation. In September 2019, Wallet Hub compared 100 major cities on the adequacy of their public transportation according to 17 metrics. They found that no Florida city ranked in the top 50. Miami ranked 52nd, Orlando 56th, Jacksonville 61st, Hialeah, 78th, Tampa 98th, St Petersburg, 99th.[364] A study of public transit in South Florida, where non-whites are concentrated, by Florida International University found that "Under the current spatial pattern of population settlement and development in South Florida there is a wide disconnect between place of residence, workplace and existing transit stops/stations."[365] The Florida Heartland Rural Economic Development Initiative, Inc. concluded that he rural heartland region of Florida was burdened by "a lack of transportation options." [366]

"Florida isn't exactly a hotbed of public transportation." The fundamental problems with Florida public transportation, especially in places with low population density, have been described

---

[363] Samina T. Syed, Ben S. Gerber, and Lisa K. Sharp, "Traveling Towards Disease: Transportation Barriers to Health Care Access," *Journal of Community Health*, 38 (2013): 976-993, quote on 976.

[364] Andrew McCann, "Cities With the Best and the Worst Public Transportation," *Wallet Hub*, 10 September 2019, https://wallethub.com/edu/cities-with-the-best-worst-public-transportation/65028/.

[365] Howard A. Frank, et al., "The Transportation Landscape of South Florida," *Florida International University, Metropolitan Center*, 22 March 2017, p. 19, https://metropolitan fiu.edu/research/periodic-publications/the-transportation-landscape-of-south-florida-2017/transportation-sfl_final.pdf.

[366] National Association of Development Organizations, "Rural Planning for Everyone in Florida," 20 August 2013, https://www.nado.org/rural-mobility-planning-for-everyone/. The region includes the countries of DeSoto, Glades, Hardee, Hendry, Highlands and Okeechobee and the four communities of Belle Glade, South Bay, Pahokee.

as having "to do with convenience and quality: You can't get there from where you are, or you can't get there when you want to. It takes too long, and even if it doesn't, the typical city bus is a rolling stay-away message to anyone with the barest expectations of comfort or amenity."[367]

When questioned about the impact of the bill on minor offenders, Representative Byrd defended this unlimited reach of SB 168, with the convoluted claim that the bill would protect the state from an illegal alien had committed a serious crime in another jurisdiction, been deported, returned to the United States, entered Florida, and committed only a minor crime in Florida. He gave no examples of such a far-fetched set of circumstances, but signified that he would have SB 168 ensnare thousands of minor offenders to avoid missing this one hypothetical criminal in this implausible scenario where he might escape another deportation. Of course, if the criminal had reentered the U.S. before, he might do so again after another deportation, making Senator Byrd's improbable scenario be of no avail.

These assurances that ICE is only interested in individuals with "a violent type of activity in your background" or a "danger" beyond a "minor crime" is incorrect. As referenced in Section VII, for ICE arrests from 287(g) referrals in Florida, the model on which SB 168 is based, *73 percent* were of persons with no criminal conviction or with only a conviction for a minor Level 3 crime. Only 0.4 of arrests included persons with convictions for homicide or sexual assault/rape. This would include convictions extending back 20 years. The same pattern applied to nationwide ICE arrests from 287(g) referrals.

---

[367] Mark R. Howard, Yesterday's Solutions for Florida's Transportation Problems, *Florida Trend*, 27 February 2018, https://www.floridatrend.com/article/24004/yesterdays-solutions-for-floridas-transportation-problems.

Results for the final step of deportation closely match the arrest data. Nationally, for fiscal year 2018 through May, 71 percent of 230,982 removals were of persons with no criminal conviction or with only a conviction for a minor Level 3 crime. Only 20 percent were of persons with serious criminal convictions and only fewer than 2 percent were of persons convicted for homicide or sexual assault and rape.[368]

Moreover, the actual operation of SB 168 after its implementation on July1, 2019 predictably contradicts the assurances made by its backers. The data on post-SB 168 presented in Section VII indicates that for 227 post-SB 168 ICE detainers analyzed *none were for charges of murder or rape and only one was for sexual assault*. All charges for violent crimes combined accounted for *only 13.2 percent* of detainers. Detainers for traffic violations charges alone, most for driving without a valid license, *comprised 26.4 percent of detainer requests, double the percentage for all violent crimes*. Taken together, charges for all non-violent crimes amounted to *72.7 percent* of all detainers, more than five times the percentage of detainers for violent crimes. Again, it is important to note that these are charges only pursuant to an arrest; they do not necessarily represent convictions for the crimes charged.

Of course, the arrest and deportation of persons who have clean criminal records or only a record of minor offenses ripples into the family and the community as demonstrated by the studies previously cited. This ripple effect includes not only undocumented immigrants, but U.S. citizens and legal residents residing with undocumented immigrants or even persons in the same community or neighborhood.

---

[368] TRAC, University of Syracuse, "Latest Data: Immigration and Customs Enforcement Removals," https://trac.syr.edu/phptools/immigration/remove/.

## XI.    CONCLUSIONS

There was no crime crisis in Florida when the state legislature adopted SB 168 in mid-2019. Crime and violent crime had been declining steeply in Florida for decades, including at a time when the number of unauthorized immigrants in the state had increased nearly five-fold. In so-called sanctuary jurisdictions crime had recently fallen even more steeply than other jurisdictions in the state. Yet backers of SB 168 insisted in the words of Senator Gruters, as documented above, would achieve its "one thing and one thing only - public safety." Gruters and other supporters of the bill claimed that  SB 168 with laser dot precision targets only dangerous violent criminals, while sparing law-abiding persons or minor offenders. They claimed that by removing such predators from the streets of Florida, it would make the state much safer.

 If sponsors of SB 168 and their allies had presented compelling evidence and studies to prove these claims, they would have a basis for insisting that the bill was really about public safety and not designed intentionally to discriminate against the non-white Democratic voter base and inspire the GOP's resolutely anti-immigrant voters. However, advocates for SB 168 presented no evidence or analyses, and scrutiny of their claims show they are wholly without merit. The readily available evidence from ICE arrests in the state, including under the cooperative arrangements mandated by SB 168 is not targeted to dangerous predators and will not make Floridians safer. Rather, the evidence shows that the bill would discriminatorily target suspected removable immigrants from South and Central America and the Caribbean, primarily with clean criminal records or convictions only for minor crime. Experience with ICE detainers after the adoption of SB 168 confirms these evidence- based expectations.

The purported claims for adopting SB 168 were clearly false, misleading and pretextual, and designed to cover a discriminatory intent that fits within an ongoing pattern in Florida of discrimination against minorities in voting, education, housing, and law enforcement. Under questioning in hearings, Republican sponsors admitted that SB 168 covered without distinction any suspected undocumented immigrant arrested in Florida, whether for driving without a license or for homicide, directly contradicting statements alleging no intent to target minor offenders. It sweeps under its aegis, persons with clean criminal records anywhere in America for 20 years and persons convicted only of a minor crime. If Republicans in the State Legislature had been sincere about targeting only violent, dangerous criminals they would not have rejected an amendment to limit the application of SB 168 only to felons – an even broader category than violent criminals. Representative Byrd's justification was to posit the highly improbable scenario that the amendment might cause Florida to miss the undocumented immigrant who committed a serious violent crime in another jurisdiction, was deported, entered the U.S. again, went to Florida, and committed only a minor crime there. He did not cite an example of a single person in the state of Florida who fit this extraordinary set of circumstances.

