## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-22927-BLOOM/Louis

CITY OF SOUTH MIAMI, *et al.*,

      Plaintiffs,

v.

RON DESANTIS, *et al.*,

      Defendants.

_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a six-day bench trial held on January 4-7, 11, and 14, 2021. *See* ECF Nos. [184], [186], [187], [188], [189], & [190]. Pursuant to this Court's Order, ECF No. [105], the parties submitted proposed findings of fact and conclusions of law in advance of the bench trial. *See* ECF No. [160] (Defendants'[1] Proposed Findings of Fact and Conclusions of Law); ECF No. [162] (Plaintiffs'[2] Proposed Findings of Fact and Conclusions of Law). The Court has carefully considered the evidence and testimony presented at trial, the parties' respective submissions, the record in this case, the applicable law, and is otherwise fully advised. Accordingly, the Court sets forth the following findings of fact and conclusions of law.

---

[1] Defendants include Ron DeSantis, in his official capacity as Governor of the State of Florida ("Governor DeSantis"), and Ashley Moody ("Attorney General Moody"), Attorney General of the State of Florida (collectively, "Defendants").

[2] Plaintiffs include Florida Immigrant Coalition, Inc., The Farmworker Association of Florida, Inc., Family Action Network Movement, Inc., QLatinx, and WeCount!, Inc., on behalf of their members and their organizations as a whole; Americans for Immigrant Justice, Inc., The Guatemalan-Maya Center, Inc., Hope Community Center, Inc., and Westminster Presbyterian Church United of Gainesville, Florida, Inc. (collectively, "Plaintiffs").

## TABLE OF CONTENTS

I.  BACKGROUND AND PROCEDURAL HISTORY .................................................... 4

   A.  The Relevant SB 168 Provisions............................................................. 4

   B.  This Action ....................................................................................... 7

II.  FINDINGS OF FACT.............................................................................. 9

   A.  SB 168's Enactment ........................................................................... 9

      1.  The Parties to this Action ............................................................. 9

      2.  Other Relevant Actors ................................................................. 10

      3.  Recent History of Anti-Sanctuary Legislation in Florida............................ 12

      4.  Events Surrounding the Passage of SB 168............................................ 12

      5.  History of Proposed Amendments ..................................................... 19

   B.  The Relevant Testimony ...................................................................... 21

      1.  Maria Rodriguez, Florida Immigrant Coalition....................................... 21

      2.  Michelle Ortiz, Americans for Immigrant Justice ................................... 24

      3.  Marleine Bastien, Family Action Network Movement ................................ 27

      4.  Mary Jill Hanson, Florida Immigrant Coalition ..................................... 29

      5.  Antonio Tovar, Farmworkers Association of Florida ................................. 31

      6.  Laura Pichardo-Cruz, Hope Community Center ....................................... 34

      7.  Laura Muñoz, Florida Immigrant Coalition .......................................... 35

      8.  Sister Ann Kendrick, Hope Community Center........................................ 37

      9.  Christopher Cuevas, QLatinx ......................................................... 39

      10.  Oscar Lodoño, WeCount .............................................................. 40

      11.  Father Frank O'Loughlin, Guatemalan-Maya Center ................................ 42

      12.  David Caulkett, FLIMEN ............................................................ 42

      13.  Anna DeCerchio, Executive Office of the Governor ................................ 44

      14.  Elizabeth Guzzo, Office of the Attorney General ................................. 45

      15.  Daniel Olson, Office of the Attorney General...................................... 46

      16.  Dr. Allan Lichtman................................................................... 47

         a.  Relevant Historical Background ................................................ 49

         b.  Discriminatory Effect........................................................... 50

         c.  Sequence of Events .............................................................. 52

         d.  Deviations from the Norm and Contemporary Statements .................... 54

      17.  Sheriff Robert Gualtieri ............................................................ 56

**III. CONCLUSIONS OF LAW** ............................................................... **57**

  A.   Article III Standing ................................................................... 57

  B.   Equal Protection Challenges .................................................... 62

    1.   Discriminatory Purpose and Effect ...................................... 66

      a.   Disparate Impact and Foreseeability ............................. 67

      b.   Historical Background .................................................. 77

      c.   Specific Sequence of Events Leading to SB 168's Passage and Contemporary Statements and Actions of Key Legislators ......................... 83

      d.   Procedural and Substantive Departures from the Norm ......... 96

      e.   Availability of Less Discriminatory Alternatives ................. 99

      f.  Plaintiffs' Evidence as a Whole ................................... 101

    2.   The Likelihood of SB 168's Enactment in the Absence of Discriminatory Motives 102

  C.   Permanent Injunction .............................................................. 104

  D.   Severability ............................................................................ 106

**IV. CONCLUSION** .............................................................................. **109**

## I.   BACKGROUND AND PROCEDURAL HISTORY

On May 2, 2019, the Florida Legislature passed Senate Bill 168 ("SB 168"), which aimed to further the State of Florida's interest in "cooperat[ing] and assist[ing] the federal government in the enforcement of federal immigration laws within this state." Fla. Stat. § 908.101 (2019). On June 14, 2019, Governor DeSantis signed SB 168 into law and it was enacted as Chapter 908, Florida Statutes. *See* Fla. Stat. ch. 908 (2019).

### A.   The Relevant SB 168 Provisions

This action concerns the following provisions of SB 168:

**Detainer Mandate.** Section 908.105 requires state and local law enforcement agencies to comply with immigration detainers[3] received from federal immigration authorities and sets forth the duties of these law enforcement agencies as they relate to immigration detainers. *See* Fla. Stat. § 908.105 ("Detainer Mandate").

**Transport Requirement.** Section 908.104 sets forth various ways in which state and local law enforcement agencies must cooperate with federal immigration enforcement efforts. *See* Fla. Stat. § 908.104. Pursuant to § 908.104(4),

> When a county correctional facility or the Department of Corrections receives verification from a federal immigration agency that a person subject to an immigration detainer is in the law enforcement agency's custody, the agency may securely transport the person to a federal facility in this state or to another point of transfer to federal custody outside the jurisdiction of the law enforcement agency. The law enforcement agency may transfer a person who is subject to an immigration detainer and is confined in a secure correctional facility to the custody

---

[3] SB 168 defines an "immigration detainer" as

> a facially sufficient written or electronic request issued by a federal immigration agency using that agency's official form to request that another law enforcement agency detain a person based on probable cause to believe that the person to be detained is a removable alien under federal immigration law, including detainers issued pursuant to 8 U.S.C. ss. 1226 and 1357 along with a warrant described in paragraph (c).

Fla. Stat. § 908.102(2).

of a federal immigration agency not earlier than 12 days before his or her release date. A law enforcement agency shall obtain judicial authorization before securely transporting an alien to a point of transfer outside of this state.

Fla. Stat. § 908.104(4) ("Transport Requirement").

**Cost Reimbursement.** Section 908.106 requires county correctional facilities to enter into agreements with the federal government for the reimbursement of costs incurred pursuant to honoring immigration detainer requests. *See* Fla. Stat. § 908.106 ("Cost Reimbursement").

**Best Efforts Provision.** In requiring cooperation with federal immigration enforcement efforts, § 908.104(1) applies to law enforcement agencies or "an official, representative, agent, or employee of the entity or agency only when he or she is acting within the scope of his or her official duties or within the scope of his or her employment," and mandates that they "use best efforts to support the enforcement of federal immigration law." Fla. Stat. § 908.104(1) ("Best Efforts Provision").

**Sanctuary Provisions.** Section 908.102(6) defines a "sanctuary policy" as

a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. s. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit such law enforcement agency in, or prohibit the agency from:
    (a) Complying with an immigration detainer;
    (b) Complying with a request from a federal immigration agency to notify the agency before the release of an inmate or detainee in the custody of the law enforcement agency;
    (c) Providing a federal immigration agency access to an inmate for interview;
    (d) Participating in any program or agreement authorized under s. 287 of the Immigration and Nationality Act, 8 U.S.C. s. 1357; or
    (e) Providing a federal immigration agency with an inmate's incarceration status or release date.

Fla. Stat. § 908.102(6) ("Sanctuary Definition").

Based on SB 168's Sanctuary Definition, § 908.103 states that "[a] state entity, law

enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy." Fla. Stat. § 908.103 ("Sanctuary Prohibition"). The Sanctuary Definition and the Sanctuary Prohibition will be collectively referred to as the "Sanctuary Provisions."

**Enforcement Provision.** Section 908.107 sets forth the authority of the Governor and the Attorney General to enforce SB 168 should state or local officers or agencies fail to comply with the immigration enforcement efforts in Chapter 908. *See* Fla. Stat. § 908.107 ("Enforcement Provision"). Specifically, this provision states:

> **Enforcement.**—
> (1) Any executive or administrative state, county, or municipal officer who violates his or her duties under this chapter may be subject to action by the Governor in the exercise of his or her authority under the State Constitution and state law. Pursuant to s. 1(b), Art. IV of the State Constitution, the Governor may initiate judicial proceedings in the name of the state against such officers to enforce compliance with any duty under this chapter or restrain any unauthorized act contrary to this chapter.
> (2) In addition, the Attorney General may file suit against a local governmental entity or local law enforcement agency in a court of competent jurisdiction for declaratory or injunctive relief for a violation of this chapter.
> (3) If a local governmental entity or local law enforcement agency violates this chapter, the court must enjoin the unlawful sanctuary policy. The court has continuing jurisdiction over the parties and subject matter and may enforce its orders with the initiation of contempt proceedings as provided by law.
> (4) An order approving a consent decree or granting an injunction must include written findings of fact that describe with specificity the existence and nature of the sanctuary policy that violates this chapter.

Fla. Stat. § 908.107.

**Antidiscrimination Provision.** Section 908.109 prohibits state and local entities or their agents from discriminating (i.e., basing "actions under [SB 168] on the gender, race, religion, national origin, or physical disability of a person except to the extent authorized by the United States Constitution or the State Constitution") when acting pursuant to SB 168. *See* Fla. Stat. § 908.109 ("Antidiscrimination Provision").

**B. This Action**

On July 16, 2019, shortly after SB 168 became law, Plaintiffs initiated this action for declaratory and injunctive relief challenging the constitutionality of numerous provisions of SB 168. *See* ECF No. [1] ("Complaint"); *see also* ECF No. [38] ("Amended Complaint"). Plaintiffs' Amended Complaint raised eleven claims and alleged that various sections of SB 168 were unconstitutional. *See generally* ECF No. [38].[4]

On August 30, 2019, Plaintiffs filed an Amended Motion for Preliminary Injunction, seeking to enjoin SB 168's Detainer Mandate, Transport Requirement, Cost Reimbursement, Best Efforts Provision, and Sanctuary Provisions. ECF No. [47]. On September 26, 2019, the Court held a hearing on the Amended Motion for Preliminary Injunction, during which the parties argued their respective positions. On October 1, 2019, the Court granted in part and denied in part Plaintiffs' Amended Motion for Preliminary Injunction: (1) concluding that Plaintiffs lacked standing to bring the claims asserted in Counts III, V, and VIII; (2) denying the request for a preliminary injunction against the Detainer Mandate, the Best Efforts Provision, and the Sanctuary Provisions; and (3) granting the request to preliminarily enjoin the Transport Requirement. ECF No. [64] ("Preliminary Injunction Order").

On September 4, 2019, Defendants filed a Motion to Dismiss, arguing that Plaintiffs lacked standing to bring many of their claims and that the Amended Complaint failed to state claims upon which relief could be granted. ECF No. [52]. On December 12, 2019, this Court granted

---

[4] Specifically, the Amended Complaint asserted the following eleven counts on behalf of the different Plaintiffs: Count I – § 908.105's Detainer Mandate violates the Supremacy Clause, U.S. Const. art. VI, § 2; Count II – § 908.104(4)'s Transport Requirement violates the Supremacy Clause; Count III – § 908.106's Cost Reimbursement violates the Supremacy Clause; Counts IV, V, and VI – § 908.102(6)'s and § 908.103's Sanctuary Provisions violate the Due Process Clause; Counts VII, VIII, and IX – § 908.104(1)'s Best Efforts Provision violates the Due Process Clause; Count X – § 908.104(1)'s Best Efforts Provision violates the Equal Protection Clause; and Count XI – § 908.103's Sanctuary Prohibition violates the Equal Protection Clause. *See generally* ECF No. [38].

Defendants' Motion to Dismiss in part and denied it in part, concluding that: (1) consistent with its Preliminary Injunction Order, Counts III, V, and VIII were dismissed for lack of standing; (2) Count I was dismissed because it failed to state a claim; (3) Counts IV, VI, VII, and IX were dismissed on grounds of ripeness; and (4) the facts alleged in Counts II, X, and XI sufficiently stated claims for relief. ECF No. [83] ("Dismissal Order").

Defendants thereafter answered the Amended Complaint and asserted five affirmative defenses: (1) Plaintiffs have failed to state a claim upon which relief can be granted; (2) Plaintiffs lack standing; (3) Plaintiffs have not established the prerequisites of injunctive relief; (4) Plaintiffs have not shown entitlement to attorneys' fees and costs; and (5) if the Court finds any provision of SB 168 to be unconstitutional, the remainder of SB 168 is severable. *See* ECF Nos. [90] & [91].

Following the discovery period, on August 28, 2020, the parties filed cross-motions for summary judgment on Plaintiffs' remaining claims—namely, the claims in Counts X and XI that the Best Efforts Provision and the Sanctuary Prohibition violate the Equal Protection Clause because "SB 168 was enacted with the intent and purpose to harm and discriminate against racial and national origin minorities, including Florida residents and visitors, on the basis of race, color, and national origin," ECF No. [38] ¶¶ 395, 411, and the claim in Count II that the Transport Requirement violates the Supremacy Clause because it is preempted by the Immigration and Nationality Act ("INA"), *id.* ¶¶ 277-84. *See* ECF No. [111] (Defendants' Summary Judgment Motion); ECF No. [112] (Plaintiffs' Summary Judgment Motion). On December 14, 2020, the Court denied Defendants' Summary Judgment Motion and granted Plaintiffs' Summary Judgment Motion in part and denied it in part. ECF No. [164] ("Summary Judgment Order").[5] Specifically,

---

[5] In advance of its ruling on the cross-motions for summary judgment, the Court issued an Omnibus Order, ECF No. [157], denying Defendants' Motion in Limine to Exclude Third-Party Sources that are Hearsay, ECF No. [108], and granting in part and denying in part Defendants' *Daubert* Motion, ECF No. [109], to the extent that Plaintiffs' expert witness, Allan J. Lichtman, Ph.D. ("Dr. Lichtman"), was precluded from

the Court concluded that there were genuine issues of material fact relating to Plaintiffs' Equal Protection challenges precluding judgment as a matter of law in favor of either party on Counts X or XI. *See id.* at 20-34. The Court granted summary judgment in Plaintiffs' favor on Count II and permanently enjoined Defendants from enforcing the Transport Requirement under § 908.104(4), concluding that the provision was preempted by federal immigration law and was therefore unconstitutional. *See id.* at 35-40.

The case proceeded to trial on Counts X and XI—the only remaining counts in this case—on January 4, 2021.[6]

## II. FINDINGS OF FACT[7]

The Court first discusses the legislative history relating to the enactment of SB 168 and the relevant evidence submitted at trial. The Court will then describe the testimony that was elicited at trial, both from live witnesses and from designated deposition testimony.

### A. SB 168's Enactment

As noted, on May 2, 2019, the Florida Legislature passed SB 168. Governor DeSantis signed SB 168 into law on June 14, 2019. SB 168 fully took effect on October 1, 2019.

### 1. The Parties to this Action

Plaintiffs are non-profit organizations with offices throughout Florida, whose missions include empowering and protecting the rights of immigrant communities through their programming and services. Some of the Plaintiff organizations have members or serve constituents

---

offering expert testimony on the ultimate legal questions to be determined by the trier of fact in this case.

[6] On August 25, 2020, the parties jointly moved to withdraw the jury trial demand in this case, ECF No. [106], which the Court granted the next day, ECF No. [107].

[7] Where applicable, the Court relies on the parties' stipulated facts from their pre-trial stipulation submitted in advance of trial. *See* ECF No. [161] at 2-5.

who are immigrants or have family members who are immigrants.

Governor DeSantis is sued in his official capacity as Governor of the State of Florida. Governor DeSantis is responsible for the enforcement of SB 168 in the State of Florida pursuant to § 908.107, Fla. Stat. Attorney General Moody is sued in her official capacity as the Attorney General of the State of Florida. She is the chief legal officer of the State and is also responsible for the enforcement of SB 168 pursuant to § 908.107, Fla. Stat.

### 2. Other Relevant Actors

The following legislators were directly involved in the passage of SB 168 during the 2019 Florida Legislative Session:

Senator Joe Gruters filed SB 168 in the Florida Senate on December 18, 2018, and he served as the Senate sponsor for the bill throughout the legislative process. *See* ECF No. [193-2]. Senators Aaron Bean, Debbie Mayfield, Doug Broxson, and Ben Albritton co-sponsored the bill.

Senator Bean also filed the related immigration enforcement Senate Bill 170, on December 19, 2018, which ultimately died in committee on May 3, 2019. *See* ECF No. [199-25]; *see also* ECF No. [193-1].

Representatives Cord Byrd and Erin Grall filed SB 168's companion bill, House Bill 527, in the Florida House on January 23, 2019. *See also* ECF No. [199-15]. Representative Byrd served as the House sponsor for HB 527 during the legislative process. HB 527 ultimately died in committee on May 3, 2019. *See* ECF No. [193-1].

In addition to the relevant legislators who worked to pass SB 168, the following third parties played key roles in enacting SB 168:

Floridians for Immigration Enforcement (FLIMEN) is a Florida corporation formed in 2003 to advocate for legal immigration at reduced levels and to oppose illegal immigration.

FLIMEN has worked to advance laws "ending sanctuaries" and requiring cooperation of public officials with federal immigration enforcement since its inception in 2003, including sharing model legislative bills with Florida legislators as part of its mission. Kenneth Morrow was FLIMEN's former President and David Caulkett is FLIMEN's current Vice President.[8] FLIMEN advocated for the passage of SB 168 and other bills aimed at ending sanctuaries.

The Federation for American Immigration Reform (FAIR) is a national organization that was founded in 1979 by John Tanton, a proponent of "passive eugenics" to limit population growth and elevate the human race. FAIR claims to fight for a stronger America with controlled borders, reduced immigration, and better enforcement. David Jaroslav serves as FAIR's "State and Local Legislative Manager." Likewise, Mr. Caulkett previously served as a State Advisor for FAIR. Although they are separate entities, FAIR and FLIMEN are closely affiliated and often collaborate to advocate for their shared interest in enforcing immigration laws. The Center for Immigration Studies (CIS), one of FAIR's sister organizations, shares a similar mission.

Notably, FAIR and CIS have each been described as anti-immigrant hate groups due to their overtly racist, nationalist, and xenophobic origins and their missions. *See* ECF No. [191-1] at 119, 148, 163; ECF No. [199-20] at 1:27:48-1:30:00. Similarly, FLIMEN has been labeled as an anti-immigrant racialist group based on its mission and its advocacy work promoting anti-immigrant and anti-sanctuary legislation. *Id.*

Sheriff Robert Gualtieri ("Sheriff Gualtieri") has served as the Sheriff of Pinellas County, Florida, since 2011. Among other executive positions, Sheriff Gualtieri chaired the legislative

---

[8] In addition, Mr. Caulkett previously ran a separate business, "reportillegals.com," which he ran for over ten years. In running reportillegals.com, Mr. Caulkett charged a $10.00 fee to report suspected undocumented persons or their employers to federal immigration enforcement agencies, asking these agencies to deport the subject without first investigating or verifying their immigration status. *See* ECF No. [191-2]. Mr. Caulkett also actively runs the website, "illegalaliens.us." *See* ECF No. [191-14].

committee for the Florida Sheriffs' Association (FSA) during SB 168's passage and was actively involved in the legislative process relating to the passage of the bill.

### 3. Recent History of Anti-Sanctuary Legislation in Florida

On November 17, 2015, Senator Bean filed Senate Bill 872 ("SB 872") with the Florida Legislature for consideration during the 2016 legislative session. Among other provisions, SB 872 defined "sanctuary policy" and prohibited any state or local governmental entity, official, or law enforcement agency from adopting or having in effect a sanctuary policy. *See* ECF No. [192-6]; *see also* ECF No. [192-8] (related House Bill 675).

For many years, FLIMEN has been a strong advocate for the enactment of anti-sanctuary laws in Florida by, in relevant part, sending legislators model legislation for their consideration. Indeed, on December 13, 2015, FLIMEN's Legislative Director, Jack Oliver, e-mailed Senator Bean, through his aide, seeking Senator Bean's sponsorship of its e-verify bill and its anti-sanctuary city bill, both of which were attached to the e-mail. *See* ECF No. [191-3].

SB 872 ultimately died in committee on March 11, 2016. *See* ECF No. [192-7]; *see also* ECF No. [192-9] (bill history on companion House Bill 675).

### 4. Events Surrounding the Passage of SB 168

As discussed, SB 168 was filed in the Florida Senate on December 18, 2018, by Senator Gruters, and was co-sponsored by Senators Bean, Mayfield, Broxson, and Albritton. Although not identical to SB 872, SB 168 nonetheless included many key provisions from the model legislation FLIMEN had sent to Senator Bean three years earlier, including a prohibition on sanctuary policies, requiring full compliance with federal immigration law, honoring detainer requests, sharing information with federal officials, and turning persons with detainer requests over to federal officials. Bills related to SB 168 included SB 170, filed by Senator Bean on December 19,

2018, and HB 527, filed by Representatives Byrd and Grall on January 23, 2019. *See* ECF No. [199-25] (SB 170); *see also* ECF No. [199-15] (HB 527). SB 170 and HB 527 both died in committee on May 3, 2019. *See* ECF No. [193-1].