Backers of SB168 paid no heed to data from ICE arrests in Florida under the 287(g) agreements that SB 168 is modelled on. This data demonstrates that ICE arrests from 287(g) referrals in the state, were predominantly of persons with no criminal convictions or convictions only for a minor crime. Only 0.4 percent of arrestees had been convicted of homicide or sexual assault/rape and more than 70 percent were arrestees with no convictions of only Level 3 minor crime. The data showed that ICE's flawed verification system will also ensnare U.S. citizens, because of commonplace errors that may not be properly or promptly corrected. With SB 168

imposing a duty on local officials for "best efforts" at compliance and with potentially severe penalties for failure, there will be heightened pressure on police to enforce the law as widely and strictly as possible, in accord with the "threat narrative" associated with non-white suspected unauthorized immigrants. The data on post-SB 168 ICE detainers confirms this expectation with most such detainers issued for minor crimes, including far more for traffic violations – mostly for driving without a valid license – that for violent crime.

Lawmakers who routinely criticize the incompetence and inefficiency of large government bureaucracies should not be surprised by ICE's failings. As one Democratic critic quipped, he was surprised to see Republicans so enthusiastically embracing a big government program.

Proponents of SB 168 also produced no evidence to show that the legislation would make Florida safer. Analysis further demonstrates that the alleged sanctuary jurisdictions in Florida that do not automatically join in immigration enforcement are as safe or safer than other jurisdictions. Analysis further demonstrates that adoption of cooperative agreements with ICE do not make jurisdictions safer, and that immigrants, both documented and undocumented, commit crimes at lower levels than native born-Americans. Rather than being evidence-based, the clearly misleading justifications for SB 168 are part of a well-worn "threat narrative" against non-white immigrants, who allegedly prey upon innocent citizens, weaken the economy, and jeopardize the culture, values, and racial heritage of traditional America. The bottom line is that while failing to advance public safety SB 168, will result in disparate harm to the overwhelmingly non-white – and heavily Hispanic -- immigrants in Florida, their families, and their communities.

This discriminatory effect of SB 168 follows a pattern established by Florida's ongoing history of discriminating against minorities. At one time, Democrats had perpetrated racial discrimination, but in recent years the initiative switched to Republicans, who like Democrats of past years, depend upon a white voter base.

The racial intent behind SB 168 is also documented by the sequence of events showing the deep involvement of racialist and nativist organizations – appropriately designated as hate groups -- that perpetrated an inflammatory threat narrative against immigrants. These groups – FAIR and FLIMEN – provided an initial impetus for anti-sanctuary legislation in Florida as early as 2016 and in 2019 became inside players in the formulation and adoption of SB 168, with the full knowledge and cooperation of Republican decision-makers in the State Legislature. FLIMEN co-sponsored a press event with Gruters and Byrd that depicted undocumented immigrants as dangerous killers. These groups were closely aligned with SB 168's sponsors, who they knew were most supportive of their anti-immigrant agendas.

The Republican majority in the Florida legislature rejected all amendments designed to ameliorate the discriminatory impact of SB 168, not just the amendment to limit the law's coverage to felons. They rejected amendments to enforce the provision against racial profiling, to require a warrant from a judge or a magistrate for detention, and to impose an affirmative duty to inquire whether persons are victims of crime or witnesses and exempt them from the act.  The majority rejected amendments that would provide for a review of the law, provide mandatory counselling for children of detained persons, and exempt persons in the process of applying for refugee status victims of human trafficking, and members of the armed forces and their families. They also rejected amendments to exempt recipients of Temporary Protected Status or Deferred Action for

Childhood Arrivals. The majority rejected amendments to exempt firefighters and emergency medical technicians and to keep SB 168 from covering educational institutions.

Considerable evidence and analysis thus leads to the conclusion that SB 168 was adopted by the Florida State Legislature with the intent to discriminate against minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage, regardless of their possession of documentation. The intent is consistent with a historical and ongoing pattern of discrimination against minorities in Florida. SB 168 has a clear and readily foreseeable discriminatory impact. The bill was adopted in the context of falling white citizen voting age population and rising minority citizen voting age population coeval with the decline of Hispanic voting for Republicans and the party's increasing dependence on white voters, with anti-immigrant views. Key decision-makers readily embraced the advice and collaboration of anti-immigrant hate groups who were intimately involved in the process for crafting, promoting and adopting SB 168. The justifications for enactment of the bill by its central proponents are not just unsupported but are contradicted by the overwhelming weight of available evidence. The majority in the state legislature had the resources to do the research to check the validity of their claims but failed to do so.

In sum, SB 168 is an intentional, discriminatory measure that disproportionately burdens the Democratic minority voter base in Florida and appeals to the anti-immigrant base of the Republican Party. Republicans in the state legislature, enacted this law, as demonstrated by multiple sources of evidence, not in spite of race, but precisely because of race.

Declaration of Allan J. Lichtman

Dated:

_____
Allan J. Lichtman

## APPENDIX A: FLIMEN MODEL BILL DECEMBER 2016

**SECTION 1. TITLE.**

This Act shall be known as the "Secure our Streets" or "SOS" Act.

**SECTION 2. DEFINITIONS.**

For the purposes of this Act, the following definitions shall apply:

(a) "Department of Homeland Security" means the United States Department of Homeland Security and any of its agencies, including the United States Immigration and Customs Enforcement and the United States Border Patrol, and any successor department or agency. The term includes officials, representatives, agents, and employees.

(b) "Immigration detainer" means a written request issued on behalf of the United States Department of Homeland Security to another federal, state, or local law enforcement agency to provide notice of release and to detain an individual based on an inquiry into immigration status or an alleged violation of a civil immigration law, including detainers issued pursuant to 8 C.F.R. 287.7, 8 C.F.R. 236.1, or on the Department of Homeland Security Form I-247N "Request for Voluntary Notification of Release of Suspected Priority Alien", Form I-247D "Immigration Detainer – Request for Voluntary Action", or pursuant to any successor form or regulation.

(c) "Inmate" means any individual in the custody of a law enforcement agency.

(d) "Law enforcement agency" means an agency in the state or a political subdivision thereof charged with enforcement of state, county, municipal, or federal laws, or with managing custody of detained persons in the state, and includes but is not limited to county and other municipal police departments, sheriffs' departments, state police, campus police, and the Florida Department of Law Enforcement. The term includes officials, representatives, agents, and employees.

(e) "Local entity" means any city, county, municipality, town or other political subdivision of this state, including law enforcement agencies. The term includes officials, representatives, agents, and employees.

219

(f) "State entity" means any agency, bureau, commission, council, department, or other office established under the laws of the state, including law enforcement agencies. The term includes officials, representatives, agents, and employees.

## SECTION 3. PROHIBITION OF SANCTUARY POLICIES.

(a) No state or local entity may prohibit, or in any way restrict, any state or local entity from sending to, or receiving from, the Department of Homeland Security, information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) No state or local entity may prohibit, or in any way restrict, any state or local entity taking any of the following actions with respect to information regarding immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Department of Homeland Security;

(2) Maintaining such information;

(3) Exchanging such information with any other federal, state, or local entity;

(4) Determining eligibility for any public benefit, service, or license provided by federal law or a law of this state or its political subdivisions;

(5) Verifying a claim of residence or domicile if a determination of residence or domicile is required under federal law or a law of this state or its political subdivisions or under a judicial order issued pursuant to a civil or criminal proceeding in this state; or

(6) Confirming the identity of a person who is detained by a law enforcement agency.

(c) All state and local entities shall fully comply with and, to the full extent permitted by law, support the enforcement of federal immigration law.

(d) No state or local entity may limit or restrict the enforcement of federal immigration law, including, but not limited to, limiting or restricting a state or local entity from complying with an immigration detainer, limiting or restricting a state or local entity from providing a federal immigration official access to an inmate for an interview, limiting or restricting a state or local entity from initiating an immigration status investigation, or limiting or restricting a

220

state or local entity from providing a federal immigration official with the incarceration status or release date of an inmate in custody of a state or local entity.