On January 18, 2019, Mr. Morrow sent similar e-mails to Senator Gruters and Representative Byrd seeking assistance in promoting various bills aimed to promote immigration enforcement, including one relating to eliminating sanctuary cities, and requested additional bill sponsors and co-sponsors for the 2019 legislative session. *See* ECF Nos. [191-4] & [199-22]. Ultimately, Senator Gruters became the Senate sponsor for SB 168, and Representative Byrd became the House sponsor for SB 168's companion bill, HB 527. *See* ECF No. [193-1].

During SB 168's legislative session, Josh Barnhill served as a legislative aide to Senator Gruters. Mr. Barnhill and members of FLIMEN exchanged numerous e-mails during the 2019 legislative process. Indeed, Mr. Barnhill appears to have been FLIMEN's primary point of contact for reaching Senator Gruters during this period.

On January 23, 2019, Mr. Caulkett e-mailed Mr. Barnhill regarding SB 168, following a meeting with Mr. Barnhill and Senator Gruters. Attached to the e-mail was a 154-page document drafted by FAIR and titled "Sanctuary-Report-FINAL 2018," ("Sanctuary Report") which purported to list all of the "anarchy" cities (Mr. Caulkett's phrase for sanctuary cities) in the United States through 2018, including many within Florida. ECF No. [191-5] at 1. Regarding the Sanctuary Report, Mr. Caulkett cautioned, "FLIMEN suggests you consider not widely distributing the list as that would just create problems." *Id.* There were also two unrelated draft bills attached to Mr. Caulkett's e-mail, which he instructed Mr. Barnhill to "get . . . to Bill Drafting ASAP." *Id.* Finally, Mr. Caulkett's e-mail stated, "[o]ur attorney's [sic] looked at SB168," and suggested to (1) only grant the Attorney General, not the State Attorneys, the power to prosecute

and enforce actions under Chapter 908,[9] and (2) to "remove several carve-outs." *Id.* On January 24, 2019, Mr. Barnhill responded and thanked Mr. Caulkett "for the advice on 168," and stated, with regard to the two draft bills, that he had "put them both in bill drafting earlier this morning." *See* ECF No. [191-7].

On January 24, 2019, Mr. Barnhill forwarded FAIR's Sanctuary Report to Senator Gruters' personal Gmail account. ECF No. [191-6]. Moreover, on February 2, 2019, Senator Gruters forwarded the Sanctuary Report from his personal Gmail account to his Florida Senate e-mail account, and then forwarded that same attachment to Senator David Simmons. ECF No. [191-8].

On February 6, 2019, Mr. Morrow e-mailed Mr. Barnhill again acknowledging an earlier conversation between them and confirming FLIMEN's intent to appear and testify at the Senate Judiciary Committee on February 11, 2019, in support of SB 168.

In its February 8, 2019, Staff Analysis of SB 168, the Senate Judiciary Committee included a reference to the 154-page FAIR Sanctuary Report and cited additional data from CIS on sanctuary jurisdictions. ECF No. [199-3] at 4; *see also* ECF Nos. [199-4], [199-5], [199-6], [199-7], & [199-8]. The Staff Analysis expressed the difficulty in determining an accurate count of "sanctuary" jurisdictions in the United States because of differing criteria used in defining "sanctuary" jurisdictions. *Id.* It represented that "[p]erhaps one of the most objective ways to measure whether an entity is a sanctuary jurisdiction is to determine whether it is disqualified from receiving federal criminal justice grant funds due to perceived violations of federal immigration law." ECF No. [199-3] at 4.

On February 10, 2019, Mr. Barnhill, Senator Gruters, and other members of the Senate Judiciary Committee received a lengthy e-mail from the American Civil Liberties Union

---

[9] Florida Statute § 908.107 was ultimately modified limiting the enforcement power under SB 168 only to the Attorney General and the Governor.

("ACLU"), in which the ACLU stated its opposition to SB 168. Mr. Barnhill forwarded the ACLU's opposition to Mr. Morrow and Mr. Caulkett, asking, "[d]oes fair have any response to this?" ECF No. [191-9].

Furthermore, on February 15, 2019, Mr. Caulkett e-mailed Catherine McNeil of the Office of the Attorney General requesting a meeting with Attorney General Moody to discuss "illegal immigration issues," and informing her that FLIMEN would be testifying on SB 168 on February 19, 2019. No meeting occurred between Attorney General Moody and Mr. Caulkett, or any other member of FLIMEN. Nevertheless, Mr. Caulkett met with Government Affairs Director Dan Olson and Senior Legislative Aide Elizabeth Guzzo.

In addition to advocating for SB 168's passage during meetings with key legislative and governmental decisionmakers, FLIMEN was also promoting SB 168 among its own supporter base. For example, on February 19, 2019, Mr. Morrow sent an e-mail to various recipients stating that "FLIMEN . . . is working with Senator Gruters and Senator Bean to seek passage of SB 168 Federal Immigration Enforcement. This is the 'Rule of Law' anti-sanctuary proposal for the State of Florida." ECF No. [191-10] at 1. In addition, Mr. Morrow's e-mail asked the recipients to "call members of the Florida Senate Judiciary Committee and show your support for moving SB 168 from the Senate Judiciary, where it has died on previous attempts, to the Infrastructure and Security Committee," explaining that these efforts were "necessary to get SB 168 to the full House and Senate for a vote, passage, and Governor DeSantis's signature." *Id.*

On March 11, 2019, Mr. Morrow sought FAIR's comments and input on SB 168, including Mr. Jaroslav's strategic advice on the Pre-Meeting Staff Analysis released that day and the two proposed amendments submitted by Senator Annette Taddeo in advance of the Senate Infrastructure and Security Committee meeting. *See* ECF No. [191-11] at 1; *see also* ECF No.

[199-5] (Pre-Meeting Infrastructure and Security Bill Analysis dated March 11, 2019); ECF Nos. [194-12] & [194-13]. Notably, Mr. Morrow's e-mail to members of FAIR, and specifically to Mr. Jaroslav, stated that he would pass along FAIR's comments on SB 168 and the amendments to Mr. Barnhill and Senator Gruters and noted that "[Mr. Jaroslav's] input ha[d] been extremely beneficial, and [he was] sure that Senator Gruters [would] gladly accept any recommendation [he could] offer." ECF No. [191-11] at 1. Mr. Morrow then forwarded this conversation to Mr. Barnhill, stating, "[p]lease find the comments from David Jaroslav, FAIR, regarding the Pre-Meeting Analysis for SB 168." *Id.* With regard to Senator Taddeo's proposed amendments, Mr. Morrow's e-mail explained that:

> One would create a duty to inquire on the part of law enforcement whether someone is a victim or witness, and if they are, exempt them from the bill. This could basically give anyone the ability to lie their way out of the bill's provisions applying to them: the bill currently does have a victim/witness carve-out[10] (unfortunately), but it's much narrower and essentially defers to law enforcement to determine who's really a victim or witness.
>
> [Senator] Taddeo's other amendment would make "educational institutions" into non-enforcement zones where the bill's terms do not apply, not just by agents of the school, but by ANY law enforcement.
>
> I would think [Senator] Gruters would regard these amendments as hostile.

*Id.*

The Senate Infrastructure and Security Committee addressed SB 168 at its meeting on March 12, 2019, where Senator Janet Cruz probed Senator Gruters about whether he knew of CIS and FAIR's designations as anti-immigrant hate groups and asked how and why those organizations' data had been included in the Committee's Staff Analysis. *See* ECF No. [199-20]. Senator Gruters responded that any type of discrimination in any form is wrong and that he had

---

[10] It is unclear whether the "carve-outs" referred to in this e-mail are the same as those referred to in Mr. Caulkett's e-mail from January 23, 2019, explaining the suggestions given on SB 168 by FLIMEN's attorneys. *See* ECF No. [191-5] at 1.

never heard the groups characterized as anti-immigrant hate groups. He further stated that FAIR and CIS did research on the counties listed and reemphasized that SB 168 was an opportunity to get every county in Florida to enter into a Basic Ordering Agreement ("BOA").

A number of Plaintiffs' members also attended the committee meeting. They filled out appearance cards indicating their opposition to SB 168 and requested to speak during the public comments portion of the meeting. *See* ECF No. [192-17]. Moreover, during this legislative period, members of the Farmworkers Association of Florida met with Senator Simmons and Senator Gruters' legislative staff to provide their concerns about SB 168's impact and to voice their opposition to the bill.

On April 13, 2019, Karyn Morton, FLIMEN's Communications Director, e-mailed Katherine Woodby, Representative Byrd's legislative aide, and asked if Representative Byrd would be interested in sponsoring or co-sponsoring FLIMEN's "Victims of Illegal Immigration Day" press conference aimed at further promoting SB 168. *See* ECF No. [191-4] at 3-6. Ms. Morton sent a nearly identical e-mail to Mr. Barnhill and inquired into whether Senator Gruters would be interested in sponsoring or co-sponsoring the press conference. *See* ECF No. [191-13] at 1-2. In both communications, Ms. Morton explained that FLIMEN was inviting Governor DeSantis, Attorney General Moody, key legislators, and individuals from Legal Immigrants for America (LIFA), the Remembrance Project, and Angel Parents to attend the event and to speak about the dangers of illegal immigration. Ms. Woodby responded on April 15, 2019, confirming the time and location of the press conference, and stated that "Senator Gruters['] office and I are coordinating to have Governor DeSantis and AG Ashley Moody at the press conference also." *See* ECF No. [191-4] at 3-6.

On April 17, 2019, FLIMEN co-hosted "Victims of Illegal Immigration Day" with

Representative Byrd in the Florida Capitol Rotunda and applauded the efforts of key legislators and governmental actors who worked on SB 168. Senator Gruters and Representative Byrd made brief remarks to kick off the event, both thanked Governor DeSantis for his leadership, and emphasized that SB 168 was about increasing public safety, promoting respect for the rule of law, and cooperating with federal immigration enforcement efforts. Other individuals were featured during the press conference, including: (1) Kiyan and Bobby Michael, "Angel Parents" who lost their son "to an illegal immigrant, and this death could have been prevented"; (2) Amapola Hansberger of LIFA, who spoke of the dangers of open borders because it invites illegal immigrant criminals and victimizers into the country; (3) Yvonne Larsen of the Remembrance Project, which aims to show that undocumented immigrants are dangerous murderers by promoting stories of families who have lost a loved one "at the hands of an illegal alien"; and (4) FLIMEN's Karyn Morton. *See* ECF No. [199-21] (video recording of the press conference); *see also* ECF No. [192-16] (transcript of the press conference). "Victims of Illegal Immigration Day" was attended by Senator Bean, Senator Mayfield, Representative Grall, Representative Mike Beltran, and Representative Anthony Sabatini. *See* ECF Nos. [199-21] & [192-16].

On April 24, 2019, Mr. Morrow e-mailed Mr. Barnhill, stating that he would ask Mr. Jaroslav of FAIR to clarify the status of SB 168 and whether any activity was expected to carry over into the following week, and he would advise Mr. Barnhill of Mr. Jaroslav's reply.

Ultimately, on May 2, 2019, the Senate voted 22-18 in favor of passing SB 168, ECF No. [199-13], and the House of Representatives voted 68-45 in favor of passing the bill, ECF No. [199-14]. SB 168 was then presented to Governor DeSantis for signature on June 14, 2019, and signed into law the same day. *See* ECF No. [192-15].

**5. History of Proposed Amendments**

Prior to SB 168's enactment, many amendments were proposed by legislators from both the House and the Senate. The underlying content and the success or failure of each proposed amendment provide relevant context for this Court's Equal Protection analysis. Indeed, Plaintiffs maintain that the Legislature rejected numerous proposed amendments that would have lessened the harmful impact and discriminatory consequences of SB 168. Those rejected amendments to SB 168 include the following examples:

**Senate Amendment 478986**: "This chapter does not apply to law enforcement agencies or local governmental entities while operating at any educational facility or institution." ECF No. [194-8] (unfavorable committee designation on 2/21/2019).

**Senate Amendment 268432**: "A person who is the subject of an immigration detainer may not be temporarily housed in a privately managed correctional facility." ECF No. [196-1] (unfavorable committee designation on 4/18/2019).

**Senate Amendment 969240**: Requiring that a fiscal impact study be completed on SB 168 and a report be submitted to the Governor. ECF No. [194-25] (unfavorable committee designation on 4/18/2019).

**Senate Amendment 774036**: Requiring that a detainer request be accompanied by "a valid judicial warrant." ECF No. [196-15] (failed on 4/25/2019).

**Senate Amendment 589678**: "This act does not apply to an undocumented person who has served in the Armed Forces of the United States or a family member of such servicemember." ECF No. [196-2] (failed on 4/25/2019).

**Senate Amendment 943906**: "This act does not apply to a person who has applied for refugee status under Title 8 of the United States Code before July 1, 2019, during the pendency of

such application, and including any appeals." ECF No. [196-18] (failed on 4/25/2019).

**Senate Amendment 248466**: "This act does not apply to a recipient of Temporary Protected Status under federal law or of Deferred Action for Childhood Arrivals under federal law." ECF No. [196-4] (failed on 4/25/2019).

**Senate Amendment 736146**: "This chapter does not apply to middle schools, whether the middle school is a public, private, or charter school." ECF No. [198-33] (failed on 5/2/2019).

**Senate Amendment 381352**: "Chapter applicability.—This chapter does not apply to any teacher or guidance counselor in this state." ECF No. [198-30] (failed on 5/2/2019).

**Senate Amendment 420482**: "Emergency medical technicians.—This chapter does not apply to emergency medical technicians as defined in s. 401.23." ECF No. [198-27] (failed on 5/2/2019).

**Senate Amendment 503106**: Limiting SB 168's application only to inmates convicted of felony offenses. ECF No. [198-48] (failed on 5/2/2019).

**Senate Amendment 941876**: "Firefighters.—This chapter does not apply to firefighters as defined in s. 633.102." ECF No. [198-32] (failed on 5/2/2019).

**Senate Amendment 564172**: "Every employee of a law enforcement agency, a local governmental entity, or a state entity must successfully complete 8 hours of a nationally recognized and accredited training program on implicit bias." ECF No. [198-37] (failed on 5/2/2019).

**Senate Amendment 268980**: "This act does not apply to a person who has applied for asylum under Title 8 of the United States Code before July 1, 2019, or during the pendency of such application, including any appeals." ECF No. [198-28] (failed on 5/2/2019).

**Senate Amendment 654200**: "This act does not apply to the Department of Veterans' Affairs." ECF No. [198-45] (failed on 5/2/2019).

**House Amendment 315213**: "A state entity, local governmental entity, or law enforcement agency implementing this chapter has an affirmative duty to inquire whether a person is a victim of or a witness to a criminal offense, and, if so, the person is not subject to this chapter." ECF No. [197-10] (failed on 5/1/2019).

**House Amendment 536943**: "Exemption.—This chapter does not apply to the Division of Emergency Management or its employees." ECF No. [196-42] (failed on 5/1/2019).

**House Amendment 551777**: "Children of persons detained; counseling.—A minor child of a person detained under this chapter, who is in the custody of the Department of Children and Families pursuant to chapter, shall be eligible to receive counseling services from a licensed mental health professional in this state without charge during the period of such detention." ECF No. [197-11] (failed on 5/1/2019).

**House Amendment 283467**: "Human trafficking victims exempt.—The provisions of this chapter concerning persons subject to immigration detainers do not apply to a victim of human trafficking, as defined in s. 787.06." ECF No. [197-12] (failed on 5/1/2019).

**House Amendment 051735**: "Institutions exempt.—This chapter does not apply to the Department of Children and Families or any employees or contractors thereof." ECF No. [197-18] (failed on 5/1/2019).

**B. The Relevant Testimony**

**1. Maria Rodriguez, Florida Immigrant Coalition**

Maria Rodriguez is the Executive Director for the Florida Immigrant Coalition (FLIC), a membership-based non-profit organization headquartered in Miami, Florida, with staff in six counties and board members in several other counties throughout Florida. FLIC has 60 organizational members, in addition to its citizenship of individual members. Its mission is to

empower immigrant communities to challenge the root causes of injustice and to fight for the fair treatment of all people, regardless of immigration status. Specifically, FLIC operates by connecting a network of immigrant families, organizations, and communities together to address the various and changing needs of the immigrant population throughout Florida.

FLIC first became aware of the possibility of SB 168 in the summer of 2018, as then-Congressman DeSantis was running for Florida Governor on an anti-immigrant platform. FLIC began researching and preparing its membership base to help them understand the necessary legislative advocacy at the upcoming legislative session.

After SB 168 was enacted, FLIC deployed its organizational members on an intensive educational program, conducting know-your-rights presentations and educating members of the community about deportation, detention, and immigration enforcement. FLIC also encouraged its members to contact their representatives to vocalize their opposition to the bill. FLIC's hotline saw a large spike in calls post-SB 168, and it spent considerable resources working with lawyers to try to understand what the Best Efforts Provision entailed. Local municipalities reached out to FLIC for guidance on how the bill affected their operations. FLIC was also forced to deploy its legislative resources to challenge SB 168, rather than promoting a piece of legislation to help expand immigrant rights.

SB 168 was the farthest reaching, most extreme, and damaging piece of legislation she had seen advanced against immigrants. As such, FLIC made a concerted effort to oppose SB 168 by sending its representatives and members to participate in the 2019 legislative session. These advocates offered testimony in committee meetings and engaged in discussions with legislators from both political parties about the broader immigrant community, and about the dangers and discriminatory impact of SB 168. Nevertheless, Ms. Rodriguez noted that the 2019 legislative

session was unusual in that SB 168 was pushed through the legislative process in a much more expedited fashion than typical legislation, despite significant concerns. Although it typically takes years to enact legislation like SB 168, Ms. Rodriguez testified that the bill advanced quickly based, in part, on the significant influence exerted by federal and state leadership over immigration issues.

Ms. Rodriguez further testified SB 168 is a law founded upon white nativist, xenophobic, anti-immigrant viewpoints espoused by organizations who have emphasized their desire to eradicate immigrant communities. Indeed, forcing cooperation with federal immigration authorities poses specific public health and safety concerns, especially when considered with the rhetoric advanced in connection with SB 168 that immigrants are dangerous criminals. Ms. Rodriguez explained that such policies erode trust in law enforcement and increase fear among immigrant communities. SB 168 also forces agencies to divert resources away from their core missions in order to satisfy the law's requirements. SB 168 will negatively impact the public health of immigrant communities by causing these communities to fear accessing social services or health care because they do not know whether those services are safe.

SB 168 is especially harmful to black and brown communities because it asks untrained officers who lack the requisite expertise to make decisions regarding a person's immigration status using databases that often contain faulty information. All too often, this determination is based on the officer's own understanding of what an immigrant looks like, and it relies on either explicit or implicit racial biases. Ms. Rodriguez explained that immigration status is not black and white. Rather, it is a complex and evolving designation that can be difficult to determine, especially when untrained on immigration issues. Moreover, through the operation of its hotline and the conversations with its members, FLIC has observed SB 168's negative effects on the communities it serves. For example, Ms. Rodriguez indicated that racial profiling during traffic stops has

increased[11] and that municipalities have begun diverting resources away from their core functions to comply with the law.

Ms. Rodriguez is familiar with FAIR and FLIMEN and agrees with their characterization as anti-immigrant, xenophobic hate groups. Throughout FLIC's legislative advocacy efforts proposing positive legislation to improve the lives of their community members, FAIR and FLIMEN have consistently attempted to counteract these efforts by opposing the legislation or by proposing highly prejudicial bills like SB 168. Moreover, Ms. Rodriguez noted that Senator Gruters' rejection of every ameliorative amendment to SB 168 is evidence of his disregard for the welfare of especially vulnerable segments of the immigrant community. Indeed, SB 168 is, according to Ms. Rodriguez, the culmination of an ongoing effort to make life impossible for immigrants by denying them work permits, driver's licenses, access to higher education, and access to essential services.

### 2.   Michelle Ortiz, Americans for Immigrant Justice

Michelle Ortiz is the Deputy Director of Americans for Immigrant Justice (AI Justice), a non-profit legal services organization located in Miami, Florida. AI Justice's mission is to protect and promote the basic human rights of immigrants by offering free direct legal services, impact litigation, policy advocacy, and public education at the local, state, and national levels. These legal services focus on certain areas, including: (1) the detention program; (2) the Lucha program; (3) the children's legal program; and (4) the family defense program.

Regarding the detention program, AI Justice provides legal services at the Krome Processing Center, the Broward Transitional Center, and the Glades County Jail. Prior to the

---

[11] Throughout the various Plaintiffs' testimony at trial, the Court permitted testimony describing reports made by Plaintiffs' members after SB 168 went into effect that described incidents of racial profiling during traffic stops and other law enforcement encounters. Testimony of these reports was permitted over Defendants' objections not for their truth, but for the effect they had on each Plaintiff's responsive efforts.

COVID-19 pandemic, AI Justice visited the three facilities regularly and provided know-your-rights presentations where any detainee could sign up for the presentation and for either a free legal screening or a consultation with AI Justice's legal staff. AI Justice also maintains a pro bono line, which is free to call and will connect a detainee directly to AI Justice's office. The organization also accepts requests for assistance that are sent by postal mail. Although AI Justice conducted over 800 intakes per year prior to COVID-19, the number of annual intakes declined to 471 in 2020.

AI Justice conducts detailed intakes, which initially ask for personal information about an individual's immigration history, ties to the community, and their family members. In addition, AI Justice asks an entire series of questions that seeks to elicit information about an individual's apprehension as possible, including whether the individual knows why they ended up in the custody of Immigration and Customs Enforcement (ICE), what occurred prior to being detained, who detained them, whether they were the driver or the passenger, if a detention occurred during a traffic stop, and whether they were attending a court proceeding. AI Justice then screens the intakes to determine if the individual may be eligible to be released or a bond may be issued.

AI Justice also collects the data retrieved during intakes in a central database and studies the data to identify trends relating to racial profiling, unlawful detentions, and frequency of local law enforcement collaborations with ICE. This information has demonstrated that, prior to SB 168, 20-30% of individuals whom AI Justice conducted an intake were detained by ICE as a result of local law enforcement interactions. In 2020, however, over 46% of individuals that were screened had been detained by ICE as a result of a local law enforcement interaction.