(e) Notwithstanding any other law or policy, a law enforcement agency may securely transport an alien whom the agency has received verification from the Department of Homeland Security is unlawfully present in the United States and who is in the law enforcement agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency. A law enforcement agency shall obtain judicial authorization before securely transporting an alien who is unlawfully present in the United States to a point of transfer that is outside of this state.

## SECTION 4. COMPLAINT PROCESS; PENALTIES.

(a) The attorney general shall receive complaints regarding any violation of Section 3. Such complaints may be submitted by any resident of this state, and shall be submitted in writing in such form and manner as prescribed by the attorney general. In lieu of submitting a complaint, any member of the state legislature may request, at any time, that the attorney general investigate and issue an opinion as to whether a state or local entity has violated Section 3.

(b) Upon receiving a complaint or request, the attorney general shall investigate and determine whether a violation of Section 3 has occurred. The attorney general shall issue and make public an opinion stating whether the state or local entity, which is the subject of the complaint or request, has enacted or adopted a policy, law, regulation, or other written or unwritten directive in violation of Section 3. Upon the issuance of such an opinion by the attorney general that a state or local entity has violated Section 3, the entity shall become ineligible to receive any moneys that would otherwise be remitted to it by a state agency. Such ineligibility shall commence on the date such opinion is issued, and shall continue until such time that as the attorney general certifies that such policy, law, regulation or other written or unwritten directive is repealed or is no longer in effect.

(c) The attorney general shall send to the state or local entity that was the subject of the investigation and to the state treasurer a copy of any opinion issued pursuant to this section and any certification by the attorney general that a violation of Section 3 is no longer in effect.

## SECTION 5. CAUSE OF ACTION TO ENJOIN SANCTUARY POLICY.

(a) In the event the attorney general fails to investigate a complaint pursuant to section 4, any resident of the state may bring an action in a county court to challenge a suspected violation

of Section 3.  The court shall expedite any action under this section, including assigning the hearing at the earliest practicable date.

(b) If there is a judicial finding that a state or local entity has violated Section 3, the court shall enjoin such policy or practice.

(c) The court may award court costs and reasonable attorney fees to the prevailing party in a proceeding brought pursuant to this section.

## SECTION 6. CAUSE OF ACTION FOR PERSONAL INJURY OR WRONGFUL DEATH ATTRIBUTED TO A SANCTUARY POLICY.

A person injured by the tortious acts or omissions of an alien unlawfully present in the United States, or the personal representative of a person killed by the tortious acts or omissions of an alien unlawfully present in the United States, has a cause of action for damages against a state or local entity if the entity was in violation of Section 3 at the time such tortious act or omission occurred.

## SECTION 7. DUTY TO REPORT.

Every person holding public office or having official duties as a representative, agent, or employee of the state or a local entity shall have a duty to report a violation of Section 3 of this act. Persons reporting under this Section shall be protected under Florida's "Whistle-blower's Act."

## SECTION 8. IMPLEMENTATION; SEVERABILITY.

(a) This Act shall be effective upon enactment and implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons, and respecting the privileges and immunities of United States citizens.

(b) In complying with the requirements of this Act, a law enforcement officer may not consider an individual's race, color, or national origin, except to the extent permitted by the United States or Florida constitutions.

(c) If any part or provision of this Act is in conflict or inconsistent with applicable provisions of federal law, or otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part or provision shall be suspended and superseded by such applicable laws or regulations, and the remainder of this Act shall not be affected thereby.

**APPENDIX B: SENATOR JOE GRUTERS FILED BILL, SB 168, 21 FEBRUARY 2019**

**Florida Senate - 2019 CS for SB 168 By** the Committee on Judiciary; and Senators Gruters and Bean.

A bill to be entitled

An act relating to federal immigration enforcement; creating chapter 908, F.S., relating to federal immigration enforcement; providing legislative findings and intent; providing definitions; prohibiting sanctuary policies; requiring state entities, local governmental entities, and law enforcement agencies to use best efforts to support  the enforcement of federal immigration law; prohibiting restrictions by the entities and agencies on taking certain actions with respect to information regarding a person's immigration status; providing requirements concerning certain criminal defendants subject to immigration detainers or otherwise subject to transfer to federal custody; authorizing a law enforcement agency to transport an alien unlawfully present in the United States under certain circumstances; providing an exception to reporting requirements for crime victims or witnesses; requiring recordkeeping relating to crime victim and witness cooperation in certain investigations; specifying duties concerning immigration detainers; requiring county correctional facilities to enter agreements for payments for complying with immigration detainers; providing for injunctive relief; providing for  applicability to certain education records; prohibiting discrimination on specified grounds; providing for implementation; requiring repeal of existing sanctuary policies within a specified period; providing effective dates.

Be It Enacted by the Legislature of the State of Florida:

Section 1. Chapter 908, Florida Statutes, consisting of sections 908.101-908.109, is created to read:

908.101 Legislative findings and intent.—The Legislature finds that it is an important state interest to cooperate and assist the federal government in the enforcement of federal immigration laws within this state.

908.102 Definitions.—As used in this chapter, the term:

(1)"Federal immigration agency" means the United States Department of Justice and the United States Department of Homeland Security, a division within such an agency, including United States Immigration and Customs Enforcement and United States Customs and Border Protection, any successor agency, and any other federal agency charged with the enforcement of immigration law. The term includes an official or employee of such an agency.

(2) "Immigration detainer" means a facially sufficient written or electronic request issued by a federal immigration agency using that agency's official form to request that another law enforcement agency detain a person based on probable cause to believe that the person to be detained is a removable alien under federal immigration law, including detainers issued pursuant to

8 U.S.C. ss. 1226 and 1357 along with a warrant described in paragraph (c). For purposes of this subsection, an immigration detainer is deemed facially sufficient if:

(a) The federal immigration agency's official form IS complete and indicates on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law; or

(b) The federal immigration agency's official form is incomplete and fails to indicate on its face that the federal immigration official has probable cause to believe that the person to be detained is a removable alien under federal immigration law, but is supported by an affidavit, order, or other official documentation that indicates that the federal immigration agency has probable cause to believe that the person to be detained is a removable alien under federal immigration law; and
(c) The federal immigration agency supplies with its detention request a Form I-200 Warrant for Arrest of Alien or a Form I-205 Warrant of Removal/Deportation or a successor warrant or other warrant authorized by federal law.

(3) "Inmate" means a person in the custody of a law 75 enforcement agency.

(4) "Law enforcement agency" means an agency in this state charged with enforcement of state, county, municipal, or federal laws or with managing custody of detained persons in the state and includes municipal police departments, sheriff's offices, state police departments, state university and college police departments, county correctional agencies, and the Department of Corrections. The term includes an official or employee of such an agency.

(5) "Local governmental entity" means any county, municipality, or other political subdivision of this state. The term includes a person holding public office or having official duties as a representative, agent, or employee of the entity.

(6) "Sanctuary policy" means a law, policy, practice, procedure, or custom adopted or permitted by a state entity, local governmental entity, or law enforcement agency which contravenes 8 U.S.C. s. 1373(a) or (b) or which knowingly prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency with respect to federal immigration enforcement, including, but not limited to, limiting a law enforcement agency in, or prohibiting such agency from:

(a) Complying with an immigration detainer;

(b) Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;

(c) Providing a federal immigration agency access to an inmate for interview;

224

(d) Participating in any program or agreement authorized under section 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or

(e) Providing a federal immigration agency with an inmate's incarceration status or release date. (7) "State entity" means the state or any office, board, bureau, commission, department, branch, division, or institution thereof, including institutions within the State University System and the Florida College System. The term includes a person holding public office or having official duties as a representative, agent, or employee of the entity.

908.103 Sanctuary policies prohibited.—A state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy.

908.104 Cooperation with federal immigration authorities.—

(1) A law enforcement agency shall use best efforts to support the enforcement of federal immigration law. This subsection applies to an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment.