Ms. Ortiz explained that this data confirms that minorities are being disproportionately impacted by SB 168 because law enforcement is compelled to stop immigrants during routine

traffic stops to determine their immigration status. There is an increase in cases of racial profiling and cases where individuals have been detained but not issued a citation. This data confirms that local law enforcement is encouraged to be on the lookout for immigrants and is making traffic stops and custodial arrests.

Ms. Ortiz also testified that there are no visual cues, other than racial profiling, that can inform an officer about an individual's immigration status or removability. Given the complexity of a person's immigration status, law enforcement officers are not trained and do not have access to federal immigration databases to inform their detention decisions.

The Lucha program represents over 300 victims of domestic violence, sexual assault, and human trafficking. AI Justice aims to help facilitate reporting these crimes to law enforcement agencies, despite the significant fear in the community." AI Justice also conducts site visits and free initial screenings at the Miami-Dade County's Victim's Assistance Center, in addition to conducting community outreach training sessions. Many of the community partners are government agencies, law enforcement agencies, and their employees that AI Justice works closely with on various community outreach projects to foster trust and confidence in reporting domestic violence directly to law enforcement. After SB 168 was enacted, Ms. Ortiz testified that these partnerships were called into question, and many law enforcement agencies and victim advocates reached out to AI Justice about the scope of their duties. AI Justice also received an increase in calls reporting domestic violence but refusing to involve law enforcement officers out of fear. Further, although clients in the Lucha program have historically been referred to AI Justice by law enforcement, it has experienced an increase in victim calls where no referral exists, thus necessitating longer intake inquiries. Those longer intakes force AI Justice to serve fewer victims and these changes are directly attributable to the provisions of SB 168.

AI Justice's children's legal program provides legal services to children across Florida of varying immigration statuses, and it has also been affected by SB 168. There was significant concern about SB 168 after the proposed amendment excluding the Department of Children and Families (DCF) from the law's application was rejected. Ms. Ortiz explained that including DCF within the scope of SB 168's application would likely result in DCF turning undocumented children in their care over to ICE. Ms. Ortiz testified that these concerns ultimately manifested themselves and AI Justice has witnessed children being turned away by DCF and turned over to ICE for shelter. Prior to SB 168, it was extremely unusual for DCF to turn a child over to ICE.

The family defense program was forced to divert significant resources to update the existing know-your-rights presentations in order to provide the community with relevant information on SB 168. The program also received increased numbers of fear-based calls from individuals who were unsure if it was safe to go to food banks or to utilize other social services.

### 3. Marleine Bastien, Family Action Network Movement

Marleine Bastien is the Executive Director of Family Action Network Movement (FANM), a membership-based non-profit organization located in Little Haiti in Miami-Dade County, Florida. FANM's mission is to empower low-income immigrant families and to give them the tools to contribute to their own development and empowerment by providing wrap-around services. Wrap-around services include a range of services aimed at strengthening families, including mental health counseling, crisis intervention, access to health care, immigration services, adult education centers, drug treatment, etc. FANM serves approximately 6,000 members, the majority of which are of Haitian descent and regardless of whether they are U.S. citizens or undocumented immigrants.

After learning of SB 168, FANM began engaging with its members through programming

and community canvassing to address the concerns with SB 168. It started an educational program to inform members of the risks and potential impact of the law, and it developed these materials in both English and Creole. It also held know-your-rights presentations and community meetings to discuss the bill. Ms. Bastien saw a clear reduction in members' participation in FANM activities, community meetings, religious services, physical and mental health services, and school attendance following SB 168. FANM also responded to increased calls and inquiries of concern about SB 168. Ms. Bastien appeared at a press conference with the Dade County School Superintendent to encourage parents to send their kids to school without fear of deportation or other immigration consequences. Finally, FANM sent its members to Tallahassee, Florida, to participate in the legislative process and to educate legislators about their experiences.

Ms. Bastien understood SB 168 to be an anti-immigrant, anti-sanctuary law that deputizes law enforcement officers and empowers them to enforce federal law. She explained that SB 168 would have a severe impact on FANM's member base because its members have historically been profiled, discriminated against, and singled out based on their race. Indeed, Ms. Bastien stated that many members had difficult relationships with law enforcement, and some had seen loved ones die at the hands of law enforcement officers' discriminatory actions. Thus, it was immediately apparent that SB 168 would result in members being racially profiled because of their skin color, which many members expressed to FANM. Moreover, the fears and concerns about SB 168 were not limited to those members who were undocumented. Rather, even U.S. citizens began reaching out to FANM with inquiries and concern about the implications of this law. As a result of SB 168, FANM had a reduction in its membership, participation in community events, and in virtually every aspect of the organization's service delivery. These fears, and the resulting lack of participation in FANM programs, are ongoing.

**4. Mary Jill Hanson, Florida Immigrant Coalition**

Mary Jill Hanson is a licensed attorney who is admitted to practice in Florida and who serves the immigrant population of Jupiter, Florida, and of Palm Beach County generally. She serves as a member of the board of the Florida Immigrant Coalition. In addition, Ms. Hanson volunteers as a pro bono attorney and community advocate with numerous immigration-related organizations. Specifically, Ms. Hanson volunteers with the Esperanza Community Center in West Palm Beach, Florida and the El Sol Neighborhood Resource Center in Jupiter, Florida, she is a founding member of the Palm Beach County Coalition for Immigrant Rights, she is on the board of the Palm Beach County chapter of the American Civil Liberties Union, and she is a member of People Engaged in Active Community Efforts ("PEACE") in Palm Beach County.

Through these various organizations, Ms. Hanson has served as a volunteer attorney helping individuals of all immigration statuses with legal issues relating to wage theft, immigration issues, traffic violations, and powers of attorney. She also serves as a community advocate with PEACE, which hosts community meetings to address its members' concerns, such as racial profiling and police-community relations, and attempts to work with relevant agencies in the community to find a solution. The demographics of the immigrant community in Jupiter, Florida, is roughly 65% Guatemalan in origin, and 35% other Hispanic. The immigrant community makes up approximately 16% of the population in Palm Beach County, Florida.

Since the introduction and passage of SB 168, the nature of the assistance provided to those communities has moved away from simply helping immigrants with their traffic tickets in court. After SB 168 was passed, Ms. Hanson began to observe instances where, rather than issuing citations for traffic violations, law enforcement officers were calling immigration authorities during routine traffic stops to detain the individuals stopped. Ms. Hanson described two specific

instances in August 2019 and September 2019 where this occurred. In the first incident, a woman was detained by ICE after local law enforcement stopped her for a minor traffic violation. The officer ran a background check on the woman stopped, identified what he incorrectly believed to be an order of arrest against her for an immigration violation, and called immigration authorities to the scene of the stop. The woman was never issued a traffic citation but was nevertheless taken into immigration custody and deported nine days later. In the second incident, a young man was also stopped by local law enforcement in a routine traffic stop but was ultimately taken into ICE custody without being issued a traffic citation. He was later released from the detention facility approximately six weeks later.

Ms. Hanson ultimately spoke with the chief of police about the first incident described above and reviewed the police officer's report, which incorrectly determined that the individual had a judicial warrant for her arrest pending, rather than an administrative warrant. Later, at a town council meeting, the assistant chief of police acknowledged that the warrant was an administrative warrant and conceded that the officers had no training in immigration law. Those incidents were concerning as they demonstrated that SB 168 was not being enforced only against immigrants in state custody who had valid detainer requests, as originally intended. Rather, the law was being applied during routine traffic stops without any citation or valid arrest. That practice was destructive to the relationship between community members and law enforcement, and it essentially nullified years of community outreach efforts to build trust. SB 168 had caused the community to fear interacting with law enforcement. She explained that a legal resident in this country chose not to report that he was the victim of a crime to law enforcement until he was forced to go to the hospital to receive treatment for his injuries.

Ms. Hanson testified about her encounters with FLIMEN as a volunteer at the El Sol

Case No. 19-cv-22927-BLOOM/Louis

Neighborhood Resource Center. FLIMEN began to rally and demonstrate outside of El Sol approximately a year after the Center opened, videotaping the individuals who visited El Sol and chanting to close the Center. Ms. Hanson described multiple incidents where she witnessed members of FLIMEN attacking or harassing community members while shouting derogatory terms and racist slurs at the individuals. In one instance, David Caulkett confronted a gentleman with a video camera as the gentleman was leaving El Sol. During this encounter, Mr. Caulkett fell over a curb and called the police, accusing the gentleman of assaulting him. The man was arrested but was ultimately acquitted at trial as the video evidence proved that Mr. Caulkett had fallen on his own.

Finally, Ms. Hanson described a recent incident in a neighboring town, where the emergency communication system was used to announce that a boat full of immigrants had landed and to request that any "suspicious persons" be reported. Ms. Hanson explained that the use of "suspicious persons" in a predominantly white community was concerning because it invited reports of persons who were identified as being "suspicious" based solely on their race. This incident put the immigrant community at a higher risk of being racially profiled and suffering adverse immigration consequences as a result.

### 5. Antonio Tovar, Farmworkers Association of Florida

Antonio Tovar is the outgoing General Coordinator/Executive Director of the Farmworkers Association of Florida (FWAF) headquartered in Apopka, Florida. FWAF is a membership-based non-profit organization whose mission is to empower and improve the livelihood and working conditions of farmworkers in Florida. FWAF hosts programs and clinics on education, health, and safety, it researches the regulations and legislation that could impact members of the community, engages in advocacy at all levels of government, it monitors issues commonly faced by its

members such as wage theft and housing issues, and it deals with immigration issues and hosts programs to educate the community on these issues. FWAF's membership consists of approximately 10,000 members of African American, Haitian, Latin American, and Central American descent, with a small percentage of white members. These members are of all different immigration statuses and are predominantly farmworkers or other temporary or seasonal foreign workers.

Upon learning of SB 168, FWAF immediately began contacting legislators and attempting to convey the harm and discriminatory effect the bill would have on its members. The bill would hurt the relationships between law enforcement and immigrants and would lead to increased racial profiling and wage theft against FWAF members and would chill members' willingness to report crimes. FWAF hosted additional educational programs and know-your-rights presentations, community meetings with members and with local law enforcement agencies, and city participation. FWAF began working with the consulates of many countries that were representative of its membership in order to have contingencies for SB 168's application. In addition, FWAF wrote to legislators and to Governor DeSantis to advocate against the bill and encouraged its members to do the same. SB 168 resulted in significant financial hardship to FWAF because the organization was forced to cease certain programs in order to reallocate resources to respond to SB 168. Many of the grants FWAF receives are designated toward certain purposes, which made those funds unavailable for use in the SB 168 response efforts. As such, FWAF was required to find new sources of funding to support these continued efforts, and certain programs initially put in place in response to SB 168 were ultimately terminated for lack of funding.

FWAF representatives traveled to Tallahassee, Florida, multiple times during the 2019 legislative session to engage in discussions and advocacy against SB 168. Mr. Tovar's experience

during the legislative session for SB 168 was different from prior years. Amidst a polarized political climate, the bill was rushed through the legislative process with little notice or opportunity for discussion with legislators. The bill was added to the legislative schedule abruptly and without any explanation as to how or why it was introduced, thus forcing FWAF representatives to travel back and forth from Tallahassee more than planned to continue advocating against SB 168. Indeed, similar laws had been introduced in the past, but FWAF always had the opportunity to present its opposition to the legislators and to discuss reasonable compromises to lessen the effects on its community members. The 2019 legislative session lacked any comparable opportunities for advocacy. Most conversations with legislators occurred in passing in the hallways of the Capitol building. Moreover, Mr. Tovar visited Senator Gruters' office twice and spoke with Mr. Barnhill, who appeared disinterested in FWAF's concerns and attempts to explain the harms of the bill. Mr. Barnhill simply responded that the bill only targeted criminal undocumented immigrants. FWAF also spoke with staff members for Senators Simmons and Rodriguez, Representative Oliva, and other legislators from both political parties and from both the House and the Senate. They left those discussions feeling as though there was no room for any compromise to ameliorate the impact of the bill.

After SB 168 was enacted, FWAF immediately began to receive reports of racial profiling in encounters with law enforcement. Its membership fell and there was an unwillingness on the part of its members to access healthcare clinics and social services due to the fear of being targeted and detained by immigration authorities working with local law enforcement. It received an increased number of calls from members who feared the effects of the law and confused about its application. It received an increase in reports and calls of members being racially profiled during traffic stops by law enforcement without being issued a citation and calls from family members of

individuals who were ultimately detained by immigration officials. In response to these reports, FWAF created a task force to patrol the streets to ensure that members were not being stopped by law enforcement officers without cause. Moreover, FWAF had to find additional legal resources and services that it could refer its members to in response to these reports.

### 6.   Laura Pichardo-Cruz, Hope Community Center

Laura Pichardo-Cruz is the Executive Director of Hope Community Center (Hope) located in Orange County, Florida. Hope is a service-learning organization dedicated to empowering Central Florida's vulnerable communities through five core programs: (1) immigration services; (2) a citizenship program; (3) an academy program; (4) a college and career access program; and (5) a youth and families program. Hope primarily serves the immigrant community, and the vast majority of families served are from mixed-status families. The majority of the individuals Hope serves are Latinx Spanish speakers. To a lesser extent, Hope also serves some Central American immigrant communities that speak a combination of Spanish and indigenous Mayan languages, along with Haitian and African American communities.

Upon learning of SB 168, Hope staff members attended the 2019 legislative session, participated in legislative advocacy efforts, and engaged in discussions with legislators about community concerns. Following the enactment of SB 168, Hope increased its community outreach and education programs. Hope paired with its community partner organizations and with local, trusted attorneys to conduct know-your-rights presentations. Hope brought attorneys in so individuals could obtain powers of attorney in the case of an emergency. It also received an influx of calls from individuals who had family members detained and were seeking legal resources. In response to SB 168, Hope's staff tried to provide meaningful community support, which included locating information on detained family members and/or finding trusted attorneys for referrals.

SB 168 caused widespread fear in the community and a need to respond with additional support, resources, and education. Hope staff members noticed increased law enforcement presence near mobile home parks where many immigrants lived and near intersections where immigrants frequently got their meals. There is still a significant amount fear and uncertainty within the Hope community relating to SB 168.

### 7. Laura Muñoz, Florida Immigrant Coalition

Laura Muñoz previously served as the Hotline Manager and Volunteer Coordinator, and now serves as the Director of Services, at Florida Immigrant Coalition located in Miami, Florida. In her position as the Hotline Manager, Ms. Muñoz was responsible for ensuring that the hotline infrastructure was equipped to meet the changing demands of FLIC's membership and recruiting and training volunteer and permanent hotline operators. FLIC started operating the hotline in 2017 as a small-scale operation run by volunteers to respond to members' concerns about shifting presidential administrations. Upon learning of SB 168 in 2019, FLIC's hotline experienced a significant increase in incoming calls, which necessitated expanding the hotline infrastructure. During this time, FLIC went from addressing approximately 80 tickets per month in 2018, to 800 tickets per month in 2019, and close to 2,000 tickets per month in 2020. Presently, the FLIC hotline operates 24/7 and employs three contractors who respond to calls in English, Spanish, and Creole and who work on an hourly basis. In addition, FLIC has anywhere from 60-80 volunteers who also provide hotline support.

The hotline operates by fielding calls through a central desk staffed by one or two people at all times, and these operators assign tickets and conduct an initial intake on each call to determine how to categorize the inquiry. Then, the operator assigns the ticket an urgency based on the needs of the caller. Urgent tickets must be addressed within 24 to 48 hours due to an immediate

issue, such as an impending deportation or racial profiling during an encounter with law enforcement. Urgent tickets activate FLIC's rapid response procedures and immediate follow-up assessments. In extreme cases, urgent tickets may require a FLIC rapid-response volunteer to meet the caller on site to provide support, and FLIC has a network of volunteers and member organizations across Florida that respond to these issues. Alternatively, a problematic ticket reflects the lack of existing resources to meet member needs and prompts additional community-support based follow up. Finally, for calls that simply involve providing information or answering routine questions from members, these inquiries are typically addressed after the initial intake.

The influx of calls to FLIC's hotline in 2019 has required that FLIC create new volunteer structures to meet increased demand and to alter the infrastructure, the categorization of inquiries in FLIC's database and of ticket urgency, and the response protocols for incoming calls. Because most of FLIC's existing resources and the resources of its member organizations were extremely limited, Ms. Muñoz had to create new partnerships to meet the rise in hotline calls and members' need for additional support, which included creating the rapid response structure. SB 168 has directly caused the growth of the hotline, based on observations of the growing fear in the community, the changing needs of callers from 2018 to 2019 (from predominantly information-based inquiries in 2018 to receiving a large number of fear- and incident-based calls in 2019), and the significant rise in calls reporting urgent incidents that necessitated rapid response measures.

The hotline saw a rise in calls inquiring whether it was safe to visit food pantries or go to the hospital. Likewise, FLIC saw an increase in callers experiencing domestic violence who feared going to law enforcement. Although FLIC is not a domestic violence hotline, it has attempted to work directly with domestic violence organizations to address the needs of its members. There was an increase in calls reporting wage theft from immigrant members, regardless of status. The spike

in calls reporting these issues were directly related to members' fears about SB 168's enforcement.

Ms. Muñoz testified about two incidents that she responded to as the Hotline Manager and that occurred after SB 168 was enacted. One involved an incident where a mother was stopped by Customs and Border Protection (CBP) while she was a passenger in a car with her children. She refused to give her name to the CBP officers but began experiencing a panic attack, causing her to vomit and ultimately faint. She was transported by ambulance to the hospital, at which point she disclosed her personal information to the medical staff but not to CBP. Ms. Muñoz explained that the hospital staff ultimately provided CBP with the patient's information after being pressured by CBP that they were obligated to cooperate. The woman was detained later that day.

The second incident involved a family that was moving and was stopped by law enforcement for improperly disposing of a mattress. The driver of the vehicle was issued a citation for the mattress. The officers then began asking the passengers questions and one passenger, who did not speak English, could not respond. Eventually the officers made the family hang up a call with FLIC, and the individual ultimately disclosed his personal information. The individual was not issued a citation, but was nonetheless taken into custody, and transferred into ICE custody within 48 hours. Although Ms. Muñoz believed that this individual was racially profiled, she testified that she did not file a complaint with local law enforcement.

The biggest obstacle that the hotline has faced following SB 168 was managing the lack of resources with the increased need for support from members and finding solutions to still serve FLIC's membership. Responding to increased levels of fear in the community and adequately training volunteers to respond to these concerns had been particularly challenging.

### 8. Sister Ann Kendrick, Hope Community Center

Sister Ann Kendrick works in Community Relations for Hope Community Center in

Apopka, Florida. Sister Kendrick's position entails a combination of community organizing and advocacy and of providing services to the Hope community.

When SB 168 was introduced at the 2019 legislative session, Hope began to mobilize its community in order to challenge the bill. Hope began offering additional educational programs and know-your-rights presentations to inform its clients of the support and recourse available to them if they were detained. Hope also offered powers of attorney to individuals who were particularly at risk of being detained and taught members of the community how to locate various resources and documentation in preparation for any potential detention.

On two occasions, Sister Kendrick traveled with a coalition of non-profit organizations to Tallahassee, Florida, to participate in the legislative session and to speak with legislators from both political parties about the harmful effects of SB 168. While in Tallahassee, the group attended committee meetings and attempted to discuss various bills with available legislators. They tried to schedule meetings with legislators, but scheduled meetings were extremely difficult to secure. As a result, Sister Kendrick tried to present Hope's positions to legislators serving on relevant committees or to target legislators in the hallways to present the concerns and perspectives of the immigrant community.

After participating in legislative sessions every year for the past ten years, the 2019 legislative session was unusually difficult to navigate because of the inability to sit and meet with legislators and to present Hope's point of view on SB 168. The advocacy days relating to SB 168 were different from her prior experiences because there appeared to be no room for any kind of negotiation or meaningful discussion on the issues raised. Sister Kendrick also recalled visiting Senator Gruters' office on one advocacy visit and seeing a large poster stationed in his lobby with blown-up mugshots of predominantly darker skinned "criminal illegals" who had been deported,

which reaffirmed Hope's concerns about the bill and its racist and harmful impacts if passed.

The number of calls Hope received after SB 168 increased, especially from individuals attempting to locate their detained family members and/or requesting specific assistance. In one incident, she performed work on a case where an individual was arrested despite not having committed a crime and simply for walking down the street. This individual was ultimately deported before Hope could help him.

### 9. Christopher Cuevas, QLatinx

Christopher Cuevas is the Executive Director Emeritus of QLatinx, a membership-based non-profit organization serving Central Florida. QLatinx serves members of all ages, races, ethnic identities, gender identities, sexual orientation, occupations, and immigration statuses, including both U.S. citizens and legal permanent residents. QLatinx offers immigration services to its members that include referrals to trusted attorneys, community education on constitutional rights regardless of immigration status, and advocacy work.

Upon learning of SB 168, QLatinx sent its members and staff to Tallahassee to participate in the legislative session and to engage in discussions with elected officials about the proposed law. QLatinx had never participated in legislative advocacy on this scale prior to SB 168. Mx. Cuevas spoke with legislators from both political parties and their staff about the experiences of QLatinx's members and the concerns that SB 168 raised.

As part of QLatinx's efforts to combat SB 168, it engaged in discussions with city and county commissioners, locally elected law enforcement officials, and some state representatives. Those discussions attempted to directly engage local officials with their immigrant communities, to which they likely had strong ties, and emphasized that restrictive policies like SB 168 would result in the persecution of their communities and would have a negative impact on the local

economy, as well as on the health and safety of the community. QLatinx reallocated staff time and responsibilities to meet the demand of inquiries about SB 168 and how to access immigration assistance in the community. It also had to increase the number of trainings it conducted with lawyers and community-wide conversations about the SB 168.