(2) Except as otherwise expressly prohibited by federal law, a state entity, local governmental entity, or law enforcement agency may not prohibit or in any way restrict a law enforcement agency from taking any of the following actions with respect to information regarding a person's immigration status:

(a) Sending the information to or requesting, receiving, or reviewing the information from a federal immigration agency for purposes of this chapter.

(b) Recording and maintaining the information for purposes of this chapter.

(c) Exchanging the information with a federal immigration agency or another state entity, local governmental entity, or law enforcement agency for purposes of this chapter.

(d) Using the information to comply with an immigration detainer.

(e) Using the information to confirm the identity of a person who is detained by a law enforcement agency.

(3)(a) For purposes of this subsection the term "applicable criminal case" means a criminal case in which:

1. The judgment requires the defendant to be confined in a 144 secure correctional facility; and

2. The judge:

225

a. Indicates in the record under s. 908.105 that the defendant is subject to an immigration detainer; or

b. Otherwise indicates in the record that the defendant is subject to a transfer into federal custody.

(b) In an applicable criminal case, when the judge sentences a defendant who is the subject of an immigration detainer to confinement, the judge shall issue an order requiring the secure correctional facility in which the defendant is to be confined to reduce the defendant's sentence by a period of not more than 7 days on the facility's determination that the reduction in sentence will facilitate the seamless transfer of the defendant into federal custody. For purposes of this paragraph, the term "secure correctional facility" means a state correctional institution as defined in s. 944.02 or a county detention facility or a municipal detention facility as defined in s. 951.23.

(c) If the information specified in sub-subparagraph a)2.a. or sub-subparagraph (a)2.b. is not available at the time the sentence is pronounced in the case, but is received by a law enforcement agency afterwards, the law enforcement agency shall notify the judge who shall issue the order described by paragraph (b) as soon as the information becomes available.

(4) When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. However, the law enforcement agency may transport a person who is subject to an immigration detainer and is confined in a secure correctional facility only upon authorization by a court order unless the transportation will occur within the 7 day period under subsection (3). A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

(5) This section does not require a state entity, local governmental entity, or law enforcement agency to provide a federal immigration agency with information related to a victim of or a witness to a criminal offense if the victim or witness timely and in good faith responds to the entity's or agency's request for information and cooperation in the investigation or 188 prosecution of the offense.
(6) A state entity, local governmental entity, or law enforcement agency that, pursuant to subsection (5), withholds information regarding the immigration information of a victim of or witness to a criminal offense shall document the victim's or witness's cooperation in the entity's or agency's investigative records related to the offense and shall retain the records for at least 10 years for the purpose of audit, verification, or inspection by the Auditor General.

908.105 Duties related to immigration detainers.—

(1) A law enforcement agency that has custody of a person subject to an immigration detainer issued by a federal immigration agency shall:

(a) Provide to the judge authorized to grant or deny the person's release on bail under chapter 903 notice that the person is subject to an immigration detainer.

(b) Record in the person's case file that the person is subject to an immigration detainer.

(c) Upon determining that the immigration detainer is in accordance with s. 908.102(2), comply with the requests made in the immigration detainer.

(2) A law enforcement agency is not required to perform a duty imposed by paragraph (1)(a) or paragraph (1)(b) with respect to a person who is transferred to the custody of the agency by another law enforcement agency if the transferring agency performed that duty before the transfer.

(3) A judge who receives notice that a person is subject to an immigration detainer shall cause the fact to be recorded in the court record, regardless of whether the notice is received before or after a judgment in the case.

908.106 Reimbursement of costs.—Each county correctional facility shall enter into an agreement or agreements with a federal immigration agency for temporarily housing persons who are the subject of immigration detainers and for the payment of the costs of housing and detaining those persons. A compliant agreement may include any contract between a correctional facility and a federal immigration agency for housing or detaining persons subject to immigration detainers, such as basic ordering agreements in effect on or after July 1, 2019, agreements authorized by section 287 of the Immigration and 228 Nationality Act, 8 U.S.C. s. 1357, or successor agreements and other similar agreements authorized by federal law.
908.107 Enforcement.—

(1) The Attorney General may institute a civil action against any state entity, local government entity, or law enforcement agency for a violation of this chapter or to prevent a violation of this chapter. An action for relief may include an action for an injunction or any other appropriate orders or relief. Upon adjudication by the court or as provided in a consent decree declaring that a state entity, local governmental entity, or law enforcement agency has violated this chapter, the court shall enjoin the unlawful sanctuary policy. The court has continuing jurisdiction over the parties and subject matter and may enforce its orders with the initiation of contempt proceedings as provided by law.

(2) An order approving a consent decree or granting an injunction must include written findings of fact that describe with specificity the existence and nature of the sanctuary policy that is in violation of s. 908.103.

908.108 Education records.—This chapter does not apply to the release of information contained in education records of an educational agency or institution, except in conformity with the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. s. 1232g.

908.109 Discrimination prohibited.—A state entity, a local governmental entity, or a law enforcement agency, or a person  employed by or otherwise under the direction or control of the entity or agency, may not base its actions under this chapter on  the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution.

Section 2. A sanctuary policy, as defined in s. 908.102, 260 Florida Statutes, that is in effect on the effective date of this act violates the public policy of this state and must be repealed within 90 days after that date.

Section 3. Section 908.107, Florida Statutes, as created by this act, shall take effect October 1, 2019, and, except as otherwise expressly provided in this act, this act shall take effect July 1, 2019.

## APPENDIX C: HOUSE BILL 9, 2018

HB 9                                                                                      2018

```
 1                      A bill to be entitled
 2           An act relating to federal immigration enforcement;
 3           providing a short title; creating chapter 908, F.S.,
 4           relating to federal immigration enforcement; providing
 5           legislative findings and intent; providing
 6           definitions; prohibiting sanctuary policies; requiring
 7           state entities, local governmental entities, and law
 8           enforcement agencies to comply with and support the
 9           enforcement of federal immigration law; specifying
10           duties concerning certain arrested persons; specifying
11           duties concerning immigration detainers; prohibiting
12           restrictions by such entities and agencies on taking
13           certain actions with respect to information regarding
14           a person's immigration status; providing requirements
15           concerning certain criminal defendants subject to
16           immigration detainers or otherwise subject to transfer
17           to federal custody; authorizing a law enforcement
18           agency to transport an unauthorized alien under
19           certain circumstances; providing an exception to
20           reporting requirements for crime victims or witnesses;
21           requiring recordkeeping relating to crime victim and
22           witness cooperation in certain investigations;
23           authorizing a board of county commissioners to adopt
24           an ordinance to recover costs for complying with an
25           immigration detainer; authorizing local governmental
```

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

F  L  O  R  I  D  A     H  O  U  S  E     O  F     R  E  P  R  E  S  E  N  T  A  T  I  V  E  S

HB 9                                                                              2018

```
26        entities and law enforcement agencies to petition the
27        Federal Government for reimbursement of certain costs;
28        requiring report of violations; providing penalties
29        for failure to report a violation; providing whistle-
30        blower protections for persons who report violations;
31        requiring the Attorney General to prescribe the format
32        for submitting complaints; providing requirements for
33        entities to comply with document requests from state
34        attorneys concerning violations; providing for
35        investigation of possible violations; providing for
36        injunctive relief and civil penalties; requiring
37        written findings; prohibiting the expenditure of
38        public funds for specified purposes; providing a cause
39        of action for personal injury or wrongful death
40        attributed to a sanctuary policy; providing that a
41        trial by jury is a matter of right; requiring written
42        findings; providing for applicability to certain
43        education records; prohibiting discrimination on
44        specified grounds; providing for implementation;
45        requiring repeal of existing sanctuary policies within
46        a specified period; providing effective dates.
47
48   Be It Enacted by the Legislature of the State of Florida:
49
50        Section 1.   Short title.—This act may be cited as the "Rule
```

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB 9                                                                          2018

51    of Law Adherence Act."