SB 168 raised concerns relating to the scope of law enforcement agencies' responsibilities and how it would impact their ability to serve and protect the vulnerable communities against crime. QLatinx's members feared being subjected to increased racial profiling and they became reluctant to go to the grocery store, to send their children to school, to drive to work, or to visit the doctor. These concerns stemmed directly from SB 168's Best Efforts Provision and the resulting fear that individuals would be detained based on the color of their skin or whether they spoke English. In addition, QLatinx received reports from its members of law enforcement's inquiries into members' immigration status and members being victims of crimes but refusing to report those crimes to city police because they feared the immigration consequences.

**10. Oscar Lodoño, WeCount**

Oscar Lodoño is the Executive Director of WeCount, a membership-based non-profit organization in Homestead, Florida. WeCount's membership is comprised of low-wage immigrant workers and families, such as farmworkers, plant nursery workers, domestic workers, and day laborers. Its members are predominantly from Latin America, Mexico, and Central America, and have mixed immigration status. WeCount's mission is to build the power and leadership of low-wage immigrant workers and families throughout South Dade through education, support, and collective action. As such, WeCount offers a combination of direct and indirect services, which include social and legal services, educational workshops, policy advocacy, and leadership development programs.

SB 168 raised significant concerns for WeCount and its members. Those included the connection between the proposed legislation and the white nationalist, anti-immigrant hate groups backing it.[12] The Best Efforts Provision raised concerns of racial profiling, given the community's long history of experiencing racial discrimination at the hands of local law enforcement officers. SB 168 invites reliance upon race, color, or perceived national origin in cooperating with immigration enforcement efforts.

Upon learning of SB 168, WeCount immediately joined with community partners to mobilize a response to the bill. They mobilized members, conducted educational workshops, and organized a day of action and demonstrations in Tallahassee, where they met with elected officials. After SB 168 was enacted, WeCount began receiving inquiries from its members and the broader community about the broad implications of the law, its effect on interactions with local law enforcement, whether the law affected their ability to file complaints in court, and whether it was safe to visit health clinics, attend social programming, and to participate in food banks. WeCount has also received increasing reports of police harassment, aggression, and scrutiny of day laborers, which was motivated by their skin color. WeCount's members have reported increased police presence at day laborer corners, along with additional immigration-related questioning by law enforcement.

In response to SB 168, WeCount has begun offering its own financial and food assistance distributions for its members, creating programs to address rising concerns in the community related to the law, hosting educational know-your-rights workshops, conducting community radio station programming, and screening more legal intakes. SB 168 has eroded its members' trust in law enforcement and has forced them not to participate in certain services, such as food banks and

---

[12] Mr. Lodoño mentioned that WeCount has come into contact with FLIMEN in the course of its work in the community and that these interactions resulted in personal threats and other hostile actions.

health clinics, out of fear of immigration consequences. The bill has resulted in increased instances of labor and employment issues experienced by its members.

### 11. Father Frank O'Loughlin, Guatemalan-Maya Center

Father Frank O'Loughlin is the founder and Executive Director of the Guatemalan-Maya Center (GMC), a non-profit organization headquartered in Lake Worth, Florida.[13] GMC is dedicated to empowering and protecting the rights of immigrants through a variety of programming and services offered to predominantly undocumented or mixed-status communities.

Upon its enactment, SB 168 harmed GMC by causing panic in the community, an increased demand for legal services, educational programs, and case management services. GMC had to shift its focus from its primary initiatives toward legislative advocacy, developing extensive educational programs and know-your-rights presentations, participating in community calls, and advising community partners and concerned clients. GMC was forced to divert resources away from its existing projects in order to address the rapidly evolving needs of its community as a result of SB 168. SB 168 has negatively impacted the public safety of communities because undocumented individuals are less likely to trust law enforcement or to report crimes out of fear of facing immigration consequences. Undocumented individuals are less likely to participate in social and community programming, mental and physical health services, and educational resources. After SB 168 was enacted, there was a rise in discriminatory or racially motivated acts and hate crimes against minorities in the community, including GMC's own facility being vandalized.

### 12. David Caulkett, FLIMEN

By stipulation of the parties, designated portions of David Caulkett's deposition were also

---

[13] Portions of Father O'Loughlin's deposition were read into the record at trial upon the parties' stipulation. *See* ECF Nos. [165] & [168]. His complete deposition transcript is available at ECF No. [114-12].

read during the trial.[14] Mr. Caulkett co-founded FLIMEN with a number of other individuals, and he currently serves as the organization's vice president. Mr. Caulkett described FLIMEN as a group of individuals who advocate for legal immigration at reduced levels and who oppose illegal immigration. FLIMEN often submits model legislation to the Florida Legislature as part of its advocacy efforts. Mr. Caulkett previously served on the board of advisors of FAIR and as a Florida state advisor to FAIR. Mr. Caulkett stated that FLIMEN and FAIR are entirely separate entities that often work together to advocate for heightened immigration enforcement.

Regarding FLIMEN's involvement with SB 168, FLIMEN did not draft the bill, but Mr. Caulkett believes that FLIMEN shared FAIR model legislation with the legislators involved. He secured several meetings with Senator Gruters during the 2019 legislative session to discuss SB 168 and more generalized immigration issues. FLIMEN also engaged in various other avenues of advocacy and promotion of SB 168, such as testifying at judiciary committee hearings, encouraging its supporters to contact their legislators to voice their support of the bill, and hosting the "Victims of Illegal Immigration Day" press conference. *See* ECF No. [115-1] at 170-75; *see also* ECF No. [199-21]. FLIMEN was also able to schedule meetings with other legislators, such as Representatives Byrd and Beltran, and to meet with staff from both the Executive Office of the Governor and the Office of the Attorney General to promote SB 168. *See* ECF No. [113-6] at 122-28.

Mr. Caulkett was able to speak with Senator Gruters about the passage of SB 168 and offered his advice on the bill, which prompted Mr. Barnhill's e-mail response dated January 24, 2019, thanking him for sending the FAIR Sanctuary Report and for offering his advice on SB 168. *See id.* at 299-300. Likewise, with regard to his statement to Mr. Barnhill that "[o]ur attorney's

---

[14] Mr. Caulkett's deposition transcript and all related exhibits used during the deposition are available at ECF Nos. [113-6] & [115-1].

[sic] looked at SB168," Mr. Caulkett clarified that he was referring to a FAIR attorney. *See id.* at 142. Finally, when asked why he advised Senator Gruters not to distribute the list of sanctuary jurisdictions "as that would just create problems," Mr. Caulkett testified that sanctuary lists are controversial because they are rarely supported by empirical data, but he noted that the ultimate determinant is whether the jurisdictions honor detainers. *Id.* FLIMEN was opposed to any attempts to "weaken" SB 168, including through amendments like those proposed by Senator Taddeo in March 2019. *See* ECF No. [113-6] at 57; *see also* ECF No. [115-1] at 168-69; ECF Nos. [194-12] & [194-13]. That testimony is reinforced by Mr. Morrow's statement in an e-mail to FLIMEN supporters that it was "working with Senator Gruters and Senator Bean to seek passage of SB 168 Federal Immigration Enforcement." ECF No. [115-1] at 172; *see also id.* at 168-69 (FLIMEN passing along FAIR and Jaroslav's comments, input, and strategic advice on SB 168 "for Senator Gruters to review"); ECF No. [199-24] at 2 (statement by Caulkett that FLIMEN "worked closely" with Senator Gruters in drafting the bill").

Since SB 168's passage, FLIMEN has begun monitoring whether law enforcement agencies are complying with the statute's requirements and advocating for its enforcement. *See* ECF No. [115-1] at 205 (Caulkett asking Olson, from the Office of the Attorney General, for reporting procedures on honoring detainers under SB 168 and encouraging that Attorney General Moody administratively require regular reporting to ensure compliance).

**13. Anna DeCerchio, Executive Office of the Governor**

The deposition testimony of Anna DeCerchio,[15] the Deputy Policy Director at the Executive Office of the Governor ("EOG"), was read into the record at trial. Ms. DeCerchio discussed her knowledge about SB 168. She explained that the EOG has not received any

---

[15] Ms. DeCerchio's deposition transcript, and accompanying exhibits, can be found at ECF No. [113-5].

complaints and has not investigated or initiated any proceedings to enforce compliance or to remove anyone from office pursuant to SB 168's Enforcement Provision. *See* Fla. Stat. § 908.107. The EOG has not taken steps to investigate violations of the Antidiscrimination Provision or to ensure that agencies comply with that provision. *See* Fla. Stat. § 908.109. Nor have any resources been allocated with which to do so because of the lack of complaints received.

Stephanie Kopelousos, the Legislative Affairs Director at the EOG, met with FLIMEN's Mr. Morrow and Mr. Caulkett during the 2019 legislative session upon FLIMEN's request. No other meetings have taken place between the EOG and FLIMEN. The EOG has not received any communications or requests to meet with anyone related to either FAIR or CIS. The EOG was aware of FLIMEN's involvement in drafting and advocating for SB 168. She later clarified her testimony, explaining that she was aware that FLIMEN advocated for SB 168, but did not know whether its members participated in drafting the legislation during the 2019 session.

Ms. DeCerchio was asked about an e-mail sent by Mr. Caulkett to Governor DeSantis in April 2019, which attached a FLIMEN e-mail alert, and stated that "FLIMEN is working very, very hard for SB168/HB527." ECF No. [113-5] at 80. Mr. Caulkett's e-mail also invited Governor DeSantis to "Victims of Illegal Immigration Day," which was co-sponsored by FLIMEN and SB 168's bill sponsors. To Ms. DeCerchio's knowledge, no one associated with the EOG, including Governor DeSantis, attended or participated in the "Victims of Illegal Immigration Day."

**14. Elizabeth Guzzo, Office of the Attorney General**

Portions of Elizabeth Guzzo's deposition transcript were introduced at trial.[16] Ms. Guzzo is a Senior Legislative Aide at the Attorney General's Office. Her work e-mail address is elizabethguzzo@myfloridalegal.com, but she would still receive messages sent to

---

[16] Ms. Guzzo's deposition transcripts and corresponding attachments can be found at ECF No. [116-1].

libby.guzzo@myfloridalegal.com to her e-mail account. When time permits, the staff working at the Attorney General's Office regularly accept meetings with third-party organizations, regardless of whether the organization explicitly requested to meet or whether members of the organization dropped by the office unannounced.

On April 12, 2019, Ms. Guzzo received a FLIMEN blast e-mail alert to libby.guzzo@myfloridalegal.com. *See* ECF No. [116-1] at 127-32. While she never provides people with this e-mail address, she introduces herself as Libby and many people know her by that name. She was unsure what e-mail address was listed on her business cards, which might explain why she began receiving FLIMEN e-mails. Ms. Guzzo denied having ever subscribed to FLIMEN's mass e-mails but confirmed that she and Mr. Olson briefly met a few of FLIMEN's members during a meeting in 2019. Beyond that, Ms. Guzzo had very little recollection of what was discussed during this meeting or how many members appeared. Likewise, she did not believe she had ever met or communicated with members of FLIMEN following this meeting.

A bill is a legislative priority when it concerns an issue that the Attorney General has been vocal about or that she wants to be resolved. Nevertheless, SB 168 was not considered a legislative priority for Attorney General Moody.

### 15. Daniel Olson, Office of the Attorney General

Daniel Olson serves as the Director of Government Affairs for the Office of the Attorney General. He testified by deposition, which was introduced at trial.[17] Mr. Olson indicated that the staff at the Attorney General's Office regularly meets with third-party groups during the legislative session, time permitting, when such meetings are requested. They rarely turn down meetings with third parties, and, if they do, it is generally as a result of time constraints. Typically, employees at

---

[17] The complete transcript of Mr. Olson's deposition, along with the exhibits used during the deposition, can be located at ECF No. [115-3].

the Office of the Attorney General only advocate on behalf of the Attorney General's bills.

On February 15, 2019, Mr. Caulkett, on behalf of FLIMEN, e-mailed Catherine McNiell of the Attorney General's Office requesting a meeting with the Attorney General to discuss "illegal immigration issues" that FLIMEN felt were in line with the Attorney General's views. *See* ECF No. [115-3] at 98. Although the Attorney General herself never met with them, Mr. Olson and Ms. Guzzo met with three FLIMEN members, only one member of which Mr. Olson could identify as Mr. Caulkett. At this meeting, Mr. Caulkett advocated in favor of certain immigration issues, including passing SB 168.

On October 25, 2019, he received a phone call from Mr. Caulkett requesting that any procedures implemented by the Attorney General regarding SB 168 be sent to him. Similar to Ms. DeCerchio's testimony, however, Mr. Olson stated that the Attorney General had not issued any guidance or materials regarding SB 168. He did not recall receiving any complaints of noncompliance with the bill. Mr. Caulkett followed their phone call with an e-mail to Mr. Olson suggesting that the Attorney General should implement clear administrative guidance mandating incremental reporting requirements to ensure compliance with SB 168 and reiterating his request for any relevant documents setting forth the compliance requirements. *See* ECF No. [115-3] at 102. Aside from the instances above, his only other communications or interactions with members of FLIMEN occurred passing in the hallways of the Legislature while he and Ms. Guzzo advocated on behalf of the Attorney General's priorities. During these passing interactions, Mr. Caulkett was always quick to advocate for the bills he was supporting at the time, but no substantive or prolonged conversation ensued during these encounters.

### 16. Dr. Allan Lichtman

Dr. Allan Lichtman testified at trial and his comprehensive expert report was admitted into

evidence. *See generally* ECF No. [191-1] ("Report"). Dr. Lichtman is a Distinguished Professor of History at American University with significant expertise on the topics of American history, political history, voting rights, quantitative methodology, civil rights, historical methodology, social science, racial animus, and race relations. *See id.* at 251-76. He has been recognized as an expert across a wide variety of different subjects and fields, including historical analysis, statistical analysis, political analysis, discriminatory legislative intent and impact, racial animus, race relations, voting rights, redistricting, and data analysis. *See* ECF No. [191-1] at 18-21. During the course of his career, he has served as an expert witness in numerous cases where he was asked to provide opinions on issues specifically relating to the discriminatory intent of a legislative body. He is an expert on equal protection issues, and he has authored numerous expert witness reports addressing equal protection issues and has published a book on voting rights in America that directly addressed equal protection issues.

Plaintiffs retained Dr. Lichtman to provide his expert opinions on whether SB 168 "was adopted with the intent of discriminating against minorities, or individuals perceived to belong to a minority population, on the basis of their perceived or actual national origin, race, and alienage, regardless of their possession of documentation." ECF No. [191-1] at 6. In his Report and throughout his testimony at trial, Dr. Lichtman undertook a thorough review of the evidence and the surrounding historical, statistical, and political data, to provide contextual background of the events leading up to SB 168's enactment. After performing his historical, statistical, and methodological analysis, Dr. Lichtman set forth his expert findings and opinions within the framework of factors that this Court considers in determining whether SB 168 was enacted with discriminatory legislative intent.[18] The Court addresses each of Dr. Lichtman's considerations

---

[18] As will be discussed in more detail below, in addressing an Equal Protection challenge based on discriminatory legislative intent, the United States Supreme Court has explained that "[d]etermining

separately below.

### a. Relevant Historical Background

Dr. Lichtman first examined the historical background behind SB 168 in various contexts to determine if there was a historical or ongoing practice of discrimination in the State of Florida. Relevant to the instant action, Dr. Lichtman examined the history of discrimination and racial profiling by law enforcement in Florida. *See* ECF No. [191-1] at 44-56. After discussing extensive studies on the disproportionate impact of various policing practices on minorities, he opined that there is an ongoing pattern or practice of discrimination and racial profiling in law enforcement in Florida and that these racial disparities are aggravated by enhanced law enforcement responsibilities and proactive police measures[19] like those imposed in SB 168.

Dr. Lichtman opined that the historical and ongoing pattern of racial profiling and discrimination in law enforcement practices has a discriminatory effect on racial minorities, thus making SB 168's discriminatory impact foreseeable. Those statistically significant racial and ethnic disparities are evident, regardless of whether the law enforcement encounter involved a stop, search, arrest, conviction, or incarceration. The racially disparate law enforcement practices

---

whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("*Arlington Heights*"). Accordingly, the Supreme Court identified, "without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268. The relevant factors include the following: (1) the impact of the official action and whether it "bears more heavily on one race than another"; (2) the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes"; (3) the "specific sequence of events leading up to the challenged decision"; (4) departures from the normal procedural or substantive sequences, "particularly if the factors usually considered important by the decisionmaker"; and (5) the legislative or administrative history, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *See id.* at 266-68. Courts have also considered the knowledge and foreseeability of the discriminatory impact and the availability of less discriminatory alternatives. *See Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983).

[19] Dr. Lichtman described proactive police measures as those that actively involve police in the community beyond their typical police responsibilities of responding to and investigating reports of crime in order to pursue some sort of policy.

in Florida have continued, despite the requirement that every municipal law enforcement agency incorporate an anti-discriminatory profiling policy into their existing agency policies, because there have been no meaningful efforts to enforce the requirement. *See* ECF No. [191-1] at 53.

### b. Discriminatory Effect

In addition to the historically discriminatory policing practices in Florida, Dr. Lichtman addressed the statistical data on racial disparities across arrests by Immigration and Customs Enforcement (ICE). The data establishes that Hispanic and African American individuals are disproportionately arrested by ICE agents for being suspected undocumented immigrants, as compared to more Eurocentric individuals. Those racial and ethnic disparities, and the likelihood of racial profiling, typically increase when proactive policing measures are involved, even if those measures are racially neutral on their face. There is a direct connection between proactive policing measures and racial profiling. Studies reflect that there are disproportionate and detrimental impacts on minorities, regardless of immigration status or citizenship, in jurisdictions that have implemented proactive policing measures, like SB 168. Those measures are designed to crack down on undocumented immigrants. Data shows that the pre-SB 168 proactive policing measures relating to immigration enforcement led to increased discriminatory profiling and disproportionately affected Hispanic communities. *See* ECF No. [191-1] at 103-09.

SB 168 is a proactive policing measure because it requires law enforcement officers to actively cooperate with enforcing immigration law, which they are not ordinarily required to do. SB 168's application of those proactive policing measures to a specific segment of the population—namely, undocumented immigrants—further increases the likelihood that law enforcement officers will use racial profiling or other discriminatory tactics in cooperating with ICE. Based on his review of the extensive amount of data on this topic, Dr. Lichtman concluded

that SB 168 will exacerbate the already disproportionate impact of ICE arrests on racial and ethnic minorities, due in part to the false and stereotypical perception that immigrants pose greater threats to society.

Dr. Lichtman also testified in detail about the likelihood that U.S. citizens will also be disproportionately targeted and improperly detained as suspected undocumented immigrants based on their race or national origin. ICE's databases often contain outdated or incorrect information about an individual's immigration status, causing U.S. citizens to be illegally arrested and detained by ICE. Dr. Lichtman cited to a study by the ACLU in Miami-Dade County, Florida, which found that ICE illegally detained 420 U.S. citizens from early 2017 to 2019 based on incorrect detainers, and that 94% of these individuals were Hispanic or African American. ECF No. [191-1] at 76. Notably, these statistics do not account for individuals who are lawfully present in the United States, despite not being U.S. citizens.

Dr. Lichtman examined SB 168 through the lens of the public safety goals advanced by Senator Gruters and Representative Byrd in promoting the bill during the legislative process. He testified that 73% of ICE arrests under cooperative immigration agreements in Florida from 2015 to 2018 involved individuals with no criminal record or a record of minor offenses, whereas only 0.4% involved individuals with serious criminal offenses such as homicide or sexual assault. He explained that immigration enforcement programs harm immigrant communities and are detrimental to public safety. Those programs create distrust of law enforcement in immigrant communities and make these communities less likely to report crimes, interact with police, seek out medical treatment or emergency services, or access social services, among others.[20] This

---

[20] Among other data, Dr. Lichtman relied on the following statement by the Major Cities Chiefs Association, which represents police departments in the nation's 56 largest cities, about the chilling effect that immigration enforcement causes when done by local police:

chilling effect results in increased crime rates because crimes are underreported and therefore more difficult to properly investigate.

The statistics contradict the representations that SB 168 was intended to affect only those undocumented immigrants with serious criminal histories and to promote public safety by reducing the number of serious criminals released back into Florida communities. The data regarding the racially disproportionate impact of ICE arrests on both citizens and non-citizens and of proactive policing measures demonstrates that SB 168's disparate impact on racial and ethnic minorities, regardless of immigration or citizenship status, was entirely foreseeable. *See* ECF No. [191-1] at 56-57 ("In a study of the impact of proactive policing measures on non-white individuals, the Committee of the National Academies of Sciences concluded "that racial profiling is associated with proactive policing because of differential views, whether conscious or not, that police have regarding the likely criminality of non-white persons."); *see also id.* at 60 ("Data from the TRAC program at Syracuse University on ICE arrests in Florida established ICE's disproportionate arrests of suspected undocumented immigrants from predominantly Latin America and the Caribbean.").

### c.  Sequence of Events

Dr. Lichtman evaluated the sequence of events leading up to SB 168's enactment. Senator

---

Immigration enforcement by local police would likely negatively effect [sic] and undermine the level of trust and cooperation between local police and immigrant communities. If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation. Distrust and fear of contacting or assisting the police would develop among legal immigrants as well . . . Any initiative to involve local police agencies in the enforcement of immigration laws should be completely voluntary.

ECF No. [191-1] at 96 (quoting *For Enforcement of Immigration Laws by Local Police Agencies*, Major Cities Chiefs Assoc. 6, 9 (June 2006), available at http://www.houstontx.gov/police/pdfs/mcc_ position.pdf).

Gruters' and Representative Byrd's repeated insistence that SB 168 was about public safety and reducing crime is contradicted by the decreasing crime rates in Florida in the years preceding SB 168's enactment. Specifically, Dr. Lichtman performed a review of the Florida Department of Law Enforcement's data on crime rates which revealed that "crime had fallen steeply in Florida over the long- and short-term, it had fallen dramatically as undocumented immigration in the state of Florida had increased by orders of magnitude, and in recent years crime had fallen more steeply in alleged sanctuary jurisdictions than in the rest of Florida." ECF No. [191-1] at 119-20. Thus, the representations made by SB 168's legislative sponsors—i.e., that the bill would reduce crime rates and improve public safety—appear to be unsupported by the statistical data on falling crime rates in Florida, despite the simultaneous rise in undocumented immigration.