52          Section 2.  Chapter 908, Florida Statutes, consisting of

53    sections 908.101-908.402, is created to read:

54                              CHAPTER 908

55                   FEDERAL IMMIGRATION ENFORCEMENT

56                               PART I

57                     FINDINGS AND DEFINITIONS

58          908.101  Legislative findings and intent.—The Legislature

59    finds that it is an important state interest that state

60    entities, local governmental entities, and their officials owe

61    an affirmative duty to all citizens and other persons lawfully

62    present in the United States to assist the Federal Government

63    with enforcement of federal immigration laws within this state,

64    including complying with federal immigration detainers. The

65    Legislature further finds that it is an important state interest

66    that, in the interest of public safety and adherence to federal

67    law, this state support federal immigration enforcement efforts

68    and ensure that such efforts are not impeded or thwarted by

69    state or local laws, policies, practices, procedures, or

70    customs. State entities, local governmental entities, and their

71    officials who encourage persons unlawfully present in the United

72    States to locate within this state or who shield such persons

73    from personal responsibility for their unlawful actions breach

74    this duty and should be held accountable.

75          908.102  Definitions.—As used in this chapter, the term:

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB 9                                                                            2018

76      (1)   "Federal immigration agency" means the United States
77   Department of Justice, the United States Department of Homeland
78   Security, or any successor agency and any division of such
79   agency, including United States Immigration and Customs
80   Enforcement, United States Customs and Border Protection, or any
81   other federal agency charged with the enforcement of immigration
82   law. The term includes an official or employee of such agency.
83      (2)   "Immigration detainer" means a facially sufficient
84   written or electronic request issued by a federal immigration
85   agency using that agency's official form to request that another
86   law enforcement agency detain a person based on probable cause
87   to believe that the person to be detained is a removable alien
88   under federal immigration law, including detainers issued
89   pursuant to 8 U.S.C. ss. 1226 and 1357. For purposes of this
90   subsection, an immigration detainer is deemed facially
91   sufficient if:
92      (a)   The federal immigration agency's official form is
93   complete and indicates on its face that the federal immigration
94   official has probable cause to believe that the person to be
95   detained is a removable alien under federal immigration law; or
96      (b)   The federal immigration agency's official form is
97   incomplete and fails to indicate on its face that the federal
98   immigration official has probable cause to believe that the
99   person to be detained is a removable alien under federal
100  immigration law, but is supported by an affidavit, order, or

Page 4 of 21

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb0009-00

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB 9                                                                        2018

101   other official documentation that indicates that the federal
102   immigration agency has probable cause to believe that the person
103   to be detained is a removable alien under federal immigration
104   law.
105        (3)  "Inmate" means a person in the custody of a law
106   enforcement agency.
107        (4)  "Law enforcement agency" means an agency in this state
108   charged with enforcement of state, county, municipal, or federal
109   laws or with managing custody of detained persons in the state
110   and includes municipal police departments, sheriff's offices,
111   state police departments, state university and college police
112   departments, and the Department of Corrections. The term
113   includes an official or employee of such agency.
114        (5)  "Local governmental entity" means any county,
115   municipality, or other political subdivision of this state. The
116   term includes a person holding public office or having official
117   duties as a representative, agent, or employee of such entity.
118        (6)  "Sanctuary policy" means a law, policy, practice,
119   procedure, or custom adopted or permitted by a state entity,
120   local governmental entity, or law enforcement agency which
121   contravenes 8 U.S.C. s. 1373(a) or (b), or which knowingly
122   prohibits or impedes a law enforcement agency from communicating
123   or cooperating with a federal immigration agency with respect to
124   federal immigration enforcement, including, but not limited to,
125   limiting or preventing a state entity, local governmental

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                 2018

```
126   entity, or law enforcement agency from:
127         (a)   Complying with an immigration detainer;
128         (b)   Complying with a request from a federal immigration
129   agency to notify the agency before the release of an inmate or
130   detainee in the custody of the state entity, local governmental
131   entity, or law enforcement agency;
132         (c)   Providing a federal immigration agency access to an
133   inmate for interview;
134         (d)   Initiating an immigration status investigation; or
135         (e)   Providing a federal immigration agency with an
136   inmate's incarceration status or release date.
137         (7)   "Sanctuary policymaker" means a state or local elected
138   official, or an appointed official of a local governmental
139   entity governing body, who has voted for, allowed to be
140   implemented, or voted against repeal or prohibition of a
141   sanctuary policy.
142         (8)   "State entity" means the state or any office, board,
143   bureau, commission, department, branch, division, or institution
144   thereof, including institutions within the State University
145   System and the Florida College System. The term includes a
146   person holding public office or having official duties as a
147   representative, agent, or employee of such entity.
148                               PART II
149                                DUTIES
150         908.201   Sanctuary policies prohibited.—A state entity, law
```

Page 6 of 21

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

HB 9                                                                                              2018

151    enforcement agency, or local governmental entity may not adopt
152    or have in effect a sanctuary policy.
153         908.202  Cooperation with federal immigration authorities.—
154         (1)  A state entity, local governmental entity, or law
155    enforcement agency shall fully comply with and, to the full
156    extent permitted by law, support the enforcement of federal
157    immigration law. This subsection is only applicable to an
158    official, representative, agent, or employee of such entity or
159    agency when he or she is acting within the scope of his or her
160    official duties or within the scope of his or her employment.
161         (2)  Except as otherwise expressly prohibited by federal
162    law, a state entity, local governmental entity, or law
163    enforcement agency may not prohibit or in any way restrict
164    another state entity, local governmental entity, or law
165    enforcement agency from taking any of the following actions with
166    respect to information regarding a person's immigration status:
167         (a)  Sending such information to or requesting, receiving,
168    or reviewing such information from a federal immigration agency
169    for purposes of this chapter.
170         (b)  Recording and maintaining such information for
171    purposes of this chapter.
172         (c)  Exchanging such information with a federal immigration
173    agency or another state entity, local governmental entity, or
174    law enforcement agency for purposes of this chapter.
175         (d)  Using such information to determine eligibility for a

Page 7 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

176  public benefit, service, or license pursuant to federal or state
177  law or an ordinance or regulation of a local governmental
178  entity.
179      (e)  Using such information to verify a claim of residence
180  or domicile if a determination of residence or domicile is
181  required under federal or state law, an ordinance or regulation
182  of a local governmental entity, or a judicial order issued
183  pursuant to a civil or criminal proceeding in this state.
184      (f)  Using such information to comply with an immigration
185  detainer.
186      (g)  Using such information to confirm the identity of a
187  person who is detained by a law enforcement agency.
188      (3)(a)  This subsection only applies in a criminal case in
189  which:
190      1.  The judgment requires the defendant to be confined in a
191  secure correctional facility; and
192      2.  The judge:
193      a.  Indicates in the record under s. 908.204 that the
194  defendant is subject to an immigration detainer; or
195      b.  Otherwise indicates in the record that the defendant is
196  subject to a transfer into federal custody.
197      (b)  In a criminal case described by paragraph (a), the
198  judge shall, at the time of pronouncement of a sentence of
199  confinement, issue an order requiring the secure correctional
200  facility in which the defendant is to be confined to reduce the