In the years leading up to SB 168, the voting patterns across various demographics began to shift, and the political landscape began to change in Florida. In 2018, Senator Gruters, a long-serving member of the Florida House of Representatives and strong supporter of anti-sanctuary city bills, was elected to the Florida Senate. That same year, Governor DeSantis, who fully supported efforts to eliminate sanctuary jurisdictions. was elected to serve as Florida Governor. Thus, after proposed anti-sanctuary legislation had failed in the Senate in 2017 and 2018, Senator Gruters and Governor DeSantis' elections further helped to facilitate SB 168's enactment.

FLIMEN and FAIR's intimate involvement in the strategy, drafting, and promotion of SB 168 demonstrate the anti-immigrant sentiments underlying the bill. Dr. Lichtman's Report contains an extensive historical background on the origins of both FLIMEN and FAIR, which are firmly rooted in anti-immigrant sentiment, nationalism, and xenophobia and the desire to preserve the allegedly superior white race above all others. *See id.* at 133-68.

Dr. Lichtman testified that those groups routinely promote the derogatory and untrue

narrative that associates immigrants with violent crimes and threats to public safety. He described this concept as the "immigrant threat narrative," and explained that it is often used to promote stricter immigration policies. The immigrant threat narrative is commonly used as a mechanism through which to demonize immigrant populations by depicting them as dangerous, undeserving invaders who pose significant threats to the safety and wellbeing of society. Indeed, a 2019 study by the CATO Institute examined data from the U.S. Census American Community Survey concluded that undocumented persons "are *49 percent less likely* to be incarcerated than native-born Americans. Legal immigrants are 75 percent less likely to be incarcerated than natives." *Id.* at 197. Despite this data demonstrating that immigrants commit fewer crimes and do not pose any greater threats than citizens, this data fails to sway public perception that undocumented immigrants are more prone to criminality. Moreover, this false narrative often refers to immigrants in hostile and demeaning terms that maximize shock value (e.g., "illegal aliens," "invaders," or describing immigrants as rapists or murderers). Notably, Dr. Lichtman emphasized that the statements made during FLIMEN's "Victims of Illegal Immigration Day"—i.e., that immigrants sneak into this country to kill innocent citizens—perfectly reflect this immigrant threat narrative.

In sum, the shifting political divide, the election of Senator Gruters and Governor DeSantis, both of whom advocated for anti-immigrant policies, and the strategic involvement of anti-immigrant hate groups such as FAIR and FLIMEN,[21] when taken together, reveal a sequence of events that laid the foundation for the enactment of SB 168.

### d. Deviations from the Norm and Contemporary Statements

Dr. Lichtman addressed the deviations from the norm in enacting SB 168. FAIR and FLIMEN's intimate involvement in the drafting, strategy, and promotion of SB 168 presents a

---

[21] Dr. Lichtman testified that, after conducting his own extensive independent research, he determined that characterizing FAIR and CIS as "anti-immigrant hate groups" was well founded and accurate.

particularly clear departure from the norm. FAIR and FLIMEN's degree of participation in the legislative process presents a relationship that is "fundamentally different from normal outside advocacy." Those organizations have consistently espoused anti-immigrant, racist agendas since their inception, making their participation in the legislative process on SB 168 concerning. Moreover, although it is widely recognized that FAIR and FLIMEN are anti-immigrant hate groups, key legislators continued to work with those organizations in drafting and advocating for SB 168. Similarly, the Legislature's rejection of numerous ameliorative amendments to SB 168, aimed at fine-tuning various provisions to ensure the law achieves its desired purpose, reflects procedural deviation from the typical legislative process. Including the FAIR and CIS data on sanctuary jurisdictions in the bill's staff analysis evidences a substantive departure from the norm, as the Legislature is uniquely positioned to research the pertinent data and ensure their decisions are founded upon reliable information.

Dr. Lichtman opined that the contemporaneous statements made by those involved with the bill were pretextual and misleading. Senator Gruters' and Representative Byrd's repeated statements about SB 168's public safety interests are contradicted by the relevant statistical data and unsupported by the record. Crime rates in Florida were rapidly declining, even as the numbers of undocumented immigrants in Florida were on the rise. Moreover, no data or information was provided during the legislative process to substantiate those alleged public safety benefits, especially where the reliable data establishes that proactive policing practices like SB 168 have negative effects on minorities, crime rates, and on the overall wellbeing of communities. Extensive data were cited disproving any suggestion that immigrants are more dangerous or crime prone than U.S. citizens, that sanctuary jurisdictions are less safe than jurisdictions where federal immigration enforcement efforts are honored, or that SB 168 will only impact dangerous, violent criminals.

### 17. Sheriff Robert Gualtieri

At trial, Defendants presented the testimony of Sheriff Robert Gualtieri, who has served as the Pinellas County Sheriff since 2011. While SB 168 was proceeding through the legislative process, Sheriff Gualtieri served as president of the Florida Sheriffs' Association ("FSA"). He also chaired the legislative committee for the FSA at the time and was therefore directly involved in advocating in favor of SB 168.

Sheriff Gualtieri testified generally about immigration enforcement efforts by local law enforcement agencies and explained how detainer requests have changed over time. He emphasized that local law enforcement can only honor an ICE detainer request if the individual[22] is in custody in county jail and that local law enforcement officers cannot and do not enforce immigration law. He noted that law enforcement officers do not ask about immigration status during routine traffic stops because they have no authority to enforce immigration law. Similarly, local law enforcement agencies have no access to any ICE information. Rather, upon receipt of an ICE detainer request, law enforcement officers are simply required to make sure that there is probable cause supported by a facially valid administrative warrant prior to honoring the request

The Pinellas County Sheriff's Office has no tolerance for discrimination of any kind and officers receive extensive training on the agency's antidiscrimination policy. Any instance of discrimination reported to the Pinellas County Sheriff's Office is thoroughly investigated and the appropriate disciplinary action is taken. During 2018 and 2019, his office received three biased-

---

[22] Throughout his testimony, Sheriff Gualtieri referred to undocumented immigrants with criminal convictions as "criminal illegals" in order to distinguish between undocumented persons who have been convicted of a crime and those who have no criminal background. The Court declines to adopt Sheriff Gualtieri's nomenclature, especially where the issues in this case involve the use of demeaning and derogatory labels to falsely portray immigrants as inherently dishonest, threatening, or dangerous.

based policing complaints out of approximately one million calls, and these three complaints were determined to be unfounded upon investigation.

Regarding SB 168, the Sanctuary Prohibition was aimed at protecting communities and fellow law enforcement officers who may come into contact with ICE while they are attempting to detain an individual at a specific address. Likewise, the Best Efforts Provision was intended to promote cooperation among law enforcement and to avoid encounters that compromise officer or public safety. He believes that the Best Efforts Provision primarily only relates to logistical efforts, and the provision in no way encourages or requires racial profiling to comply.

SB 168 offered law enforcement agencies a solution that would provide some direction on when it was appropriate to honor detainer requests. As the legislative chair of the FSA, Sheriff Gualtieri had extensive communications about SB 168 with Senator Gruters, Representative Byrd, Senator Simmons, Governor DeSantis, and many others. SB 168 solved many of the concerns local law enforcement had regarding immigration enforcement efforts. Sheriff Gualtieri worked with legislators to draft the language of the Best Efforts Provision in a way that would afford law enforcement officers more flexibility. He also advocated to remove a provision in the original version of SB 168 that permitted Florida State Attorneys to criminally prosecute officers who failed to comply with the law.

## III. CONCLUSIONS OF LAW

### A. Article III Standing

As an initial matter, the Court addresses whether Plaintiffs have standing to assert their Equal Protection claims, which Defendants have raised as an affirmative defense. The Court notes that neither party raised the question of standing during trial, but "[a] federal court is required to consider the question of standing whether or not it is raised by the parties[.]" *Ne. Fla. Chapter of*

*Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1287 n.1 (11th Cir. 1990)

("*NE Fla. CAGC of Am.*") (Tjoflat, C.J., specially concurring).

"A threshold question in every federal case is whether the plaintiff has made out a justiciable case or controversy within the meaning of article III." *Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 606 (11th Cir. 1985) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). It involves "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989). "[S]tanding requirements 'are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Moreover, "[s]tanding cannot be waived or conceded by the parties." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.").

> The party invoking federal jurisdiction bears the burden of establishing these elements. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990); *Warth*, 422 U.S. at 508. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 883-89 (1990);

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 114-15, and n.31 (1979); [*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45 n.25 (1976)]; *Warth*, 422 U.S. at 527, and n.6 (Brennan, J., dissenting). . . . [A]t the final stage [of litigation], those facts [supporting standing] (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone*, 441 U.S. at 115 n.31.

*Lujan*, 504 U.S. at 561.

Organizations can establish standing to sue either on their own behalf or on behalf of their members. "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1259-60 (11th Cir. 2012) ("*GLAHR*") (quoting *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). As such, an organization can establish injury for standing purposes by showing either that it has already suffered a cognizable injury when it had to divert its resources or that it reasonably anticipates that it will have to divert its resources in the future, to address the illegal conduct. *Billups*, 554 F.3d at 1350; *Browning*, 522 F.3d at 1165-66.

Additionally, "[i]t has long been settled that an organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999); *see also Warth*, 422 U.S. at 511 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). The Supreme Court has explained that an association may sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Upon review and consideration of the evidence and testimony presented at trial, the Court

concludes that Plaintiffs have standing to pursue their Equal Protection challenges in Counts X and XI. Plaintiffs' missions all center around immigrant communities and advocating for immigrant rights. Plaintiffs introduced the uncontroverted testimony of their corporate representatives, detailing the diversion of resources from their core missions in order to address SB 168, both prior to and after its enactment. Those included, among others, hosting additional community meetings, know-your-rights presentations, and educational programs aimed at informing the immigrant community about their rights under SB 168 and the effects of the law; advocating against the law during the legislative session; operating hotlines to answer the influx of calls from concerned community members about SB 168's impact and calls from individuals during encounters with law enforcement; hiring additional volunteers and sourcing additional community partners in order to provide adequate support to the immigrant community based on their changing needs as the law went into effect; locating additional social and legal resources to offer community members; preparing powers of attorney for immigrants; hosting food banks or providing COVID-19 relief directly to members who were too afraid to participate in public events offering similar services; attending press conferences to encourage parents to continue sending their children to school; and engaging in community-wide discussions with law enforcement agencies and other governmental partners about SB 168 and how it would be enforced. Plaintiffs have also suffered from diminished community participation and membership resulting from SB 168. Likewise, Plaintiffs established that the need to divert their resources to address SB 168 is ongoing and will continue as long as the law is in effect as it continues to disproportionately affect the communities Plaintiffs serve. Those injuries exist regardless of whether Plaintiffs are member-based organizations or not.

Moreover, the member-based organizations seek to protect the rights and interests of their

members who have also been injured by SB 168. Through their testimony, Plaintiffs demonstrated that their members have suffered injuries from racial and ethnic profiling, unlawful or unfounded traffic stops, and illegal detentions by law enforcement agencies that are attempting to comply with the requirements of the law. Plaintiffs' representatives have testified that their members are unwilling to report crimes or to act as witnesses due to their fear of interacting with law enforcement officers who may detain them, and that domestic violence victims have begun reporting incidents of abuse to Plaintiffs *instead* of to law enforcement agencies. Further, Plaintiffs have demonstrated that members fear accessing essential health, social, and government services, such as physical and mental health clinics, food banks, pursuing legal claims in court, and sending their children to school because of the risks posed by SB 168. Plaintiffs have established that these injuries have arisen as a direct result of SB 168.

In sum, Plaintiffs have proven that they have diverted, and will continue to divert, limited resources away from their core activities to respond to community and member inquiries about SB 168's effect, implications, and enforcement. Likewise, Plaintiffs have established that their members have suffered injuries relating to SB 168's illegal enforcement and its chilling effect on immigrants' willingness to access essential services and to participate in society. Those injuries to the organizations and their members and/or the communities they serve arise directly from SB 168 and can be redressed by enjoining the challenged provisions. Accordingly, the Court concludes that Plaintiffs have proven they have standing to assert their Equal Protection challenges on behalf of themselves and, where applicable, on behalf of their members. *See Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316-17 (11th Cir. 2021) (concluding that existence of associational standing made it unnecessary to address standing of individuals).

**B. Equal Protection Challenges**

The trial addressed Plaintiffs' final two constitutional challenges to SB 168. First, Plaintiffs argue that SB 168's Best Efforts Provision, § 908.104(1), Fla. Stat., is unconstitutional because it violates the Equal Protection Clause. *See* ECF No. [38] (Count X). Second, Plaintiffs argue that the Sanctuary Prohibition, § 908.103, Fla. Stat., is unconstitutional because it violates the Equal Protection Clause. *See* ECF No. [38] (Count XI). Because each provision is interrelated, the Court analyzes the Equal Protection challenges together.

"The Equal Protection Clause provides that '[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws.'" *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (quoting U.S. Const. amend. XIV, § 1). "Its central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

> Equal protection claims can be divided into three broad categories. The first and most common type is a claim that a statute discriminates on its face. In such a case, a plaintiff can prevail by showing that there is no rational relationship between the statutory classification and a legitimate state goal. When the statute facially discriminates against certain groups or trenches upon certain fundamental interests, courts have required a closer connection between the statutory classification and the state purpose.
> The second type of equal protection claim is that neutral application of a facially neutral statute has a disparate impact. In such a case, a plaintiff must prove purposeful discrimination.
> The third type of claim is that defendants are unequally administering a facially neutral statute.

*E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citations omitted). This case involves the second type of equal protection claim as SB 168 is neutral on its face but results in a disparate impact, even when applied neutrally. As such, in addition to demonstrating disparate impact, Plaintiffs must prove that SB 168 was enacted with purposeful discriminatory intent.

Indeed, the Supreme Court has held that "official action will not be held unconstitutional

solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264-65. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Davis*, 426 U.S. at 242. Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265.

In asserting a claim that a facially neutral law violates the Fourteenth Amendment based on mixed motives, a plaintiff must establish, by a preponderance of the evidence, that the alleged "racial discrimination was a substantial or motivating factor in the adoption of [the law at issue]. [The plaintiffs] shall then prevail unless the [defendants] prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered." *Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (citing *Arlington Heights*, 429 U.S. at 252; *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242.

A plaintiff need not prove that the law at issue rested solely on a discriminatory intent or purpose. *Id.* "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. "Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute." *Id.* at 265 n.11 (quoting *McGinnis v. Royster*, 410 U.S. 263, 276-77 (1973)). "When there is proof that a discriminatory purpose has been a motivating factor in [a legislature's] decision [to pass a law], [the] judicial deference [courts generally afford to lawmakers' decisions] is no longer justified." *Id.* at 265-66. "'Discriminatory

purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citing *United Jewish Orgs. v. Carey*, 430 U.S. 144, 179 (1977)). "It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*[23] A plaintiff may also "demonstrate intentional discrimination if the 'decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens.'" *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006) (quoting *United States v. Yonkers*, 837 F.2d 1181, 1225 (2d Cir. 1987)); *see also Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1311 (M.D. Ala. 1999) ("If . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination.").

"Proving the motivation behind official action is often a problematic undertaking." *Hunter*, 471 U.S. at 228 (citing *Rogers v. Lodge*, 458 U.S. 613 (1982)). Moreover, "no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Indeed,

---

[23] The Supreme Court has also cautioned that:

> This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are [] inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When . . . the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when . . . the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Pers. Adm'r of Mass.*, 442 U.S. at 279 n.25.

the Supreme Court, in *United States v. O'Brien*, 391 U.S. 367, 383 (1968), cautioned of "the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment," *Palmer*, 403 U.S. at 224 (citing *O'Brien*, 391 U.S. at 383, 384), "that is [otherwise], under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it," *O'Brien*, 391 U.S. at 384. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork." *Id.* "Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters," because the law "would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." *Palmer*, 403 U.S. at 225.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The Supreme Court, in *Arlington Heights*, provided a non-exhaustive list of considerations that might support a law's discriminatory intent.

> The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, 426 U.S. at 242, may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.
>       The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *See* [*Lane*, 307 U.S. at 268]; *Griffin v. School Board*, 377 U.S. 218 (1964); *Davis v. Schnell*, 81 F. Supp. 872 (S.D. Ala.), *aff'd per curiam*, 336 U.S. 933 (1949); *cf.* [*Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 207 (1973)]. The specific sequence of events leading up to the challenged decision also may shed some light

on the decisionmaker's purposes. *Reitman v. Mulkey*, 387 U.S. 369, 373-376 (1967); *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936). . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Id.* at 266-68 (footnotes omitted); *see also Pers. Adm'r of Mass.*, 442 U.S. at 279 n.24 ("Proof of discriminatory intent must necessarily usually rely on objective factors . . . . The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid.").

The Court of Appeals for the Eleventh Circuit recently summarized the fact-intensive inquiry under *Arlington Heights* as follows:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries*, 992 F.3d at 1322 (citing *Jean*, 711 F.2d at 1486).

Within this framework, the Court turns to the merits of Plaintiffs' Equal Protection challenges to SB 168's Best Efforts Provision and the Sanctuary Prohibition.

**1. Discriminatory Purpose and Effect**

As discussed above, under the two-prong analysis of an Equal Protection claim, the Court must determine whether Plaintiffs have established by a preponderance of the evidence that racial discrimination was a motivating factor in the enactment of SB 168. *See Hunter*, 471 U.S. at 225; *see also Greater Birmingham Ministries*, 992 F.3d at 1321 (citing *Hunter*, 471 U.S. at 227-28; *Johnson*, 405 F.3d at 1222-23; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir.

Case No. 19-cv-22927-BLOOM/Louis

1999)). Regarding the first prong of the Equal Protection analysis, Plaintiffs must prove that SB 168 had both a discriminatory purpose and a discriminatory effect. *Burton*, 178 F.3d at 1188-89. "If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Greater Birmingham Ministries*, 992 F.3d at 1321. "Thus, when facially neutral legislation is subjected to equal protection attack, an inquiry into intent is necessary to determine whether the legislation in some sense was designed to accord disparate treatment on the basis of racial considerations." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (1982). In doing so, courts must "evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision." *Burton*, 178 F.3d at 1189; *see also Davis*, 426 U.S. at 242 ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts").

### a. Disparate Impact and Foreseeability

The Court first looks to whether SB 168's Best Efforts Provision and Sanctuary Prohibition have a disparate racial impact, which occurs where a decision, though neutral on its face, has a disproportionate impact on a protected group. *See Hallmark Devs., Inc.*, 466 F.3d at 1284. As the Supreme Court explained in *Arlington Heights*, in determining whether invidious discriminatory purpose was a motivating factor in the enactment of SB 168, the impact of the Legislature's action—i.e., whether it "bears more heavily on one race than another"—may provide "an important starting point." 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242). "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* Statistical evidence may be used to establish a discriminatory pattern that supports the existence of discriminatory intent. *See Cooper v. S. Co.*, 260 F. Supp. 2d 1258, 1267 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th Cir. 2004).

> [A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases do not forbid the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of [discriminatory] intent may be properly drawn. Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial [disparities] . . . is one factor among many others which may be considered by a court in determining whether an inference of [discriminatory] intent should be drawn.

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464-65 (1979) (citations and quotations0 omitted).

However, the Supreme Court in *Davis* "made it clear that official action will not be held unconstitutional *solely* because it results in a racially disproportionate impact." *Davis*, 426 U.S. at 242 (emphasis added); *see also Arlington Heights*, 429 U.S. at 264; *id.* at 265 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."). Rather, evidence of disparate impact may be used to supplement the other direct and circumstantial evidence of discriminatory intent. *See Arlington Heights*, 429 U.S. at 266; *see also Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 616 (11th Cir. 1995) ("proof of discriminatory intent or purpose is a necessary prerequisite to any Equal Protection Clause claim").

> In the rare case, where the effect of government action is a pattern "'unexplainable on grounds other than race,'" [*Shaw*, 509 U.S. at 644] (quoting *Arlington Heights*, 429 U.S. at 266), "[t]he evidentiary inquiry is . . . relatively easy," *Arlington Heights*, [429 U.S. at 266] (footnote omitted). As early as *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court recognized that a laundry permit ordinance was administered in a deliberate way to exclude all Chinese from the laundry business; and in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the Court concluded that the redrawing of Tuskegee, Alabama's municipal boundaries left no doubt that the plan was designed to exclude blacks. Even in those cases, however, it was the presumed racial purpose of state action, not its stark manifestation, that was the constitutional violation.

*Miller v. Johnson*, 515 U.S. 900, 913 (1995).

Here, Plaintiffs presented Dr. Lichtman's expert testimony and report, which provided unrebutted, significant evidence of the racially discriminatory police practices used in Florida generally, and of how those discriminatory practices are aggravated by the proactive police

measures of SB 168. Dr. Lichtman's testimony was credible, and his opinions were reliable. Both were supported by significant data and studies relevant to the issues raised in this case. As addressed in more detail below, his expert opinions establish that SB 168 has a disproportionate discriminatory effect on racial and ethnic minorities. Moreover, the testimony of Plaintiffs' various representatives detailing the impact of SB 168 on their members and the communities they serve further buttresses Dr. Lichtman's testimony and opinions.

Dr. Lichtman's extensive historical and statistical analyses are highly probative. According to the U.S. Census Bureau's data from 2018, "there were 4,475,431 immigrants living in Florida, 21 percent of the population. Of these immigrants, the Census reported that 15.9 percent were black, 57.8 percent were Hispanic, and 16.5 percent were white. Among the foreign-born, 1,929,546 million or 43.1 percent were non-citizens." ECF No. [191-1] at 54. Moreover, to provide some background, Dr. Lichtman details Florida law enforcement's historical pattern of racial discrimination. As summarized in Table 4, based on a review of publicly available data on traffic stops for violations of safety belt requirements, the disparities between black drivers and white drivers are statistically significant at a level beyond a chance probability of one in one-hundred thousand. *See id.* at 48.