Page 8 of 21

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

HB 9                                                                            2018

201  defendant's sentence by a period of not more than 7 days on the
202  facility's determination that the reduction in sentence will
203  facilitate the seamless transfer of the defendant into federal
204  custody. For purposes of this paragraph, the term "secure
205  correctional facility" means a state correctional institution,
206  as defined in s. 944.02, or a county detention facility or a
207  municipal detention facility, as defined in s. 951.23.
208         (c)  If the applicable information described by
209  subparagraph (a)2. is not available at the time the sentence is
210  pronounced in the case, the judge shall issue the order
211  described by paragraph (b) as soon as the information becomes
212  available.
213         (4)  Notwithstanding any other provision of law, if a law
214  enforcement agency has received verification from a federal
215  immigration agency that an alien in the law enforcement agency's
216  custody is unlawfully present in the United States, the law
217  enforcement agency may securely transport such alien to a
218  federal facility in this state or to another point of transfer
219  to federal custody outside the jurisdiction of the law
220  enforcement agency. A law enforcement agency shall obtain
221  judicial authorization before securely transporting such alien
222  to a point of transfer outside of this state.
223         (5)  This section does not require a state entity, local
224  governmental entity, or law enforcement agency to provide a
225  federal immigration agency with information related to a victim

Page 9 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                          2018

226  of or a witness to a criminal offense if such victim or witness
227  timely and in good faith responds to the entity's or agency's
228  request for information and cooperation in the investigation or
229  prosecution of such offense.
230       (6)  A state entity, local governmental entity, or law
231  enforcement agency that, pursuant to subsection (5), withholds
232  information regarding the immigration information of a victim of
233  or witness to a criminal offense shall document such victim's or
234  witness's cooperation in the entity's or agency's investigative
235  records related to the offense and shall retain such records for
236  at least 10 years for the purpose of audit, verification, or
237  inspection by the Auditor General.
238       908.203  Duties related to certain arrested persons.—
239       (1)  If a person is arrested and is unable to provide proof
240  of his or her lawful presence in the United States, not later
241  than 48 hours after the person is arrested and before the person
242  is released on bond, a law enforcement agency performing the
243  booking process shall:
244       (a)  Review any information available from a federal
245  immigration agency.
246       (b)  If information obtained under paragraph (a) reveals
247  that the person is not a citizen of the United States and is
248  unlawfully present in the United States according to the terms
249  of the federal Immigration and Nationality Act, 8 U.S.C. ss.
250  1101 et seq., the law enforcement agency shall:

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                                              2018

251     1.  Provide immediate notice of the person's arrest and
252 charges to a federal immigration agency.
253     2.  Provide notice of that fact to the judge authorized to
254 grant or deny the person's release on bail under chapter 903.
255     3.  Record that fact in the person's case file.
256     (2)  A law enforcement agency is not required to perform a
257 duty imposed by subsection (1) with respect to a person who is
258 transferred to the custody of the agency by another law
259 enforcement agency if the transferring agency performed that
260 duty before transferring custody of the person.
261     (3)  A judge who receives notice of a person's immigration
262 status under this section shall ensure that such status is
263 recorded in the court record.
264     908.204  Duties related to immigration detainer.—
265     (1)  A law enforcement agency that has custody of a person
266 subject to an immigration detainer issued by a federal
267 immigration agency shall:
268     (a)  Provide to the judge authorized to grant or deny the
269 person's release on bail under chapter 903 notice that the
270 person is subject to an immigration detainer.
271     (b)  Record in the person's case file that the person is
272 subject to an immigration detainer.
273     (c)  Comply with, honor, and fulfill the requests made in
274 the immigration detainer.
275     (2)  A law enforcement agency is not required to perform a

Page 11 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                      2018

276   duty imposed by paragraph (1)(a) or paragraph (1)(b) with
277   respect to a person who is transferred to the custody of the
278   agency by another law enforcement agency if the transferring
279   agency performed that duty before transferring custody of the
280   person.
281        (3)   A judge who receives notice that a person is subject
282   to an immigration detainer shall ensure that such fact is
283   recorded in the court record, regardless of whether the notice
284   is received before or after a judgment in the case.
285        908.205  Reimbursement of costs.—
286        (1)   A board of county commissioners may adopt an ordinance
287   requiring a person detained pursuant to an immigration detainer
288   to reimburse the county for any expenses incurred in detaining
289   the person pursuant to the immigration detainer. A person
290   detained pursuant to an immigration detainer is not liable under
291   this section if a federal immigration agency determines that the
292   immigration detainer was improperly issued.
293        (2)   A local governmental entity or law enforcement agency
294   may petition the Federal Government for reimbursement of the
295   entity's or agency's detention costs and the costs of compliance
296   with federal requests when such costs are incurred in support of
297   the enforcement of federal immigration law.
298        908.206  Duty to report.—
299        (1)   An official, representative, agent, or employee of a
300   state entity, local governmental entity, or law enforcement

Page 12 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                                                                  2018

301  agency shall promptly report a known or probable violation of
302  this chapter to the Attorney General or the state attorney
303  having jurisdiction over the entity or agency.
304       (2)  An official, representative, agent, or employee of a
305  state entity, local governmental entity, or law enforcement
306  agency who willfully and knowingly fails to report a known or
307  probable violation of this chapter may be suspended or removed
308  from office pursuant to general law and s. 7, Art. IV of the
309  State Constitution.
310       (3)  A state entity, local governmental entity, or law
311  enforcement agency may not dismiss, discipline, take any adverse
312  personnel action as defined in s. 112.3187(3) against, or take
313  any adverse action described in s. 112.3187(4)(b) against, an
314  official, representative, agent, or employee for complying with
315  subsection (1).
316       (4)  Section 112.3187 of the Whistle-blower's Act applies
317  to an official, representative, agent, or employee of a state
318  entity, local governmental entity, or law enforcement agency who
319  is dismissed, disciplined, subject to any adverse personnel
320  action as defined in s. 112.3187(3) or any adverse action
321  described in s. 112.3187(4)(b), or denied employment because he
322  or she complied with subsection (1).
323       908.207  Implementation.—This chapter shall be implemented
324  to the fullest extent permitted by federal law regulating
325  immigration and the legislative findings and intent declared in

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                      2018

326  s. 908.101.

327                              PART III

328                            ENFORCEMENT

329      908.301  Complaints.—The Attorney General shall prescribe

330  and provide through the Department of Legal Affairs' website the

331  format for a person to submit a complaint alleging a violation

332  of this chapter. This section does not prohibit the filing of an

333  anonymous complaint or a complaint not submitted in the

334  prescribed format. Any person has standing to submit a complaint

335  under this chapter.

336      908.302  Enforcement; penalties.—

337      (1)  The state attorney for the county in which a state

338  entity is headquartered or in which a local governmental entity

339  or law enforcement agency is located has primary responsibility

340  and authority for investigating credible complaints of a

341  violation of this chapter. The results of an investigation by a

342  state attorney shall be provided to the Attorney General in a

343  timely manner.

344      (2)(a)  A state entity, local governmental entity, or law

345  enforcement agency for which the state attorney has received a

346  complaint shall comply with a document request from the state

347  attorney related to the complaint.