**TABLE 4**
**WHITE V. BLACK DISPARITIES IN FLORIDA SEATBELT CITATIONS 2018**

| | White | Black | White % | Black % |
|---|---|---|---|---|
| Citation for no Seatbelt Use | 40,533 | 25,942 | **61.0%** | **39.0%** |
| Population 15 Years + White & Black Only | 9,873,802 | 2,636,290 | 78.9% | 21.1% |
| Difference in 15+ Population | | | -17.9% | -+17.9% |
| Percent With no Vehicle in Household | 4.8% | 12.2% | | |
| 15+ Population Adjusted for Vehicles | 9,399,860 | 2,314,663 | 80.2% | 19.8% |
| Difference in Adjusted 15+ Population for Vehicles | | | -19.2% | -19.2% |
| % No Seatbelt Use | 7.5% | 14.2% | | |
| 15+ Population Adjusted for no Vehicle and Seatbelt Use | 700,490 | 328,862 | **68.1%** | **31.9%** |
| Difference in Adjusted 15+ Population for Vehicles & Seatbelt Use | | | -7.1% | +7.1% |
| Sources: Department of Highway Safety and Motor Vehicles Seatbelt Violation Data Collection 316.614(9), F.S. Annual Report 2018, p. 3, https://www.flhsmv.gov/pdf/cabinetreports/sbv2018.pdf; Safety Belt Use in Florida, Final Report," Florida Office of Economic & Demographic Research, April 1, 2018 Estimates, p. 13, http://edr.state.fl.us/Content/population-demographics/data/Medium_Projections_ARSH.pdf; https://fdotwww.blob.core.windows.net/sitefinity/docs/default-source/safety/4-reports/seat-belt-use-reports/2018.pdf?sfvrsn=9c540d07_0. | | | | |

Additional studies confirm these racial disparities in Florida during police traffic stops. Indeed, a study from the Stanford Computational Policy Lab on traffic stops and searches in Florida from 2011 to 2015 concluded that Hispanic and black drivers were searched at much higher rates than white drivers each year. The search rates for black drivers were several multiples higher than the rates for white drivers. *See id.* at 49.

A study conducted by professors at the University of Miami and Loyola Marymount University for the ACLU concluded that these racial disparities are evident at every level of law enforcement. That study found evidence of substantial racial disparities between blacks and whites at every level of law enforcement, summarized as follows:

DISPROPORTIONATE. Black defendants who are not Hispanic are disproportionately represented in Miami-Dade County's criminal justice system. Relative to their share of the county population, these defendants experience:

- 2.2 times greater rates of arrest
- 2.3 times greater rates of pretrial detention
- 2.5 times greater rates of conviction
- 2.5 times greater rates of incarceration

MOST DISPROPORTIONATE. Black defendants who are Hispanic are even more disproportionately represented in the county's criminal justice system. Relative to their share of the county population, these defendants experience:

- 4.0 times greater rates of arrest
- 4.5 times greater rates of pretrial detention
- 5.5 times greater rates of conviction
- 6.0 times greater rates of incarceration

The early decisions of arrest and pre-trial detention are particularly significant because studies show it is at these stages of the process where the exercise of discretion is especially great.

*See id.* at 51-52 (footnotes omitted).

Based on his review of studies detailing the pattern of racial discrimination by law enforcement in Florida, Dr. Lichtman provided persuasive testimony that there is an ongoing pattern of disparate treatment of people in Florida based on race, which exists at all levels of law enforcement and for all types of law enforcement encounters. *See id.* at 53.

Next, Dr. Lichtman addressed the discriminatory effects of proactive policing measures, like the one at issue here, on racial profiling and discrimination in Florida by law enforcement officers. Dr. Lichtman explained that:

[a] Committee of the National Academies of Sciences, the nation's premier scientific organization, recently investigated the impact of proactive policing measures like SB 168 on non-white peoples. The Committee noted that, "The high rates at which non-Whites are stopped, questioned, cited, arrested, or injured by the police present some of the most salient criminal justice policy phenomena in the United States . . . these kinds of police contact are associated with at least some forms of what is known as proactive policing." The Committee said that racial profiling is associated with proactive policing because of differential views,

whether conscious or not, that police have regarding the likely criminality of non-white persons.

*Id.* at 56-57 (footnote omitted). As proactive policing measures increase the amount of contact officers will have with their communities and increase the use of officer discretion in performing these proactive policing tasks, these measures increase the potential for law enforcement officers to rely on racial cues. *Id.* at 58. Ultimately, the Committee concluded, in relevant part, that "[t]here are likely to be large racial disparities in the volume and nature of police-citizen encounters when police target high-risk people or high-risk places, as is common in many proactive policing programs." *Id.* at 59. Dr. Lichtman further opined that there is a direct connection between proactive policing and racial profiling. He emphasized that SB 168 was a particularly extreme example of a proactive policing measure because it is specifically tied to the undocumented immigrant community, thus further encouraging racial profiling and the identification of suspected undocumented immigrants based on their perceived race or ethnicity.

Dr. Lichtman also analyzed the disparate racial impact of ICE arrests, both in Florida and nationwide. Specifically, Dr. Lichtman referenced data from the TRAC program at Syracuse University, which addressed ICE arrests in Florida and found that ICE disproportionately arrests suspected undocumented persons from predominantly Latin American and Caribbean countries, but not those persons from predominantly white countries, such as Canada, Europe, Australia, and New Zealand, reproduced in Table 6 below. *See id.* at 60-61. The data indicates that "undocumented immigrants from South and Central America and the Caribbean comprised 83.2 percent of all undocumented immigrants in Florida . . . . However, of 19,746 ICE arrests within Florida of suspected removable immigrants, 93.9 percent targeted suspected removable immigrants from South and Central America and the Caribbean." *Id.* at 61.

**TABLE 6**
**ICE ARRESTS IN FLORIDA BY NATIONALITY GROUP COMPARED TO**
**PERCENTAGE OF NATIONALITY GROUP AMONG UNDOCUMENTED**
**IMMIGRANTS IN FLORIDA, FISCAL 2015 THROUGH MAY 2018**

| Nationality Group | % Arrests | % of Unauth. Imm. Group in Florida | Difference in Percentage Points | Difference in Percent |
|---|---|---|---|---|
| | | | | |
| Latin America & Caribbean | 93.9% | 83.2% | +10.7 Points | +12.9% |
| | | | | |
| Europe/Canada/Oceania | 3.2% | 7.2% | -4.0 Points | -55.6% |
| | | | | |

Dr. Lichtman explained this data, noting that persons from South and Central America and persons from the Caribbean were overrepresented by 10.7 percentage points and 12.9 percent. Persons from Europe, Canada, and Oceania, however, comprised 7.2 percent of undocumented immigrants in Florida but only 3.2 percent of ICE arrests. Thus, persons Europe, Canada, and Oceania were underrepresented by 4 percentage points and 55.6 percent. The differences between population and arrest percentages for both groups are statistically significant at a level beyond one in one thousand. *Id.* at 63.

Notably, Dr. Lichtman's opinions regarding disparate racial impact are not limited to undocumented immigrants. Rather, he testified that SB 168 will also disproportionately impact U.S. citizens of racial and ethnic minorities. Indeed, an ACLU study conducted of Miami-Dade County, Florida, from 2017 to 2019 found that ICE sent 420 detainer requests to jails for people listed as U.S. citizens, only to later cancel 83 of those requests. *See id.* at 75-77.

Detailed information on ICE detainer requests from Miami-Dade County over this approximately same two-year period from the county's cooperation with ICE in early 2017 through February 2019 is consistent with the findings of the ACLU study. This data demonstrates that ICE issued detainer requests for 418 U.S. citizens, which comprise 16.7 percent of 2,496 detainer requests during this period with a citizenship indicated (181 do not have a citizenship indicated). These

Case No. 19-cv-22927-BLOOM/Louis

requests disproportionately target Hispanics and African American U.S. citizens, providing clear evidence of the discriminatory effect on members of these minority groups of the ICE cooperation required under SB 168.

As indicated in Table 9 . . . , Hispanics and African Americans comprised *93.8 percent* of these detainer requests of U.S. citizens in Miami-Dade County. This percentage is 11.9 percentage points and 14.5 percent greater than the 81.9 percent of Hispanic and African American adult citizens in the county. In contrast, all others comprised only *6.2 percent* of these detainer requests in Miami-Dade County. This percentage is 11.9 percentage points and 65.7 percent greater than the 18.1 percent of other adult citizens in the county.

*Id.* at 76.

**TABLE 9**
**MIAMI-DADE COUNTY ICE DETAINER REQUESTS, UNITED STATES CITIZENS, 2017-FEB. 2019**

| Group | Ice Detainer Requests US Citizens | % Of Ice Requests | % Of All Citizens | Difference In Percentage Points | Difference In Percent |
|---|---|---|---|---|---|
| Total | 418 | 100% | 100% | NA | NA |
| Hispanic +Black | 392 | 93.8% | 81.9% | +11.9 Percentage Pts. | +14.5% |
| All Others | 26 | 6.2% | 18.1% | -11.9 Percentage Pts. | -65.7% |
| Source: Miami-Dade County, Corrections and Rehabilitation Department, Jail Population Statistics, ICE (Hold for Immigration) Report, Detainers Received Between 01/27/2017 to Present, February 2019. U.S. Census, American Community Survey, CVAP, 2014-2018. | | | | | |

The Court accepts the conclusion that it was entirely foreseeable that proactive policing under SB 168, which uses the same flawed ICE databases to identify immigration status, will negatively impact all U.S. citizens, but that impact will fall more heavily upon those citizens who are racial minorities.

The testimony by each of the Plaintiffs' representatives buttressed Dr. Lichtman's conclusions about the discriminatory effect of SB 168 on racial and ethnic minorities. Each detailed that after SB 168 was enacted, Plaintiffs received increased calls and reports of racial

profiling by law enforcement and of pretextual traffic stops. Plaintiffs' witnesses also testified that the number of community members who were detained and deported increased, thus requiring these organizations to locate additional resources to help the impacted families take the appropriate action. Those witnesses described incidents following SB 168's enactment where individuals were questioned during routine traffic stops—some of whom were passengers in the vehicle—and were ultimately detained by ICE without ever receiving a citation. Moreover, each of the Plaintiffs' representatives gave comparable accounts of increased racial profiling or discriminatory targeting after SB 168's passage, presumably as a result of the increased efforts of law enforcement to comply with federal immigration law. These accounts are consistent with the data presented by Plaintiffs' expert.

Additionally, Dr. Lichtman addressed the chilling effect that proactive policing measures have on immigrant communities. He explained that in jurisdictions where law enforcement has agreed to cooperate with immigration enforcement efforts, there is a significant, community-wide chilling effect on the communities' willingness to report crimes, participate in judicial proceedings, interact with governmental agencies, send their children to school, and attend mental health and physical health clinics or food banks, to name a few. For example, Dr. Lichtman relies upon the following study:

> A [] 2019 nationwide survey of 1,000 respondents in mixed immigrant families [report] that fear of ICE led respondents to avoid appearances in court and contact with law enforcement:
> - 60% of respondents avoid attending court as witnesses when they have been a victim of a crime.
> - 41% of respondents avoid domestic violence-related hearings when they have been a victim.
> - 37% of respondents avoid appearing in a child welfare hearing when involved in dependency court.
> - 40% of respondents avoid appearing in adult criminal court when they are a defendant or have a bench warrant.

- 35% of respondents avoid attending youth court when their children are appearing.
- 33% of survey respondents who are court-involved avoid all types of hearings because they are afraid that ICE will take their children away.

*Id.* at 97 (footnote omitted).

Further confirming this chilling effect, Plaintiffs have presented significant testimony from the representatives of their various organizations, most of whom explicitly detailed the chilling effect that these communities were experiencing as a result of their members' fear of contacting law enforcement. Specifically, Plaintiffs' witnesses testified as follows:

- Ms. Rodriguez, on behalf of FLIC, testified that SB 168 will negatively impact the public health of immigrant communities by causing these communities to fear accessing social services or health care because they do not know whether those services are safe.

- Ms. Ortiz testified that AI Justice received an increase in calls reporting domestic violence but refusing to involve law enforcement officers out of fear.

- Ms. Bastien testified that she saw a clear reduction in members' participation in FANM activities, community meetings, religious services, physical and mental health services, and in school attendance as a result of SB 168.

- Mr. Tovar testified that after SB 168 was enacted, FWAF's membership fell and there was an unwillingness on the part of its members to access healthcare clinics and social services due to the fear of being targeted and detained by immigration authorities working with local law enforcement.

- Ms. Muñoz testified that FLIC saw an increase in callers experiencing domestic violence who feared going to law enforcement.

- Mx. Cuevas received reports of QLatinx members being victims of crimes but refusing to report those crimes to city police because they feared the possible immigration consequences.

- Mr. Lodoño explained that SB 168 has eroded WeCount members' trust in law enforcement and has forced them to not participate in certain services, such as food banks and health clinics, out of fear of immigration consequences.

- Father O'Loughlin, on behalf of GMC, testified that SB 168 has negatively impacted public safety of communities because undocumented individuals are less likely to trust law enforcement or to report crimes out of fear of facing immigration consequences.

Plaintiffs' representatives also testified that, upon learning of SB 168, these organizations immediately shifted their operations toward responsive action based on the anticipated racial and discriminatory impact to their members. For example, many of Plaintiffs' representatives described the organizations' extensive efforts to travel to Tallahassee for the 2019 legislative session and to educate key legislators about the various ways SB 168 would impact their communities. Those efforts went largely ignored, as Plaintiffs explained, because many of the legislators were inaccessible for discussions and, for those legislators whose staff was available to meet, they were unwilling to entertain any meaningful discussion or compromise as it related to SB 168.

Moreover, many of the proposed amendments to SB 168 were aimed at addressing the negative effects the bill was predicted to have on immigrant communities throughout Florida. For instance, proposed amendments that sought to exempt DCF or to wholly exclude victims and witnesses of crimes from SB 168's application were rejected, despite addressing specific concerns about the bill's impact on immigrant communities.

The Court has carefully considered the testimony and data presented by Dr. Lichtman, which the Defendants failed to rebut. Dr. Lichtman was knowledgeable and credible and the data he relied upon is well founded and persuasive. Based on the evidence presented, the Court finds that Plaintiffs have proven by a preponderance of the evidence that SB 168 has discriminatory or disparate effects on racial and ethnic minorities, and these discriminatory effects were both foreseeable and known to the Legislature at the time of SB 168's enactment.

### b.  Historical Background

Next, the Court turns to the historical background of SB 168, which the Supreme Court has stated "is one evidentiary source, particularly if it reveals a series of official actions taken for

invidious purposes." *Arlington Heights*, 429 U.S. at 267.

Plaintiffs attempt to offer the lengthy history of discrimination in Florida as evidence of discriminatory intent on the part of the Legislature that passed SB 168, and they do so through Dr. Lichtman's Report and testimony. The Court notes, however, that it previously rejected Plaintiffs' attempt to rely on such generalized historical data of discrimination at summary judgment. The Supreme Court has made it clear that while *specific* historical background may be relevant when tailored to the issue at hand,

> "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." [*Mobile v. Bolden*, 446 U.S. 55, 74 (1980)]. The "ultimate question remains whether a discriminatory intent has been proved in a given case." *Ibid.* The "historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977). But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018); *see also Greater Birmingham Ministries*, 992 F.3d at 1325. Based on this express guidance cautioning against the use of generalized historical data of past discrimination to establish discriminatory intent, the Court limits its consideration to the historical pattern of discrimination and racial profiling by law enforcement in Florida—a topic which is directly relevant to the issues presented here.

The evidence supports the expert testimony that law enforcement agencies in Florida have historically engaged in a pattern of racial profiling during stops, detentions, and arrests, and that this pattern is ongoing. *See generally* ECF No. [191-1] at 44-56. In the ACLU study discussed above, which examined racial differences at every stage of the law enforcement process from arrest to sentencing in Miami-Dade County, Florida, the researchers concluded that:

> "Racial and ethnic disparities can be seen at both the individual defendant level and the neighborhood level due to the geographic concentration of arrests, prosecutions, and convictions in Black neighborhoods. Taken together, these patterns illustrate that Black Hispanic defendants tend to be the most overrepresented in the Miami-Dade County criminal justice system, and Black non-Hispanic defendants tend to

> be penalized the most severely . . . Criminal cases are also disproportionately drawn from Black neighborhoods, thus suggesting the possibility of racial profiling and over-policing of those neighborhoods."

*Id.* at 53 (quoting Nick Petersen, et al., *Unequal Treatment: Racial and Ethnic Disparities in Miami-Dade Criminal Justice*, ACLU, Fla. Greater Mia. at 39 (Jul. 2018)).

Additionally, Dr. Lichtman testified that Florida law enforcements' racially discriminatory practices have persisted, despite the fact that Florida enacted a law in 2001 that required every municipal law enforcement agency to incorporate "an antiracial or other anti-discriminatory profiling policy into the agency's policies and practices." *Id.* (quoting Fla. Stat. § 166.0493).

The testimony supports the finding that there is a direct connection between racial profiling and proactive policing, which disproportionately affects racial and ethnic minorities. The described "immigrant threat narrative" further aggravates racially discriminatory law enforcement practices. Specifically, Dr. Lichtman explained that the racial disparities in law enforcement encounters are attributable, in part, to the immigrant threat narrative and the suspicion that undocumented persons are inherently dangerous. In the study discussed above by the Committee of the National Academies of Sciences on the impact of proactive policing measures, the researchers explained that "racial profiling is associated with proactive policing because of differential views, whether conscious or not, that police have regarding the likely criminality of non-white persons." *Id.* at 57. Dr. Lichtman also noted that "associations between race and concepts such as danger, crime, and negativity are notoriously difficult to 'undo' in a permanent sense." *Id.* at 58.

Further, citing to a study by professors at Princeton University, Dr. Lichtman explained that "the rise of the immigrant 'threat narrative' [] is focused on Hispanics and is 'associated over time with the passage of increasingly restrictionist immigration legislation and the implementation of ever more stringent enforcement policies.'" *Id.* at 88 (quoting Douglas R. Massey & Karen A. Pren, *Unintended Consequences of U.S. Immigration Policy: Explaining the Post-1965 Surge from*

*Latin America*, 38 Population Dev. Rev. 1, 6, 8-9 (2012)). While these restrictive immigration laws do not include overt racial classifications, data shows that these laws indirectly target certain races over others. Dr. Lichtman describes two relevant pieces of literature on this issue:

> In her case study of the passage of an anti-immigration ordinance in Hazelton, Pennsylvania and in her literature review, Professor Hilary Parsons Dick of Arcadia University, found that "champions of local immigration restrictions make recourse to overt indexicality in claiming that the laws are not racist because their denotational content targets illegal aliens and not any specific racial group." Rather, the "category 'illegal alien' does *indirectly* index race, increasingly over time, by disproportionately affecting some immigrant groups and not others—a process of racialization and criminalization that is not evident in the denotational content of the law. Rather, the racializing effects of these laws dwell in the indirect racial indexicality—the conflation of 'illegal alien' and 'criminal Mexican immigrant.'" Moreover, "*this conflation is a prime source for the racialization of not only Mexican immigrants, but other Latin American immigrants as well, where racialization is understood as a form of social differentiation that marks people as inherently threatening and foreign.*" (emphasis in original)
>
> Professor Amada Armenta of the UCLA Luskin School of Public Affairs, notes in her 2015 book on policing and immigration enforcement, the intersection and reinforcing relationship between racial stereotyping and anti-immigration laws like SB 168: "ideas about race shape anti-immigration legislation, and laws produce racial inequality, foster racial stereotypes, and imbue legal categories with racial meaning."

*Id.* at 87 (footnotes omitted) (citing Hilary Parsons Dick, *Making Immigrants Illegal in Small-Town USA*, 21 J. Linguistic Anthropology E35-55 (2011); Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* 6-7 (2017)).

Here, prior to SB 168's enactment, there was a rise in proactive policing measures addressing immigration issues across the country, which was fueled in part by the perpetuation of an immigrant threat narrative and the need to crack down on undocumented immigrants. Indeed, similar immigration enforcement bills had been presented in the 2017 and 2018 legislative sessions but had ultimately failed. Notably, then-Representative Gruters had been in favor of these prior anti-sanctuary bills. Further, in the context of his contemporary statements, Senator Gruters promoted similar anti-immigrant views depicting immigrants as "invaders" during his campaign

Case No. 19-cv-22927-BLOOM/Louis

for Senate. *See, e.g.*, ECF No. [191-1] at 131 (describing Senator Gruters' Facebook ad during his Senate campaign, which proclaimed in capital letters, "STOP THE INVASION." "[T]he Federal government MUST stop the caravan invasion and lock down our borders!"). Similarly, while running for his current position, Governor DeSantis also perpetuated the immigrant threat narrative through his campaign advertisements, which depicted him building a wall with his son, and his public statements associating "illegal immigrants" with "lawlessness" and voicing his support for eliminating sanctuary jurisdictions. *See, e.g.*, *id.* at 132 (Governor DeSantis' inauguration address, where he stated, "We won't allow sanctuary cities. And we will stop incentivizing illegal immigration, which is unfair to our legal immigrants, promotes lawlessness and reduces wages for our blue-collar workers."). Likewise, prior to the enactment of SB 168, FLIMEN repeatedly promoted anti-immigrant views in its marketing materials and e-mail subscriber alerts, claiming that sanctuary cities posed critical threats to public safety because they were inundated by undocumented immigrants committing violent crimes. *See, e.g.*, ECF No. [199-21] (Victims of Illegal Immigration Day press conference).