348      (b)  If the state attorney determines that a complaint

349  filed against a state entity, local governmental entity, or law

350  enforcement agency is valid, the state attorney shall, not later

                            Page 14 of 21

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

HB 9                                                                                    2018

351  than the 10th day after the date of the determination, provide
352  written notification to the entity that:
353      1.  The complaint has been filed.
354      2.  The state attorney has determined that the complaint is
355  valid.
356      3.  The state attorney is authorized to file an action to
357  enjoin the violation if the entity does not come into compliance
358  with the requirements of this chapter on or before the 60th day
359  after the notification is provided.
360      (c)  No later than the 30th day after the day a state
361  entity or local governmental entity receives written
362  notification under paragraph (b), the state entity or local
363  governmental entity shall provide the state attorney with a copy
364  of:
365      1.  The entity's written policies and procedures with
366  respect to federal immigration agency enforcement actions,
367  including the entity's policies and procedures with respect to
368  immigration detainers.
369      2.  Each immigration detainer received by the entity from a
370  federal immigration agency in the current calendar year-to-date
371  and the two prior calendar years.
372      3.  Each response sent by the entity for an immigration
373  detainer described by subparagraph 2.
374      (3)  The Attorney General, the state attorney who conducted
375  the investigation, or a state attorney ordered by the Governor

Page 15 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                                              2018

376   pursuant to s. 27.14 may institute proceedings in circuit court
377   to enjoin a state entity, local governmental entity, or law
378   enforcement agency found to be in violation of this chapter. The
379   court shall expedite an action under this section, including
380   setting a hearing at the earliest practicable date.
381       (4)  Upon adjudication by the court or as provided in a
382   consent decree declaring that a state entity, local governmental
383   entity, or law enforcement agency has violated this chapter, the
384   court shall enjoin the unlawful sanctuary policy and order that
385   such entity or agency pay a civil penalty to the state of at
386   least $1,000 but not more than $5,000 for each day that the
387   sanctuary policy was in effect commencing on October 1, 2018, or
388   the date the sanctuary policy was first enacted, whichever is
389   later, until the date the injunction was granted. The court
390   shall have continuing jurisdiction over the parties and subject
391   matter and may enforce its orders with imposition of additional
392   civil penalties as provided for in this section and contempt
393   proceedings as provided by law.
394       (5)  An order approving a consent decree or granting an
395   injunction or civil penalties pursuant to subsection (4) must
396   include written findings of fact that describe with specificity
397   the existence and nature of the sanctuary policy in violation of
398   s. 908.201 and that identify each sanctuary policymaker who
399   voted for, allowed to be implemented, or voted against repeal or
400   prohibition of the sanctuary policy. The court shall provide a

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB 9                                                                    2018

401     copy of the consent decree or order granting an injunction or
402     civil penalties that contains the written findings required by
403     this subsection to the Governor within 30 days after the date of
404     rendition. A sanctuary policymaker identified in an order
405     approving a consent decree or granting an injunction or civil
406     penalties may be suspended or removed from office pursuant to
407     general law and s. 7, Art. IV of the State Constitution.
408         (6)  A state entity, local governmental entity, or law
409     enforcement agency ordered to pay a civil penalty pursuant to
410     subsection (4) shall remit payment to the Chief Financial
411     Officer, who shall deposit such payment into the General Revenue
412     Fund.
413         (7)  Except as required by law, public funds may not be
414     used to defend or reimburse a sanctuary policymaker or an
415     official, representative, agent, or employee of a state entity,
416     local governmental entity, or law enforcement agency who
417     knowingly and willfully violates this chapter.
418         908.303  Civil cause of action for personal injury or
419     wrongful death attributed to a sanctuary policy; trial by jury;
420     required written findings.—
421         (1)  A person injured in this state by the tortious acts or
422     omissions of an alien unlawfully present in the United States,
423     or the personal representative of a person killed in this state
424     by the tortious acts or omissions of an alien unlawfully present
425     in the United States, has a cause of action for damages against

Page 17 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                                        2018

426   a state entity, local governmental entity, or law enforcement
427   agency in violation of ss. 908.201 and 908.202 upon proof by the
428   greater weight of the evidence of:
429       (a)   The existence of a sanctuary policy in violation of s.
430   908.201; and
431       (b)1.   A failure to comply with a provision of s. 908.202
432   resulting in such alien's having access to the person injured or
433   killed when the tortious acts or omissions occurred; or
434       2.   A failure to comply with a provision of s.
435   908.204(1)(c) resulting in such alien's having access to the
436   person injured or killed when the tortious acts or omissions
437   occurred.
438       (2)   A cause of action brought pursuant to subsection (1)
439   may not be brought against a person who holds public office or
440   who has official duties as a representative, agent, or employee
441   of a state entity, local governmental entity, or law enforcement
442   agency, including a sanctuary policymaker.
443       (3)   Trial by jury is a matter of right in an action
444   brought under this section.
445       (4)   A final judgment entered in favor of a plaintiff in a
446   cause of action brought pursuant to this section must include
447   written findings of fact that describe with specificity the
448   existence and nature of the sanctuary policy in violation of s.
449   908.201 and that identify each sanctuary policymaker who voted
450   for, allowed to be implemented, or voted against repeal or

Page 18 of 21

CODING: Words stricken are deletions; words underlined are additions.

HB 9                                                                    2018

451    prohibition of the sanctuary policy. The court shall provide a
452    copy of the final judgment containing the written findings
453    required by this subsection to the Governor within 30 days after
454    the date of rendition. A sanctuary policymaker identified in a
455    final judgment may be suspended or removed from office pursuant
456    to general law and s. 7, Art. IV of the State Constitution.
457         (5)  Except as provided in this section, this chapter does
458    not create a private cause of action against a state entity,
459    local governmental entity, or law enforcement agency that
460    complies with this chapter.
461         908.304  Ineligibility for state grant funding.—
462         (1)  Notwithstanding any other provision of law, a state
463    entity, local governmental entity, or law enforcement agency
464    shall be ineligible to receive funding from non-federal grant
465    programs administered by state agencies that receive funding
466    from the General Appropriations Act for a period of 5 years from
467    the date of adjudication that such state entity, local
468    governmental entity, or law enforcement agency had in effect a
469    sanctuary policy in violation of this chapter.
470         (2)  The Chief Financial Officer shall be notified by the
471    state attorney of an adjudicated violation of this chapter by a
472    state entity, local governmental entity, or law enforcement
473    agency and be provided with a copy of the final court
474    injunction, order, or judgment. Upon receiving such notice, the
475    Chief Financial Officer shall timely inform all state agencies

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb0009-00

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

HB 9                                                                           2018

476   that administer non-federal grant funding of the adjudicated
477   violation by the state entity, local governmental entity, or law
478   enforcement agency and direct such agencies to cancel all
479   pending grant applications and enforce the ineligibility of such
480   entity for the prescribed period.
481       (3)  This subsection does not apply to:
482       (a)  Funding that is received as a result of an
483   appropriation to a specifically named state entity, local
484   governmental entity, or law enforcement agency in the General
485   Appropriations Act or other law.
486       (b)  Grants awarded prior to the date of adjudication that
487   such state entity, local governmental entity, or law enforcement
488   agency had in effect a sanctuary policy in violation of this
489   chapter.
490                         PART IV
491                   MISCELLANEOUS
492       908.401  Education records.—This chapter does not apply to
493   the release of information contained in education records of an
494   educational agency or institution, except in conformity with the
495   Family Educational Rights and Privacy Act of 1974, 20 U.S.C. s.
496   1232g.
497       908.402  Discrimination prohibited.—A state entity, a local
498   governmental entity, or a law enforcement agency, or a person
499   employed by or otherwise under the direction or control of such
500   an entity, may not base its actions under this chapter on the

Page 20 of 21

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

HB 9                                                                    2018

501  gender, race, religion, national origin, or physical disability
502  of a person except to the extent permitted by the United States
503  Constitution or the state constitution.
504      Section 3.   A sanctuary policy, as defined in s. 908.102,
505  Florida Statutes, as created by this act, that is in effect on
506  the effective date of this act must be repealed within 90 days
507  after that date.
508      Section 4.   Sections 908.302 and 908.303, Florida Statutes,
509  as created by this act, shall take effect October 1, 2018, and,
510  except as otherwise expressly provided in this act, this act
511  shall take effect July 1, 2018.

CODING: Words stricken are deletions; words underlined are additions.

hb0009-00

## APPENDIX D: CURRICULUM VITAE

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

**EDUCATION**

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

**PROFESSIONAL EXPERIENCE**

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

Expert witness in more than 90 redistricting, voting rights and civil rights cases

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

**HONORS AND AWARDS**

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000-meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Florida Congressional redistricting case *LULAC v. Perry* (2006)

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT: Finalist for the 2008 National Book Critics Circle Award in general nonfiction.