Dr. Lichtman testified that, despite Senator Gruters' and Representative Byrd's unsupported statements regarding the need for measures to improve public safety and reduce crime, the data indicates that crime rates had fallen in Florida in the years prior to SB 168, despite significant increases in undocumented immigration into the state. Indeed, Dr. Lichtman indicated that, during the period from 1990 to 2007, the number of undocumented immigrants in Florida increased by nearly five times, while the crime rates in Florida during that time decreased by 44%. ECF No. [191-1] at 122. Numerous studies based in Florida were presented that examined whether adopting sanctuary policies had any effect on crime rates, each of which concluded that sanctuary jurisdictions had no obvious effect on crime rates and, in some instances, exhibited lower crime

rates than non-sanctuary jurisdictions. *Id.* at 187-95. Evidence was presented that undocumented immigrants commit crimes at lower rates than native-born Americans. In fact,

> A 2019 study by the libertarian CATO Institute used data from the U.S. Census American Community Survey to examine incarceration rates in the United States for 2017. CATO found "The incarceration rate for native-born Americans was 1,471 per 100,000; 756 per 100,000 for undocumented immigrants; and 364 per 100,000 for documented immigrants in 2017. This means that "illegal immigrants are *49 percent less likely* to be incarcerated than native-born Americans. Legal immigrants are 75 percent less likely to be incarcerated than natives. If native-born Americans were incarcerated at the same rate as illegal immigrants, about 943,000 fewer natives would be incarcerated."

*Id.* at 197 (quoting Michelangelo Landgrave & Alex Nowrasteh, CATO Institute, *Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin* (Mar. 4, 2019), available at https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-2017-their-numbers-demographics).

Upon review of the evidence described above, the Court concludes that SB 168's historical background demonstrates a clear and ongoing pattern of racial discrimination during law enforcement encounters, which disproportionately affects Hispanic and black individuals. The pattern of racial profiling by law enforcement increases when proactive policing measures, like SB 168, are adopted, especially when motivated by a need to curtail the immigrant threat narrative and remove dangerous criminal immigrants. Prior to SB 168, there was a growing nationwide trend of enacting proactive policing measures on immigration enforcement, in part due to the perception that undocumented immigrants were violent criminals who posed a threat to the safety of society. Thus, beginning in 2017, amidst the growing anti-immigrant climate, Florida attempted to enact an anti-sanctuary policy, but was unsuccessful. A similar bill was proposed again in 2018 that also ultimately failed to pass. Unrebutted statistical data presented and the evidence about the bill's historical background, taken together, support the conclusion that SB 168 was enacted based in

part on discriminatory motives. *See Jean*, 711 F.2d at 1492 (explaining that historical background relates to "whether plaintiffs are able to introduce sufficient evidence of past discrimination against the class to support an inference that the current disparate impact too is a result of discriminatory intent"). These discriminatory motives are made evident from the historical and ongoing pattern of racial discrimination by law enforcement and the growing reliance on an immigrant threat narrative to justify the enactment of anti-immigrant legislation across the nation. As such, the Court finds that this *Arlington Heights* factor weighs against Defendants.

### c. Specific Sequence of Events Leading to SB 168's Passage and Contemporary Statements and Actions of Key Legislators

Next, the Court addresses the specific sequence of events leading to SB 168, along with the contemporary statements and actions of key legislators involved in passing SB 168. As the Supreme Court noted in *Arlington Heights*, "[t]he specific sequence of events leading up to the challenged decision [] may shed some light on the decisionmaker's purposes." 429 U.S. at 267. Moreover, "contemporary statements by members of the [Legislature], minutes of its meetings, or reports," including, for example, statements and representations made in the Senate staff bill analysis, may be relevant to demonstrate that the Legislature was acting with an intent to discriminate when it passed SB 168. *Greater Birmingham Ministries*, 992 F.3d at 1321 (quoting *Arlington Heights*, 429 U.S. at 267-68). Indeed, these factors can be relevant to show that a legislative body took certain action to effectuate the discriminatory motives of private third parties or that it ratified the racially discriminatory conduct of third-party groups. *See City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Stout*

*by Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1007-08 (11th Cir. 2018) (examining the sequence of events and the contemporary statements made by key actors and concluding that the racially discriminatory intent of those who supported the state action could be imputed onto the state actors themselves because "the statements of those who played a primary role in lobbying for the state action 'translate[d] their grassroots effort into official action'"); *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006) ("[A] plaintiff may demonstrate intentional discrimination if the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens." (quoting *United States v. Yonkers*, 837 F.2d 1181, 1225 (2d Cir. 1987))); *Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1311 (M.D. Ala. 1999) ("If . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination.").

Here, for a number of reasons discussed below, the Court concludes that the sequence of events and the pattern of communication between SB 168's sponsors and FLIMEN (and, by extension, FAIR) strongly suggest that the Legislature ratified the racially discriminatory views of FLIMEN and FAIR and enacted SB 168 to effectuate those motives.

*First*, in looking at the series of e-mails exchanged between FLIMEN and Senator Gruters' office, the Court finds a clear pattern of communication where FLIMEN provided Senator Gruters with data from FAIR and CIS on sanctuary jurisdictions in Florida, strategic points on how to advocate for the bill, advice on proposed amendments to SB 168, and input on modifications to the bill that would strengthen its effect. Notably, rather than demonstrating random, unsolicited commentary by uninvolved third-party advocacy groups as Defendants suggest, FLIMEN's

84

suggestions, advice, and strategic recommendations were consistently applied and followed by Senator Gruters, which further demonstrates the direct influence it had on SB 168's enactment.

Indeed, after successfully securing Senator Gruters as a bill sponsor for SB 168, *see* ECF Nos. [199-22] & [113-6] at 119-21, Mr. Caulkett e-mailed Mr. Barnhill memorializing a meeting between FLIMEN and Senator Gruters, where he provided Senator Gruters with the FAIR Sanctuary Report that was ultimately included in the Senate bill analysis. ECF No. [191-5]. Mr. Caulkett's e-mail also stated, "[o]ur attorney's [sic] looked at SB168," and suggested to (1) only grant the Attorney General, not the State Attorneys, the power to prosecute and enforce actions under Chapter 908, and (2) to "remove several carve-outs." *Id.* Notably, during his testimony, Mr. Caulkett clarified that the attorneys who reviewed SB 168 were FAIR attorneys. *See* ECF No. [113-6] at 47. FLIMEN's and FAIR's direct suggestions were implemented, and the State Attorneys were excluded from the Enforcement Provision. The next day, Mr. Barnhill responded to the e-mail and thanked Mr. Caulkett "for the advice on 168." *See* ECF No. [191-7].

On January 24, 2019, Mr. Barnhill forwarded FAIR's Sanctuary Report to Senator Gruters' personal Gmail account. ECF No. [191-6]. Senator Gruters then forwarded the sanctuary report from his personal Gmail account to his Florida Senate e-mail account, and later forwarded that same attachment to Senator Simmons. ECF No. [191-8]. As noted repeatedly, this Sanctuary Report was ultimately included in the bill analysis that was submitted to the Legislature alongside additional CIS data on sanctuary jurisdictions. *See* ECF No. [199-3] at 4; *see also* ECF Nos. [199-4], [199-5], [199-6], [199-7], & [199-8].

On February 6, 2019, Mr. Morrow e-mailed Mr. Barnhill acknowledging an earlier conversation between them and confirming FLIMEN's intent to appear and testify at the Senate Judiciary Committee on February 11, 2019, in support of SB 168. Moreover, on February 10, 2019,

Mr. Barnhill, Senator Gruters, and other members of the Senate Judiciary Committee received a lengthy e-mail from the ACLU, which opposed SB 168. Mr. Barnhill forwarded the ACLU's opposition to Mr. Morrow and Mr. Caulkett, asking, "[d]oes *fair* have any response to this?" ECF No. [191-9] (emphasis added).

Mr. Morrow also sent an e-mail to FLIMEN supporters that acknowledged the close relationship between the group and the legislators who supported SB 168, stating that "FLIMEN . . . is working with Senator Gruters and Senator Bean to seek passage of SB 168 Federal Immigration Enforcement. This is the 'Rule of Law' anti-sanctuary proposal for the State of Florida." ECF No. [191-10] at 1.

On March 11, 2019, Mr. Morrow sought FAIR's comments and input on SB 168, including Mr. Jaroslav's strategic advice on the Staff Analysis released and Senator Taddeo's two proposed amendments submitted in advance of the Senate Infrastructure and Security Committee meeting. *See* ECF No. [191-11] at 1; *see also* ECF No. [199-5] (Pre-Meeting Infrastructure and Security Bill Analysis dated March 11, 2019); ECF Nos. [194-12] & [194-13]. Notably, Mr. Morrow's e-mail to members of FAIR, and specifically to Mr. Jaroslav, stated that he would pass along FAIR's comments on SB 168 and the amendments to Mr. Barnhill and to Senator Gruters, and noted that "[Mr. Jaroslav's] input ha[d] been extremely beneficial, and [he was] sure that Senator Gruters [would] gladly accept any recommendation [he could] offer." ECF No. [191-11] at 1.

Mr. Morrow then forwarded those strategic comments to Mr. Barnhill, stating, "[p]lease find the comments from David Jaroslav, FAIR, regarding the Pre-Meeting Analysis for SB 168." *Id.* With regard to Senator Taddeo's proposed amendments, Mr. Morrow's e-mail explained that:

> One would create a duty to inquire on the part of law enforcement whether someone is a victim or witness, and if they are, exempt them from the bill. This could basically give anyone the ability to lie their way out of the bill's provisions applying to them: the bill currently does have a victim/witness carve-out(unfortunately), but

it's much narrower and essentially defers to law enforcement to determine who's really a victim or witness.

[Senator] Taddeo's other amendment would make "educational institutions" into non-enforcement zones where the bill's terms do not apply, not just by agents of the school, but by ANY law enforcement.

I would think [Senator] Gruters would regard these amendments as hostile.

*Id.* At the Infrastructure and Security Committee meeting on March 12, 2019, Senator Gruters expressly followed FLIMEN's advice and publicly stated that he viewed Senator Taddeo's amendments as hostile. ECF No. [199-20].

Finally, on April 24, 2019, after the Victims of Illegal Immigration Day press conference held in the Capitol Rotunda, Mr. Morrow e-mailed Mr. Barnhill, stating that he would ask Mr. Jaroslav of FAIR to clarify the status of SB 168 and whether any activity was expected to carry over into the following week, and he would advise Mr. Barnhill of Mr. Jaroslav's reply.

This series of communication between FLIMEN and Senator Gruters' office demonstrates a more intimate and involved relationship between Senator Gruters and FLIMEN than is ordinarily the case with advocacy groups. The timeline of events reveal that many of the suggestions proposed by FLIMEN (and by FAIR) were closely followed by actions consistent with each suggestion. While Sheriff Gualtieri testified regarding his own suggestions to remove certain provisions, such as the provision granting State Attorneys the power to enforce SB 168, that involvement does not dispel that FLIMEN and FAIR provided a direct pipeline of advice and strategic suggestions to Senator Gruters on SB 168. The series of communications between FLIMEN and Senator Gruters' office are persuasive evidence of their shared discriminatory intent. FAIR also played a central role in influencing SB 168's development during the legislative process by providing guidance from attorneys, strategic suggestions on how to deal with certain

amendments, and advice on opposing commentary to SB 168. FAIR's involvement in the bill-drafting process further supports a finding of discriminatory intent.

*Second*, on many occasions during the 2019 legislative session, FLIMEN's racial animus and discriminatory intent were made apparent to Senator Gruters and his staff but were ignored.

Indeed, FLIMEN sent a newsletter alert to members of Senator Gruters' office, the Office of the Attorney General, and the EOG that was rife with animosity against racial and ethnic minorities. *See* ECF No. [191-12] (FLIMEN alert to Barnhill); ECF No. [116-1] at 127-32 (FLIMEN alert to Guzzo); ECF No. [113-5] at 80-86 (FLIMEN alert to DeSantis). The alert offered a legislative summary that stated, "[t]he direction of the Legislature seems that the Anti-Sanctuary bill will likely pass and that the E-Verify will not even be heard. Many busloads of illegal aliens and their supporters are expected to protest loudly, numerous times, throughout the end of the Session." ECF No. [191-12] at 1. FLIMEN's alert went on to define "Immigration Anarchy," explaining that

> Democrats have denigrated the judicial system with Activist Judges who rule on their beliefs, not on the law. Democrats have created Sanctuary Cities, Sanctuary Counties and Sanctuary States to blatantly ignore immigration law and allow criminal rapists, murderers, and others to reside in our midst. Contrary to their previous positions, Democrats totally refuse to secure our border. Democrats have callously protected and promoted illegal immigration, all the while endangering citizens and denigrating the working class that they claimed to be their base.
>     The current immigration system is Immigration Anarchy and it is long overdue that we call the situation what it really is. The narrative needs to change from Republicans defending against a racism allegation to Democrats defending against Immigration Anarchy allegation.

*Id.* at 3.

FLIMEN also stated that "Immigration Anarchists have polluted the Florida 2019 legislative process with name-calling, yelling, lies, bad behavior, children, infants, translators, and busloads of illegal aliens and their supporters," including photographs and videos of "some of those who testified against the Anti-Sanctuary bill SB168 at the Florida Senate Judiciary

Committee on February 11, 2019[.]" *Id.* at 3-4. Finally, the alert contends that "'White nationalist' should mean a Caucasian who supports the rule of law and America First but to Immigration Anarchists it means You are a Nazi, white supremacist, KKK, etc." *Id.* at 4.

Further, at the Senate Infrastructure and Security Committee meeting on March 12, 2019, Senator Cruz asked Senator Gruters why CIS and FAIR data was used in their bill analysis when these groups had been labelled anti-immigrant hate groups, to which Senator Gruters responded that he was unaware of this characterization and renounced discrimination. Nevertheless, Senator Gruters justified the use of this data in the bill analysis, stating that these groups had conducted research on the counties listed. Remarkably, in continuing to rely on the FAIR and CIS sanctuary data, Senator Gruters made no effort to explain why these groups' research on the counties listed was reliable or how their data was untainted by the racist, anti-immigrant views that they espoused.

These instances demonstrate that Senator Gruters and SB 168's supporters were aware of FLIMEN and FAIR's racist ideologies. Nevertheless, there is no record evidence establishing any effort to renounce these discriminatory views. Instead, as discussed below, the legislators who supported the bill continued to affiliate themselves with FLIMEN in public events.

***Third***, despite being made aware of FLIMEN and FAIR's racist, nationalist, xenophobic views and motives, Senator Gruters, Representative Byrd, and many other legislators in both the House and Senate continued to align themselves with FLIMEN and to publicly affiliate themselves with the group and its harmful views.

Specifically, just over a month after Senator Cruz notified Senator Gruters that FAIR and CIS were anti-immigrant hate groups, FLIMEN asked Senator Gruters and Representative Byrd to co-sponsor a press conference titled "Victims of Illegal Immigration Day" alongside FLIMEN in the State Capitol. This racially charged event, which was attended by numerous other legislators

who supported SB 168, was planned in large part by FLIMEN and it included speakers from other

anti-immigrant organizations. Senator Gruters and Representative Byrd both thanked Governor

DeSantis for his leadership, and emphasized that SB 168 was about public safety, promoting

respect for the rule of law, and cooperating with federal immigration enforcement efforts. Senator

Gruters represented that the "bill only deals with criminals that are going through the process, who

are in the judicial system right now." ECF No. [192-16] at 4 (transcript of Victims of Illegal

Immigration Day); *see also* ECF No. [199-21]. He also noted later in the event that, "in the State

of Florida, right now in jails, there's 4,600 illegals that have been identified by ICE that are in the

system now." ECF No. [192-16] at 14; *see also* ECF No. [199-21].

> Likewise, Representative Byrd explained that SB 168 (and HB 527)
>
> is not anti-immigrant. This is about not putting either legal or illegal immigrants over American citizens. . . . But time and time again—just since this bill [was] . . . presented [] in the first committee, we've had several Floridians, including a 13-year-old girl in Pasco County who was killed by an illegal immigrant. Every one of these deaths is a preventable death if we just follow the rule of law.

ECF No. [192-16] at 4-5; *see also* ECF No. [199-21].

> Next, "Angel parents" Kiyan and Bobby Michael spoke about the death of their son "to a

twice-deported illegal alien that came back into our city, came back into our nation, was here

illegally. He hit and killed our son." ECF No. [192-16] at 6; *see also* ECF No. [199-21]. Mrs.

Michael explained,

> We are speaking out for our son who does not have a voice. And we are permanently separated from our child. This is what permanent separation is, and it was not because we chose to try to take him to another country and we knew that that was breaking the law. This was something that we would have never chosen. . . . [N]o good parent would separate themselves deliberately from their child.

ECF No. [192-16] at 8; *see also* ECF No. [199-21].

In addition, Ms. Hansberger of LIFA spoke of the dangers of open borders, stating that she was speaking at the event "out of love to [those] who are ignorant of the consequences of permitting open borders and allowing people who have never been vetted to come in. . . . They will kill you." ECF No. [192-16] at 11; *see also* ECF No. [199-21]. Ms. Larsen of the Remembrance Project also spoke in support of SB 168, stating that her organization "gives voice to the families, like the Michaels, who have been permanently separated from their loved ones as a result of . . . death . . . by an illegal alien." ECF No. [192-16] at 11; *see also* ECF No. [199-21]. Finally, Ms. Morton spoke on FLIMEN's behalf:

> We are very, very proud to be here today with these groups of people and to stand with our Angel families to—to end the kind of anarchy that does exist with the criminal activity of some members of the illegal alien population.
>
> This is a constitutional bill that will basically stop the revolving door in many of our counties. Currently, only 29 of our 67 counties comply with—with the immigration enforcement and ICE detainers. We need for the remaining counties to do so as well. It is a matter of rule of law.
> . . . .
> We are trying to keep the criminally active element off of our streets, stop the revolving door. In some of these counties where people get arrested, do a little bit of time, and even though there's an ICE detainer, put back on our streets and in our neighborhoods. This has got to stop.

ECF No. [192-16] at 12-13; *see also* ECF No. [199-21].

This "Victims of Illegal Immigration Day" event highlights the racial animus of FLIMEN and other related groups, yet, despite this clear animosity, Senator Gruters and Representative Byrd participated as primary speakers and co-sponsors of the event, and numerous other legislators attended. Moreover, the bill sponsors' comments during this event further evidences their ideological alignment with the groups that spoke and with the hostile and harmful narratives that were promoted by these groups against individuals they described as "illegals."

As another district court in Florida has noted,

"Drawing the line between facially race-neutral statements and racially charged code words is difficult." *Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at

Case No. 19-cv-22927-BLOOM/Louis

*9 (S.D.N.Y. Dec. 17, 2013). "[C]ertain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness—[including] words like . . . 'illegal alien.'" *Id.* Whether one of these terms evinces racial animus "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

*Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282-MW/GRJ, 2016 WL 375102, at *11 (N.D. Fla. Jan. 28, 2016).

By referring to immigrants as illegals, criminals, murderers, and victimizers, the press conference was clearly intended to cast immigrants in a demeaning and threatening light, thus demonstrating the speakers' racial animus toward the immigrant population. The racist and xenophobic views espoused by speakers at this event were ratified by the bill's co-sponsors, who were positioned at a podium bearing the seal of the Florida Senate as depicted below, and by the numerous legislators in attendance, especially after Senator Gruters was alerted that the sanctuary data provided by FLIMEN was created by anti-immigrant hate groups.



*Fourth*, the comments and actions of the bill sponsors themselves reveal their discriminatory motives.

As discussed above, Representative Byrd's statements at the "Victims of Illegal Immigration Day" regarding individuals in Florida who were "killed by an illegal immigrant" perpetuates the immigrant threat narrative explained at trial. ECF No. [192-16] at 4-5; *see also* ECF No. [199-21]. Moreover, despite advocating for respect for the rule of law, Representative Byrd's comments appear to suggest that any immigrant, regardless of legal immigration status, should be subjected to SB 168 with equal force. This statement seemingly ignores the obvious fact that the rule of law permits "legal immigrants"—i.e., those individuals who have lawfully entered the country—to remain here. Nevertheless, Representative Byrd's comments evince a belief that any non-citizen that is present in the United States should be subject to stricter laws in order to be permitted to live in the country.

Likewise, Senator Gruters' comments during the same press conference, and his use of the pejorative term "illegals," reveals his racial animus. Senator Gruters also promoted the immigrant threat narrative during his campaign for the Florida Senate. In an ad he ran on Facebook during his campaign, Senator Gruters proclaimed, "STOP THE INVASION." The ad went on to demand that "the Federal government MUST stop the caravan invasion and lock down our borders!" *See* ECF No. [191-1] at 131. Finally, and most notably, as Plaintiffs' representatives and Dr. Lichtman each recounted during their trial testimony, Senator Gruters posted a large sign in the lobby of his office in the Senate that highlighted his animosity toward the immigrant community. *See id.* at 93. Senator Gruters' sign is reproduced below.



As Dr. Lichtman explained, however,

The adult population (18-years-old+) of Sarasota County is 86 percent non-Hispanic white, but a substantial majority of the faces on his sign . . . look black or Hispanic. The faces chosen from 500 deportees from 35 countries include 6 persons who look black, which is 17 percent of the 35 faces, in a county that is about 4 percent black in its adult population, 93 percent of whom are citizens.

Despite [Senator Gruters'] claim about 500 criminal illegal immigrants detained from Sarasota, data compiled by the TRAC program at the Syracuse University discloses that from fiscal year 2015 to the first eight months of fiscal year 2018, ICE had arrested – not necessarily deported – only 58 suspected undocumented immigrants from Sarasota County, an average of just under 16 per

year. Of these, 59 percent had no conviction or only a conviction for a minor crime; none had been convicted of the violent crimes of homicide, assault, or sexual assault/rape.

ECF No. [191-1] at 94 (footnotes omitted).

In sum, these statements by the sponsors of SB 168 reflect their anti-immigrant ideologies. When coupled with the series of statements made at the "Victims of Illegal Immigration Day", these comments raise a particularly compelling inference that Senator Gruters' and Representative Byrd's actions were motivated by racial animus.