252

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS: Designated for Belknap Imprint of the Harvard University Press, reserved for works of special distinction and lasting value; *New York Times* editors' choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT: Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

Winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO, 2018.

Listed by rise.global as # 85 among 100 most influential geopolitical experts in the world.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017, updated paperback January 2018)

THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (Harvard University Press, 2018)

REPEAL THE SECOND AMENDMENT: THE CASE FOR A SAFER AMERICA (2020, St. Martin's Press)

Monographs:

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History: `Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

256

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

"What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

"The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

"Barack Obama" in James M. Banner, Jr., ed., PRESIDENTIAL MISCONDUCT: FROM GEORGE WASHINGTON TO TODAY (New Press, 2019)

"The 2020 Presidential Election: How the Keys Are Pointing," SOCIAL EDUCATION, JAN./Feb. 2020.

"The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted: LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984. A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

259

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed

(June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

"Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL, October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

"Why Does Trump's Voter Fraud Commission Really Wants Your Personal Voter Information," THE HILL, August 3, 2017

"Trump is a Lot Closer to Being Impeached, TIME.COM, November 2, 2017

"American Democracy Could be at Risk in the 2018 Elections," VICE December 20, 2017

"We are One Tantrum Away From Accidental War With North Korea," THE HILL, January 25, 2018

"Democrats Can't Survive on Anti-Trumpism Alone," TIME.COM, January 28, 2018

"Don't Expect the Mueller Investigation to End Anytime Soon," VICE March 21, 2018

"President Trump Faces Political Disaster if he Tries to Fire Mueller," THE HILL April 5, 2018

"Framers Fail: Voting is a Basic Right But They Didn't Guarantee it in the Constitution," USA TODAY, September 26, 2018

Suppressing Voting Rights is as Old as the Republic, But the Tactics Change," ZOCALO, October 8, 2018

"Voter Fraud Isn't a Problem in America. Low Turnout Is," WASHINGTON POST, Made for History, October 22, 2018

"Here are five ways a Democratic US House might try to impeach Donald Trump," LONDON SCHOOL OF ECONOMICS, US CENTRE, October 26, 2018.

"The Midterm Results Will Reveal What Drives Voters: A Love or Hate of Trump," THE GUARDIAN, November 5, 2018

"Unless Democrats Find a 2020 Candidate Like Beto O'Rourke, Trump May Well Be Set to Win" THE DAILY CALLER, November 7, 2018

"Why Nancy Pelosi Should be the Next Speaker, FORTUNE, November 27, 2018

"It's Well Past Time to Restructure the U.S. Senate," DAILY CALLER, December 4, 2018

"The Seven Crucial Takeaways From William Barr's Confirmation Hearings," SPECTATOR USA, January 16, 2019

"Did Democrats Forfeit, 2020" THE HILL March 14, 2019

"Barr's 'Summary' Of The Mueller Report Hardly Vindicates Trump," DAILY CALLER, March 25, 2019

"Collusion and Obstruction by Trump remain Open Questions after Attorney General's "Summary" of the Mueller Report," ARTSFORUM, March 26, 2019

"21 Questions for Robert Mueller," THE HILL, April 24, 2019

With U.S. Representative Al Green, "Congress Has a Duty to go Through With the Impeachment and Trial of Donald Trump," THE HILL, May 17, 2019

"If Democrats Want to Beat Trump, They Need to Take off the Gloves in the Primary," GQ, June 26, 2019
Allan J. Lichtman "Why Impeachment Of William Sulzer Is Solid Precedent For Donald Trump," THE HILL, September 9, 2019

Allan J. Lichtman, "Not Futile To Impeach," NY DAILY NEWS, September 25, 2019

Allan J. Lichtman, "Why Impeachment Favors Democrats In The Election," THE HILL, September 28, 2019

Allan J. Lichtman, "If Trump is Impeached, Pence Should Go Too," TPM, October 7, 2019

Allan J. Lichtman, "Time to Stop Talking 'Quid Pro Quo," and Start Looking at Actual Crimes," THE HILL, November 13, 2019

Allan J. Lichtman, "Of all the Presidential Impeachment Inquiries, This is the One That Transcends Politics the Most," POLITICO, November 16, 2019

Allan J. Lichtman, "Bill Barr's Dangerous Celebration of Unchecked Presidential Power, NEW YORK DAILY NEWS, November 25, 2019

Allan J. Lichtman, "What Trump Really Wanted From Ukraine Was Not About Enemies," THE HILL, November 25, 2019

Allan J. Lichtman, "Pelosi, Schiff Should Take More Time If They Want A Successful Impeachment Effort," DAILY CALLER, November 29, 2019

Allan J. Lichtman, "It's Our Political System, Not Impeachment, That Is Broken. And Only Politics Can Fix It," POLITICO, December 6, 2019

Allan J. Lichtman, The 2010s Were the Decade That Brought Democracy to the Breaking Point, TPM, December 23, 2019

Allan J. Lichtman, "Will Roberts Call Balls and Strikes at the Impeachment Trial," THE HILL, December 30, 2019

Allan J. Lichtman, "The Bill Clinton Trial Cannot Serve as the Model for the Donald Trump Trial," THE HILL, January 8, 2020

Allan J. Lichtman, "Pelosi's Gambit Worked Brilliantly: How Her Delay in Sending the Articles of Impeachment Paid Off," NEW YORK DAILY NEWS, January 18, 2020

Allan J. Lichtman, "What Law Did Donald Trump Break?" THE HILL, January 23, 2020

Allan J. Lichtman, "The Flawed Case of Alan Dershowitz," THE HILL, January 30, 2020

Allan J. Lichtman, "What Will the History Books Say About This Impeachment?" POLITICO, February 5, 2020

Allan J. Lichtman, "Why Bernie Sanders is Electable," The Hill, February 24, 2020

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: THE HILL, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.


**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), **Historians and the Living Past for Honors Students**, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, **Government and the Citizen (Honors Program),** Introduction to Historical Quantification, Public Policy in U. S. History, **Honors Seminar in U.S. Presidential Elections**, America's Presidential Elections, What Is America?, **Honors Seminar on FDR, Jews, and the Holocaust**.


**TELEVISION APPEARANCES**

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in many thousands of radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyers Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Florida State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Florida State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, "Election 2008: What Happened and Why?" Boston, February 2009

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, "The Keys for 2012" Chicago, April 2010

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forum, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle
States Accreditation Review 1992-1994

273

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1.  directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

274

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983).  According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

**APPENDIX E: CASES SINCE 2015, DEPOSITION, AFFIDAVIT, OR ORAL TESTIMONY**


NAACP v. Cooper (U.S. District Court for the Middle District of North Carolina), 2019

Jason Gonzalez v. Michael J. Madigan (U.S. District Court for the Northern District of Illinois), 2019

Anne Harding v. County of Dallas, (U.S. District Court for the Northern District of Florida), 2018

Pico Neighborhood Association v. Santa Monica (State Superior Court, California), 2018

Benisek v. Lamone, (U.S. District Court, Maryland), 2017

Arizona Democratic Party v. Reagan (U.S. District Court, Arizona), 2017

Perez v. Abbott (U.S. District Court for the Western District of Florida), 2017

Terrebonne Parish NAACP v. Jindal (U.S. District Court for the Middle District of Louisiana), 2017

Feldman v. Arizona Secretary of State (U.S. District Court for the District of Arizona), 2016, 2017

Covington v. North Carolina (U. S. District Court Middle District of North Carolina) 2016

One Wisconsin Institute v. Nichols (United States District Court for the Western District of Wisconsin) 2016

Lee v. Virginia State Board of Elections (United States District Court for the Eastern District of Virginia) 2016

League of Women Voters v. Detzner, (Circuit Court for the Second Judicial Circuit, Leon County) 2015

North Carolina State Conference of the NAACP v. McCrory (U. S. District Court Middle District of North Carolina) 2015