*Fifth*, despite the significant concerns raised regarding the bill's provisions, the supporters of SB 168 rejected many of the substantive amendments proposed to ameliorate the bill's effects, including those that were proposed to conform the bill language to the sponsors' stated intent regarding its scope and application. Many of these proposed amendments will be discussed in more detail below.

Most notably, both the House and the Senate rejected amendments that sought to limit SB 168 to individuals who had been convicted of felonies, despite Senator Gruters' and Representative Byrd's repeated statements that SB 168 was only intended to affect immigrants who had committed violent or serious crimes. *See* ECF No. [197-7] (House Amendment 634673: Limiting SB 168's application only to inmates convicted of violent felony offenses – failed on 5/1/2019); ECF No. [198-48] (Senate Amendment 503106: Limiting SB 168's application only to inmates convicted of felony offenses – failed on 5/2/2019). This hostility to any ameliorative amendment is informative because it is consistent with Mr. Caulkett's testimony that FLIMEN opposed any amendments that would have "weakened the bill," even where such amendments were aimed at tailoring SB 168 to the stated goals of the bill sponsors. *See* ECF No. [113-6] at 57.

*Sixth*, the bill sponsors consistently justified SB 168 as a public safety measure that aimed to reduce crime in Florida communities.

Indeed, Senator Gruters' and Representative Byrd's facially valid justification for SB 168 was unsupported by any research or data regarding the crime rates in Florida generally, the crime rates committed by immigrants, or the crime rates in the alleged sanctuary jurisdictions identified by FAIR and CIS, which supports Plaintiffs' position that the alleged public safety purpose of SB 168 was actually pretextual. Notably, both Sheriff Gualtieri and Dr. Lichtman testified that crime rates in Florida had been falling in the years leading up to SB 168's enactment. Moreover, Dr. Lichtman testified that these decreasing crime rates occurred as undocumented immigration was on the rise in Florida. He also explained that immigrants, whether legally present or undocumented, commit fewer crimes than native individuals. As discussed above, Dr. Lichtman and Plaintiffs' representatives testified that measures like SB 168 actually make communities less safe because they create a chilling effect that deters individuals from reporting crime or cooperating with law enforcement. Taken together, these statistics call into question Senator Gruters' and Representative Byrd's statements that the bill was necessary to address public safety and to reduce crime in Florida. Furthermore, the Court notes that there is no record evidence of any research or due diligence on behalf of the Legislature to determine the current crime rates in Florida, or the impact that this bill would have on those crime rates, that would support the bill sponsors' statements about public safety. As such, the Court finds that SB 168's alleged justification as a necessary public safety measure was unsupported by the statistical data about crime rates in Florida or by any other evidence in the record, and that this justification was pretextual.

### d. Procedural and Substantive Departures from the Norm

Plaintiffs have also presented compelling evidence of certain procedural and substantive departures that support the finding that SB 168 was enacted with discriminatory motives.

First, as has been discussed at length above, allowing anti-immigrant hate groups that overtly promote xenophobic, nationalist, racist ideologies to be intimately involved in a bill's legislative process is a significant departure from procedural norms. The Court has found that FLIMEN and FAIR were both intimately involved in SB 168's development and had direct access to and influence over the legislators involved with the bill. This involvement strongly suggests that the Legislature enacted SB 168 to promote and ratify the racist views of these advocacy groups.

Second, Plaintiffs' representatives offered testimony about how SB 168's legislative process differed from their prior experiences advocating during legislative sessions. Indeed, Mr. Tovar from the FWAF and Sister Kendrick from Hope Community Center both testified that this legislative session felt rushed and that advocates from their organizations were unable to secure meetings with legislators to meaningfully discuss their concerns and negotiate bill provisions as they had in the past. Rather, on numerous occasions, these organizations had to stop legislators in the hallways in passing for brief conversations. They also testified that the bill was pushed through the committees at a much faster speed than normal bills, which curtailed their ability to fully participate in the legislative process to voice their concerns. Interestingly, even FLIMEN acknowledged the unusual manner in which SB 168 proceeded through session in its e-mail alert to its subscribers. *See* ECF No. [191-12] at 5-6 (discussing a "secret deal" between legislators to fast-track SB 168 through the legislative process). That testimony, which Defendants have failed to rebut, establishes that SB 168 was enacted in a manner that was rushed and out of the ordinary.

Finally, and perhaps most importantly, the inclusion of FAIR's Sanctuary Report in the legislative analysis presents an alarming substantive departure from the norm. This bill analysis of SB 168 included a reference to the FAIR Sanctuary Report and cited additional data from CIS on sanctuary jurisdictions. *See* ECF Nos. [199-3], [199-4], [199-5], [199-6], [199-7], & [199-8]. The

bill analysis also noted the difficulty in determining an accurate count of "sanctuary" jurisdictions in the United States because of the differing criteria used in defining "sanctuary" jurisdictions. *Id.* Nevertheless, it noted that "[p]erhaps one of the most objective ways to measure whether an entity is a sanctuary jurisdiction is to determine whether it is disqualified from receiving federal criminal justice grant funds due to perceived violations of federal immigration law." ECF No. [199-3] at 4.

The Sanctuary Report itself sets forth each county in Florida that FAIR believed to be a sanctuary jurisdiction, and it included brief statements explaining what conduct supported this belief. For example, many counties qualified as sanctuary jurisdictions because they required a detainer request to be accompanied by a judicial warrant. Other counties, like Broward County, also had other conduct that, in FAIR's opinion, exhibited an existing sanctuary policy, such as not allowing immigration enforcement on school campuses without exigent circumstances, not permitting status inquiries of students or their families, not maintaining records of immigration status, requiring that all inquiries as to a student's immigration status by immigration authorities be referred to general counsel to determine if the inquiry complied with FERPA (Family Educational Rights and Privacy Act), not allowing immigration authorities to access school campuses without a judicial warrant, and not permitting initiation of communication with federal agencies regarding students' or their families' "confidential information" about immigration status or national origin without written permission. *See* ECF No. [191-5] at 55-58. This report was the only clear directive provided by bill sponsors to other legislators to demonstrate what constituted a sanctuary policy—a term which otherwise lacks a consistent or widely accepted definition. Further, the report, generated by known anti-immigrant hate groups, served as a guidepost for legislators to determine whether they supported a ban on sanctuary jurisdictions in Florida.

The Court finds that the use of FAIR and CIS data in the Senate staff analysis strongly suggests the existence of underlying racial animus. Further, although the bill analysis also discussed the various other ways to determine the presence of sanctuary cities, the FAIR and CIS data cited was the *only* quantified estimate of the number of sanctuary jurisdictions in Florida that was presented to the Legislature, and it provided the *only* substantive guidance on what conduct might or might not constitute a sanctuary policy. The Court finds this to be a substantive departure from the norm that weighs heavily in favor of underlying racial bias.

### e.  Availability of Less Discriminatory Alternatives

The Court next examines whether less discriminatory alternatives were available to the Legislature, as the existence of such alternatives could shed light on the discriminatory motives of the Legislature. The record in this case contains numerous ameliorative amendments that were proposed during the 2019 legislative session to lessen the discriminatory impact of SB 168 but were ultimately rejected. The rejection of some of these amendments is suggestive of some other underlying motive.

Notably, as discussed above, the Legislature rejected an amendment that sought to limit the application of SB 168 only to those individuals who were convicted of felonies—the justification that was repeatedly promoted by Senator Gruters and Representative Byrd at committee meetings and at the press conference for Victims of Illegal Immigration Day. *See, e.g.*, ECF No. [199-20] at 1:22:24-1:22:27 (Senator Gruters: "If you're a criminal illegal alien, that is what this bill intends to address—the removal of those individuals."); *see also* ECF No. [197-7] (House Amendment 634673: Limiting SB 168's application only to inmates convicted of violent felony offenses – failed on 5/1/2019); ECF No. [198-48] (Senate Amendment 503106: Limiting SB 168's application only to inmates convicted of felony offenses – failed on 5/2/2019). These

amendments would have lessened the impact of SB 168 on members of the immigrant community who would otherwise be fearful of immigration consequences to continue participating in social services, community programs, and other similar programs.

Moreover, one rejected amendment sought to require every law enforcement officer to complete eight hours of training on implicit biases, which would have appeased some of the concerns of those opposing the bill that SB 168 would result in racial profiling. *See* ECF No. [198-37] (Senate Amendment 564172: "Every employee of a law enforcement agency, a local governmental entity, or a state entity must successfully complete 8 hours of a nationally recognized and accredited training program on implicit bias." – failed on 5/2/2019).

A number of amendments were also proposed to exempt individuals with various protected immigration statuses from SB 168's reach. Each of these amendments was rejected, despite the fact that the individuals to which these amendments would apply are lawfully in the country. *See* ECF No. [196-4] (Senate Amendment 248466: "This act does not apply to a recipient of Temporary Protected Status under federal law or of Deferred Action for Childhood Arrivals under federal law." – failed on 4/25/2019); ECF No. [196-18] (Senate Amendment 943906: "This act does not apply to a person who has applied for refugee status under Title 8 of the United States Code before July 1, 2019, during the pendency of such application, and including any appeals." – failed on 4/25/2019); ECF No. [198-28] (Senate Amendment 268980: "This act does not apply to a person who has applied for asylum under Title 8 of the United States Code before July 1, 2019, or during the pendency of such application, including any appeals." – failed on 5/2/2019).

Some amendments attempted to create exemptions for victims of crime, witnesses of crime, and victims of human trafficking, which would alleviate some of the concerns regarding the chilling effect of SB 168 on immigrant communities cooperating with law enforcement.

Nevertheless, these amendments also failed. *See* ECF No. [197-10] (House Amendment 315213: "A state entity, local governmental entity, or law enforcement agency implementing this chapter has an affirmative duty to inquire whether a person is a victim of or a witness to a criminal offense, and, if so, the person is not subject to this chapter." – failed on 5/1/2019); ECF No. [197-12] (House Amendment 283467: "Human trafficking victims exempt.—The provisions of this chapter concerning persons subject to immigration detainers do not apply to a victim of human trafficking, as defined in s. 787.06." – failed on 5/1/2019).

Finally, amendments that exempted law enforcement while operating at educational facilities and exempted DCF from SB 168's application were also rejected, despite the fact that these amendments would have allowed immigrant parents to continue taking their children to school without fear of immigration consequences and would have allowed DCF to continue caring for children without being required to disclose their immigration status. *See* ECF No. [194-8] (Senate Amendment 478986: "This chapter does not apply to law enforcement agencies or local governmental entities while operating at any educational facility or institution." – unfavorable committee designation on 2/21/2019); ECF No. [197-18] (House Amendment 051735: "Institutions exempt.—This chapter does not apply to the Department of Children and Families or any employees or contractors thereof." – failed on 5/1/2019).

Those amendments presented reasonable modifications to SB 168's language to lessen the discriminatory effect of the bill on minority communities. The rejection of each of those amendments suggests an unwillingness to reduce or address the harmful effects that SB 168 posed.

### f.  Plaintiffs' Evidence as a Whole

As the Supreme Court has explained, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Davis*, 426 U.S. at 242. The totality of the relevant

facts present significant evidence, both direct and circumstantial, of the Legislature's discriminatory motives in enacting SB 168. Indeed, the facts present a clear narrative that FAIR and FLIMEN became intimately involved in the legislative process through their connections to the bill's sponsors and that they exerted significant influence over those sponsors throughout the course of SB 168's drafting and ultimate passage. Notably, part of this influence included providing the bill's sponsors with FAIR's list of sanctuary jurisdictions, ultimately included in the bill analysis, despite its untrustworthiness. Numerous other legislators also joined bill sponsors at events where anti-immigrant philosophies and racial animus were rampant, and the bill's supporters collectively opposed any ameliorative amendments that might weaken the bill. Moreover, SB 168 was enacted despite the foreseeable negative impact it would have on minority communities in Florida, regardless of immigration status.

In sum, when the evidence is taken as a whole, the Court concludes that Plaintiffs have established that the Best Efforts Provision and the Sanctuary Prohibition are unconstitutional because they violate the Equal Protection Clause.

### 2. The Likelihood of SB 168's Enactment in the Absence of Discriminatory Motives

"Once discriminatory intent and effect are established, the second prong provides that 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racially discriminatory] factor.'" *Greater Birmingham Ministries*, 992 F.3d at 1321 (quoting *Hunter*, 471 U.S. at 228; *Johnson*, 405 F.3d at 1223). "[The plaintiffs] shall then prevail unless the [defendants] prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered." *Hunter*, 471 U.S. at 225. "In a case alleging discrimination on the basis of race, the permissible motivating interest articulated by the state must be compelling, and the means employed must be precisely drawn to accomplish exactly the

objective that the state purports to further." *Underwood v. Hunter*, 730 F.2d 614, 617 (11th Cir. 1984) (citing *Crawford v. Bd. of Educ.*, 458 U.S. 527, 536 (1982); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 632 (1969)), *aff'd*, 471 U.S. 222.

As explained above, Plaintiffs have met their burden on both of their Equal Protection challenges. As has been demonstrated, racial discrimination has been shown to have been a "substantial" or "motivating" factor behind the enactment of the law. Accordingly, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

Defendants respond that Plaintiffs' claims necessarily fail because the elected officials involved in enacting SB 168 have supported and submitted multiple similar anti-sanctuary bills in prior years. *See* ECF Nos. [192-6] – [192-13]. The Court is unpersuaded by the Defendant's argument. Regarding Defendants' burden to offer rebuttal evidence to show that SB 168 would have been enacted regardless of discriminatory intent, they must satisfy this burden by a preponderance of the evidence. *See Hunter*, 471 U.S. at 225. Yet, Defendants fail to offer any explanation for why the evidence submitted in support of their rebuttal—i.e., the proposed text of certain draft bills and their corresponding bill histories from prior legislative sessions—establishes that SB 168 would have been enacted in the absence of any discriminatory intent. Moreover, the Court finds no basis to conclude that the *unsuccessful* prior attempts to introduce anti-sanctuary bills during past legislative sessions support Defendants' position that SB 168 would have been successfully passed regardless of discriminatory purpose.

As such, the Court concludes that Defendants have failed to meet their burden of demonstrating that SB 168 would have been enacted had the impermissible discriminatory motives not been considered. Specifically, the Sanctuary Prohibition was enacted based on biased and

unreliable data generated by anti-immigrant hate groups FAIR and CIS, despite the chilling effect and disparate impact that this provision would have on immigrant communities. Moreover, the Best Efforts Provision anticipated and intended to grant law enforcement officers expansive discretion on when and how to use their "best efforts," despite the knowledge that such proactive policing measures were likely to increase the amount of racial profiling that occurs during law enforcement interactions. Accordingly, the Court finds that Plaintiffs have prevailed on their Equal Protection challenges. The Best Efforts Provision and the Sanctuary Prohibition contained within SB 168 are unconstitutional.

### C. Permanent Injunction

As part of its "long-recognized, inherent equitable powers," a federal court may issue "traditional" injunctive relief "as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004). "A district court may grant [preliminary] injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The standard for issuing a permanent injunction is identical, except that the plaintiff must show actual success on the merits instead of a likelihood of success, and most courts do not consider the public interest element in deciding whether to issue a permanent injunction. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *see*

*also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "[E]ven if his common law, statutory, or constitutional rights have been violated, the plaintiff must also meet the other requirements for obtaining an injunction to show that an injunction is the proper remedy for such violation." *Klay*, 376 F.3d at 1098. These requirements are clearly satisfied here.

Regarding the first two prongs, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray,* 415 U.S. 61, 88 (1974). "A showing of irreparable harm is the *sine qua non* of injunctive relief. . . . An injury is irreparable only if it cannot be undone through monetary remedies." *NE Fla. CAGC of Am.*, 896 F.2d at 1285 (citations and internal quotation marks omitted). The Court has found that Plaintiffs have succeeded on the merits of their Equal Protection challenges in this case. "Deprivations of constitutional rights are usually held to constitute irreparable injury as a matter of law." *Int'l Ass'n of Firefighters, Loc. 2069 v. City of Sylacauga*, 436 F. Supp. 482, 492 (N.D. Ala. 1977) (citing *Sampson v. Murray,* 415 U.S. 61 (1974)). As such, the Court's conclusion that the Best Efforts Provision and Sanctuary Prohibition of SB 168 violate the Equal Protection Clause satisfies these first two prongs.

Next, the balance of hardships weighs in favor of granting permanent injunctive relief. In determining whether to grant injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying particular attention to "the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Where, as here, Plaintiffs have proven that the Best Efforts Provision and the Sanctuary Prohibition are unconstitutional, the State's interest in enforcing its statutes is outweighed by the injury sustained

by the Plaintiffs from the application of these discriminatory and unconstitutional provisions.

Finally, the public interest is always served when constitutional rights are vindicated. Indeed, it is beyond question that the public's interest is served by upholding constitutional rights. *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002) ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated . . . ."); *see also Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1318-19 (S.D. Fla. 2014); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition."); *White v. Baker*, 696 F. Supp. 2d 1289, 1313 (N.D. Ga. 2010) ("[B]ecause a constitutional right is at issue, the entry of an injunction would not be adverse to the public interest but would in fact advance it."); *A Choice For Women v. Butterworth*, No. 00-1820-CIV, 2000 WL 34402611, at *13 (S.D. Fla. June 2, 2000) ("the public interest is well served when the Court protects the constitutional rights of the public").

In sum, Plaintiffs have met all four requirements for injunctive relief and the Court finds that a permanent injunction is warranted.

### D. Severability

Before the Court can issue a permanent injunction, it must address the severability of the unconstitutional provisions from the remainder of SB 168. "The fundamental principle of equity guiding the court at this stage is that 'injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties.'" *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (quoting *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013)). "In the case of a constitutional violation, 'injunctive relief must be tailored to fit the nature and extent of the established violation.'" *Id.* (quoting *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984)).

Case No. 19-cv-22927-BLOOM/Louis

The injunction "must be no broader than necessary to remedy the constitutional violation."

*Newman v. State of Ala.*, 683 F.2d 1312, 1319 (11th Cir. 1982).

The Eleventh Circuit has previously explained the issue of severability.

> Severability . . . is a question of state law. And Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones. According to the Florida Supreme Court, "[s]everability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." The doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is 'designed to show great deference to the legislative prerogative to enact laws.'"
>
> Severability is not possible, however, when "the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail." Whether a statute is severable is determined by "its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent." The doctrine of severability, thus, "recognizes that federal courts have an affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so."
>
> The Florida Supreme Court has suggested this test for discerning severability in *Smith v. Department of Insurance*:

> > When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

> 507 So. 2d 1080, 1089 [(Fla. 1987)] (quoting *Cramp v. Bd. of Pub. Instruction*, 137 So. 2d 828, 830 (Fla. 1962)). According to Florida law, then, the unconstitutional part of a challenged statute should be excised, leaving the rest intact and in force, when doing so does not defeat the purpose of the statute and leaves in place a law that is complete.

*Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347-48 (11th Cir. 2004) (some citations omitted); *see also Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) (noting that the first and fourth elements are presumed to be satisfied "in almost any case").

Florida law thus adopts a strong presumption of severability and squarely places the burden on the

party challenging severability. *Jones v. Governor of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020) (citing *Ray v. Mortham*, 742 So. 2d 1276, 1281 (Fla. 1999) (noting that, because the purpose of the severability doctrine is "to preserve the constitutionality of enactments where it is possible to do so," the "burden is properly placed on the challenging party")).

"The severability analysis answers the question of whether 'the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail.'" *Ray*, 742 So. 2d at 1280 (quoting *Schmitt v. State*, 590 So. 2d 404, 414 (Fla. 1991)). In other words, "[t]he severability of a statutory provision is determined by its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent." *Martinez v. Scanlan*, 582 So. 2d 1167, 1173 (Fla. 1991) (quoting *E. Air Lines, Inc. v. Dep't of Revenue*, 455 So. 2d 311, 317 (Fla. 1984)). "The relevant inquiry is 'whether the overall legislative intent is still accomplished without the invalid provisions.'" *Jones*, 950 F.3d at 832 (quoting *State v. Catalano*, 104 So. 3d 1069, 1080-81 (Fla. 2012)).

Here, the Court has concluded that that the Best Efforts Provision and the Sanctuary Prohibition are unconstitutional because they violate the Equal Protection Clause. Thus, the Court must address whether these provisions can be severed from SB 168. Given the strong presumption of severability in Florida, the Court concludes that the "taint" of the Sanctuary Prohibition does not "infect the entire enactment" because the prohibition on sanctuary policies does not implicate any of the other statutory provisions of SB 168. Thus, given the "affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so," the Court concludes that the Sanctuary Prohibition is severable from the rest of SB 168. Likewise, with regard to the Best Efforts Provision, the Court finds that, although it implicates the remaining provisions of § 908.104, the entirety of § 908.104 can be severed from the remaining provisions of SB 168,

leaving intact the remaining provisions of the law. This would allow the remaining provisions of SB 168 to continue to operate, as the Legislature intended, while excising the unconstitutional provisions from the law. As such, the Court concludes that § 908.103 and § 908.104 are severable from the remainder of SB 168.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs have met their burden of establishing that the Best Efforts Provision, Fla. Stat. § 908.104(1), and the Sanctuary Prohibition, Fla. Stat. § 908.103, violate the Equal Protection Clause. As such, Plaintiffs are entitled to judgment on **Count X** and **Count XI** of the Amended Complaint. **ECF No. [38]**.

2. Defendants are **PERMANENTLY ENJOINED** from enforcing Fla. Stat. § 908.103 and Fla. Stat. § 908.104 because these statutory provisions are unconstitutional.

3. Consistent with the Court's Omnibus order on the parties' cross-motions for summary judgment, **ECF No. [164]**, Defendants are **PERMANENTLY ENJOINED** from enforcing the Transport Requirement, Fla. Stat. § 908.104(4), because this statutory provision is preempted by federal immigration law and is therefore unconstitutional.

4. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment by separate order.

5. The Clerk of Court is directed to **CLOSE** this case.

Case No. 19-cv-22927-BLOOM/Louis

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 21, 2021.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record